**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

Civil Division

| | |
|---|---|
| **SHANA HARGROVE**<br>**AS POWER OF ATTORNEY**<br>**FOR KEVIN WELCH**<br>11450 Diantha Ct<br>Dunkirk, MD 20754<br>    PLAINTIFF<br><br>VS<br><br>**MEDSTAR WASHINGTON HOSPITAL**<br>**CENTER**<br>110 IRVING STREET, N.W. WASHINGTON,<br>D.C. 20010<br><br>SERVE ON: C.T. CORPORATION<br>1015 15TH STREET, N.W., SUITE 1000<br>WASHINGTON, D.C. 20005<br><br>**STEPHEN MATTHEW LUCZYCKI, MD**<br>*In His Individual and Professional Capacity*<br>4063 Ridgeview Cir<br>Mc Lean, VA 22101<br><br>**MAXWELL A. HOCKSTEIN, M.D.**<br>*In His Individual and Professional Capacity*<br>524 8th St NE<br>Washington, DC 20002<br><br>**KAITLYN MARIE DUNPHY, M.D.**<br>*In Her Individual and Professional Capacity*<br>929 Florida Ave NW Apt 2004<br>Washington, DC 20001<br><br>    DEFENDANTS | **CIVIL ACTION NO.:** <u>1:23-cv-3381</u> |

**COMPLAINT AND JURY TRIAL PRAYER**

Page 1

NOW COMES, Shana Hargrove, Power of Attorney for Kevin Welch, (the "Plaintiff") by and through her attorneys, GOVERNOR E. JACKSON, III, THE LAW OFFICES OF GOVERNOR JACKSON, III LLC, KIM PARKER, AND LAW OFFICES OF KIM PARKER, P.A., and sues the aforementioned Defendants and for reasons state:

## JURISDICTION AND VENUE

1. Jurisdiction of the Court is founded on 28 U.S.C. §1332(a) given that the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), and complete diversity of citizenship exists between the parties.

2. Venue is proper in this District pursuant to 28 U.S.C. §1391 (b) and §1391 (c), because Defendants have their headquarters, can be found and conduct business in the District of Columbia, and because the cause of action has arisen and occurred in the District of Colombia.

3. At all times relevant herein, the acts and omissions alleged by the Plaintiff occurred in the District of Columbia.

4. Plaintiff provided notice to the Defendants on February 23, 2023, of his intentions to file a lawsuit pursuant to § 16–2802. All conditions precedents have been satisfied prior to the filing of this case.

## PARTIES

5. Plaintiff, Shana Hargrove is a citizen of Maryland and has been designated as the Power of Attorney for Kevin G. Welch. Kevin G. Welch, is a citizen of Maryland, residing in Prince Georges County, at 12615 Brandywine Road, Brandywine, Maryland 20613 both at the time of this filing and at all times relevant to this complaint.

6. At all relevant times, the Defendant, Medstar Washington Hospital Center (hereinafter "Medstar"), is, and at all times relevant hereto was, a District of Columbia corporation

engaged in the provision of health care services, including the provision of emergency medicine services and other medical services, to individuals in need thereof. Moreover, Medstar was and is a medical facility offering administrative, medical, surgical, emergency, critical care, consultative, and other related services to the general public and in such capacity, such institution, its agents, servants and/or employees, administrators, medical staff, surgeons, emergency room physicians, and consultants held themselves out as practicing ordinary standards of administrative, medical, surgical, emergency, and consultative care and, as such, owed a duty to the Plaintiff to render and provide health care within the ordinary standards of care. At all times relevant hereto, Medstar acted directly and/or by and/or through its actual and/or apparent agents, servants and/or employees, including, but not limited to, Stephen Matthew Luczycki M.D, Maxwell Hockstien and Kaitlyn Marie Dunphy, M.D.

7. At all relevant times, The Defendant, Stephen Matthew Luczycki, MD, (hereinafter referred as "Dr. Luczycki") held himself out to the Plaintiff and to the general public as an experienced, competent, and able Doctor, possessing or providing that degree of skill and knowledge which is ordinarily possessed by those who devote special study and attention to the practice of emergency medicine, and, as such, owed a duty to the Plaintiff to render that degree of care and treatment which is ordinarily rendered by those who devote special study and attention to the practice of emergency medicine. At all times relevant hereto, Dr. Luczycki was acting individually and/or as an actual and/or apparent agent, servant and/or employee of Defendant Medstar.

8. At all relevant times, The Defendant, Maxwell Hockstien MD, (hereinafter referred as "Dr. Hockstien") held himself out to the Plaintiff and to the general public as an experienced, competent, and able Doctor, possessing or providing that degree of skill and knowledge which is

ordinarily possessed by those who devote special study and attention to the practice of emergency medicine, and, as such, owed a duty to the Plaintiff to render that degree of care and treatment which is ordinarily rendered by those who devote special study and attention to the practice of emergency medicine. At all times relevant hereto, Dr. Hockstien was acting individually and/or as an actual and/or apparent agent, servant and/or employee of Defendant Medstar.

9. At all relevant times, The Defendant, Kaitlyn Marie Dunphy, M.D., (hereinafter referred as "Dr. Dunphy") held herself out to the Plaintiff and to the general public as an experienced, competent, and able Doctor, possessing or providing that degree of skill and knowledge which is ordinarily possessed by those who devote special study and attention to the practice of emergency medicine, and, as such, owed a duty to the Plaintiff to render that degree of care and treatment which is ordinarily rendered by those who devote special study and attention to the practice of emergency medicine. At all times relevant hereto, Dr. Dunphy was acting individually and/or as an actual and/or apparent agent, servant and/or employee of Defendant Medstar.

10. At all times relevant hereto, the aforementioned Defendants held itself out to the public as health care providers that would render reasonably competent health care services to those individuals who came under its professional care.

**FACTS COMMON TO ALL COUNTS**

11. Plaintiff incorporates paragraphs 1-10 as though fully stated herein.

12. On June 14, 2022, Mr. Welch returned to Maryland from a road trip to Atlanta when he began to feel extreme chest pains. He called 9-1-1, and an ambulance arrived. The narrative report stated as follows:

> "PA840 arrived on scene to find a 42M with CC of chest discomfort. The patient is clammy during assessment, but no diaphoresis present during assessment. The patient does report his sweating to be a sudden onset. Chest discomfort is described as aching, but no pressure or stabbing feeling noted. No previous

history is reported and the patient continues to report feeling better with time. He reports taking an energy drink and no meal for about twenty-four hours in duration during a long road trip lasting about ten hours. IV access (18g/LAC) is established and a twelve lead EKG is accomplished without any evidence of ST elevation. The patient continues to report his condition as getting better and no additional complaint of illness/injury reported. Vitals monitored and the patient transported to [Southern Maryland Hospital Center] for additional assessment. The patient arrived in the ER with no change in his condition and all care/treatment transferred to the ER staff for further assessment."

13. Due to Mr. Welch's condition upon presentation, the medical staff at Southern Maryland Hospital Center determined that his medical needs would be better met at another facility, therefore the decision was made to refer Mr. Welch to Medstar Washington Hospital Center.

14. On June 14, 2022, at approximately 2:00 p.m., Mr. Welch was transported via helicopter to Medstar Washington Hospital Center with an "Acute-Problem" List referring to Mr. Welch's complaint of chest pain and a "type A aneurysm." According to the neurological assessment performed on this date, Mr. Welch was "oriented x 4", "alert, responsive", conscious, had characteristics of clear speech, symmetric facial symmetry, and a steady gait. He was not designated as a fall risk according to the ED Morse Fall Risk Assessment, and there were no noted concerns regarding staff safety according to the Emergency Documentation. Mr. Welch's attending provider, Patrick Finan, M.D., noted his assessment as follows:

"42-year old male with no reported past medical history who presents to the emergency department today with chest discomfort. Upon arrival to the emergency department, patient is newly symptomatic, mildly hypertensive but otherwise well-appearing, not diaphoretic with shortness of lightheadedness. EKG shows nonspecific T wave inversion in lead V6 as well as some T wave flattening in 2, 3, aVF with left axis deviation. Symptoms could be attributed to excessive caffeine use, caffeine toxicity as well as lack of sleep. Could also be esophagitis in the setting of recent heavy caffeine use, poor p.o. intake. We will give viscous lidocaine, Maalox and viscous lidocaine and reassess symptoms. Will get troponin sound in 2 hours to rule out cardiac ischemia. Dimer ordered to rule out PE but I have low suspicion for acute PE. Given the tingling in his left lower extremity we will get a DVT ultrasound but have a low clinical suspicion for this. Basic labs

ordered as well as thyroid studies given his elevated blood pressure, diaphoresis and episode of chest pain although again I suspect that it is more in the setting of caffeine toxicity."

15. On this same date, Dr. Finan obtained a consult with a cardiac surgeon, Amma Bafi, M.D., who ultimately made the diagnosis of an "ascending aortic dissection."

16. On June 14, 2022, Mr. Welch underwent an operation which included:(i) Type A aortic dissection repair, (ii) hemi-arch replacement, (iii) ascending aorta replacement, (iv) aortic valve resuspension, (v) reconstruction of sinotubular junction, (vi) circulatory arrest with retrograde cerebral perfusion (RCP). The procedure was performed without any complication. Following the procedure, Plaintiff was intubated and transferred to the Intensive Care Unit (ICU) in critical but stable condition.

17. While in ICU, Mr. Welch was under the care and supervision of ICU attending physician Maxwell Hockstein, M.D., critical care physician Stephen M. Luczycki, M.D., and surgical ICU rotating resident Kaitlyn Marie Dunphy, M.D., all of whom were acting in their capacity as agents, servants, and employees of healthcare provider MedStar. When Mr. Welch arrived in ICU, he was confused, agitated amd impulsive and restraints were added by his healthcare providers. Mr. Welch was extubated at 5:30 a.m. on June 15 and on extubation, according to the progress report "was only oriented to self. He was not aware of place or time and did not know why he was in the hospital." The neurological assessment at that time stated as follows: "Neuro: Pt. remains confused, oriented x1, Pt. become restless and agitated. Dex. FPCA, and Ketamine for pain controlled agitation.

18. On June 16, 2022, Defendant Dunphy and Defendant Luczycki charted the following assessment and plan based on his neurological condition admittedly concerned about the onset of

encephalopathy (i.e. changes in how the brain operates), however failing to have any concern about the possible onset of a stroke:

> "Assessment & Plan:
> Neuro: Exam GCS 10, intermittently follows commands but moves all extremities equally, face symmetry equal, **concern for possible encephalopathy given lack of improvement in delirium**
> Sedatives: **dex 0.2 - 0.8 for agitation/delirium, added ketamine 10 to assist w/agitation and pain**
> Acute post-operative pain: Fentanyl PCA 0/20/6; holding PO meds until more awake, **dc tylenol due to transaminitis**, lido patch for sternal incision pain
> **#encelaphalopathy: unclear etiology toxic metabolic vs relative hypotension in s/o strict BP control in a hypertensive pt. No concern for stroke given non-focal exam. Will send ammonia, HIV, TSH, hepatitis panel**
> **#post-operative delirium: frequent re-orientation, dex as needed**
> #Rehabilitation post-surgery: Passive range of motion, will consult PT/OT whe [sic] appropriate
> #Positioning: can sit up, requiring restraints for safety of self and staff" [emphasis in original]

19. On June 17, 2022, a neurology consultation was performed by Robert Cai, M.D. due to Mr. Welch exhibiting severe bi-lateral lower extremity weakness (the left leg being weaker than the right leg). During the examination, Mr. Welch had the following blood pressure readings: 135/64; 144/58 (Line); 145/73 (A-Line 2). According to the consultation note, the etiology of the bi-lateral lower extremity weakness was "a higher c/f/ thoracic (watershed region) infarct; medium c/f ACA infarct; lower c/f cervical infarct." Based on the consultation, the recommendations given were as follows: "order MRI cervical and thoracic spine without contrast w/ include DWI in comments, agree w/ CTH w/o contrast, if CTH shows signs of infarct such as hypodensity, then order MRI brain w/o contrast, continue ICU care."

20. On June 18, 2022, Dr. Luczycki charted in the critical care progress note "MRI not done for safety reasons- I think this can be deferred for now with much improved exam". Critically, however, according to the Neurology Progress Note for this date, Mr. Welch had a blood pressure reading of 156/77 and was exhibiting bilateral lower extremity weakness, the etiology of which

was charted as "concern for spinal cord infarct involving thoracic spine" by the treating neurologist.

21. On June 19, 2022, Dr. Luczycki charted  in the critical care progress note "MRI not done for safety reasons- I think this can be deferred for now with much improved exam".  Mr. Welch was also examined by Defendant Hockstein, the Critical Care Supervising Physician, who noted in relevant part:

> "Neuro: Encephalopathic. RASS Score: -1, CAM-ICU Result: Positive. Knows his name, he is unsure of his location, did not know the identity of his cousin at bedside today. Analgosedation is being accomplished with fenanyl PCA (transition to PO oxycodone), lidocaine patches. On no sedation. LLE remains ⅕ strength. RLE ⅗. MRI is pending, ordered for today. OOBC."

22. On June 20, 2022, Defendant Hockstein charted the identical aforementioned (*see* para. 19) notation in Mr. Welch's Critical Care Progress Note.

23. On June 21, 2022, Defendant Hockstein charted "Blood pressure is under better control. Awaiting MRI to aid in diagnosis of LLE paresis, through, anticipate spinal cord trespass. Approaching floor readiness."

24. On June 22, 2022, an MRI of the brain without contrast and an MRI of the cervical spine without contrast were finally performed on Mr. Welch. The indication for the MRI of the brain was noted as "stroke, TAAD repair" with the comparison study being the CT performed on June 18, 2022. The findings of the MRI of the brain read as follows:

> "The examination is limited by motion artifact. The ventricles and sulci are appropriate for patient's age. DWI hyperintensities with low signal intensity on the ADC maps are present in the bilateral cerebellum and cerebral hemispheres with bilateral basal ganglia predominance. There is no midline shift. No microhermmorhages are identified. The midline structures are within normal limit. The mastoid air cells and paranasal sinuses are unremarkable.

25. The impression read as follows: "Limited due to motion artifact. Recent bilateral cerebellar and cerebral infarcts with bilateral basal ganglia predominance which is consistent with cardioembolic etiology and hypoxic anoxic event.

26. The indication for the MRI of the cervical spine was noted as "left lower extremity weakness, TAAD repair" and the addendum to the final report for this MRI stated "Upon further review with Dr. Barry, there is DWI hyperintensity of the cord at the level of T5 consistent with cord infarct.

27. On June 22, 2022, the stroke team was consulted. On June 23, Mr. Welch's physical condition was noted as follows:

> "Eyes closed, somnolent. Purposeful, strong movements with BUE, intermittently following commands. Answering questions intermittently. Has been intermittently alert and interactive throughout the morning before becoming somnolent again."

28. The stroke team noted a hypoxic-ischemic injury of basal ganglia and a stroke in the multiple vascular territories related to dissection, and further recommended obtaining physical therapy and occupational therapy when able. According to Mr. Welch's progress notes, at no time prior to June 21, 2022 were any actions taken to increase Mr. Welch's blood pressure to mitigate the risk of neurological insult, nor was there any consideration by the Defendants prior to June 22, 2022 of the placement of a lumbar drain to mitigate the risk of neurological insult.

29. On July 8, 2022, Mr. Welch was transferred to MedStar National Rehabilitation Hospital for comprehensive, inpatient, acute, medical rehabilitation, to address residual impairments of functional mobility and self-care, in the presence of multiple medical comorbidities, to allow eventual safe discharge. The physical assessment performed on the date indicated a cognitive impairment as evidenced by impaired orientation, impaired calculation skills, and impaired attention. There was also left inattention and left facial asymmetry noted. On

September 16, 2022, Mr. Welch completed his acute inpatient therapy at MedStar National Rehabilitation Hospital and was discharged with instructions to obtain occupational therapy, physical therapy, and speech language pathology.

30. Prior to the stroke, Mr. Welch was a security officer at the Department of Defense, and regularly enjoyed martial arts training. He lived independently without any need for assistance in any daily life activities. Currently, however, he remains home and is unable to return to his previous position as a member of management. With all of his leave options exhausted, he will initiate a disability retirement. This is based on the advice of his primary care physician and neuropsychologist. Mr. Welch's current neuropsychology evaluation shows that he struggles with executive functioning and apathy amongst other things. He also now suffers from visual/spatial issues. Hence, he took his car unbeknownst to us one day and came back with scratches all over the Due to the struggles with executive functioning, it has also been recommended that Kevin retire from driving anyway as he does not have the capability to react quickly. He still is unable to give more than 2-3 sentences in conversation. He is very forgetful and lacks motivation to do much.

## COUNT ONE -MEDICAL MALPRACTICE
### (All Defendants)

31.Plaintiff incorporates paragraphs 1-30 as though fully stated herein.

32.On or about June 14, 2022, Kevin Welch (hereinafter "Mr. Welch" or "Plaintiff", respectively) presented to MedStar Health Washington Hospital Center ("MedStar") for the purpose of having the following operations: (i) Type A aortic dissection repair, (ii) hemi-arch replacement, (iii) ascending aorta replacement, (iv) aortic valve resuspension, (v) reconstruction of sinotubular junction, (vi) circulatory arrest with retrograde cerebral perfusion (RCP).

33. Following these procedures, Mr. Welch was transferred to MedStar's Intensive Care Unit (ICU) for observation and recovery.

34. While in ICU, Mr. Welch was under the care and supervision of ICU attending physician Maxwell Hockstein, M.D., critical care physician Stephen M. Luczycki, M.D., and surgical ICU rotating resident Kaitlyn Marie Dunphy, M.D., all of whom were acting in their capacity as agents, servants, and employees of healthcare provider MedStar.

35. While in ICU under the care and supervision of the aforementioned healthcare providers, Mr. Welch was given various sedation medications, and Mr. Welch remained in a state of delirium which was noticed on or about June 16, 2022. Mr. Welch subsequently began to exhibit sequelae associated with the onset of a stroke and other neurological injury, including, but not limited to, weakness of his bilateral extremities, difficulty speaking, encephalopathy, and hypoxic respiratory failure.

36. Despite this clinical profile, the aforementioned healthcare providers prolonged the performance of magnetic resonance imaging (an "MRI") for approximately a week after the physical and physiological manifestation of symptoms associated with a stroke and other neurological injury.

37. When, an MRI was ordered and performed, the results confirmed that Mr. Welch suffered multiple infarcts to his brain and spine which were not present preoperatively. Upon Mr. Welch's discharge from the care of the aforementioned healthcare providers, he experienced memory loss, difficulty ambulating unassisted, difficulty speaking, difficulty performing daily life activities, an inability to engage in his chosen vocational field, an inability to engage in physical recreational activity (i.e. martial arts), and behavioral tendencies associated with depression and emotional and psychological despair.

38. At all times relevant hereto, Defendants, individually, and through their respective employees and real and/or ostensible agents, including, but not limited to, Dr. Luczycki , Dr. Hockenstien, and Dr. Dunphy, and nursing staff, individually, and as employees and/or agents, real and/or ostensible defendant Medstar were negligent in their care and treatment of Plaintiff, by, but not limited to, the following particulars:

   a) failing to timely and appropriately recognize the onset of stroke symptoms and neurological injury

   b) failing to timely and appropriately order, monitor, and regulate the imaging, testing, and medications necessary to timely and appropriately diagnose the onset of stroke symptoms and neurological injury

   c) failing to timely treat the onset of stroke symptoms and neurological injury to prevent a worsening of Mr. Welch's physical and neurological condition

   d) failing to properly supervise surgical ICU rotating resident Kaitlyn Marie Dunphy, M.D. during the provision of her medical care and treatment to Mr. Welch

   e) Failure to take a thorough medical history

   f) Failure to conduct appropriate and timely examinations

   g) Failure to order the appropriate diagnostic testing

   h) Failure to provide medical treatment with the applicable standard of care

   i) Failure to utilize appropriate and ancillary procedures

   j) Failure to timely and adequately recognize Mr. Welch's serious medical condition

   k) Failure to timely and adequately diagnose and treat Mr. Welch's condition

   l) Failure to appropriately react to symptoms, signs, and findings which were illustrative of Mr. Welch's true condition

m) Failure to take appropriate precautions in monitoring and treating Mr. Welch's condition

n) Failure to obtain appropriate consultations and/or appropriately utilize the information made available to them

o) Failure to react to the positive symptoms, signs, physical findings and other data, which were illustrative of Mr. Welch's need for timely diagnostic procedures

p) Failure to take appropriate precautions in monitoring and treating Mr. Welch's condition throughout his surgery;

q) failing to take steps to control Mr. Welch's blood pressure prior to June 21, 2022;

r) failing to document and/or otherwise place a lumbar drain prior to June 22, 2022 pending the performance of an MRI to decrease and/or prolong the onset of the effects of ischemic stroke

s) Defendants were otherwise negligent.

39. Defendants Luczycki, Hockstein and Dunphy while acting incident to and within the course and scope of their employment or agency with Defendant Medstar Washington Hospital Center, and in furtherance of the interests of their employer, were negligent in the medical care delivered to patient, Plaintiff Kevin Welch, by failing to exercise that degree of care, skill, and diligence ordinarily employed by a medical professional generally under similar conditions and like surrounding circumstances

40. As a direct and proximate cause of these healthcare providers' breach of the applicable standards of care as agents, servants, and employees of healthcare provider MedStar Washington Hospital Center, Mr. Welch suffered, suffers, and will continue to suffer economic and non-economic damages including, but not limited, past and future hospitalizations and the costs thereof,

past and future lost wages, past and future surgeries and the costs thereof, past and future courses of physical, occupational, and speech rehabilitation and therapy and the costs thereof, past and future regimens of medications and the costs thereof, past and future well-visits and the costs thereof, past and future assistance with daily life activities and the costs thereof, mental, emotional, physical, and psychological pain and suffering, mental anguish, disfigurement, difficulty ambulating unassisted, loss of enjoyment of life, and other economic and non-economic damages which will be identified during the course of discovery.

41. All of the injuries and damages suffered by Plaintiff as described above (and all of the consequences of these conditions) were the result of the negligence of the Defendants.

WHEREFORE, As a direct and proximate result of the Defendants individual and collective conduct, Plaintiff Kevin Welch is entitled to recover from Defendants reasonable compensatory damages in an amount in excess of $20,000,000 to be determined by a fair and impartial jury for all damages Plaintiff suffered, including physical, emotional, and economic injuries.

### COUNT TWO- NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (ALL DEFENDANTS)

42. Plaintiff incorporates by reference the allegations set forth in all proceeding paragraphs as if fully set forth herein.

43. As medical professionals dedicated to promoting the well-being of patients, physicians individually and collectively have a duty to ensure that the care patients receive is safe, effective, patient centered, timely, efficient, and equitable.

44. At all times relevant herein, Plaintiff was patient of Defendant MedStar, and the individual doctors.

45. MedStar's Code of Conduct provides that "The foundation of MedStar Health is to consider our patients' needs first in providing comprehensive, quality care. As the largest healthcare provider in the region, we have a responsibility to the community to operate with the highest principles and standards as we strive to ensure a compassionate and ethical approach in healthcare delivery".

46. As a direct and proximate result of the negligent, reckless and/or grossly negligent or intentional conduct of the Defendants, Plaintiff has suffered emotional distress which resulted from the wrongful or negligent acts of Defendants.

47. The acts committed by Defendants aforesaid were done with a wanton, reckless and willful disregard of person who foreseeably might be harmed by Defendants actions.

48. As a direct and proximate cause of these healthcare providers' breach of the applicable standards of care as agents, servants, and employees of healthcare provider MedStar Washington Hospital Center, Mr. Welch suffered, suffers, and will continue to suffer economic and non-economic damages including, but not limited, mental, emotional, physical, and psychological pain and suffering, mental anguish, and disfigurement.

49. The injuries suffered by Plaintiff was foreseeable.

WHEREFORE, As a direct and proximate result of the Defendants individual and collective conduct, Plaintiff Kevin Welch is entitled to recover from Defendants reasonable compensatory damages in an amount in excess of $10,000,000 to be determined by a fair and impartial jury for all damages Plaintiff suffered, including physical, emotional, and economic injuries.

Respectfully Submitted,

/S/ GOVERNOR E. JACKSON, III

Governor E. Jackson, III (D.C. Bar No. 1002797)
LAW OFFICE OF GOVERNOR JACKSON, III LLC
10 G Street NE, Suite 600
Washington, D.C. 20002
(410) 528-5150 (o)
(410) 528-1055 (f)
E:gjackson@governorjacksonlaw.com

Kim Parker, Esquire (D.C. Bar No. 46980)
LAW OFFICES OF KIM PARKER, P.A.
2123 Maryland Avenue
Baltimore, Maryland 21218
O:410-234-2621
F: 443-486-1691
E:kp@kimparkerlaw.com

COUNSELS FOR PLAINTIFF SHANA HARGROVE

## JURY TRIAL PRAYER

Plaintiff prays a jury trial on counts stated herein.

/S/ GOVERNOR E. JACKSON, III

Governor E. Jackson, III, Esquire
Counsel for Plaintiff