UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SHANA HARGROVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 23-3381 (RJL) |
| | ) | |
| MEDSTAR WASHINGTON | ) | |
| HOSPITAL CENTER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

(June 28th, 2024) [Dkt. #19]

Plaintiff Shana Hargrove, as power of attorney for Kevin Welch ("Welch"), brings this suit against MedStar Washington Hospital Center and three of its doctors in connection with emergency medical care that Welch received in June 2022. Pending before the Court is defendants' Motion to Dismiss Count II of the Amended Complaint, which alleges a violation of the D.C. Consumer Protection Procedures Act ("CPPA"). For the reasons discussed below, the Court will **GRANT** defendants' Motion to Dismiss Count II on the ground that plaintiff has failed to state a claim under the CPPA.

### I.   BACKGROUND

On June 14, 2022, Kevin Welch began experiencing extreme chest pains upon returning to Maryland from a road trip to Atlanta. Am. Compl. [Dkt. #15] ¶ 12. Welch called 911, and an ambulance transported him to Southern Maryland Hospital Center. *Id.* While he was being evaluated, Welch reported "taking an energy drink and no meal for

1

about twenty-four hours in duration during a long road trip." *Id.* After the initial evaluation, the medical staff at Southern Maryland Hospital Center decided to transfer Welch to MedStar Washington Hospital Center ("MedStar") via helicopter. Am. Compl. ¶¶ 13–14. The medical staff at MedStar originally suspected that Welch's symptoms may have been due to "caffeine toxicity" and lack of sleep, but upon consulting with a cardiac surgeon, the medical staff diagnosed Welch with an "ascending aortic dissection," which is a tear in the inner layer of the body's main artery. Am. Compl. ¶¶ 14–15. The same day, Welch underwent an emergency operation to repair the aortic dissection. Am. Compl. ¶ 16. The operation was performed "without any complication," and following the procedure, Welch was intubated and transferred to the ICU. *Id.*

While in the ICU, Welch was under the care of ICU attending physician Dr. Maxwell Hockstein, critical care physician Dr. Stephen M. Luczycki, and surgical ICU resident Dr. Kaitlyn Marie Dunphy. Am. Compl. ¶ 17. When Welch was extubated on June 15, 2022, the day after the surgery, he was "confused," "restless and agitated," and "was not aware of place or time and did not know why he was in the hospital." *Id.* This is in contrast to the neurological assessment that was performed prior to the surgery, in which Welch was "alert, responsive," and "had characteristics of clear speech." Am. Compl. ¶ 14. On June 16, 2022, the ICU doctors noted a "concern for possible encephalopathy," or brain dysfunction, due to the "lack of improvement in delirium." Am. Compl. ¶ 18. On June 17, 2022, a neurology consultation was performed because Welch was "exhibiting severe bi-lateral lower extremity weakness." Am. Compl. ¶ 19. Based on the consultation, the neurologist recommended the performance of an MRI due

2

to "concern for spinal cord infarct," or a stroke that occurs in the spinal cord. Am. Compl. ¶¶ 19–20. However, the following day, Dr. Luczycki charted that the "MRI [was] not done for safety reasons" and observed that he thought the MRI could "be deferred for now with much improved exam." Am. Compl. ¶ 20. On June 19, 2022, Dr. Hockstein also examined Welch and noted that he continued to have issues with disorientation. Am. Compl. ¶ 21.

On June 22, 2022, an MRI was performed on Welch's brain and cervical spine, which indicated that Welch had suffered a stroke. Am. Compl. ¶¶ 24–28. According to the plaintiff, no actions were taken prior to June 21, 2022, "to increase Mr. Welch's blood pressure to mitigate the risk of neurological insult," nor was there any consideration given prior to June 22, 2022, to "the placement of a lumbar drain to mitigate the risk of neurological insult." Am. Compl. ¶ 28. After he left the ICU, Welch spent approximately two months in inpatient rehabilitation therapy "to address residual impairments of functional mobility and self-care." Am. Compl. ¶ 29. Welch continues to struggle with executive functioning and plans to initiate a disability retirement due to the effects of the stroke. Am. Compl. ¶ 30.

On November 9, 2023, plaintiff filed this lawsuit against MedStar Washington Hospital Center, Dr. Luczycki, Dr. Hockstein, and Dr. Dunphy (collectively, "defendants") on the basis of diversity jurisdiction. Compl. [Dkt. #1] ¶¶ 1, 5–9. Plaintiff alleges that Welch first began to exhibit symptoms associated with the onset of a stroke or other neurological injury on or about June 16, 2022, but defendants prolonged the performance of an MRI for approximately one week after his symptoms first began. Am.

3

Compl. ¶¶ 35–36. Plaintiff alleges that defendants were negligent in providing medical care to Welch by failing to timely recognize and adequately address his symptoms. Am. Compl. ¶ 38.

The original complaint included two counts: medical malpractice (Count I) and negligent infliction of emotional distress ("NIED") (Count II). Compl. ¶¶ 31–49. On December 12, 2023, defendants filed a motion to dismiss Count II on the basis that under D.C. law, an NIED claim cannot stand where, as here, the plaintiff alleges to have also suffered a physical injury. Defs.' Mot. to Dismiss Count II [Dkt. #7] at 2. In response, plaintiff filed an amended complaint, withdrawing the NIED claim and replacing it with a claim for violation of the D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq.* *See* Am. Compl. ¶¶ 42–52. Defendants again filed a motion to dismiss Count II, arguing that plaintiff failed to state a claim upon which relief can be granted under the CPPA. Defs.' Mot. to Dismiss Count II of the Am. Compl. [Dkt. #19] at 2. Plaintiff filed an opposition, *see* Pl.'s Resp. and Opp'n to Defs.' Mot. to Dismiss Count II of the Am. Compl. [Dkt. #22] ("Pl.'s Opp'n"), and defendants filed a reply, *see* Defs.' Reply in Supp. of Mot. to Dismiss Count II of the Am. Compl. [Dkt. #24]. Defendants' Motion to Dismiss Count II of the Amended Complaint is now ripe for the Court's review.

## II.   LEGAL STANDARD

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate where a party has failed to set forth "a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain

sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In analyzing such a motion, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *Goode v. District of Columbia*, 531 F. Supp. 3d 366, 376 (D.D.C 2021). However, the plaintiff must offer "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

### III. ANALYSIS

The CPPA prohibits "engag[ing] in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby." D.C. Code § 28-3904. Specifically, it is a prohibited unfair or deceptive trade practice to "represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another," *id.* § 28-3904(d), "misrepresent as to a material fact which has a tendency to mislead," *id.* § 28-3904(e), "fail to state a material fact if such failure tends to mislead," *id.* § 28-3904(f), or "use innuendo or ambiguity as to a material fact, which has a tendency to mislead," *id.* § 28-3904(f)(1), among other enumerated prohibitions.[1]

---

[1] Plaintiff also cites D.C. Code § 28-3904(e-1), (i), (k), (p), and (u), but those subsections are plainly irrelevant to plaintiff's claim. *See* Am. Compl. ¶ 50; D.C. Code § 28-3904(e-1) (making it an unfair or deceptive trade practice to "represent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law"); D.C. Code § 28-3904(i) (making it an unfair or deceptive trade practice to "advertise or offer goods or services without supplying reasonably expected public demand"); D.C. Code § 28-3904(k) (making it an unfair or deceptive trade practice to "falsely state that services, replacements, or repairs are needed"); D.C. Code § 28-3904(p) (making it an unfair or deceptive trade practice to "falsely state or represent that repairs, alterations, modifications, or servicing have been made and receiving remuneration therefor when they have not been made"); D.C. Code § 28-3904(u) (making it an unfair or deceptive trade practice to "represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not"). Plaintiff does not make any factual allegations relevant to these subsections; in fact, in the briefing on the

In assessing whether a plaintiff's allegations plausibly plead an unfair or deceptive trade practice through the use of material misrepresentations or omissions, a court must "consider an alleged unfair trade practice 'in terms of how the practice would be viewed and understood by a reasonable consumer.'" *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013) (quoting *Pearson v. Chung*, 961 A.2d 1067, 1075 (D.C. 2008)). A statement or omission "is material if a significant number of unsophisticated consumers would find that information important in determining a course of action." *Id.* (quoting *Green v. H & R Block, Inc.*, 735 A.2d 1039, 1059 (Md. 1999)). "How the practice would be viewed by a reasonable consumer is generally a question for the jury," although "there are times when it is sufficiently clear to be determined as a matter of law." *Mann v. Bahi*, 251 F. Supp. 3d 112, 126 (D.D.C. 2017). For example, if "[a]ll statements that [plaintiff] points to as misleading are in fact either accurate, not misleading to a reasonable consumer, or mere puffery," there is no actionable conduct under the CPPA. *Whiting v. AARP*, 701 F. Supp. 2d 21, 29 (D.D.C. 2010).

Here, plaintiff alleges that Welch had a reasonable expectation of truthful and non-misleading information about the medical services that MedStar would provide. Am. Compl. ¶ 46. Instead, plaintiff alleges that MedStar engaged in "false advertising" and "misrepresented the characteristics, use, benefits, quantities, standard and quality of medical services that they would provide to Mr. Welch, and to the general public." Am.

---

Motion to Dismiss, plaintiff acknowledged that her citations to the D.C. Code in the Amended Complaint "may not be a model of clarity" and focused her arguments entirely on the subsection regarding material misrepresentations. Pl.'s Opp'n at 14; *see also* Pl.'s Opp'n at 10 (citing D.C. Code § 28-3904(e)).

6

Compl. ¶¶ 48–49. Specifically, plaintiff points to the following statements that MedStar made in its brochures, websites, and other promotional materials as alleged misrepresentations:

    a) Medstar is "an [i]ndispensable provider of complex patient care for the region."

    b) "MedStar Washington offers an [e]xperienced medical/dental and surgical staff of 1,500 physicians and 350 advanced practice providers."

    c) "While you are here in the hospital, we'll make sure your stay is as safe, pleasant, and comfortable as possible."

    d) "Our multidisciplinary teams of specialists are in the air and on the ground for critical emergencies throughout the region."

    e) "No other area hospital has the experience and expertise in acute care. That's why, every year, thousands depend on us for help in medical and surgical emergencies."

    f) "Our services help our community's residents get and stay healthy and help to improve patients' quality of life by managing chronic illness."

    g) "We are proud to have the most advanced diagnostic and treatment options in the region."

    h) "We bring together highly skilled medical specialists, surgeons, and nurses — and the most advanced technology — to provide intensive medical treatment for adults and newborns with life-threatening illness or injury."

    i) "We provide the region with the highest quality care, thanks to the latest medical advances in education and research."

    j) "To treat each patient as we would a member of our own family by providing the best medical treatment with caring and compassion."

    k) "Our reputation for excellence is well-earned."

    l) "Our multidisciplinary teams of specialists are in the air and on the ground for critical emergencies throughout the region. No other area hospital has the experience and expertise in acute care."

Am. Compl. ¶ 49.

The fundamental flaw in Count II is that none of the alleged misrepresentations are actually statements of material fact or actionable representations regarding the quality of services to be provided. "[G]eneral statements, such as efforts to achieve certain quality standards, are statements of 'puffery' and are non-actionable." *Nat'l Consumers League v. Wal-Mart Stores, Inc.*, No. 2015 CA 007731 B, 2016 WL 4080541, at *5 (D.C. Super. Ct. July 22, 2016); *see also Earth Island Inst. v. Coca Cola Co.*, No. 2021 CA 001846 B, 2022 D.C. Super. LEXIS 59, at *3 (D.C. Super. Ct. Nov. 10, 2022) (finding that "aspirational sentiments, such as future goals or vague corporate ethos," are not actionable statements under the CPPA). "[C]ommercial puffery is non-actionable because it consists of statements whose 'truth or falsity . . . cannot be precisely determined,' such as a sign in a storefront window promising 'Satisfaction Guaranteed.'" *Meta Platforms, Inc. v. District of Columbia*, 301 A.3d 740, 759 (D.C. 2023) (quoting *Pearson*, 961 A.2d at 1076); *see also Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 30 (D.D.C. 2007) ("KFC's claims that its restaurants serve the 'best food' is a non-measurable, 'bald statement of superiority' that is non-actionable puffery."). These types of "general assertion[s], incapable of measurement, [are] unlikely to lead reasonable consumers astray and therefore cannot be the basis for a CPPA violation." *Meta Platforms*, 301 A.3d at 759.

Further, plaintiff makes no attempt to explain how these statements are allegedly false, material, or have a tendency to mislead. Instead, the Amended Complaint simply lists the statements along with the conclusory allegation that the statements were misrepresentations regarding the quality of medical care that MedStar provides. *See* Am.

Compl. ¶¶ 48–50. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss pursuant to Rule 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[2]

### IV. CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendants' Motion to Dismiss Count II of the Amended Complaint. The case will proceed with respect to the remaining count for medical malpractice (Count I). An order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[2] The parties also disagree on the extent to which the CPPA applies to medical providers. *See* Defs.' Mot. to Dismiss Count II of the Am. Compl. at 2; Pl.'s Opp'n at 14–15; *see also Frankeny v. District of Columbia*, 225 A.3d 999, 1008 (D.C. 2020) ("[C]ertain aspects of the practice of medicine, such as those premised on public service or ethical norms, may lend necessary context to evaluate a medical professional's conduct and determine whether it can support a CPPA claim."). However, because plaintiff has failed to state a CPPA claim regardless of the nature of defendants' industry, it is not necessary for the Court to address this dispute.