IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA
Civil Division

| | |
|---|---|
| SHANA HARGROVE<br>AS POWER OF ATTORNEY<br>FOR KEVIN WELCH, | *<br><br>*    Civil Action No.:  1:23-cv-3381 (RJL) |
| Plaintiff, | * |
| v. | * |
| MEDSTAR WASHINGTON HOSPITAL<br>CENTER, *ET AL.*, | *<br><br>* |
| Defendants. | * |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION IN LIMINE
TO EXCLUDE TESTIMONY OF PLAINTIFF'S PROPOSED EXPERT AHMAD
ELAKIL M.D. REGARDING PROXIMATE CAUSATION AND DAMAGES**

Defendants, Washington Hospital Center Corporation d/b/a MedStar Washington Hospital

Center, Stephen Matthew Luczycki, M.D., Maxwell A. Hockstein, M.D., and Kaitlyn Marie

Dunphy, M.D., collectively referred to as "Defendants"), by and through their undersigned

attorneys, Donna P. Sturtz and Nelson Mullins Riley & Scarborough L.L.P., submit this

Memorandum of Law in Support of Motion in Limine to Exclude Testimony of Plaintiff's

Proposed Expert Ahmad Elakil, M.D. on Proximate Causation and Damages[1] and state as follows:

> **I.    INTRODUCTION**

---

[1] This is a dispositive Motion because without the requisite expert testimony, Plaintiff cannot maintain a claim and summary judgment should be entered in favor of the Defendants. Because several experts are at issue, Defendants are filing Motions in Limine to Exclude both experts, followed by a companion Motion for Summary Judgment incorporating these Motions.

1

On November 9th, 2023, Plaintiff filed a Complaint against Defendants and then filed an Amended Complaint on December 22, 2023, withdrawing the Count II ("NIED") claim and replacing it with Count II - Violation of the D.C. Consumer Protections and Procedures Act Code 28-3905 ("CPPA"). By Memorandum Opinion dated June 28, 2024, Count II of the Amended Complaint was dismissed and thus the only claim remaining is a medical negligence claim (Count I) that arises out of emergency surgery performed to save Plaintiff's life after he suffered a Type A Aortic Dissection and was rushed to the hospital for surgery.

Plaintiff alleges the standard of care required different action post-operatively by the critical care doctors in response to symptoms related to a cerebral stroke and spinal stroke caused by the Type A Aortic Dissection. Plaintiff suggests that earlier diagnosis and action related to the strokes may have lessened the Plaintiff's alleged residual neurological injury. Defendants deny the allegations on standard of care and on proximate causation maintaining that the care was reasonable and that any residual neurological injury was caused by the Type A Aortic Dissection and surgical repair and was not caused by any alleged breach in the standard of care. Per the Joint Rule 16.3 Statement filed on January 16, 2024, and Order dated February 6, 2024, discovery in this case closed on October 14, 2024.

One of Plaintiff's experts, Dr. Ahmad Elakil testified that he is not offering any opinions at trial on standard of care.  As set forth below, in rendering his proposed causation and damages opinions, Dr. Ahmad Elakil (a spine surgeon) undertook no rigor that is accepted in neurology (of which he is not an expert) and did not give legitimate consideration to all the medical facts in this case related to the Plaintiff. This is the exact type of "opinion" that Federal Rule of Evidence Rule 5-702 is meant to preclude. For these reasons, Defendants' Motion to Exclude Dr. Elakil should be granted.

## II.   BACKGROUND

A.  Statement of Facts

On June 13, 2022, Mr. Welch, while driving from Atlanta to Maryland, repeatedly consumed numerous energy drinks (espresso shot, Pepsi, 5-hour energy). (Medical Record of Kevin Welch at p. 4, collectively attached as Exhibit A). (Exhibit A at pp. 4, 82-83).  Upon his return home, he felt a sudden sharp chest pain (described as 10/10), left leg pain and tingling and called for an ambulance. (Exhibit A at p. 4). The EMTs assessed his blood pressure at 164/107 (severe hypertension – high blood pressure) and he was given ASA 324 (aspirin). (Exhibit A at p. 4). Mr. Welch was taken to Southern Maryland Hospital where a chest CT scan was ordered revealing a Type A aortic dissection of 4.3 cm in diameter, with a Type A intramural hematoma (pooling of blood) ("Type A Aortic Dissection"). (Exhibit A at p. 4).

The aorta is the **largest** blood vessel in the body and it carries blood from the heart to the rest of the body. A Type A Aortic Dissection means the aorta **close to the heart (in the front of the chest)** has ripped open and it is a life-threatening medical emergency.[2] If the patient is fortunate enough to make it to the operating room (about half do not), the surgery required for survival is an **open-chest surgery** that includes circulatory arrest (i.e., the temporary draining of blood from the heart/aorta so the surgeon can operate in a bloodless field to do the repair) and cardiopulmonary bypass (i.e., the use of a heart-lung machine). The injury with related surgery is high-risk with a significant mortality rate. In addition, the short and long-term complication rates are high for

---

[2] There is a distinctly different dissection called a Type B aortic dissection (sometimes referred to as TBAD) which is a separation of the aorta *not* as near the heart but in the abdomen. Type B dissections sometimes do not require surgery but if surgery is done it is normally through a *vascular* procedure where a stent is placed in the area of the tear (referred to as a TEVAR procedure). There is an entirely separate set of practice guidelines for the management of a Type B dissection. Because of the location of a Type B dissection (closer to the spine v. Type A), spinal arteries can be compromised and surgeons sometimes use a spinal fluid drain as part of that procedure to reduce spinal swelling. *About Aortic Dissection*, INTERNATIONAL REGISTRY OF AORTIC DISSECTIONS: LIVING WITH AORTIC DISSECTION, https://livingwithdissection.iradonline.org/about-aortic-dissection/.

various complications including neurological injuries from different causes such as the extent of the aortic injury, the related hematoma, the required circulatory arrest during the surgery, anemia, unstable hemodynamics, strokes, etc.[3]

Mr. Welch urgently was transferred by air to MedStar Washington Hospital Center ("MWHC") for emergency surgery to save his life. (Exhibit A at pp. 4, 48-50). The pre-surgery consent form was signed by Mr. Welch and specifically lists the risks of the surgery, including bleeding, infection, stroke, heart attack/failure, and death. (Exhibit A at pp. 1-2). Surgery by Dr. Alassar (a cardiothoracic surgeon)[4] took place on June 14, 2022 (approximately 6 hours after the ambulance dispatch around 8:30 a.m.) including Type A Aortic Dissection repair, hemi-arch replacement, ascending aorta replacement, aortic valve resuspension and reconstruction of sinotubular junction. (Exhibit A at pp. 22-26).

After the surgery, Mr. Welch was transferred to the intensive care unit (ICU) where he was cared for by a variety of health care providers including critical care doctors: Dr. Stephen Luczycki (*from June 15-19*), Dr. Kaitlyn Dunphy (*a resident in training*) (*from June 15-17*) and Dr. Maxwell Hockstein (*from June 20-26*).  The care of a patient following surgical repair of a Type A Aortic Dissection is complex because of the potential for many complications related to the pulmonary function (breathing), organ function, hemodynamics (including temperature and blood pressure), and neurological complications.  In terms of the blood pressure, the cardiothoracic surgeon sets a blood pressure goal because if the blood pressure gets too high, it can negatively impact the surgical repair. The blood pressure goal for Mr. Welch post-operatively was set at MAP (mean

---

[3] *See* Santi Trimarchi, et al., *Contemporary results of surgery in acute type A aortic dissection: The International Registry of Acute Aortic Dissection experience*, THE JOURNAL OF THORACIC AND CARDIOVASCULAR SURGERY. https://www.jtcvs.org/article/S0022-5223(04)01321-2/fulltext.

[4] Cardiothoracic surgeons specialize in operating on the heart, its valves and structures and the veins and arteries close to the heart. It requires specialized training and a distinct board certification in thoracic surgery by the American Board of Thoracic Surgery. *See American Board of Thoracic Surgery*, *www.abts.org*.

arterial pressure) range of 70-90 (systolic BP <130).  (Exhibit A at p. 58). Once farther out from surgery, this goal may be modified depending on the status of various factors such as bleeding, cardiac performance, etc. Despite this goal, over the following days, Mr. Welch (due to the complicated nature of his cardiac condition) had at times MAP levels *higher* than the goal (so the issue the providers were working on was *hyper*tension (too high) not hypotension (too low). (Exhibit A at pp. 59-81). Mr. Welch also was placed on numerous medications one of which was 81 mg of aspirin daily – to assist with potential clotting/strokes from the dissection and repair. (Exhibit A at p. 56).

After waking up from anesthesia and being removed from the ventilator, Mr. Welch was confused and restless (which is not uncommon). On June 15, 2022, he was examined by Dr. Luczycki (with Dr. Dunphy) and noted to be critically ill with high potential for acute decompensation (i.e., heart failure or respiratory failure). (Exhibit A at pp. 39A-C).  On June 16, there was a noted concern for possible encephalopathy (post-surgical confusion) and a Glasgow Coma Score of 10 (scores the level of consciousness with a range from 1-15) ("GCS") (Exhibit A at p. 38). Other GCS that day were 13. Dr. Luczycki noted "no concern for stroke given non-focal exam." (Exhibit A at p. 38).

Sometime during the afternoon of June 16 or morning of the 17th, bilateral lower extremity weakness was noted (left worse than right).  (Exhibit A at p. 4). Dr. Luczycki and Dr. Dunphy's progress note that day documented GCS of 13 and encephalopathy of "uncertain etiology" –and consulted with neurology[5] and with Dr. Alassar (the cardiothoracic surgeon).  (Exhibit A at pp. 34-35). The neurologist (Dr. Lin) assessed Mr. Welch and concluded that the likely etiology of the

---

[5] There are different areas and specialties in neurology, with vascular neurologists specializing in the treatment of strokes and obtaining board certification from the American Board of Psychiatry and Neurology – Vascular Neurology. *See, American Board of Psychiatry and Neurology,* www.apbn.org.

symptoms was thoracic and lower cervical strokes/infarcts related to a higher risk from recent cardiac surgery (and some contribution of sedation side effect).  (Exhibit A at pp. 3-7). Dr. Lin's recommendations included a CT spine and head CT without contrast – "if shows signs of infarct, then order brain MRI without contrast." He also recommended MRI of cervical and thoracic spine without contrast. (Exhibit A at p. 6). Thus, even without imaging, the providers appreciated the likelihood of infarcts and continued the related ongoing medical management of aspirin, blood pressure management, stabilizing the patient's hemodynamics, etc. There were no changes to this medical management recommended by neurology. (Exhibit A at p. 6).

Unlike a CT Scan[6], to perform an MRI, the patient has to be <u>safe</u> for transport to a connected but separate building; <u>safe</u> to be only minimally monitored and to be able to lay flat and still for an extended time (i.e., *not* disoriented, *not* on high level nasal cannula for oxygen, *not* needing continuous infusion of BP medications, and *not* at risk for acute decompensation); and <u>safe</u> *without* epicardial lead wires still in place (lead wires remain in place due to hypertension and related medication that impacts the heart). (Deposition of Dr. Luczycki at p. 33:16-36:2, attached as Exhibit B: Exhibit A at p. 58A).  Thus, the timing of MRI imaging requires an assessment of risks (of a patient at risk for acute decompensation) and benefits by the health care team.

On June 18, 2022, the head CT scan was performed in minutes (lasting from 1:48 a.m. to 1:52 a.m.) showing "no *acute* intracranial pathology or traumatic injury." (Exhibit A at pp. 51-52). On June 18, 2022, Mr. Welch again was evaluated by the neurology team (Dr. Tulsi Shah and Dr. Brian Barry) who noted improvements in his neurological condition, noted the negative head CT and concluded "no indication or further head imaging at this time" but recommended a spinal MRI

---

[6] CT Scan uses x-rays (and no tube to be lying inside of) where as an MRI uses radio waves and can detect different detail. The CT Scan is performed in just a few minutes whereas an MRI takes up to an hour or longer with the patient lying very still inside of a tube. Here, the CT Scan was interpreted as negative for an acute process. The Plaintiff is *not* alleging that the strokes developed after June 18, just that not reported on this CT imaging modality.

for possible spinal cord infarct. (Exhibit A at p. 46). No changes to medical management of critically ill patient were recommended by neurology.

On June 19-20, Mr. Welch's neurological assessments were improved: GCS 11-14s, and more alert and responsive. (Exhibit A at pp. 31).  Dr. Luczycki noted on June 19, Mr. Welch was still confused but is now moving left lower extremity, the CT scan was negative, and that MRIs not done "for safety" and can be deferred for now given "much improved exam (Discussed with (DW) Dr. Alassar)." (Exhibit A at p. 31). Dr. Hockstein took over for Dr. Luczycki on June 20 and noted that the patient was encephalopathic, had reduced lower extremity strength and still had medical concerns including (among others) his respiratory status (still needing nasal cannula but lower level and resolving), hypertension (resolving with medication), and anemia. (Exhibit A at pp. 28-29). Because his blood pressure was better under control with medication and because his cardiac condition revealed normal sinus rhythm, the epicardial lead wires were removed on June 20 at 3:06 p.m. (Exhibit A at p. 27).

The MRIs took place on June 22 with imaging lasting *several hours* (from 1:17 a.m. to 3:58 a.m.) (Exhibit A at pp. 53-55). The brain MRI showed multiple infarcts in the brain and spine (with basal ganglia predominance) "consistent with cardioembolic etiology and hypoxic anoxic event." (Exhibit A at p. 55A). The spine MRIs initially did not show any infarct but "upon further review there is a DWI hypodensity of the cord at level T5 (*thoracic*) consistent with cord infarct." (Exhibit A at p. 55). A stroke consult on June 23, 2022 noted multiple cardio-embolic infarcts and anoxic injury to basal ganglia with etiology secondary to aortic dissection and related repair ("multiple strokes in vascular territories related to dissection"). (Exhibit A at pp. 8, 10).

The neurologist noted plan of care recommended continuing Antiplatelet ASA 81 mg daily

7

(i.e., aspirin), continuing monitoring of his blood pressure[7], and participation in physical therapy consultation – all of which were being done from the inception of the ICU admission. (Exhibit A at p. 10).  Thus, while the MRI imaging provided **diagnostic confirmation**, there was no correlated change in his treatment plan because the treatment he could receive in these circumstances **was already being done** between June 14-23, 2022. Mr. Welch, because of his Type A Aortic Dissection and surgical repair was not a candidate, <u>at any point after surgery</u> for interventional treatment of thrombolytic therapy (called tPA which is a tissue activator administered through the veins) or endovascular intervention (called EVT which is a surgical procedure sometimes done for an acute stroke).[8]

Mr. Welch improved, was transferred out of ICU on June 26 and was discharged on July 8.  (Exhibit A at p. 14). A neurological assessment described him as GCS 14 and reduced movement of lower extremities (4/5 on right and 2/5 on left). (Exhibit A at p. 19). Mr. Welch was discharged on July 8, 2022, to MedStar Rehabilitation Hospital for multiple comorbidities where he remained until mid-September, 2022. At discharge, he was noted as having significant improvement in bilateral lower extremity motor strength but in need of continued home physical and occupational therapy. (Exhibit A at p. 14).

Regarding his lower extremity weakness (4/5 right leg and 2/5 left leg at discharge from MWHC), this improved to 5/5, normal. A Physical Medicine & Rehab Office note from January 23, 2023, noted Mr. Welch as ambulating without a walker; bilateral upper extremity strength 5/5 and bilateral lower extremity strength 4 to 5/5. (Exhibit A at p. 86). Mr. Welch was noted as independent with activities of daily living and ambulation. (Exhibit A at p. 87). An office visit

---

[7] Note because this was now 8 days from surgery – the blood pressure goal range was widened to MAP 70-110 depending on the continued monitoring of bleeding levels (i.e., anemia) and cardiac performance. (Exhibit A at p. 57)
[8] Mr. Welch also was not prescribed any medications such as statin medication or anticoagulation medication (not indicated because of the risk of bleeding after this surgery).

with primary care in February 2023 revealed reports of no limb weakness ("all extremities move well with full range of motion and strength, no tenderness and no swelling" and alert and oriented/no focal deficits – "strength and sensation are intact without any focal deficits."). (Exhibit A at pp. 90-90A). During office visits with providers between August 2023 and December 2023, Mr. Welch's physical examinations noted that all extremities move well with <u>full range of motion and strength</u> and <u>no focal motor deficits</u>. (Exhibit A at pp. 93-94). Per the medical records, a physical neurological examination of Mr. Welch in August 2024 showed <u>lower extremity strength of 5/5</u>, no gait abnormality, no walking assistive devices, and able to independently perform all of his activities of mobility and daily living. (Exhibit A at pp. 95-96, 98) (no gait abnormality observed). Although mentioned by Plaintiff in some pleadings and reports, Mr. Welch does *not* suffer from any bowel and bladder dysfunction. (Exhibit A at p.98).

Regarding his cognitive and mental status, Mr. Welch unfortunately does suffer from residual deficits from this medical emergency. A neuropsychologist (Dr. Gorter) diagnosed him with a cognitive disorder stemming from the cerebral strokes caused by the Type A dissection and repair (with attention and processing speed deficits and occasional visual-perceptual/decreased balance issues from the cerebral infarcts and/or cardiac disease with related medications) and a primary behavioral pattern of apathy. (Exhibit A at pp. 91, 97). Mr. Welch performs his own activities of daily living, but he has not returned to work since the Type A Aortic Dissection and does not drive a car (pending a driving assessment not yet obtained). (Exhibit A at p. 98-99). Per an office note of Dr. Gorter on February 20, 2024, Mr. Welch plans to return to work at the National Geospacial Agency, initially part-time in 2024, but the records also indicate he plans to explore government medical retirement and apply for permanent disability. (Exhibit A at pp. 91, 100). He has undergone counseling with Dr. Gorter since 2022 but plans to stop counseling in the Fall of

9

2024. (Exhibit A at p. 100). Mr. Welch will be started on a neuro-stimulant medication (methylphenidate) to assist with attention deficit and his apathy, planning to start this after his return from a trip to Europe in the Fall of 2024. (Exhibit A at p. 96).

Regarding his cardiac condition, Mr. Welch's current care providers include vascular, nephrology, cardiology, and primary care.  Mr. Welch requires these providers because of the Type A Aortic Dissection and surgical repair which necessitates ongoing treatment of hypertension, chronic kidney disease (stage IIIB), anemia, and coronary artery disease. His current medications include losartan, aspirin, atorvastatin, clonidine, ergocalciferol, folic acid, hydralazine, lipitor, and labetalol – all of which are related to his cardiac disease. (Exhibit A at p. 96).

B.  What this case does **not** contend and Plaintiff's Own Neurology Expert

There is *no* dispute in this case that Mr. Welch suffered a Type A Aortic Dissection and required life-saving emergency surgery. There is *no* dispute that a high percentage of patients who suffer this event do not survive or survive with residual deficits. There is *no* dispute that the strokes he suffered were caused by that injury and related surgical repair.  **There is *no* allegation that the providers somehow could have prevented the strokes themselves.** Finally, there is *no* dispute that Mr. Welch was *not* a candidate for interventional treatment of the strokes with thrombolytic therapy or endovascular intervention and that is why there was no change to his treatment plan after the MRIs were safely completed.

In fact, Plaintiff designated a neurologist/stroke doctor (board certified by the American Board of Psychiatry and Neurology), Dr. Roland Hamilton ("Dr. Hamilton") from Atlanta, Georgia. (Deposition of Dr. Hamilton at p. 6:15-23, attached as Exhibit C. Tellingly, Dr. Hamilton is *not* offering any standard of care opinions about any providers in this case (including the neurologists who were consulted repeatedly before and after the MRIs were safely completed). Dr.

10

Hamilton *agrees* that the strokes were caused by the Type A Aortic Dissection and repair. (Exhibit C (Hamilton Depo.) at p.13:14-17; p. 14:8-18; p. 45:3-6; p. 60:9-14). Finally, Dr. Hamilton is *not offering an opinion* that some different type of medical intervention would have prevented or altered the cerebral strokes or the spinal stroke. (Exhibit C (Hamilton Depo.) at p. 13:14-17; 15:8-17).[9] He *agrees* (as do all experts and providers in the case) that Mr. Welch at *no point* was a candidate for interventional stroke treatment at any time after the surgery:

> Q: Do you agree that Mr. Welch was not a candidate for thrombolytic therapy or endovascular intervention, correct?
>
> A: That is correct.
>
> Q: At any point in time following the surgery, correct?
>
> A: That is correct.

(Exhibit C (Hamilton Depo.) at p. 33:12-18).

### C. Statement of Allegations

Saddled with these facts and with this testimony of Plaintiff's own stroke neurology expert, Plaintiff is left grasping for straws in a desperate attempt to maintain a case, alleging that a "delay" in confirming the strokes with imaging *may* have impacted his outcome. For the requisite expert testimony, Plaintiff pivots to Dr. Schulman, a critical care doctor, on standard of care and to Dr. Elakil, a spine surgeon  (*who is not a cardiothoracic surgeon and has no experience caring for patients after surgical repair of a Type A Aortic Dissection*) on the issue of proximate causation and damages to cobble together a theory as follows: Per Dr. Schulman, the Defendants should have performed imaging sooner on June 17, 2022, and on June 17-18, 2022, should have talked to the cardiothoracic surgeon or neurologist for "consideration of a spinal drain placement" and/or consideration of a "higher blood pressure goal." (Exhibit D Schulman Report). Dr. Elakil then

---

[9] Dr Hamilton limits his opinions <u>to damages</u> stating only that the strokes are permanent and that those strokes could lead to residual deficits by their nature. Dr. Hamilton, however, did not even bother to review any medical records after June 2022 to gain an understanding of his current condition/deficits, (Exhibit C (Hamilton Depo.) at p. 23:8-15).

opines that, *assuming* the standard of care required this "consultation," a spinal drain placement and/or a higher blood pressure goal may have lessened the impact to Mr. Welch's leg weakness and gait (ability to walk) and prevented his "current severe outcome of lower leg weakness." ("Leg Gait Claim"). (Deposition of Dr. Elakil at p. 52:16-53:3 attached as Exhibit E)

Putting aside for purposes of this Motion, the narrow allegations on the standard of care **which Defendants deny**, this proposed proximate causation opinion by Dr. Elakil (who is not qualified in this area of medicine) is speculative and deficient under the law as established by Federal Rule of Evidence 702 and the principles of *Daubert*.

D.  Dr. Ahmad Elakil

Plaintiff does not have an expert in cardiothoracic surgery who performs Type A Aortic Dissection repairs and does not have a neurology stroke expert to attest to proximate causation. Instead, Plaintiff designated Dr. Ahmad Elakil, who is a neurosurgeon (90% of his practice is spine surgery) at Insight Hospital in Chicago (a hospital that does not have a cardiac surgery unit, does not employ cardiothoracic surgeons, and does not perform Type A Aortic Dissection repairs). (Exhibit E (Elakil Depo.) at p. 6:13-17; 10:16-18; 10:19-11:3; 11:5-11; 32:10-12) (Per Insight Hospital, Dr. Elakil specializes in "treating tumors, neck pain, lower back pain and spine surgery."). **Dr. Elakil testified that he is not offering any standard of care opinions in this case.[10]** (Exhibit E (Elakil Depo.) at p. 21:13-22; 69:2-10; 112:15-19).  **Dr. Elakil is not a neurologist and is not trained in strokes.** (Exhibit E (Elakil Depo.) at p. 28:17-22).  He has never talked to Mr. Welch or performed any physical examination of him. (Exhibit E (Elakil Depo.) at p. 28:22-25).  Dr. Elakil has not reviewed any medical records from 2023 or 2024 and has no

---

[10] Thus, his off-hand suggestions at times in his report from March 2024 to "delays" and "omissions in the standard of care" and "lack of timely management" are all stricken because those are standard of care type comments and he testified in his deposition in May 2024 **unequivocally** that he is **not offering any standard of care opinions at trial** (because he is *not* qualified to do so).

knowledge of physical examinations of Mr. Welch after June 2022 as documented in the medical records (showing normal strength and sensation in his legs (5/5 scores)). (Exhibit E (Elakil Depo.) at p. 29:4-10; 39:22-40:10; 113:14-18). Dr. Elakil reviewed only the MWHC records from 2022 for "causation." (Exhibit E (Elakil Depo.) at p. 29:14-22).

In terms of literature, Dr. Elakil reviewed a few articles. (Exhibit E (Elakil Depo.) at p. 34:16-35:10).[11] Dr. Elakil did these searches to gain an understanding of the association of aortic dissection and spinal infarct (though, because it is beyond his expertise, he does not know the nature of the differences between a Type A Dissection and a Type B Dissection). (Exhibit E (Elakil Depo.) at p. 36:23-37:15):

A) *Delayed Onset Postoperative Paraplegia in Acute Type A Aortic Dissection* – Dr. Elakil reviewed this article for the undisputed point that, though rare, a spinal infarct can occur after a Type A Aortic Dissection. (Exhibit E (Elakil Depo.) at p. 67:2-20). This article also discusses the use of a lumbar drain in one patient that only resulted in a "*partial benefit*" of leg paralysis *so, if anything, this article contradicts any bald assertion that a drain placement would have fully resolved Mr. Welch's leg weakness, and in any event, his leg weakness totally resolved without the use of a spinal drain*);

B) *Perioperative Care After Thoracoabdominal Aortic Aneurysm Repair* – This article involves a *thoracoabdominal aneurysm* and *vascular repair* which is not even a Type A or Type B dissection and so involves a totally different injury and procedure. This article at most addresses the standard of care for a thoracoabdominal aneurysm which is not this case at all;

C) *Spinal Cord Ischemia Management: Current indications and Timing of Drainage* – This article also relates to a *thoracoabdominal aortic aneurysm* which is not even a Type A or Type B dissection. This article at best addresses the standard of care for a thoracoabdominal aneurysm and a *TEVAR vascular surgery* which is *not* at issue in this case;[12] and

D) *2022 ACC Guideline for Diagnosis and Management of Aortic Disease* – This practice guideline is relevant to the surgical standard of care for a cardiothoracic surgeon for different types of aortic injuries and surgeries. The section on Type A Aortic Dissection supports the concept of the emergency nature of this injury and the likelihood of

---

[11] Dr. Elakil also was sent articles from Plaintiff counsel but he did not review them and is not relying upon them for any opinions. (Exhibit E (Elakil Depo.) at p. 37:25-38:8).

[12] If anything, this article's discussion of the significant risks of placement of a spinal drain undermines Dr. Elakil's suggestion that spinal drain placement does not involve any risks to the patient.

residual deficits even with surgical repair. This is a guideline that would apply to cardiothoracic surgical standard of care of which Dr Elakil is *not* offering an opinion. Nothing in this guideline for Type A Aortic Dissection supports the proposed causation opinion in this case. (Articles collectively attached as Exhibit F).[13]

It is telling that *none* of these articles are authored by or published in a spine surgery journal. In addition, all these articles are published by authors and in journals that are *beyond* Dr. Elakil's expertise: Society of Thoracic Surgeons; Journal of Thoracic Surgery; Endovascular Surgery Today; and American College of Cardiology. (See Exhibit F).

At his deposition, **Dr. Elakil testified that his proposed causation opinion is limited to the spinal infarct only (i.e., lower leg strength - (the Leg Gait Claim).** (Exhibit E (Elakil Depo.) at p. 52:16-53:3).[14]

Q: And so your opinions in this case on causation and damages are limited to the spinal infarct, is that correct?

A:      That's correct.

(Exhibit E (Elakil Depo.) at p. 52:25-53:3). Because he is not a cardiothoracic surgeon, Dr. Elakil (while generally knowing that a spinal infarct is a known and recognized complication of Type A Aortic Dissection) cannot offer any opinion about Type A aortic dissections and how it could cause a spinal infarcts. (Exhibit E (Elakil Depo.) at p. 53:22-54:24; 61:11-16). Thus, his proposed causation opinion is limited to a theory that, once present, paraplegia (leg weakness) from a spinal infarct *may* be lessened with the use of a spinal drain as treatment (which he theorizes increases "spinal perfusion pressure" to lessen the impact of the spinal infarct).

---

[13] Of note, none of these articles make any reference to a connection between a spinal drain and a *cerebral or brain* stroke.

[14] Later, Dr. Elakil briefly and casually implies in the deposition that the cerebral (brain) strokes are "related" to spine strokes and he "could comment" on these. However, cerebral brain infarcts are well beyond his expertise and experience as a spine surgeon – Dr. Elakil is not a stroke neurologist or cerebral stroke expert and *tellingly Plaintiff's own stroke neurologist* does not even try to render such a baseless opinion that a spinal drain (or any other intervention) would somehow have altered the impact of the cerebral strokes. Also of note, the 4 articles referenced by Dr. Elakil, if anything, relate to spinal cord ischemia/strokes, *not* cerebral ones.

At his current hospital, Dr. Elakil has never placed a spinal drain in a patient after a Type A Aortic Dissection. Exhibit E (Elakil Depo.) at p. 80:18-25). Previously, he did this on one occasion after his training and the patient's lower extremity strength score improved only partially (from a 1/5 to a 3 or 4/5). Exhibit E (Elakil Depo.) at p. 81:1-82:7). Dr. Elakil admits to a general understanding that the use of a drain and its outcome on paraplegia varies: "some people do not improve, some people partially improve and some people fully recover." (Exhibit E (Elakil Depo.) at p. 71:19-23). He opines that with the use of a lumbar drain (assuming that was required by the standard of care), Mr. Welch "to a reasonable degree of probability" "he might have a complete resolution" of his "lower extremity weakness." (Exhibit E (Elakil Depo.) at p. 76:12-20).

Alternatively to a lumbar drain, Dr. Elakil proposes  a "higher blood pressure" (he refers to a MAP of 85-90) (Exhibit E (Elakil Depo.) at p.97:4-5) ("*I want the MAP at 85-90*" if there is leg weakness) might have increased "spinal perfusion pressure" and assisted with the spinal infarct *if* a spinal drain was not an option and *if* higher blood pressure was allowed post-Type A Aortic Dissection repair (*again, he is not qualified on standard of care*).  (Exhibit E (Elakil Depo.) at p. 108:5-9 ("ask cardiothoracic surgeon about the MAP goals")). But again, Dr. Elakil clearly and admittedly did not even assess the actual MAP levels in the medical records during this time period which show that Mr. Welch's average MAP scores were in the range of 85-90 (the exact range cited by Dr. Elakil) and that his issue was hypertension (high) *not* hypotension (low) blood pressure during this time period (and thereafter).[15] (Exhibit A at p. 59-81). As such, Dr. Elakil obviously employed no requisite methodology specific to the facts in this case to even support his causation and damages hypothesis.

---

[15] In fact, looking at June 17-19 time frame for example, Mr. Welch's MAP was *over 85* around 75% of the time per the medical records and the average MAP was *over 85*. (See Chart MAP summary from medical records, attached as Exhibit G).

What is even more nonsensical, however, about Dr. Elakil' s whole proposed causation and damages opinion is he readily admits it is **speculative**:

> Q: So your opinion is he would have – with different interventions – either a partial or complete resolution of the deficits related to the spinal cord infarction?
> A:      Correct
> Q:      And you can't say whether it would have been partial or complete, one or the other?
> A:      I can't.

(Exhibit E (Elakil Depo.) at p. 117:7-14).[16]

But the biggest flaw in this admittedly speculative opinion is this: **Mr. Welch has had a resolution of symptoms related to the spinal infarct** - something Dr. Elakil **did not even bother to learn or understand**. (Exhibit E (Elakil Depo.) at p. 117:15-118:11). Mr. Welch **does not have paraplegia and has full strength in his legs** – his leg strength returned from a 2/5 on right and 4/5 on left in June 2022 **to 5/5 strength** on both sides (no paraplegia) (Exhibit A at p. 90-90A, 93-94, 95-96, 98). Thus Dr. Elakil's periodic statements that the lumbar drain or higher MAP goal would have prevented "the patient's current severe outcome of lower extremity weakness" or prevented "the death sentence" to his "ability to walk" are baseless and **are directly contrary to the actual medical records**.[17]

## III.    STATEMENT OF POINTS AND AUTHORITIES

### A.  Choice of Law

When federal courts sit pursuant to their diversity jurisdiction, they are "to apply state substantive law and federal procedural law." *Smith v. Summers*, 334 F. Supp. 3d 339, 342 (D.D.C.

---

[16] Dr. Elakil goes on to acknowledge in response to questions *from* Plaintiff's counsel that he could not possibly quantify the extent of some difference in outcome "without doing an actual examination" of Mr. Welch **which he had never done**. (Exhibit E (Elakil Depo.) at p. 128:2-16).

[17] Dr. Elakil also casually mentions Mr. Welch's current severe bowel and bladder problems from the spinal infarct – **but there is none** per the medical records he chose to not even review. (Exhibit A at p. 98).

2018) (citing *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). The Federal Rules of Evidence and

Federal Rules of Civil Procedure are procedural law. *Smith*, 334 F. Supp. 3d at 341.[18]

## B. **Proximate Causation**

In order to establish a *prima facie* case of medical negligence/malpractice, the plaintiff

bears the burden of proving: (1) the standard of care; (2) that defendant/s deviated from the

standard of care; (3) and that there is a causal relationship between this deviation and plaintiff's

injury. *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1033 (D.C. 2015) (citing *Woldeamanuel*

*v. Georgetown Univ. Hosp.*, 703 A.2d 1243, 1244 (D.C. 1997) (affirming grant of summary

judgment for hospital because the only evidence presented by plaintiff on the standard of care and

breach was prospective expert testimony that was merely conclusory in nature)). The third prong,

causation, imposes upon plaintiffs the burden of proving that the health care provider's negligence

was a proximate cause of the accident or injury. *See Derzavis v. Bepko*, 766 A.2d 514, 521 (D.C.

2000) (affirming judgment as a matter of law for doctor where the best evidence of causation was

a temporal relationship between the alleged onset of pain and the alleged injury, but where

plaintiff's expert could not explain at what point the injury took place or what the mechanism of

the injury was).

To establish proximate cause in a medical malpractice case, the plaintiff must prove "a

direct and substantial causal relationship between the defendant's breach of the standard of care

and the plaintiff's injuries." *Grant v. American Nat'l Red Cross*, 745 A.2d 316, 319 (D.C. 2000).

Expert testimony is required in medical malpractice cases, and the evidence is sufficient to

establish proximate cause if the expert "states an opinion, based on a reasonable degree of medical

certainty, that the defendant's negligence is **more likely than anything else** to have been the cause

---

[18] Regardless, in *Motorola Inc. v. Murray*, 147 A.3d 751, 752 (D.C. 2016), the District of Columbia Court of Appeals adopted Fed. R. Evid. 702 and the *Daubert* standard.

(or a cause) of the plaintiff's injuries." *Id*. (emphasis added); *see also Talley v. Varma*, 689 A.2d 547, 553 (D.C. 1997) ("Medical testimony as to the mere possibility of a causal relation . . . is not sufficient"). In other words, the plaintiff "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact." *Grant*, 745 A.2d at 319. To determine whether something is a cause in fact, D.C. courts have adopted the "substantial factor test" – defendant's conduct must be a "substantial factor in bringing about the harm." *District of Columbia v. Carlson*, 793 A.2d 1285, 1288 (2002); *see also* Civil Jury Instructions for D.C. 9.10 (Professional Liability – Causation).

## C. **The Standard for Expert Testimony**

Under Federal Rule of Evidence 702, "trial courts are required to act as gatekeepers who may only admit expert testimony if it is both relevant and reliable." *Heller v. District of Columbia*, 952 F. Supp. 2d 133, 139 (D.D.C. 2013) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). "[A]s the gatekeepers of expert testimony, courts must be careful to avoid the potential pitfalls of junk science." *United States v. Bonner*, 648 F.3d 209, 215 (4th Cir. 2011). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The current iteration of Rule 702 is the product of 2023 Amendments, which sought "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 (Notes of Advisory Committee on 2023 Amendments). The 2023 Amendments sought to address "incorrect" rulings that

18

erroneously "held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." *Id.*

As an initial matter, the expert should be possessed of the requisite "knowledge, skill, experience, training or education" from which it can be assumed that the information imparted or the opinion rendered is reliable. *See* Fed. R. Evid. 702; *See Daubert,* 509 U.S. 579. The scope of the expert's testimony must be limited to his area of expertise. *See Arias v. DynCorp*, 928 F. Supp. 2d 10, 17 (D.D.C. 2013). "Merely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001). The proponent of a proposed expert may not simply recite the expert's degrees, they must go further and demonstrate how the expert's academic and professional experiences make the expert qualified to testify about the particular factual questions at issue. *See Arias* 928 F. Supp. 2d at 17. "Part of the court's gatekeeping function is to ensure that an expert witness is qualified to testify about each component of his testimony." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 1005 (4th Cir. 2020).

In addition, the proponent of the expert testimony bears the burden of establishing the admissibility of such testimony by a preponderance of the evidence. *Daubert,* 509 U.S. 592 n. 10. Because "[e]xpert evidence can be both powerful and quite misleading," a court has greater leeway in excluding expert testimony…than it does lay witness testimony. *Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 86 (D.D.C. 2012) (citing *Daubert*, 509 U.S. at 595). This Court has wide latitude in determining how to assess the reliability and relevance of the expert testimony at issue. *Kumho Tire Company, Ltd v. Carmichael*, 526 U.S. 137, 152-53 (1999).

A "reliable" expert opinion is one based on scientific, technical or other specialized knowledge, and not on belief or speculation. *Daubert,* 509 U.S. at 590. "The *sine qua non* of

19

expert opinion testimony is that its basis be grounded in fact -- not conjecture." *Logsdon v. Baker*, 366 F. Supp. 332, 336 (D.D.C. 1973). Although reliability is generally indicated by testing, peer review, evaluation of rates of error and general acceptability, the evaluation is a "flexible one." *Daubert,* 509 U.S. at 594-595. At bottom, "the focus, of course, must be solely on principles and methodology, not on the conclusions they generate." *Daubert,* 509 U.S. at 595; *see Kumho Tire*, 526 U.S. at 158 (upholding the trial court's decision to exclude expert's opinion on the grounds that his methodology was unreliable); *Freeman v. Case Corp.*, 118 F.3d 1011, 1016 (4th Cir. 1997). Courts have noted that when a doctor's opinion "strays from" the doctor's "professional experience," the opinion is "less reliable, and more likely to be excluded under Rule 702." *Madej v. Maiden*, 951 F.3d 364, 376 (6th Cir. 2020) (quoting *Gass v. Marriott Hotel Servs.*, 558 F.3d 419, 428 (6th Cir. 2009)).

An expert's testimony is "relevant" where it is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *Daubert*, 509 U.S. at 591 (internal citations omitted). The trial judge must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Stryker Spine v. Biedermann Motech GmbH*, 684 F. Supp. 2d 68, 100 (D.D.C. 2010) (quoting *Daubert*, 509 U.S. at 592-93). In other words, an expert's testimony should be excluded where its proponent cannot demonstrate that the evidence bears "a valid . . . connection to the pertinent inquiry." *Daubert,* 509 U.S. at 588. *See also General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (opining that an expert witness' testimony is irrelevant where "there is simply too great an analytic gap between the data and the opinion proffered.").

## IV.    ARGUMENT

**A. Dr. Elakil' s Unqualified and Conclusory Statements on Proximate Causation and Damages Are Deficient and Inadmissible Under the Law and Should be Excluded Under Federal Rule of Evidence 702 and Principles of _Daubert_.**

Dr. Elakil is not qualified to offer the opinion he proposes in this case. In addition, his proffered expert testimony is not the product of reliable principles and methods and it does not reflect a reliable application of the principles and methods to the facts of this case. As a result, his purported opinions on causation and damages do not comply with the _Daubert_ standards or Federal Rule of Evidence 702. Accordingly, his proffered testimony must be excluded.

**(a) Dr. Elakil's scientific, technical, or other specialized knowledge will not help the trier of fact to understand the evidence or to determine a fact in issue.**

Merely holding a medical degree does not make Dr. Elakil qualified to testify about everything within the broad field of medicine. Dr. Elakil, as a spine surgeon, should testify as to matters related to spine surgery – which is not the subject matter of this case. Accordingly, Dr. Elakil concedes that he is _not_ qualified to opine on standard of care in this case, but this concession also should extend to causation and damages. Dr. Elakil is not a cardiothoracic surgeon and his practice does not involve caring for patients after surgical repair of a Type A Aortic Dissection. (Exhibit E (Elakil Depo.) at p. 6:13-17; 10:16-18; 10:19-11:3; 11:5-11; 32:10-12). In fact, the hospital where Dr. Elakil works does not even have a cardiac surgery unit, so he is not even around the medical professionals who care for these patients and thus his proposed opinions cannot be grounded in his experience. (Exhibit E (Elakil Depo.) at p. 6:13-17; 10:16-18; 10:19-11:3). As for the alleged "interventions" of a spinal drain or a different blood pressure goal and their potential impact on a patient, Dr. Elakil's medical practice does _not_ include the experience of assessing a patient for use of a spinal drain or placing a spinal drain after a Type A Aortic Dissection repair; his medical practice does _not_ include consulting with cardiothoracic surgeons on the blood pressure goal for these patients; and his medical practice does _not_ involve following cardiac

21

surgery patients after hospital admission to evaluate the impact of such an intervention. (Exhibit E (Elakil Depo.) at p. 80:18-25). Dr. Elakil has never written any publications related to the diagnosis, treatment or sequalae of strokes and has not participated in any research in stroke studies. In addition, Dr. Elakil's expertise is not as a vascular neurologist: strokes, regardless of location (spine or brain), are a vascular neurological issue which is why neurologists repeatedly saw Mr. Welch during the care at issue in this case. (Exhibit E (Elakil Depo.) at p. 28:17-22). Dr. Elakil is not qualified in training or in his experience to diagnose, treat or evaluate the long-term sequalae of strokes or to compare the long-term sequalae of strokes in patients after an aortic dissection who did or did not have certain types of "intervention." Accordingly, Dr. Elakil lacks the requisite specialized knowledge to assist this Jury and to offer opinions on proximate causation and damages.

**(b) Dr. Elakil's testimony is not based on sufficient facts or data.**

Defendants maintain that Dr. Elakil is not qualified to render an opinion as to proximate causation and damages, but if deemed qualified, he most certainly must undertake an objective, reliable and detailed methodology required to meet the *Daubert* standards. For litigation purposes, Dr. Elakil fixated on the conclusory mantra that earlier imaging and consideration of a spinal drain or a different blood pressure goal (*if* required by the standard of care) would have led to a better outcome for his lower extremity weakness and related ability to walk.[19] This fixation, however, lacked any methodology or any ability to quantify this suggestion in any measurable way as required by law:

---

[19] Again, Dr. Elakil limited his opinions to the spinal stroke/leg weakness claim. (Exhibit E (Elakil Depo.) at p. 52:16-53:3). A hypothetical expansion to proximate causation with the cerebral strokes would be even more unacceptable under the law: even more beyond his area of expertise and experience; even more speculative and lacking in methodology; and even more incompatible with Plaintiff's own stroke neurologist's unwillingness to speculate and offer such a causation opinion.

> Q: So your opinion is he would have – with different interventions – either a partial or complete resolution of the deficits related to the spinal cord infarction?
> A:     Correct
> Q:     And you can't say whether it would have been partial or complete, one or the other?
> A:     I can't.

(Exhibit E (Elakil Depo.) at p. 117:7-14).

Dr. Elakil's proposed testimony, however, is even worse than speculative guesswork – the actual facts of this case run counter to his suggestion because Mr. Welch, even without these "interventions," in fact went on to achieve full strength in his lower extremities (5/5).

Dr. Elakil: (1) Ignored data in the medical records he did review from 2022 (including critical data such as blood pressure/MAP levels higher, not lower; neurology consults that did not make these recommendations, etc.); (2) Ignored the Plaintiff's own stroke neurologist who does *not* attempt to state that different intervention would have altered the sequalae of strokes caused by the aortic dissection and repair; and (3) Ignored all the medical data after 2022 (by not even reviewing one single medical record after 2022) showing that Mr. Welch does not have residual leg weakness from a spinal infarct per all of his current medical examinations (scores 5/5). (Exhibit A at p. 90-90A, 93-94, 95-96, 98) (Exhibit E (Elakil Depo.) at p. 28:22-25; 29:4-10; 39:22-40:10; 113:14-18).[20]  It is inappropriate for an expert to "cherry pick material," but Dr. Elakil does not even cherry pick – he just jumps to conclusory statements without any basis or methodology. A reliable expert cannot possibly render an opinion on how a course of treatment caused a "different" outcome without even bothering to understand the actual outcome. Accordingly, Dr. Elakil has no reliable basis or evidence to state that his leg weakness would somehow be different today than

---

[20] Dr. Elakil – and in fact no Plaintiff expert- has performed an examination of Mr. Welch. (Exhibit E (Elakil Depo.) at p. 28:22-25). Plaintiff designated a life care planner (Dr. Kaplan – *not* a causation expert) who met the plaintiff on zoom; did not observe any gait abnormality during the call; and testified at deposition in June 2024 that he would need to do a physical examination of the Plaintiff in order to testify – but *never* did that examination and discovery closed a month ago (October 14, 2024). (Deposition of Dr. Kaplan at pp. 64:19-65:10, 107:7 to 111:3), attached as Exhibit H).

the complete resolution it in fact is. As such, Dr. Elakil cannot causally link the alleged standard of care actions to causation and damages in this case.

**(c) Dr. Elakil's testimony is not the product of reliable principles and methods.**

While Dr. Elakil discusses the general concept of increasing "spinal perfusion pressure," he does not apply it to the specifics of this injury, this surgical recovery, this patient, the related risk factors, and this outcome. Dr. Elakil conducted a literature review that was cursory at best, involved topics outside his area of expertise, involved other types of surgeries, and did not address or establish a causation methodology for this case. (Exhibit E (Elakil Depo.) at p. 34:16-35:10). Dr. Elakil does not look at the facts of the case, and even he admits, as a general concept, the use of a spinal drain may only partially improve leg weakness. (Exhibit E (Elakil Depo.) at p. 71:19-23). Nonetheless, had Dr. Elakil reviewed the most recent medical records from 2023 or 2024 or evaluated Mr. Welch, he would know that this is a moot point, because even without the drain or without the supposed different MAP goal – Mr. Welch's leg weakness has resolved.

**(d) Dr. Elakil's expert opinion does not reflect a reliable application of reliable principles and methods to this case.**

For the same reasons as discussed above, Dr. Elakil's proffered testimony fails to meet the fourth prong of Rule 702. Dr. Elakil's proposed opinion is nothing more than speculative generalities and was not formed with the rigor that is accepted in vascular neurology, the area of medicine with physicians who specialize in strokes involving the brain and spinal cord. His review of the medical records was so incomplete that he is in no position to reliably apply the general principles he espouses to the specific circumstances of this case. Admission of Dr. Elakil's proposed conclusory opinion about the proximate cause of Mr. Welch's current condition would be unfairly prejudicial to the Defendants. It would impermissibly bias the jury to hear this speculation when the basis for the opinion is wholly insufficient and contrary to the medical facts

in this case. Because the extremely limited probative value of Dr. Elakil's unqualified and unreliable opinion is substantially outweighed by the severe risk of unfair prejudice and confusion of the issues/misleading of the jury, his opinion must be excluded under both Federal Rules of Evidence 702 and 403.

## V.  CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant Defendants' Motion to Exclude the Opinions of Dr. Elakil on Causation and Damages or, if the Court finds the need, the Defendants request a hearing.

Respectfully submitted,

*/s/ Donna P. Sturtz*

Donna P. Sturtz (Federal Bar No. 435617)
David M. Sturtz (Federal Bar No. 90017707)
Nelson Mullins Riley & Scarborough LLP
100 S. Charles Street, Suite 1600
Baltimore, MD  21201
(443) 392-9400 (Telephone)
(443) 392-9499 (Facsimile)
donna.sturtz@nelsonmullins.com
david.sturtz@nelsonmullins.com
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 12th day of November, 2024 a copy of the foregoing was

served by electronic submissions via CM/ECF, in accordance with the Federal Rules of Civil

Procedure and the Local Rules of the United States District Court for the District of Columbia, on:

Governor E. Jackson, III
Law Office of Governor Jackson, III LLC
10 G Street NE, Suite 600
Washington, D.C.  20002
gjackson@governorjacksonlaw.com

Kim Parker, Esquire
Law Offices of Kim Parker, P.A.
2123 Maryland Avenue
Baltimore, MD  21218
kp@kimparkerlaw.com

Counsel for Plaintiff


*/s/ Donna P. Sturtz*
Donna P. Sturtz