# EXHIBIT C

**DEFENDANTS' MOTION EXHIBIT C PAGE 1**

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| SHANA HARGROVE as Power of | ) | |
| Attorney for KEVIN WELCH, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| | ) | |
| vs. | ) | NO. 1:23-cv-3381 |
| | ) | |
| MEDSTAR WASHINGTON HOSPITAL | ) | |
| CENTER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

- - -

Remote Videoconference Deposition of ROLAND HAMILTON, JR., MD, located in Decatur, Georgia, taken on behalf of the Defendants, before Kimberly S. Bennett, RPR, CRR, CRC, Certified Court Reporter, on the 17th day of May 2024, commencing at the hour of 1:00 p.m. Eastern.

- - -

Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 6

A    Okay.

Q    The other thing that will make Kimberly's job much easier is if you just can keep in mind to give verbal answers to my questions.  It's hard for her to get down things like nods and shakes of the head.  So just try your best to give verbal answers.

A    Okay.

Q    And the last thing is if you need a break at any time, I'm happy to take a break.  I don't think we'll be too terribly long today, but just let me know if you need a break for any reason.  Okay?

A    Yes, ma'am.

Q    All right.  Great.  So will you just start by telling me what is your current business address.

A    My current business address is 2107 North Decatur Road, Decatur, Georgia.

Q    Okay.  And is that a hospital address or a business office?

A    That is my business address.

Q    Okay.  And do you -- where do you currently practice medicine?

A    I currently practice medicine at Northside Hospital, Atlanta campus.

Q    And how far is Dakota [sic], Georgia, from the Northside Hospital in Atlanta?



Page 13

contacted in this case?

A    It was definitely before February 2024.  It was definitely within 2023 of last year.

Q    Have you worked with the plaintiff's attorney in any of your other cases where you've provided expert witness review?

A    I have not.

Q    Do you know if you have reviewed any other cases that involve care provided in Washington, D.C.?

A    No.

Q    You've never practiced medicine in Washington, D.C., correct?

A    I have not.

Q    And you're not testifying in this case as to the standard of care of any of the providers who provided care to Mr. Welch, correct?

A    That is correct.

Q    And you're not offering any opinion in this case that the infarcts suffered by Mr. Welch are unrelated to the aortic dissection, correct?

A    Correct.

Q    It is your opinion that the strokes are related to the aortic dissection, correct?

A    Repeat that, please.

Q    Is that me?



Page 14

A    Could you repeat your question, please, ma'am.

Q    Yeah.  I just don't know where that noise is coming from.

MR. JACKSON:  There's a cleaning crew here in the main area that the humming is probably the vacuum noise, but it should stop momentarily.

MS. STURTZ:  Okay.

Q    (By Ms. Sturtz) It is your opinion to a reasonable degree of probability that the infarcts are related to the aortic dissection, correct?

A    Yes.

MR. JACKSON:  Object.  You may respond.

MS. STURTZ:  I think -- did you hear it, Kimberly?  Did you hear his answer?  Answer was "yes"?

COURT REPORTER:  Yes, that's what I heard.  If the doctor wants to repeat it.

THE WITNESS:  Yes.  That is correct.

Q    (By Ms. Sturtz) And you agree, Doctor, that strokes are a known and recognized complication of an aortic dissection, correct?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  They can be complications.

Q    (By Ms. Sturtz) And you are not offering any


MAGNA
LEGAL SERVICES

Page 15

opinion in this case that the infarcts Mr. Welch suffered would have been different with some different medical intervention, correct?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  Repeat the question, please.

Q    (By Ms. Sturtz) You are not offering an opinion in this case that to a reasonable degree of probability that Mr. Welch's strokes or infarcts would have been different with some different type of medical intervention, correct?

A    Yes.

MR. JACKSON:  Same objection.  You may respond.

Q    (By Ms. Sturtz) "Yes"?

A    Yes.  Correct.

COURT REPORTER:  Doctor, when there's an objection, you may have to wait just a second because if you both speak at the same time only one of you may come across.  That's why we may not hear your answer.

THE WITNESS:  Noted.

Q    (By Ms. Sturtz) In terms of your current practice, Doctor, you work full-time as a



Page 23

related to aortic dissections?

A    That was out of the scope of the question I was asked by Mr. Governor.

Q    What was the question you were asked by Mr. Governor?

A    To comment on the neurologic injury Mr. Welch suffered from the stroke.

Q    And you in performing that -- or answering that question reviewed the medical records from the MedStar Washington Hospital admission in June of 2022, correct?

A    Yes, I did.

Q    And have you reviewed any other medical records since that point in time?

A    I have not.

Q    So you have not seen any --

A    I take that back.  Mr. Jackson sent me some depositions, and I reviewed those records.

Q    Okay.  But in terms of medical records, you have not reviewed any medical records that postdate the admission to MedStar Washington Hospital Center in June of 2022, correct?

A    Correct.

Q    So you haven't seen any of Mr. Welch's care records from 2023 or 2024, correct?



DEFENDANTS' MOTION EXHIBIT C PAGE 7

Page 33

Q    Same question with the agitation that you mention.  Will you be offering any opinion at trial as to what the cause was of the agitation, or is it just in your report as background information?

A    I will not.  It is in my report as background information.

Q    And same with delirium and confusion.  Will you be offering any opinion at trial as to what was the cause of delirium or confusion, or is that in your report as background information?

A    It is in my report as background information.

Q    Do you agree that Mr. Welch was not a candidate for thrombolytic therapy or endovascular intervention, correct?

A    That is correct.

Q    At any point in time following the surgery, correct?

A    Correct.

Q    You mention the neurology team recommended blood pressure treatment.  Do you recall what the recommendation was and will you be offering any opinion that -- or do you agree that that recommendation was reasonable?

A    Yes.  The after stroke care we do recommend a specific blood pressure parameter.  So I agree with



Page 45

related to the aortic dissection.  Whether they are cardioembolic is -- I'm not sure about that.

Q    Okay.  So you would agree with the statement that his infarcts are secondary to aortic dissection and repair?

A    Yes.

Q    Bear with me for one minute.  I'm almost done, I promise.

(Brief pause)

Q    The second article that you reference is an Ingeman article from 2011 entitled In-Hospital Medical Complications, Length of Stay, and Mortality Among Stroke Unit Patients.  Can you tell me why it is you reference that article?

A    Because Mr. Welch was hospitalized.  It's a pretty comprehensive article.

Q    And do you agree this article, though, does not -- do you recall one way or the other as to whether this article relates to acute strokes versus strokes stemming from an aortic dissection?

A    I do not recall if it commented on aortic dissections.  But to the best of my ability acute strokes are covered.

Q    To the best of your ability -- what was the end?  I'm sorry.  I didn't hear you.



Page 60

A    I do.

Q    Okay.

MR. JACKSON:  I have no further questions pending questions from counsel.  Thank you.

MS. STURTZ:  I have just a few, Dr. Hamilton.

FURTHER EXAMINATION

BY MS. STURTZ:

Q    In terms of this discussion about the etiology and cardioembolic, I am correct that it's your opinion to a reasonable degree of probability that the etiology of the strokes that Mr. Welch suffered is the dissection and the repair of the dissection, correct?

A    Correct.

Q    And you were asked about pages 29 and then I think 35 of the deposition.  Can I direct you to page 34 of the deposition.  Let me know when you've gotten there.

A    Yes, ma'am.

Q    Okay.  So I believe in answer to Mr. Jackson's questions about vision you were linking his complaints earlier in the deposition about having some vision problems to the infarcts.  Do you recall saying that?

A    Yes, ma'am.

Q    And do you see here on page 34 that was

