# EXHIBIT E

Page 1

NORTHLAND REPORTING AGENCY (Laurie Austin)

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

Civil Division

SHANA HARGROVE AS POWER OF

ATTORNEY FOR KEVIN WELCH

Civil Action No. 1:23-cv-3381

Plaintiff,

vs.

MEDSTAR WASHINGTON HOSPITAL

CENTER, et al,

Defendants.

ZOOM DEPOSITION

The following is the Zoom

deposition of AHMAD ELAKIL, M.D., taken

before Laurie Austin, RPR, Notary Public,

pursuant to Notice of Taking Deposition, all

parties appearing remotely, commencing at

approximately 12:06 p.m., Central Time, on

May 29, 2024.



Page 6

Q.   All right.  And the last thing is opinions
     to -- to be admissible in court are given to
     a reasonable degree of probability.  I will
     do my best to include that phrase in my
     questions, but do we have an understanding
     that when I ask for your opinions it is for
     an opinion to a reasonable degree of
     probability?

A.   Yes.

Q.   Okay.  All right.  Let's start by where are
     you today for this deposition?  What -- what
     is your address?

A.   At the hospital; 2525 South Michigan Avenue,
     Chicago, Illinois.

Q.   Okay.  Great.

     And that is the Insight Hospital?

A.   Correct.

Q.   And I was provided prior to the deposition a
     copy of your CV, and it has an updated date
     of August 24, 2022.

     Do you have any -- a more
     up-to-date CV than the one dated August 24,
     2022?

A.   I -- I need to -- I need to look into this.
     I'm sure I have an updated one.  I can



MAGNA
LEGAL SERVICES

Page 10

of Mercy Hospital who left in 2021?

A.   That's correct.

Q.   When did you first consider coming to Insight Hospital?  I know you started in August of 2021, but when did that process begin?

A.   April.

Q.   And in August of 2021, did Mercy Hospital have an ICU?

A.   Sorry.  What month?

Q.   The summer -- let's say the summer of 2021. Did it have a functioning ICU?

A.   That's correct.

Q.   Did it have a cardiac surgery unit?

A.   Not -- no cardiac surgery.

Q.   Does it currently have a cardiac surgery unit?

A.   No.

Q.   So there are not patients {sic} at Insight Hospital who perform type A aortic dissection surgery; is that correct?

A.   That's correct.

Q.   And that is true from summer of 2022 through to today?

A.   Correct.



DEFENDANTS' MOTION EXHIBIT E PAGE 4

Page 11

Q.  Does Insight Hospital employ any
cardiothoracic surgeons?

A.  No.  They are in the process of building the
department.

Q.  You do not perform cardiothoracic surgery,
correct?

A.  No.  I'm a neurosurgeon.

Q.  And you do not perform surgery on patients
who are getting a repair for type A aortic
dissection, correct?

A.  No.  I'm a neurosurgeon.

Q.  Where were you working in April of 2022 when
you were considering the position at
Insight Hospital?

A.  Louisiana.

Q.  And what were you doing in Louisiana?

A.  Private practice in neurosurgery.

Q.  What was the name of the private practice?

A.  Ahmad Elakil Medical Consul---
Ahmad Elakil --
I -- I forgot what it's called.  My
first name, last name, medical --
professional medical service, something like
that.

Q.  So when you were in Lafayette, were you



Page 21

spine?

A. Spine.

Q. Do you specialize in minimally invasive surgeries?

A. No. Open surgery.

Q. What percentage of the spine surgeries you do are min--- minimally invasive surgeries?

A. I would say 5 to 10 percent. They would be a simple minimally invasive laminectomy or discectomies.

Q. The surgery that Mr. Welch underwent is not a minimally invasive surgery, correct?

A. I don't know. That's not my specialty.

Q. You will not be offering any opinions in this case as to the standard of care regarding the performance of the surgical repair of Mr. Welch, correct?

A. Correct.

Q. And, in fact, you won't be offering any standard of care opinions in this case, correct?

A. Correct.

Q. You're -- you're currently licensed in Illinois; is that -- is that correct?

A. That's correct.



Page 28

any appreciated weakness.

Q. Appreciated weakness?

A. Yes.

Q. That was it?

A. Yes.

Q. Okay.

A. One way abduction, that means his power is five over five.

Q. As a --

Okay. As a neurosurgeon, what does strength and sensation are intact without any focal deficit mean to you?

A. That this patient neurologically is normal.

Q. And you're not board certified in critical care, correct?

A. Correct.

Q. And you're not board certified in neurology, correct?

A. Correct.

Q. You didn't do a stroke fellowship, correct?

A. No.

Q. You have not performed any physical examination of Mr. Welch, correct?

Is that yes? Pardon?

A. No.



Page 29

Q. Okay.

A. Okay. No. I --

Q. You can't hear nods.

Okay. Are you aware of any recent neurological assessments of Mr. Welch in the year 2023 or 2024?

A. No.

Q. Have you reviewed any medical records for Mr. Welch from the year 2023 or 2024?

A. No.

Q. What medical records have you reviewed?

A. The hospital records when he was admitted for the surgery and the postoperative care.

Q. So just the one admission to MedStar Washington Hospital Center? Those are the only medical records you reviewed in this case?

A. Yes.

Q. Did you review any rehab records after that hospital admission?

A. (Shakes head from side to side.)

I was asked only for the causation.

Q. Okay. Have -- have you reviewed any deposition transcripts in this case?

A. Yes. I was sent recently a deposition.



Page 32

Washington Hospital Center medical bills?

A. Yes.

Q. Have you been provided with any medical bills other than MedStar Washington Hospital Medical Center?

A. No.

Q. Okay. And that --

A. I think it was for the nurse -- nursing and -- and the hospital.

Q. Okay. But you -- you don't perform type A aortic dissection surgery, correct?

A. (Shakes head from side to side.)

Q. So in terms of what medical bills and services are provided for that service -- for those services, that's beyond your area of expertise, correct?

MR. JACKSON: Objection.

You may respond.

THE WITNESS: So I'm -- I'm the chairman of the neurosurgery at Insight Hospital. We deal with a lot of the business side of general ICU admissions, general surgery collections, nursing, and so forth.

And for these, I do have general



Page 34

reasonable.

However, how much is that surgery cost, that is something that I have not seen before.

BY MS. STURTZ:

Q.   Okay.  So the extent of your opinions on the bills -- bills from MedStar Washington Hospital Center is that, to you, in a general sense, they appear to be fair and reasonable billing for those services that were provided?

A.   Yes.

Q.   Anything else that you reviewed other than what you've told me about?

A.   No.

Q.   I was sent one article yesterday, and I'll go into that in more detail later.  Is there -- are there any other articles that you pulled other than the one article that was sent to me yesterday?

A.   There is two or three articles that I reviewed while I'm writing the report.

Q.   Okay.

A.   I have not share it yet.

Q.   Have you not shared those with Mr. Jackson



Page 35

yet?

A.   (Shakes head from side to side.)

Q.   Okay.  And the article that you sent yesterday is -- is an article that you found after writing the report?

A.   Yes.

Q.   And did you just start searching for that article in getting ready for your deposition today?

A.   Yes.  That's correct.

Q.   And what search did you perform and where to obtain that article?

A.   (Audio disturbance.)

        THE COURT REPORTER:  I'm sorry. Say again.

        THE WITNESS:  PubMed, B-u-b-m-e-d {sic}.

        THE COURT REPORTER:  Thank you.

BY MS. STURTZ:

Q.   And what search did you put into BubMed to obtain that article?

A.   Type A aortic dissection.

        MR. JACKSON:  And I think PubMed, P as in Paul.  P-u-b-m-e-d.



Page 36

BY MS. STURTZ:

Q. So you put into PubMed type A aortic dissection. Anything else?

A. And the relationship -- and the relationship to spinal cord infarction. So plus spinal cord infarction, plus cerebrospinal fluid drainage.

Q. And was the article that you provided yesterday one of several articles that came up in response to that search on PubMed?

A. That was one of the areas. One that I just opened, and I start the search after this one.

Q. The two or three other articles, I'm going to go ahead and have Laurie hold that open as Deposition Exhibit 2. And if you could please give those articles to Mr. Jackson and he'll send those to me.

A. (Nods head up and down.)

Q. What -- were those articles also that you got through a search on PubMed?

A. Yes.

Q. And do you recall what the search was on PubMed for those two or three articles?

A. The same.



DEFENDANTS' MOTION EXHIBIT E PAGE 12

Page 37

Q.    Okay.

A.    I think I didn't say type A.  It was general aortic dissection plus spinal cord infarction, plus cerebrospinal fluid drainage.

Q.    Do you have an understanding that there's a difference between a type A aortic dissection and a type B aortic dissection?

A.    I know there is a difference, but again, it's not my expertise.

Q.    So would you defer to a cardiothoracic surgeon on the difference between a type A aortic dissection and a type B aortic dissection?

A.    Yes.

            MR. JACKSON:  Objection.

            You may respond.

BY MS. STURTZ:

Q.    I think your answer was yes?

A.    Yes.

Q.    Were any other articles provided to you that pertained to your review of this case?

A.    Yes.  There was articles by the counsel that was revealed to me recently.

Q.    So recently Mr. Jackson provided you with a



Page 39

A.    That was one of the articles that I pulled, and I forgot what that journal called.

Q.    Okay.  So my question to you is just more a general one.  If you were -- you know, are there certain sources that you use in your practice?  If you have a question about something like spinal cord infarctions, what sources do you use to get some answers?

A.    Usually the best thing to use is the main guidelines that's done, you know, after multiple studies, which is usually the guide--- the guidelines that's made by the American Association of Cardiology, the American Association of Neurosurgery.

            If that -- if that disease that happened is extremely rare that there is not much under my studies to really decide which -- which way to proceed with, I look to several study -- the studies, and then I go -- you know, make -- make an opinion as -- after studying all these results.

Q.    As a neurosurgeon, what does this neurological exam indicate to you:  Awake, alert, and oriented to person, place, and time, cranial nerves 2 through 12 are grossly


MAGNA
LEGAL SERVICES

Page 40

intact; sensation to light touch intact; normal focal motor deficits, strength and sensation are intact without any focal deficit?

A. That's a normal neurosurgical examination.

Q. Have you ever spoken to Mr. Welch?

A. No.

Q. Have you spoken to any of his treating health care providers?

A. No.

Q. Have you spoken to any other experts in this case?

A. No.

Q. There was a -- something --
Do you know what a life care plan is?

A. Yes.  It was sent by Mr. Jackson to me. However, I didn't review it.

Q. Okay.  And you've never spoken to Dr. Kaplan?

A. No.

Q. So you don't intend to offer opinions at trial as to what, if any, Mr. Welch's future care needs are; is that correct?

A. If I'm -- unless -- not up to this moment unless I'm asked to provide -- I'm asked this


MAGNA
LEGAL SERVICES

DEFENDANTS' MOTION EXHIBIT E PAGE 15

Page 52

A. No, it's not January yet.  It was -- I would say around maybe two weeks before.

Q. Okay.  So if the report is February 29th, you were probably contacted sometime earlier in February of 2024?

A. Yes.  Around mid February.

Q. And were you contacted by Mr. Jackson?

A. Correct.

Q. And did you review the complaint in this case?

A. No.

Q. Did he tell you what the case was about when he contacted you?

A. He told me spinal cord infarction after an aortic dissection surgery.

Q. Okay.  And, again, we've -- we've already figured out that you're not going to be offering any standard of care opinions in this case; is that correct?

A. That's correct.

Q. And were you asked by Mr. Governor {sic} to comment on causation related to the spinal infarct when he first contacted you?

A. Correct.

Q. And, so, your opinions in this case on



Page 53

causation and damages are limited to the spinal infarct; is that correct?

A.  That's correct.

Q.  Okay.  And just bear with me for a moment. I'm looking through some notes.

So the one article, I don't know if you have that in front of you, that was just provided yesterday?

A.  No, I don't have it.

Q.  Okay.  I can try to pull it up and share screen, but I don't know that that will be necessary.

This was an article that was published by the Society of Thoracic Surgeons.  Do you recall that?

A.  I review a lot of articles on a daily basis, but I don't remember this exactly.

Q.  Okay.  Assuming it was published by the Society of Thoracic Surgeons, you're not a member of that society, correct?

A.  No.

Q.  So it states here in patients with operated type A aortic dissection, irreversible spinal cord injury may result from several factors; prolonged circulatory arrest, extension of


MAGNA
LEGAL SERVICES

Page 54

replacement, and hypoperfusion of segmental arteries, secondary to the aortic false lumen thrombosis.

Do you agree with that statement, Doctor?

A.   Again, I can just provide opinions on -- on neurosurgical opinions.  I can't provide anything about aortic dissection and how aortic dissection causes the spinal cord infarction.  I can just provide that there is now spinal cord infarction; how we can manage that.

Q.   Okay.  Do you -- or if it's beyond your area of expertise, let me know, but do you agree that spinal cord infarction is a known and recognized complication of a type A aortic dissection?

A.   Yes.

MR. JACKSON:  Objection.

You can respond.

BY MS. STURTZ:

Q.   Yes, you agree?

A.   I -- I agree that spinal cord infarction is a widely known risk for aortic dissection.

Q.   And do you agree in this case that the spinal



MAGNA
LEGAL SERVICES

Page 61

was a complication of the surgery for the acute type A aortic dissection, correct?

MR. JACKSON:  Objection.

You may respond.

THE WITNESS:  That's -- that's -- that's -- that's -- that happened during the postoperative care.  Postoperative care is part of the -- of the surgery, in general. So if -- if that's what you mean, then yes.

BY MS. STURTZ:

Q.  Okay.  And I mean that in this case the spinal cord infarction is a -- was a complication of the aortic dissection and surgical repair that was detected during the ICU care, correct?

A.  That's correct.

Q.  The article that you sent has a sentence that says the patient underwent an emergency operation through a full sternotomy.

The -- do you agree the surgery in this case was an emergency operation through a full sternotomy?

A.  Again, I can't comment about any approach of other specialities.  All -- all -- my only knowledge is the spinal cord infarction and



Page 67

aortic dissection.

Q. So the article that you sent called Delayed Onset Postoperative Paraplegia in Acute Type A Aortic Dissection, why did you believe that this opinion -- this article supports your opinion?

A. No.  It was -- one of the deposition that I reviewed was for the ICU doctor, and he said that aortic -- sorry.

That spinal cord infarction does not happen with type A aortic dissection.  So that -- that's why this article is there.

Q. Did he say that infarction did not occur, or that they typically do not use a lumbar drain for type A aortic dissection?

A. No.  He said it's unusual to have a type A dissection with a spinal cord infarction. That's what I --

Q. Do you have --

A. -- remember.

Q. Do you have -- do you have an opinion as to whether a spinal infarct is more or less -- with a complication rate -- strike that.

Do you have an opinion as to whether the complication rate of a spinal



Page 69

A.    It's a lumbar drain.

Q.    Okay.  So, again, whether in lumbar --
whether the standard of care required the use
of a lumbar drain in this case, is that
something you're going to be testifying to?
Correct?

A.    Standard of -- standard of care -- I'm
only -- asked by Mr. Jackson to provide an
opinion on causation only.

Q.    Correct.

So you're not going to testify at
trial that the standard of care required the
use of a lumbar drain.  Your opinion at trial
is going to be limited to that a lumbar drain
may have provided some benefit in terms of
the residual effects of the spinal infarct,
correct?

MR. JACKSON:  Objection.

You may respond.

THE WITNESS:  That's up to the
moment now.  If I'm asked by the counsel
later on to provide an opinion about standard
of care, I can.

BY MS. STURTZ:

Q.    Yeah.  It doesn't really work that way.  You



Page 71

reasonable degree of probability, that the placement of a lumbar drain would have prevented any residual deficit from the spinal cord infarct, correct?

MR. JACKSON:  Objection.

You may respond.

THE WITNESS:  To the degree of medical certainty, more likely than not it would have prevented.

BY MS. STURTZ:

Q.  And what are you -- well, let me -- let me back up for one second.

The article that you provided, they placed a drain, correct?

A.  Correct.

Q.  And after four days, there was no improvement in the incomplete paraplegia for that patient, correct?

A.  He -- he -- so the -- the -- the -- the placement of a lumbar drain and the outcome -- some -- it's like any surgery; some people do improve, some people partially improve, some people totally recover.

Q.  Okay.

A.  In this article, they partially im--- they


MAGNA
LEGAL SERVICES

Page 76

MR. JACKSON: Objection.

You may respond.

THE WITNESS: Not true. That's not true. So the -- the -- the hole of the lumbar drain is to increase what we call the spinal perfusion pressure; increase the blood flow to the spinal cord.

And how you can reach that by decreasing the pressure inside the spinal cord; how you can do that by inserting the lumbar drain.

So inserting a lumbar drain will enhance the -- what we call is the spine perfusion pressure; the blood reaching all the tissue inside Mr. Welch's spinal cord.

And if we would have done that, I would think that to a medical -- to a reasonable degree of medical certainty, more likely than not, that he might have a complete resolution of his symptoms.

Given all the --

BY MS. STURTZ:

Q. He might have had no resolution of his symptoms, correct?

MR. JACKSON: Object to form.



DEFENDANTS' MOTION EXHIBIT E PAGE 23

Page 80

cord injuries.  And those are managed the same way as aortic dissection.  That's now.

Before I join Insight, I did place one time, I -- I think, in -- as an attending, and the few times as a resident a drain for a aortic dissection specifically.

However, lumbar drain in general -- placement of a lumbar drain in general, whether after aortic dissection or no, this is a very common procedure that's done on a weekly basis for neurosurgeons.

Q.  Okay.  So are you, as a neurosurgeon, the one who actually places in the lumbar drain, or is that done by a different specialist?

A.  Usually it's either the neurosurgeon himself or an interventional neurologist, who is trained to do that kind of procedure.

Q.  Okay.  And, so, at your current position at Insight where you have been since 2021, you have never placed a lumbar drain in a patient who suffered an aortic dissection and had surgical repair; is that correct?

A.  Not at this hospital because this specific hospital we don't have a cardiothoracic surgeon.



DEFENDANTS' MOTION EXHIBIT E PAGE 24

Page 81

Q.    Okay.  And when you had your position in Lafayette from 2020 to 2021, you did not place a lumbar drain in any patient who suffered a type A aortic dissection and surgical repair, correct?

A.    I did for one.

Q.    You earlier said you did for one, you thought, back to -- at the time of your residency.

A.    That's not true.  I said -- you can go to my deposition writing.  I said one earlier on before Insight, and a few in the residency.

Q.    Okay.  So one time when you were in Lafayette you placed a lumbar drain in a patient who had suffered a type A aortic dissection and had surgical repair for that --

A.    Correct.

Q.    -- correct?

      And was that -- what was the -- the reason for the placement of the drain?

A.    Spinal cord infarction.

Q.    And what was the outcome of the -- did the patient have any residual neurologic deficits after --

A.    Yes.  He --


MAGNA
LEGAL SERVICES

DEFENDANTS' MOTION EXHIBIT E PAGE 25

Page 82

Q.   Did the patient survive the surgery and postoperative time period?

A.   Yes, he did.  And he had a partial improvement, not full improvement; that specific patient.  I think he went from power one and two to three or four.  I don't remember exactly.

Q.   What does power one and power three to four mean?  Does that -- on the out-of-five scale?

A.   Yes.

Q.   Okay.  And, in this case, what was Mr. Welch's --

Was it the left side of the lower extremity weakness that he had on June 17th?

A.   What I remember -- the notes are different, right?  Some people run the power one, some people run the power two, but, to my knowledge, what I remember, it was weaker on the left side.  He had weakness on the right as well, but the left was more dense.

Q.   Okay.

A.   I recall some of them calling it zero out of five and some of them called it one out of five.

Q.   And what was it by the time he left MedStar



Page 97

you say, Hello, Dr. Elakil, you're the neurosurgeon.  The patient has spinal cord infarction.  What's the MAP?

Then I will tell you, I want the MAP in the 85 to 90 --

BY MS. STURTZ:

Q.   And --

A.   -- which is high.

Q.   Okay.  And do you have any understanding as to what risk there would be to Mr. Welch of having a MAP of 85 to 90 -- let's start first within the first three days postoperatively.

A.   That's a great question.

So let's say the cardiothoracic tells me it's pretty high risk to have a very high MAP.  Then I will be, That's okay.  The lumbar drain -- we can really decrease the intraspinal pressure from the lumbar drain and increase the spinal perfusion of pressure with the current -- with that specific MAP that you want.

But the spinal perfusion pressure should be very high at all times regardless, and there's many ways to do so.

Q.   Okay.  So it's --



Page 108

manage a spinal cord infarction without increasing the intraspinal perfusion pressure.  That would be a death sentence to the patient ability to walk.

Q.  Okay.  And same question with the MAP scores and goals.  Ask the cardiothoracic surgeon as to what the risks are for the repair, correct?

A.  That's correct.

Q.  All right.  Then I think the next thing you mentioned is enhanced oxygen delivery to spinal cord.  What did you mean by that?

A.  That's the spinal perfusion pressure.  So spinal perfusion pressure is how much oxygen -- a simple way, that's how much oxygen blood flow delivery you're doing the nerve tissue in the spinal cord.  And that's what we mean by the spinal perfusion pressure.

Q.  Okay.  So it's not -- it's not some other intervention; that's what the result would be of increasing the spinal fluid?

A.  Intervention is large volume resuscitation and lumbar drain.  Those are your main interventions.



Page 112

Q.   -- an infarct?

A.   It helps decreasing the risk of future infarcts.  All of this, managing the blood pressure and the future -- managing the -- the -- the different lifestyle, that all helps in the future.

Q.   How about antiplatelet medication?

A.   Which is the aspirin.  It does help with his brain infarct from having another infarct -- preventing him from having another infarct.

Q.   Okay.  In your report, you reference a couple times in the history section of the case summary that an MRI was -- was deemed to be unsafe.

        So, again, it -- you're not testifying as the standard of care as to whether an MRI was safe or unsafe to do on a certain day, correct?

A.   No.  I don't know what was situation.

Q.   Okay.

A.   That's what I saw in the records.

Q.   Okay.  So you stated in your report -- you refer to the patient's current severe outcome of lower extremity weakness, bowel and bladder dysfunction, but you don't -- you're



Page 113

not -- you haven't reviewed any medical records to know whether he currently has bowel and bladder dysfunction, correct?

A.  If he's currently.  You're saying like at this time, no.

Q.  When you wrote that in your report, were you referring to bowel and bladder dysfunction while he was a patient at MedStar Washington Hospital Center?

A.  The records that Mr. Jackson sent to me.

Q.  Which are the -- the ones from June of 2022?

A.  Yes.

Q.  So in terms of whether he had some --

You don't, sitting here today -- know what extent, if any, he has lower extremity weakness here today in 2024, correct?

A.  No, I do not examine him.

Q.  So if, hypothetically, Mr. -- if, hypothetically, Mr. Welch had been diagnosed with this spinal infarct on June 17th rather than on June 22nd, do you agree that he was likely to have some def--- residual deficits from that infarct?

A.  So as I say, the studies in the literature,


MAGNA
LEGAL SERVICES

Page 117

that, what happens complete resolution of symptoms or partial improvement.

For all these articles in the literature I base my opinion, and the facts present for that patient, medical records, to have that opinion for you.

Q. Okay. So your opinion is he would have -- with different interventions had either partial or complete resolution of deficits related to the spinal cord infarction?

A. Correct.

Q. And you can't say whether it would have been partial or complete, one or the other?

A. I can't.

Q. And sitting here today, you don't know whether or not he had partial or complete resolution of his lower extremity weakness, correct?

MR. JACKSON: Objection.

You may respond.

THE WITNESS: From the deposition he say. I don't -- I don't -- I don't really recall how much improvement he had after all these years. It's really hard to say without a medical assessment, medical examination.



Page 118

All I can tell you that if -- if that lumbar drain and volume resuscitations would have done, he would have improved more than what he is now.

BY MS. STURTZ:

Q.  What the -- my -- my question is:  You don't know --

A.  I don't know.

Q.  You haven't seen any -- any physical examinations of him since 2022, correct?

A.  That's correct.  From a medical provider.

Q.  You're not a vocational expert, correct?  And you won't be offering any opinions as to whether or not Mr. Welch can work, correct?

A.  I can provide an opinion from the neurology point of view whether he can work or not if I can examine him.

Q.  But sitting here today --

But you don't have any expertise in vocational rehabilitation, correct?

A.  In what?

Q.  Vocational rehabilitation.  Do you know what that is?

A.  Vocational?

Q.  Vocational.


MAGNA
LEGAL SERVICES

Page 128

percentages.

Let me be -- let me lay the foundation. Would putting a percentage on it, in your view, be giving him a disability rating? Because that's not what I'm asking you to do.

A. Yeah. That -- that -- that -- I would need an actual examination, that's correct.

Q. Okay. Okay. So -- but other than a disability rating, the only way you could quantify it to his -- the -- the -- his potential for recovery would be complete or partial from the way that he was when the stroke was discovered; is that accurate?

A. Correct. Without examining the patient myself.

Q. Okay. Just a few more questions, Doctor.

Based on the detection of the infarct on June 17th for Mr. Welch and it being postop from the dissection, at this point, would you defer to your treatment of -- management of the infarct, would you defer to a cardiothoracic surgeon in his case?

A. No. It's a neurosurgical problem. So spinal

