# EXHIBIT H

**DEFENDANTS' MOTION EXHIBIT H PAGE 1**

Page 1

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
CIVIL DIVISION

- - -

SHANA HARGROVE              : CIVIL ACTION
                           :NO: 1:23-cv-3381
AS POWER OF ATTORNEY       :
FOR KEVIN WELCH,           :
     Plaintiff,            :
                           :
vs.                        :
                           :
MEDSTAR WASHINGTON         :
HOSPITAL CENTER, ET AL.,   :
     Defendants.           :

- - -

WEDNESDAY, JUNE 12, 2024

- - -

Oral deposition of RICHARD S. KAPLAN, M.D., taken pursuant to Notice, was held via video conference, commencing at 10:03 a.m., on the above date, before JACOB DAGENAIS, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
(866) 624 6221



Page 64

Q.   I take it you did not go to his home?

A.   Correct.

Q.   You didn't do any sort of home evaluation?

A.   I did not.

Q.   Did you videotape the call at all?

A.   I'm sorry.  What's the question?

Q.   Did you videotape the call?

A.   I did not.

Q.   Did you take any photographs or still shots?

A.   I did not.

Q.   Did you ask him to get up and walk around?

A.   I did not.

Q.   Well, it says "During the telemedicine visit, Mr. Welch appeared to have gait within normal limits."

A.   I'm -- I'm sorry.  I'm sorry. Yes, he did briefly walk around the -- the room for that -- for that purpose, as



Page 65

could be accomplished via the -- the video.

        Q.    So did you ask him to do that?

        A.    Yes, I did.  Yes.

        Q.    And your conclusion was that he appeared to have a gait within normal limits of at least for short distances within the room.

        A.    Correct.

        Q.    And what, exactly, did he do -- just walk in a circle in the room?

        A.    Correct.

        Q.    What room was it?

        A.    I don't know which room it was.

        Q.    You don't know if it was his bedroom or his living room?

        A.    It didn't seem pertinent.  I don't know for sure.

        Q.    Did you ask him to do anything else, other than to walk around the room?

        A.    No.



Page 107

A.    I don't know exactly, no.

Q.    And you don't know what percentage of patients who've suffered a type A aortic dissection have the sequelae of strokes.  Correct?

A.    I don't know.

Q.    Did you observe any coordination deficits when you saw him in March of 2024?

A.    I did not.  And again, I think with -- nor would I expect to.  One of the reasons why I requested to do or advised that I think an in-person exam is needed is because the nature of the -- of the neurological deficits in this case are such that it would be difficult to detect over telemedicine.

Q.    But over the telemedicine, you didn't observe any facial or coordination deficits?

A.    Correct.

Q.    And have you scheduled this in-person examination of him?

A.    I discussed it with Counsel



Page 108

and I believe he's -- he's trying to work it out with his client.  There's a question of whether the client can travel to me or whether I should travel to him. And that hasn't been determined.

Q.    Is the first time you discussed this with Plaintiff's Counsel today?

A.    No, it's in my report.

Q.    I know.  Other than the comment in your report -- let me -- I guess let me ask you this.

Between the date of your report and today, was there any discussion with Mr. Jackson about arranging this in-person assessment of Mr. Welch prior to today?

A.    No.

Q.    What time today did you and he discuss arranging for an in-person assessment of Mr. Welch?  The deposition started at ten o'clock.

A.    We had a number of calls an hour before the deposition.



Page 109

Q.    You had a call at nine o'clock today?

A.    We had two -- we had two different calls during the hour, two or maybe three calls in the hour before the deposition.

Q.    So you and he had two and three phone calls between 9 and 10 a.m. today, and that's when this was discussed for the first time since your report was prepared in March of 2024.  Correct?

A.    Yeah, but I don't have to say the first time.  My report is my communication with the attorneys.

Q.    But you didn't have any communication in between your report and 9 a.m. today about arranging for an in-person assessment of Mr. Welch. Correct?

A.    Correct.

Q.    And so was it sometime between 9 and 10 a.m. today that you reviewed the neuropsychological report from May of 2023?



DEFENDANTS' MOTION EXHIBIT H PAGE 7

Page 110

A.    Yes.

Q.    And you haven't spoken to those providers about Mr. Welch. Correct?

A.    Correct.

Q.    And you are not a neuropsychologist.  Correct?

A.    That's correct.

MS. STURTZ:  All right.  I, at this point in time, don't have any further questions.  I just am -- we are by agreement leaving this deposition open for me to depose you based on an examination if that happens and any supplemental reports.  And I will then, of course, request that the defense be given a period of time after that to respond to any supplemental opinions because I know our expert designation deadline is coming up.  So we'll just -- Governor Jackson and I will work that out, but we are leaving



DEFENDANTS' MOTION EXHIBIT H PAGE 8

Page 111

the deposition open.  And with that, I don't have any more questions at this time.

- - -

EXAMINATION

- - -

BY MR. JACKSON:

Q.    I just have a couple, Doctor.

Based on your review of Dr. Gorder's report, does that change any of the opinions that you've expressed today or in your report, your preliminary report?

A.    No.

Q.    You had mentioned the differential diagnosis of impairment as the methodology that you used in forming your opinions in this case.  Is that -- and your 30 years of experience and using it as a basis of it being commonly acceptable.

Do you have any other basis for knowing whether that methodology is generally acceptable in the medical

