IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| SHANA HARGROVE<br>AS POWER OF ATTORNEY<br>FOR KEVIN WELCH, | * | |
| | * | Civil Action No.:  1:23-cv-3381 (RJL) |
| Plaintiff, | * | |
| v. | * | |
| MEDSTAR WASHINGTON HOSPITAL<br>CENTER, *ET AL.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION IN LIMINE
TO EXCLUDE TESTIMONY OF PLAINTIFF'S PROPOSED EXPERT PETER
SCHULMAN M.D. REGARDING PROXIMATE CAUSATION AND DAMAGES**

Defendants, Washington Hospital Center Corporation d/b/a MedStar Washington Hospital

Center, Stephen Matthew Luczycki, M.D., Maxwell A. Hockstein, M.D., and Kaitlin Marie

Dunphy, M.D., collectively referred to as "Defendants"), by and through their undersigned

attorneys, Donna P. Sturtz and Nelson Mullins Riley & Scarborough L.L.P., submit this

Memorandum of Law in Support of Motion in Limine to Exclude Testimony of Plaintiffs'

Proposed Expert Peter Schulman M.D. on Proximate Causation and Damages[1] and state as follows:

I.     **INTRODUCTION**

---

[1] This is a dispositive Motion because without the requisite expert testimony, the Plaintiff cannot maintain a claim and summary judgment should be entered in favor of the Defendants. Because several experts are at issue, Defendants are filing these Motions in Limine to Exclude two experts, followed by a companion Motion for Summary Judgment incorporating these Motions.

On November 9, 2023, Plaintiff filed a Complaint against Defendants and then filed an Amended Complaint on December 22, 2023, withdrawing the Count II ("NIED") claim and replacing it with Count II - Violation of the D.C. Consumer Protections and Procedures Act Code 28-3905 ("CPPA"). By Memorandum Opinion dated June 28, 2024, Count II of the Amended Complaint was dismissed and thus the only claim remaining is a medical negligence claim (Count I) that arises out of emergency surgery performed to save Plaintiff's life after he suffered a Type A Aortic Dissection and was rushed to the hospital for surgery. Plaintiff alleges the standard of care required different action post-operatively by the critical care doctors in response to symptoms related to a cerebral stroke and spinal stroke caused by the Type A Aortic Dissection. Plaintiff suggests that earlier diagnosis and action related to the strokes may have lessened the Plaintiff's alleged residual neurological injury. Defendants deny the allegations on standard of care and on proximate causation maintaining that the care was reasonable and that any residual neurological injury was caused by the Type A Aortic Dissection and surgical repair and was not caused by any alleged breach in the standard of care. Per the Joint Rule 16.3 Statement filed on January 16, 2024 and Order dated February 6, 2024, discovery in this case closed on October 14, 2024.

Expert testimony is required in medical malpractice actions on both standard of care and proximate causation. In the Plaintiff's Expert Designation that is required by Federal Rule of Civil Procedure 26(a)(2), one of Plaintiff's experts, Dr. Peter Schulman, was *only* designated as a standard of care expert and in his report *only* offered standard of care opinions. Midway through his subsequent deposition, however, Dr. Schulman proposed some comments on causation and damages that were not disclosed in accordance with the rules and which nevertheless (1) lack the rigor required in neurology (of which he is not an expert) and (2) lack legitimate consideration of all the medical facts in this case related to the Plaintiff. This is the exact type of "opinion" that

Federal Rule of Evidence Rule 5-702 is meant to preclude. For these reasons, Defendants' Motion to Exclude Dr. Schulman's causation and damages opinions should be granted.

## II.    BACKGROUND

### A.  Statement of Facts

On June 13, 2022, Mr. Welch, while driving from Atlanta to Maryland, repeatedly consumed numerous energy drinks (espresso shot, Pepsi, 5-hour energy). (Medical Record of Kevin Welch at p. 4, collectively attached as Exhibit A). (Exhibit A at pp. 4, 82-83. Upon his return home, he felt a sudden sharp chest pain (described as 10/10), left leg pain and tingling and called for an ambulance. (Exhibit A at p. 4). The EMTs assessed his blood pressure at 164/107 (severe hypertension – high blood pressure) and he was given ASA 324 (aspirin). (Exhibit A at p. 4). Mr. Welch was taken to Southern Maryland Hospital where a chest CT scan was ordered revealing a Type A aortic dissection of 4.3 cm in diameter, with a Type A intramural hematoma (pooling of blood) ("Type A Aortic Dissection"). (Exhibit A at p. 4).

The aorta is the **largest** blood vessel in the body and it carries blood from the heart to the rest of the body. A Type A Aortic Dissection means the aorta **close to the heart (in the front of the chest)** has ripped open and it is a life-threatening medical emergency.[2] If the patient is fortunate enough to make it to the operating room (about half do not), the surgery required for survival is an **open-chest surgery** that includes circulatory arrest (i.e., the temporary draining of blood from the heart/aorta so the surgeon can operate in a bloodless field to do the repair) and cardiopulmonary

---

[2] There is a distinctly different dissection called a Type B aortic dissection (sometimes referred to as TBAD) which is a separation of the aorta *not* as near the heart but in the abdomen. Type B dissections sometimes do not require surgery but if surgery is done it is normally through a *vascular* procedure where a stent is placed in the area of the tear (referred to as a TEVAR procedure). There is an entirely separate set of practice guidelines for the management of a Type B dissection. Because of the location of a Type B dissection (closer to the spine v. Type A), spinal arteries can be compromised and surgeons sometimes use a spinal fluid drain as part of that procedure to reduce spinal swelling. *About Aortic Dissection*, INTERNATIONAL REGISTRY OF AORTIC DISSECTIONS: LIVING WITH AORTIC DISSECTION, https://livingwithdissection.iradonline.org/about-aortic-dissection/.

bypass (i.e., the use of a heart-lung machine). The injury with related surgery is high-risk with a significant mortality rate. In addition, the short and long-term complication rates are high for various complications including neurological injuries from different causes such as the extent of the aortic injury, the related hematoma, the required circulatory arrest during the surgery, anemia, unstable hemodynamics, strokes, etc.[3]

Mr. Welch urgently was transferred by air to MedStar Washington Hospital Center ("MWHC") for emergency surgery to save his life. (Exhibit A at pp. 4, 48-50). The pre-surgery consent form was signed by Mr. Welch and specifically lists the risks of the surgery, including bleeding, infection, stroke, heart attack/failure, and death. (Exhibit A at pp. 1-2). Surgery by Dr. Alassar (a cardiothoracic surgeon)[4] took place on June 14, 2022 (approximately 6 hours after the ambulance dispatch around 8:30 a.m.) including Type A Aortic Dissection repair, hemi-arch replacement, ascending aorta replacement, aortic valve resuspension and reconstruction of sinotubular junction. (Exhibit A at pp. 22-26).

After the surgery, Mr. Welch was transferred to the intensive care unit (ICU) where he was cared for by a variety of health care providers including critical care doctors: Dr. Stephen Luczycki (*from June 15-19*), Dr. Kaitlyn Dunphy (*a resident in training*) (*from June 15-17*) and Dr. Maxwell Hockstein (*from June 20-26*). The care of a patient following surgical repair of a Type A Aortic Dissection is complex because of the potential for many complications related to the pulmonary function (breathing), organ function, hemodynamics (including temperature and blood pressure), and neurological complications. In terms of the blood pressure, the cardiothoracic surgeon sets a

---

[3] *See* Santi Trimarchi, et al., *Contemporary results of surgery in acute type A aortic dissection: The International Registry of Acute Aortic Dissection experience*, THE JOURNAL OF THORACIC AND CARDIOVASCULAR SURGERY. https://www.jtcvs.org/article/S0022-5223(04)01321-2/fulltext.
[4] Cardiothoracic surgeons specialize in operating on the heart, its valves and structures and the veins and arteries close to the heart. It requires specialized training and a distinct board certification in thoracic surgery by the American Board of Thoracic Surgery. *See American Board of Thoracic Surgery*, *www.abts.org*.

blood pressure goal because if the blood pressure gets too high, it can negatively impact the surgical repair. The blood pressure goal for Mr. Welch post-operatively was set at MAP (mean arterial pressure) range of 70-90 (systolic BP <130). (Exhibit A at p. 58). Once farther out from surgery, this goal may be modified depending on the status of various factors such as bleeding, cardiac performance, etc. Despite this goal, over the following days, Mr. Welch (due to the complicated nature of his cardiac condition) had at times MAP levels *higher* than the goal (so the issue the providers were working on was *hyper*tension (too high) not hypotension (too low). (Exhibit A at pp. 59-81). Mr. Welch also was placed on numerous medications one of which was 81 mg of aspirin daily – to assist with potential clotting/strokes from the dissection and repair. (Exhibit A at p. 56).

After waking up from anesthesia and being removed from the ventilator, Mr. Welch was confused and restless (which is not uncommon). On June 15, 2022, he was examined by Dr. Luczycki (with Dr. Dunphy) and noted to be critically ill with high potential for acute decompensation (i.e., heart failure or respiratory failure). (Exhibit A at pp. 39A-C). On June 16, there was a noted concern for possible encephalopathy (post-surgical confusion) and a Glasgow Coma Score of 10 (scores the level of consciousness with a range from 1-15) ("GCS") (Exhibit A at p. 38). Other GCS that day were 13. Dr. Luczycki noted "no concern for stroke given non-focal exam." (Exhibit A at p. 38).

Sometime during the afternoon of June 16 or morning of the 17th, bilateral lower extremity weakness was noted (left worse than right). (Exhibit A at p. 4). Dr. Luczycki and Dr. Dunphy's progress note that day documented GCS of 13 and encephalopathy of "uncertain etiology" –and

consulted with neurology[5] and with Dr. Alassar (the cardiothoracic surgeon). (Exhibit A at pp. 34-35). The neurologist (Dr. Lin) assessed Mr. Welch and concluded that the likely etiology of the symptoms was thoracic and lower cervical strokes/infarcts related to a higher risk from recent cardiac surgery (and some contribution of sedation side effect). (Exhibit A at pp. 3-7). Dr. Lin's recommendations included a CT spine and head CT without contrast – "if shows signs of infarct, then order brain MRI without contrast." He also recommended MRI of cervical and thoracic spine without contrast. (Exhibit A at p. 6). Thus, even without imaging, the providers appreciated the likelihood of infarcts and continued the related ongoing medical management of aspirin, blood pressure management, stabilizing the patient's hemodynamics, etc. There were no changes to this medical management recommended by neurology. (Exhibit A at p. 6).

Unlike a CT Scan[6], to perform an MRI, the patient has to be <u>safe</u> for transport to a connected but separate building; <u>safe</u> to be only minimally monitored and to be able to lay flat and still for an extended time (i.e., *not* disoriented, *not* on high level nasal cannula for oxygen, *not* needing continuous infusion of BP medications, and *not* at risk for acute decompensation); and <u>safe</u> *without* epicardial lead wires still in place (lead wires remain in place due to hypertension and related medication that impacts the heart). (Deposition of Dr. Luczycki at p. 33:16-36:2, attached as Exhibit B: Exhibit A at p. 58A). Thus, the timing of MRI imaging requires an assessment of risks (of a patient at risk for acute decompensation) and benefits by the health care team.

On June 18, 2022, the head CT scan was performed in minutes (lasting from 1:48 a.m. to

---

[5] There are different areas and specialties in neurology, with vascular neurologists specializing in the treatment of strokes and obtaining board certification from the American Board of Psychiatry and Neurology – Vascular Neurology. *See, American Board of Psychiatry and Neurology,* www.apbn.org.

[6] CT Scan uses x-rays (and no tube to be lying inside of) where as an MRI uses radio waves and can detect different detail. The CT Scan is performed in just a few minutes whereas an MRI takes up to an hour or longer with the patient lying very still inside of a tube. Here, the CT Scan was interpreted as negative for an acute process. The Plaintiff is *not* alleging that the strokes developed after June 18, just that not reported on this CT imaging modality.

1:52 a.m.) showing "no *acute* intracranial pathology or traumatic injury." (Exhibit A at pp. 51-52). On June 18, 2022, Mr. Welch again was evaluated by the neurology team (Dr. Tulsi Shah and Dr. Brian Barry) who noted improvements in his neurological condition, noted the negative head CT and concluded "no indication or further head imaging at this time" but recommended a spinal MRI for possible spinal cord infarct. (Exhibit A at p. 46). No changes to medical management of critically ill patient were recommended by neurology.

On June 19-20, Mr. Welch's neurological assessments were improved: GCS 11-14s, and more alert and responsive. (Exhibit A at pp. 31). Dr. Luczycki noted on June 19, Mr. Welch was still confused but is now moving left lower extremity, the CT scan was negative, and that MRIs not done "for safety" and can be deferred for now given "much improved exam (Discussed with (DW) Dr. Alassar)." (Exhibit A at p. 31). Dr. Hockstein took over for Dr. Luczycki on June 20 and noted that the patient was encephalopathic, had reduced lower extremity strength and still had medical concerns including (among others) his respiratory status (still needing nasal cannula but lower level and resolving), hypertension (resolving with medication), and anemia. (Exhibit A at pp. 28-29). Because his blood pressure was better under control with medication and because his cardiac condition revealed normal sinus rhythm, the epicardial lead wires were removed on June 20 at 3:06 p.m. (Exhibit A at p. 27).

The MRIs took place on June 22 with imaging lasting *several hours* (from 1:17 a.m. to 3:58 a.m.) (Exhibit A at pp. 53-55). The brain MRI showed multiple infarcts in the brain and spine (with basal ganglia predominance) "consistent with cardioembolic etiology and hypoxic anoxic event." (Exhibit A at p. 55A). The spine MRIs initially did not show any infarct but "upon further review there is a DWI hypodensity of the cord at level T5 (*thoracic*) consistent with cord infarct." (Exhibit A at p. 55). A stroke consult on June 23, 2022, noted multiple cardio-embolic infarcts and

anoxic injury to basal ganglia with etiology secondary to aortic dissection and related repair ("multiple strokes in vascular territories related to dissection"). (Exhibit A at pp. 8, 10).

The neurologist noted plan of care recommended continuing Antiplatelet ASA 81 mg daily (i.e., aspirin), continuing monitoring of his blood pressure[7], and participation in physical therapy consultation – all of which were being done from the inception of the ICU admission. (Exhibit A at p. 10). Thus, while the MRI imaging provided **diagnostic confirmation**, there was no correlated change in his treatment plan because the treatment he could receive in these circumstances **was already being done** between June 14-23, 2022. Mr. Welch, because of his Type A Aortic Dissection and surgical repair was not a candidate, <u>at any point after surgery</u> for interventional treatment of thrombolytic therapy (called tPA which is a tissue activator administered through the veins) or endovascular intervention (called EVT which is a surgical procedure sometimes done for an acute stroke).[8]

Mr. Welch improved, was transferred out of ICU on June 26 and was discharged on July 8. (Exhibit A at p. 14). A neurological assessment described him as GCS 14 and reduced movement of lower extremities (4/5 on right and 2/5 on left). (Exhibit A at p. 19). Mr. Welch was discharged on July 8, 2022, to MedStar Rehabilitation Hospital for multiple comorbidities where he remained until mid-September, 2022. At discharge, he was noted as having significant improvement in bilateral lower extremity motor strength but in need of continued home physical and occupational therapy. (Exhibit A at p. 14).

Regarding his lower extremity weakness (4/5 right leg and 2/5 left leg at discharge from MWHC), this improved to 5/5, normal. A Physical Medicine & Rehab Office note from January

---

[7] Note because this was now 8 days from surgery – the blood pressure goal range was widened to MAP 70-110 depending on the continued monitoring of bleeding levels (i.e., anemia) and cardiac performance. (Exhibit A at p. 57)
[8] Mr. Welch also was not prescribed any medications such as statin medication or anticoagulation medication (not indicated because of the risk of bleeding after this surgery).

23, 2023, noted Mr. Welch as ambulating without a walker; bilateral upper extremity strength 5/5 and bilateral lower extremity strength 4 to 5/5. (Exhibit A at p. 86). Mr. Welch was noted as independent with activities of daily living and ambulation. (Exhibit A at p. 87). An office visit with primary care in February 2023 revealed reports of no limb weakness ("all extremities move well with full range of motion and strength, no tenderness and no swelling" and alert and oriented/no focal deficits – "strength and sensation are intact without any focal deficits."). (Exhibit A at pp. 90-90A). During office visits with providers between August 2023 and December 2023, Mr. Welch's physical examinations noted that all extremities move well with <u>full range of motion and strength</u> and <u>no focal motor deficits</u>. (Exhibit A at pp. 93-94). Per the medical records, a physical neurological examination of Mr. Welch in August 2024 showed <u>lower extremity strength of 5/5</u>, no gait abnormality, no walking assistive devices, and able to independently perform all of his activities of mobility and daily living. (Exhibit A at pp. 95-96, 98) (no gait abnormality observed). Although mentioned by Plaintiff in some pleadings and reports, Mr. Welch does *not* suffer from any bowel and bladder dysfunction. (Exhibit A at p. 98).

Regarding his cognitive and mental status, Mr. Welch unfortunately does suffer from residual deficits from this medical emergency. A neuropsychologist (Dr. Gorter) diagnosed him with a cognitive disorder stemming from the cerebral strokes caused by the Type A dissection and repair (with attention and processing speed deficits and occasional visual-perceptual/decreased balance issues from the cerebral infarcts and/or cardiac disease with related medications) and a primary behavioral pattern of apathy. (Exhibit A at pp. 91, 97). Mr. Welch performs his own activities of daily living, but he has not returned to work since the Type A Aortic Dissection and does not drive a car (pending a driving assessment not yet obtained). (Exhibit A at p. 98-99). Per an office note of Dr. Gorter on February 20, 2024, Mr. Welch plans to return to work at the National

Geospacial Agency, initially part-time in 2024, but the records also indicate he plans to explore government medical retirement and apply for permanent disability. (Exhibit A at pp. 91, 100). He has undergone counseling with Dr. Gorter since 2022 but plans to stop counseling in the Fall of 2024. (Exhibit A at p. 100). Mr. Welch will be started on a neuro-stimulant medication (methylphenidate) to assist with attention deficit and his apathy, planning to start this after his return from a trip to Europe in the Fall of 2024. (Exhibit A at p. 96).

Regarding his cardiac condition, Mr. Welch's current care providers include vascular, nephrology, cardiology, and primary care. Mr. Welch requires these providers because of the Type A Aortic Dissection and surgical repair which necessitates ongoing treatment of hypertension, chronic kidney disease (stage IIIB), anemia, and coronary artery disease. His current medications include losartan, aspirin, atorvastatin, clonidine, ergocalciferol, folic acid, hydralazine, lipitor, and labetalol – all of which are related to his cardiac disease. (Exhibit A at p. 96).

B.  What this case does **not** contend and Plaintiff's Own Neurology Expert

There is *no* dispute in this case that Mr. Welch suffered a Type A Aortic Dissection and required life-saving emergency surgery. There is *no* dispute that a high percentage of patients who suffer this event do not survive or survive with residual deficits. There is *no* dispute that the strokes he suffered were caused by that injury and related surgical repair. **There is *no* allegation that the providers somehow could have prevented the strokes themselves.** Finally, there is *no* dispute that Mr. Welch was *not* a candidate for interventional treatment of the strokes with thrombolytic therapy or endovascular intervention and that is why there was no change to his treatment plan after the MRIs were safely completed.

In fact, Plaintiff designated a neurologist/stroke doctor (board certified by the American Board of Psychiatry and Neurology), Dr. Roland Hamilton ("Dr. Hamilton") from Atlanta,

Georgia. (Deposition of Dr. Hamilton at p. 6:15-23, attached as Exhibit C. Tellingly, Dr. Hamilton is *not* offering any standard of care opinions about any providers in this case (including the neurologists who were consulted repeatedly before and after the MRIs were safely completed). Dr. Hamilton *agrees* that the strokes were caused by the Type A Aortic Dissection and repair. (Exhibit C (Hamilton Depo.) at p.13:14-17; p. 14:8-18; p. 45:3-6; p. 60:9-14). Finally, Dr. Hamilton is *not offering an opinion* that some different type of medical intervention would have prevented or altered the cerebral strokes or the spinal stroke. (Exhibit C (Hamilton Depo.) at p. 13:14-17; 15:8-17).[9] He *agrees* (as do all experts and providers in the case) that Mr. Welch at *no point* was a candidate for interventional stroke treatment at any time after the surgery:

> Q: Do you agree that Mr. Welch was not a candidate for thrombolytic therapy or endovascular intervention, correct?
>
> A: That is correct.
>
> Q: At any point in time following the surgery, correct?
>
> A: That is correct.

(Exhibit C (Hamilton Depo.) at p. 33:12-18).

    C.  <u>Dr. Peter Schulman</u>

Saddled with these facts and with this testimony of Plaintiff's own stroke neurology expert, Plaintiff is left grasping for straws in a desperate attempt to maintain a case, alleging that a "delay" in confirming the strokes with imaging *may* have impacted his outcome. For the requisite expert testimony, Plaintiff pivots to Dr. Schulman, a critical care doctor who practices in Oregon, on standard of care. Per Dr. Schulman, the Defendants should have performed imaging sooner on June 17, 2022, and on June 17-18, 2022, should have talked to the cardiothoracic surgeon or neurologist for "consideration of a spinal drain placement" and/or consideration of a "higher blood

---

[9] Dr Hamilton limits his opinions <u>to damages</u> stating only that the strokes are permanent and that those strokes could lead to residual deficits by their nature. Dr. Hamilton, however, did not even bother to review any medical records after June 2022 to gain an understanding of his current condition/deficits, (Exhibit C (Hamilton Depo.) at p. 23:8-15).

pressure goal." (Exhibit D Schulman Report; Expert Designation of Dr. Schulman attached as Exhibit F at pp. 20-21; Deposition of Dr. Schulman at p. 8: 2-10 attached as Exhibit H).  He did not do any research that he used to form any of his opinions in this case. (Exhibit H (Schulman Depo.) at p. 101:18-102:4). In some notes he produced, Dr. Schulman references 5 articles (mostly provided to him by Plaintiff's counsel) that he did **not review prior to his report** and that he did **not use in forming his opinions in this case.** (Exhibit H (Schulman Depo. at p. 101:12-102:18):

A) *Rates of Spinal Cord Infarction After Repair of Aortic Aneurysm or Dissection* – Dr. Schulman made note of this article for the undisputed concept that a patient can suffer a rare complication of a spinal infarct after an aortic dissection. If anything, this article undermines his standard of care opinion because it suggests no set standard for addressing such a complication;

B) *Three Cases of Newly Developed Paraplegia After Repairing Type A Acute Aortic* Dissection – this case study of only 3 people relates to the undisputed concept that a patient can suffer paraplegia after a Type A aortic dissection. If anything, this article undermines the standard of care opinion and regardless, in this case, Mr. Welch does *not* have paraplegia;

C)  *Spinal Cord Ischemia Secondary to Aortic Dissection* – this neurology article supports the undisputed concept that a spinal infarction is rare and the causes for it and outcomes vary. Because he is not a thoracic surgeon and apparently only read the conclusion, he did not realize that the article references use of a lumbar drain in *thoracic* (from the side) or *endovascular* (i.e., in the vein) procedures when this case involves an open *sternotomy* (front of the chest) Type A surgery. In any event, here Mr. Welch's leg weakness resolved and he does *not* have paraplegia;

D) Delayed *Onset Postoperative Paraplegia in Acute Type A Aortic Dissection* – this article also was cited by Dr. Elakil (spine surgeon) and proposes the undisputed point that, though rare, a spinal infarct can occur after a Type A Aortic Dissection. This article also discusses the use of a lumbar drain in one patient that had only a "*partial benefit*" of leg paralysis *so, if anything, this article contradicts any bald assertion that a drain placement would have fully resolved Mr. Welch's leg weakness, and regardless his leg weakness totally resolved without the use of a spinal drain*);

E) *2022 ACC Guideline for Diagnosis and Management of Aortic Disease* – This practice guideline (also cited by Dr. Elakil) includes a section on Type A Aortic Dissection supporting the concept of the emergency nature of this injury and the likelihood of residual deficits even with surgical repair. This is a guideline that would apply to cardiothoracic surgical standard of care for surgical management which is not at issue here and is outside Dr. Schulman's area of expertise. Highlighting this fact is Dr.

> Schulman's reference in a note to page e395 of this surgical standard which is for *thoracoabdominal aortic aneurysms* (not even the section on acute dissections) which is *not what this case* is even about and is *not* the correct portion of this guideline (starts at e407 – acute Type A aortic dissection). (Articles collectively attached as Exhibit I).

Dr. Schulman defers to a cardiothoracic surgeon in terms of the surgical management of this patient. Exhibit H (Schulman Depo.) at p. 25:6-9). Consistent with his designation and report, he does not have any opinion, to a reasonable degree of probability, that there was a breach in the standard of care prior to June 17, 2022 **or** after June 18, 2022. (Exhibit F at p. 20-21; Exhibit D at p. 7-8; Exhibit H (Schulman Depo.) at p. 50:18-51:5; 55:15-21; 60:14-61:1; 93:14-94:6).

Federal Rule 26(a)(2) governs the disclosure of expert testimony and subsection (B) identifies witnesses who must provide a report, stating that the report must include the "statement of **all** opinions the witness will express at trial" and must be prepared by and signed by the retained expert witness. (emphasis added) Fed. Rule Civ. P. 26(a)(2)(B). When a party fails to provide information or identify an expert's full opinions in compliance with Rule 26(a)(2), the court has wide discretion to strike or exclude testimony that did not comply with Rule 26. *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008) (citing Fed. R. Civ. P. 37(c)(1)); *see Hancock v. Wash. Hosp. Ctr.*, 13 F. Supp. 3d 1, 12 (D.D.C. 2014) (this Court held that proposed medical expert testimony on causation was properly excluded for failure to comply with Rule 26); *see also Blaes v. Johnson & Johnson*, 2016 WL 543163 (E.D. MO. 2016) (Court struck medical expert testimony regarding causation opinion not disclosed in accordance with Rule 26, reasoning that the defendants were prejudiced at the deposition because they were unaware of the extent or specifics of such a causation opinion prior to the deposition). Specifically, Federal Rule of Civil Procedure 37 directs that the district court may exclude the information or testimony unless the party's failure to comply "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). This Court has

noted that "[c]ourts routinely strike experts or expert reports that fail to comply with court discovery deadlines." *Grimes v. District of Columbia*, 308 F. Supp. 3d 93, 105 (D.D.C. 2018).

In this case: (1) Plaintiff's Expert Designation **only identifies** Dr. Schulman as a standard of care expert (Exhibit F); and (2) Dr. Schulman's Federal Rule 26 report dated February 17, 2024, includes **no causation opinion whatsoever**. (Exhibit D (Schulman Report) at p. 7-8). Several months later, Dr. Roland Hamilton (Plaintiff neurologist) was deposed (May 17, 2024) and failed to provide the requisite proximate causation opinion, instead limiting his opinion to damages only (i.e., the strokes are permanent and can cause neurological deficits (though to what extent here he does not know) *but no* opinion that some action by the providers could have prevented or altered the strokes)   (Exhibit C (Hamilton Depo.) at p. 13:14-17; 15:8-17). Next, Dr. Ahmad Elakil (Plaintiff spine surgeon) was deposed on May 29, 2024, and he too failed to provide an adequate proximate causation opinion, falling woefully short on qualifications and methodology. (Exhibit E (Elakil Depo.) at p. 52:16-53:3; 17:7-14). Several weeks later, Dr. Schulman then was deposed on June 6, 2024, and, clearly sensing the gaping flaws in Plaintiff's case, meekly dabbled with expanding his Expert Designation and his Rule 26 report into causation by making a few causation-like comments that *are immediately* tethered to deference to stroke neurology (which is *not* his expertise).

At his deposition, Dr. Schulman reiterated that his opinion on standard of care is limited to June 17-18, 2022, but after that there is a "bit of a slippery slope" so I am "hedging a little bit" and "I do not know after that if anything "could have been done to prevent" his complications.[10] (Exhibit H (Schulman Depo.) at p. 50:9-52:13). On causation, Dr. Schulman then testified as follows:

---

[10] For this reason, Defendants will be filing a Motion to Summary Judgment on any claim related to Dr. Hockstein who is a named Defendant but was not involved in the medical care until June 20, 2022.

Q:        …Are you going to testify that the breach in the standard of care that you identify caused injury to Mr. Welch or are you unable to state that to a reasonable degree of probability?

A:        I guess I feel that it likely did **but I would largely defer to a neurologist**.

(Exhibit H (Schulman Depo.) at p. 54:13-55:1) (emphasis added).  So, Dr. Schulman did not

include causation opinions in his report and then at deposition **defers to neurology** – something

he is not an expert in.  Dr, Schulman did not review any medical records after 2022 so has no

knowledge of Mr. Welch's condition after June 2022 because he only really reviewed the "ICU

care at the time." (Exhibit H (Schulman Depo.) at p. 83:19-84:10; 86:5-9) ("I paid less attention to

the subsequent care that Mr. Welch would have received after he left the ICU [June 26] because

that is not really directly pertinent to my expertise" and "my expertise is to testify on the care that

Mr. Welch received in the–during his time in the ICU" and I was just "asked to opine on the

standard of care he received in the ICU"). He is not going to testify about Mr. Welch's current

condition and does not know what it is. (Exhibit H (Schulman Depo.) at p. 85:19-86:1). As for

potential treatments for a stroke, Dr. Schulman states that he **is not a neurologist** and *repeatedly*

states in his deposition that he defers to neurology.  (Exhibit H (Schulman Depo.) at p. 90:3-18;

92:6-12).

Putting aside for purposes of this Motion, the narrow allegations on the standard of care

**which Defendants deny**, any such proposed proximate causation opinion from Dr. Schulman

should be excluded because Plaintiff did not comply with Federal Rule report disclosure for

opinions beyond the standard of care on June 17 and 18, 2022 and Dr. Schulman is not qualified

to do so (and himself declares neurology to be outside the scope of his expertise and outside the

parameters of his expert review in this case). Additionally, Dr. Schulman has not and cannot meet

the standards required by *Daubert* and Federal Rule 702.

### III.    STATEMENT OF POINTS AND AUTHORITIES

### A.  <u>Choice of Law</u>

When federal courts sit pursuant to their diversity jurisdiction, they are "to apply state substantive law and federal procedural law." *Smith v. Summers*, 334 F. Supp. 3d 339, 342 (D.D.C. 2018) (citing *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). The Federal Rules of Evidence and Federal Rules of Civil Procedure are procedural law. *Smith*, 334 F. Supp. 3d at 341.[11]

### B.  <u>Proximate Causation</u>

In order to establish a *prima facie* case of medical negligence/malpractice, the plaintiff bears the burden of proving: (1) the standard of care; (2) that defendant/s deviated from the standard of care; (3) and that there is a causal relationship between this deviation and plaintiff's injury. *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1033 (D.C. 2015) (citing *Woldeamanuel v. Georgetown Univ. Hosp.*, 703 A.2d 1243, 1244 (D.C. 1997) (affirming grant of summary judgment for hospital because the only evidence presented by plaintiff on the standard of care and breach was prospective expert testimony that was merely conclusory in nature)). The third prong, causation, imposes upon plaintiffs the burden of proving that the health care provider's negligence was a proximate cause of the accident or injury. *See Derzavis v. Bepko*, 766 A.2d 514, 521 (D.C. 2000) (affirming judgment as a matter of law for doctor where the best evidence of causation was a temporal relationship between the alleged onset of pain and the alleged injury, but where plaintiff's expert could not explain at what point the injury took place or what the mechanism of the injury was).

To establish proximate cause in a medical malpractice case, the plaintiff must prove "a direct and substantial causal relationship between the defendant's breach of the standard of care

---

[11] Regardless, in *Motorola Inc. v. Murray*, 147 A.3d 751, 752 (D.C. 2016), the District of Columbia Court of Appeals adopted Fed. R. Evid. 702 and the *Daubert* standard.

and the plaintiff's injuries." *Grant v. American Nat'l Red Cross*, 745 A.2d 316, 319 (D.C. 2000).

Expert testimony is required in medical malpractice cases, and the evidence is sufficient to

establish proximate cause if the expert "states an opinion, based on a reasonable degree of medical

certainty, that the defendant's negligence is **more likely than anything else** to have been the cause

(or a cause) of the plaintiff's injuries." *Id.* (emphasis added); *see also Talley v. Varma*, 689 A.2d

547, 553 (D.C. 1997) ("Medical testimony as to the mere possibility of a causal relation . . . is not

sufficient"). In other words, the plaintiff "must introduce evidence which affords a reasonable

basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause

in fact." *Grant*, 745 A.2d at 319. To determine whether something is a cause in fact, D.C. courts

have adopted the "substantial factor test" – defendant's conduct must be a "substantial factor in

bringing about the harm." *District of Columbia v. Carlson*, 793 A.2d 1285, 1288 (2002); *see also*

Civil Jury Instructions for D.C. 9.10 (Professional Liability – Causation).

### C. <u>The Standard for Expert Testimony</u>

Under Federal Rule of Evidence 702, "trial courts are required to act as gatekeepers who

may only admit expert testimony if it is both relevant and reliable." *Heller v. District of Columbia*,

952 F. Supp. 2d 133, 139 (D.D.C. 2013) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

579, 589 (1993)). "[A]s the gatekeepers of expert testimony, courts must be careful to avoid the

potential pitfalls of junk science." *United States v. Bonner*, 648 F.3d 209, 215 (4th Cir. 2011). Rule

702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if the proponent demonstrates
> to the court that it is more likely than not that: (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to understand the evidence or to determine
> a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the
> product of reliable principles and methods; and (d) the expert's opinion reflects a reliable
> application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The current iteration of Rule 702 is the product of 2023 Amendments, which sought "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 (Notes of Advisory Committee on 2023 Amendments). The 2023 Amendments sought to address "incorrect" rulings that erroneously "held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." *Id.*

As an initial matter, the expert should be possessed of the requisite "knowledge, skill, experience, training or education" from which it can be assumed that the information imparted or the opinion rendered is reliable. *See* Fed. R. Evid. 702; *See Daubert,* 509 U.S. 579. The scope of the expert's testimony must be limited to his area of expertise. *See Arias v. DynCorp*, 928 F. Supp. 2d 10, 17 (D.D.C. 2013). "Merely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001). The proponent of a proposed expert may not simply recite the expert's degrees, they must go further and demonstrate how the expert's academic and professional experiences make the expert qualified to testify about the particular factual questions at issue. *See Arias* 928 F. Supp. 2d at 17. "Part of the court's gatekeeping function is to ensure that an expert witness is qualified to testify about each component of his testimony." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 1005 (4th Cir. 2020).

In addition, the proponent of the expert testimony bears the burden of establishing the admissibility of such testimony by a preponderance of the evidence. *Daubert,* 509 U.S. 592 n. 10. Because "[e]xpert evidence can be both powerful and quite misleading," a court has greater leeway in excluding expert testimony…than it does lay witness testimony. *Parsi v. Daioleslam*, 852 F.

Supp. 2d 82, 86 (D.D.C. 2012) (citing *Daubert*, 509 U.S. at 595). This Court has wide latitude in determining how to assess the reliability and relevance of the expert testimony at issue. *Kumho Tire Company, Ltd v. Carmichael*, 526 U.S. 137, 152-53 (1999).

A "reliable" expert opinion is one based on scientific, technical or other specialized knowledge, and not on belief or speculation. *Daubert,* 509 U.S. at 590. "The *sine qua non* of expert opinion testimony is that its basis be grounded in fact -- not conjecture." *Logsdon v. Baker*, 366 F. Supp. 332, 336 (D.D.C. 1973). Although reliability is generally indicated by testing, peer review, evaluation of rates of error and general acceptability, the evaluation is a "flexible one." *Daubert,* 509 U.S. at 594-595. At bottom, "the focus, of course, must be solely on principles and methodology, not on the conclusions they generate." *Daubert,* 509 U.S. at 595; *see Kumho Tire*, 526 U.S. at 158 (upholding the trial court's decision to exclude expert's opinion on the grounds that his methodology was unreliable); *Freeman v. Case Corp.*, 118 F.3d 1011, 1016 (4th Cir. 1997). Courts have noted that when a doctor's opinion "strays from" the doctor's "professional experience," the opinion is "less reliable, and more likely to be excluded under Rule 702." *Madej v. Maiden*, 951 F.3d 364, 376 (6th Cir. 2020) (quoting *Gass v. Marriott Hotel Servs.*, 558 F.3d 419, 428 (6th Cir. 2009)).

An expert's testimony is "relevant" where it is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *Daubert*, 509 U.S. at 591 (internal citations omitted). The trial judge must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Stryker Spine v. Biedermann Motech GmbH*, 684 F. Supp. 2d 68, 100 (D.D.C. 2010) (quoting *Daubert*, 509 U.S. at 592-93). In other words, an expert's testimony should be excluded where its proponent cannot demonstrate that the

evidence bears "a valid . . . connection to the pertinent inquiry." *Daubert,* 509 U.S. at 588. *See also General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (opining that an expert witness' testimony is irrelevant where "there is simply too great an analytic gap between the data and the opinion proffered.").

### IV.    ARGUMENT

**Dr. Schulman's Nondisclosed, Unqualified and Conclusory Statements on Proximate Causation and Damages Are Deficient and Inadmissible Under the Law and Should be Excluded Under Federal Rule of Evidence 702 and the Principles of _Daubert_.**

Dr. Schulman is not qualified to offer the opinions that he proposes to offer on proximate causation and damages in this case. In addition, his proffered expert testimony is not the product of reliable principles and methods and it does not reflect a reliable application of the principles and methods to the facts of this case. As a result, his purported opinions on causation and damages do not comply with the *Daubert* standards or Federal Rule of Evidence 702. Accordingly, his proffered testimony must be excluded.

**(a) Dr. Schulman's scientific, technical, or other specialized knowledge will not help the trier of fact to understand the evidence or to determine a fact in issue.**

Merely holding a medical degree does not make Dr. Schulman qualified to testify about everything within the broad field of medicine. Dr. Schulman is not qualified to testify about areas of medicine (i.e., vascular neurology) that lie outside of his area of expertise. Dr. Schulman repeatedly acknowledges that his expertise is limited to the care that Mr. Welch received in the ICU. (Exhibit H (Schulman Depo.) at p. 83:19-84:10; 86:5-9). This is precisely why his designation and report are limited to that issue only. Expansion beyond his expertise to causation and damages, that he himself qualifies with phrases like "I guess," "hedging," and "I defer to neurologists" should not be allowed.

Dr. Schulman is a critical care physician, he is not a thoracic surgeon or a stroke neurologist. (Exhibit F; Exhibit H (Schulman Depo.) at p. 8: 2-10). Dr. Schulman admits that on causation, he "would largely defer to a neurologist." (Exhibit H (Schulman Depo.) at p. 54:13-55:1). Dr. Schulman has never written any publications related to the diagnosis, treatment or sequalae of strokes and has not participated in any research in stroke studies. Strokes – regardless of location (spine or brain) are a vascular neurological issue and within the expertise of neurology – which is why neurologists repeatedly saw Mr. Welch during the care at issue in this case. The manner in which this unfolded (*not* designated as a causation expert; did *not* write a causation report; and *guessed/deferred* in his deposition), makes it readily apparent that Dr. Schulman is not comfortable with this area of testimony because <u>it is in fact outside his expertise and his role in this case</u>. In sum, Dr. Schulman is not qualified in training or in his experience to diagnose, treat, or evaluate the long-term sequalae of strokes or to compare the long-term sequalae of strokes in patients after an aortic dissection who did or did not have certain types of "intervention." Accordingly, Dr. Schulman lacks the requisite specialized knowledge to assist this Jury and to offer opinions on proximate causation and damages.

**(b) Dr. Schulman's testimony is not based on sufficient facts or data.**

Defendants maintain that Dr. Schulman is not qualified to render an opinion as to proximate causation and damages, but if deemed qualified, he most certainly must undertake an objective, reliable, and detailed methodology required to meet the *Daubert* standards. Here, however, Dr. Schulman has not even reviewed the necessary information to render an opinion on proximate causation and damages. Dr. Schulman only reviewed medical records from 2022 and even within that limited review ignored critical data that would be vital to any legitimate methodology for a proximate causation opinion (including, for example, critical data such as the actual blood

pressure/MAP levels that were higher, *not* lower than the goal, precluding a legitimate consideration of how a "higher goal" would lead to the requisite proximate causation). Because Dr. Schulman did not review any medical records for after 2022 (Exhibit H (Schulman Depo.) at p. 83:19-84:10; 86:5-9), Dr. Schulman does not even know what Mr. Welch's current condition is. (Exhibit H (Schulman Depo.) at p. 85:19-86:1). Clearly, when rendering an opinion on causation and damages with regards to a living patient, a core element of the methodology must be evaluating how the patient is currently doing. In other words, a reliable expert cannot possibly render an opinion on how a course of treatment caused a "different" outcome without even bothering to understand the actual outcome. Dr. Schulman offers no methodology and no quantification in any measurable way, as required by law, on how the outcome would have been different with consideration of some different "intervention." This glaring deficiency in the last ditch efforts by Plaintiff to expand Dr. Schulman's role beyond his stated area of expertise, reflects the reality that he is not in a position to testify about proximate causation and damages, and should be excluded.

**(c) Dr. Schulman's testimony is not the product of reliable principles and methods.**

Dr. Schulman did not do any research in order to form his opinions in this case. (Exhibit H (Schulman Depo.) at p. 101:18-102:4). Dr. Schulman's notes reference five articles, mostly provided to him by Plaintiff's Counsel, that he did not review in order to help him form his opinions. Nonetheless, as discussed above, the articles largely just stand for the general, undisputed principle, that a spinal infarct can occur after a Type A Aortic Dissection. (Exhibit H (Schulman Depo. at p. 101:12-102:18). None of these articles provide a basis for specific proximate causation in this case such as the statistical difference between the treatment that was in fact given to Plaintiff during his ICU care compared to potential use of a spinal drain or higher blood pressure goal on

the long-term residual effects of strokes (which admittedly were not caused by the alleged negligence but stem from the dissection and surgery). From Dr. Schulman's isolated (and qualified) comments beyond his area of expertise, there is no way for this Court or a Jury to assess or quantify how (to a reasonable degree of probability) the outcome would have been different. Dr. Schulman has done nothing to apply the general principles he discusses to the specifics of this injury, this surgical recovery, this patient, the related risk factors, and this outcome. The purpose of the attempted expansion of his testimony clearly is for litigation purposes and is not the type of process Dr. Schulman would employ as an ICU doctor and it should be excluded.

### (d) Dr. Schulman's expert opinion does not reflect a reliable application of reliable principles and methods to this case.

For the same reasons as discussed above, Dr. Schulman's proffered testimony fails to meet the fourth prong of Rule 702. Dr. Schulman's proposed opinion is nothing more than speculative generalities. His review of the medical records was so incomplete that he is in no position to reliably apply the general principles he espouses to the specific circumstances of this case. Any extremely limited probative value of Dr. Schulman's unqualified and unreliable opinion is substantially outweighed by the severe risk of unfair prejudice and confusion of the issues/misleading of the jury. As a result, Dr. Schulman must be excluded under both Federal Rules of Evidence 702 and 403.

### V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant Defendants' Motion to Exclude the Opinions of Dr. Schulman on Proximate Causation and Damages or, if the Court finds the need for further fact finding, the Defendants request a hearing.

Respectfully submitted,

*/s/ Donna P. Sturtz*
Donna P. Sturtz (Federal Bar No. 435617)
David M. Sturtz (Federal Bar No. 90017707)
Nelson Mullins Riley & Scarborough LLP
100 S. Charles Street, Suite 1600
Baltimore, MD  21201
(443) 392-9400 (Telephone)
(443) 392-9499 (Facsimile)
donna.sturtz@nelsonmullins.com
david.sturtz@nelsonmullins.com
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 13th day of November, 2024 a copy of the foregoing was

served by electronic submissions via CM/ECF, in accordance with the Federal Rules of Civil

Procedure and the Local Rules of the United States District Court for the District of Columbia, on:

Governor E. Jackson, III
Law Office of Governor Jackson, III LLC
10 G Street NE, Suite 600
Washington, D.C.  20002
gjackson@governorjacksonlaw.com

Kim Parker, Esquire
Law Offices of Kim Parker, P.A.
2123 Maryland Avenue
Baltimore, MD  21218
kp@kimparkerlaw.com

Counsel for Plaintiff, Shana Hargrove

*/s/ Donna P. Sturtz*
Donna P. Sturtz