**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

|  |  |
|---|---|
| **SHANA HARGROVE**<br><br>      PLAINTIFF<br><br>VS-<br><br>**MEDSTAR WASHINGTON HOSPITAL,**<br>**CENTER, ET AL**<br><br>      DEFENDANT | Civil Case No.: 1:23-CV-03381-RJL |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### <u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF AHMAD ELAKIL, M.D.</u>

Plaintiff Shana Hargrove, on behalf of Kevin Welch, by and through her undersigned attorneys Governor Jackson, III of the Law Office of Governor Jackson, III, L.L.C., and Kim Parker of the Law Office of Kim Parker, P.A. hereby files this Opposition to Defendants' Motion In Limine To Exclude the Testimony of Ahmad Elakil, M.D., and in furtherance of her Opposition states as follows:

#### *Statement of Material Facts*

On June 14, 2022, Mr. Welch underwent an operation which included:(i) Type A aortic dissection repair, (ii) hemi-arch replacement, (iii) ascending aorta replacement, (iv) aortic valve resuspension, (v) reconstruction of sinotubular junction, (vi) circulatory arrest with retrograde cerebral perfusion (RCP). To be clear, according to the operative note the procedure was performed without any complication. Specifically, the operative note for the Type A aortic dissection repair of Mr. Welch performed by Dr. Alassar reads, in relevant part, as follows:

1

> "PREOP DIAGNOSIS:    Acute Type A Dissection
> POSTOP DIAGNOSIS:    Same
> SPECIMENS REMOVED:   Ascending aorta
> URINE OUTPUT/IV FLUIDS/ESTIMATED BLOOD LOSS: Per anesthesia record
> COMPLICATIONS:    None."
> *See Exhibit 1* [Operative Note of Aiman Alassar, M.D. dated June 14, 2022]

Following the procedure, Plaintiff was intubated and transferred to the Intensive Care Unit (ICU) in critical but stable condition. *See* First Amended Complaint at para. 16.

While in ICU, Mr. Welch was under the care and supervision of ICU attending physician Maxwell Hockstein, M.D., critical care physician Stephen M. Luczycki, M.D., and surgical ICU rotating resident Kaitlyn Marie Dunphy, M.D., all of whom were acting in their capacity as agents, servants, and employees of healthcare provider MedStar. *Id* at para. 17.

On June 17, 2022, a neurology consultation was performed by Robert Cai, M.D. due to Mr. Welch exhibiting severe bi-lateral lower extremity weakness (the left leg being weaker than the right leg). During the examination, Mr. Welch had the following blood pressure readings: 135/64; 144/58 (Line); 145/73 (A-Line 2). According to the consultation note, the etiology of the bi-lateral lower extremity weakness was "a higher c/f/ thoracic (watershed region) infarct; medium c/f ACA infarct; lower c/f cervical infarct." Based on the consultation, the recommendations given were as follows: "order MRI cervical and thoracic spine without contrast w/ include DWI in comments, agree w/ CTH w/o contrast, if CTH shows signs of infarct such as hypodensity, then order MRI brain w/o contrast, continue ICU care." *Id*. at para. 19.

Despite Mr. Welch's clinical presentation of bi-lateral lower extremity weakness on this critical date, Defendant Dr. Luczycki testified as to his ignorance of any clinical or diagnostic procedures - including any of the interventions opined about by Plaintiff's experts - that could have been performed to address Mr. Welch's lower extremity weakness as he stated:

> "Q:After this consultation with neurology, were you aware, as the attending physician, of any clinical or diagnostic procedures that could have been performed to address Kevin's — Mr. Welch's lower extremity weakness, given that the MRI had not been performed on this day?
>
> MS. STURTZ: Objection to form and foundation. And I assume you mean above and beyond what they were already doing?
> BY MR. JACKSON:
>
> Q: Yes. Was there any other clinical diagnostic– or diagnostic procedure other than what was being documented as being done in the record that could have been done to address Mr. Welch's lower extremity weakness?
>
> MS. STURTZ: Same objection. But you can answer if you're able.
>
> THE WITNESS: There's a broad differential for that weakness. So other studies that could have been done– okay. Potentially the patient did have— I can't really think of any at the moment."
> *See Exhibit 2* [Depo. Tr. of Stephen Luczycki, M.D. at p.40-41]

Defendant Dr. Dunphy, who was a resident at the time of Mr. Welch's hospitalization, did not act independently of Dr. Luczycki in this regard as Dr. Dunphy was under Dr. Luczycki's supervision as he testified:

> "Q: So my direct question is, would you have then [been] considered her supervising physician for purposes of any treatment she provided to Mr. Welch?
> A: For the ICU rotation, yes ." *Id*. at p. 11.

On June 18, 2022, Dr. Luczycki charted  in the critical care progress note "MRI not done for safety reasons- I think this can be deferred for now with much improved exam". Critically, however, according to the Neurology Progress Note for this date, Mr. Welch had a blood pressure reading of 156/77 and was exhibiting bilateral lower extremity weakness, the etiology of which was charted as "concern for spinal cord infarct involving thoracic spine" by the treating neurologist. *See First Amended Complaint* at para. 20. Even still, Dr. Luczycki did not utilize any of the interventions opined about by Plaintiff's experts that could have been performed to address Mr. Welch's lower extremity weakness believing that they were not clinically indicated as he stated:

"Q:But with respect to the CSF procedure we had discussed before, is it your answer that on this date, 6-18, Mr. Welch would not have been an appropriate candidate for the same reasons you had discussed before in your prior answer? A: The usual practice would be to have a discussion, if - if we thought we would consider that therapy. Based on the kind of surgery where the aortic repair was, we would discuss it with the, again, the cardiac surgeon and the neurologist, looking at the risks and benefits of that procedure, potential injury during that procedure, to spinal cord is a possibility and— and bleeding. And so we would weigh those risks and benefits before doing that. But in– again, in this case, typically for a Type-A dissection, it's — that therapy would not be indicated." *See Exhibit 2* at 46-47.

On June 19, 2022, Dr. Luczycki charted in the critical care progress note "MRI not done for safety reasons- I think this can be deferred for now with much improved exam". *See First Amended Complaint* at para. 21. Mr. Welch was also examined by Defendant Hockstein, the Critical Care Supervising Physician, who noted in relevant part:

"Neuro: Encephalopathic. RASS Score: -1, CAM-ICU Result: Positive. Knows his name, he is unsure of his location, did not know the identity of his cousin at bedside today. Analgosedation is being accomplished with fenanyl PCA (transition to PO oxycodone), lidocaine patches. On no sedation. LLE remains ⅕ strength. RLE ⅗. MRI is pending, ordered for today. OOBC." *See First Amended Complaint* at para. 21.

On June 20, 2022, Defendant Dr. Hockstein charted the identical aforementioned (*see* para. 19) notation in Mr. Welch's Critical Care Progress Note. *See First Amended Complaint* at para. 22.

Defendant Dr. Hockstein, despite being familiar with the positive effects of cerebral fluid drainage following an aortic dissection, failed to order any such same or similar appropriate interventions as he testified:

"Q: Based on your education, training, and experience, are you familiar with the process of cerebral fluid drainage?
A: Yes.
Q: How are you familiar with that?

> A: It – it is done after certain types of aortic dissection repairs, in the postoperative period to- to prevent or to mitigate the effects of spinal cord swelling."
> ********************************
> "Q: On this date, 6-20, were you aware of any clinical or diagnostic procedure that could have been performed to address Mr. Welch's lower extremity paresis?
> A: No.
> *See Exhibit 3* [Depo. Tr. of Maxwell A. Hockstein, M.D. at p. 15; 35-36]

On June 21, 2022, Defendant Dr. Hockstein charted "Blood pressure is under better control. Awaiting MRI to aid in diagnosis of LLE paresis, through, anticipate spinal cord trespass. Approaching floor readiness." *See First Amended Complaint* at para. 23. Defendant Dr. Hockstein testified:

> "Q: On 6-21-2022, were you aware of any clinical or diagnostic procedure that could have been performed to address Mr. Welch's lower left extremity weakness?
> A: Can you clarify when you say address?
> **Q: According to the attestation that I just read, it stated that there was a diagnosis of LLE paresis and that you were awaiting the MRI to aid in that diagnosis. So my specific question is, was there anything that you were aware of, clinically or diagnostically, that could have been done to improve his LLE paresis?**
> **A: Not to my knowledge."**
> *See Exhibit 3* at p. 39 (emphasis added).

Defendant Dr. Hockstein was, in fact, completely unaware of the stroke which was localized to Mr. Welch's spinal cord at the time that he was providing care and treatment to Mr. Welch while the MRI was pending. He testified:

> "Okay. If you go to Page 307, and I'm referring to the attestation section of the progress note authored by you on 6-21-202. And on the fourth sentence in it states "awaiting MRI—MRI to aid in diagnosis of LLE paresis, though anticipate spinal cord trespass." What was the basis for your anticipation of spinal cord trespass? Well, let me back up. Can you define spinal cord trespass as referred to in this context?
> A: Spinal cord pathology.
> Q: Generally? When you say spinal cord pathology, what– you– you're just referring to the area of the spinal cord?
> A: Correct. A disease that localizes to the spinal cord.

5

> *Q: Okay. Was there a particular disease that you felt was localized to Mr. Welch's spinal cord at the time that you made this note of spinal cord trespass?*
> *A: I don't recall.*
> *Q: Was there any particular level of the spinal cord at which you thought the — the disease state was occurring based on this note in reference to Mr. Welch's condition?*
> *A: I don't recall.*
> *Q: Do you know why the MRI was still pending on this date, June 21st, 2022?*
> *A: I don't recall.*" *Id.* at p. 37-38 (emphasis added).

On June 22, 2022, an MRI of the brain without contrast and an MRI of the cervical spine without contrast were finally performed on Mr. Welch. The indication for the MRI of the brain was noted as "stroke, TAAD repair" with the comparison study being the CT performed on June 18, 2022. The findings of the MRI of the brain read as follows:

> "The examination is limited by motion artifact. The ventricles and sulci are appropriate for patient's age. DWI hyperintensities with low signal intensity on the ADC maps are present in the bilateral cerebellum and cerebral hemispheres with bilateral basal ganglia predominance. There is no midline shift. No microhermmorhages are identified. The midline structures are within normal limit. The mastoid air cells and paranasal sinuses are unremarkable. *See First Amended Complaint* at para. 24.

The impression read as follows: "Limited due to motion artifact. Recent bilateral cerebellar and cerebral infarcts with bilateral basal ganglia predominance which is consistent with cardioembolic etiology and hypoxic anoxic event. *Id.* at para. 25.

The indication for the MRI of the cervical spine was noted as "left lower extremity weakness, TAAD repair" and the addendum to the final report for this MRI stated "Upon further review with Dr. Barry, there is DWI hyperintensity of the cord at the level of T5 consistent with cord infarct. *Id.* at para. 26.

On June 22, 2022, the stroke team was consulted. On June 23, Mr. Welch's physical condition was noted as follows:

> "Eyes closed, somnolent. Purposeful, strong movements with BUE, intermittently

6

following commands. Answering questions intermittently. Has been intermittently alert and interactive throughout the morning before becoming somnolent again." *Id.* at para. 27.

The stroke team noted a hypoxic-ischemic injury of basal ganglia and a stroke in the multiple vascular territories related to dissection, and further recommended obtaining physical therapy and occupational therapy when able. According to Mr. Welch's progress notes, at no time prior to June 21, 2022 were any actions taken to increase Mr. Welch's blood pressure to mitigate the risk of neurological insult, nor was there any consideration by the Defendants prior to June 22, 2022 of the placement of a lumbar drain to mitigate the risk of neurological insult. *Id.* at para. 28.

Contrary to Defendant's representation, Mr. Welch currently suffers from a host of physical and cognitive disabilities as a result of experiencing a stroke, specifically concerns of falling while ambulating, bouts of left side weakness, difficulty maintaining a normal gait, and difficulty completing household chores, as he testified:

> "Q: Okay. Can you explain– do you have difficulty going down the stairs?
> A: Yes, going down the stairs.
> ***********************************
> "Q;Okay. So you've– okay. Do you believe you would be able to live by yourself?
> A: No.
> Q: No. Do you believe that because you wouldn't feel comfortable with that or has
>
> a doctor told you that?
> A: I wouldn't feel comfortable with that.
> Q: What are your concerns about living with yourself?
> A: Just in case I fall ro something.
> Q: In case you fall. Have you fallen?
> A: Yes, I've fallen.
> Q: How many time have you fallen?
> A: Twice.
> Q: Both– I assume both since the occurrence giving rise to this lawsuit?
> A: Yes.
> Q: Okay. When was the most recent fall?
> A: I can't remember.
> Q: Okay. And did you report those falls to your medical providers?

A: Yes."
                **************************************
"Q: And do you plan on applying for disability?
A: Yes.
Q: Do you view yourself as disabled?
A: Yes.
Q: Do you view yourself as totally and permanently disabled?
A: Yes."
                **************************************
"Q: Can you please list your current health problems?
        MR. JACKSON: Objection as to form. You may respond.
A: I have vision problems. My vision goes blurry from time to time.
        MR. STURTZ: I'm sorry.
A: I have, like, a weakness on my left side of my body. I have, like, just I'm out of breath a lot and that's it."
                **************************************
"Q: And you also said you have weakness on your left side. Can you describe that a little bit more for me?
A: Yea, so when I do something that's physical, my left side just gets weak.
Q: Okay. And what do you mean by physical?
A: Like walking up and down the steps.
Q: So it doesn't necessarily have to be a strenuous activity, just any physical activity triggers it?
A: Yes."
                **************************************
"Q: Are there specific activities you feel like you're no longer able to do?
A: I can't do martial arts anymore.
Q: Can you tell me about your participation in martial arts before–before the occurrence giving rise to this case?
A: Yeah, I used to teach martial arts twice a week at a community center."
                **************************************
"Q: Any other activities you're no longer able to do?
A: I can't bowl anymore.
Q: Can't bowl. Okay. Can you describe your bowling before the occurrence giving—-
A: My gait won't allow me to walk up to the lane normally and throw the ball.
Q: Okay.
A: And I can't lift a 15 pound ball anymore.
Q: Any other activities you can't do?
A: Like, walk around the lake at Costco Park.
Q: Is that a park near your house?
A: Yes.
Q: Are you able to drive?
A: No.
Q: Has a doctor told you or a medical professional told you— advised you not to drive or do you just not feel comfortable?

A: My medical advisor advised me not to drive."

*************************************

"Q: You're not able to play video games?

A: No, not really.

Q: Why is that?

A: I can't look at it and work the buttons anymore.

Q: It's a coordination?

A: Coordination.

Q: Hand-eye coordination. Do you have any problems doing chores?

A: Sometimes.

Q: Sometimes. Which specific chores do you struggle with?

A: Like, washing the dishes, laundry, cleaning the bathrooms.

Q: Why do you have difficulties? If you can just go through those one by one and explain why you struggle to do those?

A: So washing the dishes is picking up the pots and the pans. The laundry, sometimes with the laundry basket it's too heavy and then cleaning the bathrooms is bending down.

Q: Okay. Have you— I'm sorry. Excuse me. Are there any struggles with your social life?

A: Yes.

Q: Can you describe those for me?

A: So the lack of communication is a big one, like, I can't really focus in on what people are saying, it's difficult.

Q: And that wasn't a problem before the—

A: No."

*************************************

"Q: Are you doing anything for purposes of physical rehabilitation?

A: Just the workouts I do with my nephew at home.

Q: Okay. Is that– are those workouts that are being recommended to you by a health care provider?

A: Yes.

Q: Which provider is recommending those?

A: My physical therapists."

*************************************

"Q: Can you describe those workouts for me; what they usually entail?

A: Some leg exercises and then we walk on the treadmill for 15 minutes.

Q: Okay. So sorry if you already said this, how many days a week do you do those workouts?

A: Like three days a week.

Q: How long do they typically last for?

A: About half an hour."

*************************************

"Q: You mentioned some difficulties with doing household daily chores. You mentioned with doing the dishes you have difficulty with the pots and pans?

A: Uh-huh.

Q: Can you describe why that's difficult; is it too heavy or?

9

A: It's too heavy and my hands aren't coordinated enough."
*See Exhibit 4* [Depo. Tr. Kevin Welch at p. 9-10; 27; 31-32; 35-37; 39-40; 51-52; 72]

On August 19, 2024, Mr. Welch's treating healthcare provider, Richard Zorowitz, M.D., opined as follows:

> "To Whom It May Concern:
> This patient was seen today at MedStar NRN Physiatry at Irving St Physician Center.
>
> I am writing this letter on behalf of Kevin Welch (03/14/1980), who is a 44 year old right-handed African-American male, with history of asthma, COVID-19 (05.2022), and type B aortic dissection, who suffered bilateral cerebellar and cerebral strokes and ischemic myelopathy status-post type B aortic dissection repair, Hemi arch replacement, ascending aorta replacement, aortic valve suspension, and reconstruction of sinotubular junction 06/14/2022. This letter medically certifies that Mr. Welch is permanently disabled as a result of his condition.
>
> Please do not hesitate to contact me with any questions or concerns: 202-877-1765.
>
> Sincerely [signed],
> Richard Zorowitz, M.D."
> *See Exhibit 5* [Letter from Richard Horowitz, M.D. to Kevin Welch dated August 19, 2024]

As the Defendants concede, Mr. Welch's neuropsychologist, Dr. Gorter, diagnosed him with a cognitive disorder stemming from the cerebral strokes caused not by the Type A dissection and repair (i.e. recall Mr. Welch's cardiothoracic surgeon Dr. Alassar's note of "Complication: None"), but rather by the mismanagement of the postoperative care rendered by the Defendants in this case.

Defendants attempt to mislead the court regarding the viability of Plaintiff's theory of the case by juxtaposing the opinion of Plaintiff's expert, Roland Hamilton, M.D., with that of Dr.

10

Elakil who is the subject of the instant motion, positing that because Dr. Hamilton did not offer any standard of care opinions, because Dr. Hamilton opined that strokes were caused by the Type A dissection, because Dr. Hamilton is not offering any opinion on whether any different type of medical intervention would have prevented or altered the cerebral or spinal strokes, and because Dr. Hamilton agreed that Mr. Welch was not a candidate for interventional stroke treatment, that Plaintiff cannot prove to a reasonable degree of medical certainty that the failure to order interventions such as increasing Mr. Welch's intraspinal blood pressure and/or the placement of a lumbar drain proximately caused neurological insult to Mr. Welch. This position by the Defendants fails to appreciate the nuances of the anticipated scope of testimony to be offered at trial by Dr. Hamilton based on his expertise, fails to appreciate the full parameter of alternatives that were available to the Defendants to prevent Mr. Welch's neurological injury, and fails to appreciate the compelling nature of the expert testimony of Plaintiff's expert Peter Schulman, M.D., a licensed physician board-certified in the same and similar specialty as each of the named Defendants.

Taking each of Defendant's failed considerations in turn, *first*, Dr. Hamilton is a neurohospitalist, *not* a neurosurgeon like Dr. Elakil, and furthermore, his scope of participation in the case was to opine on the neurologic injury to Mr. Welch <u>as a result of the stroke</u>, not the cause and/or exacerbation of the stroke itself. Dr. Hamilton testified:

> "Q: Okay. So can you tell me what you practice involves as a neurohospitalist?
> A: As a neurohospitalist I see patients that are strictly hospitalized inside the hospital. They can be in the emergency room, in the intensive care unit, on the regular medical floors. The vast majority of my patients have strokes. When it comes to strokes, they can be acute, subacute, chronic treatment management. And then I see a various array of other neurologic conditions. I'm not sure if you want me to give you an example. Seizures, epilepsy, neuromuscular disorders, altered sensorium, altered mental status, any type of spinal cord weakness related issues, neuropathics."
> ************************************

11

"Q: You attached two articles to your report. Neither one of those are specific to sequelae from an aortic dissection, correct?
A: I'd have to go back and look at them. I believe that is correct.
Q: Did you do any other research in this case related to aortic dissections?
A: That was out of the scope of the question I was asked by Mr. Governor.
***Q: What was the question you were asked by Mr. Governor?***
***A: To comment on the neurologic injury Mr. Welch suffered from the stroke?"***
****************************************
"Q: Is there a subspecialty within the board of neurology that focuses on strokes?
A: Yes.
Q: And you don't have that specialty board certification, correct?
A: Correct."
*See Exhibit 6* [Depo. Tr. of Roland Hamilton, M.D. at p. 16; 22-23; 27 (emphasis added)]

*Second*, Dr. Hamilton's opinion that Mr. Welch was not a candidate for post-surgical thrombolytic therapy or endovascular intervention is not dispositive of the opinion of Dr. Elakil, a board-certified neurosurgeon (which Dr. Hamilton is not), that Mr. Welch was an appropriate candidate for blood pressure optimization or the implementation of a lumbar drain. *Third*, standard of care opinions against neurologists would not have been appropriate in this case given that the named Defendants, Drs. Luczycki and Hockstein as attending physicians of record for Mr. Welch and resident Dr. Dunphy, were responsible for acting in accordance with the standard of care for the post-surgical management of Mr. Welch's condition as Plaintiff's expert Dr. Schulman testified:

"MS. STURTZ: How exactly did Dr. Dunphy— who was a resident in training and only involved in the care on June 17th— breach the standard of care, in your opinion to a reasonable degree of probability?
A: I would say the same way that Dr. Luczycki breached the standard of care.
Q: So she breached the standard of care in failing to obtain a head CT on June 17th, correct?
A: Correct.
Q: And she breached the standard of care in failing to consider targeting a higher blood pressure and/or lumbar drain placement, and//or discussing whether a higher blood pressure and/or lumbar drain placement was warranted with a neurologist and cardiothoracic surgeon on June 17th, correct?
A: I would also add to that, but that's correct.

12

Q: Those are the only breaches in the standard of care in terms of Dr. Dunphy that you identified in your report, correct?

A: Yeah. But at the time I didn't realize that the hematocrit was 21. So I would add to that that they breached the standard of care by not transfusing Mr. Welch's blood– or at least discussing whether a transfusion was warranted— with Dr. Alassar and the neurology team.

Q: DId he have any transfusions during his tenure in the ICU?

A: I don't specifically recall, but when I went through the record after I wrote that report to look at his blood count levels, they seemed to be persistently low. When you have a spinal cord infarct, one of the other interventions that should be considered is to, you know, transfuse blood to raise the hematocrit so that you can increase the perfusion pressure to the spinal cord."

Q: Okay.

A: And that wasn't done."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Okay. So, we've outlined the breaches of the standard of care. The one that you've added to your report is the hematocrit on June 17th, and you now want to add another breach in the standard of care, so something the doctors did that was not reasonable? What are you adding now that you believe was not reasonable on June 17th?

A: What I'll tell you is they should have had a discussion and contemplated doing— making interventions to lessen the risk of the — and lessen the damage to Mr. Welch's spinal cord infarct. There are a variety of things that could have been entertained and done that were not done. Those include placing a lumbar drain, raising the blood pressure, giving a blood transfusion, volume loading, arguably also starting a naloxone infusion."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: And in the — is it the same breaches in the standard of care that you identified on June 17th, or is there anything else about the June 18th that you believe was a breach in the standard of care?

A: The same. All of this has to do with— from my perspective– failure to act, to address new profound neurologic deficits."

*See Exhibit 7* [Depo. Tr. of Peter Schulman, M.D. at p. 71-72; 88-89; 93]

Also, contrary to Defendants' assertion, there are allegations, specifically the opinions of Dr. Elakil and Dr. Schulman, that the providers could have, either partially or completely, prevented the residual deficits caused by Mr. Welch's strokes.

13

During the course of discovery in the instant case, Plaintiff designated Ahmad Elakil, M.D. as an expert witness. Dr. Elakil is the Chief of the Department of Neurosurgery at Insight Hospital and Medical Center in Chicago, Illinois. He received his medical degree from King Saud University, his Master of Business Administration from Cornell University, completed his neurosurgery residency at the University of Calgary, and his Neurosurgical postgraduate training at the University of Miami. He is Board Certified in neurosurgery and licensed in Illinois and Michigan. Dr. Elakil has otherwise taught, worked, and published peer-reviewed literature in the fields of neurology, neurosurgery, and cerebrovascular disease. *See Exhibit 8* [Curriculum Vitae of Dr. Elakil]. While Defendants state that "Plaintiff does not have an expert in cardiothoracic surgery who performs Type A aortic dissection repairs", such an expert is not necessary in this case to meet Plaintiff's burden of proof given that, as stated in the operative note of Mr. Welch's treating cardiothoracic surgeon, Dr. Alassar, there were no complications during the surgery, nor was there any other viable basis to allege that Dr. Alassar violated the standard of care during his performance of Mr. Welch's Type A aortic dissection. Defendant also states that Plaintiff "does not have a neurology stroke expert to attest to proximate causation"; however this claim is <u>false</u> in light of Plaintiff's designation of Dr. Elakil whose clinical experience with stroke patients belies this claim.

Dr. Elakil testified as follows regarding his training, education, and experience in the field of neurology and neurosurgery at institutions where Type A Aortic Dissections were performed:

> "Q: Where were you working in April of 2022 when you were considering the position at Insight Hospital?
> A: Louisiana.
> Q: And what were you doing in Louisiana?
> A: Private practice in neurosurgery.
> Q: What was the name of the private practice?

14

A: Ahmad Elakil Medical Consul–Ahmad Elakil– I – forgot what it's called. My first name, last name, medical-professional medical service, something like that.
Q: So when you were in Lafeyette, were you working at a hospital?
A: It was a private practice, and I have —- I had credentials at the hospital.
Q: What was the name of the hospital where you had credentials in Lafeyette?
A: Our Lady of Lourdes Hospital.
Q: And you were performing neurosurgery at Our Lady of Lourdes Hospital?
A: Correct.
Q: Did Our Lady of Lourdes Hospital have a cardiac surgery department that performed- where type A aortic dissections were performed?
A: Yes." *See Exhibit 9* [Depo. Tr. of Ahmad Elakil, M.D. at p.11-12]

He also described his patient population as follows:

"Q: What types of patients did you see in Lafeyette?
A: All kinds of for brain and spinal surgical issues.
Q: Was there a breakdown in terms of your surgery what percentage was brain versus what percentage was spine?
A: I would say, as any general practice, it's around 10 to 20 percent brain and 80 to 90 percent spine.
Q: How many surgeries would you say you performed when you were in Lafeyette?
A: I would say around 200."*See Exhibit 9* at p. 13-14.

He also testified as follows regarding his relevant current clinical experience participating in

neurological consultations regarding stroke patients:

"Q: Is the Insight Hospital in Chicago a comprehensive stroke center, if you know?
A: Yes.
Q: Is it s a prim– a prime– is comprehensive or primary, or do you now know the difference?
A: I don't know the difference, but I know that they have— they fully certified in taking care of stroke patients.
Q: But in terms of what certification level the hospital has, that's not something you're familiar with?
A: I don't know.
Q: And you don't work in that stroke department at the Insight Hospital, correct?
A: We all work as a team. So the neurology stroke team, if they need surgical consultation, they consult me.
Q: But you're not part of the neurosurgery- neurology stroke team, correct?
A: I'm–I'm— we– stroke team is not only based on – on neurology or neurosurgery. Stroke team—if –if the neurologist need a neurosurgical consultation, they they call the neurosurgeon. You can't have a stroke center

15

without a neurosurgery presence. So you can't take care of the patient without 24/7 neurosurgery coverage. So we were part of the stroke team.
Q: What type of spine neurosurgeries do you perform?
A: All kind of complex spine surgery." *See Exhibit 9* at 26-27.

He also testified as to his ability and qualification to provide clinical opinions and prognosis on the current and future care needs for patients who, similar to Mr. Welch, suffered a spinal cord infarction as a post-operative complication following an aortic dissection, which according to Mr. Welch's medical record, had no intraoperative complications. He stated:

"So to the extent Mr. Welch has any current or future care needs related to neurology, that would be beyond your area of expertise, correct?
A: It depends. What's– what's the disease? Is it for on this example– on this specific matter where spinal cord infarction led into his problem? Weak—
        Neurosurgeons are qualified to give opinions on a prognosis and— and what's –what's the need for this patient— what's the future needs for this patient. However, I—from —from an aortic dissection perspective, for that, I don't know."
        ********************************
"Q: But you don't follow patients for years after they undergo neurosurgery, correct?
A: That's not true. They become my patients. In fact, I follow them– I have– one of my patients I have been following since I started here." *See Exhibit 9* at p. 42-43.

He also testified regarding his expertise and ability to opine in this case regarding Mr. Welch's stroke suffered in his spine and his brain and their interrelatedness in this case as he explained:

"Q: You won't be commenting at all about any other complications that Mr. Welch suffered after the type A aortic dissection repair beyond the spinal cord infarct?
        MR. JACKSON: Objection. You may respond.
        THE WITNESS: I can comment on the stroke in the brain that he had and the spinal cord infarction.
        BY MS. STURTZ:
Q: Well, I asked you earlier if your opinions were going to be limited to the spinal cord infarct and you said correct because I'm a spine doctor.
A: I did not– I did not say I'm a spine doctor. I'm a neurosurgeon.
Q: Okay.
A: Neurosurgery deals with the brain and spine. And infarction and the spinal cord, those are the same etiology that results in an infarction in the brain as well."
        *********************************************

16

Q: Now you're going to testify about the spinal cord infarct and the brain infarct?
A: They both related. The cause of this infarct that happened in the brain and the spine, they related. The one in the brain– the one in the brain is different than the spine because the structure in the brain represent different areas than what the spine control, but they all related to each other. They the same causation."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q:So do you have a - an opinion to a reasonable degree of probability as to what the complication rate is for infarctions after a Type A aortic dissection and surgical repair?
A: It's between 1 to 3 percent. That's the last I read."
*See Exhibit 9* at p. 63-65.

Plaintiff proffered in her designation that Dr. Elakil would testify, in part, as follows:

"It is anticipated that Dr. Elakil will opine that the failure to promptly order and do a CT scan on June 17th immediately after the patient experienced complications significantly delayed the diagnosis of spinal cord infarction, because although a CT head scan was conducted on June 18th which is considered a significant delay and returned with normal results, the strokes which Mr. Welch experienced may not have been evident on such scans. It is anticipated that he will testify that this oversight underscores the critical importance of considering clinical presentation and symptoms which consistently suggested the possibility of a stroke or spinal cord infarction.

It is anticipated that Dr. Elakil will opine that the subsequent delay in utilizing MRI scanning for both the brain and spine further postponed the identification and management of the patient's condition, despite eventual diagnoses of stroke and spinal cord infarction on June 22, and the lack of discussions regarding vital interventions, such as optimizing the patient's blood pressure or considering the implementation of a lumbar drain exacerbated the situation. He will opine to a reasonable degree of medical certainty that these cumulative delays and omissions in diagnosis and treatment have led to the patient's current severe outcome of lower extremity weakness, bowel, and bladder dysfunctions.

It is anticipated that Dr. Elakil will testify to a reasonable degree of medical certainty that there is a direct causal relationship between Mr. Welch's clinical status and the injuries sustained post surgery, that it is more likely than not that the severity of the patient's symptoms can be attributed to a significant delay in the diagnosis of the patient's conditions, including stroke and spinal cord infarction, and it is more likely than not that the failure to implement measures aimed at optimizing Mr. Welch's physiological state, such as blood pressure management and the installation of a cerebrospinal fluid drain which is widely accepted and straightforward procedure to do, contributed to the exacerbation of the patient's deficits, and that it is more likely than not that the omissions in the standard of care practices directly impacted the patient's recovery trajectory and overall lower extremity, bladder and bowel functions, underscoring a clear causal

17

link between the delayed diagnosis, lack of appropriate and timely management, and the severe complications experienced by Mr. Welch.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

It is further anticipated that Dr. Elakil will testify as to the fairness and reasonableness of Mr. Welch's bills as to the hospitalization at MedStar Washington Hospital Center, and will testify as to the fairness and reasonableness of Mr. Welch's life care plan.

Dr. Elakil will express his opinions to a reasonable degree of medical certainty. Dr. Elakil may base his opinions on his review of case materials, including deposition testimony, discovery responses, videos, police reports, medical records, and all exhibits, and documents produced by the parties and witnesses in this case. Dr. Elakil will also base his opinions on his education, experience, training knowledge, and review of records, documents and other evidence." *See* Plaintiff's Expert Witness Designation.

Consistent with Plaintiff's designation, Dr. Elakil confirmed that prior to his deposition, he reviewed Mr. Welch's medical records, deposition transcripts of Mr. Welch, his power of attorney Shana Hargrove, and a treating provider and named Defendant, Dr. Hockstein, reviewed radiology imaging for Mr. Welch's brain and spine and the accompanying reports for such imaging, reviewed billing for treatment for Mr. Welch from MedStar Hospital, and referenced peer-reviewed literature related to the study of the success rate of neurologic interventions for patients similar to Kevin Welch who experienced post-operative complications following an aortic dissection. He testified:

"Q: What medical records have you reviewed?
A: The hospital records when he was admitted for the surgery and the postoperative care.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Okay. Have— have you reviewed any deposition transcripts in this case?
A: Yes. I was sent recently a deposition
Q: What deposition were you sent?
A: The patient, I think his power of attorney, and the —one of the doctors.
Q: Do you recall which doctor it was?
A: If you say the name, I would tell you.
Q: Was it Dr. Hockstein?
A: Yes."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Have you reviewed any imaging?
A: Yes.

Q: What imaging have you reviewed?

A: The radiology images that was done when he was admitted. So his MRI brain and the MRI spine, as I remember, and the —yea. That's what I remember."

******************************

"Q: Did you review the reports that went along with the MRIs and the CT?

A: Yes."

******************************

"Q: Anything else that you reviewed in the case other than the medical records, the

three deposition transcripts, and the MRI imaging?

A: For the patient?

Q: Yes.

A: Not to my knowledge. I don't remember. No.

Q: I was provided with a copy of one article yesterday. That is an article you reviewed, correct?

A: Sorry. I remember I was sent the bills. Yes. That–that's another thing. I was sent

the bills that was charged by the– to the patient from the hospital.

Q: Okay. So the bills were the MedStar Washington Hospital Center medical bills?

A: Yes."

******************************

"So you don't have a way of saying— because the treatment for type A aortic dissection is beyond your area of expertise, you don't have a way of saying whether the bills incurred at MedStar Washington Hospital Center were necessary.

MR. JACKSON: Objection. You may respond.

THE WITNESS: I— the only thing I can say is the general knowledge of – that I have from my expertise dealing with the business side of neurosurgery, our billing department for general ICU, general operating room, nursing, nurse— and nursing needs for the patients, they look — they look reasonable. However, how much is that surgery cost, that is something that I have not seen before.

BY MS. STURTZ:

Q: Okay. So the extent of your opinions on the bills- bills from MedStar Washington Hospital Center is that, to you, in a general sense, they appear to be fair and reasonable billing for those services that were provided?

A: Yes.

Q: Anything else that you reviewed other than what you've told me about?

A: No.

Q: I was sent one article yesterday, and I'll go into that in more detail later. Is there– are there any other articles that you pulled other than the one article that was sent to me yesterday?

A: There is two or three articles that I reviewed while I'm writing the report." *See Exhibit 9* at p. 29-34.

Indeed, while Defendants attempt to portray Dr. Elakil's knowledge base as deficient regarding Mr. Welch's current physical status because "he has never talked to Mr. Welch or performed any physical examination on him", Dr. Elakil, at the time of his deposition, was privy to the deposition testimony of Mr. Welch describing his current physical limitations as previously cited to herein. Additionally, Defendants' assertion that Dr. Elakil does not know the nature of the differences between a Type A dissection and a Type B dissection is <u>false</u>. Dr. Elakil testified:

> "Q: Do you have an understanding that there's a difference between a type A aortic
>
> dissection and a type B aortic dissection?
> A: I know there is a difference, but again, it's not my expertise."
> *See Exhibit 9* at p. 37.

Likewise, Defendants' characterization of Dr. Elakil's reliance on the peer-reviewed articles referenced in Defendants' motion is misleading. Specifically, Defendants state that Dr. Elakil reviewed the article *Delayed Onset Postperative Paraplegia in Acute Type A Aortic Dissection* "for the undisputed point that, though rare, a spinal infract can occur after a Type A aortic dissection." This is not why Dr. Elakil reviewed this article. He testified otherwise as follows:

> "Q: So the article that you sent called Delayed Onset Postoperative Paraplegia in Acute Type A Aortic Dissection, why did you believe that this opinion– this article supports your opinion?
> A: No. It was— one of the deposition that I reviewed was for the ICU doctor, and he said that aortic- sorry. That spinal cord infarction does not happen with type A aortic dissection. So that— that's why this article is there." *See Exhibit 9* at p. 67.

With respect to this article, Defendants comment that Mr. Welch's "leg weakness totally resolved without the use of a spinal drain", however this statement is <u>false</u> based on the previously cited testimony above of Mr. Welch describing his current physical limitations he attributes to the treatment at issue in this case. Furthermore, the purpose of Dr. Elakil's reference to the articles cited in Defendants' motion was clear: to provide peer-reviewed literature in support of the fact

20

that insertion of a lumbar drain enhances the spinal cord perfusion and results in at least partial improvement in a patient's condition. Dr. Elakil testified:

> "Q: Okay.
>  A: And they provided in the references in these articles– two or three articles that I
>
> reviewed earlier, and they– they talk about complete resolution of symptoms. So I can't base what would be the outcome on one article that they had partial improvement there. There's many—
>  Q: Okay.
>  A: —- in the literature with a complete resolution."
>                 *************************************
> "Q: Okay. What facts are you relying upon to state that, in your opinion, there would have been— is it some resolution of his symptoms with a lumbar– placement of a lumbar drain?
> A:These articles that I refer to, they guidelines for– for us doctors. Those are articles
>
> that they created. They got all their results from multiple and multiple studies that were done.
> Q: Okay.
> A: Those I can provide to you after– after the– I can provide to Mr. Jackson after the call, but those articles very clearly mention the benefit of lumbar drainage in patients with spinal infarction. And many of these present many cases that shows complete resolution of patient symptoms. The main fact that we produce articles got their basis on– is based on this simple question: Spinal perfusion pressure is equal to mean arterial pressure minus the intraspinal pressure.
>         As much as you can, whenever you decrease the intraspinal pressure by draining that fluid, the more– the spinal perfusion of pressure is more, which is great. It can— goes through all the tissue in the spinal cord and prevent that infarction from happening. But when we do not decrease the intraspinal pressure, that means that number of the cerebral perfusion pressure in that equation goes low. When it goes low, infarction can happen.
> Q: Okay.
> A: That's the main basis fact; that equation for all these articles."
> *See Exhibit 9* at p. 75-75; 77-78

Defendants' assertion that Dr. Elakil "testified that his proposed causation opinion is limited

to the spinal infarct only" is <u>false</u>. Dr. Elakil unambiguously testified otherwise as follows:

> "Q: You won't be commenting at all about any other complications that Mr. Welch
>
> suffered after the type A aortic dissection repair beyond the spinal cord infarct?
>         MR. JACKSON: Objection. You may respond.

THE WITNESS: I can comment on the stroke in the brain that he had and the spinal cord infarction.
BY MS. STURTZ: Q: Well, I asked you earlier if your opinions were going to be limited to the spinal cord infarct and you said correct because I'm a spine doctor.
A: I did not— I did not say I'm a spine doctor. I'm a neurosurgeon.
Q: Okay.
A: Neurosurgery deals with the brain and spine. And infarction and the spinal cord,
those are the same etiology that results in an infarction in the brain as well."*See Exhibit 9* at p. 63.

Defendants' assertion that "Dr. Elakil clearly and admittedly did not even assess the actual MAP levels in the medical records" is <u>false</u>. Dr. Elakil did, in fact, consider Mr. Welch's MAP levels as he testified:

"Q:And do you have– did you study when you looked at the records, and if you didn't, it's fine, what his MAP scores were? I know there was a goal, but did you— did you study what his actual scores were and as to whether he was meeting the goal, under the goal, or above the goal?
A: I remember looking into this. I don't remember exactly each day what, where his
MAP. And some days he had more increased blood pressure, then they reduced it and he had lower blood pressure. It's really hard to recall specific hour-to-hour citation with his blood pressure, but a goal specific that was set, I don't recall."
*See Exhibit 9* at p. 105.

Defendants' assertion that Dr. Elakil's whole proposed causation opinion is "speculative" is

<u>false</u>. Dr. Elakil testified that the identified breach of the standard (i.e the failure to install the

lumber drain, etc.) *proximately caused* Mr. Welch to incur permanent neurological deficits which

otherwise would not have been sustained but for the negligence of the Defendants, as he testified:

"Q: But you can't state in this case, to a reasonable degree of probability, that the placement of a lumbar drain would have prevented any residual deficit from the spinal cord infarct, correct?
MR. JACKSON: Objection. You may respond.
THE WITNESS: To the degree of medical certainty, more likely than not it would have prevented."
*************************************
"Q: Okay. I'll see if I can pull it up, but it says– you talk about the delay spanning

22

several days, which was a critical factor—here we go. Moreover, it's more likely than not the failure to implement measures aimed at optimizing the patient's physiological state, such as blood pressure management and installation of a cerebrospinal fluid drain which is widely accepted and straightforward procedure to do, continued to– the exacerbation of patient's deficits and adverse outcome. Is that your opinion?
A: Yes."

**********************************

"[I]f that lumbar drain and volume resuscitations would have done, he would have improved more than what he is now." *See Exhibit 9*, p. 70-71; 114-115; 118.

The issue raised by Defendants of whether Mr. Welch's improvement would have been partial or complete is 1) an issue related to damages rather than causation and only tangential to Dr. Elakil's above-reference primary theory of causation that the failure to implement interventions proximately caused an adverse outcome for Mr. Welch, and 2) wholly ignores Dr. Elakil's relevant and unequivocal causation opinion that the breach of the standard of care by the Defendants caused permanent, rather than temporary injury as he testified:

"Q: Okay. And you used the phrase that this exacerbated it. So that means there were going to be some deficits, but this made the deficits exacerbated or worse, correct?
A: Permanent.
    MR. JACKSON: Objection. You may respond.
    BY MS. STURTZ:
Q: To what– to what extent were they made worse– or are you able to quantify that in any way what you meant by exacerbation?
A: I meant it's now permanent and– instead of likely temporary.
Q:To what – to what extent were they made worse– or are you able to quantify that in any way what you meant by exacerbation?
A: I meant it's now permanent and– instead of likely temporary."*See Exhibit 9* at p. 115-116.

To wit, Dr. Elakil's opinion that the lumbar drain or higher MAP goal would have prevented "the patient's current severe outcome of lower extremity weakness" is consistent with Mr. Welch's deposition testimony regarding his current physical condition and the written opinion of Defendant

Medstar's own treating physician Dr. Horowitz that Mr. Welch is "permanently disabled as a result

of his condition." *See Exhibit 5, supra*.

Also, consistent with the Plaintiff's Expert Witness Designation, Dr. Elakil opined as to

exactly when the spinal cord infarction occurred, and further attributed the spinal cord infarction

to the post-operative care rather than the surgical repair, as he testified:

> "Q:In this case, you don't have an opinion to a reasonable degree of probability one way or the other when the spinal infarct occurred, correct?
> MR. JACKSON: Objection as to form. You may answer.
> THE WITNESS: The only thing we- we have scientifically that he had this weakness on June 17th documented, and that is the only date that I can say that's likely he had spinal infarction. More likely than not June 17th. Now, whether he had it before or no, I can't provide a – an opinion for that."
> **************************************
> "Q: Right. You're not going to tell the jury in this case that his spinal infarct was not caused by the dissection and the surgical repair, correct?
> MR. JACKSON: Objection. You may respond.
> ***THE WITNESS: Spinal cord infarction was not caused by the surgical repair. That's — I – I think the spinal cord infarction happened with the postoperative care for the patient.***
> **************************************
> Q:And you agree that the spinal cord infarct was a complication of the surgery for the acute type A aortic dissection, correct?
> MR. JACKSON: Objection. You may respond.
> THE WITNESS: That's – that's– that's – that's- that happened during the postoperative care. Postoperative care is part of the— of the surgery, in general. So if— if that's what you mean, then yes." *See Exhibit 9* at p. 58 - 60 (emphasis added).

Importantly, consistent with the Plaintiff's expert witness designation, Dr. Elakil

unequivocally testified to a reasonable degree of probability that the placement of a lumbar drain

would have led to a different outcome for Mr. Welch, as he stated:

> "Q: But you cannot testify to a reasonable degree of probability that the placement
> of a lumbar drain would have led to a different outcome for Mr. Welch in terms of the spinal cord infarct. That's too speculative, correct?

24

A: Placement of cerebrospinal fluid, as indicated in many research and many of the culture and studies, prevent these worse outcomes for the patient, and that's why we place them.

Q: But you can't state in this case, to a reasonable degree of probability, that the placement of a lumbar drain would have prevented any residual deficit from the spinal cord infarct, correct?

MR. JACKSON: Objection. You may respond.

THE WITNESS: To the degree of medical certainty, more likely than not it would have prevented."

************************************************

"Q: Okay. So my question to you is: In this case, you would agree with me that you cannot state to a reasonable degree of probability that the placement of a lumbar drain would have resulted in complete resolution of the– of any lower extremity weakness for Mr. Welch, correct?

MR. JACKSON: Objection. You may respond.

THE WITNESS: Not true. That's not true. So the— the – the hole of the lumbar drain is to increase what we call the spinal perfusion pressure, increase the blood flow to the spinal cord. And how you can reach that by decreasing the pressure inside the spinal cord; how you can do that by inserting the lumbar drain.

So inserting a lumbar drain will enhance the– what we call is the spine perfusion pressure; the blood reaching all the tissue inside Mr. Welch's spinal cord.

And if we would have done that, I would think that to a medical– to a reasonable degree of medical certainty, more likely than not, that he might have complete resolution of his symptoms. Given all the—

BY MS. STURTZ:

Q: He might have had no resolution of his symptoms, correct?

MR. JACKSON: Object to form.

BY MS. STURTZ:

Q: Or only partial resolution, correct?

A: Very less likely because the articles and the literature, they do agree that insertion of lumbar drain does enhance the spinal cord perfusion and does result with resolution of patient's symptoms, and there was at least a partial improvement." *See Exhibit 9* at p. 70-71;76-77.

Dr. Elakil also testified as to his reliance on his own clinical experience of placing a lumbar drain in a patient after a type A aortic dissection to obtain improvement in the neurological function.

He stated:

"Q: And how many times have you placed a lumbar drain in a patient after a type A aortic dissection and surgical repair? Have you ever done that?

A: Yes. We do— we– we do see patients with spinal cord infarction after multiple spinal cord injuries. And those are managed the same way as aortic dissection.

25

That's not. Before I join Insight, I did place one time, I – I think, in– as an attending, and the few times as a resident a drain for a aortic dissection specifically. However, lumbar drain in general- placement of a lumbar drain in general, whether after aortic dissection or no, this is a very common procedure that's done on a weekly basis for neurosurgeons."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Okay. So one time when you were in Lafayette you placed a lumbar drain in a patient who had suffered a Type A aortic dissection and had surgical repair for that–

A: Correct.

Q: —correct? And was that— what was the — the reason for the placement of the drain?

A: Spinal cord infarction.

Q: And what was the outcome of the — did the patient have any residual neurologic deficits after—

A: Yes. He—

Q: Did the patient survive the surgery and postoperative time period?

A: Yes, he did. And he had a partial improvement, not full improvement; that specific patient. I think he went from power one and two to three or four. I don't remember exactly."

*See Exhibit 9* at p. 79 -82.

Consistent with Plaintiff's expert witness designation, Dr. Elakil testified regarding the

extent of his ability to use the method of a differential diagnosis to rule out any other cause of

Mr. Welch's lower extremity weakness as follows:

"Q: Okay. Sorry. Do you know what types of things can cause lower extremity weakness following a type A aortic dissection and surgical repair?

A: The first thing is– is exactly what the doctor of his team thought. So you can't see it, as a neurologist, as I see a doctor looking at their notes that they think it's a spinal cord infarction. I do agree with them. I do– I would think it's a spinal cord infarction.

Q: So what other things would be on the differential, or is that beyond your area of expertise?

A: Having upper limb– his upper limb is strong, and his lower limb being the issue, that would be spinal infarction, by far, number one.

Q: Anything else on the differential?

My question was– I understand they had it on their differential, but is there anything else that would be on your differential—

A: No.

Q:--- as to what could cause lower extremity weakness following type A aortic dissection and surgical repair?

> A: Stroke in the brain in an area that only controlled the lower limbs. And that—
> that would be the– the second one, but— but due to– you know, after aortic
> dissection was only lower extremity, by fair is spinal cord infarction.
> *See Exhibit 9* at at p. 88-90.

He also testified as to his knowledge about the specific pathophysiology of Mr. Welch's stroke

and the imaging which he reviewed and relied upon in forming the basis of his opinion regarding

the relationship between Mr. Welch's spinal perfusion pressure, intraspinal pressure, and mean

arterial pressure during the relevant postoperative period. Specifically, he testified:

> "Q: Well, what type of stroke did he have on the imaging that you reviewed in the
> spine?
> A: He had infarction due to lower in his spinal perfusion pressure. When you
> lower the spinal perfusion pressure, the blood that reaches the spinal cord goes
> very little and that causes the infarction. It's simple equation. Spinal perfusion
> pressure equal the mean arterial pressure minus the intraspinal pressure.
> Q: Right. The– what does cardioembolic etiology mean to you, if anything?
> A: It's a stroke that happens because– let's say the heart is pumping very fast and
> can send clot into the brain.
> Q: And you agree that his strokes were– the etiology of his strokes were
> cardioembolic?
> A: I think it's the decrease in his spinal perfusion pressure. And that's what all
> these articles out there describing.
> Q: And what caused the decrease in spinal perfusion pressure?
> A: It's increase in his in– he was not managed right because the spinal perfusion
> of pressure should be always very high. And if the intraspinal pressure is not
> decreased inserting a drain, the spinal perfusion is low. However, if you insert the
> drain, the spinal perfusion pressure goes up, and then infarction would have
> managed, the blood flow would have reached that nerve tissue that's dead.
> Q: My question to you is: What cause– You said it was caused by a decrease in
> spinal perfusion pressure. What causes the decrease in spinal perfusion pressure?
> A: Increase in the intraspinal pressure.
> Q: And what caused an increase in the intraspinal pressure?
> A: And the MAP. And the MAP and– the mean arterial pressure. So what happens
> is when you try to decrease the patient, let's say, systolic and diastolic blood
> pressure, that will decrease the MAP. The MAP is the mean arterial pressure. And
> that will decrease the spinal perfusion pressure.
>     So there's two– two ways to enhance the spinal perfusion pressure. The
> first way is by enhancing the MAP, the mean arterial pressure, by allowing him to
> have higher than normal systolic and diastolic blood pressure.
>     If you do have higher than the normal systolic and diastolic, you can
> increase the spinal perfusion pressure.

27

In that case, though, when the stroke team saw him, they recommended actually decrease the systolic and diastolic, and — instead of allowing a little bit of increase, which would increase the spinal perfusion pressure.

Now, if we can't increase the systolic or the diastolic due to some reason then the only variable here we have as— as his intraspinal pressure, which you need to decrease— decrease it as much you can. How you can do that by inserting a lumbar drain.
*See Exhibit 9* at 92-95.

Dr. Elakil also testified about his lack of deference to a cardiothoracic surgeon based on his expertise when assessing the risks of setting a specific mean arterial pressure goal for a patient such as Mr. Welch who has suffered a spinal cord infarction. He testified:

"Q: Okay. And then in terms of– do you— again, is this— if it's outside of your area of expertise, that's fine, but in terms of what level the MAP goal should be following a type A aortic dissection and surgical repaid, do you defer to the cardiothoracic surgeon on that?
MR JACKSON: Objection. You may respond.
THE WITNESS: Let's say— let's say patient has no spinal cord infarction; then yes. I do defer to the — the cardiothoracic surgeon, but when you tell me the patient has weakness and you consult me, you say, Hello, Dr. Elakil, you're the neurosurgeon. The patient has spinal cord infarction. What's the MAP? Then I will tell you, I want the MAP in the 85 to 90—-
BY MS. STURTZ:
Q: And—
A: — which is high.
Q: Okay. And do you have any understanding as to what risk there would be to Mr. Welch of having a MAP of 85 to 90— let's start first within the first three days postoperatively.
A: That's a great question. So let's say the cardiothoracic tells me it's pretty high risk to have a very high MAP. Then I will be, That's okay. The lumbar drain– we can really decrease the intraspinal pressure from the lumbar drain and increase the spinal perfusion of pressure with the current— with that specific MAP that you want. But the spinal perfusion pressure should be very high at all times regardless, and there's many ways to do so.
Q: Okay. So it's — Okay. So I think my question when we started this was asking— I'm trying to pull up— bear with me for a second while I see if I can find the imaging report.
Do the— from your review of records, did the neurologist at any time rec– recommended a lumbar drain?
A: No. But multiple timers they say they think the patient has spinal cord infarction."*See Exhibit 9* at p. 96-98.

Based on Dr. Elakil's clinical experience, he also testified as to the obvious nature of the imaging signal indicating the presence of a postoperative stroke on Mr. Welch's spine as he testified:

> "Q: Oh. Here. So initially– am I right from the MRI initially they weren't sure it was an infarct at T5 and then there was a further review? Is that your understanding from what you reviewed?
> A: Yes.
> Q: And it says there was a DWI. What does that mean?
> A: DWI is a signal— signal sequence in the MRI that tell you for a fact, for a sure thing, that there is a stroke– a new stroke.
> Q: Okay.
> A: And it can – it can tell you if the stroke is an old stroke or new stroke. Here, when you see a DWI hyperintensity, it's a new stroke. That's like them happen a year ago.
> Q: Okay. And it's at level T5, right?
> A: Yes.
> Q: Does the— does the fact that it wasn't seen or was questionable initially and it took an addendum review indicate anything about the size of the infarct?
> A: No. That's — it was very obvious to me.
> Q: Okay. Well, you knew it– you were looking at this retrospectively when you reviewed the images, correct?
> A: No. When you see DWI hyperintensity, right away you know this is a stroke."
> *See Exhibit 9* at p. 100-101.

Consistent with Plaintiff's expert witness designation and his expert report, Dr. Elakil also testified as to the clinical significance of the post-operative care team failing to use volume loading as a particular intervention that, had it been utilized, would have, more likely not, changed the outcome of Mr. Welch's condition. Dr. Elakil testified:

> "Q: Okay. You make reference in your report to — we talked about the lumbar drain. You also make reference to volume loading. What did you mean by volume loading as an intervention?
> A: That's— that's a great question. So remember the equation that I told you about? Spinal perfusion pressure equal mean arterial pressure minus intraspinal pressure. Any way to increase that spinal perfusion pressure will make the best outcome.
>     So increasing the volume will increase his systolic blood pressure up; means the MAP will be higher. So volume— inserting lumbar drain, volume raises station, which is what you really want; to increase the perfusion pressure to

avoid all the sequences that happened to him. So yes, lumbar drain, volume raises station; those are the main big one.
Q: And when the – when the stroke team consulted in this case, did they make any recommendations related to volume loading?
A: No.
Q: What was– in terms of volume loading, what was being done for Mr. Welch postoperatively?
A: If I remember correctly, and please excuse me if I don't, I remember they actually asked for lower blood pressure. So less than 130 over 80, which is– goes against the management of spinal cord infarction."
*See Exhibit 9* at p. 102-103.

Dr. Elakil also testified as to the absence of any direct therapeutic treatment for Mr. Welch's

spinal infract during the critical treatment window of June 17th until June 22nd. He opined:

> "Q:Okay. What treatment, if any, was Mr. Welch getting between June 17th and June 22nd that were directly or directly therapeutic for the spinal infarct?
> A: I did not see any." [*See Exhibit 9* at p. 109]

Dr. Elakil confirmed that the surgical management of the spinal infarct was indeed an issue to be

properly placed under the auspices and direction of a neurologist rather than a cardiothoracic

surgeon as he testified:

> "Q: Okay. Just a few more questions, Doctor. Based on the detection of the infarct on June 17th for Mr. Welch and it being postop from the dissection, at this point, would you defer to your treatment of— management of the infarct, would you defer to a cardiothoracic surgeon in his case?
> A: No. It's a neurosurgical problem. So spinal cord infarction is something we are very familiar with. We need to enhance the spinal perfusion pressure. The only question would be to a cardiothoracic is it okay from your standpoint to increase his MAP. And that will just make that decision for me whether I need to volume resuscitate him or no. If he says yes, then I will volume resuscitate him. If he says no, then I will hold on the volume resuscitation, but only thing that definitely I'm going to do, 100 percent regardless of the cardiothoracic surgeon opinion, is my inserting a lumbar drain." *See Exhibit 9* at p. 128-129.

### *Legal Standard*

Under District of Columbia law, "[i]n a negligence action predicated on medical

malpractice, the plaintiff must carry a tripartite burden, and establish: (1) the applicable standard

of care; (2) a deviation from that standard by the defendant; and (3) a causal relationship between

that deviation and the plaintiff's injury." Washington v. Wash. Hosp. Ctr., 579 A.2d 177, 181 (D.C. 1990) (citations omitted). "Expert testimony is required to prove all three of the required elements, including causation, except where the proof is so obvious as to lie within the ken of the average lay juror." Providence Hosp., Inc. v. Willis, 103 A.3d 533, 538-39 (D.C. 2014).. In order to establish proximate cause, "[t]he expert need only state an opinion, based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of the plaintiff's injuries." Psychiatric Inst. of Washington v. Allen, 509 A.2d 619, 624 (D.C.1986); Grant v. American Nat'l Red Cross, 745 A.2d 316, 319 (D.C. 2000)("to establish proximate cause in a medical malpractice case, the plaintiff must prove "a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries.").

Federal Rule of Evidence 702 provides: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Fed. R. Evid. Rule 702, trial judges serve as gatekeepers to ensure that the methodology underlying the expert testimony is valid and the expert's conclusion is based on "good grounds." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590 (1993); see also Haarhuis v. Kunnan Enters., Ltd., 177 F.3d 1007, 1015 (D.C. Cir. 1999) ("[T]he decision whether to qualify an expert witness is within the broad latitude of the trial court and is reviewed for abuse of discretion."). This court has recognized that physicians acquire the knowledge they use

31

in the profession from many sources, including their personal experiences and through others in

related fields. *See* Garvey v. O'Donoghue, 530 A.2d 1141, 1147 (D.C.1987).

In general, Rule 702 has been interpreted to favor admissibility." Khairkhwa v. Obama,

793 F.Supp.2d 1, 11 (D.D.C.2011)(citing Daubert v. Merrell Dow Pharms, Ins., 509 U.S. at 587,

113 S.Ct. 2786 (1993); Fed. R.Evid. 702 Advisory Committee's note ("A review of the caselaw

after Daubert shows that the rejection of expert testimony is the exception rather than the rule.")).

### *Legal Argument*

**A.      Dr. Elakil's Opinions on Proximate Causation and Damages Are Sufficient and Shall Be Admissible Under Principles of *Daubert* and Federal Rule of Evidence 702.**

**1.  Dr. Elakil possesses the requisite scientific, technical and other specialized knowledge to assist the trier of fact to understand the evidence and determine the facts at issue.**

Dr. Elakil is a board certified neurosurgeon, thereby making him qualified to opine on

matters related to infarctions in the spinal cord and the brain. ("Neurosurgery deals with the brain

and spine. And infarction and the spinal cord, those are the same etiology that results in an

infarction in the brain as well."*See Exhibit 8* at p. 63.). In this capacity, he is regularly consulted

by members of the stroke team at Insight Hospital. *Id.* at p. 27. Even though Dr. Elakil is not a

cardiothoracic surgeon, prior to offering his opinions in this case he obtained training and

experience from 2020 until 2021 performing neurosurgery at Our Lady of Lourdes Hospital, an

environment where medical professionals cared for patients who underwent type A aortic

dissections similar to the one performed on Mr. Welch. *Id.* at p. 12.

As for the interventions of a spinal drain and different blood pressure goals and their potential impact on a patient, Dr. Elakil's education, training, and clinical experience has included the placement of a lumbar drain and his assessment of the viability of these interventions in patients following a Type A aortic dissection repair as he testified that he placed a lumbar drain as a resident a drain for a aortic dissection specifically, and while at Lafeyette, both placed a lumbar drain and followed the cardiac surgery patient postoperatively to assess the degree of the patient's residual neurologic deficits *Id*. at p. 79-82. Defendants' assertion that Dr. Elakil's *current* practice does not include consulting with cardiothoracic surgeons is inconsequential for purposes of an F.R.E. 702 analysis given that in this case, 1) the cardiothoracic surgeon's care who performed the aortic dissection without complication is not at issue and 2) Dr. Elakil relied on his prior clinical experience consulting with a cardiothoracic surgeon when opining how to determine whether a patient such as Mr. Welch was at risk of having a MAP of 85 to 90 when he testified:

the-
> "Let's say– let's say patient has no spinal cord infarction then yes. I do defer to
>
> the cardiothoracic surgeon, but when you tell me the patient has weakness and you consult me, you say, Hello, Dr. Elakil, you're the neurosurgeon. The patient has spinal cord infarction. What's the MAP? Then I will tell you, I want the MAP in the 85 to 90–"
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> "So let's say the cardiothoracic tells me it's pretty high risk to have a high MAP. Then I will be, That's okay. The lumbar drain– we can really decrease the intraspinal pressure from the lumbar drain and increase the spinal perfusion of pressure with the current- with that specific MAP that you want." *Id.* at p. 96, 97.

and, (3) Dr. Elakil has clinical experience serving on the very team of neurologists who were consulted by the named Defendants during the postoperative care of Mr. Welch as Dr. Elakil testified "so the neurology stroke team, if they need surgical consultation, they consult me." *Id.* at p. 26.

33

Defendants' assertion that "Dr. Elakil has never written any publications related to the diagnosis, treatment or sequelae of strokes" is <u>false</u>. According to Dr. Elakil's curriculum vitae which was attached to Plaintiff's expert witness designation, he authored the following peer-reviewed article:

- "Alaqeel, A., AlAmmari, A., AlSyefi, N., Al-Hussain, F. and Mohammad, Y., 2014. Stroke awareness in the Saudi community living in Riyadh: prompt public health measures must be implemented. *Journal of Stroke and Cerebrovascular Diseases*, 23(3), pp. 500-504.

As this Court is aware, a witness may also be qualified as an expert based on his experience. If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." <u>Arias v. DynCorp</u>, 928 F.Supp.2d 10 (2013); Fed.R.Evid. 702 advisory committee's note; *cf.* <u>DL v. District of Columbia</u>, 730 F.Supp.2d 78, 81 (D.D.C.2010). Here, based on Dr. Elakil's testimony, he demonstrates how his experience placing lumbar drains in patients who have experienced a spinal infarct following an Type A aortic dissection and consulting with neurologists and cardiothoracic surgeons regarding targeted blood pressure levels of such patients led to his conclusion that based on Mr. Welch's presentation, had such interventions been utilized, Mr. Welch would not have, more likely than not, incurred permanent neurological injury. Dr. Elakil also established why that experience is a sufficient basis for his opinion when he testified "Yes. We do–we – we do see patients with spinal cord infarction after multiple spinal cord injuries. And those are managed the same way as aortic dissection." *See Exhibit 9* at 79-80. Dr. Elakil also established how that experience is reliably applied to the facts in this case when he testified:

"Q: Okay. Do you recall if there's any variability in the medical records in terms of what his lower-lower left-leg movement and level of strength were? And if you don't

MR. JACKSON: Objection
BY MS. STURTZ: Q: — remember, that's fine.
A: Yes, I do remember. Some of them say it's zero, some of them say one, but, you know, zero, one, two, three, the bottom line is this very weak leg, and that's what we care about here.
Q: Okay. What do you— do you agree that in terms of the spinal infarct it was a single embolic stroke at T5?
A: Single– single embolic stroke?
Q: (Nods head up and down.)
A: What do you mean?
Q: Well, what type of stroke did he have on the imaging that you reviewed in the spine?
A: He had infarction due to lower in his spinal perfusion pressure. When you lower the spinal perfusion pressure, the blood that reaches the spinal cord goes very little and that causes the infarction. It's simple equation. Spinal perfusion pressure equal the mean arterial pressure minus the intraspinal pressure." *Id*. at p. 92-93.

As this honorable Court is aware, The degree of "knowledge, skill, experience, training, or education" required to qualify an expert witness "is only that necessary to insure that the witness's testimony `assist' the trier of fact." Khairkhwa v. Obama, 793 F.Supp.2d 1, 11 (D.D.C.2011); *see also* Mannino v. Int'l Mfg. Co*., 650 F.2d 846, 851 (6th Cir.1981) (noting that the weight of the evidence is a matter to be assessed by the trier of fact). "[I]t is not necessary that the witness be recognized as a leading authority in the field in question or even a member of a recognized professional community." Khairkhwa, *supra*; *see also* 29 FED. PRAC. & PROC. (EVID.) § 6265. "The `assist' requirement is satisfied where expert testimony advances the trier of fact's understanding to any degree." *Id.* Here, Dr. Elakil possesses the requisite knowledge, skill, experience, training, and education to advance the trier of fact's understanding of the implications of failing to place a lumbar drain and monitor blood pressure goals in a patient who is experiencing a spinal infarct following a Type A aortic dissection, and is also qualified to diagnose, treat, and evaluate the long-term sequelae of strokes and compare the long-term

sequelae of strokes in patients after an aortic dissection to those who did and did not have certain types of intervention.

Therefore his testimony shall be deemed admissible and the Defendants' Motion *In Limine* shall be denied.

**2. Dr. Elakil's testimony is based on sufficient facts and data.**

As this honorable Court is aware an expert need not employ a rigorous analytical methodology if the expert is instead qualified on the basis of his or her practical experience or training. Boesen v. Brown, Civ. Action No. 19-3499 (EGS)(D.D.C. 2023). Notwithstanding Dr. Elakil's qualifications, Defendants essentially challenge Dr. Elakil's opinions by pointing to information that Dr. Elakil "ignored" or information that differs from the testimony of Plaintiff's expert neurologist Roland Hamlilton, M.D. However, Defendants' challenge turns a blind eye to the exhaustive list of sufficient facts and data upon which Dr. Elakil relied including: (i) Mr. Welch's medical records from his hospitalization in 2022 (including records from the surgery and postoperative care), (ii) radiology images from Mr. Welch's hospitalization in 2022 including his MRI of the brain and the MRI of the spine, (iii) the written radiologist reports that accompanied the MRI and CT imaging from Mr. Welch's hospitalization in 2022, (iv) deposition transcript of Kevin Welch, (v) deposition transcript of Shana Hargrove, (vi) deposition transcript of Defendant Hockstein, (vii) a review of *Delayed Onset Postoperative Paraplegia in Acute Type A Aortic Dissection*, (viii) a review of *Perioperative Care After Thoracoabdominal Aortic Aneurysm Repair*, (ix) a review of *Spinal Cord Ischemia Management: Current indications and Timing of Drainage*, (x) a review of 2022 ACC Guideline for Diagnosis and Management of Aortic Disease, (xi) a reliance on clinical experience placing a lumbar drain in a patient who suffered an aortic dissection, and  (xii) a reliance on clinical experience consulting with

36

cardiothoracic surgeons regarding the management of a spinal cord infarct. This set of facts and data form a sufficient basis for Dr. Elakil's testimony. *See* Estate of Gaither ex rel Gaither v. District of Columbia 831 F.Supp.2d 56 (2011)("Roberts' substantial experience and knowledge of sentencing practices in the Superior Court, the same factors that qualify her as an expert to begin with, coupled with her review of historical sentencing data compiled by others, constitute "sufficient facts or data" to support some form of a predictive judgment about how a judge might sentence a criminal defendant in a particular case.").

Defendants' challenge in this regard is similar to the Defendants' challenge of Plaintiff's expert in Boesen v. Brown, Civ. Action No. 19-3499 (EGS)(D.D.C. 2023). This medical malpractice claim before this Court alleged that had Dr. Brown properly biopsied and diagnosed Mrs. Boesen's tongue lesion as tongue cancer in either August or December of 2016, she would have avoided a neck dissection and radiation therapy. The Defendants, similar to those here, challenged the sufficiency of the facts and data relied upon by Plaintiff's expert, and the Boesen court found as follows:

> "Often intertwined with his argument about methodology, Defendant challenges the reliability of Dr. Bernstein's opinions by pointing to all the information Dr. Bernstein "does not know." Def.'s Mot., ECF No. 41-1 at 18. Since Rule 702 requires that expert testimony be "based on sufficient facts or data," Fed. R. Evid. 702(b), the Court addresses this argument as a separate challenge to Dr. Bernstein's testimony on the grounds that he was without sufficient facts or data to render his opinion. *See* Def.'s Reply, ECF No. 43-1 at 11-12 (claiming that an admitted lack of knowledge about the doubling rate of Mrs. Boesen's cancer is "an admission by Plaintiffs that Dr. Bernstein is without the `data' he needs to render a causation opinion about the December 15th appointment").

> Essentially, Defendant argues that Dr. Bernstein is not able to claim that "had dysplasia or a less invasive carcinoma been diagnosed 5 months earlier[,] Ms. Boesen would likely have been able to avoid the neck dissection and radiation and might have needed less tongue surgery," because he "does not know when the cancer first formed, how fast it grew, [and] when it reached a point when it required a neck dissection or radiation therapy." Def.'s Mot., ECF No. 41-1 at 18 (internal quotation marks omitted). Plaintiffs respond that they are "not obligated to prove absolute certainty in this case," Pls.' Opp., ECF No. 42-1 at 22; and that

"[t]he evidentiary standard that must be met in this matter is *not* on what specific date did the dysplasia or cancer form; [but] rather, . . . as a result of the violations of the standard of care, more likely than not and within a reasonable degree of medical certainty, what damages occurred," *id.* at 17.

The Court again agrees with Plaintiffs. Beginning with Dr. Bernstein's opinion that Mrs. Boesen had dysplasia on her first visit to Dr. Brown, Defendant implies that knowing when the lesion began to be precancerous is a prerequisite to forming such an opinion. Certainly, if Dr. Bernstein knew the moment the cancer formed or even how fast it grew, this would provide a strong basis for his opinion—perhaps even certainty—that Mrs. Boesen had dysplasia when Dr. Brown examined her in either August or December 2016. But such knowledge is not necessary to form that opinion or to render that opinion admissible. *See* West, 293 F. Supp. 3d at 93 ("Where two highly experienced and knowledgeable infectious disease doctors opine about the most likely bacterial cause of a patient's infectious disease based on all of the facts surrounding his history and clinical presentation, those opinions are not subject to exclusion simply because they are not also confirmed by tests that *definitively prove* the presence of that bacteria." (emphasis added)). Rather, those facts, would only strengthen (or undermine) Dr. Bernstein's opinion. And thus, they go to the weight of his opinion instead of its admissibility."

Likewise, a similar challenge was made by the Defendants against the Plaintiff's experts in West v. Bayer Healthcare Pharmaceuticals, Inc. 293 F.Supp.3d 82 (2018). In that case, Plaintiff William alleged that he contracted a severe bacterial infection after using a contaminated alcohol prep pad that was packaged with an injectable medicine produced by Defendant Bayer HealthCare Pharmaceuticals, Inc. Defendant Bayer raised challenges similar to those raised by the Defendants here to the proffered testimony of Plaintiff's experts, harping on Plaintiff West's experts' perceived reliance on factually incorrect information, the proffering of testimony that contradicted published peer-reviewed materials or the testimony of other Plaintiff's experts, and the use of the answer "I don't know" in a deposition. However the West court found that those objections, similar to those raised by the Defendants here, did not warrant the exclusion of expert witness testimony. The West court found as follows:

Defendant raises various other critiques of Drs. Abbruzzese and Auwaerter's opinions and statements they made during their depositions. The Court has considered all of those critiques and is not persuaded that any of them call for

38

exclusion. Defendant argues that one statement in Dr. Abbruzzese's deposition testimony — that Plaintiff had received antibiotics before certain of his cultures were taken — is factually incorrect. Def.'s Reply in Support of Mot. to Exclude at 3-4. Defendant argues that when asked a particular question about cultures and *B. cereus,* "Dr. Abbruzzese admitted he did not know." *Id.* at 4. Defendant argues that one statement Dr. Auwaerter made during his deposition is "at odds with what he has published on this very question." *Id.* And Defendant argues that Dr. Auwaerter and Dr. Abbruzzese may disagree on certain points. Def.'s Mot. to Exclude at 11 n.5. The Court's answer to all of these arguments is the same: they are possible (and, indeed, fairly traditional) avenues of cross-examination and impeachment and go merely to the weight of the experts' opinions.

In sum, despite the large volume of arguments raised by Defendant, the Court is not persuaded that the testimony of Drs. Abbruzzese and Auwaerter should be excluded. All of Defendant's arguments regarding the proffered experts' testimony go to weight, not admissibility, and should be explored before the jury. West at 96.

Similarly, Defendants claim that because Dr. Elakil cannot quantify whether Mr. Welch would have had partial or complete recovery had the lumbar drain placed, he is not able to claim that had it been placed it would have made a difference in the permanency of Mr. Welch's neurologic deficits. However, knowing *for certain* whether the recovery would be complete or partial  goes to the weight of Dr. Elakil's opinion and not its admissibility. Absolute certainty in a causation opinion is not necessary. *See* Mendes-Silva v. United States*,* 980 F.2d 1482, 1488 (D.C. Cir. 1993) (holding that the fact "that no scientific evidence exists which *conclusively* establishes [a] causal link" is not a "bar to the admissibility of ... expert opinion on causation.") (emphasis in original). Therefore, Defendants' Motion shall be denied in this regard.

### 3.    Dr. Elakil's testimony is the product of reliable principles and methods.

Discussing and then applying established medical knowledge to the facts of a specific case is a common practice for rendering an expert opinion. *See* West v. Bayer HealthCare Pharm. Inc.*,* 293 F. Supp. 3d 82, 91 (D.D.C. 2018) ("Plaintiffs' experts are infectious disease doctors who have applied their education, experience and knowledge of infectious diseases to the information available to them about a patient and, based on that information, have chosen what

they believe is the most likely cause of that patient's illness over all other possibilities. This type

of medical diagnosis—while obviously not infallible—is a reliable, scientific manner of

generating an expert opinion."). Dr. Elakil applies the concept of increasing spinal perfusion

pressure to the specifics of the injuries sustained by Mr. Welch, the related risk factors, and Mr.

Welch's outcome. Specifically, Dr. Elakil applied the concept of increasing spinal perfusion

pressure to Mr. Welch's in the context of explaining how volume loading would have contributed

to a favorable outcome for Mr. Welch. Dr. Elakil testified:

> "Q: Okay. You make reference in your report to— we talked about the lumbar drain. You also make reference to volume loading. What did you mean by volume loading as an intervention?
> A: That's—- that's a great question. So remember the equation that I told you about? Spinal perfusion pressure equal mean arterial pressure minus intraspinal pressure. Any way to increase that spinal perfusion pressure will make the best outcome. So increasing the volume will increase his systolic blood pressure up; means the MAP will be higher. So volume— inserting lumbar drain, volume raises station, which is what you really want; to increase the perfusion pressure to avoid all this sequences that happened to him. So yes, lumbar drain, volume raises station; those are the main big one."
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> "Q: And in this case— Okay. And– and I think you already answered— never mind. Strike that. I was going to ask you about— Okay. Do you recall– in your review of the records– if you don't recall the specific numbers, but from your review the progress notes, were– if they have concern that his— he was hyp— having issues with hypertension?
> A: I - I remember seeing one time hypertension. I remember seeing one time hypotension. I don't remember what date, and what time, or what so forth. As I say, this is usually fluctuation. And the goal here is to make sure that the patient MAP always high with– with the large volume to increase the cervical perfusion pressure, and with the lumbar drain to decrease the intraspinal blood pressure, and subsequently increase the spinal perfusion pressure."
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> "Q: Okay. And is there any risk to the patient in terms of increasing the — the spinal perfusion pressure? Is there any risk to the cardiac surgical repair that was done in doing that, or—
> A: You–
> Q: — would you defer to a cardiothoracic surgeon on that?
> A: You can ask a cardiothoracic surgeon for that, but I don't know any other way you can manage a spinal cord infarction without increasing the intraspinal perfusion pressure. That would be a death sentence to the patient ability to walk."

*See Exhibit 9* at p. 102-103; 106-108.

Defendants' concerns about the conclusions Dr. Elakil's experience led him to, and the believability of those conclusions, go to the weight of the testimony and can be appropriately addressed through cross-examination. *See* U.S. v. H & R Block, Inc., 831 F.Supp.2d 27, 34 (D.D.C.2011) (noting that "technical deficiencies that can be adequately explored on cross-examination generally go to the weight, rather than the admissibility, of the evidence, unless the methodological deficiencies are so sweeping or fundamental as to render the survey wholly unreliable and therefore inadmissible").

Likewise, Dr. Elakil's review of peer- reviewed literature for purposes of providing his testimony is a reliable principle for opining on the clinical management of a spinal infarct given that such references to peer-reviewed literature is generally accepted within the community of neurosurgeons who are tasked with participating in the care and treatment of patients with spinal infarcts. Dr. Elakil testified to the general acceptance of this reliable principle as follows:

> "Q:Okay. So my question to you is just more a general one. If you were– you know, are certain sources that you use in your practice? If you have a question about something like spinal cord infarctions, what sources do you use to get some answers?
> A: Usually the best thing to use is the main guidelines that's done, you know, after multiple studies, which is usually the guide- the guidelines that's made by the American Association of Cardiology, the American Association of Neurosurgery. If that– if that disease that happened is extremely rare that there is not much under my studies to really decide which- which way to proceed with, I look to several study— the studies, and then I go— you know, make– make an opinion as — after studying all these results."
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> "Q: Okay. What facts are you relying upon to state that, in your opinion, there would have been– is it some resolution of his symptoms with a lumbar– placement of a lumbar drain?
> A: These articles that I refer to, they guidelines for—for us doctors. Those are articles that they created. They got all their results from multiple and multiple studies that were done." *See Exhibit 9* at p. 39; 77.

Here, Dr. Elakil uses the same methodology that has been approved by courts in a variety of cases involving experts whose experience forms the basis of their opinions where the expert "observed the relevant evidence" and "applied their specialized knowledge" to the case at hand. Heller v. District of Columbia, 952 F.Supp.2d 133 (2013); Russell v. Whirlpool Corp., 702 F.3d 450, 457 (8th Cir. 2012). Based on Dr. Elakil's aforementioned testimony, his reliance on his prior knowledge, training, education, experience, review of Mr. Welch's medical records, imaging, discovery, and peer-reviewed literature, Dr. Elakil has used reliable principles and methods in arriving at his opinions formed in this case, and his proffered testimony is properly grounded, well-reasoned and not speculative, and shall therefore before be admitted.

**4. Dr. Elakil's opinions reflect a reliable application of reliable principles and methods**
        **to this case.**

For the reasons stated above, Dr. Elakil's proffered testimony meets the fourth prong of F.R.E. 702. His opinions were formed with the rigor accepted in the field of neurosurgery, which is the area of medicine specializing in the surgical intervention of spinal cord and brain infarcts. Based on his review of medical records, imaging, imaging reports, deposition transcripts, and relevant peer-reviewed literature, Dr. Elakil's opinion are beyond the realm of conjecture and speculation, and would assist the trier of fact in determining the relevant issues raised in Plaintiff's claim. Because of their probative value, Dr. Elakil's opinions shall be admitted under F.R.E. 702.

### *Conclusion*

For the reasons stated herein, Plaintiff respectfully requests that this Court deny Defendants' Motion to Exclude the Opinions of Dr. Elakil on Causation and Damages.

Respectfully Submitted,

/s/ Kim Parker

_____

Kim Parker, Esquire
D.C. Bar No. 46980
LAW OFFICES OF KIM PARKER, P.A.
2123 Maryland Avenue
Baltimore, Maryland 21218
Office 410-234-2621
Facsimile 443-486-1691
Email: kp@kimparkerlaw.com

Governor E. Jackson, III, Esquire
D.C. Bar No. 1002797
LAW OFFICE OF GOVERNOR JACKSON, III LLC
400 E. Joppa Road, Suite 50
Towson, Maryland 21286
Office (410) 528-5150
Facsimile (410) 528-1055
Email gjackson@governorjacksonlaw.com

COUNSEL FOR PLAINTIFF

CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of November, 2024, I filed Plaintiff's Opposition to

Defendants' Motion to Exclude the Opinions of Dr. Elakil on Causation and Damages and Order

via ECF thereby effectuating service upon all counsel of record.

/s/ Governor Jackson, III

43