Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Civil Division

SHANA HARGROVE            *

AS POWER OF ATTORNEY  *

FOR KEVIN WELCH,          *     CIVIL ACTION NO.:

         PLAINTIFF, *     1:23-cv-3381

v.                        *

MEDSTAR WASHINGTON    *

HOSPITAL                  *

CENTER, ET AL.,           *

         DEFENDANTS.

* * * * * * * * * * * *


        The Virtual Zoom deposition of PETER

SCHULMAN, M.D. was held on Thursday, June 6, 2024,

commencing at 1:00 p.m., at the home of 1626 Southwest

Elizabeth Street, Portland, Oregon 97201, before Susan

Wootton, Notary Public.

REPORTED BY:  Susan Wootton, RPR, CLR



Page 2

APPEARANCES:
ON BEHALF OF PLAINTIFF:
GOVERNOR JACKSON, III (Via Zoom)
Law Office of Governor Jackson, III, L.L.C.
10 G Street, NE, Suite 600
Washington, D.C. 20002
Telephone: 202.637.5600
Email: gjackson@governorjacksonlaw.com

ON BEHALF OF DEFENDANTS:
DONNA STURTZ, ESQUIRE (Via Zoom)
Nelson Mullins Riley & Scarborough LLP
100 S. Charles Street, Suite 1600
Baltimore, MD 21201
Telephone: (443) 392-9400
Email: donna.sturtz@nelsonmullins.com

Page 3

INDEX
Deposition of PETER SHULMAN
June 6, 2024

Examination by:                    Page
MS. STURTZ                          4
MR. JACKSON                         157

Exhibit No.                        Marked
Exhibit 1    Updated CV               6
Exhibit B    Invoices for Dr. Schulman    100
Exhibit 3    CASE REPORT:  Kawanishi,
     et al., New Paraplegia In 3
     Cases After Aortic Dissection   104

Page 4

THE REPORTER:  Would the attorneys please identify themselves and state whom they represent, for the record?

MS. STURTZ:  Donna Sturtz on behalf of the defendants.

MR. JACKSON:  Governor Jackson, the III, on behalf of the plaintiffs.

Whereupon,
        DR. PETER SHULMAN,
called as a witness, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY MS. STURTZ

Q    Good afternoon, Dr. Schulman, or I guess it's morning there.  My name is Donna Sturtz and I'll be taking your deposition today.

I know that you've had your deposition taken before, but just want to mention a couple of things.

We're doing this remotely, obviously,

Page 5

so if at any point in time you don't hear all or part of a question I've asked you, please let me know and I'll be happy to correct that with the technology and restate my question.

If you go ahead and answer my question, I'm going to assume that you've heard and understood my question as asked, okay?

A    Yes.

Q    Also, it's sometimes hard remotely to not talk over.  At no point in time do I mean to talk over an answer you're giving.

A    Okay.

Q    If I do that, please let me know because I want a full and complete answer to my question.

A    Sure.

Q    If you don't tell me that, I'm going to assume that the answer you gave me was a full and complete answer to my question, okay?

A    Yes.

Q    All right.  And then, you're being



MAGNA
LEGAL SERVICES

Page 6

deposed today as an expert witness. I'll try to use the full magic words, but can we have an agreement that when I ask for your opinion, I'm asking for your opinion to a reasonable degree of probability?

A    Yes.

Q    Okay. So, Doctor, I was provided, prior to the deposition, with a copy of your CV. This CV is dated February 28th of 2023. My first question to you is, is there any update to your CV?

A    I'm sure there is.

Q    Okay. So I'm just going to have Susan hold open as Exhibit 1, to be your updated CV. If you could provide a copy of that to Mr. Jackson, he will get it to the court reporter, okay?

A    No problem.

(Schulman Exhibit 1 was marked for purposes of identification.)

Q    Have there been any changes to your professional activities since February 28th of

Page 7

2023?

A    No.

Q    Have there been any publications that you have authored that are pertinent to your opinions in this case since February 28th of 2023?

A    I've authored publications since then, I believe, but they would not be pertinent to the matter we're discussing today.

Q    Okay. You're licensed to practice medicine in Oregon, correct?

A    That's correct.

Q    Any other states?

A    No. I've previously been licensed in other states before I, you know, moved to Oregon and let the other licenses lapse, but currently I only practice in Oregon, so I'm only licensed in Oregon.

Q    In terms of where you practice medicine, has your practice been limited to Oregon since 2007?

A    2007 was the year that I moved to

Page 8

Oregon.

Q    So have you practiced medicine exclusively in Oregon since 2007?

A    Yes. I believe that's correct.

Q    You've never practiced medicine in the state of -- or in Washington, D.C, correct?

A    No. I have not.

Q    You're board certified in anesthesia with a subspecialty in critical care, correct?

A    Correct.

Q    Did you pass those board examinations on the first attempt?

A    Yes.

Q    You currently work at Oregon Health & Science University; is that correct?

A    That's correct.

Q    From your CV, it looks like you were the director of the cardiac ICU up until May of 2020; is that correct?

A    I don't recall the exact date that I relinquished that duty, but if that's what it says

Page 9

on my CV, then I'm sure that's accurate.

Q    Okay. So what changed -- assuming your CV uses a date of May 2020, when you stopped being Chief of the Division of Cardiac Surgery and Medical Director of the Cardiovascular Intensive Care Unit -- what changed in May of 2020?

A    Well, I need to correct something you just said that's inaccurate.

Q    Okay.

A    I was never the chief of cardiac surgery.

Q    Oh, my apologies. It says -- let me reask my question then, more correctly.

A    Sure.

Q    According to your CV, in May of 2020, you stopped being Chief, Division of Cardiac and Surgical Subspecialty Critical Care and Medical Director of the Knight Cardiovascular Intensive Care Unit.

A    That's true.

Q    And why was that change --

MAGNA
LEGAL SERVICES

Page 10

A   I still --

Q   -- made?  Go ahead.

A   I still work in that ICU, but I'm no longer the director of that ICU.

Q   Okay.  Why was there that change in May of 2020?

A   What do you mean by -- why did I step down from that position?

Q   Yes.

A   I was no longer interested in being in that role, because I didn't really enjoy the administrative responsibilities that came along with it.

I was also becoming more focused on clinical research and wanted to devote the majority of my nonclinical time to my clinical research endeavors and not spend so much time doing administrative work that was required --

Q   Okay.

A   -- with respect to that job.

Q   Okay.  And in terms of the research,

Page 11

do you have a particular focus or research interest?

A   I do.

Q   What is that?

A   Well, globally, I focus on cardiovascular risk reduction.  But my specific interest and sort of niche, if you will, is the perioperative management of patients with pacemakers and defibrillators.

So that's -- that's one major focus of my clinical research.  The other major focus over the last few years has been working in conjunction with an artificial intelligence lab at OHSU to try to develop a novel algorithm to automatically detect and diagnose heart sounds.

Q   Oh, interesting.  Okay.  Do you -- how would you break down your time since May of 2020, in terms of, you know, the percentage of time that's spent doing research versus doing other activities?

A   Well, I have one day a week that is

Page 12

afforded to me to focus on research.

Q   Then how many -- what is the balance of your professional activities, beyond the one day a week focused on research?

A   The majority of the -- the vast majority of the time that I'm not doing research, I'm doing clinical work.

Q   So would you say that you do one day a week of research and is it four days a week of clinical work?

A   Approximately, the --

The more specific answer is I don't -- even though I have one day a week that is dedicated to research -- I don't exclusively do research on that day only.

Q   All right.

A   And there are some days when I'm earmarked to do, you know, my research day when I might be pulled into doing other things as well.

Q   Okay.

A   So it's not so black and white, if you

Page 13

will.  But, you know, I would say the majority of my time is spent doing clinical work and a significant but, you know, certainly less than the majority of my time is spent doing research.

Q   Okay.  So just as a general approximation, would you estimate that 80 percent of your time involves clinical practice and 20 percent involves research?

A   Sure.  80/20, 70/30, something along those lines.

Q   Okay.  In terms of your clinical practice, describe for me your clinical practice.

A   I split my clinical time between working as an anesthesiologist in the operating room, and doing intensive care medicine in the cardiovascular ICU.

So those are two separate clinical jobs, and I do both of those.  So when I'm scheduled to be working in the intensive care unit, I'm not practicing anesthesiology in the operating room and vice versa.

MAGNA
LEGAL SERVICES

Page 14

Q   Okay.  In terms of those two areas of practice, how would you approximate you split your time between anesthesiology in the operating room and working in the ICU heart -- the cardiovascular ICU?

A   I spend -- well, I would say on the average over the last, you know, since 2007 -- which was the year that I started at my current practice at OHSU, I've -- I've done probably an average of 8 to 10 weeks, meaning 7 days, 7 days would be a week -- so 8 to 10 seven-day stints in the cardiovascular ICU a year.

And then the balance of my time is spent working as an anesthesiologist in the operating.

Q   So when you -- I just want to make sure I understand it.  So, you said you do 8 to 10 weeks --

A   Uh-huh.

Q   -- in the cardiovascular ICU, and each week is 7 days --

Page 15

A   Yes, some -- some --

Q   -- so, approximately 70 days a year --

A   Correct.

Q   -- you do anesthesia care --

A   Right.

Q   -- I mean, you do care in the cardiovascular ICU, and the remaining days of the year, you do anesthesia?

A   Yeah.  So somewhere between, if you multiply 8 by 7, that's 56.  So somewhere between, let's say, 55 and 70 or 80 days a year, at most, in the cardiovascular ICU; and then the balance of my time that is not, you know, off or research, I'm working as an anesthesiologist in the operating room.

Q   All right.  So in terms of your anesthesia practice, which is in the range of 56 to -- I mean, strike that.

In terms of your anesthesia practice, in what types of surgeries do you perform anesthesia?  Is it all kinds?  Is it specific

Page 16

kinds?

A   Well, all kinds, but I don't -- I don't provide anesthesia for pediatrics, children.  We have a separate, independent pediatric hospital where I work, and they have a separate team of specialty trained anesthesiologists and other medical providers to take care of children.

Q   And so --

A   And I don't practice obstetrical anesthesia anymore.  But in terms of what I do in the operating room, I, you know, take care of a wide variety of patients undergoing, you know, a fairly wide range of operations.

Q   Do those include minimally invasive operations, as well as more complex surgeries?

A   Yes.

Q   What percentage of the operations where you provide anesthesia services involve cardiac surgery?

A   Well, cardiac surgery specifically?  I don't provide anesthesia for those cases.  I do

Page 17

provide anesthesia for thoracic surgery and for vascular surgery; but for open heart cardiac surgery, I -- I don't do that.

I take care of those patients in the intensive care unit after their surgery.  But we have a different team of anesthesiologists that does the cardiac anesthesia in the operating room and I'm not on that team.

Q   Okay.  So, for example, you're not on the team for -- well, I guess, I should back up.

Does the Oregon Health & Science University perform surgeries to repair Type A aortic dissections?

A   Yes.

Q   And you're not on the anesthesiology team that provides anesthesia for surgical repair of Type A aortic dissections; is that correct?

A   That's correct.  I'm on the ICU team that takes care of those patients as soon as the surgery is done and they are admitted to the ICU.

But you are correct; I'm not on the

MAGNA
LEGAL SERVICES

Page 18

team that takes care of those patients in the operating room.

Q    You're not, in this case, offering any standard of care opinions related to the anesthesia team that took care of Mr. Welch during his surgery, correct?

A    That's correct.

Q    In terms of the ICU work that you do, that's around 56 to 70 days a year, how many times would you say you've provided ICU care for a patient following a Type A aortic dissection, surgical repair?

A    Many.  I mean, I would say I can't give you a specific number, but more often than not, when I'm on service in this cardiovascular ICU, we have a patient who is in the ICU because they have an aortic dissection or have had an aortic dissection repair or have had surgery on their aorta.

So if you, you know, roughly think about the math, if that's -- you know, if there's

Page 19

at least one of those patients, sometimes more than one of those patients every time I'm on service -- and I'm on service 8 to 10 weeks a year, and I've been doing this for probably, you know, close to -- not probably -- close to 20 years now, out of fellowship -- then you know, you could do the math more specifically if you want, but it's many patients.

Q    For, annually, would -- you say that you provide ICU care for patients who have undergone surgical repair of a Type A dissection, you would see 50 of those patients a year?  Is it that high?

A    No.  I don't think it's 50.

Q    Do you think it's --

A    But it's probably more than -- it's probably more than 10.

Q    So you would say, on an annual basis, you see more than 10 patients in the ICU following surgical repair of a Type A aortic dissection?

A    Well, certainly if you count -- you

Page 20

know, you're -- you're -- I can't give you an exact number.

Q    I know.  I'm just trying to get a rough estimate.

A    I'm giving you a very, very rough estimate.  And we also have patients who are in the ICU who have aortic dissections, but don't necessarily require surgery -- either, immediately or at all -- and I take care of those patients.

There are also patients with other aortic problems like aneurysms, and I take care of those patients as well.

So I -- it's hard for me to give you a very good estimate of exactly how many Type A dissection patients I see and take care of in a year.

But as I've mentioned, it's -- it's -- if I had to guess, it's probably -- it's probably more than 10; just -- just for the Type A dissection patients.

Q    How about for Type B dissection, would

Page 21

it be a similar number per year?

A    Probably, if not more.

Q    Which is more rare, a Type A dissection or a Type B dissection?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  Sorry.

MS. STURTZ:  He objected, but you can still answer.

A    Oh, you know, I'm not sure.  What I can tell you is that Type A patients who don't get to the hospital in a timely manner have a very high risk of dying.

So, in terms of patients who we see -- who make it to the hospital -- it's probably a higher proportion of Type B patients; because you know, we are not seeing a lot of Type A patients who die before they make it to get the care that they need.

But I don't actually know what the breakdown is statistically of, you know, the --

Page 22

the relative incidence of Type A versus -- Type A versus Type B, versus both types; because you can have a dissection that is both Type A and Type B.

I don't, off the top of my head, know the relative incidence of each of those diseases. I would have to look that up.

Q    Okay.  Did Mr. Welch, in this case, suffer a Type A aortic dissection?

A    He did, although his -- his dissection extended all the way down I believe to about the level of T12.

So just above, just all the way down through his thoracic aorta.  So it -- it was classified, you would classify it as a Type A dissection, but he really also had a Type B dissection as well.

Q    His dissection did not involve the descending aorta, correct?

A    I believe it did because if you look at -- if I pull up the CT scan read, it said -- so this is what I'm going on, maybe you have

Page 23

different information, but -- crescentic hypodensity -- this is his preoperative CT scan -- originating in the aortic arch, involving the entirety of the thoracic aorta, extending to the level of the aortic hiatus --

Q    The aortic --

A    -- which is right before the aorta goes through, transitions through the diaphragm and becomes the abdominal aorta.

Q    But the aortic hiatus is not technically part of the abdominal aorta, correct?

A    That is true, but a Type B dissection is defined as distal to the takeoff of the left subclavian artery; and if you go by that CT result, this abnormality in his aorta definitely extends more distally than the takeoff of the left subclavian artery.

So according to that read, this would be characterized as both a "Type A and a Type B dissection."

Q    Did you actually review that, chest CT

Page 24

images themselves or just going off the report?

A    I was not provided with the actual images, so I'm just going off the report.

Q    Did anything about the operative report indicate to you whether there was any repair of the descending aorta?

A    I don't recall, but more typically than not, they -- when someone presents with a dissection like this that involves both, you know, the ascending and descending thoracic aorta, they -- and again, I'm not a cardiac surgeon, but they, you know -- in my experience -- and I take care of a lot of these patients -- they will focus on repairing the ascending part of the aorta and leave the descending part of the aorta for a subsequent procedure, or to see whether that's going to be necessary to fix that part.

So the -- the emergent part of this is to fix the proximal or ascending part of the aorta, and it's not as big of an emergency to fix the entire thing.

Page 25

Q    So --

A    And just because the -- in this case -- the surgeon only focused on repairing the more proximal part of the aorta, doesn't mean that the dissection didn't extend beyond that.

Q    Okay.  But you, though you would defer to a thoracic surgeon, you have an understanding in this case that the repair that was done was to the Type A aortic dissection?

A    That's correct.  But clearly, based on that read, the dissection extends beyond.

Q    Right.  But what was repaired was the Type A portion, is your understanding?

A    That's my understanding.

Q    And the pathology that was submitted was the Type A aorta, correct?

A    I don't recall that.  I would have to look it up.

Q    Would you describe the dissection as extensive?

A    Yes.



Page 26

Q    Was this a life-threatening aortic dissection?

A    All Type A aortic dissections are life-threatening.

Q    Did this -- did he require surgery because of the Type A aortic dissection?

A    Well, he underwent surgery.

Q    What would have happened to him if he hadn't had surgery for the Type A aortic dissection?  Would he have died?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  Sorry?

MS. STURTZ:  That's all right.  Can you answer again, because I think he cut -- he objected, but you can answer.

A    Oh, repeat the question, please.

Q    Would he have died if he had not had the surgical repair of the Type A aortic dissection?

A    I believe he would have died, yes.

Page 27

The chances are very high he would have died.

Q    Do you have an understanding, statistically, of what percentage of patients who have a Type A aortic dissection die before they're able to present to the hospital?

A    Yes.

Q    What percentage?

A    To the best of my recollection, is it's about half.

Q    Do you have an understanding, statistically, of what percentage of patients with a Type A aortic dissection die due to -- let me strike that.

Do you have an understanding of what the 30-day mortality rate is for a patient who has suffered a Type A aortic dissection and has surgery?

A    Yes.  Yes, I have some understanding of that.

Q    What is your understanding of that?

A    I mean, there are -- you have to

Page 28

understand that there are a number of variables that go into this.  It's not a one size fits all situation.

So I'm going to preface my answer by saying, you know, someone who is previously young and otherwise pretty healthy without, you know, other preexisting comorbidities, would have a much higher chance of surviving than someone who let's say is older, sicker and had -- and/or had previous cardiac surgery.

Patients like that would have a much higher risk of having complications or dying afterwards.

The other thing I would say is that we've become better and better at taking care of these patients after their operations.

So if you look in the literature, you'll find a wide range of answers to your question, probably from anywhere, you know, from just a couple of percent -- like, let's say two percent -- all the way up to some percentage

Page 29

in the 20s or maybe even more.

But with better surgical techniques and better postoperative care, the mortality rate has certainly been diminishing; and more current evidence probably suggests that the overall mortality rate -- especially in the high volume center like the center that Mr. Welch presented to, or my center -- is probably less than five percent.

Q    You agree that the postoperative, 30-day mortality rate for Type A aortic dissection ranges between 10 to 35 percent?

A    No.  I don't agree with that.

Q    Do you agree the, in-hospital, Type A dissection mortality rate is in the 22 percent range?

A    Can you repeat the question, please?

Q    Do you agree that the "in-hospital" Type A dissection mortality rate is in the 22 percent range?

A    So you're suggesting that 22 percent

MAGNA
LEGAL SERVICES

Page 30

of patients who present with a Type A dissection, and undergo surgery to correct that dissection, end up dying before they leave the hospital? Is that what you're asking me?

Q    Right. The in-hospital Type A dissection mortality rate is in the 22 percent range.

A    That sounds very high to me. So, I think it just depends where you got that number from, what year that -- you know, if you're quoting a specific study, when -- when that was done, what the patient population was; whether it was from high volume centers where they do the surgery all the time; what the patient mix was; whether, you know, they included patients who were previously low risk or previously high risk, et cetera, et cetera. But that number on the face of it sounds quite high to me for 2024.

Q    Are you familiar with, at all, with the International Registry of Acute Aortic Dissections?

Page 31

A    I'm familiar with. I can't say I'm an expert in that registry and I can't quote -- quote things off the top of my head from that registry, but I'm -- I'm certainly familiar that that registry exists.

Q    Do you agree that the International Registry for Acute Aortic Dissections is reasonably reliable?

A    Yes.

Q    Do you agree that the life expectancy of someone who has suffered a Type A aortic dissection is reduced?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  Can you repeat the question, please?

MS. STURTZ:  Do you agree that the life expectancy of someone who has suffered a Type A aortic dissection is reduced?

MR. JACKSON:  Same objection.  You may respond.

Page 32

THE WITNESS:  As compared to what?

MS. STURTZ:  The average life expectancy?

A    I don't understand your question.  Can you be more specific, please?

Q    Sure.  Do you agree that someone who has suffered a Type A aortic dissection is less likely to live an average life expectancy than someone who has not suffered a Type A aortic dissection?

A    Yes.

MR. JACKSON:  Objection.

MS. STURTZ:  Do you agree that long-term data suggests that the 10-year survival rate, post surgery for a Type A aortic dissection, is 50 percent?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  I don't know the answer to that.  I would have to look that up.

Q    So you currently aren't aware of what

Page 33

the five and ten year survival rate is for someone who has undergone surgical repair of a Type A aortic dissection?

A    Not off the top of my head, because I -- I mean, I take care of these patients in the immediate postoperative period in the ICU.

Q    All right.

A    So I'm not typically focused on what happens to them, you know, five or 10 years later.

Q    Okay.  So you don't have experience caring for patients who have suffered a Type A aortic dissection, with surgical repair, after they are discharged from the ICU?

A    That's correct.

Q    Is there a range of how long those patients stay in the cardiac ICU, after surgery, for a Type A aortic dissection?

A    There's definitely a range.

Q    What is the range of admissions to the cardiac ICU, following that surgery?

A    The shortest duration of ICU day -- or

MAGNA
LEGAL SERVICES

Page 34

of ICU stay, excuse me, would be on the order of, you know, one to three days and the longest duration could be weeks.

Q   Is there an average, in that range, that you have experienced with the patients you've taken care of in the cardiac ICU?

A   I would say the average, in my -- and I don't have -- I'm just estimating.

But my estimate of the average is probably somewhere on the order of five days. But again, every patient is different.

Q   Okay.

A   And some patients sail through with no problems and can be discharged from the ICU very quickly, and others suffer complications and are thus needing to stay in the ICU for a prolonged period of time.

Q   Right. And there are known and recognized complications that can occur following surgical repair of a Type A aortic dissection, correct?

Page 35

A   Yes.

Q   And the fact that a known and recognized complication occurs does not, in and of itself, indicate that there was a breach in the standard of care, correct?

A   Correct.

Q   Have you had patients who -- following a Type A aortic dissection and surgical repair -- suffered cerebral strokes?

A   Yes.

Q   What percentage of those patients?

A   In my practice?

Q   In your experience, yes.

A   I don't know the number off the top of my head.

Q   How about, have you cared for patients in the cardiac ICU who had surgery for a Type A aortic dissection, who suffered a spinal infarct?

A   Me, personally? I'm not sure. I know that in our cardiovascular ICU, we have had at

Page 36

least several patients who have undergone Type A aortic dissection repair, and have had spinal cord ischemia afterwards or infarcts.

We've also had a patient, actually recently, who presented to our hospital with a Type A aortic dissection and already had evidence of malperfusion to the spinal cord.

Q   Okay.

A   And that patient ended up not being a candidate for surgery. So, I do know that we have had those patients.

I can't honestly remember with respect to the other patients that I mentioned, whether I was directly involved in their care or not; but I do know that we've had those patients in our cardiovascular ICU.

Q   Okay. So I guess I'm -- I just wanted to make sure I understand your answer. In terms of patients who suffered a Type A aortic dissection, with surgical repair, and had a complication of a postoperative spinal infarct,

Page 37

you believe there had been some patients like that in the ICU at your hospital, but you can't recall --

A   I don't believe -- I know there have been.

Q   You know there have been patients like that at the ICU in your hospital --

A   Right.

Q   -- but you are unsure as to whether you were directly involved in the care of those patients?

A   I can't specifically remember, because it wasn't very recent, except for the one patient I mentioned who came and didn't get surgery because they were essentially too sick.

Q   Okay. So when is the last time you believe there was a patient in the ICU at your hospital who had undergone a Type A -- surgery for a Type A aortic dissection, who suffered the complication of a spinal infarct after that?

A   I'm -- I'm estimating it might have

MAGNA
LEGAL SERVICES

Page 38

been two or three or four years ago.

Q   How about --

A   If you --

Q   -- if you --

A   Can I say one more thing?

Q   Of course, yes.  I didn't mean to cut you off.

A   We do see patients in the CV-ICU, in our cardiovascular ICU on a more frequent basis who do have aortic problems, and have the complication or sequelae of spinal cord ischemia and/or infarct.  And I know that I have been involved in taking care of patients like that.

Q   Right.  Because there's different kinds of aortic disease, correct?

A   Yes.

Q   And Type A aortic dissection is one kind of aortic disease, correct?

A   That's correct.

Q   And Type B dissection is a different kind of aortic disease, correct?

Page 39

A   Well, it's still an aortic dissection.  It's just the -- as I mentioned, if it's purely a Type B dissection, then the dissection, the origin of the dissection occurs distal to the takeoff of the left subclavian artery.  That is the difference --

Q   All right.

A   -- but if the patient still has a dissection or tear, if you will, in their aorta, there is also something called an aortic aneurysm, which is an out-pouching of the aorta, and there can be a risk of rupture there.

And those patients often need surgery, and we take care of those patients as well, and sometimes those patients end up needing care for spinal cord related issues.

Q   Okay.  So the treatment for a Type A dissection is different than for a Type B dissection, correct?

A   Well, it depends on the scenario.  For a Type A dissection, that -- if, for all intents

Page 40

and purposes, if the patient wants to live, then surgery is required.

Surgery is not always required for a Type B dissection.  Sometimes it is, but it's not always required.

Q   Right --

A   For a Type A dissection, surgery is mandatory for survival.

Q   And the surgical approach for Type B dissection is different than for a Type A, or do you defer to a thoracic surgeon on that?

A   Well, generally speaking, I know the answer to these questions --

Q   Okay.

A   -- but nuances about how, you know, what type of -- whether you would, you know, whether you would decide to fix a Type B dissection with a stent or with open surgery -- and these sorts of things -- I would certainly defer to a cardiac or a vascular surgeon.

Q   Okay.  But you do have a general

Page 41

understanding that a Type A dissection isn't something that's repaired with a stent?

A   I would -- stents are becoming more and more used, but typically that's true.

But the nuances of, you know, when it is the best approach to use a stent versus an open repair, I would defer to a surgeon.

Q   Okay.  In terms of your ICU practice, have you had occasion where there was a patient with a Type B aortic dissection, and repair of the Type B dissection, who had a spinal cord infarct as a complication?

A   I -- I believe there have been.  I can't specifically, off the top of my head, think of the, you know, exact patient.

But I certainly know and recall that I have taken care of a number of patients who have had spinal cord related issues after aortic surgery or as, you know, related to the fact that they present with an aortic problem and end up having spinal cord related issues.

MAGNA
LEGAL SERVICES

Page 42

Q    Okay.  And the fact that they had spinal cord related infarct does not, in itself, mean there was a breach in the standard of care at your hospital, correct?

A    Correct.

Q    The short and long-term complications of a Type A aortic dissection, with surgical repair, include strokes, correct?

A    Can you repeat the question, please?

Q    The short and long-term complications of a Type A aortic dissection, with surgical repair, include strokes, correct?

A    Correct.

Q    And include renal failure, correct?

A    Correct.

Q    Include paraplegia, correct?

A    Correct.

Q    Include end organ or limb ischemia, correct?

A    Ischemia, yes.  True.

Q    Do you agree that patients who have

Page 43

suffered a Type A aortic dissection, with surgical repair, should avoid any strenuous activities that can cause increases in their blood pressure?  Or is that beyond your area of expertise?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  I think that question is too open ended.  So it's hard to give you a specific answer.

I mean, it just would depend on -- are you talking about five minutes after their operation or a year after their operation?

MS. STURTZ:  Yeah.  Any time after their operation, isn't it -- isn't it true that patients who have suffered a Type A aortic dissection, with surgical repair, are advised to avoid strenuous activities that can cause increases in their blood pressure?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  I -- I would defer to a

Page 44

cardiac surgeon to answer that question.

Q    Okay.  In your work in the cardiac ICU -- well, let me first ask you this.  How many cardiac ICU beds do you have at the Oregon hospital?

A    26.

Q    How many surgeons at the Oregon hospital perform surgery for Type A aortic dissections?

A    I believe it's five now.  It used to be four, but they hired a new person, so I think we're up to five.

Q    Okay.  What are the names of those surgeons?

A    Is that --

MR. JACKSON:  Objection.  You may respond.

Q    Well, let me ask you this.  Do you consult with those surgeons when you are --

A    All the time.

Q    Right.

Page 45

A    Yes.  I -- I guess I'm happy to -- if you really want the names.  I just -- it makes me a little uncomfortable to bring other people who aren't involved in this.

Q    Right.  I'm not going to ask to take their depositions or something, but --

A    All right.

Q    -- I assume I could go to the Oregon website?

A    I'm more than happy to give you their names, or, you know, they're all on our website.

Q    Okay.  So I want to just know, in terms of who you work with.  So, am I correct when you are caring for these patients who have had this surgery, and you're caring for them in the cardiac ICU, during the time in the ICU, you consult with those surgeons?

A    Yes.

Q    And that's a reasonable thing for a critical care provider to do, correct?

A    Correct.

MAGNA
LEGAL SERVICES

Page 46

Q   And do you consult with them about what the blood pressure goal should be for the patient during their time in the cardiac ICU?

A   Yes.

Q   Do you know if any of the cardiac surgeons at Oregon have published in the area of Type A aortic dissections?

A   I suspect so, but I'm really not -- I'm just -- I'm not -- I'm not abreast of exactly what other people have or have not published.

Q   Do you defer to the cardiac surgeons on what the blood pressure goal should be following the Type A aortic dissection, surgical repair?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  No.  I wouldn't use the word "defer."

Q   What is -- is there a range that you and the surgeons at Oregon use for the blood pressure goal, during the initial admission to the

Page 47

cardiac ICU, following the surgery?

A   It depends on the situation.

Q   What is the risk of the blood pressure going too high, when the patient is in the cardiac ICU following this type of surgery?

A   I mean, there's always a balance of risks and benefits for any decision, including blood pressure management.

So, in someone where the main concern would be bleeding, then the balance, risk-benefit balance favors a lower blood pressure.

If there is a concern, as there was in this case, for spinal cord ischemia then -- and there's less of a concern for bleeding -- then the risk-benefit balance would favor a higher blood pressure.

So every case is different and it really just depends on the situation.

Q   And it necessarily involves the clinical and medical judgment of the providers directly involved in that patient's care, correct?

Page 48

A   Yes.

Q   So you're making judgment decisions all the time when you're involved in critical care of a patient following a Type A aortic dissection, correct?

A   Part of the job of the intensivist is to make determinations for that specific patient based on the specific circumstances.

So it would have been incumbent on the providers -- the ICU providers in this case -- to think very critically about the blood pressure management, in light of the extenuating circumstances that were going on with Mr. Welch after his operation.

Q   In making those considerations, they needed to include concerns about -- well, let me ask you.

Did they have issues with him having hypertension following the surgery while he was in the ICU?

A   They were -- it appears from the

Page 49

record that they were consistently making a concerted and ongoing effort to lower Mr. Welch's blood pressure.

Q   Is that because his blood pressure was at levels that were above the goal they set?

A   They were above the goal for a sort of -- a patient who has had a Type A dissection, but has not had a spinal cord infarct.

They were -- there's no evidence in the record that they took into account the possibility that Mr. Welch had had a spinal cord infarct, in terms of the blood pressure goals that they elected to set.

Q   Okay.  So let's -- let's -- and we're going to get to all that --

A   Okay.

Q   -- but in terms of when Mr. Welch -- he first gets to the ICU on the 15th, correct?

A   Yes.  And just so you know, no, it was -- well, yes, the -- he had surgery on the 14th, June 14th.

Page 50

Q    Right.

A    And then he -- so I actually don't recall exactly what time he got to the ICU, whether it was before or after midnight on the 14th.

But I do know he had his surgery on the 14th, and then he was subsequently admitted to the ICU immediately after his surgery.

Q    Okay.  Maybe I -- I have a shorter way to deal with this.  Looking at your reports, am I correct, Doctor, that you will not be offering any opinions in this case that there was a breach in the standard of care prior to June 17th, 2022?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  That's -- that's correct.

MS. STURTZ:  And you will, Doctor, not be offering any opinion in this case that there was any breach in the standard of care after June 18th, 2022, correct?

Page 51

MR. JACKSON:  The same objection.  You may respond.

Q    I'm looking at pages 7 and 8 of your report.

A    Yes.  I believe that's correct.

Q    So the --

A    If --

Q    Go ahead.

A    If that's -- if that is -- I believe that's consistent with what I wrote in the report.

Q    Okay.  So I'm looking at page 18, is that -- page 7 and 8 of your report and it indicates that you believe there were breaches in the standard of care on June 17 and/or June 18th, 2022.

So I'm correct that you will not be offering any opinions in this case that there was any breach in the standard of care after June 18th, 2022; is that correct?

A    It's a little bit of a slippery slope, to be honest with you, because I really feel that

Page 52

the ball was dropped on -- as soon as they discovered that Mr. Welch couldn't move his legs and that situation was ongoing.

I think the most important dates that -- when they could have acted to do something to mitigate or to prevent him from having complications was -- were those two earlier dates.

But I do feel that, you know, it's a bit of a slippery slope that you're -- you're sort of trying to pin me down to, because this, this was an ongoing problem that continued past those first two dates that you mentioned, and that's why I'm hedging a little bit.

(Overlapping speakers.)

Q    Okay.  So let me -- let me ask you a couple things about that.  So, we can agree --

A    Not everything --

Q    -- you're not offering --

A    -- is black and white.

Q    -- any opinions that there was any breach in the standard of care prior to June 17th,

Page 53

2022, correct?

THE REPORTER:  Hold on.  You two talked over top of each other.  Could you try that again?

A    That's correct.

Q    We can agree, I think we already agreed, that you are not going to offer any opinions that there was a breach in the standard of care after June 22nd, 2022, which is the date the MRI was performed?

A    Yes.

Q    And my understanding from your report is that you are offering standard of care opinions only, and that you're not offering any opinions on causation and damages; is that correct?

A    I'm certainly not offering any opinions on damages.  I think I would need to have you ask more specific questions -- question or questions about causation to know how to best answer that question.

Q    You didn't include any opinions in

MAGNA
LEGAL SERVICES

Page 54

your report that relate to causation, correct?

MR. JACKSON: Objection. You may respond.

THE WITNESS: I don't believe I did. No.

MS. STURTZ: Okay. So, are you deferring to the plaintiff's other experts, Dr. Hamilton and Dr. Elakil, on causation and damages, or are you anticipating also testifying on causation in this case?

A   Can you be more specific about "causation?"

Q   Right. Are you going to testify that the breach in the standard of care, that you identify, caused injury to Mr. Welch or are you unable to state that to a reasonable degree of probability?

MR. JACKSON: Objection. You may respond.

THE WITNESS: I guess I feel that it likely did, but I would largely defer to a

Page 55

neurologist.

MS. STURTZ: So it's my understanding that in this case you're going to testify about standard of care only, and that on causation opinions, you will defer to an expert in other areas such as neurology, correct?

MR. JACKSON: Objection. You may respond.

THE WITNESS: Yes. I believe that's -- yes.

MS. STURTZ: And the --

A   The reason -- sorry.

Q   Dr. Dunphy -- I want to ask you another question about standard of care opinions.

The only providers that you are going to offer a standard of care opinion about includes Dr. Luczycki, correct?

A   Correct.

Q   And it's your opinion that he breached the standard of care on June 17 and June 18, correct?

Page 56

A   Correct.

Q   And Dr. Dunphy, do you have a -- do you understand that she was a resident at the time?

A   I do.

Q   And there's no evidence that she was acting outside of her residency, correct?

A   I have no knowledge about that one way or the other.

Q   You're not going to offer an opinion at trial that she acted outside of her residency, correct?

A   Not unless somebody provides more information to demonstrate that. I mean, I certainly haven't seen from any evidence that she did --

Q   All right.

A   -- but, you know, if more evidence were to come to light, I reserve the right to, you know, change my view on that.

But I certainly haven't seen any

Page 57

evidence of that from the records I reviewed.

Q   That would be extraordinary, right? Residents don't operate outside of their residency, do they?

MR. JACKSON: Objection. You may respond, if you know?

THE WITNESS: I'm sure there have been residents who have done that. I don't know. I don't think it's very frequent.

Q   Do you work with residents?

A   All the time.

Q   And do you understand from the deposition testimony in this case that Dr. Dunphy was working under the direction of Dr. Luczycki, who was an attending?

A   I do.

Q   Do you understand that she was only involved in Mr. Welch's care on June 15 through June 17?

A   I'll take your word for it. I don't remember exactly when she went off service.

MAGNA
LEGAL SERVICES

Page 58

Q    So if Dr. Dunphy went off service on June 17th, she authored notes on the day she was on service in this case under the direction of an attending physician, do you agree that Dr. Dunphy did not breach the standard of care as a resident?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  I'm not sure how to answer that to be honest.  I mean, the standard of care --

MS. STURTZ:  Do residents in your hospital --

MR. JACKSON:  Let him -- he's finishing his answer.

MS. STURTZ:  Yes, okay.

A    Thank you.  The standard of care, in my opinion, was breached on those days by the ICU team collectively.

I do agree that Doctor -- and forgive me if I mispronounce his name, Luczycki -- how do you pronounce his name properly?

Page 59

Q    That sounds, yeah, I think you're saying it right.

A    I do agree that Dr. Luczycki was the attending intensivist in charge of the ICU team.  But I do -- I -- my opinion is, collectively, the ICU team breached the standard of care.

Dr. Dunphy was part of that ICU team.  So how you hash out what her, you know, responsibility was, specifically, you know, I don't -- I don't know that I have a good answer for that.  But she, in my mind, was part of the team that breached the standard of care.

Q    Would you agree that, and that team -- I just wanted to make sure there's not some other person that I don't know of, in terms of, on those dates of June 17th and June 18th -- well, I take it back.  She wasn't -- strike that.

She wasn't there on the 18th.  So in terms of June 17th -- and the breach in the standard of care on June 17th -- the individuals you intend to testify about at trial are

Page 60

Dr. Luczycki and Dr. Dunphy?  No other providers, correct?

A    I intend to provide my expert opinion about the care that was provided by the ICU team, which included, on that specific day, both Dr. Luczycki and Dr. Dunphy.

I don't know at this point -- unless I'm forgetting someone -- of anyone else who provided ICU care on that specific day that you are mentioning.

Q    Okay.

A    If somebody else was involved, you know, I'm not aware at this time.

Q    Okay.  So sitting here today, you haven't formed an opinion about any other provider -- in terms of June 17th -- other than Dr. Dunphy and Dr. Luczycki, correct?  Yes?

A    Correct.

Q    Okay.  And it was reasonable for Dr. Dunphy to follow the directions of the attending physician, correct?

Page 61

A    Correct.

Q    And as a resident, Dr. Dunphy did not set the treatment plan for this patient, correct?

MR. JACKSON:  Objection to form.

THE WITNESS:  Should I answer?

MR. JACKSON:  You may answer.  Yes.

THE WITNESS:  It's -- you're -- you're -- I'm trying to think of the best way to answer that.

I think you know residents are given various degrees of latitude and autonomy, and residents do make decisions about the care of patients and they do make independent treatment decisions sometimes.

So I think it would depend on the specific situation, how much latitude Dr. Luczycki was giving Dr. Dunphy; whether, you know, Dr. Dunphy may have directed a nurse to, let's say, target a certain blood pressure and that blood pressure might have been targeted at a particular time, and then later on she could have



Page 62

told Dr. Luczycki that, "hey, I told the nurse to do X, Y and Z." Do you agree with this?

Or Dr. Luczycki could have been rounding and found that the blood pressure was X and he wanted it to be Y. And he asked the nurse "what happened" and the nurse could have said, "well, Dr. Dunphy told me to do X without" -- and, you know, Dr. Luczycki might not have been in the loop at that time.

So you're trying to turn a dynamic relationship into, you know, something that might be like more yes or no answer, and --

Q    Right. She's a resident, she's in training, right?

A    She is in training and she's a resident, but she's still, you know, heavily involved in the care of the patient.

And, you know, often might be actually the first one privy to information that Dr. Luczycki, as the attending, might not be immediately privy to have. And she might have to

Page 63

at times make --

Q    Okay.

A    -- decisions without necessarily immediately running them by Dr. Luczycki.

Q    Okay. Was it reasonable and appropriate for Dr. Dunphy on June 17th to note the neurologic findings that she observed that day?

A    Can you please repeat the question?

Q    Was it reasonable and appropriate for Dr. Dunphy to note the neurologic deficits that she observed that day on June 17th?

A    Yes.

Q    Was it reasonable and appropriate for her to discuss those findings with the attending physician and with the surgeon?

A    Well, I don't know that she did do that. It would have been the right thing to do, to discuss those findings -- because they were very critical -- with the attending and with the surgeon.

Page 64

But there isn't really any evidence that she did do that, as far as I recall.

Q    Did you see that the note of June 17th includes information in that note written by both Dr. Dunphy and Dr. Luczycki?

A    Yes. But I don't see anything about the surgeon.

Q    Did you not notice in the medical records when it says D/W, Dr. Alassar?

A    I don't see -- what I believe you're asking is whether Dr. Dunphy, the resident, specifically had a discussion or notified Dr. Luczycki and Dr. Alassar, who I believe was the cardiac surgeon, that there were new very concerning focal deficits.

I don't -- I don't recall seeing that specific language in the record.

Q    Do you agree it was reasonable for Dr. Dunphy to discuss her findings with Dr. Luczycki?

A    It wouldn't have -- it's not just

Page 65

reasonable, it would have been incumbent upon her to discuss those finding with Dr. Luczycki.

I just -- I'm not -- I'm not sure based on the record, how much of a discussion they had and what the specific nature of the discussion was.

Q    Okay.

A    So whether she did that or not I'm not totally sure.

Q    Did you read her deposition transcript?

A    Yes, I did. Well, wait a minute. Did I read Dr. Dunphy's? I'm not sure I read Dr. Dunphy's.

I read Dr. Luczycki's deposition transcript. I read Dr. Hockstein's deposition transcript. I'm not -- I don't recall that I was provided Dr. Dunphy's deposition transcript.

Q    Okay. Am I sharing my screen now. Hold on. Can you see my screen, Doctor?

A    Yes.

MAGNA
LEGAL SERVICES

Page 66

Q   Okay. And do you see here, this is a note from the 15th, A/P, does that stand for action plan or assessment and plan, discussed with ICU team, Dr. Alassar?

A   Yes. That is what that stands for.

Q   Was that a reasonable thing for Dr. Dunphy to have done on June 15th?

A   Can you scroll up, please?

Q   I'm just asking whether it was reasonable for her to discuss things with the ICU team, and Dr. Alassar, as it reflected in that medical record?

A   It's always reasonable to discuss things. I just don't -- I don't know exactly what was or was not discussed.

Q   Okay. Here is a note from June 16th. Plan discussed with ICU team and Dr. Alassar. Was that a reasonable thing to do on June 16th?

A   Again, it's always reasonable and appropriate to discuss the care plan. If you're talking specifically about the resident, it's

Page 67

always reasonable and appropriate to discuss the care plan with the attending.

It's also reasonable and appropriate to discuss the care plan with the surgeon.

Q   Okay. Do you agree that those notes reflect that the surgeon was involved with the care plan at MedStar Washington Hospital Center when Mr. Welch was in the ICU, correct?

A   No. I don't agree.

MR. JACKSON: Objection, you may respond.

Q   So you don't -- do you -- you don't agree that the notation discussed with Dr. Alassar indicates that there was a discussion with Dr. Alassar?

A   It's very nonspecific, so I don't -- I really can't tell you. That's not what you asked me, I don't believe. I think you asked me if -- can you read the question back, please?

(The reporter read back as requested.)

A   I mean, I assume that there was some

Page 68

level of discussion with Dr. Alassar since it says "discussed with Dr. Alassar," but I really have no idea what was discussed; how much was discussed; whether Dr. Alassar was informed that there were -- there was a concern about a stroke and the spinal cord infarct; whether there was any discussion about blood pressure parameters; whether there was any discussion about transfusing Mr. Welch because his hematocrit was low.

I really have no idea. You know, maybe there was a discussion and they said "everything is fine."

Q   Okay.

A   And that's -- that's just something that is very frequently, almost auto-populated on notes these days.

But without any more specific details, it's really hard to say for sure whether, you know -- if there was any meaningful discussion and what the nature of that discussion would have been.

Page 69

Q   Because these discussions don't get documented in full, correct?

A   It depends on --

MR. JACKSON: Objection. You may respond.

THE WITNESS: It depends on the nature of the problem and how serious it is.

MS. STURTZ: Okay.

A   I mean, what I can tell you is, if -- if I consulted my -- the cardiac surgeon who I worked with -- because I was concerned that the patient had had a stroke and/or a spinal cord infarct -- I would more specifically state that in the note.

And I would more specifically outline what our treatment plan was going to be; and that that treatment plan -- specifically for that problem -- would be noted in the chart, and it would be noted that the surgeon agreed with that, et cetera.

Moreover, I would say more often than

MAGNA
LEGAL SERVICES

Page 70

not in a situation like this, our cardiac surgeons actually, independently, write notes confirming that they've been involved in the care of the patient in the ICU.

And I didn't see any notes from Dr. Alassar specifically that he, or anyone from his team, wrote himself. So I really can't, you know, speculate about what "discussed with Dr. Alassar" specifically means.

Q    Okay. So you would defer to the people who were there, in terms of what was discussed, correct, because you weren't there?

MR. JACKSON: Objection. Objection. You may respond.

THE WITNESS: I was not there.

MS. STURTZ: How exactly did Dr. Dunphy -- who was a resident in training and only involved in the care on June 17th -- breach the standard of care, in your opinion to a reasonable degree of probability?

A    I would say the same way that

Page 71

Dr. Luczycki breached the standard of care.

Q    So she breached the standard of care in failing to obtain a head CT on June 17th, correct?

A    Correct.

Q    And she breached the standard of care in failing to consider targeting a higher blood pressure and/or lumbar drain placement, and/or discussing whether a higher blood pressure and/or lumbar drain placement was warranted with a neurologist and cardiothoracic surgeon on June 17th, correct?

A    I would also add to that, but that's correct.

Q    Those are the only breaches in the standard of care in terms of Dr. Dunphy that you identified in your report, correct?

A    Yeah. But at the time I didn't realize that the hematocrit was 21. So I would add to that that they breached the standard of care by not transfusing Mr. Welch's blood -- or at

Page 72

least discussing whether a transfusion was warranted -- with Dr. Alassar and the neurology team.

Q    Did he have any transfusions during his tenure in the ICU?

A    I don't specifically recall, but when I went through the record after I wrote that report to look at his blood count levels, they seemed to be persistently low.

When you have a spinal cord infarct, one of the other interventions that should be considered is to, you know, transfuse blood to raise the hematocrit so that you can increase the perfusion pressure to the spinal cord.

Q    Okay.

A    And that wasn't done.

Q    What was done by the providers in response to the hematocrit of 21?

A    As far as I can tell, nothing.

Q    Did the hematocrit of 21 -- what is the normal range for the hematocrit?

Page 73

A    In somebody walking around on the street?

Q    No, in this patient? I'm not --you know, I'm not --

A    A normal hematocrit for a man is 42.

Q    And what was -- when was his hematocrit 21?

A    Well, let me refer to my note here. On June 17th, at 3:09, I believe -- I assume that's a.m. -- I found a hematocrit in the chart of 21.1 percent.

Q    What had it been prior to 3:00 a.m.?

A    I don't know, but that's -- that's sort of not -- the pertinent part of this is that the hematocrit was 21 when they noticed that he couldn't move his legs and they were concerned about spinal cord ischemia.

Q    What can cause the hematocrit to drop in a patient such as Mr. Welch?

A    Bleeding, chronic anemia, iron deficiency, hemodilution.

MAGNA
LEGAL SERVICES

Page 74

Q    Is it your understanding that Mr. Welch was not given a transfusion on June 16 or June 17?

A    I don't recall if he was.  He may -- he may have been given a transfusion, but if -- if he was, that was A, before they understood that he had serious neurologic deficits.

So it really kind of doesn't -- that's immaterial and, therefore, I don't really remember off the top of my head whether he was given a transfusion.

And if he was given a transfusion, then it was not sufficient, because on June 17th his hematocrit was still 21, which is way too low for somebody who is having a stroke and a spinal cord infarct.

Q    So it's your understanding that no transfusions were given to him after 3:00 a.m. on June 17th?

A    I certainly didn't see any evidence of that.  On June 18th, I wrote down the hemoglobin I

Page 75

found in the chart was 7.5, which is, you know, more or less about the same as 21.

It could be 22 or something, but that leads me to believe that there was no transfusion given.  If there was a transfusion given, then there wasn't an appropriate response and they should have given more.

Q    When did the hematocrit return to -- well, what is the hematocrit goal level?  If 21 is not it, what is the goal level in this context?

A    For someone like Mr. Welch --

Q    Yes.

A    -- who can't move his legs, the hematocrit goal level should have been 30.

Q    Was his hematocrit ever at 30 during his ICU admission?

A    I would have to look in the record more specifically, but I can tell you it certainly wasn't at 30 on June -- even close to 30 on June 27th or June 28th.

I'm not sure if I found what it was on

Page 76

June 29th.  Yeah.  I don't know if and when it returned to -- was returned to 30 or higher.  I really -- I don't know the answer to that.

But I do know that it was 21 on June 27th and probably close to 21, because his hemoglobin was 7.5, on June -- sorry, on June 17th at -- I do know his hematocrit was 21 and on June 18th, I know his hemoglobin was 7.5.

Q    And you don't know what it was on the next day?

A    I don't because I, you know, I was only privy to the records that I was given and I don't recall.

They could be there and maybe I missed it, but I don't recall seeing what the hematocrit was on the subsequent days.

Q    Did you get the full -- the records for the full hospital admission to MedStar Washington Hospital Center?

A    I mean, I got -- I got a voluminous amount of records.  I don't know whether, you

Page 77

know, what your definition is of "full" but I certainly received them.

Q    Did you review the lab records?  Where did you get the hematocrit of 21 from that is in your notes?  Did you get that from a progress note?  Did you get that from a --

A    I got it from a progress note.

Q    Did you take the time to go and look at the laboratory records to --

A    I don't believe I saw the laboratory records.  Now perhaps I missed that, but I don't believe I saw it.  So I don't know whether I missed it or I wasn't given the laboratory records.

But if the people who wrote the progress note took the time -- either took the time to write the hematocrit as 21, or the hematocrit of 21 autopopulated into their note, then, you know, I take that as -- at face value.

And believe that that's what the hematocrit was, unless you can demonstrate it was

MAGNA
LEGAL SERVICES

Page 78

something else.

Q    I'm not saying it wasn't that at that time.  My question to you is, in sitting here today, you did not review the laboratory records for the MedStar Washington Hospital Center admission?

A    I don't recall reviewing them and, again, I don't -- I don't know if they were provided to me or not at this time.

Q    How about blood pressure?  Did you review the documentation of the blood pressure during his admission?

A    I reviewed the blood pressures that were -- that were provided in all of the progress notes that I -- that I was provided and reviewed.

Q    Okay.  So you looked at only the progress notes?  You didn't go through and look at other sections of the medical records documenting the blood pressures?

A    I don't recall, again, seeing a more granular record of the blood pressures than what

Page 79

was provided in the progress notes.

Q    Wait.  You look at -- where do you go in your hospital when you want to look at the blood pressures?  Where do you go in the chart to look at the blood pressures?

A    It depends what I'm looking for.

Q    Do you look beyond just the progress notes?  Do you go to --

A    It depends on what I'm looking for and how -- I mean, that just depends.

Q    Okay.

A    There are other places to look for blood pressure, but it just depends what I'm looking for.

Q    How about if you want to look at the lab results?  Where do you go in the chart to look at the lab results?

A    If the labs that I'm interested in are embedded in a progress note, then that's sufficient.  If the labs are not -- that I'm interested in finding are not embedded in a

Page 80

progress note, then I might have to look elsewhere.

Q    Where would "elsewhere" be?

A    Elsewhere would be -- so in -- we use Epic, which is an automatic hospital record system and there's a digital tab that says "lab results." You can click on that and see all of the lab results.

Q    And my understanding is in this case you didn't go to the lab results section of the medical records?

A    I don't have -- I don't -- I don't work at Washington Hospital and I don't have access to Mr. Welch's, like to log into Mr. Welch's Epic.  So unless --

Q    How many --

A    -- unless you provided a printout to me of like his -- the entire, you know, if you --

If somebody went in and clicked on lab results, and printed out every lab value and then sent them to me, that would be the only way that I

Page 81

would be able to do that.

Q    Okay.  So tell me exactly what medical records you reviewed in this case and how many page numbers?

A    Okay.  I'm going to open up what Mr. Jackson sent me.  Can you bear with me for a second?

Q    Sure.

A    So predominantly -- (Sound echos.)

THE REPORTER:  I'm sorry, if you said something, I didn't get it.

THE WITNESS:  I did, but then I heard and echo, so I wasn't sure if someone else was speaking while I was speaking, so then I stopped speaking.

MS. STURTZ:  I think it's all clear now.

A    Okay.  So I received a folder from Mr. Jackson labeled June 20, 2022 treatment records, and within that folder, there's an ambulance record.

Page 82

There's a chest CT. There's a head CT. There's an ED clinical summary. There's an ED note. There's an ED nursing note. There's an ED, another ED nursing note.

There's an ED patient summary. There's another ED patient summary. There's an ED record. There's another ED record. There's an ED results callback, PDF. There are some EKGs.

There's an intraoperative TE report. There's a health summary. There's an MRI brain. There's an MRI spine. There's a nephrology consultation note. There's a neurology consultation note. There's an operative report.

There's a physical medicine and rehab consultation note. There's a stroke service consultation note. There's a surgical pathology report. There's a triage note.

There's an ultra -- there's an upper -- there's an ultrasound, lower extremity, duplex veins report. Do you want me to keep going?

Page 83

Q   So these are -- they were just sent to you? Like, they're different folders?

A   Those are different -- those are different PDF files of the records within that particular folder. That is from June 20, '22.

Then there's another folder that was sent to me labeled July of 2022, treatment records. That has history and physical. It has health summary. It has an EKG. It has a chest x-ray. And then separately, and subsequent to that, I was sent some deposition reports.

Q   Okay. So the --

A   I suspect that --

Q   You were sent folders from the plaintiff's lawyer from June 2022, and then you were also sent medical records from July of 2022, correct?

A   That's correct.

Q   You haven't reviewed any medical records that postdate July 2022, correct?

A   The only thing that I reviewed more

Page 84

recently -- oh, he did send September 2022 treatment records. But again, my focus was on the -- I work as an ICU intensive care doctor. So, my focus was on the time Mr. Welch was in the ICU.

Q   Right.

A   I paid less attention to the subsequent care that Mr. Welch would have received after he left the ICU, because that is not really directly pertinent to my expertise.

Q   Right. And that -- that's consistent with your testifying in this case on standard of care, not on causation, correct?

A   Well, no. There can still be causation from the ICU standpoint.

Q   You don't know anything -- you've never met Mr. Welch, correct?

A   That is correct. I have never met Mr. Welch.

Q   You don't -- you never talked to any of his health care providers, his current health

Page 85

care providers, correct?

A   I've never talked to anyone -- any of his health care providers.

Q   Do you know anything about his neurologic assessments in 2023 or 2024?

A   A little bit because I was provided recently by Mr. Jackson with a -- I can't remember what it's called -- a treatment plan for him now. There's a name for it that I'm blanking on.

Q   A life care plan by Dr. Kaplan?

A   Yes, I did. I did receive that and I did, I did review -- I can't say I memorized that, but I -- I read that report.

Q   Okay. And Dr. Kaplan in that report talks about --

A   In general, from the best of my recollection, he talks about Mr. Welch's, you know, current deficits and problems and so forth.

Q   But again, you're not going to testify at trial about his current deficits and problems, correct?

MAGNA
LEGAL SERVICES

Page 86

A    That's correct.

Q    You're not going to testify at trial about his current or future medical care needs, if any, correct?

A    Correct, as I -- as I have stated I'm an intensive care specialist.  And my -- my expertise and focus is on the care -- is to opine on the care that Mr. Welch received in the -- during his time in the ICU.

Q    So we talked about -- you told me what medical records you reviewed, and I apologize if you listed this already.

Did you -- have you reviewed -- what deposition transcripts have you reviewed?

A    Well, I reviewed -- I'm just going to look here because I want to make sure that I get this right, Dr. Luczycki's deposition transcript.

I reviewed Dr. Hockstein's deposition transcript.  I reviewed Ms. Shana Hargrove's deposition transcript, who I believe is Mr. Welch's niece.  And I reviewed Mr. Welch's

Page 87

deposition transcript.

Q    Okay.  Other than the medical records, the deposition transcripts, there's some articles I've been provided with.  Anything else that you reviewed in this case?

A    Not that I can think of.  I think we pretty much summarized.

Q    For Dr. Dunphy, are there any other breaches in the standard of care on June 17th other than the failure to obtain a head CT on the 17th; the failure to talk to the team about considering a higher blood pressure and/or lumbar drain placement; and/or discuss whether a higher blood pressure target, and/or lumbar drain placement was warranted with a neurologist and cardiothoracic surgeon on June 17th and address the hematocrit of 21?  Anything else?

A    They -- there's one other thing they could have also considered.  Oh, you just seem --

Q    I just came prepared to address your report.  So for --

Page 88

MR. JACKSON:  Objection.

MS. STURTZ:  -- for you to be adding things, but go ahead.  If you want --

THE WITNESS:  If I'm allowed to add anything, then I --

MS. STURTZ:  Let me ask you -- go ahead and add it and then I'm going to ask you?

THE WITNESS:  I'm not allowed to add things?

MR. JACKSON:  You are, Doctor, you are.  You're allowed to, you are.

(Overlapping speakers.)

Q    Let me ask you before you add, Doctor, can you define for me, do you know what the definition of "standard of care" is?

A    What a reasonably prudent and careful practitioner would do under the same circumstance.

Q    Okay.  So, we've outlined the breaches of the standard of care.  The one that you've added to your report is the hematocrit on June 17th, and you now want to add another breach

Page 89

in the standard of care; so something the doctors did that was not reasonable?  What are you adding now that you believe was not reasonable on June 17th --

A    What I'll tell you is they should have had a discussion and contemplated doing -- making interventions to lessen the risk of the -- and lessen the damage to Mr. Welch's spinal cord infarct.

There are a variety of things that could have been entertained and done that were not done.

Those include placing a lumbar drain, raising the blood pressure, giving a blood transfusion, volume loading, arguably also starting a naloxone infusion.

Q    Anything else?

A    No.  Those -- those are the -- those are the things that I can think of.

Q    Do you agree with the plaintiff's stroke expert that Mr. Welch was not a candidate

23 (Pages 86 to 89)

Page 90

at any time, postoperatively, for a TPA or EVT treatment?

A    I agree with the TPA, and I would have to honestly defer to a neurologist about EVT treatment, because that's not a decision that I --

As the intensive care doctor, I'm -- I would be responsible for identifying that Mr. Welch had an acute, very serious problem and interfacing with the neurologist and the cardiac surgeon to come up with a plan.

But with respect to the EVT treatment specifically, I would defer to the neurology team on that.

Q    You're not going to come into trial and say Dr. Hamilton, the patient's stroke expert is wrong and this patient was a candidate for EVT treatment, correct?

A    No.  I'm not a neurologist --

Q    Okay.

A    -- or a neurosurgeon or somebody who performs, you know, EVT treatment or even makes

Page 91

it -- makes a decision.  I might call -- I would call the neurologist and say, "you know, I have this guy here who I'm very concerned just had a stroke and can't move his legs and I'm concerned about a stroke, and I'm concerned about spinal cord infarct."

"Can you please come evaluate him and can we talk about possible interventions, including EVT treatment?"

But ultimately, it would be the neurologist who would make the determination as to whether, you know, EVT treatment would or would not be appropriate and potentially useful in this situation.

Q    And there was in this case consultation with a neurologist on June 17th, correct?

A    There was -- there was consultation with a neurology team on June 17th.

Q    There was consultation with a neurology team on June 18th, correct?

Page 92

A    Yes, that's correct.

Q    Okay.

A    Where they continued to note that Mr. Welch had serious neurologic deficits on the 18th as well as the 17th.

Q    You're not offering any opinions in this case that those neurologists breached the standard of care, correct?

A    No.  I can't really -- I'm not a neurologist, so I can't specifically comment on whether a neurologist did or did not breach the standard of care.

Q    Okay.  Any other breaches in the standard of care on June 17th, other than what we've talked about?

A    I can't think of any at the moment.

Q    June the 18th, Dr. Dunphy wasn't working that day, correct, or didn't care for Mr. Welch on that day, correct?

A    I'm not totally sure.  I don't know. I would have to look at the record specifically.

Page 93

I don't recall seeing a note from her on that day.

Q    Okay.  So if she testified that June 17th was the last day she was involved with this patient, you don't have any reason to disagree with that, correct?

A    No.  I don't have any reason to disagree.

Q    So, the -- in terms of June 18th -- which is the other date referenced in your report -- it's your opinion that Dr. Luczycki breached the standard of care on June 18th, correct?

A    Correct.

Q    And in the -- is it the same breaches in the standard of care that you identified on June 17th, or is there anything else about the June 18th that you believe was a breach in the standard of care?

A    The same.  All of this has to do with -- from my perspective -- failure to act, to address new profound neurologic deficits.

MAGNA
LEGAL SERVICES

Page 94

Q   All right.  But there's nothing, in addition to June 18th, that you're going to say was a breach in the standard of care other than what we've talked about, correct?

A   Not -- at this time, I can't think of anything else.

Q   Okay.  Can we do this?  I'm going to be a bit longer.  Hopefully not too much longer, but would everyone mind if we just take a quick bathroom break, maybe reconvene in five minutes?

A   Sure.

Q   Thank you so much.  I appreciate it.

(There was a break in the proceedings at 2:45 p.m. and testimony resumed at 2:50 p.m.)

BY MS. STURTZ:

Q   Dr. Schulman, any other breaches in the standard of care, other than what we've talked about and is in your report?

A   Not that I can think of at this time.

Q   Okay.  I want to ask you a little bit about your expert witness work.

Page 95

Have you ever worked with Mr. Jackson or anyone in his firm before?

A   I don't believe so, no.

Q   When did you start doing expert witness work for medical malpractice cases?

A   Probably about 10 years ago.

Q   And how many cases would you say you've reviewed in the last 10 years?

A   Maybe 20.

Q   And of the 20 cases, have any of those other cases involved an aortic dissection?

A   Let me look here.  I don't believe so, no.

Q   What percentage of the cases that you've reviewed have been on behalf of the plaintiff?

A   The majority, probably 70 or 80 percent.

Q   Have you ever testified at trial on behalf of a defendant in a medical malpractice case?

Page 96

A   No, but I've given a deposition on behalf of the defense, and I was supposed to go to trial on behalf of the defense but it canceled like several days before.

Q   Was that the same case?

A   I'm sorry?

Q   Was that the same case?

A   No, no, that was a different case.

Q   And so --

A   I think that I may have provided, if I remember correctly, I was asked to provide some records about my prior expert witness work to Mr. Jackson.  I don't know if you have a copy of that or not.

Q   Yes.  So, I just want to follow up on what you just told me, and then I'll get to that.

The case where you were deposed on behalf of the defense, what was the name of that case?

A   That was Carpenter versus Miller.

Q   In what state?

Page 97

A   I believe that was in Washington state, if I remember correctly.  This was in 2018.

Q   Do you recall what the issue was in that case?

A   Bleeding during surgery and questions about -- related to activating what we call a massive transfusion protocol.

Q   Of the cases that you've reviewed as an expert witness, what percentage of those involved opinions related to anesthesia or anesthesiology versus opinions related to cardiac ICU care?

A   I would just be guessing.  Half and half.

Q   Okay.  How many times have you been deposed?

A   Are you including trial testimony or no?

Q   First, I'm just going to ask you how many times you've been deposed and then how many times have you testified at trial?

**MAGNA**
LEGAL SERVICES

Page 98

A    Two, three, four, five. As far as I can -- to the best of my knowledge, it's --

Are you including today?

Q    No.

A    Okay. Then I think it's five. You know, I could be missing something.

Q    Sure. No worries.

A    It's been over 10 years, and I don't do a ton of this.

Q    No worries.

A    But I --

Q    How about trials, how many times have you testified at trial?

A    Several. I think maybe three now. Maybe it's four.

Q    In what states?

A    One, two, three. Let's see.

I know two in Oregon for sure. This one was in Oregon. This one was in Oregon. This one was in Oregon. I think they've all been in Oregon.

Page 99

Q    And were they all on behalf of the plaintiff?

A    The trial testimony, yes. As I mentioned, there was one case where I was supposed to go testify for the defense, and it was -- it settled right before.

Q    What are the names of the three cases where you've testified in court in Oregon?

A    Howzer versus Melton. Rivera versus Dan Leonard. Albrecht versus Crook. I'm not making that up. That's the doctor's name, Dr. Crook.

Q    Okay.

A    And, yeah, I think, to the best of my recollection right now, that's, that's the ones that I've testified in.

Q    And the fees are $550 per hour for the review of records; is that right?

A    That's correct.

Q    How many hours would you say you've spent, to date, reviewing this case?

Page 100

A    I really -- you would have to go back. Maybe Mr. Jackson can provide that information.

When I, you know, spend time reviewing records, I send an invoice. He, then, you know, compensates me for my time.

And so, I would have to go back and look at the invoices and count up the number of hours. I don't really recall, off the top of my head.

Q    Okay. So that's fine. I'm just going to have Susan hold open Exhibit B of the deposition, and would ask to get provided with the invoices you've generated to date, so I can get the information that way.

A    I'll defer to Mr. Jackson to provide those.

(Schulman Exhibit B was marked for purposes of identification.)

Q    That's fine. Do you charge the same fee for deposition testimony of $550 an hour?

A    No. I charge $650 an hour for

Page 101

deposition testimony and for testifying at trial.

Q    All right. And I understand from Mr. Jackson -- he provided me with your notes. So I take it that these notes, which for the record is a document that has 11 pages of notes.

Do you have any other notes in this case, other than this 11-page document?

A    No. I just have those notes and all of the documents that were provided to me by Mr. Jackson, you know, with the records and so forth that I believe we've discussed.

Q    All right. And these notes reference some articles that you reviewed in this case.

Are there any other articles -- other than the five articles that you identify on the last two pages of these notes -- that you reviewed in forming your opinions in this case?

A    No. And, to be clear, I didn't really review those articles to formulate my opinions.

I reviewed them because I wanted to have some articles to reference in case you asked

MAGNA
LEGAL SERVICES

Page 102

me about -- to support answers to questions -- you know, in case you asked me about literature.

But I didn't need to review those articles specifically to formulate my opinions.

Q    Okay.

A    My opinions were formulated based on my education and training and expertise in this area.

Q    Okay.  And so, these are articles that you did not review prior to drafting your report on February 17th, 2024?

A    I don't believe I reviewed them before February 20th, or --

Q    Were they articles that you found on your own or were they provided to you by plaintiff's counsel?

A    He did, Mr. Jackson did provide some articles.

Q    All right.

A    So, there may be a couple articles that Mr. Jackson provided that are not on that

Page 103

list, and there may be a little bit of an overlap because I know Mr. Jackson did send me a few articles.

Q    All right.

A    So --

Q    So, of the five articles that are referenced in your notes, were those articles that you found or were those articles that Mr. Jackson provided to you?

A    I would have to look up and see which articles Mr. Jackson provided, and we would have to cross-reference those articles with these articles, if that makes sense?

Q    Okay.  Can you give me -- can you look up what articles that he provided to you?

A    Yeah, sure.  Hang on just a second, and we can do that.

It might take me a couple of minutes to sift through this and find the articles that were --

Q    Will you produce them?  Is there like

Page 104

an email list, because I could just have us mark, as Exhibit 3, sort of a list of the articles that were provided, and you could get that to me later?

(Schulman Exhibit 3 was marked for purposes of identification.)

A    Yeah.  To be honest with you, though, I don't really want to spend a lot of time after this sifting through, like I would rather just get it all done now --

Q    Okay.

A    -- if possible.

Mr. Jackson, do you happen to have quick access to the articles that you provided me? Actually here, (indicating.)

MR. JACKSON:  Well --

A    Here, here are the articles I believe that Mr. Jackson sent to me.  Do you want me to list them for you?

Q    Yes, please.

MR. JACKSON:  Just list them, yes.

A    So, there is the 2022, ACC/AHA

Page 105

Guideline for the Diagnosis and Management of Aortic Disease.

Now, I was already familiar with that article before he sent it to me, but this is the list of articles that he sent to me.

Q    Okay.

A    There is an article, first author Chatterjee, called -- titled, Perioperative Care after Thoracoabdominal Aortic Aneurysm Repair, the Baylor College of Medicine experience.

He sent an article titled, Spinal Cord Ischemia Management, Current Indications and Timing for Drainage; first author Fairman.

He sent an article, Delayed-Onset Postoperative Paraplegia in an Acute Aortic Dissection; first author Leone.

This may have been one that I sent to him initially.  I can't recall, but that might have been the one that I sent to him initially.

And that's it.  Those are the articles, as far as I can tell at the moment, that

MAGNA
LEGAL SERVICES

Page 106

Mr. Jackson sent to me.

Q    Okay.  Your CV mentions something about you've authored articles for UpToDate in the past?

A    That's correct.

Q    Do you agree that UpToDate is a reasonably reliable source?

A    I do.

Q    Did you review any UpToDate articles about the treatment of Type A aortic dissections, in forming your opinions in this case?

A    No.  I don't think I did.

Q    One of the papers that you reference in your notes is called, "Three Cases of Newly Developed Paraplegia After Repairing Type A Acute Aortic Dissection?"

A    Yes.

Q    And this is a case study from Japan, correct?

A    I would have to pull up the article again to refresh my memory.  I don't remember if

Page 107

it was.

If you say so, I believe you, but I would need to pull up the article to refresh my memory as to whether this was from Japan or not.

Would you like me to pull up the article?

Q    Well, sure.

A    Okay.  I have the article in front of me, and, yes, I agree it's from Japan.

Q    Okay.  And this was an article that you obtained on your own?  This was not one of the ones provided to you by Mr. Jackson?

A    I don't believe it was -- I don't want to get confused, but the list that I just read to you was, I believe, the list that was provided by Mr. Jackson.

So, assuming this article was not on that list -- I don't think it was -- then that would be correct.

Q    Okay.  You haven't spoken to -- let me strike that.

Page 108

Have you reviewed the reports of plaintiff's other experts, Dr. Hamilton and Dr. Elakil?

A    Oh, I did review -- Mr. Jackson, I believe yesterday or the day before, sent me the deposition transcript of -- Dr. Elakil is the neurosurgeon; is that true?

Q    Yes.

A    Yeah.  I -- I did receive that, and I have gotten about two-thirds or halfway through that.  I didn't -- I didn't get to finish reading it before this morning, but I reviewed a lot of it.

The other one, what was the other one you mentioned?

Q    Dr. Hamilton.

A    I don't believe I've received that, that report.  No.

Q    Okay.  So, this Japan article, do you agree with this statement, "although paraplegia is well-known as a complication after

Page 109

thoracoabdominal aortic repair, postoperative paraplegia after repair of Type A, acute aortic dissection has been -- has rarely been reported?"

A    Yes, I think it's less common than --

The reports of spinal cord infarct after Type A dissection are less frequent than after thoracoabdominal aortic repair.  That I would agree with.

Q    In this case, was Mr. Welch's false lumen of the descending thoracic aorta thrombosed?

A    I don't know the answer to that.

Q    Did you review any imaging to see whether there's any evidence of that in this case?

A    I don't recall if I reviewed -- I mean, again, you asked me if I reviewed the actual images, and, no, I read the reports.

I do remember reading the report of the MRI of his spine that was obtained, I believe on the 22nd, if memory serves me well.

But I would have to pull it up to see exactly what it says about the true versus false

MAGNA
LEGAL SERVICES

Page 110

lumen, but that --

Whether, whether the true lumen -- whether the false lumen was thrombosed or not doesn't really materially impact any of my opinions as to the breach of standard of care in this case, so I --

Q    All right.

A    -- didn't pay an excessive amount of attention to that.

Q    And would an MRI -- do MRIs assess the false lumen of the descending thoracic aorta?

A    I believe they do, but, you know, I'm not -- I'm not a radiologist, I'm not a radiologist.

Q    Okay.

A    But I believe they do.  Yes.

Q    So, in this case, you don't know, one way or the other, the condition of the false lumen of the descending thoracic aorta --

A    Let's pull up --

Q    Well, I --

Page 111

A    Let's pull up the MRI report and see if it mentions that.  Give me a second.

I don't see any comments about that on this MRI report, so I don't -- I don't really know the answer to that.

And I'm not sure whether you would need like a CT with contrast to determine that.  I would probably -- if I really wanted to know the answer to that -- I would probably ask a radiologist or a cardiac surgeon what the state of the false lumen was and whether it was thrombosed.

But that's typically something that the cardiac surgeon will determine because they may -- they may end up wanting or needing to do a procedure to like fenestrate, to open up the false lumen, depending on the situation.

But that, that's really tangential to my area of expertise.  And, again, whether, whether the false lumen is open or not, the main issue here for me was that Mr. Welch had serious neurologic deficits and that there wasn't any

Page 112

intervention done to address that.

Q    Was Mr. Welch receiving antiplatelet medication?

A    When?

Q    In the ICU on June 17th and 18th?

A    I suspect that this --

He probably was on aspirin, although I don't specifically recall.  I would have to look that up.  I don't know the answer to that, off the top of my head.

Q    Was he receiving fluid management on June 17th and 18th?

A    I suspect he was, but, again, you know, we did --

That's a very generic question, that's hard to answer.

Q    Was he receiving glucose management on those dates?

A    Those are all standard --

Those are all standard interventions that are done in a patient like Mr. Welch in the

Page 113

ICU, but, you know, I don't -- I don't specifically know, one way or the other, whether he was, was or was not receiving glucose management.

I would expect that he was, but I don't know the answer to that.

Q    How about temperature management?

A    The same answer.

Q    Was he receiving that?

A    The same answer.

Q    The same answer?

A    Right.

Q    So you didn't really look specifically at what cardiac care management was being provided for Mr. Welch on the June 17th and 18th date that you identify in your report?

A    Of course, I looked, I looked very closely at that, but whether -- what his temperature was or was not, was really superfluous and not pertinent to the fact that he couldn't move his legs.  And the fact that he couldn't move

MAGNA
LEGAL SERVICES

Page 114

his legs was my main focus.

Q    And he's able to move his legs now, or do you not know that, one way or the other?

A    I mean, my loose understanding is he can move his legs now, but he has significant residual deficits.

Q    And who gave you an understanding that he has -- in terms of his lower extremities -- "significant neurologic deficits with his legs?"

A    Now?

Q    Yes.

A    Well, I gained that understanding from Mr. Welch's deposition that I read, where I believe he was asked about that; and also from that report that I mentioned earlier that was provided to me that outlines his -- what did we call it -- a life plan.

Q    Did you see in the report, in the life plan by Dr. Kaplan where he observed Mr. Welch with a normal gait?

A    I don't specifically recall that, one

Page 115

way or the other.

Q    Do you recall, one way or the other, if he observed Mr. Welch walking around?

A    I don't.  I just -- I have a global recollection of what that said.

If it -- if that's in the report, then I'll, you know, take that at face value, but I don't really recall what that said.

And, again, that wasn't my main focus because, as we've discussed, you know, I'm an ICU doctor and my -- I was asked to opine on the care he received in the ICU, not -- not whether he can, you know, can or can't walk around now.

Q    Okay.  And that makes sense.

Again, your testimony in this case is going to be about the ICU care and whether there was a breach in the standard of care, in the ICU care, correct?

A    That's correct.

Q    You're not going to testify about whether that caused any current deficits, correct?

Page 116

A    Well, I believe it caused -- I do believe that it led to deficits, but the extent and nature and severity of the deficits he has now I'm not -- I'm not going to testify about.

But I do believe there were consequences of the breach of standard of care in the ICU that led to, you know, downstream residual deficits that Mr. Welch has now.

Q    But you don't know what, if any, deficits he has now, correct?

MR. JACKSON:  Objection.  You may answer.

A    Well, I do know --

Q    You haven't reviewed any medical records from 2023 or 2024, correct?

A    As I mentioned --

MR. JACKSON:  Objection to form.  You may respond.

A    I reviewed Mr. Welch's deposition transcript which -- in which he testifies to the fact that he has a number of residual deficits.

Page 117

And I reviewed that life plan which also seems to state that Mr. Welch has ongoing residual deficits.

Q    Can you opine, to a reasonable degree of probability, that Mr. Welch's residual deficits would be the same or different if he had been administered a lumbar drain on June 18th?

A    In -- in --

My opinion -- on a more probably than not basis, is, had the ICU team critically thought about and paid attention to and had a discussion with the cardiac surgeon, the neurologist, about a constellation of interventions that could have been done -- that weren't done -- had they done those things, which, you know, we've previously outlined -- including the lumbar drain placement, including raising the blood pressure, including giving a transfusion -- I believe, more probably than not, that Mr. Welch's deficits would be less than they are now.

Q    And exactly -- So, he would have some

Page 118

deficits, but they would be less?  To what degree --

A    I don't know.

Q    -- would they be less?

A    That, I don't know.

Q    You're unable to quantify --

A    I would defer to a neurologist on that.

Q    And what exact facts are you relying upon, in terms of his condition and how his deficits would be less, or do you defer to a neurologist on that?

A    I don't understand your question?

Q    You're unable to testify, to a reasonable degree of probability, to what degree his deficits would be less if there had been different interventions on June 17th and 18th, correct?

A    I still don't -- I'm sorry.  Could you rephrase the question or say it in a different way?

Page 119

Q    I believe you testified that it is your opinion, to a reasonable degree of probability, that Mr. Welch would still have some deficits today --

A    I did not say --

Q    -- but his deficits would be less if these interventions had happened on June 17th and 18th.  Did I understand that correctly?

A    No.

Q    Do you -- do you have any opinion as to --

A    I believe --

Q    -- in what way his deficits would be less today, if those interventions had happened, or are you deferring to a neurologist on that?

A    I believe that, had they done the -- had they met the standard of care with respect to appropriately managing the fact that he could not -- he had -- he had lower extremity deficits and couldn't move his legs, had they done the constellation of therapies that I mentioned, that

Page 120

that would have -- more probably than not -- resulted in some degree of improvement in his overall condition.

How much?  Would he have been completely back to normal or would he be 10 percent better or 20 percent better, that I can't tell you, and I would defer to a neurologist.

But, more probably, those interventions have been proven to -- more probably than not -- make a difference in terms of outcome under the situation that Mr. Welch was in.

Q    Okay.  And the lumbar drain would address the spinal infarct only; is that correct?

A    As opposed to what else?

Q    The cerebral infarcts.

A    You mean the strokes in his brain?

Q    Isn't that what a cerebral infarct is, or not?

A    Yes.  I just wanted to make sure we're talking about the same thing.

Page 121

Yes.  So the lumbar drain would be to, to lessen or correct the deficit that he was experiencing in -- you know, with respect to moving his legs.

Q    Okay.  And the --

As a critical care doctor, what does "strength and sensation are intact without any focal deficit" mean?

A    That means that, you know, at the time that was written, whoever wrote that, didn't appreciate that there were any, you know, neurologic insults or focal problems.

Q    As a critical care doctor, what does the statement, "no paresthesia and no limb weakness" mean to you?

A    It means the patient was not having any, according to that person who did that exam at that time.  Granted, these things are dynamic.

So, one person can go in, you know, one minute and do an exam, and then half an hour or an hour later they can go in and find different

MAGNA
LEGAL SERVICES

Page 122

deficits.

And that's why, you know, vigilant critical care is incredibly important for these patients.

These patients are some of the, you know, highest risk and sickest patients we encounter in the cardiovascular ICU; and, therefore, vigilance and attention to detail and jumping on top of problems when you see them is very important.

So, we do, we typically do neurologic assessments every hour. And sometimes you find -- you go in and you might find that somebody found an exam and it was normal.

And then an hour later or two hours later somebody found that the exam was not normal.

There was a day when the critical care person, at the time they did it, said, "you know, things are better," but, on the exact same day, the neurologist came in and found that there were still serious neurologic deficits.

Page 123

Q    Did you see that in the records in this case, where there was variation in terms of --

A    Yes.

Q    -- the lower extremity?

A    I did. I did, but I saw consistently every day that some folks, some providers, were still identifying serious neurologic deficits, so, it's not --

It's not unusual to have a waxing and waning neurologic exam. But this is why, in the ICU, it's critical to continue to make ongoing and serial assessments and to interface closely with the neurology team and the surgeons to determine that, you know, you might have seen that things looked better at 9:00 o'clock but then the neurology team comes by at noon and sees that there's still a problem.

Q    Okay.

A    And you have to act on that.

Q    So, why, Doctor, are these the highest

Page 124

risk and sickest patients you handle?

A    Well, they're not -- I said they're "among."

Q    Okay. Why are they among the highest risk and sickest patients that you handle?

A    Because they've undergone a major cardiac operation, and they are at risk for a number of serious complications afterwards, which is what we saw with Mr. Welch.

There's -- you know, we are always looking out for complications in these patients and need to be very vigilant about responding to problems as they arise, when they arise because of how -- how high risk they are.

Q    Okay. And --

A    That's one of the reasons that they -- you know, we put these patients in the cardiovascular ICU for a reason, so that they get specialty and high intensive care; and, when a problem is identified, it can be immediately acted upon so there isn't a delay.

Page 125

Like, if the patient was on the regular floor and not in the ICU, there might have been many hours of delay before the lower extremity weakness was identified.

Q    If, hypothetically, there's a note of 2023 -- so we're not in the ICU period of time -- that indicates there's no paresthesia and no limb weakness, what does that mean to you?

MR. JACKSON: Objection. You can respond.

A    2023?

Q    Yes.

A    Isn't that after? There's a note from who?

Q    Hypothetically, if there's a note on a medical record that indicates the patient has no paresthesia and no limb weakness, what does that mean to you?

MR. JACKSON: Objection. You can respond.

A    That means, at the time of the exam --

MAGNA
LEGAL SERVICES

Page 126

I don't know who did the exam and whether it's accurate. That's a hypothetical question.

But, hypothetically speaking, whoever did the exam determined at the time that Mr. Welch -- or whatever hypothetical patient we're talking about -- doesn't have paresthesias or weakness.

Q    Mr. Welch had lead wires in place; is that correct?

A    I believe you're probably referring to temporary epicardial pacing wires.

Q    Uh-huh. And when were his pacing wires removed, do you know?

A    Yes. I know they were removed. I just have to pull up my notes because I don't have a photographic memory. But I'll tell you the exact date.

They were removed on June 20th -- which is postop day six -- by Jacob Miller, PA.

Q    Do you know whether an MRI can be performed when pacing wires are still in place?

Page 127

A    It cannot, but the pacing wires could have, in this case, could have been easily removed prior to June 20th, which would have allowed for the MRI.

Q    Do you know, from your review of the medical records, whether there was a medical concern that led the doctors to keep the pacing wires in place until June 20th?

A    I didn't appreciate any, any specific medical concern.

The reason we keep pacing wires in place is, when patients are requiring pacing, or are at high risk for requiring pacing.

And I did not see any specific necessity or indication in this case that would have required them to keep the pacing wires in until postop day six, June 20th.

Now, in a normal patient who doesn't have, you know, lower extremity paralysis, you might decide the benefit of keeping the pacing wires in just in case makes sense.

Page 128

But, in a case where you're worried that somebody has a spinal cord infarct -- and is going to be paralyzed and doesn't need pacing -- the risk-benefit discussion, more likely than not, strongly favors removing the pacing wires earlier so that you can get an MRI.

Q    Is it your opinion, to a reasonable degree of probability, that leaving the pacing wires in place until June 20th was a breach in the standard of care?

A    No. But I'm just telling you that they could have removed the pacing wires earlier and gotten an MRI sooner.

There are also other ways, if you pull out pacing wires and then you need to pace the patient, there are other ways that you can then pace the patient, even after you've removed the pacing wires.

Q    Okay. But it wasn't a breach in the standard of care in this case for the doctors to leave the pacing wires in place until June 20th,

Page 129

correct?

A    No, because the --

Getting the MRI --

MR. JACKSON: Objection to form.

A    -- proved that -- There's an echo. Let me see if it's gone.

We already very strongly suspected that Mr. Welch had a spinal cord infarct on June 17th, so it was incumbent upon them to act and do something on June 17th, irregardless of getting an MRI or not.

Q    Okay. But the answer to my question is, no, it was not a breach?

A    Not in and of itself, in my opinion.

Q    Have you ever written any publications about aortic dissections?

A    Not to the best of my recollection. I mean, if you look at my CV, I've written a lot of -- a decent number of publications.

But, to the best of my recollection, nothing that I wrote specifically pertains to the

MAGNA
LEGAL SERVICES

Page 130

management of aortic dissections.

Q    Do you agree that aortic dissection is a relatively rare, but highly lethal disease?

MR. JACKSON: Objection. You can respond.

A    It's certainly highly --
Are you talking about Type A dissections or all dissections?

Q    Type A?

A    Type A dissections are relatively rare. But, you know, working in a high acuity CVICU, we see patients with Type A dissections all the time.

I mean, they're not -- you know, I don't know, off the top of my head, what the overall incidence is in the general population of people getting a Type A aortic dissection.

I suppose it's relatively rare, but it's a relatively frequent problem that we take care of in our cardiac ICU; and certainly, as we've discussed, without surgery it's a very

Page 131

lethal disease.

Q    What is anterior spinal artery syndrome?

A    So, when you have --
There's blood flow to the spinal cord from the back -- which is the posterior part -- and the front, which is the anterior part. So there's -- essentially, you can divide the blood flow to the spinal cord into the front part and the back part.

So that we're talking about lack of blood flow to the front part of the spinal cord, which can cause motor deficits like the one that Mr. Welch suffered.

Q    Mr. Welch, there's no evidence that Mr. Welch had anterior spinal artery syndrome, correct?

A    Well, I think the evidence is that he had severe lower extremity motor deficits, so I think he probably did have anterior spinal artery syndrome.

Page 132

Q    Well, do you have an opinion, to a reasonable degree of probability, as to what exactly caused the spinal cord infarct?

A    Well, there's a differential diagnosis.

Q    Is it your opinion that the spinal cord infarct was caused by spinal artery syndrome?

A    It's my opinion that, you know, the infarct was caused by a lack of blood flow, a lack of perfusion to his spinal cord.

Q    So, the answer to my question is, no, it's not your opinion that his infarct was caused by anterior spinal artery syndrome?

A    If -- if --
If anterior spinal -- if the exact definition of anterior spinal artery syndrome is -- if I'm correct -- that it is a compromised blood flow to the anterior part of his spinal cord, then, yes, that -- that is -- those things go hand in hand.

Q    Do you know if his arteries were

Page 133

patent on imaging?

A    You mean patent?

Q    Patent, sorry. Yes.

A    No. I don't know whether his --
Which arteries are you talking about?

Q    Spinal arteries?

A    No. I do not know whether his spinal arteries were patent on imaging. But I do know that he, you know, clearly had an insult to his spinal cord related to lack of blood flow.

So, it's possible that those arteries were not patent. I just don't know for sure.

Q    Okay. Do you agree with this statement, "in patients with operated Type A aortic dissections, irreversible spinal cord injury may result from several factors; prolonged circulatory arrest; extension of replacement and hypoperfusion of segmental arteries?"

A    What do you mean by "extension of replacement?"

Q    I don't know.

MAGNA
LEGAL SERVICES

Page 134

A    Okay.  I don't know exactly what you mean by that.  But I do agree with the first; that -- with the other etiologies that you mentioned.  And I would need some clarification on, on what you mean by that?

Q    And you would agree it's a known and recognized complication of operated Type A aortic dissection?

A    What is?

Q    Spinal injury.

A    Yes.  Spinal injury is a known potential risk of having a Type A dissection and surgery.

Q    Okay.  And then you cited, in your notes to this 2022 Guide for Diagnosis and Management of Aortic Disease, and you cite to page 395, correct, in your notes?

A    Well, I underlined some, some of the conclusions, I believe, from these papers.  Yes.

Q    Right.  And for that paper it's page 395?

Page 135

A    Which paper are we talking about again.

Q    ACC/AHA.

A    Oh, the ACC Guideline, yes, the ACC Guideline.

Q    And page 395 deals with, is addressing a TAAA, correct?

A    That's true.

Q    And a TAAA is a thoracoabdominal aortic aneurysm, correct?

A    Thoracoabdominal aneurysm, uh-huh.

Q    Right.

A    So that's another, it's another type of aortic disease, as we touched on earlier in, in my --

Q    That's not what Mr. Welch had, correct?

A    He had a dissection, not an aneurysm, but there's overlapping -- both of those aortic conditions can lead to spinal cord ischemia and infarction.

Page 136

So I -- I believe, and I think the vast majority of people who do this for a living, would opine that this conclusion, this statement related to thoracoabdominal aneurysm disease and surgery would also apply to the -- a patient who has had a dissection, who then goes on to have acute neurologic lower extremity deficits.

Q    Did you look to see if that language was included in the ACC/AHA section that addresses Type A aortic dissections?

A    Yes.  I didn't see that there.

Q    It wasn't in that section, correct?

A    I did not see that there.  That is correct.  I didn't see that there.

Q    I'm almost done.  Let me just look -- bear with me while I go through my notes.

A    Sure.

Q    Do you agree that Mr. Welch's caffeine consumption caused the Type A aortic dissection?

A    No.  I don't think I agree with that.

Q    Do you agree that his caffeine

Page 137

consumption contributed to the Type A aortic dissection?

A    It might have contributed to it.  It's hard to say for sure.

Q    Do you have an opinion, to a reasonable degree of probability, as to what caused the Type A aortic dissection?

A    I think it's probably a constellation of things.  Probably he had, you know, he had preexisting high blood pressure.

It might have been the combination of preexisting high blood pressure, stress, maybe the caffeine, the energy drinks.

I think it's hard to say, but those are, those would be typical risk factors.

Some -- there are some, some people who are genetically predisposed to having an aortic dissection because they have connective tissue disorders, or other congenital types of problems that we don't know about until they present with an aortic dissection.

MAGNA
LEGAL SERVICES

Page 138

I really -- I don't know in this case.

Q    Are you the one who places lumbar drains in?

A    I do place lumbar drains.  Yes.

Q    What are the risks of the placement of a lumbar drain?

A    The most common risk would be headache.  That would be, the most common risk would be a headache.

And then, whenever we do procedures like this, there's -- there's a relatively small, but, you know, not zero risk of infection, bleeding, damaging a surrounding structure.

Q    Anything else?

A    Very rarely, if you put a lumbar drain in and then you were to mistakenly drain cerebral spinal fluid very quickly -- I haven't personally seen this happen, but, if somebody did that by mistake and you drained a lot of fluid too quickly -- you could cause a bleed in the brain or you could even cause the brain to herniate.

Page 139

But that would be pretty rare and unlikely.

Q    Do you agree that the potential complications associated with lumbar drain placement can be significant?

A    I -- I would say, just like any other procedure, we always have to weigh the risks and the benefits.

And I think, in Mr. Welch's case, the benefit of a lumbar drain would have far exceeded the risk.

Q    Do you agree that the complications associated with drain placement include spinal hematoma, leading to paralysis, intracranial hemorrhage and meningitis?

A    So, I mentioned intracranial hemorrhage just a couple of seconds ago.

You can get a spinal hematoma.  That typically would happen in someone who is on a strong anticoagulant, a strong blood thinning medication, which Mr. Welch wasn't on.

Page 140

You can have, as I mentioned before, infection.  A type of infection is meningitis.  So, yeah, these things are all possible, but they're really pretty rare and unlikely.

And, again, in Mr. Welch's case, the benefit of doing the lumbar drain would have far outweighed these risks.

Q    You would agree that the significant complication rate of placing a lumbar drain is between 1 and 20, and 1 and 50 patients?

A    No.  That sounds pretty high to me.

Q    One --

A    It depends what kind of complication you're talking about?

Q    Do you have an understanding of what the complication rate is?

A    For a significant complication, I would put it at, you know, one percent or less.

Q    Have you ever had a patient who suffered a significant complication after the placement of a lumbar drain?

Page 141

A    Aside from a headache, I don't think so.  No.

Q    Have you ever had a patient who has suffered a complication in the ICU following a Type A aortic dissection surgery, caused by the blood pressure being too high?

A    Probably.

Q    What type of injury can occur to the patient if the blood pressure is too high, postoperatively, after a Type A aortic dissection surgical repair?

A    The main one would be more bleeding.

Q    Bleeding from where?

A    You know, from -- from the aorta, from the aortotomy, from where they -- where they did the surgery; from the surgical anastomoses sites; any of those places, internal bleeding.

Q    Is it reasonable to set a blood pressure goal when a patient is transferred from the operating room to the ICU after this surgery?

A    It's not only reasonable, it's

MAGNA
LEGAL SERVICES

Page 142

mandatory.

Q    And what is the typical blood pressure goal that you set in your practice -- along with the surgeon -- when the patient comes to the ICU after this surgery?

A    Well, in a patient like Mr. Welch who can't move his legs, and who --

Q    No. I want to start when they first -- I'll get to that.

When they first come to the ICU, the patient has had the surgery, they come to the ICU. What's the initial blood pressure goal that you set in your practice?

A    Assuming there's no evidence of any neurologic deficits, then, for the first few hours, we set a blood pressure, systolic blood pressure goal of less than 110.

And then, over the subsequent, you know, 48 hours, we liberalize the blood pressure goal to maybe less than a systolic pressure of 130.

Page 143

But, ultimately, then, if we acutely discover that someone can't move their legs and they're not bleeding, we decide we want a MAP goal of somewhere about 90.

So, we let the blood pressure come way, way up, because we're very concerned that the person is going to end up being paralyzed.

Q    When you say "less than 130," what does that translate to in terms of a MAP goal?

A    Well, the MAP is -- is, you know -- the --

What goes into the MAP is both the diastolic blood pressure and the systolic blood pressure, okay.

And the diastolic pressure is actually a larger component of the MAP than a systolic pressure.

And, typically, in those first, you know, the first hours, and first day or two, we're more focused for someone who doesn't have neurologic deficits on the systolic pressure.

Page 144

Q    Than the MAP goal?

A    No.

Q    You also said a MAP goal, initially?

A    Than the diastolic pressure.

We would like the MAP to be, you know, over 60 or 65. But it's sometimes not possible to have a MAP over 60 or 65, if you're trying to get, keep the systolic pressure less than 110 or 130.

Q    Okay. So, when your -- patients like this first comes into the ICU, and you set an initial blood pressure goal of less than 110, do you set a corresponding MAP goal of over 60?

A    Sure.

Q    Or what goal do you set?

A    Yes. But the primary objective -- in the first number of hours after the surgery, if there aren't other extraneous factors -- is to keep the systolic blood pressure less than 110; because, in the first few hours, first let's say, you know, six hours, 12 hours, 24 hours, the surgeons are especially concerned about bleeding.

Page 145

As time elapses, after they come out of surgery, so now you're into day two and day three, that concern about acute bleeding is much less.

So, we are able to liberalize the blood pressure goal, and let it go up.

And then, ultimately, like in this case, on postop day three and four -- if there's a concern that somebody can't move their legs and they aren't bleeding -- you say, the risk of, you know, high blood pressure, allowing the blood pressure to be high, the benefit of allowing the high -- the blood pressure to be high -- vastly outweighs the risk.

Q    Okay. And you believe there would be a benefit to have the MAP reaching 90 or higher?

A    In a patient who you're worried about can't move their legs and has acute lower extremity ischemia and/or paralysis, yes.

Q    And do you put a cap on the "or higher" to where then that is going to cause other

MAGNA
LEGAL SERVICES

Page 146

problems?

A   Yeah.  Yeah.  I mean you're not going to let the MAP be 300.

Q   So, 90 to what?

A   Sorry?

Q   Ninety to what?

A   100.  It -- The other thing that's important is, you know, how high was the patient's blood pressure before, like what kind of blood pressure does this person live with?

So, this -- Mr. Welch is somebody who probably had preexisting -- he was walking around in his everyday life with high blood pressure that was probably untreated to begin with; because, when he presented with this Type A dissection, they found that his blood pressure was very, very high.

And, therefore, this would be somebody who, you know, would be even more important to raise their blood pressure more than the average person in a situation like this.

Page 147

Q   What were the risks to Mr. Welch on June 17th of a MAP goal over 90?

A   Bleeding.  Maybe, theoretically, cardiac ischemia, but he didn't have any preexisting -- he never had a heart attack.  He didn't have stents in his heart.

So I think that risk would be pretty low.  I think the predominant risk would be bleeding.

Q   Do you know if Mr. Welch's MAP ever reached over 90, prior to June 22?

A   Let me just look here and see if I have any information on that.  Do I know if it reached over 90?

Q   Yes.

A   Prior to June 22?

Q   Yes.

A   I don't know for sure.  I suspect it probably didn't.

He was -- he was -- they had placed him on very strong medications to lower his blood

Page 148

pressure, and were consistently trying to lower it for multiple days in a row.

Q   Why?

A   The notes seem to indicate that they're trying, you know, to up-titrate his -- the blood pressure, the ENT hypertensive medications, and to continue to try to lower his blood pressure for a goal of less than 130.

So I would -- I would surmise that his blood pressure -- the MAP was not ever 90, but I don't know for sure.

Q   You are surmising that his MAP, prior to June 22nd, was never over 90?

A   In his life, or in the hospital?

Q   Between June 15th and June 22nd, are you surmising that his MAP was never over 90?

A   I don't know if his MAP was over 90 or not, for any period of time.

You know, the blood pressure changes all the time.  He's on multiple medications to try to lower his blood pressure.  He's getting pain

Page 149

medication.

It's a very dynamic thing, which is again one of the main reasons he's in the ICU.

Q   Why --

A   Exactly what his blood pressure was at any given moment, I don't know the answer to that.

Q   Do you know if his blood pressure or his MAP score -- between June 15th and June 22nd -- was ever under 70?

A   His MAP?

Q   Yes.

A   Yeah.  I don't know the answer to that either.

Q   When you say that they were trying to do things to lower his blood pressure, why would they do that?

A   Because, in a typical patient -- not for Mr. Welch -- but, in a typical patient who doesn't have a spinal cord infarct, we err on the side of keeping the blood pressure on the lower side to try to mitigate the risk of bleeding.

MAGNA
LEGAL SERVICES

Page 150

And, also, for his long-term management, he has now had a Type A dissection repair.

So it's important, when he goes home -- and the further out he gets -- to be on appropriate medication to keep his blood pressure on the lower side so he doesn't have another dissection problem.

Q    Right.  He's on -- Do you know if he's on blood pressure medications now?

A    I'm sorry?

Q    Do you know if he's on blood pressure medications now?

A    Now, I don't.  I wouldn't know that, no.

But what I can tell you is, in the acute period when somebody -- when it becomes, you know, apparent that somebody has severe neurologic deficits like Mr. Welch had, then you say, "you know, I'm going to try to raise the blood pressure temporarily to see if we can get his -- to treat

Page 151

his lower extremity deficits."

Q    And you would want to raise the MAP to a range of --

A    I would just say --

Q    -- 70 to 90 or --

A    -- to make it -- to make it, well, more than 70.

Typically, typically people would talk about raising it to probably a MAP goal of 90.

Q    All right.

A    You want to, and I know, I believe you've heard this before, but, you know, the -- there's an equation, the spinal cord perfusion pressure.

You want to do everything you can to increase the perfusion pressure to the spinal cord.

And that is a function of the blood pressure, raising the blood pressure as much as you can that, within a reasonable degree, and decreasing the -- the CSF, intraspinal pressure.

Page 152

The only way to decrease the intraspinal pressure is to put in a lumbar drain.

Q    Okay.  And the MAP goal of 90, for how long, a day, two days, how long?

A    It could be a day or two days.  It could be you do it, and then you see if it's making him better.

Q    If it --

A    If he's getting improvement from that, then you might decide -- and he's not bleeding -- you might decide to allow him to have a -- have a higher blood pressure for two or three days and then gradually lower it again and see if the deficits come back.

Q    The CT scan that was done on the 18th, I think, you didn't review those images, correct?

A    I read the report.  As I believe I previously stated, I read the report.  But I did not actually look at the images myself.  I was not provided those, and I'm also not a radiologist.

Q    Okay.  So, when you --

Page 153

A    I would typically defer to the radiology report over my own --

I do, in my practice, routinely look at images myself.  But, I, you know, would defer to the expertise of the radiologist who read the report over my own actual viewing of the images.

Q    You agree that Mr. Welch did not have large vessel occlusion?

A    I don't agree with that.  I don't have -- I don't know whether he had large vessel occlusions or not.  I can't comment on that.

Q    Okay.

A    I don't even know what vessels -- what vessels are you talking about?

Q    You'd defer to a neurologist on that?

A    Which vessels, in his brain or in his spinal cord?

Q    Anywhere?

A    Anywhere?  Yeah, I don't -- I don't think I was provided that information.

Q    And the -- in terms of -- sorry about

MAGNA
LEGAL SERVICES

Page 154

that.

In terms of viewing his CT scan on June 17th versus June 18th, are you going to be rendering an opinion that it would have been different on June 17th, in terms of what was found on the CT, or do you not know?

A    Well, I believe --

I suspect that the result of the CT scan would have been the same on the 17th or the 18th.

But I believe that it was a deviation of the standard of care not to obtain the head CT on June 17th.

Q    So, if they, hypothetically, had gotten the CT scan on June 17th instead of the 18th and the results were the same --

A    Uh-huh.

Q    -- what difference did the day make?

A    Maybe it would have pressed them to even more critically think about the fact that he had a -- likely had a spinal cord infarct. And

Page 155

maybe they would have done some things on the 17th to manage that.

So, in other words, the head CT showed no acute intracranial abnormality. That doesn't necessarily mean that there's no -- not -- there's not going to be a stroke in the brain that doesn't eventually materialize.

But it tells you that there wasn't like a huge, immediate, devastating stroke that can explain why he can't move his legs; and, therefore, maybe it makes you think that he can't move his legs because there's something wrong with his spine.

Q    Okay.

A    So there still would have been some utility and importance to getting the head CT on June 17th, and that's why, in these situations, we always immediately get a head CT.

That's like the first thing that you do when you find that someone has focal neurologic deficits in the ICU.

Page 156

That is always done immediately, in conjunction with calling the neurology or stroke team.

Q    Okay. And neurology was involved in the care of this patient -- in terms of a consultation -- on both the 17th and the 18th, correct?

A    I think that you asked me that before; but, yes, that is correct.

Q    Any other -- Just sort of as a wrap-up question -- I think we've been at it for a while -- are there any other opinions you intend to offer in this case, other than what we've talked about today?

A    I can't think of anything else, but, if you have other specific questions, I'm, of course, more than happy to answer them.

MS. STURTZ:  Nope.  I don't have any other questions.  Thank you very much for your time.

A    Okay.  Thank you so much.

Page 157

EXAMINATION BY MR. JACKSON

Q    Doctor, I just have one question in follow-up regarding your opinion about the hematocrit levels.

How are you able to hold your opinion -- to a reasonable degree of medical certainty -- regarding the drop in the hematocrit levels, without reviewing the laboratory records?

A    You mean what -- To clarify, are you asking how do I know what the hematocrit level was at that time?

MR. JACKSON:  Yeah.  How are you able to state your opinion regarding what the hematocrit levels were, without having reviewed the laboratory records?

A    Because it was documented in the progress notes by the providers who were taking care of Mr. Welch.

Q    Okay.  And was that documentation in the notes enough for you to hold your, form and hold your opinions to a reasonable degree of

MAGNA
LEGAL SERVICES

Page 158

medical certainty, regarding the violations of standard of care that you've addressed in this case?

A    Yes.

MR. JACKSON:  I have nothing further.

MS. STURTZ:  Okay.  Thank you.  Susan, I might need this sooner.  Do you have an email that you can put in the chat in case I need it?  I have to check on our designation deadline.

THE REPORTER:  Sure.  Do you want him to read and sign, Mr. Jackson?

MR. JACKSON:  We will waive.

THE REPORTER:  Do you want a copy of the transcript, and what would you like to receive?

MR. JACKSON:  Just the four to a page, condensed, please.

(Deposition concluded at 4:10 p.m.)

Page 159

State of Maryland
County of Baltimore, to wit:

I, Susan M. Wootton, a Notary Public of the State of Maryland, County of Baltimore, do hereby certify that the within-named witness remotely appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

As witness my hand this _____ day of _____, 2024.

_____
SUSAN WOOTTON
Notary Public

My Commission Expires:
June 12, 2027

MAGNA
LEGAL SERVICES

**A**

**abdominal**
23:9,11
**able**
27:5 81:1 114:2
145:5 157:5,12
**abnormality**
23:15 155:4
**abreast**
46:9
**ACC**
135:4,4
**access**
80:14 104:13
**account**
49:10
**accurate**
9:1 126:2
**ACC/AHA**
104:21 135:3 136:9
**act**
93:20 123:20 129:9
**acted**
52:5 56:11 124:20
**acting**
56:7
**action**
1:7 66:3
**activating**
97:6
**activities**
6:21 11:20 12:3 43:2
43:17
**actual**
24:2 109:15 153:6
**acuity**
130:11
**acute**
30:20 31:7 90:8
105:15 106:15
109:2 136:7 145:3
145:18 150:17
155:4
**acutely**
143:1

**add**
71:13,20 88:4,7,8,13
88:21
**added**
88:20
**adding**
88:2 89:2
**addition**
94:2
**address**
87:16,20 93:21 112:1
120:14
**addressed**
158:2
**addresses**
136:9
**addressing**
135:6
**administered**
117:7
**administrative**
10:12,18
**admission**
46:21 75:16 76:18
78:6,12
**admissions**
33:19
**admitted**
17:20 50:7
**advised**
43:16
**afforded**
12:1
**afternoon**
4:15
**ago**
38:1 95:6 139:17
**agree**
29:10,13,14,18 31:6
31:10,17 32:6,13
42:21 52:16 53:6
58:4,19 59:3,13
62:2 64:18 67:5,9
67:13 89:20 90:3
106:6 107:9 108:20
109:8 130:2 133:13

134:2,6 136:18,20
136:21 139:3,12
140:8 153:7,9
**agreed**
53:7 69:19
**agreement**
6:3
**ahead**
5:5 10:2 51:8 88:3,7
**al**
1:12 3:13
**Alassar**
64:9,13 66:4,11,17
67:13,15 68:1,2,4
70:6,9 72:2
**Albrecht**
99:10
**algorithm**
11:14
**allow**
152:11
**allowed**
88:4,8,11 127:3
**allowing**
145:11,12
**ambulance**
81:21
**amount**
76:21 110:8
**anastomoses**
141:16
**and/or**
28:9 38:12 51:14
69:12 71:8,8,9
87:12,13,14 145:19
**anemia**
73:20
**anesthesia**
8:8 15:4,8,17,19,21
16:3,10,18,21 17:1
17:7,16 18:5 97:10
**anesthesiologist**
13:14 14:14 15:14
**anesthesiologists**
16:6 17:6
**anesthesiology**

13:20 14:3 17:15
97:11
**aneurysm**
39:10 105:9 135:10
135:11,18 136:4
**aneurysms**
20:11
**annual**
19:18
**annually**
19:9
**answer**
5:5,11,14,18,19
12:12 21:9 26:15,16
28:4 32:19 36:18
40:13 43:9 44:1
53:20 58:9,14 59:10
61:5,6,9 62:12 76:3
109:11 111:5,9
112:9,16 113:6,8,10
113:11 116:12
129:12 132:11
149:6,12 156:17
**answers**
28:18 102:1
**anterior**
131:2,7,16,20 132:13
132:15,16,18
**anticipating**
54:9
**anticoagulant**
139:20
**antiplatelet**
112:2
**anymore**
16:10
**aorta**
18:19 22:13,18 23:4
23:7,9,11,15 24:6
24:10,14,15,20 25:4
25:16 39:9,11
109:10 110:11,19
141:14
**aortic**
3:14 17:13,17 18:11
18:17,18 19:20 20:7



20:11 22:8 23:3,5,6 23:10 25:9 26:1,3,6 26:9,19 27:4,12,16 29:11 30:20 31:7,11 31:19 32:7,9,15 33:3,12,17 34:20 35:8,18 36:2,6,19 37:19 38:10,15,17 38:18,21 39:1,10 41:10,18,20 42:7,11 43:1,15 44:8 46:7 46:13 48:4 95:11 105:2,9,15 106:10 106:16 109:1,2,7 129:16 130:1,2,17 133:15 134:7,16 135:10,14,19 136:10,19 137:1,7 137:18,21 141:5,10

**aortotomy**
141:15

**apologies**
9:12

**apologize**
86:11

**apparent**
150:18

**APPEARANCES**
2:1

**appeared**
159:5

**appears**
48:21

**apply**
136:5

**appreciate**
94:12 121:11 127:9

**approach**
40:9 41:6

**appropriate**
63:6,10,14 66:20 67:1,3 75:6 91:13 150:6

**appropriately**
119:18

**approximate**

14:2

**approximately**
12:11 15:2

**approximation**
13:6

**arch**
23:3

**area**
43:4 46:6 102:8 111:18

**areas**
14:1 55:6

**arguably**
89:15

**arrest**
133:17

**arteries**
132:21 133:5,6,8,11 133:18

**artery**
23:14,17 39:5 131:2 131:16,20 132:7,13 132:16

**article**
105:4,7,11,14 106:20 107:3,6,8,10,17 108:19

**articles**
87:3 101:13,14,15,19 101:21 102:4,9,14 102:18,20 103:3,6,7 103:8,11,12,13,15 103:19 104:2,13,16 105:5,21 106:3,9

**artificial**
11:13

**ascending**
24:10,14,19

**Aside**
141:1

**asked**
5:2,7 62:5 67:17,18 96:11 101:21 102:2 109:15 114:14 115:11 156:8

**asking**

6:4 30:4 64:11 66:9 157:10

**aspirin**
112:7

**assess**
110:10

**assessment**
66:3

**assessments**
85:5 122:12 123:13

**associated**
139:4,13

**assume**
5:6,18 45:8 67:21 73:9

**assuming**
9:2 107:17 142:14

**attack**
147:5

**attempt**
8:12

**attending**
57:15 58:4 59:4 60:21 62:20 63:15 63:20 67:2

**attention**
84:7 110:9 117:11 122:8

**ATTORNEY**
1:6

**attorneys**
4:1

**author**
105:7,13,16

**authored**
7:4,6 58:2 106:3

**automatic**
80:5

**automatically**
11:14

**autonomy**
61:11

**autopopulated**
77:18

**auto-populated**
68:15

**average**
14:7,10 32:2,8 34:4,7 34:9 146:20

**avoid**
43:2,17

**aware**
32:21 60:13

**a.m**
73:10,12 74:18

**A/P**
66:2

---

**B**

**B**
3:11 20:21 21:4,16 22:2,3,15 23:12,19 38:20 39:3,18 40:4 40:9,17 41:10,11 100:11,17

**back**
17:10 59:17 67:19,20 100:1,6 120:5 131:6 131:10 152:14

**balance**
12:2 14:13 15:12 47:6,10,11,15

**ball**
52:1

**Baltimore**
2:14 159:2,4

**based**
25:10 48:8 65:4 102:6

**basis**
19:18 38:9 117:10

**bathroom**
94:10

**Baylor**
105:10

**bear**
81:6 136:16

**becoming**
10:14 41:3

**beds**
44:4

**behalf**



2:2,10 4:4,7 95:15
95:20 96:2,3,18
99:1
**believe**
7:7 8:4 22:10,19
26:21 37:1,4,17
41:13 44:10 51:5,9
51:13 54:4 55:9
64:10,13 67:18 73:9
75:4 77:10,12,20
86:20 89:3 93:17
95:3,12 97:1 101:11
102:12 104:16
107:2,13,15 108:5
108:17 109:18
110:12,16 114:14
116:1,2,5 117:18
119:1,12,16 126:10
134:19 136:1
145:15 151:11
152:17 154:7,11
**benefit**
127:20 139:10 140:6
145:12,16
**benefits**
47:7 139:8
**best**
27:8 41:6 53:19 61:8
85:16 98:2 99:14
129:17,20
**better**
28:15,15 29:2,3
120:6,6 122:19
123:16 152:7
**beyond**
12:3 25:5,11 43:4
79:7
**big**
24:20
**bit**
51:20 52:9,13 85:6
94:8,20 103:1
**black**
12:21 52:19
**blanking**
85:9

**bleed**
138:20
**bleeding**
47:10,14 73:20 97:5
138:13 141:12,13
141:17 143:3
144:21 145:3,10
147:3,9 149:21
152:10
**blood**
43:3,18 46:2,12,20
47:3,8,11,15 48:11
49:3,4,12 61:19,20
62:4 68:7 71:7,9,21
72:8,12 78:10,11,13
78:19,21 79:4,5,13
87:12,14 89:14,14
117:17 131:5,8,12
132:9,18 133:10
137:10,12 139:20
141:6,9,18 142:2,12
142:16,16,19 143:5
143:13,13 144:11
144:18 145:6,11,11
145:13 146:9,9,13
146:16,20 147:21
148:6,7,10,19,21
149:5,7,15,20 150:6
150:10,12,20
151:18,19 152:12
**board**
8:8,11
**brain**
82:10 120:17 138:20
138:21 153:16
155:6
**breach**
35:4 42:3 50:12,20
51:18 52:21 53:8
54:14 58:5 59:19
70:18 88:21 92:11
93:17 94:3 110:5
115:17 116:6 128:9
128:19 129:13
**breached**
55:19 58:17 59:6,12

71:1,2,6,20 92:7
93:11
**breaches**
51:13 71:15 87:9
88:18 92:13 93:14
94:16
**break**
11:17 94:10,13
**breakdown**
21:21
**bring**
45:3

------------------------------

**C**

**caffeine**
136:18,21 137:13
**call**
91:1,2 97:6 114:17
**callback**
82:8
**called**
4:10 39:10 85:8
105:8 106:14
**calling**
156:2
**canceled**
96:3
**candidate**
36:10 89:21 90:16
**cap**
145:20
**cardiac**
8:18 9:4,10,16 16:19
16:20 17:2,7 24:11
28:10 33:16,20 34:6
35:17 40:20 44:1,2
44:4 45:16 46:3,5
46:11 47:1,4 64:14
69:10 70:1 90:9
97:11 111:10,13
113:14 117:12
124:7 130:20 147:4
**cardiothoracic**
71:11 87:16
**cardiovascular**
9:5,18 11:6 13:16

14:4,12,20 15:7,12
18:15 35:21 36:16
38:9 122:7 124:18
**care**
8:9 9:6,17,19 13:15
13:19 15:4,6 16:7
16:11 17:4,5,19
18:1,4,5,10 19:10
20:9,11,15 21:18
24:13 28:15 29:3
33:5 34:6 35:5
36:14 37:10 38:13
39:14,15 41:17 42:3
45:20 47:21 48:3
50:13,20 51:14,18
52:21 53:9,13 54:14
55:4,14,16,20 57:18
58:5,10,16 59:6,12
59:20 60:4,9 61:12
62:17 66:20 67:2,4
67:7 70:3,18,19
71:1,2,6,16,21 84:3
84:8,13,21 85:1,3
85:10 86:3,6,7,8
87:9 88:15,19 89:1
90:6 92:8,12,14,18
93:11,15,18 94:3,17
97:12 105:8 110:5
113:14 115:11,16
115:17,18 116:6
119:17 121:6,13
122:3,17 124:19
128:10,20 130:20
154:12 156:5
157:18 158:2
**cared**
35:16
**careful**
88:16
**caring**
33:11 45:14,15
**Carpenter**
96:20
**case**
3:12 7:5 18:3 22:7
25:3,8 47:13,17



51:17 54:10 55:3
57:13 58:3 80:9
81:3 84:12 87:5
91:15 92:7 95:21
96:5,7,8,17,19 97:4
99:4,21 101:7,13,17
101:21 102:2
106:11,18 109:9,13
110:6,17 115:15
123:2 127:2,15,21
128:1,20 138:1
139:9 140:5 145:8
156:13 158:3,8
**cases**
3:14 16:21 95:5,7,10
95:11,14 97:8 99:7
106:14
**causation**
53:15,19 54:1,8,10
54:12 55:4 84:13,15
**cause**
43:3,17 73:18 131:13
138:20,21 145:21
**caused**
54:15 115:21 116:1
132:3,7,9,12 136:19
137:7 141:5
**center**
1:12 29:7,7,8 67:7
76:19 78:5
**centers**
30:13
**cerebral**
35:9 120:16,18
138:16
**certain**
61:19
**certainly**
13:3 19:21 29:4 31:4
40:19 41:16 53:16
56:15,21 74:20
75:18 77:2 130:6,20
**certainty**
157:7 158:1
**certified**
8:8

**certify**
159:5,9
**cetera**
30:17,17 69:20
**chance**
28:8
**chances**
27:1
**change**
9:21 10:5 56:20
**changed**
9:2,6
**changes**
6:20 148:19
**characterized**
23:19
**charge**
59:4 100:19,21
**Charles**
2:13
**chart**
69:18 73:10 75:1
79:4,16
**chat**
158:8
**Chatterjee**
105:8
**check**
158:9
**chest**
23:21 82:1 83:9
**chief**
9:4,10,16
**children**
16:3,7
**chronic**
73:20
**circulatory**
133:17
**circumstance**
88:17
**circumstances**
48:8,13
**cite**
134:16
**cited**

134:14
**Civil**
1:3,7
**clarification**
134:4
**clarify**
157:9
**classified**
22:14
**classify**
22:14
**clear**
81:16 101:18
**clearly**
25:10 133:9
**click**
80:7
**clicked**
80:19
**clinical**
10:15,16 11:11 12:7
12:10 13:2,7,11,12
13:13,17 47:20 82:2
**close**
19:5,5 75:19 76:5
**closely**
113:18 123:13
**CLR**
1:21
**collectively**
58:18 59:5
**College**
105:10
**COLUMBIA**
1:2
**combination**
137:11
**come**
56:19 90:10,14 91:7
142:10,11 143:5
145:1 152:14
**comes**
123:17 142:4 144:10
**commencing**
1:18
**comment**

92:10 153:11
**comments**
111:3
**Commission**
159:18
**common**
109:4 138:7,8
**comorbidities**
28:7
**compared**
32:1
**compensates**
100:5
**complete**
5:14,19
**completely**
120:5
**complex**
16:15
**complication**
35:3 36:21 37:20
38:11 41:12 108:21
134:7 140:9,13,16
140:17,20 141:4
**complications**
28:12 34:15,19 42:6
42:10 52:7 124:8,11
139:4,12
**component**
143:16
**compromised**
132:17
**concern**
47:9,12,14 68:5
127:7,10 145:3,9
**concerned**
69:11 73:16 91:3,4,5
143:6 144:21
**concerning**
64:15
**concerns**
48:16
**concerted**
49:2
**concluded**
158:18



MAGNA
LEGAL SERVICES

**conclusion**
 136:3
**conclusions**
 134:19
**condensed**
 158:17
**condition**
 110:18 118:10 120:3
**conditions**
 135:20
**confirming**
 70:2
**confused**
 107:14
**congenital**
 137:19
**conjunction**
 11:12 156:2
**connective**
 137:18
**consequences**
 116:6
**consider**
 71:7
**considerations**
 48:15
**considered**
 72:12 87:19
**considering**
 87:12
**consistent**
 51:10 84:11
**consistently**
 49:1 123:6 148:1
**constellation**
 117:13 119:21 137:8
**consult**
 44:19 45:17 46:1
**consultation**
 82:12,13,15,16 91:16
  91:18,20 156:6
**consulted**
 69:10
**consumption**
 136:19 137:1
**contemplated**

 89:6
**context**
 75:10
**continue**
 123:12 148:7
**continued**
 52:11 92:3
**contrast**
 111:7
**contributed**
 137:1,3
**copy**
 6:8,15 96:13 158:13
**cord**
 36:3,7 38:11 39:16
  41:11,18,21 42:2
  47:13 49:8,11 68:6
  69:12 72:10,14
  73:17 74:16 89:8
  91:6 105:11 109:5
  128:2 129:8 131:5,9
  131:12 132:3,7,10
  132:19 133:10,15
  135:20 149:19
  151:13,17 153:17
  154:21
**correct**
 5:3 7:10,11 8:4,6,9
  8:10,15,16,19 9:7
  15:3 17:17,18,21
  18:6,7 22:18 23:11
  25:10,16 30:2 33:14
  34:21 35:5,6 38:15
  38:18,19,21 39:19
  42:4,5,8,12,13,14
  42:15,16,17,19
  45:13,20,21 47:21
  48:5 49:18 50:11,17
  50:21 51:5,16,19
  53:1,5,15 54:1 55:6
  55:17,18,21 56:1,7
  56:12 60:2,17,18,21
  61:1,3 67:8 69:2
  70:12 71:4,5,12,14
  71:17 83:17,18,20
  84:13,17,18 85:1,21

 86:1,4,5 90:17
  91:17,21 92:1,8,18
  92:19 93:5,12,13
  94:4 99:19 106:5,19
  107:19 115:18,19
  115:21 116:10,15
  118:18 120:14
  121:2 126:9 129:1
  131:17 132:17
  134:17 135:7,10,17
  136:12,14 152:16
  156:7,9
**correctly**
 9:13 96:11 97:2
  119:8
**corresponding**
 144:12
**counsel**
 102:16 159:8
**count**
 19:21 72:8 100:7
**County**
 159:2,4
**couple**
 4:19 28:20 52:16
  102:20 103:18
  139:17
**course**
 38:6 113:17 156:17
**court**
 1:1 6:16 99:8
**crescentic**
 23:1
**critical**
 8:9 9:17 45:20 48:3
  63:20 121:6,13
  122:3,17 123:12
**critically**
 48:11 117:10 154:20
**Crook**
 99:10,12
**cross-reference**
 103:12
**CSF**
 151:21
**CT**

 22:20 23:2,14,21
  71:3 82:1,2 87:10
  111:7 152:15 154:2
  154:6,8,12,15 155:3
  155:16,18
**current**
 14:8 29:4 84:21
  85:18,20 86:3
  105:12 115:21
**currently**
 7:15 8:14 32:21
**cut**
 26:15 38:6
**CV**
 3:10 6:8,9,11,14 8:17
  9:1,3,15 106:2
  129:18
**CVICU**
 130:12
**CV-ICU**
 38:8

_____

**D**

**damage**
 89:8
**damages**
 53:15,17 54:8
**damaging**
 138:13
**Dan**
 99:10
**data**
 32:14
**date**
 8:20 9:3 53:9 93:9
  99:21 100:13
  113:15 126:17
**dated**
 6:9
**dates**
 52:4,7,12 59:16
  112:18
**day**
 11:21 12:4,8,13,15
  12:18 33:21 58:2
  60:5,9 63:8,12


MAGNA
LEGAL SERVICES

76:10 92:18,19 93:1
93:3 108:5 122:17
122:19 123:7
126:19 127:17
143:19 145:2,2,8
152:4,5 154:18
159:13
**days**
12:9,17 14:10,10,21
15:2,7,11 18:9 34:2
34:10 58:17 68:16
76:16 96:4 148:2
152:4,5,12
**deadline**
158:9
**deal**
50:10
**deals**
135:6
**decent**
129:19
**decide**
40:17 127:20 143:3
152:10,11
**decision**
47:7 90:5 91:1
**decisions**
48:2 61:12,14 63:3
**decrease**
152:1
**decreasing**
151:21
**dedicated**
12:14
**defendant**
95:20
**defendants**
1:13 2:10 4:5
**defense**
96:2,3,18 99:5
**defer**
25:6 40:11,20 41:7
43:21 46:11,18
54:21 55:5 70:10
90:4,12 100:15
118:7,11 120:7

153:1,4,15
**deferring**
54:7 119:15
**defibrillators**
11:9
**deficiency**
73:21
**deficit**
121:2,8
**deficits**
63:11 64:15 74:7
85:18,20 92:4 93:21
111:21 114:6,9
115:21 116:2,3,8,10
116:21 117:3,5,19
118:1,11,16 119:4,6
119:13,19 122:1,21
123:8 131:13,19
136:7 142:15
143:21 150:19
151:1 152:14
155:21
**define**
88:14
**defined**
23:13
**definitely**
23:15 33:18
**definition**
77:1 88:15 132:16
**degree**
6:4 54:16 70:20
117:4 118:2,15,15
119:2 120:2 128:8
132:2 137:6 151:20
157:6,21
**degrees**
61:11
**delay**
124:21 125:3
**Delayed-Onset**
105:14
**demonstrate**
56:14 77:21
**depend**
43:10 61:15

**depending**
111:16
**depends**
30:9 39:20 47:2,18
69:3,6 79:6,9,10,13
140:13
**deposed**
6:1 96:17 97:16,20
**deposition**
1:16 3:2 4:17,18 6:8
57:13 65:10,15,16
65:18 83:11 86:14
86:17,18,20 87:1,3
96:1 100:12,20
101:1 108:6 114:13
116:19 158:18
**depositions**
45:6
**descending**
22:18 24:6,10,15
109:10 110:11,19
**describe**
13:12 25:19
**designation**
158:9
**detail**
122:8
**details**
68:17
**detect**
11:15
**determination**
91:11
**determinations**
48:7
**determine**
111:7,13 123:14
**determined**
126:4
**devastating**
155:9
**develop**
11:14
**Developed**
106:15
**deviation**

154:11
**devote**
10:15
**diagnose**
11:15
**diagnosis**
105:1 132:5 134:15
**diaphragm**
23:8
**diastolic**
143:13,15 144:4
**die**
21:18 27:4,12
**died**
26:10,18,21 27:1
**difference**
39:6 120:11 154:18
**different**
17:6 23:1 34:11
38:14,20 39:18
40:10 47:17 83:2,3
83:4 96:8 117:6
118:17,20 121:21
154:5
**differential**
132:4
**digital**
80:6
**diminishing**
29:4
**directed**
61:18
**direction**
57:14 58:3
**directions**
60:20
**directly**
36:14 37:10 47:21
84:10
**director**
8:18 9:5,18 10:4
**disagree**
93:5,7
**discharged**
33:13 34:14
**discover**



143:2
**discovered**
52:2
**discuss**
63:15,19 64:19 65:2
  66:10,13,20 67:1,4
  87:13
**discussed**
66:3,15,17 67:13
  68:2,3,3 70:8,12
  101:11 115:10
  130:21
**discussing**
7:8 71:9 72:1
**discussion**
64:12 65:4,5 67:14
  68:1,7,8,11,19,20
  89:6 117:11 128:4
**discussions**
69:1
**disease**
38:15,18,21 105:2
  130:3 131:1 134:16
  135:14 136:4
**diseases**
22:5
**disorders**
137:19
**dissection**
3:14 18:11,17,18
  19:11,20 20:15,20
  20:21 21:4,4 22:3,8
  22:9,15,16,17 23:12
  23:20 24:9 25:5,9
  25:11,19 26:2,6,10
  26:20 27:4,12,16
  29:11,15,19 30:1,2
  30:6 31:12,19 32:7
  32:10,15 33:3,12,17
  34:20 35:8,18 36:2
  36:6,20 37:19 38:17
  38:20 39:1,3,3,4,9
  39:18,19,21 40:4,7
  40:10,18 41:1,10,11
  42:7,11 43:1,16
  46:13 48:4 49:7

95:11 105:16
106:16 109:3,6
130:2,17 134:8,12
135:18 136:6,19
137:2,7,18,21 141:5
141:10 146:15
150:2,8
**dissections**
17:13,17 20:7 26:3
  30:21 31:7 44:9
  46:7 106:10 129:16
  130:1,8,8,10,12
  133:15 136:10
**distal**
23:13 39:4
**distally**
23:16
**DISTRICT**
1:1,2
**divide**
131:8
**Division**
1:3 9:4,16
**doctor**
6:7 50:11,18 58:19
  65:20 84:3 88:10,13
  90:6 115:11 121:6
  121:13 123:21
  157:2
**doctors**
89:1 127:7 128:20
**doctor's**
99:11
**document**
101:5,7
**documentation**
78:11 157:19
**documented**
69:2 157:16
**documenting**
78:18
**documents**
101:9
**doing**
4:21 10:18 11:19,19
  12:6,7,19 13:2,4,15

19:4 89:6 95:4
140:6
**Donna**
2:11 4:4,16
**donna.sturtz@nels...**
2:16
**downstream**
116:7
**Dr**
3:11 4:9,15 54:7,8
  55:13,17 56:2 57:13
  57:14 58:1,4 59:3,7
  60:1,1,6,6,17,17,20
  61:2,16,17,18 62:1
  62:3,7,8,20 63:4,6
  63:11 64:5,5,9,11
  64:13,13,19,20 65:2
  65:13,14,15,16,18
  66:4,7,11,17 67:13
  67:15 68:1,2,4 70:6
  70:9,17 71:1,16
  72:2 85:10,14 86:17
  86:18 87:8 90:15
  92:17 93:10 94:16
  99:12 108:2,3,6,16
  114:19
**drafting**
102:10
**drain**
71:8,10 87:13,14
  89:13 117:7,16
  120:13 121:1 138:6
  138:15,16 139:4,10
  139:13 140:6,9,21
  152:2
**Drainage**
105:13
**drained**
138:19
**drains**
138:3,4
**drinks**
137:13
**drop**
73:18 157:7
**dropped**

52:1
**due**
27:12
**duly**
4:10 159:7
**Dunphy**
55:13 56:2 57:13
  58:1,4 59:7 60:1,6
  60:17,20 61:2,17,18
  62:7 63:6,11 64:5
  64:11,19 66:7 70:17
  71:16 87:8 92:17
**Dunphy's**
65:13,14,18
**duplex**
82:20
**duration**
33:21 34:3
**duty**
8:21
**dying**
21:13 28:12 30:3
**dynamic**
62:10 121:18 149:2
**D.C**
2:6 8:6
**D/W**
64:9

———————————————
E
———————————————
**earlier**
52:7 114:15 128:5,12
  135:14
**earmarked**
12:18
**easily**
127:2
**echo**
81:13 129:5
**echos**
81:9
**ED**
82:2,3,3,4,4,5,6,6,7,7
**education**
102:7
**effort**



49:2
**either**
20:8 77:16 149:13
**EKG**
83:9
**EKGs**
82:8
**Elakil**
54:8 108:3,6
**elapses**
145:1
**elected**
49:13
**Elizabeth**
1:19
**email**
2:8,16 104:1 158:7
**embedded**
79:19,21
**emergency**
24:20
**emergent**
24:18
**encounter**
122:7
**endeavors**
10:17
**ended**
36:9 43:8
**energy**
137:13
**enjoy**
10:11
**ENT**
148:6
**entertained**
89:11
**entire**
24:21 80:18
**entirety**
23:4
**Epic**
80:5,15
**epicardial**
126:11
**equation**

151:13
**err**
149:19
**especially**
29:6 144:21
**ESQUIRE**
2:11
**essentially**
37:15 131:8
**estimate**
13:6 20:4,6,14 34:9
**estimating**
34:8 37:21
**et**
1:12 3:13 30:17,17
69:20
**etiologies**
134:3
**evaluate**
91:7
**eventually**
155:7
**everyday**
146:13
**evidence**
29:5 36:6 49:9 56:6
56:15,18 57:1 64:1
74:20 109:13
131:15,18 142:14
**EVT**
90:1,4,11,16,21 91:9
91:12
**exact**
8:20 20:2 41:15
118:9 122:19
126:17 132:15
**exactly**
20:14 46:9 50:3
57:21 66:14 70:16
81:2 109:21 117:21
132:3 134:1 149:5
**exam**
121:17,20 122:14,16
123:11 125:21
126:1,4
**examination**

3:5 4:14 157:1 159:9
**examinations**
8:11
**examined**
4:12 159:8
**example**
17:9
**exceeded**
139:10
**excessive**
110:8
**exclusively**
8:3 12:14
**excuse**
34:1
**Exhibit**
3:9,10,11,12 6:14,18
100:11,17 104:2,4
**exists**
31:5
**expect**
113:5
**expectancy**
31:10,18 32:3,8
**experience**
24:12 33:10 35:13
105:10
**experienced**
34:5
**experiencing**
121:3
**expert**
6:1 31:2 55:5 60:3
89:21 90:15 94:21
95:4 96:12 97:9
**expertise**
43:4 84:10 86:7
102:7 111:18 153:5
**experts**
54:7 108:2
**Expires**
159:18
**explain**
155:10
**extend**
25:5

**extended**
22:10
**extending**
23:4
**extends**
23:16 25:11
**extension**
133:17,19
**extensive**
25:20
**extent**
116:2
**extenuating**
48:12
**extraneous**
144:17
**extraordinary**
57:2
**extremities**
114:8
**extremity**
82:19 119:19 123:5
125:4 127:19
131:19 136:7
145:19 151:1

--- F ---

**face**
30:17 77:19 115:7
**fact**
35:2 41:19 42:1
113:20,21 116:21
119:18 154:20
**factors**
133:16 137:15
144:17
**facts**
118:9
**failing**
71:3,7
**failure**
42:14 87:10,11 93:20
**fairly**
16:13
**Fairman**
105:13



**false**
109:9,21 110:3,11,18
111:11,15,19
**familiar**
30:19 31:1,4 105:3
**far**
64:2 72:19 98:1
105:21 139:10
140:6
**favor**
47:15
**favors**
47:11 128:5
**February**
6:9,21 7:5 102:11,13
**fee**
100:20
**feel**
51:21 52:8 54:20
**fees**
99:17
**fellowship**
19:6
**fenestrate**
111:15
**files**
83:4
**find**
28:18 103:19 121:21
122:12,13 155:20
**finding**
65:2 79:21
**findings**
63:7,15,19 64:19
**fine**
68:12 100:10,19
**finish**
108:11
**finishing**
58:14
**firm**
95:2
**first**
4:10 6:9 8:12 44:3
49:18 52:12 62:19
97:19 105:7,13,16

134:2 142:9,10,15
143:18,19,19
144:10,16,19,19
155:19
**fits**
28:2
**five**
29:9 33:1,9 34:10
43:11 44:10,12
94:10 98:1,5 101:15
103:6
**fix**
24:17,19,20 40:17
**floor**
125:2
**flow**
131:5,9,12 132:9,18
133:10
**fluid**
112:11 138:17,19
**focal**
64:15 121:8,12
155:20
**focus**
11:1,5,10,11 12:1
24:13 84:2,4 86:7
114:1 115:9
**focused**
10:14 12:4 25:3 33:8
143:20
**folder**
81:18,20 83:5,6
**folders**
83:2,14
**folks**
123:7
**follow**
60:20 96:15
**following**
18:11 19:19 33:20
34:19 35:7 46:13
47:1,5 48:4,19
141:4
**follows**
4:13
**follow-up**

157:3
**forgetting**
60:8
**forgive**
58:19
**form**
61:4 116:17 129:4
157:20
**formed**
60:15
**forming**
101:17 106:11
**formulate**
101:19 102:4
**formulated**
102:6
**forth**
85:18 101:11
**found**
62:4 73:10 75:1,21
102:14 103:8
122:13,16,20
146:16 154:5
**four**
12:9 38:1 44:11 98:1
98:15 145:8 158:16
**frequent**
38:9 57:9 109:6
130:19
**frequently**
68:15
**front**
107:8 131:7,9,12
**full**
5:14,18 6:2 69:2
76:17,18 77:1
**function**
151:18
**further**
150:5 158:5 159:9
**future**
86:3

———————————
**G**
———————————
**G**
2:5

**gained**
114:12
**gait**
114:20
**general**
13:5 40:21 85:16
130:16
**generally**
40:12
**generated**
100:13
**generic**
112:15
**genetically**
137:17
**getting**
129:3,11 130:17
148:21 152:9
155:16
**give**
18:14 20:1,13 43:8
45:10 103:14 111:2
**given**
61:10 74:2,5,10,12
74:18 75:5,5,7
76:12 77:13 96:1
149:6
**giving**
5:11 20:5 61:17
89:14 117:18
**gjackson@govern...**
2:8
**global**
115:4
**globally**
11:5
**glucose**
112:17 113:3
**go**
5:5 10:2 23:14 28:2
45:8 51:8 77:8
78:17 79:2,4,8,16
80:10 88:3,6 96:2
99:5 100:1,6 121:19
121:21 122:13
132:20 136:16



145:6
**goal**
46:2,12,21 49:5,6
75:9,10,14 141:19
142:3,12,17,20
143:3,9 144:1,3,11
144:12,14 145:6
147:2 148:8 151:9
152:3
**goals**
49:12
**goes**
23:8 136:6 143:12
150:4
**going**
5:6,17 6:13 22:21
24:1,3,17 28:4 45:5
47:4 48:13 49:15
53:7 54:13 55:3,15
56:10 69:16 81:5
82:21 85:19 86:2,15
88:7 90:14 94:2,7
97:19 100:10
115:16,20 116:4
128:3 143:7 145:21
146:2 150:20 154:3
155:6
**good**
4:15 20:14 59:10
**gotten**
108:10 128:13
154:15
**Governor**
2:3,4 4:6
**gradually**
152:13
**Granted**
121:18
**granular**
78:21
**guess**
4:16 17:10 20:18
36:17 45:1 54:20
**guessing**
97:13
**Guide**

134:15
**Guideline**
105:1 135:4,5
**guy**
91:3

---
**H**
---

**half**
27:9 97:13,14 121:20
**halfway**
108:10
**Hamilton**
54:8 90:15 108:2,16
**hand**
132:20,20 159:13
**handle**
124:1,5
**Hang**
103:16
**happen**
104:12 138:18
139:19
**happened**
26:8 62:6 119:7,14
**happens**
33:9
**happy**
5:3 45:1,10 156:17
**hard**
5:9 20:13 43:8 68:18
112:16 137:4,14
**HARGROVE**
1:5
**Hargrove's**
86:19
**hash**
59:8
**head**
22:4 31:3 33:4 35:15
41:14 71:3 74:10
82:1 87:10 100:9
112:10 130:15
154:12 155:3,16,18
**headache**
138:8,9 141:1
**health**

8:14 17:11 82:10
83:9 84:21,21 85:3
**healthy**
28:6
**hear**
5:1
**heard**
5:6 81:12 151:12
**heart**
11:15 14:4 17:2
147:5,6
**heavily**
62:16
**hedging**
52:13
**held**
1:17
**hematocrit**
68:9 71:19 72:13,18
72:20,21 73:5,7,10
73:15,18 74:14 75:8
75:9,14,15 76:7,15
77:4,17,18,21 87:17
88:20 157:4,7,10,14
**hematoma**
139:14,18
**hemodilution**
73:21
**hemoglobin**
74:21 76:6,8
**hemorrhage**
139:15,17
**herniate**
138:21
**hey**
62:1
**hiatus**
23:5,10
**high**
19:13 21:13 27:1
29:6 30:8,13,16,18
47:4 124:14,19
127:13 130:11
137:10,12 140:11
141:6,9 145:11,12
145:13,13 146:8,13

146:17
**higher**
21:16 28:8,12 47:15
71:7,9 76:2 87:12
87:13 145:16,21
152:12
**highest**
122:6 123:21 124:4
**highly**
130:3,6
**hired**
44:11
**history**
83:8
**Hockstein's**
65:16 86:18
**hold**
6:14 53:2 65:20
100:11 157:5,20,21
**home**
1:18 150:5
**honest**
51:21 58:9 104:6
**honestly**
36:12 90:4
**Hopefully**
94:8
**hospital**
1:11 16:4 21:12,15
27:5 30:3 36:5 37:2
37:7,18 42:4 44:5,8
58:12 67:7 76:18,19
78:5 79:3 80:5,13
148:14
**hour**
99:17 100:20,21
121:20,21 122:12
122:15
**hours**
99:20 100:8 122:15
125:3 142:16,19
143:19 144:16,19
144:20,20,20
**Howzer**
99:9
**huge**


MAGNA
LEGAL SERVICES

155:9
**hypertension**
48:19
**hypertensive**
148:6
**hypodensity**
23:2
**hypoperfusion**
133:18
**hypothetical**
126:2,5
**hypothetically**
125:5,15 126:3
154:14

**I**

**ICU**
8:18 10:3,4 13:16
14:4,5,12,20 15:7
15:12 17:18,20 18:8
18:10,16,16 19:10
19:19 20:7 33:6,13
33:16,20,21 34:1,6
34:14,16 35:17,21
36:16 37:2,7,17
38:9 41:8 44:3,4
45:16,16 46:3 47:1
47:5 48:10,20 49:18
50:3,8 58:17 59:4,6
59:7 60:4,9 66:4,10
66:17 67:8 70:4
72:5 75:16 84:3,5,9
84:15 86:9 97:12
112:5 113:1 115:10
115:12,16,17 116:7
117:10 122:7
123:12 124:18
125:2,6 130:20
141:4,20 142:4,10
142:11 144:10
149:3 155:21
**idea**
68:3,10
**identification**
6:19 100:18 104:5
**identified**

71:17 93:15 124:20
125:4
**identify**
4:2 54:15 101:15
113:16
**identifying**
90:7 123:8
**III**
2:3,4 4:7
**images**
24:1,3 109:16 152:16
152:19 153:4,6
**imaging**
109:12 133:1,8
**immaterial**
74:9
**immediate**
33:6 155:9
**immediately**
20:8 50:8 62:21 63:4
124:20 155:18
156:1
**impact**
110:4
**importance**
155:16
**important**
52:4 122:3,10 146:8
146:19 150:4
**improvement**
120:2 152:9
**inaccurate**
9:8
**incidence**
22:1,5 130:16
**include**
16:14 42:8,12,14,16
42:18 48:16 53:21
89:13 139:13
**included**
30:15 60:5 136:9
**includes**
55:16 64:4
**including**
47:7 91:9 97:17 98:3
117:16,17,17

**increase**
72:13 151:16
**increases**
43:3,18
**incredibly**
122:3
**incumbent**
48:9 65:1 129:9
**independent**
16:4 61:13
**independently**
70:2
**INDEX**
3:1
**indicate**
24:5 35:4 148:4
**indicates**
51:13 67:14 125:7,16
**indicating**
104:14
**indication**
127:15
**Indications**
105:12
**individuals**
59:20
**infarct**
35:19 36:21 37:20
38:12 41:11 42:2
49:8,12 68:6 69:13
72:10 74:16 89:9
91:6 109:5 120:14
120:18 128:2 129:8
132:3,7,9,12 149:19
154:21
**infarction**
135:21
**infarcts**
36:3 120:16
**infection**
138:12 140:2,2
**information**
23:1 56:14 62:19
64:4 100:2,14
147:13 153:20
**informed**

68:4
**infusion**
89:16
**initial**
46:21 142:12 144:11
**initially**
105:18,19 144:3
**injury**
54:15 133:16 134:10
134:11 141:8
**insult**
133:9
**insults**
121:12
**intact**
121:7
**intelligence**
11:13
**intend**
59:21 60:3 156:12
**intensive**
9:5,18 13:15,19 17:5
84:3 86:6 90:6
124:19
**intensivist**
48:6 59:4
**intents**
39:21
**interest**
11:2,7
**interested**
10:10 79:18,21
**interesting**
11:16
**interface**
123:13
**interfacing**
90:9
**internal**
141:17
**International**
30:20 31:6
**intervention**
112:1
**interventions**
72:11 89:7 91:8



112:20 117:13
118:17 119:7,14
120:10
**intracranial**
139:14,16 155:4
**intraoperative**
82:9
**intraspinal**
151:21 152:2
**invasive**
16:14
**invoice**
100:4
**invoices**
3:11 100:7,13
**involve**
16:18 22:17
**involved**
36:14 37:10 38:13
45:4 47:21 48:3
57:18 60:12 62:17
67:6 70:3,18 93:3
95:11 97:10 156:4
**involves**
13:7,8 24:9 47:19
**involving**
23:3
**in-hospital**
29:14,18 30:5
**iron**
73:20
**irregardless**
129:10
**irreversible**
133:15
**ischemia**
36:3 38:11 42:18,20
47:13 73:17 105:12
135:20 145:19
147:4
**issue**
97:3 111:20
**issues**
39:16 41:18,21 48:18

**J**

**Jackson**
2:3,4 3:7 4:6,6 6:15
21:5 26:11 31:13,20
32:12,17 43:5,19
44:16 46:15 50:14
51:1 54:2,18 55:7
57:5 58:6,13 61:4,6
67:10 69:4 70:13
81:6,19 85:7 88:1
88:10 95:1 96:13
100:2,15 101:3,10
102:17,21 103:2,8
103:11 104:12,15
104:17,20 106:1
107:12,16 108:4
116:11,17 125:9,19
129:4 130:4 157:1
157:12 158:5,11,12
158:16
**Jacob**
126:19
**Japan**
106:18 107:4,9
108:19
**job**
10:20 48:6
**jobs**
13:18
**judgment**
47:20 48:2
**July**
83:7,16,20
**jumping**
122:9
**June**
1:17 3:3 49:21 50:13
50:21 51:14,14,19
52:21 53:9 55:20,20
57:18,19 58:2 59:16
59:16,19,20 60:16
63:6,12 64:3 66:7
66:16,18 70:18 71:3
71:12 73:9 74:2,3
74:13,19,21 75:19
75:20,20 76:1,5,6,6
76:8 81:19 83:5,15

87:9,16 88:21 89:4
91:16,19,21 92:14
92:17 93:3,8,11,16
93:17 94:2 112:5,12
113:15 117:7
118:17 119:7
126:18 127:3,8,17
128:9,21 129:9,10
147:2,11,16 148:13
148:15,15 149:8,9
154:3,3,5,13,15
155:17 159:19

**K**

**Kaplan**
85:10,14 114:19
**Kawanishi**
3:12
**keep**
82:20 127:7,11,16
144:8,18 150:6
**keeping**
127:20 149:20
**KEVIN**
1:7
**kind**
38:18,21 74:8 140:13
146:9
**kinds**
15:21 16:1,2 38:15
**Knight**
9:18
**know**
4:18 5:3,13 7:14
11:18 12:18 13:1,3
14:7 15:13 16:11,12
18:20,21 19:5,6
20:1,3 21:10,17,20
21:21 22:4 24:9,12
28:5,6,19 30:10,15
32:19 33:9 34:2
35:14,20 36:10,15
37:4,6 38:12 40:12
40:15,16 41:5,15,16
41:19 45:11,12 46:5
49:19 50:6 52:8

53:19 56:18,20 57:6
57:8 59:8,9,10,15
60:7,13 61:10,17
62:8,11,16,18 63:17
66:14 68:10,19 70:8
72:12 73:4,13 75:1
76:1,3,4,7,8,9,11,21
77:1,12,19 78:8
80:18 84:16 85:4,18
88:14 90:21 91:2,12
92:20 96:13 98:6,18
100:3,4 101:10
102:2 103:2 109:11
110:12,17 111:4,8
112:9,14 113:1,2,6
114:3 115:7,10,13
116:7,9,13 117:15
118:3,5 121:3,9,11
121:19 122:2,6,18
123:15 124:10,17
126:1,13,14,20
127:5,19 130:11,14
130:15 132:8,21
133:4,7,8,9,12,21
134:1 137:9,20
138:1,12 140:18
141:14 142:19
143:10,19 144:5,20
145:11 146:8,19
147:10,13,18 148:5
148:11,17,19 149:6
149:7,12 150:9,12
150:14,18,20
151:11,12 153:4,10
153:13 154:6
157:10
**knowledge**
56:8 98:2
**known**
34:18 35:2 134:6,11

**L**

**lab**
11:13 77:3 79:16,17
80:6,7,10,19,20
**labeled**



81:19 83:7
**laboratory**
77:9,10,13 78:4
157:8,15
**labs**
79:18,20
**lack**
131:11 132:9,9
133:10
**language**
64:17 136:8
**lapse**
7:15
**large**
153:8,10
**largely**
54:21
**larger**
143:16
**latitude**
61:11,16
**law**
2:4 159:7
**lawyer**
83:15
**lead**
126:8 135:20
**leading**
139:14
**leads**
75:4
**leave**
24:15 30:3 128:21
**leaving**
128:8
**led**
116:2,7 127:7
**left**
23:13,16 39:5 84:9
**legs**
52:2 73:16 75:13
91:4 113:21 114:1,2
114:5,9 119:20
121:4 142:7 143:2
145:9,18 155:10,12
**Leonard**

99:10
**Leone**
105:16
**lessen**
89:7,8 121:2
**lethal**
130:3 131:1
**let's**
15:11 28:8,20 49:14
49:14 61:18 98:17
110:20 111:1
144:19
**level**
22:11 23:5 68:1 75:9
75:10,14 157:10
**levels**
49:5 72:8 157:4,8,14
**liberalize**
142:19 145:5
**licensed**
7:9,13,16
**licenses**
7:15
**life**
31:10,18 32:2,8
85:10 114:17,18
117:1 146:13
148:14
**life-threatening**
26:1,4
**light**
48:12 56:19
**limb**
42:18 121:14 125:7
125:17
**limited**
7:19
**lines**
13:10
**list**
103:1 104:1,2,18,20
105:5 107:14,15,18
**listed**
86:12
**literature**
28:17 102:2

**little**
45:3 51:20 52:13
85:6 94:20 103:1
**live**
32:8 40:1 146:10
**living**
136:2
**LLP**
2:12
**loading**
89:15
**log**
80:14
**long**
33:15 152:4,4
**longer**
10:4,10 94:8,8
**longest**
34:2
**long-term**
32:14 42:6,10 150:1
**look**
22:6,19 25:18 28:17
32:20 72:8 75:17
77:8 78:17 79:2,3,5
79:7,12,15,16 80:1
86:16 92:21 95:12
100:7 103:10,14
112:8 113:13
129:18 136:8,15
147:12 152:19
153:3
**looked**
78:16 113:17,17
123:16
**looking**
50:10 51:3,11 79:6,9
79:14 124:11
**looks**
8:17
**loop**
62:9
**loose**
114:4
**lot**
21:17 24:13 104:7

108:12 129:18
138:19
**low**
30:16 68:9 72:9
74:14 147:8
**lower**
47:11 49:2 82:19
114:8 119:19 123:5
125:3 127:19
131:19 136:7
145:18 147:21
148:1,7,21 149:15
149:20 150:7 151:1
152:13
**Luczycki**
55:17 57:14 58:20
59:3 60:1,6,17
61:16 62:1,3,8,20
63:4 64:5,13,20
65:2 71:1 93:10
**Luczycki's**
65:15 86:17
**lumbar**
71:8,10 87:12,14
89:13 117:7,16
120:13 121:1 138:2
138:4,6,15 139:4,10
140:6,9,21 152:2
**lumen**
109:10 110:1,2,3,11
110:18 111:11,16
111:19
**L.L.C**
2:4

---
**M**

**M**
159:3
**magic**
6:2
**main**
47:9 111:19 114:1
115:9 141:12 149:3
**major**
11:10,11 124:6
**majority**



10:16 12:5,6 13:1,4
95:17 136:2
**making**
48:2,15 49:1 89:6
99:11 152:7
**malperfusion**
36:7
**malpractice**
95:5,20
**man**
73:5
**manage**
155:2
**management**
11:8 47:8 48:12
105:1,12 112:11,17
113:4,7,14 130:1
134:16 150:2
**managing**
119:18
**mandatory**
40:8 142:1
**manner**
21:12
**MAP**
143:3,9,10,12,16
144:1,3,5,7,12
145:16 146:3 147:2
147:10 148:10,12
148:16,17 149:8,10
151:2,9 152:3
**mark**
104:1
**marked**
3:9 6:18 100:17
104:4
**Maryland**
159:1,4
**massive**
97:7
**materialize**
155:7
**materially**
110:4
**math**
18:21 19:7

**matter**
7:8
**MD**
2:14
**mean**
5:10 10:7 15:6,18
18:13 25:4 27:21
33:5 38:6 42:3
43:10 47:6 56:14
58:9 67:21 69:9
76:20 79:10 109:15
114:4 120:17 121:8
121:15 125:8,18
129:18 130:14
133:2,19 134:2,5
146:2 155:5 157:9
**meaning**
14:10
**meaningful**
68:19
**means**
70:9 121:9,16 125:21
**medical**
9:5,17 16:7 47:20
64:8 66:12 78:18
80:11 81:2 83:16,19
86:3,11 87:2 95:5
95:20 116:14
125:16 127:6,6,10
157:6 158:1
**medication**
112:3 139:21 149:1
150:6
**medications**
147:21 148:6,20
150:10,13
**medicine**
7:10,19 8:2,5 13:15
82:14 105:10
**MedStar**
1:10 67:7 76:18 78:5
**Melton**
99:9
**memorized**
85:12
**memory**

106:21 107:4 109:19
126:16
**meningitis**
139:15 140:2
**mention**
4:19
**mentioned**
20:17 36:13 37:14
39:2 52:12 99:4
108:15 114:15
116:16 119:21
134:4 139:16 140:1
**mentioning**
60:10
**mentions**
106:2 111:2
**met**
84:17,18 119:17
**midnight**
50:4
**Miller**
96:20 126:19
**mind**
59:11 94:9
**minimally**
16:14
**minute**
65:12 121:20
**minutes**
43:11 94:10 103:18
**mispronounce**
58:20
**missed**
76:14 77:11,13
**missing**
98:6
**mistake**
138:19
**mistakenly**
138:16
**mitigate**
52:6 149:21
**mix**
30:14
**moment**
92:16 105:21 149:6

**morning**
4:16 108:12
**mortality**
27:15 29:3,6,11,15
29:19 30:6
**motor**
131:13,19
**move**
52:2 73:16 75:13
91:4 113:21,21
114:2,5 119:20
142:7 143:2 145:9
145:18 155:10,12
**moved**
7:14,21
**moving**
121:4
**MRI**
53:10 82:10,11
109:18 110:10
111:1,4 126:20
127:4 128:6,13
129:3,11
**MRIs**
110:10
**Mullins**
2:12
**multiple**
148:2,20
**multiply**
15:10
**M.D**
1:17

---

**N**

**naloxone**
89:16
**name**
4:16 58:20,21 85:9
96:18 99:11
**names**
44:13 45:2,11 99:7
**nature**
65:5 68:20 69:6
116:3
**NE**



2:5
**necessarily**
20:8 47:19 63:3
155:5
**necessary**
24:17
**necessity**
127:15
**need**
9:7 21:19 39:13
53:17 102:3 107:3
111:7 124:12 128:3
128:15 134:4 158:7
158:8
**needed**
48:16
**needing**
34:16 39:15 111:14
**needs**
86:3
**Nelson**
2:12
**nephrology**
82:11
**neurologic**
63:7,11 74:7 85:5
92:4 93:21 111:21
114:9 121:12
122:11,21 123:8,11
136:7 142:15
143:21 150:18
155:20
**neurologist**
55:1 71:11 87:15
90:4,9,18 91:2,11
91:16 92:10,11
117:12 118:7,12
119:15 120:8
122:20 153:15
**neurologists**
92:7
**neurology**
55:6 72:2 82:12
90:12 91:19,21
123:14,17 156:2,4
**neurosurgeon**

90:20 108:7
**never**
8:5 9:10 84:17,18,20
85:2 147:5 148:13
148:16
**new**
3:13 44:11 64:14
93:21
**Newly**
106:14
**niche**
11:7
**niece**
86:21
**Ninety**
146:6
**nonclinical**
10:16
**nonspecific**
67:16
**noon**
123:17
**Nope**
156:18
**normal**
72:21 73:5 114:20
120:5 122:14,16
127:18
**Notary**
1:20 159:3,16
**notation**
67:13
**note**
63:6,11 64:3,4 66:2
66:16 69:14 73:8
77:6,7,16,18 79:19
80:1 82:3,3,4,12,13
82:15,16,17 92:3
93:1 125:5,13,15
**noted**
69:18,19
**notes**
58:2 67:5 68:16 70:2
70:5 77:5 78:15,17
79:1,8 101:3,4,5,6,8
101:12,16 103:7

106:14 126:15
134:15,17 136:16
148:4 157:17,20
**notice**
64:8
**noticed**
73:15
**notified**
64:12
**novel**
11:14
**nuances**
40:15 41:5
**number**
18:14 20:2 21:1 28:1
30:9,17 35:14 41:17
100:7 116:21 124:8
129:19 144:16
**numbers**
81:4
**nurse**
61:18 62:1,5,6
**nursing**
82:3,4

---

**O**

**objected**
21:8 26:16
**objection**
21:5 26:11 31:13,20
32:12,17 43:5,19
44:16 46:15 50:14
51:1 54:2,18 55:7
57:5 58:6 61:4
67:10 69:4 70:13,13
88:1 116:11,17
125:9,19 129:4
130:4
**objective**
144:15
**observed**
63:7,12 114:19 115:3
**obstetrical**
16:9
**obtain**
71:3 87:10 154:12

**obtained**
107:11 109:18
**obviously**
4:21
**occasion**
41:9
**occlusion**
153:8
**occlusions**
153:11
**occur**
34:19 141:8
**occurs**
35:3 39:4
**offer**
53:7 55:16 56:10
156:13
**offering**
18:3 50:11,19 51:17
52:18 53:13,14,16
92:6
**Office**
2:4
**oh**
9:12 11:16 21:10
26:17 84:1 87:19
108:4 135:4
**OHSU**
11:13 14:9
**okay**
5:7,12,19 6:7,13,16
7:9 9:2,9 10:5,19,21
11:16 12:20 13:5,11
14:1 17:9 22:7 25:6
33:10 34:12 36:8,17
37:16 39:17 40:14
40:21 41:8 42:1
44:2,13 45:12 49:14
49:16 50:9 51:11
52:15 54:6 58:15
60:11,14,19 63:2,5
65:7,19 66:1,16
67:5 68:13 69:8
70:10 72:15 78:16
79:11 81:2,5,18
83:12 85:14 87:2


MAGNA
LEGAL SERVICES

88:18 90:19 92:2,13 93:2 94:7,20 97:15 98:5 99:13 100:10 102:5,9 103:14 104:10 105:6 106:2 107:8,10,20 108:19 110:15 115:14 120:13 121:5 123:19 124:4,15 128:19 129:12 133:13 134:1,14 143:14 144:9 145:15 152:3,21 153:12 155:14 156:4,21 157:19 158:6

**older**
28:9

**ones**
99:15 107:12

**ongoing**
49:2 52:3,11 117:2 123:12

**open**
6:14 17:2 40:18 41:6 43:8 81:5 100:11 111:15,19

**operate**
57:3

**operated**
133:14 134:7

**operating**
13:14,21 14:3,15 15:15 16:11 17:7 18:2 141:20

**operation**
43:12,12,14 48:14 124:7

**operations**
16:13,15,17 28:16

**operative**
24:4 82:13

**opine**
86:7 115:11 117:4 136:3

**opinion**

6:3,4 50:19 55:16,19 56:10 58:17 59:5 60:3,15 70:19 93:10 117:9 119:2,10 128:7 129:14 132:1 132:6,8,12 137:5 154:4 157:3,6,13

**opinions**
7:5 18:4 50:12 51:17 52:20 53:8,13,14,17 53:21 55:5,14 92:6 97:10,11 101:17,19 102:4,6 106:11 110:5 156:12 157:21

**opposed**
120:15

**order**
34:1,10

**Oregon**
1:19 7:10,14,16,17 7:19 8:1,3,14 17:11 44:4,7 45:8 46:6,20 98:18,19,19,20,21 99:8

**organ**
42:18

**origin**
39:3

**originating**
23:3

**outcome**
120:11

**outline**
69:15

**outlined**
88:18 117:16

**outlines**
114:16

**outside**
56:7,11 57:3

**outweighed**
140:7

**outweighs**
145:14

**out-pouching**

39:11

**overall**
29:5 120:3 130:16

**overlap**
103:1

**overlapping**
52:14 88:12 135:19

**o'clock**
123:16

---

**P**

**PA**
126:19

**pace**
128:15,17

**pacemakers**
11:9

**pacing**
126:11,12,21 127:1,7 127:11,12,13,16,20 128:3,5,8,12,15,18 128:21

**page**
3:5 51:11,12 81:4 134:17,21 135:6 158:16

**pages**
51:3 101:5,16

**paid**
84:7 117:11

**pain**
148:21

**paper**
134:20 135:1

**papers**
106:13 134:19

**paralysis**
127:19 139:14 145:19

**paralyzed**
128:3 143:7

**parameters**
68:7

**paraplegia**
3:13 42:16 105:15 106:15 108:20

109:2

**paresthesia**
121:14 125:7,17

**paresthesias**
126:6

**part**
5:2 23:11 24:14,15 24:17,18,19 25:4 48:6 59:7,11 73:14 131:6,7,9,10,12 132:18

**particular**
11:1 61:21 83:5

**pass**
8:11

**patent**
133:1,2,3,8,12

**pathology**
25:15 82:16

**patient**
18:11,16 27:15 30:12 30:14 34:11 36:4,9 37:13,17 39:8 40:1 41:9,15 46:3 47:4 48:4,7 49:7 61:3 62:17 69:12 70:4 73:3,19 82:5,6 90:16 93:4 112:21 121:16 125:1,16 126:5 127:18 128:16,17 136:5 140:19 141:3,9,19 142:4,6,11 145:17 149:17,18 156:5

**patients**
11:8 16:12 17:4,19 18:1 19:1,2,8,10,12 19:19 20:6,9,10,12 20:15,20 21:11,14 21:16,17 24:13 27:3 27:11 28:11,16 30:1 30:15 33:5,11,16 34:5,13 35:7,11,16 36:1,11,13,15,19 37:1,6,11 38:8,13 39:13,14,15 41:17



42:21 43:15 45:14 61:13 122:4,5,6 124:1,5,11,17 127:12 130:12 133:14 140:10 144:9

**patient's**
47:21 90:15 146:8

**pay**
110:8

**PDF**
82:8 83:4

**pediatric**
16:4

**pediatrics**
16:3

**people**
45:3 46:10 70:11 77:15 130:17 136:2 137:16 151:8

**percent**
13:6,8 28:20,21 29:9 29:12,16,20,21 30:7 32:16 73:11 95:18 120:6,6 140:18

**percentage**
11:18 16:17 27:3,7 27:11 28:21 35:11 95:14 97:9

**perform**
15:20 17:12 44:8

**performed**
53:10 126:21

**performs**
90:21

**perfusion**
72:14 132:10 151:13 151:16

**period**
33:6 34:17 125:6 148:18 150:17

**perioperative**
11:8 105:8

**persistently**
72:9

**person**

44:11 59:15 121:17 121:19 122:18 143:7 146:10,21

**personally**
35:20 138:17

**perspective**
93:20

**pertains**
129:21

**pertinent**
7:4,7 73:14 84:10 113:20

**PETER**
1:16 3:2 4:9

**photographic**
126:16

**physical**
82:14 83:8

**physician**
58:4 60:21 63:16

**pin**
52:10

**place**
126:8,21 127:8,12 128:9,21 138:4 159:6

**placed**
147:20

**placement**
71:8,10 87:13,15 117:16 138:5 139:5 139:13 140:21

**places**
79:12 138:2 141:17

**placing**
89:13 140:9

**plaintiff**
1:8 2:2 95:16 99:2

**plaintiffs**
4:7

**plaintiff's**
54:7 83:15 89:20 102:16 108:2

**plan**
61:3 66:3,3,17,20 67:2,4,7 69:16,17

85:8,10 90:10 114:17,19 117:1

**please**
4:2 5:2,13 26:17 29:17 31:16 32:5 42:9 63:9 66:8 67:19 91:7 104:19 158:17

**point**
5:1,10 60:7

**population**
30:12 130:16

**portion**
25:13

**Portland**
1:19

**position**
10:8

**possibility**
49:11

**possible**
91:8 104:11 133:11 140:3 144:6

**post**
32:15

**postdate**
83:20

**posterior**
131:6

**postop**
126:19 127:17 145:8

**postoperative**
29:3,10 33:6 36:21 105:15 109:1

**postoperatively**
90:1 141:10

**potential**
134:12 139:3

**potentially**
91:13

**POWER**
1:6

**practice**
7:9,16,18,19 13:7,12 13:12 14:2,9 15:17 15:19 16:9 35:12

41:8 142:3,13 153:3

**practiced**
8:2,5

**practicing**
13:20

**practitioner**
88:17

**predisposed**
137:17

**predominant**
147:8

**predominantly**
81:9

**preexisting**
28:7 137:10,12 146:12 147:5

**preface**
28:4

**preoperative**
23:2

**prepared**
87:20

**present**
27:5 30:1 41:20 137:21

**presented**
29:7 36:5 146:15

**presents**
24:8

**pressed**
154:19

**pressure**
43:3,18 46:2,12,21 47:3,8,11,16 48:11 49:3,4,12 61:19,20 62:4 68:7 71:8,9 72:14 78:10,11 79:13 87:12,14 89:14 117:17 137:10,12 141:6,9 141:19 142:2,12,16 142:17,19,20 143:5 143:13,14,15,17,21 144:4,8,11,18 145:6 145:11,12,13 146:9 146:10,13,16,20



148:1,6,7,10,19,21 149:5,7,15,20 150:6 150:10,12,20 151:14,16,19,19,21 152:2,12
**pressures** 78:13,19,21 79:4,5
**pretty** 28:6 87:7 139:1 140:4,11 147:7
**prevent** 52:6
**previous** 28:10
**previously** 7:13 28:5 30:16,16 117:15 152:18
**primary** 144:15
**printed** 80:20
**printout** 80:17
**prior** 6:8 50:13 52:21 73:12 96:12 102:10 127:3 147:11,16 148:12
**privy** 62:19,21 76:12
**probability** 6:5 54:17 70:20 117:5 118:15 119:3 128:8 132:2 137:6
**probably** 14:9 19:4,5,16,17 20:18,18 21:2,15 28:19 29:5,8 34:10 76:5 95:6,17 111:8 111:9 112:7 117:9 117:18 120:1,9,10 126:10 131:20 137:8,9 141:7 146:12,14 147:19 151:9
**problem**

6:17 41:20 52:11 69:7,18 90:8 123:18 124:20 130:19 150:8
**problems** 20:11 34:14 38:10 85:18,20 121:12 122:9 124:13 137:20 146:1
**procedure** 24:16 111:15 139:7
**procedures** 138:10
**proceedings** 94:13 159:11
**produce** 103:21
**professional** 6:21 12:3
**profound** 93:21
**progress** 77:5,7,16 78:14,17 79:1,7,19 80:1 157:17
**prolonged** 34:16 133:16
**pronounce** 58:21
**properly** 58:21
**proportion** 21:16
**protocol** 97:7
**proved** 129:5
**proven** 120:10
**provide** 6:15 16:3,18,21 17:1 19:10 60:3 96:11 100:2,15 102:17
**provided** 6:7 18:10 24:2 60:4,9 65:18 78:9,14,15

79:1 80:17 85:6 87:4 96:10 100:12 101:3,9 102:15,21 103:9,11,15 104:3 104:13 107:12,15 113:14 114:16 152:20 153:20
**provider** 45:20 60:16
**providers** 16:7 47:20 48:10,10 55:15 60:1 72:17 84:21 85:1,3 123:7 157:17
**provides** 17:16 56:13
**proximal** 24:19 25:4
**prudent** 88:16
**Public** 1:20 159:3,16
**publications** 7:3,6 129:15,19
**published** 46:6,10
**pull** 22:20 106:20 107:3,5 109:20 110:20 111:1 126:15 128:14
**pulled** 12:19
**purely** 39:2
**purposes** 6:19 40:1 100:18 104:5
**put** 124:17 138:15 140:18 145:20 152:2 158:8
**p.m** 1:18 94:14,14 158:18

**Q**

**quantify** 118:6
**question** 5:2,4,6,7,15,19 6:10 9:13 26:17 28:19 29:17 31:16 32:4 42:9 43:7 44:1 53:18,20 55:14 63:9 67:19 78:3 112:15 118:13,20 126:2 129:12 132:11 156:11 157:2
**questions** 40:13 53:18,19 97:5 102:1 156:16,19
**quick** 94:9 104:13
**quickly** 34:15 138:17,20
**quite** 30:18
**quote** 31:2,2
**quoting** 30:11

**R**

**radiologist** 110:13,14 111:10 152:20 153:5
**radiology** 153:2
**raise** 72:13 146:20 150:20 151:2
**raising** 89:14 117:17 151:9 151:19
**range** 15:17 16:13 28:18 29:16,20 30:7 33:15 33:18,19 34:4 46:19 72:21 151:3
**ranges** 29:12
**rare**



21:3 130:3,11,18 139:1 140:4

**rarely**
109:3 138:15

**rate**
27:15 29:3,6,11,15 29:19 30:6 32:15 33:1 140:9,16

**reached**
147:11,14

**reaching**
145:16

**read**
22:20 23:18 25:11 65:10,13,13,15,16 67:19,20 85:13 107:14 109:16 114:13 152:17,18 153:5 158:11

**reading**
108:11 109:17

**realize**
71:19

**really**
10:11 22:15 45:2 46:8 47:18 51:21 64:1 67:17 68:2,10 68:18 70:7 74:8,9 76:3 84:9 92:9 100:1,8 101:18 104:7 110:4 111:4,8 111:17 113:13,19 115:8 138:1 140:4

**reask**
9:13

**reason**
55:12 93:4,6 124:18 127:11

**reasonable**
6:4 45:19 54:16 60:19 63:5,10,14 64:18 65:1 66:6,10 66:13,18,19 67:1,3 70:20 89:2,3 117:4 118:15 119:2 128:7 132:2 137:6 141:18

141:21 151:20 157:6,21

**reasonably**
31:8 88:16 106:7

**reasons**
124:16 149:3

**recall**
8:20 24:7 25:17 37:3 41:16 50:3 64:2,16 65:17 72:6 74:4 76:13,15 78:7,20 93:1 97:3 100:8 105:18 109:14 112:8 114:21 115:2 115:8

**receive**
85:11 108:9 158:15

**received**
77:2 81:18 84:8 86:8 108:17 115:12

**receiving**
112:2,11,17 113:3,9

**recognized**
34:19 35:3 134:7

**recollection**
27:8 85:17 99:15 115:5 129:17,20

**reconvene**
94:10

**record**
4:3 49:1,10 64:17 65:4 66:12 72:7 75:17 78:21 80:5 81:21 82:7,7 92:21 101:4 125:16 159:11

**recorded**
159:10

**records**
57:1 64:9 76:12,17 76:21 77:3,9,11,14 78:4,18 80:11 81:3 81:20 83:4,8,16,20 84:2 86:11 87:2 96:12 99:18 100:4 101:10 116:15

123:1 127:6 157:8 157:15

**reduced**
31:12,19

**reduction**
11:6

**refer**
73:8

**reference**
101:12,21 106:13

**referenced**
93:9 103:7

**referring**
126:10

**reflect**
67:6

**reflected**
66:11

**refresh**
106:21 107:3

**regarding**
157:3,7,13 158:1

**registry**
30:20 31:2,3,5,7

**regular**
125:2

**rehab**
82:14

**relate**
54:1

**related**
18:4 39:16 41:18,19 41:21 42:2 97:6,10 97:11 133:10 136:4

**relationship**
62:11

**relative**
22:1,5

**relatively**
130:3,10,18,19 138:11

**reliable**
31:8 106:7

**relinquished**
8:21

**relying**

118:9

**remaining**
15:7

**remember**
36:12 37:12 57:21 74:9 85:7 96:11 97:2 106:21 109:17

**remotely**
4:21 5:9 159:5

**removed**
126:13,14,18 127:2 128:12,17

**removing**
128:5

**renal**
42:14

**rendering**
154:4

**repair**
17:12,16 18:12,18 19:11,20 24:6 25:8 26:19 33:2,12 34:20 35:8 36:2,20 41:7 41:10 42:8,12 43:2 43:16 46:14 105:9 109:1,2,7 141:11 150:3

**repaired**
25:12 41:2

**repairing**
24:14 25:3 106:15

**repeat**
26:17 29:17 31:15 42:9 63:9

**rephrase**
118:20

**replacement**
133:17,20

**report**
3:12 24:1,3,5 51:4,10 51:12 53:12 54:1 71:17 72:8 82:9,13 82:17,20 85:13,14 87:21 88:20 93:10 94:18 102:10 108:18 109:17



111:1,4 113:16 114:15,18 115:6 152:17,18 153:2,6

**reported**
1:21 109:3

**reporter**
4:1 6:16 53:2 67:20 81:10 158:10,13

**reports**
50:10 83:11 108:1 109:5,16

**represent**
4:3

**requested**
67:20

**require**
20:8 26:5

**required**
10:18 40:2,3,5 127:16

**requiring**
127:12,13

**research**
10:15,17,21 11:1,11 11:19 12:1,4,6,9,14 12:15,18 13:4,8 15:13

**reserve**
56:19

**residency**
56:7,11 57:4

**resident**
56:3 58:5 61:2 62:13 62:16 64:11 66:21 70:17

**residents**
57:3,8,10 58:11 61:10,12

**residual**
114:6 116:7,21 117:3 117:5

**respect**
10:20 36:12 90:11 119:17 121:3

**respond**
21:6 26:12 31:14,21

32:18 43:6,20 44:17 46:16 50:15 51:2 54:3,19 55:8 57:6 58:7 67:11 69:5 70:14 116:18 125:10,20 130:5

**responding**
124:12

**response**
72:18 75:6

**responsibilities**
10:12

**responsibility**
59:9

**responsible**
90:7

**restate**
5:4

**result**
23:15 133:16 154:8

**resulted**
120:2

**results**
79:16,17 80:6,8,10 80:20 82:8 154:16

**resumed**
94:14

**return**
75:8

**returned**
76:2,2

**review**
23:21 77:3 78:4,11 85:12 99:18 101:19 102:3,10 106:9 108:4 109:12 127:5 152:16

**reviewed**
57:1 78:13,15 81:3 83:19,21 86:11,13 86:14,15,18,19,21 87:5 95:8,15 97:8 101:13,16,20 102:12 108:1,12 109:14,15 116:14 116:19 117:1

157:14

**reviewing**
78:7 99:21 100:3 157:8

**right**
5:21 12:16 15:5,16 23:7 25:12 26:14 30:5 33:7 34:18 37:8 38:14 39:7 40:6 44:21 45:5,7 50:1 54:13 56:17,19 57:2 59:2 62:13,14 63:18 84:6,11 86:17 94:1 99:6,15,18 101:2,12 102:19 103:4 110:7 113:12 134:20 135:12 150:9 151:10

**Riley**
2:12

**risk**
11:6 21:13 28:12 30:16,16 39:12 47:3 89:7 122:6 124:1,5 124:7,14 127:13 134:12 137:15 138:7,8,12 139:11 145:10,14 147:7,8 149:21

**risks**
47:7 138:5 139:7 140:7 147:1

**risk-benefit**
47:10,15 128:4

**Rivera**
99:9

**role**
10:11

**room**
13:15,21 14:3 15:15 16:11 17:7 18:2 141:20

**rough**
20:4,5

**roughly**
18:20

**rounding**
62:4

**routinely**
153:3

**row**
148:2

**RPR**
1:21

**running**
63:4

**rupture**
39:12

—————

**S**

**S**
2:13

**sail**
34:13

**saw**
77:10,12 123:6 124:9

**saying**
28:5 59:2 78:2

**says**
8:21 9:12 64:9 68:1 80:6 109:21

**scan**
22:20 23:2 152:15 154:2,9,15

**Scarborough**
2:12

**scenario**
39:20

**scheduled**
13:19

**Schulman**
1:17 3:11 4:15 6:18 94:16 100:17 104:4

**Science**
8:15 17:11

**score**
149:8

**screen**
65:19,20

**scroll**
66:8

**second**



81:7 103:16 111:2
**seconds**
 139:17
**section**
 80:10 136:9,12
**sections**
 78:18
**see**
 19:12,19 20:15 21:14
    24:16 38:8 64:3,6
    64:10 65:20 66:1
    70:5 74:20 80:7
    98:17 103:10
    109:12,20 111:1,3
    114:18 122:9 123:1
    127:14 129:6
    130:12 136:8,11,13
    136:14 147:12
    150:21 152:6,13
**seeing**
 21:17 64:16 76:15
    78:20 93:1
**seen**
 56:15,21 123:15
    138:18
**sees**
 123:17
**segmental**
 133:18
**send**
 84:1 100:4 103:2
**sensation**
 121:7
**sense**
 103:13 115:14
    127:21
**sent**
 80:21 81:6 83:1,7,11
    83:14,16 104:17
    105:4,5,11,14,17,19
    106:1 108:5
**separate**
 13:17 16:4,5
**separately**
 83:10
**September**

84:1
**sequelae**
 38:11
**serial**
 123:13
**serious**
 69:7 74:7 90:8 92:4
    111:20 122:21
    123:8 124:8
**serves**
 109:19
**service**
 18:15 19:3,3 57:21
    58:1,3 82:15
**services**
 16:18
**set**
 49:5,13 61:3 141:18
    142:3,13,16 144:10
    144:12,14 159:6
**settled**
 99:6
**seven-day**
 14:11
**severe**
 131:19 150:18
**severity**
 116:3
**Shana**
 1:5 86:19
**sharing**
 65:19
**short**
 42:6,10
**shorter**
 50:9
**shortest**
 33:21
**showed**
 155:3
**SHULMAN**
 3:2 4:9
**sick**
 37:15
**sicker**
 28:9

**sickest**
 122:6 124:1,5
**side**
 149:20,21 150:7
**sift**
 103:19
**sifting**
 104:8
**sign**
 158:11
**significant**
 13:3 114:5,9 139:5
    140:8,17,20
**similar**
 21:1
**sites**
 141:16
**sitting**
 60:14 78:3
**situation**
 28:3 47:2,18 52:3
    61:16 70:1 91:14
    111:16 120:12
    146:21
**situations**
 155:17
**six**
 126:19 127:17
    144:20
**size**
 28:2
**slippery**
 51:20 52:9
**slope**
 51:20 52:9
**small**
 138:11
**somebody**
 56:13 60:12 73:1
    74:15 80:19 90:20
    122:13,16 128:2
    138:18 145:9
    146:11,18 150:17
    150:18
**soon**
 17:19 52:1

**sooner**
 128:13 158:7
**sorry**
 21:7 26:13 55:12
    76:6 81:10 96:6
    118:19 133:3 146:5
    150:11 153:21
**sort**
 11:7 49:6 52:9 73:14
    104:2 156:10
**sorts**
 40:19
**Sound**
 81:9
**sounds**
 11:15 30:8,18 59:1
    140:11
**source**
 106:7
**Southwest**
 1:18
**speakers**
 52:14 88:12
**speaking**
 40:12 81:14,14,15
    126:3
**specialist**
 86:6
**specialty**
 16:6 124:19
**specific**
 11:6 12:12 15:21
    18:14 30:11 32:5
    43:9 48:7,8 53:18
    54:11 60:5,9 61:16
    64:17 65:5 68:17
    127:9,14 156:16
**specifically**
 16:20 19:7 37:12
    41:14 59:9 64:12
    66:21 69:13,15,17
    70:6,9 72:6 75:18
    90:12 92:10,21
    102:4 112:8 113:2
    113:13 114:21
    129:21



speculate
70:8
spend
10:17 14:6 100:3
  104:7
spent
11:19 13:2,4 14:14
  99:21
spinal
35:18 36:3,7,21
  37:20 38:11 39:16
  41:11,18,21 42:2
  47:13 49:8,11 68:6
  69:12 72:10,14
  73:17 74:15 89:8
  91:5 105:11 109:5
  120:14 128:2 129:8
  131:2,5,9,12,16,20
  132:3,6,7,10,13,15
  132:16,18 133:6,7
  133:10,15 134:10
  134:11 135:20
  138:17 139:13,18
  149:19 151:13,16
  153:17 154:21
spine
82:11 109:18 155:13
split
13:13 14:2
spoken
107:20
stand
66:2
standard
18:4 35:5 42:3 50:13
  50:20 51:14,18
  52:21 53:8,13 54:14
  55:4,14,16,20 58:5
  58:9,16 59:6,12,20
  70:19 71:1,2,6,16
  71:20 84:12 87:9
  88:15,19 89:1 92:8
  92:12,14 93:11,15
  93:18 94:3,17 110:5
  112:19,20 115:17
  116:6 119:17

128:10,20 154:12
  158:2
standpoint
84:15
stands
66:5
start
95:4 142:8
started
14:8
starting
89:16
state
4:2 8:6 54:16 69:13
  96:21 97:2 111:10
  117:2 157:13 159:1
  159:4
stated
86:5 152:18
statement
108:20 121:14
  133:14 136:3
states
1:1 7:12,14 98:16
statistically
21:21 27:3,11
stay
33:16 34:1,16
stenographically
159:10
stent
40:18 41:2,6
stents
41:3 147:6
step
10:7
stints
14:11
stopped
9:3,16 81:14
street
1:19 2:5,13 73:2
strength
121:7
strenuous
43:2,17

stress
137:12
strike
15:18 27:13 59:17
  107:21
stroke
68:5 69:12 74:15
  82:15 89:21 90:15
  91:4,5 155:6,9
  156:2
strokes
35:9 42:8,12 120:17
strong
139:20,20 147:21
strongly
128:5 129:7
structure
138:13
study
30:11 106:18
Sturtz
2:11 3:6 4:4,4,14,16
  21:8 26:14 31:17
  32:2,13 43:13 50:18
  54:6 55:2,11 58:11
  58:15 69:8 70:16
  81:16 88:2,6 94:15
  156:18 158:6
subclavian
23:14,17 39:5
submitted
25:15
subsequent
24:16 76:16 83:10
  84:8 142:18
subsequently
50:7
subspecialty
8:9 9:17
suffer
22:8 34:15
suffered
27:16 31:11,18 32:7
  32:9 33:11 35:9,18
  36:19 37:19 43:1,15
  131:14 140:20

141:4
sufficient
74:13 79:20
suggesting
29:21
suggests
29:5 32:14
Suite
2:5,13
summarized
87:7
summary
82:2,5,6,10 83:9
superfluous
113:19
support
102:1
suppose
130:18
supposed
96:2 99:4
sure
5:16 6:12 9:1,14 13:9
  14:17 21:10 32:6
  35:20 36:18 57:7
  58:8 59:14 65:3,9
  65:13 68:18 75:21
  81:8,13 86:16 92:20
  94:11 98:7,18
  103:16 107:7 111:6
  120:20 133:12
  136:17 137:4
  144:13 147:18
  148:11 158:10
surgeon
24:11 25:3,7 40:11
  40:20 41:7 44:1
  63:16,21 64:7,14
  67:4,6 69:10,19
  71:11 87:16 90:10
  111:10,13 117:12
  142:4
surgeons
44:7,14,19 45:17
  46:6,11,20 70:1
  123:14 144:21



MAGNA
LEGAL SERVICES

surgeries
15:20 16:15 17:12
surgery
9:4,11 16:19,20 17:1
17:2,3,5,20 18:6,18
20:8 26:5,7,9 27:17
28:10 30:2,14 32:15
33:16,20 35:17
36:10 37:14,18
39:13 40:2,3,7,18
41:19 44:8 45:15
47:1,5 48:19 49:20
50:6,8 97:5 130:21
134:13 136:5 141:5
141:16,20 142:5,11
144:16 145:2
surgical
9:17 17:16 18:12
19:11,20 26:19 29:2
33:2,12 34:20 35:8
36:20 40:9 42:7,11
43:1,16 46:13 82:16
141:11,16
surmise
148:9
surmising
148:12,16
surrounding
138:13
survival
32:14 33:1 40:8
surviving
28:8
Susan
1:19,21 6:13 100:11
158:6 159:3,15
suspect
46:8 83:13 112:6,13
147:18 154:8
suspected
129:7
sworn
4:10 159:7
syndrome
131:3,16,21 132:7,13
132:16

system
80:5
systolic
142:16,20 143:13,16
143:21 144:8,18

**T**

TAAA
135:7,9
tab
80:6
take
16:7,11 17:4 20:9,11
20:15 24:12 33:5
39:14 45:5 57:20
59:16 77:8,19 94:9
101:4 103:18 115:7
130:19
taken
4:19 34:6 41:17
takeoff
23:13,16 39:4
takes
17:19 18:1
talk
5:10,11 87:11 91:8
151:8
talked
53:3 84:20 85:2
86:10 92:15 94:4,17
156:14
talking
43:11 66:21 120:21
126:6 130:7 131:11
133:5 135:1 140:14
153:14
talks
85:15,17
tangential
111:17
target
61:19 87:14
targeted
61:20
targeting
71:7

TE
82:9
team
16:5 17:6,8,10,16,18
18:1,5 58:18 59:4,6
59:7,12,13 60:4
66:4,11,17 70:7
72:3 87:11 90:12
91:19,21 117:10
123:14,17 156:3
tear
39:9
technically
23:11
techniques
29:2
technology
5:4
Telephone
2:7,15
tell
4:11 5:17 21:11
67:17 69:9 72:19
75:18 81:2 89:5
105:21 120:7
126:16 150:16
telling
128:11
tells
155:8
temperature
113:7,19
temporarily
150:21
temporary
126:11
ten
33:1
tenure
72:5
terms
7:18 10:21 11:18
13:11 14:1 15:16,19
16:10 18:8 21:14
36:18 41:8 45:13
49:12,17 59:15,19

60:16 70:11 71:16
93:8 114:8 118:10
120:11 123:2 143:9
153:21 154:2,5
156:5
testified
4:12 93:2 95:19
97:21 98:13 99:8,16
119:1
testifies
116:20
testify
54:13 55:3 59:21
85:19 86:2 99:5
115:20 116:4
118:14
testifying
54:9 84:12 101:1
testimony
57:13 94:14 97:17
99:3 100:20 101:1
115:15
Thank
58:16 94:12 156:19
156:21 158:6
theoretically
147:3
therapies
119:21
thing
24:21 28:14 38:5
45:19 63:18 66:6,18
83:21 87:18 120:21
146:7 149:2 155:19
things
4:20 12:19 31:3
40:19 52:16 66:10
66:14 88:3,9 89:10
89:19 117:15
121:18 122:19
123:15 132:19
137:9 140:3 149:15
155:1
think
18:20 19:14,15 26:15
30:9 41:14 43:7



44:11 48:11 52:4
53:6,17 57:9 59:1
61:8,10,15 67:18
81:16 87:6,6 89:19
92:16 94:5,19 96:10
98:5,14,20 99:14
106:12 107:18
109:4 131:18,20
136:1,20 137:8,14
139:9 141:1 147:7,8
152:16 153:20
154:20 155:11
156:8,11,15
**thinning**
139:20
**thoracic**
17:1 22:13 23:4
24:10 25:7 40:11
109:10 110:11,19
**thoracoabdominal**
105:9 109:1,7 135:9
135:11 136:4
**thought**
117:10
**three**
34:2 38:1 98:1,14,17
99:7 106:14 145:3,8
152:12
**thrombosed**
109:10 110:3 111:11
**Thursday**
1:17
**time**
5:1,10 10:16,17
11:17,18 12:6 13:2
13:4,7,13 14:3,13
15:13 19:2 30:14
34:17 37:16 43:13
44:20 45:16 46:3
48:3 50:3 56:4
57:11 60:13 61:21
62:9 71:18 77:8,16
77:17 78:3,9 84:4
86:9 90:1 94:5,19
100:3,5 104:7 121:9
121:18 122:18

125:6,21 126:4
130:13 145:1
148:18,20 156:20
157:11 159:6
**timely**
21:12
**times**
18:9 63:1 97:15,20
97:21 98:12
**Timing**
105:13
**tissue**
137:19
**titled**
105:8,11
**today**
4:17 6:1 7:8 60:14
78:4 98:3 119:4,14
156:14
**told**
62:1,1,7 86:10 96:16
**ton**
98:9
**top**
22:4 31:3 33:4 35:14
41:14 53:3 74:10
100:8 112:10 122:9
130:15
**totally**
65:9 92:20
**touched**
135:14
**TPA**
90:1,3
**trained**
16:6
**training**
62:14,15 70:17 102:7
**transcript**
65:11,16,17,18 86:17
86:19,20 87:1 108:6
116:20 158:14
159:10
**transcripts**
86:14 87:3
**transferred**

141:19
**transfuse**
72:12
**transfusing**
68:8 71:21
**transfusion**
72:1 74:2,5,11,12
75:4,5 89:15 97:7
117:18
**transfusions**
72:4 74:18
**transitions**
23:8
**translate**
143:9
**treat**
150:21
**treatment**
39:17 61:3,13 69:16
69:17 81:19 83:7
84:2 85:8 90:2,5,11
90:17,21 91:9,12
106:10
**triage**
82:17
**trial**
56:11 59:21 85:20
86:2 90:14 95:19
96:3 97:17,21 98:13
99:3 101:1
**trials**
98:12
**true**
9:20 23:12 41:4
42:20 43:14 108:7
109:21 110:2 135:8
159:11
**truth**
4:11,11,12
**try**
6:1 11:13 53:3 148:7
148:20 149:21
150:20
**trying**
20:3 52:10 61:8
62:10 144:7 148:1,5

149:14
**turn**
62:10
**two**
13:17 14:1 28:21
38:1 52:7,12 53:2
98:1,17,18 101:16
122:15 143:19
145:2 152:4,5,12
**two-thirds**
108:10
**type**
17:12,17 18:11 19:11
19:20 20:14,20,21
21:4,4,11,16,17
22:1,1,2,3,3,8,15,15
23:12,19,19 25:9,13
25:16 26:3,6,9,19
27:4,12,16 29:11,15
29:19 30:1,6 31:11
31:19 32:7,9,15
33:3,12,17 34:20
35:8,18 36:2,6,19
37:18,19 38:17,20
39:3,18,18,21 40:4
40:7,9,10,16,17
41:1,10,11 42:7,11
43:1,15 44:8 46:7
46:13 47:5 48:4
49:7 106:10,15
109:2,6 130:8,9,10
130:12,17 133:14
134:7,12 135:13
136:10,19 137:1,7
140:2 141:5,8,10
146:15 150:2
**types**
15:20 22:2 137:19
**typical**
137:15 142:2 149:17
149:18
**typically**
24:7 33:8 41:4
111:12 122:11
139:19 143:18
151:8,8 153:1



**T12**
22:11

___

**U**

**uh-huh**
14:19 126:12 135:11
  154:17
**ultimately**
91:10 143:1 145:7
**ultra**
82:18
**ultrasound**
82:19
**unable**
54:16 118:6,14
**uncomfortable**
45:3
**undergo**
30:2
**undergoing**
16:12
**undergone**
19:11 33:2 36:1
  37:18 124:6
**underlined**
134:18
**understand**
14:17 28:1 32:4
  36:18 56:3 57:12,17
  101:2 118:13 119:8
**understanding**
25:7,13,14 27:2,10
  27:14,18,20 41:1
  53:12 55:2 74:1,17
  80:9 114:4,7,12
  140:15
**understood**
5:7 74:6
**underwent**
26:7
**unit**
9:6,19 13:20 17:5
**UNITED**
1:1
**University**
8:15 17:12

**unsure**
37:9
**untreated**
146:14
**unusual**
123:10
**update**
6:10
**updated**
3:10 6:14
**upper**
82:19
**UpToDate**
106:3,6,9
**up-titrate**
148:5
**use**
6:2 41:6 46:17,20
  80:4
**useful**
91:13
**uses**
9:3
**utility**
155:16

___

**V**

**v**
1:9
**value**
77:19 80:20 115:7
**variables**
28:1
**variation**
123:2
**variety**
16:12 89:10
**various**
61:11
**vascular**
17:2 40:20
**vast**
12:5 136:2
**vastly**
145:13
**veins**

82:20
**versa**
13:21
**versus**
11:19 22:1,2,2 41:6
  96:20 97:11 99:9,9
  99:10 109:21 154:3
**vessel**
153:8,10
**vessels**
153:13,14,16
**vice**
13:21
**view**
56:20
**viewing**
153:6 154:2
**vigilance**
122:8
**vigilant**
122:2 124:12
**violations**
158:1
**Virtual**
1:16
**volume**
29:6 30:13 89:15
**voluminous**
76:20

___

**W**

**wait**
65:12 79:2
**waive**
158:12
**walk**
115:13
**walking**
73:1 115:3 146:12
**waning**
123:11
**want**
4:19 5:14 14:16 19:8
  45:2,12 55:13 79:3
  79:15 82:20 86:16
  88:3,21 94:20 96:15

104:7,17 107:13
142:8 143:3 151:2
151:11,15 158:10
158:13
**wanted**
10:15 36:17 59:14
  62:5 101:20 111:8
  120:20
**wanting**
111:14
**wants**
40:1
**warranted**
71:10 72:2 87:15
**Washington**
1:10 2:6 8:6 67:7
  76:19 78:5 80:13
  97:1
**wasn't**
37:13 59:17,18 72:16
  75:6,19 77:13 78:2
  81:13 92:17 111:21
  115:9 128:19
  136:12 139:21
  155:8
**waxing**
123:10
**way**
22:10,12 28:21 50:9
  56:8 61:8 70:21
  74:14 80:21 100:14
  110:18 113:2 114:3
  115:1,2 118:21
  119:13 143:6,6
  152:1
**ways**
128:14,16
**weakness**
121:15 125:4,8,17
  126:7
**website**
45:9,11
**week**
11:21 12:4,9,9,13
  14:11,21
**weeks**



14:10,18 19:3 34:3
**weigh**
 139:7
**Welch**
 1:7 18:5 22:7 29:7
  48:13 49:11,17 52:2
  54:15 67:8 68:9
  73:19 74:2 75:11
  84:4,8,17,19 86:8
  89:21 90:8 92:4,19
  111:20 112:2,21
  113:15 114:19
  115:3 116:8 117:2
  119:3 120:12 124:9
  126:5,8 129:8
  131:14,15,16
  135:16 139:21
  142:6 146:11 147:1
  149:18 150:19
  153:7 157:18
**Welch's**
 49:2 57:18 71:21
  80:14,15 85:17
  86:21,21 89:8 109:9
  114:13 116:19
  117:5,19 136:18
  139:9 140:5 147:10
**well-known**
 108:21
**went**
 57:21 58:1 72:7
  80:19
**weren't**
 70:12 117:14
**we're**
 4:21 7:8 44:12 49:14
  120:20 125:6 126:6
  131:11 143:6,19
**we've**
 28:15 36:4,15 88:18
  92:15 94:4,17
  101:11 115:10
  117:15 130:21
  156:11,13
**white**
 12:21 52:19

**wide**
 16:12,13 28:18
**wires**
 126:8,11,13,21 127:1
  127:8,11,16,21
  128:5,9,12,15,18,21
**wit**
 159:2
**within-named**
 159:5
**witness**
 4:10 6:1 21:7 26:13
  31:15 32:1,19 43:7
  43:21 46:17 50:16
  54:4,20 55:9 57:7
  58:8 61:5,7 69:6
  70:15 81:12 88:4,8
  94:21 95:5 96:12
  97:9 159:5,13
**Wootton**
 1:20,21 159:3,15
**word**
 46:18 57:20
**words**
 6:2 155:3
**work**
 8:14 10:3,18 12:7,10
  13:2 16:5 18:8 44:2
  45:13 57:10 80:13
  84:3 94:21 95:5
  96:12
**worked**
 69:11 95:1
**working**
 11:12 13:14,19 14:4
  14:14 15:14 57:14
  92:18 130:11
**worried**
 128:1 145:17
**worries**
 98:7,10
**wouldn't**
 46:17 64:21 150:14
**wrap-up**
 156:10
**write**

70:2 77:17
**written**
 64:4 121:10 129:15
  129:18
**wrong**
 90:16 155:12
**wrote**
 51:10 70:7 72:7
  74:21 77:15 121:10
  129:21

___

**X**

**X**
 62:2,4,7
**x-ray**
 83:10

___

**Y**

**Y**
 62:2,5
**yeah**
 15:9 43:13 59:1
  71:18 76:1 99:14
  103:16 104:6 108:9
  140:3 146:2,2
  149:12 153:19
  157:12
**year**
 7:21 14:8,12 15:2,8
  15:11 18:9 19:4,12
  20:16 21:1 30:10
  33:1 43:12
**years**
 11:12 19:6 33:9 38:1
  95:6,8 98:8
**yesterday**
 108:5
**young**
 28:5

___

**Z**

**Z**
 62:2
**zero**
 138:12
**Zoom**

1:16 2:3,11

___

**$**

**$550**
 99:17 100:20
**$650**
 100:21

___

**1**

**1**
 3:10 6:14,18 140:10
  140:10
**1:00**
 1:18
**1:23-cv-3381**
 1:8
**10**
 2:5 14:10,11,18 19:3
  19:17,19 20:19
  29:12 33:9 95:6,8
  98:8 120:6
**10-year**
 32:14
**100**
 2:13 3:11 146:7
**104**
 3:14
**11**
 101:5
**11-page**
 101:7
**110**
 142:17 144:8,11,18
**12**
 144:20 159:19
**130**
 142:21 143:8 144:8
  148:8
**14th**
 49:21,21 50:5,7
**15**
 57:18
**15th**
 49:18 66:2,7 148:15
  149:8
**157**



3:7

**16**
74:2
**16th**
66:16,18
**1600**
2:13
**1626**
1:18
**17**
51:14 55:20 57:19
  74:3
**17th**
50:13 52:21 58:2
  59:16,19,20 60:16
  63:6,12 64:3 70:18
  71:3,12 73:9 74:13
  74:19 76:6 87:9,11
  87:16 88:21 89:4
  91:16,19 92:5,14
  93:3,16 102:11
  112:5,12 113:15
  118:17 119:7 129:9
  129:10 147:2 154:3
  154:5,9,13,15 155:1
  155:17 156:6
**18**
51:11 55:20
**18th**
50:21 51:14,19 59:16
  59:18 74:21 76:8
  91:21 92:5,17 93:8
  93:11,17 94:2 112:5
  112:12 113:15
  117:7 118:17 119:8
  152:15 154:3,10,16
  156:6

---
**2**

**2:45**
94:14
**2:50**
94:14
**20**
13:8 19:6 81:19 83:5
  95:9,10 120:6

140:10
**20s**
29:1
**20th**
102:13 126:18 127:3
  127:8,17 128:9,21
**20002**
2:6
**2007**
7:20,21 8:3 14:7
**2018**
97:2
**202.637.5600**
2:7
**2020**
8:19 9:3,6,15 10:6
  11:17
**2022**
50:13,21 51:15,19
  53:1,9 81:19 83:7
  83:15,16,20 84:1
  104:21 134:15
**2023**
6:9 7:1,5 85:5 116:15
  125:6,11
**2024**
1:17 3:3 30:18 85:5
  102:11 116:15
  159:14
**2027**
159:19
**21**
71:19 72:18,20 73:7
  73:15 74:14 75:2,9
  76:4,5,7 77:4,17,18
  87:17
**21.1**
73:11
**21201**
2:14
**22**
29:16,20,21 30:7
  75:3 83:5 147:11,16
**22nd**
53:9 109:19 148:13
  148:15 149:9

**24**
144:20
**26**
44:6
**27th**
75:20 76:5
**28th**
6:9,21 7:5 75:20
**29th**
76:1

---
**3**

**3**
3:12,13 104:2,4
**3:00**
73:12 74:18
**3:09**
73:9
**30**
75:14,15,19,19 76:2
**30-day**
27:15 29:11
**300**
146:3
**35**
29:12
**392-9400**
2:15
**395**
134:17,21 135:6

---
**4**

**4**
3:6
**4:10**
158:18
**42**
73:5
**443**
2:15
**48**
142:19

---
**5**

**50**
19:12,14 32:16

140:10
**55**
15:11
**56**
15:10,18 18:9

---
**6**

**6**
1:17 3:3,10
**60**
144:6,7,12
**600**
2:5
**65**
144:6,7

---
**7**

**7**
14:10,10,21 15:10
  51:3,12
**7.5**
75:1 76:6,8
**70**
15:2,11 18:9 95:17
  149:9 151:5,7
**70/30**
13:9

---
**8**

**8**
14:10,11,17 15:10
  19:3 51:3,12
**80**
13:6 15:11 95:18
**80/20**
13:9

---
**9**

**9:00**
123:16
**90**
143:4 145:16 146:4
  147:2,11,14 148:10
  148:13,16,17 151:5
  151:9 152:3
**97201**



1:19

