## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

**SHANA HARGROVE**

     PLAINTIFF

VS-

**MEDSTAR WASHINGTON HOSPITAL,
CENTER, ET AL**

     DEFENDANT

Civil Case No.: 1:23-CV-03381-RJL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF PETER SCHULMAN, M.D.

Plaintiff Shana Hargrove, on behalf of Kevin Welch, by and through her undersigned attorneys Governor Jackson, III of the Law Office of Governor Jackson, III, L.L.C., and Kim Parker of the Law Office of Kim Parker, P.A. hereby files this Opposition to Defendants' Motion In Limine To Exclude the Testimony of Peter Schulman, M.D., and in furtherance of her Opposition states as follows:

### *Statement of Material Facts*

On June 14, 2022, Mr. Welch underwent an operation which included:(i) Type A aortic dissection repair, (ii) hemi-arch replacement, (iii) ascending aorta replacement, (iv) aortic valve resuspension, (v) reconstruction of sinotubular junction, (vi) circulatory arrest with retrograde cerebral perfusion (RCP). To be clear, according to the operative note the procedure was performed without any complication. Specifically, the operative note for the Type A aortic dissection repair of Mr. Welch performed by Dr. Alassar reads, in relevant part, as follows:

1

"PREOP DIAGNOSIS:     Acute Type A Dissection
POSTOP DIAGNOSIS:    Same
SPECIMENS REMOVED:  Ascending aorta
URINE OUTPUT/IV FLUIDS/ESTIMATED BLOOD LOSS: Per anesthesia record
COMPLICATIONS:      None."
*See Exhibit 1* [Operative Note of Aiman Alassar, M.D. dated June 14, 2022]

Following the procedure, Plaintiff was intubated and transferred to the Intensive Care Unit (ICU) in critical but stable condition. *See* First Amended Complaint at para. 16.

While in ICU, Mr. Welch was under the care and supervision of ICU attending physician Maxwell Hockstein, M.D., critical care physician Stephen M. Luczycki, M.D., and surgical ICU rotating resident Kaitlyn Marie Dunphy, M.D., all of whom were acting in their capacity as agents, servants, and employees of healthcare provider MedStar. *Id* at para. 17. Plaintiff's expert Dr. Schulman testified that this group of physicians led by attending intensivist Dr. Luczycki was the ICU team that breached the standard of care in this case. He opined:

"Q: That sounds, yeah, I think you're saying it right.
A: I do agree that Dr. Luczycki was the attending intensivist in charge of the ICU team. But I do– I– my opinion is, collectively, the ICU team breached the standard of care. Dr. Dunphy was part of that ICU team. So how you hash out what her, you know, responsibility was, specifically, you know, I don't — I don't know that I have a good answer for that. But she in my mind was part of the team that breached the standard of care." *See Exhibit 2* [Depo. Tr. of Peter Schulman, M.D. at p. 59]

On June 17, 2022, a neurology consultation was performed by Robert Cai, M.D. due to Mr. Welch exhibiting severe bi-lateral lower extremity weakness (the left leg being weaker than the right leg). During the examination, Mr. Welch had the following blood pressure readings: 135/64; 144/58 (Line); 145/73 (A-Line 2). According to the consultation note, the etiology of the bi-lateral lower extremity weakness was "a higher c/f/ thoracic (watershed region) infarct; medium c/f ACA infarct; lower c/f cervical infarct." Based on the consultation, the

recommendations given were as follows: "order MRI cervical and thoracic spine without contrast w/ include DWI in comments, agree w/ CTH w/o contrast, if CTH shows signs of infarct such as hypodensity, then order MRI brain w/o contrast, continue ICU care." *See* First Amended Complaint at para. 19.

Despite Mr. Welch's clinical presentation of bi-lateral lower extremity weakness on this critical date, Defendant Dr. Luczycki testified as to his ignorance of any clinical or diagnostic procedures - including any of the interventions opined about by Plaintiff's experts - that could have been performed to address Mr. Welch's lower extremity weakness as he stated:

> "Q: After this consultation with neurology, were you aware, as the attending physician, of any clinical or diagnostic procedures that could have been performed to address Kevin's — Mr. Welch's lower extremity weakness, given that the MRI had not been performed on this day?
> MS. STURTZ: Objection to form and foundation. And I assume you mean above and beyond what they were already doing?
> BY MR. JACKSON:
> Q: Yes. Was there any other clinical diagnostic– or diagnostic procedure other than what was being documented as being done in the record that could have been done to address Mr. Welch's lower extremity weakness?
> MS. STURTZ: Same objection. But you can answer if you're able.
> THE WITNESS: There's a broad differential for that weakness. So other studies that could have been done– okay. Potentially the patient did have— I can't really think of any at the moment."
> *See Exhibit 3* [Depo. Tr. of Stephen Luczycki, M.D. at p.40-41]

Defendant Dr. Dunphy, who was a resident at the time of Mr. Welch's hospitalization, did not act independently of Dr. Luczycki in this regard as Dr. Dunphy was under Dr. Luczycki's supervision as he testified:

> "Q: So my direct question is, would you have then [been] considered her supervising physician for purposes of any treatment she provided to Mr. Welch?
> A: For the ICU rotation, yes ." *Id*. at p. 11.

Importantly, Dr. Schulman testified that there was no documented evidence of the attending physicians, neither Defendant Luczycki or Defendant Dunphy, ever discussing with the treating

cardiothoracic surgeon Dr. Alassar, the concerning nature of Mr. Welch's focal deficits (i.e. inability to move his extremities) and his fragile susceptibility to suffering a stroke or spinal cord infarct. Dr. Schulman opined:

> "Q: Was it reasonable and appropriate for her to discuss those findings with the attending physician and with the surgeon?
> A: Well, I don't know that she did do that. It would have been the right thing to do, to discuss those findings- because they were very critical— with the attending and with the surgeon. But there isn't really any evidence that she did do that, as far as I recall.
> Q: Did you see that the note of June 17th includes information in the note written by both Dr. Dunphy and Dr. Luczycki?
> A: Yes. But I don't see anything about the surgeon.
> Q: Did you not notice in the medical records when it says D/W, Dr. Alassar?
> A: I don't see— what I believe you're asking is whether Dr. Dunphy, the resident, specifically had a discussion or notified Dr. Luczycki and Dr. Alassar, who I believe was the cardiac surgeon, that there were new very concerning focal deficits. I don't— I don't recall seeing that specific language in the record."
>                     ******************************
> "Q:Okay. Do you agree that those notes reflect that the surgeon was involved with the care plan at MedStar Washington Hospital Center when Mr. Welch was in the ICU, correct?
> A: No, I don't agree."
>                     ******************************
> "Q: Because these discussions don't get documented in full, correct?
> A: It depends on —--
>         MR. JACKSON: Objection. You may respond.
>         THE WITNESS: It depends on the nature of the problem and how serious it is.
>         MS. STURTZ: Okay,
> A: I mean, what I can tell you is, if– if I consulted my– the cardiac surgeon who I worked with– because I was concerned that the patient had had a stroke and/or spinal cord infarct— I would more specifically state that in the note. And I would more specifically outline what our treatment plan was going to be; and that that treatment plan —-specifically for that problem— would be noted in the chart, and it would be noted that the surgeon agreed with that, et cetera. Moreover, I would say more often than not in a situation like this, our cardiac surgeons actually, independently, write notes confirming that they've been involved in the care of the patient in the ICU. And I didn't see any notes from Dr. Alassar specifically

that he, or anyone from his team, wrote himself. So I really can't, you know, speculate about what "discussed with Dr. Alassar" specifically means."
*See Exhibit 2* at p. 63-64; 67; 69-70.

On June 18, 2022, Dr. Luczycki charted in the critical care progress note "MRI not done for safety reasons- I think this can be deferred for now with much improved exam". Critically, however, according to the Neurology Progress Note for this date, Mr. Welch had a blood pressure reading of 156/77 and was exhibiting bilateral lower extremity weakness, the etiology of which was charted as "concern for spinal cord infarct involving thoracic spine" by the treating neurologist. *See First Amended Complaint* at para. 20. Even still, Dr. Luczycki did not utilize any of the interventions opined about by Plaintiff's experts that could have been performed to address Mr. Welch's lower extremity weakness believing that they were not clinically indicated as he stated:

> "Q:But with respect to the CSF procedure we had discussed before, is it your answer that on this date, 6-18, Mr. Welch would not have been an appropriate candidate for the same reasons you had discussed before in your prior answer? A: The usual practice would be to have a discussion, if - if we thought we would consider that therapy. Based on the kind of surgery where the aortic repair was, we would discuss it with the, again, the cardiac surgeon and the neurologist, looking at the risks and benefits of that procedure, potential injury during that procedure, to spinal cord is a possibility and— and bleeding. And so we would weigh those risks and benefits before doing that. But in– again, in this case, typically for a Type-A dissection, it's — that therapy would not be indicated."
> *See Exhibit 3* at 46-47.

On June 19, 2022, Dr. Luczycki charted  in the critical care progress note "MRI not done for safety reasons- I think this can be deferred for now with much improved exam". *See First Amended Complaint* at para. 21. Mr. Welch was also examined by Defendant Hockstein, the Critical Care Supervising Physician, who noted in relevant part:

> "Neuro: Encephalopathic. RASS Score: -1, CAM-ICU Result: Positive. Knows his name, he is unsure of his location, did not know the identity of his cousin at bedside today. Analgosedation is being accomplished with fenanyl PCA (transition to PO oxycodone), lidocaine patches. On no sedation. LLE remains ⅕

strength. RLE ⅗. MRI is pending, ordered for today. OOBC." *See First Amended Complaint* at para. 21.

On June 20, 2022, Defendant Dr. Hockstein charted the identical aforementioned (*see* para. 19) notation in Mr. Welch's Critical Care Progress Note. *See First Amended Complaint* at para. 22.

Defendant Dr. Hockstein, despite being familiar with the positive effects of cerebral fluid drainage following an aortic dissection, failed to order any such same or similar appropriate interventions as he testified:

> "Q: Based on your education, training, and experience, are you familiar with the process of cerebral fluid drainage?
> A: Yes.
> Q: How are you familiar with that?
> A: It – it is done after certain types of aortic dissection repairs, in the postoperative
> period to- to prevent or to mitigate the effects of spinal cord swelling."
> ********************************
> "Q: On this date, 6-20, were you aware of any clinical or diagnostic procedure that
> could have been performed to address Mr. Welch's lower extremity paresis?
> A: No.
> *See Exhibit 4* [Depo. Tr. of Maxwell A. Hockstein, M.D. at p. 15; 35-36]

On June 21, 2022, Defendant Dr. Hockstein charted "Blood pressure is under better control. Awaiting MRI to aid in diagnosis of LLE paresis, through, anticipate spinal cord trespass. Approaching floor readiness." *See First Amended Complaint* at para. 23. Defendant Dr. Hockstein testified:

> "Q: On 6-21-2022, were you aware of any clinical or diagnostic procedure that
> could have been performed to address Mr. Welch's lower left extremity weakness?
> A: Can you clarify when you say address?
> ***Q: According to the attestation that I just read, it stated that there was a diagnosis***
> ***of LLE paresis and that you were awaiting the MRI to aid in that diagnosis. So***
> ***my specific question is, was there anything that you were aware of, clinically or***
> ***diagnostically, that could have been done to improve his LLE paresis?***

>*A: Not to my knowledge."*
>*See Exhibit 4* at p. 39 (emphasis added).

Defendant Dr. Hockstein was, in fact, completely unaware of the stroke which was localized to Mr. Welch's spinal cord at the time that he was providing care and treatment to Mr. Welch while the MRI was pending. He testified:

>"Okay. If you go to Page 307, and I'm referring to the attestation section of the progress note authored by you on 6-21-202. And on the fourth sentence in it states "awaiting MRI—MRI to aid in diagnosis of LLE paresis, though anticipate spinal cord trespass." What was the basis for your anticipation of spinal cord trespass? Well, let me back up. Can you define spinal cord trespass as referred to in this context?
>A: Spinal cord pathology.
>Q: Generally? When you say spinal cord pathology, what– you– you're just referring to the area of the spinal cord?
>A: Correct. A disease that localizes to the spinal cord.
>*Q: Okay. Was there a particular disease that you felt was localized to Mr. Welch's spinal cord at the time that you made this note of spinal cord trespass?*
>*A: I don't recall.*
>*Q: Was there any particular level of the spinal cord at which you thought the — the disease state was occurring based on this note in reference to Mr. Welch's condition?*
>*A: I don't recall.*
>*Q: Do you know why the MRI was still pending on this date, June 21st, 2022?*
>*A: I don't recall.*" *Id.* at p. 37-38 (emphasis added).

Although the Defendant physicians documented that an MRI could not be performed because of the presence of pacing wires inserted into Mr. Welch, these wires could have been easily removed as Dr. Schulman testified:

>"Q: Do you know whether an MRI can be performed when pacing wires are still in place?
>A: It cannot, but the pacing wires could have, in this case, could have been easily removed prior to June 20th, which would have allowed for the MRI."
>           ********************************
>"Q: Do you know, from your review of the medical records, whether there was a medical concern that led the doctors to keep the pacing wires in place until June 20th?
>A: I didn't appreciate any, any specific medical concern. The reason we keep pacing wires in place is, when patients are requiring pacing, or are at high risk for

requiring pacing. And I did not see any specific necessity or indication in this case that would have required them to keep the pacing wires in until postop day six, June 20th. Now, in a normal patient who doesn't have, you know, lower extremity paralysis, you might decide the benefit of keeping the pacing wires in just in case it makes sense.

But, in a case where you're worried that somebody has a spinal cord infract– and is going to be paralyzed and doesn't need pacing— the risk-benefit discussion, more likely than not, strongly favors removing the pacing wires earlier so that you can get an MRI."
*See Exhibit 2* [Depo. Tr. of Peter Schulman, M.D. at p. 126-128]

During this critical time of Mr. Welch's hospitalization in the ICU under the care of the

Defendants, there is no evidence that they took into account the possibility that Mr. Welch had a

spinal cord infarct despite his clinical presentation as Dr. Schulman testified:

"Q: In making those considerations, they needed to include concerns about– well, let me ask you. Did they have issues with him having hypertension following the surgery while he was in the ICU?
A: They were– it appears from the record that they were consistently making a concerted and ongoing effort to lower Mr. Welch's blood pressure.
Q: Is that because his blood pressure was at levels that were above the goal they set?
A: They were above the goal for a sort of– a patient who has had a Type A dissection, but has not had a spinal cord infarct. They were– there's no evidence in the record that that they took into account the possibility that Mr. Welch had had a spinal cord infarct, in terms of the blood pressure goals they elected to set."
*Id* at p. 48-49

Dr. Schulman confirmed that Mr. Welch's inability to move his legs during this time was the

focus of his review of the cardiac care management given by the Defendants as he testified:

"Q:So you didn't really look specifically at what cardiac care management was being provided for Mr. Welch on the June 17th and 18th date that you identify in your report?
A: Of course, I looked, I looked very closely at that, but whether— what his temperature was or was not, was really superfluous and not pertinent to the fact that he couldn't move his legs. And the fact that he couldn't move his legs was my main focus." *Id*. at 113-114.

Dr. Schulman testified as to the importance of the failure of the Defendants to obtain a head CT

of Mr. Welch on June 17th, as he opined:

> "Q:--- what difference did the day make?
> A: Maybe it would have pressed them to even more critically think about the fact
> that he had a– likely had a spinal cord infarct. And maybe they would have done
> some things on the 17th to manage that. So, in other words, the head CT showed
> no acute intracranial abnormality. That doesn't necessarily mean that there's no—
> not— not going to be a stroke in the brain that doesn't eventually materialize. But
> it tells you that there wasn't like a huge, immediate, devastating stroke that can
> explain why he can't move his legs; and, therefore, maybe it makes you think that
> he can't move his legs because there's something wrong with his spine.
> Q: Okay.
> A: So there still would have been some utility and importance to getting the head
> CT on June 17th, and that's why, in these situations, we always immediately get a
> head CT. That's like the first thing that you do when you find that someone has
> focal neurologic deficits in the ICU." *Id*. at 154-155.

On June 22, 2022, an MRI of the brain without contrast and an MRI of the cervical spine

without contrast were finally performed on Mr. Welch. The indication for the MRI of the brain

was noted as "stroke, TAAD repair" with the comparison study being the CT performed on June

18, 2022. The findings of the MRI of the brain read as follows:

> "The examination is limited by motion artifact. The ventricles and sulci are
> appropriate for patient's age. DWI hyperintensities with low signal intensity on
> the ADC maps are present in the bilateral cerebellum and cerebral hemispheres
> with bilateral basal ganglia predominance. There is no midline shift. No
> microhermmorhages are identified. The midline structures are within normal
> limit. The mastoid air cells and paranasal sinuses are unremarkable. *See First
> Amended Complaint* at para. 24.

The impression read as follows: "Limited due to motion artifact. Recent bilateral

cerebellar and cerebral infarcts with bilateral basal ganglia predominance which is consistent

with cardioembolic etiology and hypoxic anoxic event. *Id.* at para. 25.

The indication for the MRI of the cervical spine was noted as "left lower extremity

weakness, TAAD repair" and the addendum to the final report for this MRI stated "Upon further

review with Dr. Barry, there is DWI hyperintensity of the cord at the level of T5 consistent with cord infarct. *Id.* at para. 26.

On June 22, 2022, the stroke team was consulted. On June 23, Mr. Welch's physical condition was noted as follows:

> "Eyes closed, somnolent. Purposeful, strong movements with BUE, intermittently following commands. Answering questions intermittently. Has been intermittently alert and interactive throughout the morning before becoming somnolent again." *Id.* at para. 27.

The stroke team noted a hypoxic-ischemic injury of basal ganglia and a stroke in the multiple vascular territories related to dissection, and further recommended obtaining physical therapy and occupational therapy when able. According to Mr. Welch's progress notes, at no time prior to June 21, 2022 were any actions taken to increase Mr. Welch's blood pressure to mitigate the risk of neurological insult, nor was there any consideration by the Defendants prior to June 22, 2022 of the placement of a lumbar drain to mitigate the risk of neurological insult. *Id.* at para. 28.

Contrary to Defendant's representation, Mr. Welch currently suffers from a host of physical and cognitive disabilities as a result of experiencing a stroke, specifically concerns of falling while ambulating, bouts of left side weakness, difficulty maintaining a normal gait, and difficulty completing household chores, as he testified:

> "Q: Okay. Can you explain– do you have difficulty going down the stairs?
> A: Yes, going down the stairs.
>                \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> "Q;Okay. So you've– okay. Do you believe you would be able to live by yourself?
> A: No.
> Q: No. Do you believe that because you wouldn't feel comfortable with that or has
> a doctor told you that?
> A: I wouldn't feel comfortable with that.
> Q: What are your concerns about living with yourself?
> A: Just in case I fall ro something.

Q: In case you fall. Have you fallen?
A: Yes, I've fallen.
Q: How many time have you fallen?
A: Twice.
Q: Both– I assume both since the occurrence giving rise to this lawsuit?
A: Yes.
Q: Okay. When was the most recent fall?
A: I can't remember.
Q: Okay. And did you report those falls to your medical providers?
A: Yes."
*************************************
"Q: And do you plan on applying for disability?
A: Yes.
Q: Do you view yourself as disabled?
A: Yes.
Q: Do you view yourself as totally and permanently disabled?
A: Yes."
*************************************
"Q: Can you please list your current health problems?
    MR. JACKSON: Objection as to form. You may respond.
A: I have vision problems. My vision goes blurry from time to time.
    MR. STURTZ: I'm sorry.
A: I have, like, a weakness on my left side of my body. I have, like, just I'm out of breath a lot and that's it."
*************************************
"Q: And you also said you have weakness on your left side. Can you describe that a little bit more for me?
A: Yea, so when I do something that's physical, my left side just gets weak.
Q: Okay. And what do you mean by physical?
A: Like walking up and down the steps.
Q: So it doesn't necessarily have to be a strenuous activity, just any physical activity triggers it?
A: Yes."
*************************************
"Q: Are there specific activities you feel like you're no longer able to do?
A: I can't do martial arts anymore.
Q: Can you tell me about your participation in martial arts before–before the occurrence giving rise to this case?
A: Yeah, I used to teach martial arts twice a week at a community center."
*************************************
"Q: Any other activities you're no longer able to do?
A: I can't bowl anymore.
Q: Can't bowl. Okay. Can you describe your bowling before the occurrence giving—-
A: My gait won't allow me to walk up to the lane normally and throw the ball.
Q: Okay.

A: And I can't lift a 15 pound ball anymore.

Q: Any other activities you can't do?

A: Like, walk around the lake at Costco Park.

Q: Is that a park near your house?

A: Yes.

Q: Are you able to drive?

A: No.

Q: Has a doctor told you or a medical professional told you— advised you not to drive or do you just not feel comfortable?

A: My medical advisor advised me not to drive."

*****************************************

"Q: You're not able to play video games?

A: No, not really.

Q: Why is that?

A: I can't look at it and work the buttons anymore.

Q: It's a coordination?

A: Coordination.

Q: Hand-eye coordination. Do you have any problems doing chores?

A: Sometimes.

Q: Sometimes. Which specific chores do you struggle with?

A: Like, washing the dishes, laundry, cleaning the bathrooms.

Q: Why do you have difficulties? If you can just go through those one by one and explain why you struggle to do those?

A: So washing the dishes is picking up the pots and the pans. The laundry, sometimes with the laundry basket it's too heavy and then cleaning the bathrooms is bending down.

Q: Okay. Have you— I'm sorry. Excuse me. Are there any struggles with your social life?

A: Yes.

Q: Can you describe those for me?

A: So the lack of communication is a big one, like, I can't really focus in on what people are saying, it's difficult.

Q: And that wasn't a problem before the—

A: No."

*****************************************

"Q: Are you doing anything for purposes of physical rehabilitation?

A: Just the workouts I do with my nephew at home.

Q: Okay. Is that– are those workouts that are being recommended to you by a health care provider?

A: Yes.

Q: Which provider is recommending those?

A: My physical therapists."

*****************************************

"Q: Can you describe those workouts for me; what they usually entail?

A: Some leg exercises and then we walk on the treadmill for 15 minutes.

Q: Okay. So sorry if you already said this, how many days a week do you do those workouts?
A: Like three days a week.
Q: How long do they typically last for?
A: About half an hour."
      **************************************

"Q: You mentioned some difficulties with doing household daily chores. You mentioned with doing the dishes you have difficulty with the pots and pans?
A: Uh-huh.
Q: Can you describe why that's difficult; is it too heavy or?
A: It's too heavy and my hands aren't coordinated enough."
*See Exhibit 5* [Depo. Tr. Kevin Welch at p. 9-10; 27; 31-32; 35-37; 39-40; 51-52; 72]

On August 19, 2024, Mr. Welch's treating healthcare provider, Richard Zorowitz, M.D., opined as follows:

"To Whom It May Concern:
This patient was seen today at MedStar NRN Physiatry at Irving St Physician Center.

I am writing this letter on behalf of Kevin Welch (03/14/1980), who is a 44 year old right-handed African-American male, with history of asthma, COVID-19 (05.2022), and type B aortic dissection, who suffered bilateral cerebellar and cerebral strokes and ischemic myelopathy status-post type B aortic dissection repair, Hemi arch replacement, ascending aorta replacement, aortic valve suspension, and reconstruction of sinotubular junction 06/14/2022. This letter medically certifies that Mr. Welch is permanently disabled as a result of his condition.

Please do not hesitate to contact me with any questions or concerns: 202-877-1765.

Sincerely [signed],
Richard Zorowitz, M.D." *See Exhibit 6* [Letter from Richard Zorowitz, M.D. to Kevin Welch dated August 19, 2024]

Mr. Welch's neuropsychologist, Dr. Gorter, diagnosed him with a cognitive disorder stemming from the cerebral strokes caused not by the Type A dissection and repair (i.e. recall Mr. Welch's cardiothoracic surgeon Dr. Alassar's note of "Complication: None"), but rather by the mismanagement of the postoperative care rendered by the Defendants in this case.Based on Mr.

Welch's permanently disabled condition, he will need appropriate medical care and treatment for the duration of his life according to Richard Kaplan, M.D. *See Plaintiff's Expert Witness Designation.*

During the course of discovery in the instant case, Plaintiff designated Peter Schulman, M.D. as an expert witness. *See* Plaintiff's Expert Witness Designation. Dr. Schulman is currently a Professor at the Department of Anesthesiology and Perioperative Medicine at Oregon Health & Science University and within the last five years, has served as the Medical Director for the Knight Cardiovascular Intensive Care Unit at Oregon Health & Science University. He also served as Chief of the Division of Cardiac and Surgical Subspecialty Critical Care. He was the principal investigator of an investigator-initiated, industry-sponsored prospective observational study evaluating the effects of intraoperative electromagnetic interference on implantable cardioverter-defibrillators. Dr. Schulman is licensed in the State of Oregon and is Board Certified in Anesthesiology with subspecialty certification in Critical Care Medicine. Dr. Schulman has otherwise taught, worked, and published peer-reviewed literature in the fields of cardiac surgery, critical care medicine, neurointensive care, neuroanesthesia,and cardiothoracic and vascular anesthesia. *See Exhibit 7* [Curriculum Vitae of Peter Schulman, M.D.]

Consistent with Plaintiff's Expert Designation, Dr. Schulman testified about the relevant scope of his clinical practice regarding his involvement practicing medicine in the cardiovascular intensive care unit at the Knight Cardiovascular Intensive Care Unit in Oregon, and specifically his experience treating patients in the intensive care unit following a Type A aortic dissection similar to Mr. Welch. He testified as follows:

> "Q: Okay. In terms of your clinical practice, describe for me your clinical practice.
> A: I split my clinical time between working as an anesthesiologist in the operating

room, and doing intensive care medicine in the cardiovascular ICU. So those are two separate clinical jobs, and I do both of those. So when I'm scheduled to be working in the intensive care unit, I'm not practicing anesthesiology in the operating room and vice versa."

******************************************

"Q: What percentage of the operations where you provide anesthesia services involve cardiac surgery?

A: Well, cardiac surgery specifically? I don't provide anesthesia for those cases. I do provide anesthesia for thoracic surgery and for vascular surgery; but for open heart cardiac surgery, I– I don't do that. I take care of those patients in the intensive care unit after their surgery. But we have different team of anesthesiologists that does the cardiac anesthesia in the operating room and I'm not on that team."

*************************************

"Q: And you're not on the anesthesiology team that provides anesthesia for surgical repair of Type A aortic dissections; is that correct?

A: That's correct. I'm on the ICU team that takes care of those patients as soon as the surgery is done and they are admitted to the ICU. But you are correct; I'm not on the team that takes care of those patients in the operating room."

*************************************

"Q:In terms of the ICU work that you do, that's around 56 to 70 days a year, how many times would you say you've provided ICU care for a patient following a Type A aortic dissection, surgical repair?

A: Many. I mean, I would say I can't give you a specific number, but more often than not, when I'm on service in this cardiovascular ICU, we have a patient who is in the ICU because they have an aortic dissection or have had an aortic dissection repair or have had surgery on their aorta. So if you, you know, roughly think about the math, if that's— you know, if there's at least one of those patients, sometimes more than one of those patients every time I'm on service– and I'm on service 8 to 10 weeks a year, and I've been doing this for probably, you know, close to– not probably— close to 20 years now, out of fellowship—-then you know, you could do the math more specifically if you want, but it's many patients."

**************************************

"Q: Okay. So when is the last time you believe there was a patient in the ICU at your hospital who had undergone a Type A- surgery for a Type A aortic dissection, who suffered the complication of a spinal infarct after that?

A: I'm — I'm estimating it might have been two or three or four years ago."
*See Exhibit 2* [Depo. Tr. of Peter Schulman, M.D. at p. 13; 16-19; 37-38]

Dr. Schulman also testified as to his experience treating patients with cerebral strokes by stating

as follows:

> "Q:Have you had patients who—following a Type A aortic dissection and surgical
> repair— suffered cerebral strokes?
> A: Yes."
>                 ***************************************
> "Q: How about, have you cared for patients in the cardiac ICU who had surgery

for

> Type A aortic dissection, who suffered a spinal infarct?
> A: Me, personally? I'm not sure. I know that in our cardiovascular ICU, we have
> had at least several patients who have undergone Type A aortic dissection repair,
> and have had spinal cord ischemia afterwards or infarcts. We've also had a
> patient, actually recently, who presented to our hospital with a Type A aortic
> dissection and already had evidence of malperfusion to the spinal cord."
>                 ***************************************
> "Q: Of course, yes. I didn't mean to cut you off.
> A: We do see patients in the CV-ICU, in our cardiovascular ICU on a more
> frequent basis who do have aortic problems, and have the complication or
> sequelae of spinal cord ischemia and/or infarct. And I know that I have been
> involved in taking care of patients like that."
>                 ***************************************
> "Q: Okay. In terms of your ICU practice, have you had occasion where there was
> a patient with a Type B aortic dissection, and repair of the Type B dissection, who
> had a spinal cord infarct as a complication?
> A: I - I believe there have been. I can't specifically, of the top of my head, think of
> the, you know, exact patient. But I certainly know and recall that I have taken care
> of a number of patients who have had spinal cord related issues after aortic
> surgery or as, you know, related to the fact that they present with an aortic
> problem and end up having spinal cord related issues."
> *Id.* at 35-36; 38; 41

Dr. Schulman also testified as to his knowledge, training, and experience with evaluating the risk

to a patient of increasing their blood pressure supply following cardiac surgery, and the

responsibility that the Defendant providers in this case had to think critically about blood

pressure management for Mr. Welch given his fragile clinical condition. Dr. Schulman stated:

"Q: What is the risk of the blood pressure going too high, when the patient is in the

cardiac ICU following this type of surgery?
A: I mean, there's always a balance of risks and benefits for any decision, including

blood pressure management. So, in someone where the main concern would be bleeding, then the balance, risk-benefit balance favors a lower blood pressure. If there is a concern, as there was in this case, for spinal cord ischemia then– and there's less of a concern for bleeding– then the risk-benefit balance would favor a higher blood pressure. So every case is different and it really just depends on the situation."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: So you're making judgment decisions all the time when you're involved in critical care of a patient following a Type A aortic dissection, correct?
A: Part of the job of the intensivist is to make determinations for that specific patient based on the specific circumstances. ***So it would have been incumbent on the providers– the ICU providers in this case– to think very critically about the blood pressure management in light of the extenuating circumstances that were going on with Mr. Welch after his operation***."
*Id*. at 47-48 (emphasis added)

Plaintiff proffered in expert designation as to the scope of Dr. Schulman's anticipated

testimony as follows:

"It is anticipated that Dr. Schulman will testify that prior to June 2022, Kevin Welch was a previously healthy 42-year-old-man who developed severe chest and back pain and was found to have an acute type A aortic dissection, and that he was subsequently transferred from a referring facility to MedStar Washington Hospital Center on June 14, 2022 for an emergent repair by his cardiac surgeon, Dr. Aiman Alassar.
It is further anticipated that Dr. Schulman will testify that Mr. Welch's intraoperative course was uncomplicated, that he was admitted to the Cardiovascular Intensive Care Unit immediately following his operation, and that he was extubated (had his breathing tube removed) on June 15, 2022 (postoperative day 1). It is further anticipated that Dr. Schulman will testify that on June 17, 2022 (postoperative day 3,) after Mr. Welch was weaned off his sedatives around noon his nurse discovered that he had new left lower extremity weakness, and that Dr. Kaitlyn Dunphy (a resident physician on the critical care medicine team) noted that Mr. Welch was "encephalopathic", had right lower extremity weakness, and was unable to move his left lower extremity. Dr. Schulman will opine that Dr. Dunphy's documented plan at that time was, "consult neuro and get CTH (CT head) and MRI brain today", and that for Mr.

Welch's hypertension her plan was "MAP goal 70-90, SBP < 130." Dr. Schulman will opine that the attending critical care medicine physician Dr. Stephen M. Luczycki also noted that Mr. Welch was "confused" and that he had lower extremity weakness, and that Dr. Luczycki's differential diagnosis at this time was "stroke or spinal cord infarct", and his stated plan was to minimize sedation and obtain a stroke team consult.

It is further anticipated that Dr. Schulman will testify that Mr. Welch was subsequently evaluated by the neurology service on June 17, 2022 (including resident physician Dr. Robert Cai, and attending neurologist Dr. Mark Lin), and that they found Mr. Welch was "too altered to provide a history", and that he had "no spontaneous movement of the left leg" and that his right leg was weak. Dr. Schulman will opine that the treating neurologists attributed Mr. Welch's weakness to possible thoracic versus cervical infarct versus ACA (anterior cerebral artery) infarct, and recommended ordering an MRI of the cervical and thoracic spine, and that they attributed his encephalopathy to possible acute infarct and recommended ordering a head CT. Dr. Schulman will opine that Mr. Welch's medical records during his hospitalization at MedStar Washington Hospital Center do not reflect that the ICU team (or anyone else) ordered a head CT, or any other neurologic imaging that day, nor that any consideration was given to lumbar drain placement and/or to targeting a higher blood pressure, given the likelihood that spinal cord ischemia was the cause of Mr. Welch's neurologic deficits.

It is further anticipated that Dr. Schulman will testify that on June 18, 2022 (postoperative day 4), Mr. Welch underwent a head CT, and that he was again evaluated by Dr. Stephen Luczycki who noted that Mr. Welch was still confused but now following commands and moving his left lower extremity; that he also noted that Mr. Welch's head CT was negative; that his stated plan was as follows:

"use dexmedetomidine to control agitation and symptomatic delirium; patient admits to 5-7 alcoholic drinks per day prior to admission --May need additional symptomatic control for any withdrawal symptoms; normalize sleep-wake cycles to the extent that we can; correct hypernatremia of 158 with additional water repletion --recheck sodium later in the day, if remains elevated may need IV D5W; MRI not done for safety reasons--I think this can be deferred for now with much improved exam" and that based on Dr. Luczyci's note, Dr. Luczycki ascribed Mr. Welch's altered state / abnormal neurologic examination to alcohol withdrawal and hypernatremia rather than to a stroke and/or spinal cord ischemia. It is anticipated that Dr. Schulman will opine that Mr. Welch was also evaluated that day by a different neurology team consisting of resident physician Dr. Tulsi Shah MD and attending neurologist Dr. Brian Barry, and that they noted that Mr. Welch's head CT was normal, but that he was still altered,that he still in fact had lower extremity weakness, that their stated differential for Mr. Welch's ongoing weakness was thoracic or cervical spinal cord infarct, as "an ACA (anterior cerebral artery) infarct had been ruled out by normal head CT", and that Dr. Barry's note that day states "left more than right lower extremity weakness concerning for possible spinal cord infarct." Dr. Schulman will opine that their

recommendations were as follows: "Order MRI cervical and thoracic spine w/o contrast, pending. No indication or further head imaging at this time.", but that despite these recommendations, a spine MRI was not obtained that day, and again it also does not appear that consideration was given to targeting a higher blood pressure and/or to lumbar drain placement.

It is anticipated that Dr. Schulman will testify that on June 20, 2022 (postoperative day 6), Mr. Welsh was seen by a different critical care medicine resident, Dr. Brandon Glousman, and different critical medicine attending physician, Dr. Maxwell Hockstein, that Dr. Glousman noted that Mr. Welch still had significant lower extremity weakness and that there was still ongoing concern for a spinal cord infarct, that Dr. Hockstein noted that Mr. Welch still had significant bilateral lower extremity deficits ("LLE remains 1/5 strength. RLE 3/5"), and that although he indicated that the MRI was ordered for that day, it was still not obtained.

It is anticipated that Dr. Schulman will opine that on June 21, 2022 (postoperative day 7), Mr. Welch was again evaluated by Dr. Glousman and Dr. Hockstein, that again, they noted lower extremity weakness, and expressed concern for a spinal cord infarct, that Dr. Hockstein stated that he anticipated Mr. Welch had suffered "spinal cord trespass", and they again stated an MRI was pending however it was still not obtained that day. Dr. Schulman will testify that on June 22, 2022 (postoperative day 8), the MRI was finally obtained, and that Mr. Welch's brain MRI showed multiple infarcts. Mr. Welsh's spine MRI was initially read by the radiologist as "no definite cord infarct", however the read was then addended as follows, "Upon further review with Dr. Barry, there is DWI hyperintensity of the cord at the level of T5 consistent with cord infarct." Dr. Schulman will opine that  this finding was, more likely than not, the explanation for Mr. Welch's ongoing lower extremity weakness.

It is further anticipated that Dr. Schulman will opine that the standard of care applicable to physicians in a similar situation under similar circumstances in a similar setting required (i) Mr. Welch's treating ICU team to obtain a head CT on June 17, 2022, (ii) a consideration of targeting a higher blood pressure for Mr. Welch, and (iii) a consideration of whether a lumbar drain placement was warranted with a neurologist and/or cardiothoracic surgeon on June 17 and/or June 18, 2022. He will opine that the ICU team's failure to obtain a head CT on June 17 was a deviation of the standard of care, and that the ICU team's failure to consider targeting a higher blood pressure and/or lumbar drain placement, and/or to discuss whether a higher blood pressure target and/or lumbar drain placement was warranted with the neurologist and/or cardiothoracic surgeon on June 17 and/or June 18 was also a deviation of the standard of care. Dr. Schulman will express his opinions to a reasonable degree of medical certainty." *See* Plaintiff's Expert Witness Designation.

Consistent with the expert witness designation, Dr. Schulman testified specifically that

Defendant Dunphy breached the applicable standard of care as follows:

"MS. STURTZ: How exactly did Dr. Dunphy— who was a resident in training and

only involved in the care on June 17th— breach the standard of care, in your opinion to a reasonable degree of probability?
A: I would say the same way that Dr. Luczycki breached the standard of care.
Q: So she breached the standard of care in failing to obtain a head CT on June 17th, correct?
A: Correct.
Q: And she breached the standard of care in failing to consider targeting a higher blood pressure and/or lumbar drain placement, and//or discussing whether a higher blood pressure and/or lumbar drain placement was warranted with a neurologist and cardiothoracic surgeon on June 17th, correct?
A: I would also add to that, but that's correct.
Q: Those are the only breaches in the standard of care in terms of Dr. Dunphy that you identified in your report, correct?
A: Yeah. But at the time I didn't realize that the hematocrit was 21. So I would add to that that they breached the standard of care by not transfusing Mr. Welch's blood– or at least discussing whether a transfusion was warranted— with Dr. Alassar and the neurology team.
Q: Did he have any transfusions during his tenure in the ICU?
A: I don't specifically recall, but when I went through the record after I wrote that report to look at his blood count levels, they seemed to be persistently low. When you have a spinal cord infarct, one of the other interventions that should be considered is to, you know, transfuse blood to raise the hematocrit so that you can increase the perfusion pressure to the spinal cord."
Q: Okay.
A: And that wasn't done.
Q: What was done by the providers in response to the hematocrit of 21?
A: As far as I can tell, nothing."
*See Exhibit 2* at p. 71-72.

Dr. Schulman also testified that the Defendants' failure to provide a blood transfusion to Mr.

Welch on June 16 and June 17, 2022 was also a breach of the standard of care given Mr. Welch's

condition. He opined:

"Q: What can cause the hematocrit to drop in a patient such as Mr. Welch?
A: Bleeding, chronic anemia, iron deficiency, hemodilution.
Q: Is it your understanding that Mr. Welch was not given a transfusion on June 16 or June 17?

A: I don't recall if he was. He may– he may have been given a transfusion, but if–
if he was, that was A, before they understood that he had serious neurologic
deficits. So it really kind of doesn't — that's immaterial and, therefore, I don't
really remember off the top of my head whether he was given a transfusion. And
if he was given a transfusion, then it was not sufficient, because on June 17th his
hematocrit was still 21, which is way too low for somebody who is having a
stroke and a spinal cord infarct.

Q: So it's your understanding that no transfusions were given to him after 3:00
a.m. on June 17th?

A: I certainly didn't see any evidence of that. On June 18th, I wrote down the
hemoglobin I found in the chart was 7.5, which is, you know, more or less about
the same as 21. It could be 22 or something, but that leads me to believe that there
was no transfusion given. If there was a transfusion given, then there wasn't an
appropriate response and they should have given more."

Q: When did the hematocrit return to— well, what is the hematocrit goal level? If
21 is not it, what is the goal level in this context?

A: For someone like Mr. Welch-

Q: Yes.

A: — who can't move his legs the hematocrit goal level should have been 30."

*********************************************

"Q: Did you review the lab records? Where did you get the hematocrit of 21 from
that is in your notes? Did you get that from a  progress note? Did you get that
from a—

A: I got it from a progress note."

*See Exhibit 2* at p. 73-75; 77.

Dr. Schulman opined further that the Defendant doctors breached the standard of care on

June 17 and June 18 by also failing to start a naloxone infusion[1]. He testified:

"Q: Okay. So, we've outlined the breaches of the standard of care. The one that
you've added to your report is the hematocrit on June 17th, and you now want to

---

[1] Naloxone (a.k.a. "Narcan") is an opioid antagonist that can be used to improve blood flow in
patients with shock, including septic, cardiogenic, hemorrhagic, or spinal shock. Effects begin
within two minutes when given intravenously, five minutes when injected into a muscle, and ten
minutes as a nasal spray. *See* "Naloxone Hydrochloride", *The American Society of Health-System
Pharmacists,* 2 January 2015; *see also* McDonald R., Lorch U., Woodward J., Bosse B., Dooner
H., Mundin G., et al.  (March 2018). "Pharmacokinetics of concentrated naloxone  nasal spray
for opioid overdose reversal: Phase I healthy volunteer study.", *Addiction*, 113(3): 484-493.; *see
also* Boeuf B., Poirier V., Gauvin F., Guerguerian AM., Roy C, Farrell CA, et al. (2003).
"Naloxone for shock",  *The Cochrane Database of Systematic Reviews*. 2010(4): CD004443.

add another breach in the standard of care, so something the doctors did that was not reasonable? What are you adding now that you believe was not reasonable on June 17th?

A: What I'll tell you is they should have had a discussion and contemplated doing— making interventions to lessen the risk of the — and lessen the damage to Mr. Welch's spinal cord infarct. There are a variety of things that could have been entertained and done that were not done. Those include placing a lumbar drain, raising the blood pressure, giving a blood transfusion, volume loading, arguably also starting a naloxone infusion."

**********************************************

"Q: And in the — is it the same breaches in the standard of care that you identified on June 17th, or is there anything else about the June 18th that you believe was a breach in the standard of care?

A: The same. All of this has to do with— from my perspective– failure to act, to address new profound neurologic deficits." *See Exhibit 2* at p. 88-89; 93.

Dr. Schulman unequivocally testified that the spinal cord infarct was due to a lack of blood flow to Mr. Welch's spinal cord. He stated:

"Q: Is it your opinion that the spinal cord infarct was caused by spinal artery Syndrome

A: It's my opinion that, you know, the infarct was caused by a lack of blood flow,

a

lack of perfusion to his spinal cord." *Id.* at p. 132.

Defendants attempt to mislead the court regarding the viability of Plaintiff's theory of the case by juxtaposing the opinion of Plaintiff's expert, Roland Hamilton, M.D., with that of Dr. Elakil who is the subject of the instant motion, positing that because Dr. Hamilton did not offer any standard of care opinions, because Dr. Hamilton opined that strokes were caused by the Type A dissection, because Dr. Hamilton is not offering any opinion on whether any different type of medical intervention would have prevented or altered the cerebral or spinal strokes, and because Dr. Hamilton agreed that Mr. Welch was not a candidate for interventional stroke treatment, that Plaintiff cannot prove to a reasonable degree of medical certainty that the failure to order interventions such as increasing Mr. Welch's intraspinal blood pressure and/or the placement of a

22

lumbar drain proximately caused neurological insult to Mr. Welch. This position by the Defendants fails to appreciate the nuances of the anticipated scope of testimony to be offered at trial by Dr. Hamilton based on his expertise, fails to appreciate the full parameter of alternatives that were available to the Defendants to prevent Mr. Welch's neurological injury, and fails to appreciate the compelling nature of the expert testimony of Plaintiff's expert Peter Schulman, M.D., a licensed physician board-certified in the same and similar specialty as each of the named Defendants.

Dr. Hamilton is a neurohospitalist, *not* a critical care physician like Dr. Schulman, and furthermore, his scope of participation in the case was to opine on the neurologic injury to Mr. Welch <u>as a result of the stroke</u>, not the breaches of the standard of care with respect to the treatment rendered to Mr. Welch in the ICU. Dr. Hamilton testified:

> "Q: And you're not testifying in this case as to the standard of care of any of the providers who provided care to Mr. Welch, correct?
> A: That is correct?"
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> "Q: Okay. So can you tell me what you practice involves as a neurohospitalist?
> A: As a neurohospitalist I see patients that are strictly hospitalized inside the hospital. They can be in the emergency room, in the intensive care unit, on the regular medical floors. The vast majority of my patients have strokes. When it comes to strokes, they can be acute, subacute, chronic treatment management. And then I see a various array of other neurologic conditions. I'm not sure if you want me to give you an example. Seizures, epilepsy, neuromuscular disorders, altered sensorium, altered mental status, any type of spinal cord weakness related issues, neuropathics."
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> "Q: You attached two articles to your report. Neither one of those are specific to sequelae from an aortic dissection, correct?
> A: I'd have to go back and look at them. I believe that is correct.
> Q: Did you do any other research in this case related to aortic dissections?
> A: That was out of the scope of the question I was asked by Mr. Governor.
> ***Q: What was the question you were asked by Mr. Governor?***
> ***A: To comment on the neurologic injury Mr. Welch suffered from the stroke?"***
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
> "Q: Is there a subspecialty within the board of neurology that focuses on strokes?
> A: Yes.

Q: And you don't have that specialty board certification, correct?
A: Correct."
*See Exhibit 8* [Depo. Tr. of Roland Hamilton, M.D. at p. 13, 16; 22-23; 27 (emphasis added)]

Dr. Schulman ultimately testified to a reasonable degree of medical certainty that had the interventions of a lumbar drain placement and raising the blood pressure been done, Mr. Welch's neurological deficits would be less than they are now.

"Q: You're not going to testify about whether that caused any current deficits, correct?
A: Well, I believe it caused- I do believe that it led to deficits, but the extent and nature and severity of the deficits he has now I'm not– I'm not going to testify about. But I do believe there were consequences of the breach of the standard of care in the ICU that led to, you know, downstream residual deficits that Mr. Welch has now.
Q: But you don't know what, if any, deficits, he has now, correct?
        MR. JACKSON: Objection. You may answer.
A: Well, I do know—-
Q: You haven't reviewed any medical records from 2023 or 2024, correct?
A: As I mentioned—
        MR. JACKSON: Objection to form. You may respond.
A: I reviewed Mr. Welch's deposition transcript which– in which he testifies to the fact that he has a number of residual deficits. And I reviewed that life plan which also seems to state that Mr. Welch has ongoing residual deficits.
Q: Can you opine, to a reasonable degree of probability, that Mr. Welch's residual deficits would be the same or different if he had been administered a lumbar drin on June 18th?
A: In— in– My opinion— on a more probable than not basis, is, had the ICU team critically thought about and paid attention to and had a discussion with the cardiac surgeon, the neurologist, about a constellation of interventions that could have been done— that weren't done– had they done those things, which, you know, we've previously outlined– including the lumbar drain placement, including raising the blood pressure, including giving a transfusion— I believe, more probably than not, that Mr. Welch's deficits would be less than they are now."
        ******************************************
"Q:--- in what way his deficits would be less today, if those interventions had happened or are you deferring to a neurologist on that?

A: I believe that, had they done the — had they met the standard of care with respect to appropriately managing the fact that he could not— he had— he had lower extremity deficits and couldn't move his legs, had they done the constellation of therapies that I mentioned, that that would have— more probably than not— resulted in some degree of improvement in his overall condition. How much? Would he have been completely back to normal or would he be 10 percent better or 20 percent better, that I can't tell you, and I would defer to a neurologist. But, more probably, those interventions have been proven to— more probably than not— make a difference in terms of outcome under the situation that Mr. Welch was in." *See Exhibit 2* at at p. 115-117; 119-120.

Therefore, even though Mr. Welch was not a candidate for thrombolytic therapy or endovascular intervention as Defendants maintain, he *was a candidate* for the placement of a lumbar drain. *Id.*

### *Legal Standard*

Under District of Columbia law, "[i]n a negligence action predicated on medical malpractice, the plaintiff must carry a tripartite burden, and establish: (1) the applicable standard of care; (2) a deviation from that standard by the defendant; and (3) a causal relationship between that deviation and the plaintiff's injury." Washington v. Wash. Hosp. Ctr., 579 A.2d 177, 181 (D.C. 1990) (citations omitted). "Expert testimony is required to prove all three of the required elements, including causation, except where the proof is so obvious as to lie within the ken of the average lay juror." Providence Hosp., Inc. v. Willis, 103 A.3d 533, 538-39 (D.C. 2014).

In a medical malpractice action, the plaintiff must prove the applicable standard of care, deviation from that standard and a causal relationship between the deviation and the injury. *See, e.g.,* Washington v. Washington Hosp. Ctr., 579 A.2d 177, 181 (D.C. 1990). In this jurisdiction, the applicable standard is a national standard, not just a local custom. *See id.* (citing Morrison v. MacNamara, 407 A.2d 555, 565 (D.C.1979)). In order to establish a national standard, "the plaintiff must establish through expert testimony the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances."

Meek v. Shepard, 484 A.2d 579, 581 (D.C.1984). In order to establish proximate cause, "[t]he expert need only state an opinion, based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of the plaintiff's injuries." Psychiatric Inst. of Washington v. Allen, 509 A.2d 619, 624 (D.C.1986); Grant v. American Nat'l Red Cross, 745 A.2d 316, 319 (D.C. 2000).

    Federal Rule of Evidence 702 provides: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

    Under Fed. R. Evid. Rule 702, trial judges serve as gatekeepers to ensure that the methodology underlying the expert testimony is valid and the expert's conclusion is based on "good grounds." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590 (1993); see also Haarhuis v. Kunnan Enters., Ltd., 177 F.3d 1007, 1015 (D.C. Cir. 1999) ("[T]he decision whether to qualify an expert witness is within the broad latitude of the trial court and is reviewed for abuse of discretion."). This court has recognized that physicians acquire the knowledge they use in the profession from many sources, including their personal experiences and through others in related fields. See Garvey v. O'Donoghue, 530 A.2d 1141, 1147 (D.C.1987).

    In general, Rule 702 has been interpreted to favor admissibility." Khairkhwa v. Obama, 793 F.Supp.2d 1, 11 (D.D.C.2011)(citing Daubert v. Merrell Dow Pharms, Ins., 509 U.S. at 587, 113 S.Ct. 2786 (1993); Fed. R.Evid. 702 Advisory Committee's note ("A review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule.")).

### *Legal Argument*

**A.    Dr. Schulman's Opinions on Standard of Care, Proximate Causation and Damages Are Sufficient and Shall Be Admissible Under Principles of *Daubert* and Federal Rule of Evidence 702.**

**1.    Dr. Schulman possesses the requisite scientific, technical and other specialized knowledge to assist the trier of fact to understand the evidence and determine the facts at issue.**

Rule 702 allows an expert witness to be qualified by their "knowledge, skill, experience, training, or education." Fed R. Evid. 702. A court qualifying an expert witness must conclude that the proposed expert possesses "a reliable basis in the knowledge and experience of [the relevant] discipline." *Daubert* 509 U.S. at 592. Here, the relevant discipline is the practice of medicine in an intensive care unit treating patients who have suffered a spinal infarct following the performance of a Type -A aortic dissection.

Dr. Schulman is currently a Professor at the Department of Anesthesiology and Perioperative Medicine at Oregon Health & Science University and within the last five years, has served as the Medical Director for the Knight Cardiovascular Intensive Care Unit at Oregon Health & Science University. He also served as Chief of the Division of Cardiac and Surgical Subspecialty Critical Care. He was the principal investigator of an investigator-initiated, industry-sponsored prospective observational study evaluating the effects of intraoperative electromagnetic interference on implantable cardioverter-defibrillators. Dr. Schulman is licensed in the State of Oregon and is Board Certified in Anesthesiology with subspecialty certification in Critical Care Medicine. Dr. Schulman has otherwise taught, worked, and published peer-reviewed literature in the fields of cardiac surgery, critical care medicine, neurointensive care, neuroanesthesia,and cardiothoracic and vascular anesthesia. *See Exhibit 8.*

At the time of his deposition testimony, Dr. Schulman's clinical practice involved practicing intensive care medicine in the cardiovascular ICU, a similarly situated environment in which the Defendant physicians were practicing at the time they provided treatment to Mr. Welch ("I'm on the ICU team that takes care of those patients as soon as the surgery is done and they are admitted to the ICU.") *See Exhibit 2*, p. 13, 16-19. Specifically, "more often than not, when [Dr. Schulman is] on service in this cardiovascular ICU, [he has] a patient who is in the ICU because they have an aortic dissection or have had an aortic dissection repair or have had surgery on their aorta. *Id.* at 37-38. Within the last three years, he has treated a patient in the ICU at his hospital who underwent a Type A- surgery for a Type A aortic dissection and who suffered the complication of a spinal infarct. Dr. Schulman has also treated patients suffering from cerebral strokes. *Id*. at 35-36. He testified:

> "We do see patients in the CV-ICU, in our cardiovascular ICU on a more frequent basis who do have aortic problems, and have the complication or sequelae of spinal cord ischemia and/or infarct. And I know that I have been involved in taking care of patients like that."

Dr. Schulman also testified as to his knowledge, training, and experience with evaluating the risk to a patient of increasing their blood pressure supply following cardiac surgery. *Id*. at 47-48. He also testified as to his clinical experience placing a lumbar drain such as the one at issue in this case as he testified:

> "Q: Are you the one who places lumbar drains in?
> A: I do place lumbar drains. Yes.
> Q: What are the risks of the placement of a lumbar drain?
> A: The most common risk would be headache. That would be, the most common risk would be a headache. And then, whenever we do procedures like this, there's a— there's a relatively small, but, you know, not zero risk of infection, bleeding, damaging a surrounding structure.
> Q: Anything else?
> A: Very rarely, if you put a lumbar drain in and then you were to mistakenly drain

cerebral spinal fluid very quickly— I haven't personally seen this happen, but, if somebody did that by mistake and you drained a lot of fluid too quickly— you could cause a bleed in the brain or your could even cause the brain to herniate. But that would be pretty rare and unlikely.

Q: Do you agree that the potential complications associated with lumbar drain placement can be significant?

A: I– I would say, just like any other procedure, we always have to weigh the risks and benefits. And I think, in Mr. Welch's case, the benefit of a lumbar drain would have far exceeded the risk."

 *See Exhibit 2* at p. 138 -139.

As this honorable Court is aware, the degree of "knowledge, skill, experience, training, or education" required to qualify an expert witness "is only that necessary to insure that the witness's testimony `assist' the trier of fact." <u>Khairkhwa v. Obama</u>, 793 F.Supp.2d 1, 11 (D.D.C.2011); *see also* <u>Mannino v. Int'l Mfg. Co.</u>*,* 650 F.2d 846, 851 (6th Cir.1981) (noting that the weight of the evidence is a matter to be assessed by the trier of fact). "[I]t is not necessary that the witness be recognized as a leading authority in the field in question or even a member of a recognized professional community." <u>Khairkhwa</u>, *supra*; *see also* 29 FED. PRAC. & PROC. (EVID.) § 6265. "The `assist' requirement is satisfied where expert testimony advances the trier of fact's understanding to any degree." *Id.*

Contrary to Defendant's assertion, Dr. Schulman is also qualified to opine as to proximate causation. Defendant's motion states that Dr. Schulman "admits that on causation, he "would largely defer to a neurologist."" <u>This assertion by the Defendants is false and mischaracterizes Dr. Schulman's testimony</u>. He testified that he would defer to a neurologist only as to the extent of the deficit caused by the breach of the standard of care. Specifically, he opined:

"Q: You're not going to testify about whether [a breach in the standard of care in the ICU care] caused any current deficits, correct?
A: Well, I believe it caused- I do believe that it led to deficits, but the extend and nature and severity of the deficits he has now I'm not– I'm not going to testify about. But I do believe there were consequences of the breach of standard of care

in the ICU that led to you know, downstream residual deficits that Mr. Welch has now."

*****************************************

"Q:---- in what way his deficits would be less today, if those interventions had happened, or are you deferring to a neurologist on that?
A: I believe that, had they done the— had they met the standard of care with respect to appropriately managing the fact that he could not– he had — he had lower extremity deficits and couldn't move his legs, had they done the constellation of therapies that I mentioned, that that would have— more probably than not— resulted in some degree of improvement in his overall condition.

*How much? Would he have been completely back to normal or would he be 10 percent better or 20 percent better, that I can't tell you, and I would defer to a neurologist.*

*But, more probably, those interventions have been proven to — more probably than not– make a difference in terms of outcome under the situation that Mr. Welch was in.*"
*See Exhibit 2* at 115-116.; 119-120 (emphasis added).

**2.    Dr. Schulman's testimony is based on sufficient facts and data.**

As this honorable Court is aware an expert need not employ a rigorous analytical methodology if the expert is instead qualified on the basis of his or her practical experience or training. <u>Boesen v. Brown</u>, Civ. Action No. 19-3499 (EGS)(D.D.C. 2023). Notwithstanding Dr. Schulman's qualifications, he testified as to the sufficient of the facts and data upon which he based his opinions including medical records, deposition transcripts, and peer-reviewed literature as he testified:

"Q: Okay. So tell me exactly what medical records you reviewed in this case and how many page numbers?
Q: Okay. I'm going to open up what Mr. Jackson sent me. Can you bear with me for a second?
Q: Sure.
A: So predominantly— (sound echos).

THE REPORTER: I'm sorry, if you said something, I didn't get it.

THE WITNESS: I did, but then I heard an echo, so I wasn't sure if someone else was speaking while I was speaking, so then I stopped speaking.

MS. STURTZ: I think it's all clear now.

A: Okay. So I received a folder from Mr. Jackson labeled June 20, 2022 treatment records, and within that folder, there's an ambulance record. There's a chest CT. There's a head CT. There's an ED clinical summary. There's an ED note. There's

an ED nursing note. There's an ED, another ED nursing note. There's an ED patient summary. There's another ED patient summary. There's an ED record. There's another ED record. There's an ED results callback, PDF. There are some EKGs

There's an intraoperative TE report. There's a health summary. There's an MRI brain. There's an MRI spine. There's a nephrology consultation note. There's a neurology consultation note. There's an operative report.

There's a physical medicine and rehab consultation note. There's a stroke service consultation note. There's a surgical pathology report. There's a triage note. There's an ultra— there's an upper- there's an ultrasound, lower extremity, duplex veins report. Do you want me to keep going?

Q: So these are– they were just sent to you? Like, they're different folders?

A: Those are different– those are different PDF files of the records within that particular folder. That is from June 20, '22. Then there's another folder that was sent to me labeled July of 2022, treatment records. That has history and physical. It has health summary. It has EKG. It has a chest x-ray. And then separately, and subsequent to that, I was sent some deposition reports."

********************************

"Q: You were sent folders from the plaintiff's lawyer from June 2022, and then you were also sent medical records from July of 2022, correct?

A: That's correct."

********************************

"Q: Do you know anything about his neurologic assessments in 2023 or 2024?

A: A little bit because I was provided recently by Mr. Jackson with a — I can't remember what it's called– a treatment plan for him now. There's a name for it that I;m blanking on.

Q: A life care plan by Dr. Kaplan?

A: Yes, I did. I did receive that and I did, I did review— I can't say I memorized that, but I— I read that report."

********************************

"Q: So we talked about– you told me what medical records you reviewed, and I apologize if you listed this already. Did you— have you reviewed- what deposition transcripts have you reviewed?

A: Well, I reviewed— I'm just going to look here because I want to make sure that I get this right, Dr. Luczycki's deposition transcript. I reviewed Dr. Hockstein's deposition transcript. I reviewed Ms. Shana Hargrove's deposition transcript, who I believe is Mr. Welch's niece. And I reviewed Mr. Welch's deposition transcript.

Q: Okay. Other than the medical records, the deposition transcripts, there's some articles I've been provided with. Anything else that you reviewed in this case?

A: Not that I can think of. I think we pretty much summarized."

********************************

"Q: One of the papers that you reference in your notes is called, "Three Cases of Newly Developed Paraplegia After Repairing Type A Acute Aortic Dissection?"
A: Yes."

****************************************

"Q: Okay. And then you cited, in your notes to this 2022 Guide for Diagnosis and Management of Aortic Disease, and you cite to page 395, correct, in your notes?
A: Well, I underlined some, some of the conclusions, I believe, from these papers. Yes.
Q: Right. And for that paper it's page 395?
A: Which paper are we talking about again.
Q: ACC/AHA.
A: Oh, the ACC Guideline, yes, the ACC Guideline.
Q: And page 395 deals with, is addressing a TAAA, correct?
A: That's true.
Q: And a TAAA is a thoracoabdominal aortic aneurysm, correct?
A: Thoracoabdominal aneurysm, uh-huh.
Q: Right.
A: So that's another, it's another type of aortic disease, as we touched on earlier in, in my—
Q: That's not what Mr. Welch had, correct?
A: He had a dissection, not an aneurysm, but there's overlapping– both of those aortic conditions can lead to spinal cord ischemia and infarction. So I– I believe, and I think the vast majority of people who do this for a living, would opine that this conclusion, this statement related to thoracoabdominal aneurysm disease and surgery would also apply to the—- a patient who has had a dissection, who then goes on to have acute neurologic lower extremity deficits."
*See Exhibit 2* at p. 82-83, 85, 86-87, 106, 134-136

Defendants assert that Dr. Schulman did not have any peer-reviewed articles to support his opinions. This assertion by the Defendants is <u>false</u>. Dr. Schulman pointedly testified as to his purpose for reviewing peer reviewed literature as he stated:

"I reviewed them because I wanted have some articles to reference in case you asked me about —-***to support answers to questions***— you know, in case you asked me about literature." *Id*. at p. 102:1 (emphasis added).

Also, Defendants attempt to mislead the court about the importance of the article entitled *Three Cases of Newly Developed Paraplegia After Repairing type A Acute Aortic Dissection*, which is a peer-reviewed article which Dr. Schulman located and reviewed on his own accord prior to testifying. *Id*. at 107:10-15. Defendants baldly state that "this case study of only 3 people relates to the undisputed concept that a patient can suffer paraplegia after a Type A aortic dissection." Defendants' summation is incomplete and misleading. Specifically, this article discusses the positive effects that placement of a lumbar drain and monitoring of mean arterial pressure (MAP) had on the case study patients' ability to recover movement in their extremities, indeed the same interventions which Dr. Schulman opined was not considered or placed by the Defendants in violation of the standard of care. The relevant findings of the peer-reviewed article conspicuously absent from Defendants' "summation" read as follows:

> **"Case Reports**
>
> *Patient 1*
> A 51-year old man with acute type A aortic dissection underwent total arch replacement. He had regained consciousness and strength of his extremities, but 2 hours after extubation, weakness of his lower extremities had developed and progressed to paraplegia. His mean arterial pressure was approximately 70 mm HG. A chest computed tomographic scan demonstrated that false lumen of the descending thoracic aorta was completely thrombosed (Fig. 1). *A cerebrospinal fluid (CSF) catheter was immediately inserted. Initial CSF pressure was 28 mm Hg and drainage was continued for 3 days to maintain the CSF pressure below 10 mm Hg. At the same time, the mean arterial pressure was augmented up to 100 mm Hg with dopamine and dobutamine to maintain adequate spinal perfusion pressure*. Corticosteroid, free radical scavenger, and mannitol were administered as well. *Paraplegia was fully recovered promptly*.
>
> *Patient 2*
> A 54-year-old man with severe mitral insufficiency underwent valve repair. Type A aortic dissection originating from the aortic cannulation site was found intraoperatively, and ascending aortic repair was performed. He regained consciousness with normal movement of extremities. However, on day 2, his

systolic blood pressure deteriorated down to 50 mm Hg because of cardiac tamponade. After re-exploration for bleeding, he regained consciousness with weakness of the lower extremities. Angiography demonstrated that the false lumen of the descending thoracic aorta was completely thrombosed and the intercostal arteries originating from the false lumen were occluded. ***Systolic arterial pressure augmentation with dopamine and CSF drainage was performed for 3 days, and mannitol and corticosteroid were used. Leg movement recovered gradually and eventually he could walk independently.***

*Patient 3*
A 57-year-old man with acute type A aortic dissection underwent total arch replacement. He recovered without any neurologic complications. Twenty-four hours after the operation, he suddenly collapsed due to cardiac tamponage with decreased systolic blood pressure down to 40 mm Hg, and he was re-explored for bleeding. He regained consciousness presenting with paraplegia. A computed tomographic scan demonstrated that the false lumen of the descending thoracic aorta was thrombosed. Magnetic resonance imaging revealed spinal cord infarction at the level between Th6 and L2 (Fig. 2). The arterial mean pressure was maintained over 90 mm Hg with dopamine, ***but the CSF drainage was not applied because 24 hours had passed after diagnosis of spinal cord infarction. He was discharged with permanent neurologic deficit.***"
*See Exhibit 9* [*"Three Cases of Newly Developed Paraplegia After Repairing type A Acute Aortic Dissection"* (emphasis added]

The article's conclusion also aligns with the opinions expressed by Dr. Schulman regarding the benefits of placement of a lumbar drain and MAP monitoring as the article's conclusion states in relevant part:

"Because CSF drainage and augmentation of arterial pressure have been reported to

be effective to counteract the delayed paraplegia after open surgery or endovascular repair, we have applied them with medications such as corticosteroid, free radical scavenger, and mannitol. To maintain appropriate spinal cord circulation, the systemic mean arterial pressure should be greater than 100 mm Hg and the CSF pressure should be below 10 mm Hg, respectively. ***We believe that such interventions are useful in the case of paraplegia after repairing type A acute aortic dissection***." *Id* (emphasis added).

Defendants pressed Dr. Schulman in his deposition that he did not have sufficient facts or data to form an opinion because he did not recall viewing the laboratory records for Mr. Welch's hospital admission when questioned. *See Exhibit 2* at 78. However, he explained that "if the labs that I'm interested in are embedded in a progress note, then that's sufficient." *Id*. at 79. Indeed, the laboratory record that Defense counsel was interested in was the "hematocrit of 21" based on their own question posed to Dr. Schulman which was as follows:

> "Q:Did you review the lab records? Where did you get the hematocrit of 21 from that is in your notes? Did you get that from a progress note? Did you get that from a—-
> A: I got it from a progress note."
> *Id*. at 77.

### 3.    Dr. Schulman's testimony is the product of reliable principles and methods.

Discussing and then applying established medical knowledge to the facts of a specific case is a common practice for rendering an expert opinion. *See* West v. Bayer HealthCare Pharm. Inc., 293 F. Supp. 3d 82, 91 (D.D.C. 2018) ("Plaintiffs' experts are infectious disease doctors who have applied their education, experience and knowledge of infectious diseases to the information available to them about a patient and, based on that information, have chosen what they believe is the most likely cause of that patient's illness over all other possibilities. This type of medical diagnosis—while obviously not infallible—is a reliable, scientific manner of generating an expert opinion."). Dr. Schulman aptly applied his medical knowledge to the facts of this specific case when he testified as follows:

> "Q: In making those considerations, they needed to include concerns about– well, let me ask you. Did they have issues with him having hypertension following the surgery while he was in the ICU?
> A: They were- it appears from the record that they were consistently making a concerted and ongoing effort to lower Mr. Welch's blood pressure.
> Q: Is that because his blood pressure was at levels that were above the goal they Set?
> A: They were above the goal for a sort of– a patient who has had a Type A dissection, but has not had a spinal cord infarct. They were- there's no evidence in

the record that they took into account the possibility that Mr. Welch had had a spinal cord infarct, in terms of the blood pressure goals that they elected to set."

*************************************

"Q:Because these discussion don't get documented in full, correct?

A: It depends on—

    MR. JACKSON: Objection. You may respond.

    THE WITNESS: It depends on the nature of the problem and how serious it is.

    MS. STURTZ: Okay.

A: I mean, what I can tell you is, if– if I consulted my– the cardiac surgeon who I worked with– because I was concerned that the patient had had a stroke and/or spinal cord infarct– I would more specifically state that in the note. And I would more specifically outline what our treatment plan was going to be; and that that treatment plan– specifically for that problem– would be noted in the chart, and it would be noted that the surgeon agreed with that, et cetera. Moreover, I would say more often than not in a situation like this, our cardiac surgeons actually, independently, write notes confirming that they've been involved in the care of the patient in the ICU.

And I didn't see any notes from Dr. Alassar specifically that he, or anyone from his team, wrote himself. So I really can't, you know, speculate about what "discussed with Dr. Alassar" specifically means."

 *See Exhibit 2* at p. 48-49; 69-70

Dr. Schulman also employed the same reliable methodology of applying established medical knowledge to the facts of this specific case when assessing the critical nature of the drop in the hematocrit level[2] of Mr. Welch when he testified as follows:

"Q: What can cause the hematocrit to drop in a patient such as Mr. Welch?

A: Bleeding, chronic anemia, iron deficiency, hemodilution.

Q: Is it your understanding that Mr. Welch was not given a transfusion on June 16 or June 17?

---

[2] The hematocrit (Ht or HCT), also known by several other names, is the volume percentage (vol%) of red blood cells (RBCs) in blood, measured as part of a blood test. The measurement depends on the number and size of red blood cells.[3] Because the purpose of red blood cells is to transfer oxygen from the lungs to body tissues, a blood sample's hematocrit—the red blood cell volume percentage—can become a point of reference of its capability of delivering oxygen. Hematocrit levels that are too high or too low can indicate a blood disorder, dehydration, or other medical conditions. *See* Mondal H, Lotfollahzadeh S (2024). *"Hematocrit"*. StatPearls. Treasure Island (FL): StatPearls Publishing. PMID 31194416; *"Hematocrit"*. MedlinePlus Medical Encyclopedia. U.S. National Library of Medicine. Archived from the original on 2020-09-28; Hematocrit Test". MedlinePlus. U.S. National Library of Medicine. Archived from the original on 6 May 2019.

A: I don't recall if he was. He may– he may have been given a transfusion, but if–
if he was, that was A, before they understood that he had serious neurologic
deficits. So it really kind of doesn't — that's immaterial and, therefore, I don't
really remember off the top of my head whether he was given a transfusion. And
if he was given a transfusion, then it was not sufficient, because on June 17th his
hematocrit was still 21, which is way too low for somebody who is having a
stroke and a spinal cord infarct.

Q: So it's your understanding that no transfusions were given to him after 3:00
a.m. on June 17th?

A: I certainly didn't see any evidence of that. On June 18th, I wrote down the
hemoglobin I found in the chart was 7.5, which is, you know, more or less about
the same as 21. It could be 22 or something, but that leads me to believe that there
was no transfusion given. If there was a transfusion given, then there wasn't an
appropriate response and they should have given more."

Q: When did the hematocrit return to— well, what is the hematocrit goal level? If
21 is not it, what is the goal level in this context?

A: For someone like Mr. Welch-

Q: Yes.

A: — who can't move his legs the hematocrit goal level should have been 30."
*See Exhibit 2* at p. 73-75.

Dr. Schulman also employed the same reliable methodology of applying established
medical knowledge to the facts of this specific case when discussing why, in the capacity of a
critical care doctor as the individual Defendants in this case, it was important to monitor the
change in severity of Mr. Welch's lower extremity weakness given his presentation in the ICU.
After being read to interpret a phrase from Mr. Welch's record suggesting that Mr. Welch did not
have any limb weakness in the ICU, he testified:

"Q: As a critical care doctor, what does the statement "no paresthesia and no limb
weakness" mean to you?

A: It means the patient was not having any, according to that person who did that
exam at that time. Granted, these things are dynamic.

So, on person can go in, you know, one minute and do an exam and then
half an hour or an hour later they can go in and find different deficits.

And that's why, you know, vigilant critical care is incredibly important for
these patients. These patients are some of the, you know, highest risk and sickest
patients we encounter in the cardiovascular ICY; and, therefore, vigilance and
attention to detail and jumping on top of problems when you see them is very
important.

So, we do, we typically do neurologic assessments every hour. And sometimes you find— you go in and you might find that somebody found an exam and it was normal.

And then an hour later or two hours later somebody found that the exam Was not normal. There was a day when the critical care person, at the time they did

it, said, "you know, things are better," but, on the exact same day, the neurologist came in and found that there were still serious neurologic deficits.

Q: Did you see in the records in this case, where there was variation in terms of —

A: Yes.

Q: — the lower extremity?

A: I did. I did, but I saw consistently every day that some folks, some providers, were still identifying serious neurologic deficitys, so, it's not—

It's not unusual to have a waxing and waning neurologic exam. But this is why, in the ICU, it's critical to continue to make ongoing and serial assessments and to interface closely with the neurology team and the surgeons to determine that, you know, you might have seen that things looked better at 9:00 o'clock but then the neurology team comes by at noon and sees that there's still a problem.

Q: Okay.

A: And you have to act on that." *Id.* at 121-123.

Dr. Schulman also employed the same reliable methodology of applying established medical knowledge to the facts of this specific case when opining as to why the pacing wires that Mr. Welch had could have been easily removed prior to June 20th to allow for an MRI to take place. He testified:

"Q: Do you know whether an MRI can be performed when pacing wires are still in place?

A: It cannot, but the pacing wires could have, in this case, could have been easily removed prior to June 20th, which would have allowed for the MRI."

*********************************

"Q: Do you know, from your review of the medical records, whether there was a medical concern that led the doctors to keep the pacing wires in place until June 20th?

A: I didn't appreciate any, any specific medical concern. The reason we keep pacing wires in place is, when patients are requiring pacing, or are at high risk for requiring pacing. And I did not see any specific necessity or indication in this case that would have required them to keep the pacing wires in until postop day six, June 20th. Now, in a normal patient who doesn't have, you know, lower extremity paralysis, you might decide the benefit of keeping the pacing wires in just in case it makes sense.

But, in a case where you're worried that somebody has a spinal cord infract– and is going to be paralyzed and doesn't need pacing— the risk-benefit discussion, more likely than not, strongly favors removing the pacing wires earlier so that you can get an MRI."
*Id.* at p. 126-128]

Dr. Schulman again employed this reliable methodology when opining that the benefits of a lumbar drain would have "far exceeded the risk." as he testified:

"Q: Do you agree that the complications associated with drain placement include spinal hematoma, leading to paralysis, intracranial hemorrhage and meningitis?
A: So I mentioned intracranial hemorrhage just a couple of seconds ago.
You can get a spinal hematoma. That typically would happen in someone who is on a strong anticoagulant, a strong blood thinning medication, which Mr. Welch wasn't on. You can have, as I mentioned before, infection. A type of infection is meningitis. So yeah, these things are all possible, but they're really pretty rare and unlikely.
And, again, in Mr. Welch's case, the benefit of doing the lumbar drain would have far outweighed these risks." *Id*. at 139-140.

Therefore, even though Mr. Welch was not a candidate for thrombolytic therapy or endovascular intervention as Defendants maintain, he *was a candidate* for the placement of a lumbar drain. *Id*.

Dr. Schulman again employed this reliable methodology when opining about determining how to set an appropriate MAP goal for a patient in ICU in light of risk factors to patients such as Mr. Welch, as Dr. Schulman testified:

"Q: Okay. So, when your- patients like this first comes into the ICU, and you set an
initial blood pressure goal of less than 110, do you set a corresponding MAP goal of over 60?
A: Sure.
Q: Or what goal do you set?
A: Yes. But the primary objective– in the first number of hours after the surgery, if
there aren't other extraneous factors– is to keep the systolic blood pressure less than 110; because, in the first few hours, first let's say, you know, six hours, 12 hours, 24 hours, the surgeons are especially concerned about bleeding.
As time elapses, after they come out of surgery, so now you're into day two
and day three, that concern about acute bleeding is much less.
So, we are able to liberalize the blood pressure goal, and let it go up.

And then, ultimately, like in this case, on postop day three and four- if there's a concern that somebody can't move their legs and they aren't bleeding– you say, the risk of, you know, high blood pressure, allowing the blood pressure to be high, the benefit of allowing the high– the blood pressure to be high– vastly outweighs the risk.

Q: Okay. And you believe there would be a benefit to have the MAP reaching 90 or higher?

A: In a patient who you're worried about can't move their legs and has acute lower extremity ischemia and/or paralysis, yes." *Id.* at 144-145.

Dr. Schulman employed the same reliable methodology of applying established medical knowledge to the facts of this specific case when further opining about the importance of lowering the blood pressure as he testified as follows:

"Q:When you say that they were trying to do things to lower his blood pressure, why would they do that?

A: Because, in a typical patient- not for Mr. Welch– but, in a typical patient who doesn't have a spinal cord infarct, we err on the side of keeping the blood pressure on the lower side to try to mitigate the risk of bleeding.

And, also, for his long-term management, he has now had a Type A dissection repair.

So it's important, when he goes home— and the further out he gets- to be on appropriate medication to keep his blood pressure on the lower side so he doesn't have another dissection problem." *Id*. at 149-150.

Dr. Schulman also employed the methodology of "differential diagnosis" to arrive at his conclusions. This methodology involves first identifying possible causes of a patient's symptoms and then differentiating among them. Thereafter other possible causes are sought to be ruled out, usually through further examination and laboratory tests. Lakie v. SmithKline Beech 965 F.Supp. 49, 55 (1997). However, an expert must not eliminate each and every possible alternative cause. *Id*. The reliability of this methodology is well established. *Id*. *See also* Benedi v. McNeil-P.P.C. Inc., 66 F.3d 1378, 1384 (4th Cir.1995). Dr. Schulman testified:

"Q: Well, do you have an opinion, to a reasonable degree of probability, as to what

exactly caused the spinal cord infarct?

A: Well, there's a differential diagnosis.

Q: Is it your opinion that the spinal cord infarct was caused by spinal artery

syndrome?
A: It's my opinion that, you know, the infarct was caused by a lack of blood flow,

a

lack of perfusion to his spinal cord." *Id.* at p. 132.

It has long been held that a *prima facie* case of medical malpractice must normally consist of evidence which establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of. Kosberg v. Washington Hospital Center, et al., 394 F.2d 947, 949 (1968). Here, Dr. Schulman also sufficiently opined as to causation. He testified:

> "Q: Okay. And that makes sense. Again, your testimony in this case is going to be about the ICU care and whether there was a breach in the standard of care, in the ICU care, correct?
> A: That's correct.
> Q: You're not going to testify about whether that caused any current deficits, correct?
> A: Well, I believe it caused- I do believe that it led to deficits, but the extent and nature and severity of the deficits he has now I'm not— I'm not going to testify about. But I do believe there were consequences of the breach of the standard of care in the ICU that led to, you know, downstream residual deficits that Mr. Welch has now." *Id.* 115-116.

Dr. Schulman also testified as to his understanding and application of the breach of the standard of care as to the Defendants. In order to establish a national standard, "the plaintiff must establish through expert testimony the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." Meek v. Shepard, 484 A.2d 579, 581 (D.C.1984). Dr. Schulman professed his understanding of the definition of the "standard of care" consistent with the interpretation of this Court when he stated:

> "Q: Let me ask you before you add, Doctor, can you define for me, do you know what the definition of "standard of care" is?
> A: What a reasonably prudent and careful practitioner would do under the same

circumstance." *See Exhibit 2* at 88.

With respect to individual breaches of the standard of care assignable to each of the individually named Defendants, Dr. Schulman testified that the entire ICU team assigned to Mr. Welch's care-*including the named Defendants*-breached the standard of care. He opined:

> "Q: That sounds, yeah, I think you're saying it right.
> A: I do agree that Dr. Luczycki was the attending intensivist in charge of the ICU team. But I do– I– my opinion is, collectively, the ICU team breached the standard of care. Dr. Dunphy was part of that ICU team. So how you hash out what her, you know, responsibility was, specifically, you know, I don't — I don't know that I have a good answer for that. But she in my mind was part of the team that breached the standard of care."
>
> *******************************************
>
> "MS. STURTZ: How exactly did Dr. Dunphy— who was a resident in training and only involved in the care on June 17th— breach the standard of care, in your opinion to a reasonable degree of probability?
> A: I would say the same way that Dr. Luczycki breached the standard of care.
> Q: So she breached the standard of care in failing to obtain a head CT on June 17th, correct?
> A: Correct.
> Q: And she breached the standard of care in failing to consider targeting a higher blood pressure and/or lumbar drain placement, and//or discussing whether a higher blood pressure and/or lumbar drain placement was warranted with a neurologist and cardiothoracic surgeon on June 17th, correct?
> A: I would also add to that, but that's correct.
> Q: Those are the only breaches in the standard of care in terms of Dr. Dunphy that you identified in your report, correct?
> A: Yeah. But at the time I didn't realize that the hematocrit was 21. So I would add to that that they breached the standard of care by not transfusing Mr. Welch's blood– or at least discussing whether a transfusion was warranted— with Dr. Alassar and the neurology team.
> Q: DId he have any transfusions during his tenure in the ICU?
> A: I don't specifically recall, but when I went through the record after I wrote that report to look at his blood count levels, they seemed to be persistently low. When you have a spinal cord infarct, one of the other interventions that should be considered is to, you know, transfuse blood to raise the hematocrit so that you can increase the perfusion pressure to the spinal cord."
> Q: Okay.

A: And that wasn't done."

             **********************************

Q: Is it your understanding that Mr. Welch was not given a transfusion on June 16 or June 17?

A: I don't recall if he was. He may– he may have been given a transfusion, but if–if he was, that was A, before they understood that he had serious neurologic deficits. So it really kind of doesn't — that's immaterial and, therefore, I don't really remember off the top of my head whether he was given a transfusion. And if he was given a transfusion, then it was not sufficient, because on June 17th his hematocrit was still 21, which is way too low for somebody who is having a stroke and a spinal cord infarct.

Q: So it's your understanding that no transfusions were given to him after 3:00 a.m. on June 17th?

A: I certainly didn't see any evidence of that. On June 18th, I wrote down the hemoglobin I found in the chart was 7.5, which is, you know, more or less about the same as 21. It could be 22 or something, but that leads me to believe that there was no transfusion given. If there was a transfusion given, then there wasn't an appropriate response and they should have given more."

             **********************************

"Q: Okay. So, we've outlined the breaches of the standard of care. The one that you've added to your report is the hematocrit on June 17th, and you now want to add another breach in the standard of care, so something the doctors did that was not reasonable? What are you adding now that you believe was not reasonable on June 17th?

A: What I'll tell you is they should have had a discussion and contemplated doing— making interventions to lessen the risk of the — and lessen the damage to Mr. Welch's spinal cord infarct. There are a variety of things that could have been entertained and done that were not done. Those include placing a lumbar drain, raising the blood pressure, giving a blood transfusion, volume loading, arguably also starting a naloxone infusion."

*See Exhibit 2* at p. 59; 71-72; 73-75; 88-89

    At the time of his deposition testimony, Dr. Schulman's clinical practice involved practicing intensive care medicine in the cardiovascular ICU, a similarly situated environment in which the Defendant physicians were practicing at the time they provided treatment to Mr. Welch ("I'm on the ICU team that takes care of those patients as soon as the surgery is done and they are admitted to the ICU.") *See Exhibit 2*, p. 13, 16-19. Specifically, "more often than not, when

[Dr. Schulman is] on service in this cardiovascular ICU, [he has] a patient who is in the ICU because they have an aortic dissection or have had an aortic dissection repair or have had surgery on their aorta. *Id.* at 37-38. Within the last three years, he has treated a patient in the ICU at his hospital who underwent a Type A- surgery for a Type A aortic dissection and who suffered the complication of a spinal infarct. Dr. Schulman has also treated patients suffering from cerebral strokes. *Id.* at 35-36.While such evidence usually goes to whether an expert has sufficient qualifications to testify, several circuits have treated it as circumstantial evidence as to whether the expert employed a scientifically valid methodology or mode of reasoning. Ambrosini v. Labarraque, 101 F.3d 129, 135 (1996). *See* United States v. Downing, 753 F.2d 1224, 1239 (3d Cir.1985).Once an expert has explained his or her methodology, and has withstood cross-examination or evidence suggesting that the methodology is not derived from the scientific method, the expert's testimony, so long as it "fits" an issue in the case, is admissible under Rule 702 for the trier of fact to weigh. Ambrosini v. Labarraque, 101 F.3d 129, 135 (1996). "[W]hen a court denies the right to have a jury decide a disputed issue, especially one of a scientific nature, its reasons for doing so must be strong." Ambrosini v. Labarraque, 966 F.2d 1464, 1469 (D.C.Cir.1992).

### 4. Dr. Schulman's opinions reflect a reliable application of reliable principles and methods to this case.

For the reasons stated above, Dr. Schulman's proffered testimony meets the fourth prong of F.R.E. 702. His standard of care and causation opinions were formed with the rigor accepted in the field of critical care medicine, which is the area of medicine specializing in the post-surgical intervention of spinal cord and brain infarcts in an Intensive Care Unit. Based on his review of medical records, imaging, imaging reports, deposition transcripts, and relevant peer-reviewed literature, Dr. Schulman's opinions are beyond the realm of conjecture and

speculation, and would assist the trier of fact in determining the relevant issues raised in

Plaintiff's claim. Because of their probative value, Dr. Schulman's opinions shall be admitted

under F.R.E. 702.

**Conclusion**

For the reasons stated herein, Plaintiff respectfully requests that this Court deny

Defendants' Motion to Exclude the Opinions of Dr. Schulman on Causation and Damages.

Respectfully Submitted,

/s/ Kim Parker

_____

Kim Parker, Esquire
D.C. Bar No. 46980
LAW OFFICES OF KIM PARKER, P.A.
2123 Maryland Avenue
Baltimore, Maryland 21218
Office 410-234-2621
Facsimile 443-486-1691
Email: kp@kimparkerlaw.com

Governor E. Jackson, III, Esquire
D.C. Bar No. 1002797
LAW OFFICE OF GOVERNOR JACKSON, III LLC
400 E. Joppa Road, Suite 50
Towson, Maryland 21286
Office (410) 528-5150
Facsimile (410) 528-1055
Email gjackson@governorjacksonlaw.com

COUNSEL FOR PLAINTIFF

CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of November, 2024, I filed Plaintiff's Opposition to
Defendants' Motion to Exclude the Opinions of Peter Schulman, M.D. on Standard of Care and
Causation and Order via ECF thereby effectuating service upon all counsel of record.

/s/ Governor Jackson, III