**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

| | |
|---|---|
| **SHANA HARGROVE** | |
| PLAINTIFF | |
| VS- | Civil Case No.: 1:23-CV-03381-RJL |
| **MEDSTAR WASHINGTON HOSPITAL, CENTER, ET AL** | |
| DEFENDANT | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

Plaintiff Shana Hargrove, on behalf of Kevin Welch, by and through her undersigned attorneys Governor Jackson, III of the Law Office of Governor Jackson, III, L.L.C., and Kim Parker of the Law Office of Kim Parker, P.A. hereby files this Opposition to Defendants' Motion for Summary Judgment and in furtherance of her Opposition states as follows:

***Statement of Material Facts***

On June 14, 2022, Mr. Welch underwent an operation which included:(i) Type A aortic dissection repair, (ii) hemi-arch replacement, (iii) ascending aorta replacement, (iv) aortic valve resuspension, (v) reconstruction of sinotubular junction, (vi) circulatory arrest with retrograde cerebral perfusion (RCP). To be clear, according to the operative note the procedure was performed without any complication. Specifically, the operative note for the Type A aortic dissection repair of Mr. Welch performed by Dr. Alassar reads, in relevant part, as follows:

1

"PREOP DIAGNOSIS:          Acute Type A Dissection
POSTOP DIAGNOSIS:         Same
SPECIMENS REMOVED:    Ascending aorta
URINE OUTPUT/IV FLUIDS/ESTIMATED BLOOD LOSS: Per anesthesia record
COMPLICATIONS:            None."
*See Exhibit 1* [Operative Note of Aiman Alassar, M.D. dated June 14, 2022]

Following the procedure, Plaintiff was intubated and transferred to the Intensive Care Unit (ICU) in critical but stable condition. *See* First Amended Complaint at para. 16.

While in ICU, Mr. Welch was under the care and supervision of ICU attending physician Maxwell Hockstein, M.D., critical care physician Stephen M. Luczycki, M.D., and surgical ICU rotating resident Kaitlyn Marie Dunphy, M.D., all of whom were acting in their capacity as agents, servants, and employees of healthcare provider MedStar. *Id* at para. 17. During the care and treatment of Plaintiff Welch, Dr. Dunphy, as a resident, was subject to the District of Columbia Municipal Regulations §4611.7(f)(1)-(2) which requires that a postgraduate physician be supervised by a licensed physician who is a member of the medical staff of the medical institution or medical facility through which the clinical training program takes place, and approved by the clinical training program to be a supervising physician. *See* 17 DCMR §4611.7(f)(1)-(2). Defendant Dunphy testified:

> "Q: As a third year resident in June of 2022, how were you assigned to patients in the ICU at Medstar?
> A: Essentially, the ICU team, there's, like, whatever number of patients, they split them amongst the residents and the physician assistants, and then we were all overseen by the attending physicians for that team."
>                    *********************************************
> "Q: Okay. For the treatment for which you were involved for Kevin Welch, would Dr. Luczycki have been the attending physician responsible for your team?
> A: Yes."
> *See Exhibit 2* [Depo. Tr. of Kaitlyn Dunphy, M.D. at p 8-9]

Defendant Dunphy further explained her lack of autonomy from the attending physician as follows:

2

> "Q: So can you explain for the members of the jury who may not be familiar with residency in terms of how much autonomy, if any, you would've been given for Kevin Welch specifically is who I'm asking, given that you had a supervising attending physician? How would that work in terms of decision-making regarding drafting or coming up with a treatment plan or coming up with an assessment? How much autonomy or leeway would you have been given as a resident?
> A: In the ICU, it's very limited because we are- it's considered an off service rotation, so essentially, it's not your main specialty. So I would examine the patients and report those findings to the attending. And then you can make plans, but you cannot– basically, I couldn't do anything without it being cleared by the attending." *Id.* at p. 10-11.

Plaintiff's expert Dr. Schulman testified that this group of physicians led by attending intensivist Dr. Luczycki was the ICU team, including resident Dr. Dunphy, that breached the standard of care in this case. He opined:

> "Q: That sounds, yeah, I think you're saying it right.
> A: I do agree that Dr. Luczycki was the attending intensivist in charge of the ICU team. But I do– I– my opinion is, collectively, the ICU team breached the standard of care. Dr. Dunphy was part of that ICU team. So how you hash out what her, you know, responsibility was, specifically, you know, I don't — I don't know that I have a good answer for that. But she in my mind was part of the team that breached the standard of care." *See Exhibit 3* [Depo. Tr. of Peter Schulman, M.D. at p. 59]

On June 17, 2022, a neurology consultation was performed by Robert Cai, M.D. due to Mr. Welch exhibiting severe bi-lateral lower extremity weakness (the left leg being weaker than the right leg). During the examination, Mr. Welch had the following blood pressure readings: 135/64; 144/58 (Line); 145/73 (A-Line 2). According to the consultation note, the etiology of the bi-lateral lower extremity weakness was "a higher c/f/ thoracic (watershed region) infarct; medium c/f ACA infarct; lower c/f cervical infarct." Based on the consultation, the recommendations given were as follows: "order MRI cervical and thoracic spine without contrast w/ include DWI in comments, agree w/ CTH w/o contrast, if CTH shows signs of infarct such as

hypodensity, then order MRI brain w/o contrast, continue ICU care." *See* First Amended

Complaint at para. 19.

Despite Mr. Welch's clinical presentation of bi-lateral lower extremity weakness on this

critical date, Defendant Dr. Luczycki testified as to his ignorance of any clinical or diagnostic

procedures - including any of the interventions opined about by Plaintiff's experts - that could

have been performed to address Mr. Welch's lower extremity weakness as he stated:

> "Q:After this consultation with neurology, were you aware, as the attending
> physician, of any clinical or diagnostic procedures that could have been
> performed to address Kevin's — Mr. Welch's lower extremity weakness, given
> that the MRI had not been performed on this day?
> MS. STURTZ: Objection to form and foundation. And I assume you mean
> above and beyond what they were already doing?
> BY MR. JACKSON:
> Q: Yes. Was there any other clinical diagnostic– or diagnostic procedure
> other than what was being documented as being done in the record that could
> have been done to address Mr. Welch's lower extremity weakness?
> MS. STURTZ: Same objection. But you can answer if you're able.
> THE WITNESS: There's a broad differential for that weakness. So other
> studies that could have been done– okay. Potentially the patient did have— I can't
> really think of any at the moment."
> *See Exhibit 4* [Depo. Tr. of Stephen Luczycki, M.D. at p.40-41]

Defendant Dr. Dunphy, who was a resident at the time of Mr. Welch's hospitalization, did not act

independently of Dr. Luczycki in this regard as Dr. Dunphy was under Dr. Luczycki's

supervision as he testified:

> "Q: So my direct question is, would you have then [been] considered her
> supervising physician for purposes of any treatment she provided to Mr. Welch?
> A: For the ICU rotation, yes ." *Id*. at p. 11.

Importantly, Dr. Schulman testified that there was no documented evidence of the attending

physicians, neither Defendant Luczycki or Defendant Dunphy, ever discussing with the treating

cardiothoracic surgeon Dr. Alassar, the concerning nature of Mr. Welch's focal deficits (i.e.

inability to move his extremities) and his fragile susceptibility to suffering a stroke or spinal cord

infarct. Dr. Schulman opined:

> "Q: Was it reasonable and appropriate for her to discuss those findings with the
> attending physician and with the surgeon?
> A: Well, I don't know that she did do that. It would have been the right thing to
> do, to discuss those findings- because they were very critical— with the attending
> and with the surgeon. But there isn't really any evidence that she did do that, as
> far as I recall.
> Q: Did you see that the note of June 17th includes information in the note written
> by both Dr. Dunphy and Dr. Luczycki?
> A: Yes. But I don't see anything about the surgeon.
> Q: Did you not notice in the medical records when it says D/W, Dr. Alassar?
> A: I don't see— what I believe you're asking is whether Dr. Dunphy, the resident,
> specifically had a discussion or notified Dr. Luczycki and Dr. Alassar, who I
> believe was the cardiac surgeon, that there were new very concerning focal
> deficits. I don't— I don't recall seeing that specific language in the record."
> ********************************
> "Q:Okay. Do you agree that those notes reflect that the surgeon was involved with
> the care plan at MedStar Washington Hospital Center when Mr. Welch was in the
> ICU, correct?
> A: No, I don't agree."
> ********************************
> "Q: Because these discussions don't get documented in full, correct?
> A: It depends on —--
>      MR. JACKSON: Objection. You may respond.
>      THE WITNESS: It depends on the nature of the problem and how serious
> it is.
>      MS. STURTZ: Okay,
> A: I mean, what I can tell you is, if– if I consulted my– the cardiac surgeon who I
> worked with– because I was concerned that the patient had had a stroke and/or
> spinal cord infarct— I would more specifically state that in the note. And I would
> more specifically outline what our treatment plan was going to be; and that that
> treatment plan —--specifically for that problem— would be noted in the chart, and
> it would be noted that the surgeon agreed with that, et cetera. Moreover, I would
> say more often than not in a situation like this, our cardiac surgeons actually,
> independently, write notes confirming that they've been involved in the care of
> the patient in the ICU. And I didn't see any notes from Dr. Alassar specifically
> that he, or anyone from his team, wrote himself. So I really can't, you know,
> speculate about what "discussed with Dr. Alassar" specifically means."

*See Exhibit 3* at p. 63-64; 67; 69-70.

Defendant Dunphy confirmed that she did not recall any specific conversation with Dr. Alassar or Dr. Luczycki about placement of a lumbar drain in light of Mr. Welch's onset of lower left extremity weakness or changing Mr. Welch's targeted blood pressure goals as she testified:

> "Q: Do you recall any specific conversation with Dr. Alassar or Dr. Luczycki about
>
> the performance of a placement of a lumbar drain in Mr. Welch prior to the performance of an MRI to address his new onset of lower left extremity weakness?
> A: No.
> Q: Do you recall any conversation with Dr. Luczycki or Dr. Alassar prior to the consult with neurology and prior to the performance of the MRI about changing the SBP goal of less than 130 for Mr. Welch to address his new onset of lower left extremity weakness?
> A: I– I don't recall any discussion of changing the blood pressure goals prior to the neurology consult." *See Exhibit 2* at p. 28-29.

On June 18, 2022, Dr. Luczycki charted in the critical care progress note "MRI not done for safety reasons- I think this can be deferred for now with much improved exam". Critically, however, according to the Neurology Progress Note for this date, Mr. Welch had a blood pressure reading of 156/77 and was exhibiting bilateral lower extremity weakness, the etiology of which was charted as "concern for spinal cord infarct involving thoracic spine" by the treating neurologist. *See First Amended Complaint* at para. 20. Even still, Dr. Luczycki did not utilize any of the interventions opined about by Plaintiff's experts that could have been performed to address Mr. Welch's lower extremity weakness believing that they were not clinically indicated as he stated:

> "Q:But with respect to the CSF procedure we had discussed before, is it your answer that on this date, 6-18, Mr. Welch would not have been an appropriate candidate for the same reasons you had discussed before in your prior answer?
> A: The usual practice would be to have a discussion, if - if we thought we would consider that therapy. Based on the kind of surgery where the aortic repair was,

we would discuss it with the, again, the cardiac surgeon and the neurologist, looking at the risks and benefits of that procedure, potential injury during that procedure, to spinal cord is a possibility and— and bleeding. And so we would weigh those risks and benefits before doing that. But in– again, in this case, typically for a Type-A dissection, it's — that therapy would not be indicated." *See Exhibit 4* at 46-47.

On June 19, 2022, Dr. Luczycki charted in the critical care progress note "MRI not done for

safety reasons- I think this can be deferred for now with much improved exam". *See First*

*Amended Complaint* at para. 21. Mr. Welch was also examined by Defendant Hockstein, the

Critical Care Supervising Physician, who noted in relevant part:

"Neuro: Encephalopathic. RASS Score: -1, CAM-ICU Result: Positive. Knows his name, he is unsure of his location, did not know the identity of his cousin at bedside today. Analgosedation is being accomplished with fenanyl PCA (transition to PO oxycodone), lidocaine patches. On no sedation. LLE remains ⅕ strength. RLE ⅘. MRI is pending, ordered for today. OOBC." *See First Amended Complaint* at para. 21.

On June 20, 2022, Defendant Dr. Hockstein charted the identical aforementioned (*see*

para. 19) notation in Mr. Welch's Critical Care Progress Note. *See First Amended Complaint* at

para. 22.

Defendant Dr. Hockstein, despite being familiar with the positive effects of cerebral fluid

drainage following an aortic dissection, failed to order any such same or similar appropriate

interventions as he testified:

"Q: Based on your education, training, and experience, are you familiar with the process of cerebral fluid drainage?
A: Yes.
Q: How are you familiar with that?
A: It – it is done after certain types of aortic dissection repairs, in the postoperative period to- to prevent or to mitigate the effects of spinal cord swelling."
         ********************************
"Q: On this date, 6-20, were you aware of any clinical or diagnostic procedure that could have been performed to address Mr. Welch's lower extremity paresis?
A: No.

*See Exhibit 5* [Depo. Tr. of Maxwell A. Hockstein, M.D. at p. 15; 35-36]

On June 21, 2022, Defendant Dr. Hockstein charted "Blood pressure is under better control.

Awaiting MRI to aid in diagnosis of LLE paresis, through, anticipate spinal cord trespass.

Approaching floor readiness." *See First Amended Complaint* at para. 23. Defendant Dr.

Hockstein testified:

> "Q: On 6-21-2022, were you aware of any clinical or diagnostic procedure that
> could have been performed to address Mr. Welch's lower left extremity
> weakness?
> A: Can you clarify when you say address?
> ***Q: According to the attestation that I just read, it stated that there was a
> diagnosis***
> ***of LLE paresis and that you were awaiting the MRI to aid in that diagnosis. So
> my specific question is, was there anything that you were aware of, clinically or
> diagnostically, that could have been done to improve his LLE paresis?***
> ***A: Not to my knowledge."***
> *See Exhibit 5* at p. 39 (emphasis added).

Defendant Dr. Hockstein was, in fact, completely unaware of the stroke which was localized to

Mr. Welch's spinal cord at the time that he was providing care and treatment to Mr. Welch while

the MRI was pending. He testified:

> "Okay. If you go to Page 307, and I'm referring to the attestation section of the
> progress note authored by you on 6-21-202. And on the fourth sentence in it states
> "awaiting MRI—MRI to aid in diagnosis of LLE paresis, though anticipate spinal
> cord trespass." What was the basis for your anticipation of spinal cord trespass?
> Well, let me back up. Can you define spinal cord trespass as referred to in this
> context?
> A: Spinal cord pathology.
> Q: Generally? When you say spinal cord pathology, what– you– you're just
> referring to the area of the spinal cord?
> A: Correct. A disease that localizes to the spinal cord.
> ***Q: Okay. Was there a particular disease that you felt was localized to Mr.
> Welch's spinal cord at the time that you made this note of spinal cord trespass?***
> ***A: I don't recall.***
> ***Q: Was there any particular level of the spinal cord at which you thought the —
> the disease state was occurring based on this note in reference to Mr. Welch's
> condition?***
> ***A: I don't recall.***
> ***Q: Do you know why the MRI was still pending on this date, June 21st, 2022?***

*A: I don't recall.*" *Id*. at p. 37-38 (emphasis added).

Although the Defendant physicians documented that an MRI could not be performed because of the presence of pacing wires inserted into Mr. Welch, these wires could have been easily removed as Dr. Schulman testified:

> "Q: Do you know whether an MRI can be performed when pacing wires are still in place?
> A: It cannot, but the pacing wires could have, in this case, could have been easily removed prior to June 20th, which would have allowed for the MRI."
> ********************************
> "Q: Do you know, from your review of the medical records, whether there was a medical concern that led the doctors to keep the pacing wires in place until June 20th?
> A: I didn't appreciate any, any specific medical concern. The reason we keep pacing wires in place is, when patients are requiring pacing, or are at high risk for requiring pacing. And I did not see any specific necessity or indication in this case that would have required them to keep the pacing wires in until postop day six, June 20th. Now, in a normal patient who doesn't have, you know, lower extremity paralysis, you might decide the benefit of keeping the pacing wires in just in case it makes sense.
>> But, in a case where you're worried that somebody has a spinal cord infract– and is going to be paralyzed and doesn't need pacing— the risk-benefit discussion, more likely than not, strongly favors removing the pacing wires earlier so that you can get an MRI."
> *See Exhibit 3* [Depo. Tr. of Peter Schulman, M.D. at p. 126-128]

During this critical time of Mr. Welch's hospitalization in the ICU under the care of the Defendants, there is no evidence that they took into account the possibility that Mr. Welch had a spinal cord infarct despite his clinical presentation as Dr. Schulman testified:

> "Q: In making those considerations, they needed to include concerns about– well, let me ask you. Did they have issues with him having hypertension following the surgery while he was in the ICU?
> A: They were– it appears from the record that they were consistently making a concerted and ongoing effort to lower Mr. Welch's blood pressure.
> Q: Is that because his blood pressure was at levels that were above the goal they set?

A: They were above the goal for a sort of– a patient who has had a Type A dissection, but has not had a spinal cord infarct. They were– there's no evidence in the record that that they took into account the possibility that Mr. Welch had had a spinal cord infarct, in terms of the blood pressure goals they elected to set." *Id* at p. 48-49

Dr. Schulman confirmed that Mr. Welch's inability to move his legs during this time was the focus of his review of the cardiac care management given by the Defendants as he testified:

"Q:So you didn't really look specifically at what cardiac care management was being provided for Mr. Welch on the June 17th and 18th date that you identify in your report?
A: Of course, I looked, I looked very closely at that, but whether— what his temperature was or was not, was really superfluous and not pertinent to the fact that he couldn't move his legs. And the fact that he couldn't move his legs was my main focus." *Id*. at 113-114.

Dr. Schulman testified as to the importance of the failure of the Defendants to obtain a head CT of Mr. Welch on June 17th, as he opined:

"Q:--- what difference did the day make?
A: Maybe it would have pressed them to even more critically think about the fact that he had a– likely had a spinal cord infarct. And maybe they would have done some things on the 17th to manage that. So, in other words, the head CT showed no acute intracranial abnormality. That doesn't necessarily mean that there's no— not— not going to be a stroke in the brain that doesn't eventually materialize. But it tells you that there wasn't like a huge, immediate, devastating stroke that can explain why he can't move his legs; and, therefore, maybe it makes you think that he can't move his legs because there's something wrong with his spine.
Q: Okay.
A: So there still would have been some utility and importance to getting the head CT on June 17th, and that's why, in these situations, we always immediately get a head CT. That's like the first thing that you do when you find that someone has focal neurologic deficits in the ICU." *Id*. at 154-155.

On June 22, 2022, an MRI of the brain without contrast and an MRI of the cervical spine without contrast were finally performed on Mr. Welch. The indication for the MRI of the brain

was noted as "stroke, TAAD repair" with the comparison study being the CT performed on June

18, 2022. The findings of the MRI of the brain read as follows:

> "The examination is limited by motion artifact. The ventricles and sulci are appropriate for patient's age. DWI hyperintensities with low signal intensity on the ADC maps are present in the bilateral cerebellum and cerebral hemispheres with bilateral basal ganglia predominance. There is no midline shift. No microhermmorhages are identified. The midline structures are within normal limit. The mastoid air cells and paranasal sinuses are unremarkable. *See First Amended Complaint* at para. 24.

The impression read as follows: "Limited due to motion artifact. Recent bilateral

cerebellar and cerebral infarcts with bilateral basal ganglia predominance which is consistent

with cardioembolic etiology and hypoxic anoxic event. *Id.* at para. 25.

The indication for the MRI of the cervical spine was noted as "left lower extremity

weakness, TAAD repair" and the addendum to the final report for this MRI stated "Upon further

review with Dr. Barry, there is DWI hyperintensity of the cord at the level of T5 consistent with

cord infarct. *Id.* at para. 26.

On June 22, 2022, the stroke team was consulted. On June 23, Mr. Welch's physical

condition was noted as follows:

> "Eyes closed, somnolent. Purposeful, strong movements with BUE, intermittently following commands. Answering questions intermittently. Has been intermittently alert and interactive throughout the morning before becoming somnolent again." *Id.* at para. 27.

The stroke team noted a hypoxic-ischemic injury of basal ganglia and a stroke in the

multiple vascular territories related to dissection, and further recommended obtaining physical

therapy and occupational therapy when able. According to Mr. Welch's progress notes, at no time

prior to June 21, 2022 were any actions taken to increase Mr. Welch's blood pressure to mitigate

the risk of neurological insult, nor was there any consideration by the Defendants prior to June

22, 2022 of the placement of a lumbar drain to mitigate the risk of neurological insult. *Id.* at para. 28.

Contrary to Defendant's representation, Mr. Welch currently suffers from a host of physical and cognitive disabilities as a result of experiencing a stroke, specifically concerns of falling while ambulating, bouts of left side weakness, difficulty maintaining a normal gait, and difficulty completing household chores, as he testified:

> "Q: Okay. Can you explain– do you have difficulty going down the stairs?
> A: Yes, going down the stairs.
> **************************************
> "Q;Okay. So you've– okay. Do you believe you would be able to live by yourself?
> A: No.
> Q: No. Do you believe that because you wouldn't feel comfortable with that or has
>
> a doctor told you that?
> A: I wouldn't feel comfortable with that.
> Q: What are your concerns about living with yourself?
> A: Just in case I fall ro something.
> Q: In case you fall. Have you fallen?
> A: Yes, I've fallen.
> Q: How many time have you fallen?
> A: Twice.
> Q: Both– I assume both since the occurrence giving rise to this lawsuit?
> A: Yes.
> Q: Okay. When was the most recent fall?
> A: I can't remember.
> Q: Okay. And did you report those falls to your medical providers?
> A: Yes."
> **************************************
> "Q: And do you plan on applying for disability?
> A: Yes.
> Q: Do you view yourself as disabled?
> A: Yes.
> Q: Do you view yourself as totally and permanently disabled?
> A: Yes."
> **************************************
> "Q: Can you please list your current health problems?
> MR. JACKSON: Objection as to form. You may respond.
> A: I have vision problems. My vision goes blurry from time to time.
> MR. STURTZ: I'm sorry.
> A: I have, like, a weakness on my left side of my body. I have, like, just I'm out of

breath a lot and that's it."
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: And you also said you have weakness on your left side. Can you describe that a little bit more for me?
A: Yea, so when I do something that's physical, my left side just gets weak.
Q: Okay. And what do you mean by physical?
A: Like walking up and down the steps.
Q: So it doesn't necessarily have to be a strenuous activity, just any physical activity triggers it?
A: Yes."
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Are there specific activities you feel like you're no longer able to do?
A: I can't do martial arts anymore.
Q: Can you tell me about your participation in martial arts before–before the occurrence giving rise to this case?
A: Yeah, I used to teach martial arts twice a week at a community center."
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Any other activities you're no longer able to do?
A: I can't bowl anymore.
Q: Can't bowl. Okay. Can you describe your bowling before the occurrence giving—-
A: My gait won't allow me to walk up to the lane normally and throw the ball.
Q: Okay.
A: And I can't lift a 15 pound ball anymore.
Q: Any other activities you can't do?
A: Like, walk around the lake at Costco Park.
Q: Is that a park near your house?
A: Yes.
Q: Are you able to drive?
A: No.
Q: Has a doctor told you or a medical professional told you— advised you not to drive or do you just not feel comfortable?
A: My medical advisor advised me not to drive."
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: You're not able to play video games?
A: No, not really.
Q: Why is that?
A: I can't look at it and work the buttons anymore.
Q: It's a coordination?
A: Coordination.
Q: Hand-eye coordination. Do you have any problems doing chores?
A: Sometimes.
Q: Sometimes. Which specific chores do you struggle with?
A: Like, washing the dishes, laundry, cleaning the bathrooms.
Q: Why do you have difficulties? If you can just go through those one by one and explain why you struggle to do those?

A: So washing the dishes is picking up the pots and the pans. The laundry, sometimes with the laundry basket it's too heavy and then cleaning the bathrooms is bending down.

Q: Okay. Have you— I'm sorry. Excuse me. Are there any struggles with your social life?

A: Yes.

Q: Can you describe those for me?

A: So the lack of communication is a big one, like, I can't really focus in on what people are saying, it's difficult.

Q: And that wasn't a problem before the—

A: No."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Are you doing anything for purposes of physical rehabilitation?

A: Just the workouts I do with my nephew at home.

Q: Okay. Is that– are those workouts that are being recommended to you by a health care provider?

A: Yes.

Q: Which provider is recommending those?

A: My physical therapists."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: Can you describe those workouts for me; what they usually entail?

A: Some leg exercises and then we walk on the treadmill for 15 minutes.

Q: Okay. So sorry if you already said this, how many days a week do you do those workouts?

A: Like three days a week.

Q: How long do they typically last for?

A: About half an hour."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: You mentioned some difficulties with doing household daily chores. You mentioned with doing the dishes you have difficulty with the pots and pans?

A: Uh-huh.

Q: Can you describe why that's difficult; is it too heavy or?

A: It's too heavy and my hands aren't coordinated enough."

*See Exhibit 6* [Depo. Tr. Kevin Welch at p. 9-10; 27; 31-32; 35-37; 39-40; 51-52; 72]

On August 19, 2024, Mr. Welch's treating healthcare provider, Richard Zorowitz, M.D.,

opined as follows:

"To Whom It May Concern:
This patient was seen today at MedStar NRN Physiatry at Irving St Physician Center.

I am writing this letter on behalf of Kevin Welch (03/14/1980), who is a 44 year

old right-handed African-American male, with history of asthma, COVID-19 (05.2022), and type B aortic dissection, who suffered bilateral cerebellar and cerebral strokes and ischemic myelopathy status-post type B aortic dissection repair, Hemi arch replacement, ascending aorta replacement, aortic valve suspension, and reconstruction of sinotubular junction 06/14/2022. This letter medically certifies that Mr. Welch is permanently disabled as a result of his condition.

Please do not hesitate to contact me with any questions or concerns: 202-877-1765.

Sincerely [signed],
Richard Zorowitz, M.D." *See Exhibit 7* [Letter from Richard Zorowitz, M.D. to Kevin Welch dated August 19, 2024]

Mr. Welch's neuropsychologist, Dr. Gorter, diagnosed him with a cognitive disorder stemming from the cerebral strokes caused not by the Type A dissection and repair (i.e. recall Mr. Welch's cardiothoracic surgeon Dr. Alassar's note of "Complication: None"), but rather by the mismanagement of the postoperative care rendered by the Defendants in this case. Based on Mr. Welch's permanently disabled condition, he will need appropriate medical care and treatment for the duration of his life according to Richard Kaplan, M.D. *See Plaintiff's Expert Witness Designation.*

### *Legal Standard*

The Court will grant a motion for summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits or declarations show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Factual assertions in the moving party's affidavits or declarations may be accepted as true unless the opposing party submits its own affidavits or declarations or documentary evidence to the contrary. Neal v. Kelly, 963 F.2d 453, 456 (D.C.Cir.1992).

Under District of Columbia law, "[i]n a negligence action predicated on medical malpractice, the plaintiff must carry a tripartite burden, and establish: (1) the applicable standard of care; (2) a deviation from that standard by the defendant; and (3) a causal relationship between that deviation and the plaintiff's injury." Washington v. Wash. Hosp. Ctr., 579 A.2d 177, 181 (D.C. 1990) (citations omitted). "Expert testimony is required to prove all three of the required elements, including causation, except where the proof is so obvious as to lie within the ken of the average lay juror." Providence Hosp., Inc. v. Willis, 103 A.3d 533, 538-39 (D.C. 2014).

In a medical malpractice action, the plaintiff must prove the applicable standard of care, deviation from that standard and a causal relationship between the deviation and the injury. *See, e.g.,* Washington v. Washington Hosp. Ctr., 579 A.2d 177, 181 (D.C. 1990). In this jurisdiction, the applicable standard is a national standard, not just a local custom. *See id.* (citing Morrison v. MacNamara, 407 A.2d 555, 565 (D.C.1979)). In order to establish a national standard, "the plaintiff must establish through expert testimony the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." Meek v. Shepard, 484 A.2d 579, 581 (D.C.1984). In order to establish proximate cause, "[t]he expert need only state an opinion, based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of the plaintiff's injuries." Psychiatric Inst. of Washington v. Allen, 509 A.2d 619, 624 (D.C.1986); Grant v. American Nat'l Red Cross, 745 A.2d 316, 319 (D.C. 2000).

**Legal Analysis**

**A. A genuine issue of material fact exists with respect to the breach of the standard of care by Defendant Drs. Hockstein, Luczycki , and Dunphy.**

Given Mr. Welch's clinical presentation involving the onset of lower extremity weakness, the standard of care required that these Defendants acutely and critically manage Mr. Welch's

blood pressure and account for the possibility of the development of a spinal cord infarct. Dr.

Schulman testified:

> "Q: So you're making judgment decisions all the time when you're involved in critical care of a patient following a Type A aortic dissection, correct?
> A: Part of the job of the intensivist is to make determinations for that specific patient
> based on the specific circumstances. So it would have been incumbent on the providers- the ICU providers in this case– to think very critically about the blood pressure management, in light of the extenuating circumstances that were going on with Mr. Welch after his operation." *See Exhibit 3* at p. 49.

Dr. Schulman also pointedly testified that the standard of care in this case required the Defendant

health care providers to contemplate specific interventions to lessen the risk of damage from Mr.

Welch's spinal cord infarct including placing a lumbar drain, raising his blood pressure, giving a

blood transfusion, engaging in volume loading, and starting a naloxone infusion. *Id*. at 89.

Dr. Schulman discussed why, in the capacity of a critical care doctor as the individual

Defendants in this case, it was important to monitor the change in severity of Mr. Welch's lower

extremity weakness given his presentation in the ICU. After being read to interpret a phrase from

Mr. Welch's record suggesting that Mr. Welch did not have any limb weakness in the ICU, he

testified:

> "Q: As a critical care doctor, what does the statement "no paresthesia and no limb weakness" mean to you?
> A: It means the patient was not having any, according to that person who did that exam at that time. Granted, these things are dynamic.
> So, on person can go in, you know, one minute and do an exam and then half an hour or an hour later they can go in and find different deficits.
> And that's why, you know, vigilant critical care is incredibly important for these patients. These patients are some of the, you know, highest risk and sickest patients we encounter in the cardiovascular ICY; and, therefore, vigilance and attention to detail and jumping on top of problems when you see them is very important.
> So, we do, we typically do neurologic assessments every hour. And sometimes you find— you go in and you might find that somebody found an exam and it was normal.
> And then an hour later or two hours later somebody found that the exam

did

Was not normal. There was a day when the critical care person, at the time they

it, said, "you know, things are better," but, on the exact same day, the neurologist came in and found that there were still serious neurologic deficits.

Q: Did you see in the records in this case, where there was variation in terms of —

A: Yes.

Q: — the lower extremity?

A: I did. I did, but I saw consistently every day that some folks, some providers, were still identifying serious neurologic deficits, so, it's not—

It's not unusual to have a waxing and waning neurologic exam. But this is why, in the ICU, it's critical to continue to make ongoing and serial assessments and to interface closely with the neurology team and the surgeons to determine that, you know, you might have seen that things looked better at 9:00 o'clock but then the neurology team comes by at noon and sees that there's still a problem.

Q: Okay.

A: And you have to act on that." *Id.* at 121-123.

Dr. Schulman also opined about determining how to set an appropriate MAP goal for a

patient in ICU in light of risk factors to patients such as Mr. Welch, as Dr. Schulman testified:

an

"Q: Okay. So, when your- patients like this first comes into the ICU, and you set

initial blood pressure goal of less than 110, do you set a corresponding MAP goal of over 60?

A: Sure.

Q: Or what goal do you set?

A: Yes. But the primary objective– in the first number of hours after the surgery,

if

there aren't other extraneous factors– is to keep the systolic blood pressure less than 110; because, in the first few hours, first let's say, you know, six hours, 12 hours, 24 hours, the surgeons are especially concerned about bleeding.

As time elapses, after they come out of surgery, so now you're into day

two

and day three, that concern about acute bleeding is much less.

So, we are able to liberalize the blood pressure goal, and let it go up.

And then, ultimately, like in this case, on postop day three and four- if there's a concern that somebody can't move their legs and they aren't bleeding– you say, the risk of, you know, high blood pressure, allowing the blood pressure to be high, the benefit of allowing the high– the blood pressure to be high– vastly outweighs the risk.

Q: Okay. And you believe there would be a benefit to have the MAP reaching 90 or higher?

A: In a patient who you're worried about can't move their legs and has acute lower extremity ischemia and/or paralysis, yes." *Id.* at 144-145.

In order to establish a national standard, "the plaintiff must establish through expert testimony the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." Meek v. Shepard, 484 A.2d 579, 581 (D.C.1984). Dr. Schulman professed his understanding of the definition of the "standard of care" consistent with the interpretation of this Court when he stated:

> "Q: Let me ask you before you add, Doctor, can you define for me, do you know what the definition of "standard of care" is?
> A: What a reasonably prudent and careful practitioner would do under the same circumstance." *See Exhibit 2* at 88.

With respect to individual breaches of the standard of care assignable to each of the individually named Defendants, Dr. Schulman testified that the entire ICU team assigned to Mr. Welch's care—*including each of the named Defendants*-breached the standard of care. He opined:

> "Q: That sounds, yeah, I think you're saying it right.
> A: ***I do agree that Dr. Luczycki was the attending intensivist in charge of the ICU team. But I do– I– my opinion is, collectively, the ICU team breached the standard of care.*** Dr. Dunphy was part of that ICU team. So how you hash out what her, you know, responsibility was, specifically, you know, I don't — I don't know that I have a good answer for that. But she in my mind was part of the team that breached the standard of care."
> *******************************************
> "MS. STURTZ: How exactly did Dr. Dunphy— who was a resident in training and only involved in the care on June 17th— breach the standard of care, in your opinion to a reasonable degree of probability?
> A: I would say the same way that Dr. Luczycki breached the standard of care.
> Q: So she breached the standard of care in failing to obtain a head CT on June 17th, correct?
> A: Correct.
> Q: And she breached the standard of care in failing to consider targeting a higher blood pressure and/or lumbar drain placement, and//or discussing whether a higher blood pressure and/or lumbar drain placement was warranted with a neurologist and cardiothoracic surgeon on June 17th, correct?
> A: I would also add to that, but that's correct.

Q: Those are the only breaches in the standard of care in terms of Dr. Dunphy that you identified in your report, correct?

A: Yeah. But at the time I didn't realize that the hematocrit was 21. So I would add to that that they breached the standard of care by not transfusing Mr. Welch's blood– or at least discussing whether a transfusion was warranted— with Dr. Alassar and the neurology team.

Q: DId he have any transfusions during his tenure in the ICU?

A: I don't specifically recall, but when I went through the record after I wrote that report to look at his blood count levels, they seemed to be persistently low. When you have a spinal cord infarct, one of the other interventions that should be considered is to, you know, transfuse blood to raise the hematocrit so that you can increase the perfusion pressure to the spinal cord."

Q: Okay.

A: And that wasn't done."

*******************************************

Q: Is it your understanding that Mr. Welch was not given a transfusion on June 16 or June 17?

A: I don't recall if he was. He may– he may have been given a transfusion, but if– if he was, that was A, before they understood that he had serious neurologic deficits. So it really kind of doesn't — that's immaterial and, therefore, I don't really remember off the top of my head whether he was given a transfusion. And if he was given a transfusion, then it was not sufficient, because on June 17th his hematocrit was still 21, which is way too low for somebody who is having a stroke and a spinal cord infarct.

Q: So it's your understanding that no transfusions were given to him after 3:00 a.m. on June 17th?

A: I certainly didn't see any evidence of that. On June 18th, I wrote down the hemoglobin I found in the chart was 7.5, which is, you know, more or less about the same as 21. It could be 22 or something, but that leads me to believe that there was no transfusion given. If there was a transfusion given, then there wasn't an appropriate response and they should have given more."

*******************************************

"Q: Okay. So, we've outlined the breaches of the standard of care. The one that you've added to your report is the hematocrit on June 17th, and you now want to add another breach in the standard of care, so something the doctors did that was not reasonable? What are you adding now that you believe was not reasonable on June 17th?

A: What I'll tell you is they should have had a discussion and contemplated doing— making interventions to lessen the risk of the — and lessen the damage to Mr. Welch's spinal cord infarct. There are a variety of things that could have been

entertained and done that were not done. Those include placing a lumbar drain, raising the blood pressure, giving a blood transfusion, volume loading, arguably also starting a naloxone infusion."
*See Exhibit 3* at p. 59; 71-72; 73-75; 88-89 (emphasis added0

Based on the identified standards of care applicable in this case and the breaches thereof supported by expert witness testimony and testimony of the named Defendants referenced in the Statement of Facts incorporated herein, a genuine issue of material fact exists with respect to the breach of the standard of care by Defendant Drs. Hockstein, Luczycki , and Dunphy, and therefore Defendants' Motion shall be denied.

**B.  A genuine issue of material fact exists with respect to proximate causation.**

Plaintiff Welch has demonstrated a genuine issue of material fact with respect to proximate causation, primarily through the expert witness testimony of Ahmad Elakil, M.D. Dr. Elakil is the Chief of the Department of Neurosurgery at Insight Hospital and Medical Center in Chicago, Illinois. He received his medical degree from King Saud University, his Master of Business Administration from Cornell University, completed his neurosurgery residency at the University of Calgary, and his Neurosurgical postgraduate training at the University of Miami. He is Board Certified in neurosurgery and licensed in Illinois and Michigan. Dr. Elakil has otherwise taught, worked, and published peer-reviewed literature in the fields of neurology, neurosurgery, and cerebrovascular disease. *See Exhibit 8* [Curriculum Vitae of Dr. Elakil].

Dr. Elakil testified that the identified breach of the standard (i.e the failure to install the lumber drain, etc.) *proximately caused* Mr. Welch to incur permanent neurological deficits which otherwise would not have been sustained but for the negligence of the Defendants, as he testified:

"Q: But you can't state in this case, to a reasonable degree of probability, that the placement of a lumbar drain would have prevented any residual deficit from the spinal cord infarct, correct?
MR. JACKSON: Objection. You may respond.

THE WITNESS: To the degree of medical certainty, more likely than not it would have prevented."
*********************************************
"Q: Okay. I'll see if I can pull it up, but it says– you talk about the delay spanning several days, which was a critical factor—here we go. Moreover, it's more likely than not the failure to implement measures aimed at optimizing the patient's physiological state, such as blood pressure management and installation of a cerebrospinal fluid drain which is widely accepted and straightforward procedure to do, continued to– the exacerbation of patient's deficits and adverse outcome. Is that your opinion?
A: Yes."
*********************************************
"[I]f that lumbar drain and volume resuscitations would have done, he would have improved more than what he is now." *See Exhibit 9* [Depo. Tr. of Ahmad Elakil, M.D. at p. 70-71; 114-115; 118]

Dr. Elakil also testified as to his reliance on his own clinical experience of placing a lumbar drain in a patient after a type A aortic dissection to obtain improvement in the neurological function. He stated:

"Q: And how many times have you placed a lumbar drain in a patient after a type A aortic dissection and surgical repair? Have you ever done that?
A: Yes. We do— we– we do see patients with spinal cord infarction after multiple spinal cord injuries. And those are managed the same way as aortic dissection. That's not. Before I join Insight, I did place one time, I – I think, in– as an attending, and the few times as a resident a drain for a aortic dissection specifically. However, lumbar drain in general- placement of a lumbar drain in general, whether after aortic dissection or no, this is a very common procedure that's done on a weekly basis for neurosurgeons."
*********************************************
"Q: Okay. So one time when you were in Lafayette you placed a lumbar drain in a patient who had suffered a Type A aortic dissection and had surgical repair for that–
A: Correct.
Q: —correct? And was that— what was the — the reason for the placement of the drain?
A: Spinal cord infarction.
Q: And what was the outcome of the — did the patient have any residual neurologic deficits after—
A: Yes. He—
Q: Did the patient survive the surgery and postoperative time period?
A: Yes, he did. And he had a partial improvement, not full improvement; that specific patient. I think he went from power one and two to three or four. I don't remember exactly."

*See Exhibit 9* at p. 79 -82.

Dr. Elakil also relied upon peer-reviewed literature in support of the fact that insertion of a

lumbar drain enhances the spinal cord perfusion and results in at least partial improvement in a

patient's condition, thereby establishing a genuine issue of material fact with respect to

proximate causation in this case. Dr. Elakil testified:

> "Q: Okay.
>  A: And they provided in the references in these articles– two or three articles that I
>
> reviewed earlier, and they– they talk about complete resolution of symptoms. So I
> can't base what would be the outcome on one article that they had partial
> improvement there. There's many—
>  Q: Okay.
>  A: —- in the literature with a complete resolution."
>   *****************************************
> "Q: Okay. What facts are you relying upon to state that, in your opinion, there
> would have been— is it some resolution of his symptoms with a lumbar–
> placement of a lumbar drain?
> A:These articles that I refer to, they guidelines for– for us doctors. Those are articles
>
> that they created. They got all their results from multiple and multiple studies that
> were done.
> Q: Okay.
> A: Those I can provide to you after– after the– I can provide to Mr. Jackson after
> the call, but those articles very clearly mention the benefit of lumbar drainage in
> patients with spinal infarction. And many of these present many cases that shows
> complete resolution of patient symptoms. The main fact that we produce articles
> got their basis on– is based on this simple question: Spinal perfusion pressure is
> equal to mean arterial pressure minus the intraspinal pressure.
>      As much as you can, whenever you decrease the intraspinal pressure by
> draining that fluid, the more– the spinal perfusion of pressure is more, which is
> great. It can— goes through all the tissue in the spinal cord and prevent that
> infarction from happening. But when we do not decrease the intraspinal pressure,
> that means that number of the cerebral perfusion pressure in that equation goes
> low. When it goes low, infarction can happen.
> Q: Okay.
> A: That's the main basis fact; that equation for all these articles."
> *See Exhibit 9* at p. 75-75; 77-78

He also testified as to his knowledge about the specific pathophysiology of Mr. Welch's stroke

and the imaging which he reviewed and relied upon in forming the basis of his opinion regarding

the relationship between Mr. Welch's spinal perfusion pressure, intraspinal pressure, and mean

arterial pressure during the relevant postoperative period. Specifically, he testified:

"Q: Well, what type of stroke did he have on the imaging that you reviewed in the spine?
A: He had infarction due to lower in his spinal perfusion pressure. When you lower the spinal perfusion pressure, the blood that reaches the spinal cord goes very little and that causes the infarction. It's simple equation. Spinal perfusion pressure equal the mean arterial pressure minus the intraspinal pressure.
Q: Right. The– what does cardioembolic etiology mean to you, if anything?
A: It's a stroke that happens because– let's say the heart is pumping very fast and can send clot into the brain.
Q: And you agree that his strokes were– the etiology of his strokes were cardioembolic?
A: I think it's the decrease in his spinal perfusion pressure. And that's what all these articles out there describing.
Q: And what caused the decrease in spinal perfusion pressure?
A: It's increase in his in– he was not managed right because the spinal perfusion of pressure should be always very high. And if the intraspinal pressure is not decreased inserting a drain, the spinal perfusion is low. However, if you insert the drain, the spinal perfusion pressure goes up, and then infarction would have managed, the blood flow would have reached that nerve tissue that's dead.
Q: My question to you is: What cause– You said it was caused by a decrease in spinal perfusion pressure. What causes the decrease in spinal perfusion pressure?
A: Increase in the intraspinal pressure.
Q: And what caused an increase in the intraspinal pressure?
A: And the MAP. And the MAP and– the mean arterial pressure. So what happens is when you try to decrease the patient, let's say, systolic and diastolic blood pressure, that will decrease the MAP. The MAP is the mean arterial pressure. And that will decrease the spinal perfusion pressure.

So there's two– two ways to enhance the spinal perfusion pressure. The first way is by enhancing the MAP, the mean arterial pressure, by allowing him to have higher than normal systolic and diastolic blood pressure.

If you do have higher than the normal systolic and diastolic, you can increase the spinal perfusion pressure.

In that case, though, when the stroke team saw him, they recommended actually decrease the systolic and diastolic, and — instead of allowing a little bit of increase, which would increase the spinal perfusion pressure.

Now, if we can't increase the systolic or the diastolic due to some reason then the only variable here we have as— as his intraspinal pressure, which you need to decrease— decrease it as much you can. How you can do that by inserting a lumbar drain.
*See Exhibit 9* at 92-95.

Dr. Elakil also testified as to the clinical significance of the post-operative care team failing to use volume loading as a particular intervention that, had it been utilized, would have, more likely not, changed the outcome of Mr. Welch's condition. Dr. Elakil testified:

> "Q: Okay. You make reference in your report to — we talked about the lumbar drain. You also make reference to volume loading. What did you mean by volume loading as an intervention?
> A: That's— that's a great question. So remember the equation that I told you about? Spinal perfusion pressure equal mean arterial pressure minus intraspinal pressure. Any way to increase that spinal perfusion pressure will make the best outcome.
> So increasing the volume will increase his systolic blood pressure up; means the MAP will be higher. So volume— inserting lumbar drain, volume raises station, which is what you really want; to increase the perfusion pressure to avoid all the sequences that happened to him. So yes, lumbar drain, volume raises station; those are the main big one.
> Q: And when the – when the stroke team consulted in this case, did they make any recommendations related to volume loading?
> A: No.
> Q: What was– in terms of volume loading, what was being done for Mr. Welch postoperatively?
> A: If I remember correctly, and please excuse me if I don't, I remember they actually asked for lower blood pressure. So less than 130 over 80, which is– goes against the management of spinal cord infarction."
> *See Exhibit 9* at p. 102-103.

Based on Dr. Elakil's testimony and the medical records, peer-reviewed literature, and clinical experience referenced in his aforementioned deposition testimony, a genuine issue of material fact exists with respect to the prima facie element of 'proximate causation', and therefore Defendants' Motion shall be denied.

### C. A genuine issue of material fact exists with respect to the harm to Mr. Welch proximately caused by the breaches of the standard of care by Defendant Drs. Hockstein, Luczycki , and Dunphy.

As a proximate cause of the identified breaches of the standard of care by Defendant Drs. Hockstein, Luczycki, and Dunphy, Mr. Welch sustained non-economic and economic harm, including incurring medical bills reasonably related to the alleged negligence, future lost wages,

physical and cognitive deficits, and the need for future medical care related to the anticipation of these deficits.

Specifically, Mr. Welch currently suffers from a host of physical and cognitive disabilities as a result of experiencing a stroke, specifically concerns of falling while ambulating, bouts of left side weakness, difficulty maintaining a normal gait, and difficulty completing household chores. *See Exhibit 6* at p. 9-10; 27; 31-32; 35-37; 39-40; 51-52; 72. His power of attorney, Shana Hargrove, testified regarding Mr. Welch's limitations. She stated:

> "Q: Okay. Do you feel like it's necessary for you to still be his power of attorney?
> A: Absolutely.
> Q: Why do you say that?
> A: Kevin lacks executive summary- executive functioning, my apologies, to make sure that he's, A, not taken advantage of. I do the majority of the communications with his job. I had to step in on his behalf. His mother passed a year ago, so for any dealings with the estate, I have to step in."
> ***********************************************
> "Q:Can you just elaborate more– a little bit more what your concerns are about Kevin returning to work?
> A: The lack of initiation, the lack of executive functioning. He works for an intelligence agency. I do know that he would always say he messes up, someone could die. I have been told by his medical professionals, and I also believe he is not in position to supervisee a team of employees. When he gets stuck, he does not always initiate asking for a way forward, and at the level that he worked, it's just apparent he would not be able to return to that position."
> *See Exhibit 10* [Depo.Tr. of Shana Hargrove at p.14-15; 25]

Ms. Hargrove's testimony is similar in nature and context to Plaintiff's relevant executed interrogatory answer regarding damages and harm to the Plaintiff which read as follows:

> "INTERROGATORY NO. 14: Provide the details of any physical, mental or emotional pain, physical injury or damage, disfigurement, or other injury, specifying as to each whether it is temporary or permanent, which you claim to have suffered a a result of any alleged negligence on the part of Defendants. Include in your answer the names of all persons who can testify with respect thereto.

**ANSWER: Plaintiff objects to this Request to the extent it is overly broad, or unduly burdensome. Plaintiff further objects on the basis that the request fails to take into account the ongoing nature of discovery and the evolving understanding of the case that may arise as more information becomes available. Subject to and without waiving the foregoing objections, Kevin Welch has suffered severe physical and mental injuries as a direct result of the alleged negligence of the Defendants, MedStar Washington Hospital center, Stephen Matthew Luczycki, MD, Maxwell A. Hockstein, M.D., and Kaitlyn Marie Dunphy, M.D. the injuries encompass but are not limited to paralysis, loss of bodily functions, extreme emotional distress, and mental trauma. The extent and permanence of these injuries are still being evaluated by medical professionals and will be more fully detailed as medical treatment progresses and more information becomes available. Specifically: Anemia of chronic disease (still present), basal ganglia infarction (permanent), Benign hypertension CAD (coronary artery disease)(permanent), CKD (chronic kidney disease) stage 3 (permanent), Depression due to acute stroke (permanent), Dysphagia (temporary), Pain (permanent), Peripheral edema (temporary), Physical deconditioning (permanent), Urinary incontinence (temporary), bowel dysfunction (still present), apathy (permanent), loss of executive functioning (permanent), sadness due to loss of connection with family and friends (permanent) (girlfriend broke up with him because it was too much), left side weakness (permanent), lacks initiation (permanent), chronic fatigue (still present). Persons who can testify to these injuries include but are not limited to Kevin Welch's treating physicians, mental health professionals, family members, and friends who have had direct knowledge of his condition both before and after the incident. Furthermore, the Plaintiff reserves the right to amend or supplement this response as additional information becomes available.**"

*See Exhibit 11* [Plaintiff's Answers to Interrogatories](emphasis in original)

Plaintiff's expert, Roland Hamilton, M.D., a board-certified neurologist and neurohospitalist, testified regarding his experience and the long-term neurological implications of Mr. Welch's spinal cord injury as follows:

"Q: Okay. So can you tell me what your practice involves as a neurohospitalist. A: As a neurohospitalist I see patients that are strictly hospitalized inside the hospital. They can be in the emergency room, in the intensive care unit, on the regular medical floors. The vast majority of my patients have strokes. When it comes to strokes, they can be acute, subacute, chronic treatment management.

And then I see a various array of other neurologic conditions. I'm not sure if you want me to give you an example. Seizures, epilepsy, neuromuscular disorders, altered sensorium, altered mental status, any type of spinal cord weakness related issues, neuropathies."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: And what exactly are Mr. Welch's deficits that you attribute to his aortic dissection and related infarcts?

A: So the deficits I attributed to his infarcts are— starting in the brain. He would have balance issues. He will have long-term cognitive issues. The ability to perform executive functioning. Planning for himself. Caring for himself. When we then look at the spinal cord infarcts, he should have leg weakness, lower extremity weakness."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: (By Ms. Sturtz) Based on the records that you reviewed, was it your expectation that Mr. Welch's lower extremity weakness would improve?

A: No."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"Q: And there at 31, line 21 actually, question:"Can you please list your current health problems?" Over to page 32. "Mr. Jackson: Objection as to form. You may respond." Line 3, answer. "I have vision problems. My vision goes blurry from time to time." "Mr. Sturtz: I'm sorry." Answer: "I have, like , a weakness on my left side of my body. I have, like, just I'm out of breath a lot and that's it." Based on that portion of testimony that I've just read, does that testimony in any way affect one way or another your opinion to a reasonable degree of medical certainty as to the long-term sequelae that you opine Mr. Welch would exhibit as a result of sustaining the infarcts you discuss?

MS. Sturtz: Objection.

THE WITNESS: Yes, it does.

MS. STURTZ: I'm sorry. Objection but you can answer and then go ahead. Sorry.

THE WITNESS: Yes, sir. It supports that he will have long-term sequelae.

Q: (By Mr. Jackson) How does it support it? Can you explain for the court specifically how that testimony supports your opinion to a reasonable degree of medical certainty.

MS. STURTZ: Same objection.

THE WITNESS: SO he states that, "I have vision problems." The vision problems with a certain degree of medical certainty stem from the cerebral, the brain infarcts/strokes. His weakness on the left side of the body stems from a combination of the thoracic, the spinal strokes and possibly even the brain strokes as well."

**********************************

"Q: (By Mr. Jackson) If you look at the first page of Mr. Welch's deposition, you will note that it was taken on Wednesday, April 10, 2024, which is almost about two years out from his hospitalization at MedStar in June of 2022. Given that his testimony about his current difficulties physically and cognitively are occurring based on the date of this deposition in 2024, does the fact that he's having these deficits almost two years from his hospitalization at MedStar affect one way or the other your opinion regarding the long-term sequelae that you have anticipated Mr. Welch to exhibit as a result of the infarcts?

MS. STURTZ: Objection to form, but you can answer.

THE WITNESS: Yes, sir. They support my opinion. It's been two years out. Mr. Welch still demonstrates cognitive disability, physical disability. It's unlikely that he will have any meaningful improvement and that his current physical and cognitive states are permanent for the foreseeable future."

*See Exhibit 12* [Depo. Tr. of Roland Hamilton at p. 16, 34, 36, 50-51, 58-59]

Additionally, Plaintiff's disclosed in their expert witness disclosure the identification and expert report in support of the opinion of Robert N. Carter, MS, CPA/CFF/ABV, CVA, CFE, CEPA who is anticipated that tp testify that the net economic loss to Mr. Welch includes the net present value of lost wages and benefits, the present value of lost household services and the present value of the Life Care Plan delineated under three scenarios in accordance with the Life Care Plan and that relate to the Impairment Based Diagnosis. It is further anticipated that Mr. Carter will testify that the net economic loss to Mr. Welch using scenarios 1, 2, and 3 are $6,328,342, $7,507,533 and $10,831,188, respectively, and that prejudgment interest has been estimated to be $4,351 assuming a trial date of April 1, 2025. *See* Plaintiff's Expert Witness Designation.

Plaintiff's expert Richard Kaplan, M.D., a board-certified physiatrist and certified life-care

planner, further opined regarding Plaintiff's future life care and his needs proximately related to

the negligence alleged herein in the context of Dr. Kaplan's development of a life care plan for

Mr. Welch. Dr. Kaplan testified:

"Q: Do you agree that the goal of a lifecare plan is to provide for reasonable support

for care as it relates to the injury at issue in this case?"
        **************************************

"Q: Okay.
A: So I'm trying to project what's likely to occur over his lifetime.
Q: And to address what?
A: Well, he has— he has apparently cerebellar deficits and perceptual deficits,
which are likely to progress in the future. And as he gets older, he's likely to have
difficulties with balance, with gait, with cognition, which will require evaluation
for safety, and ultimately are likely to need to the — lead to the need for physical
assistance.
        **************************************

"Q: It's not really a standard of care. It's based on his condition and
complications. But how about primary care? Why did you include one primary
care visit per year?
A: Oh, clearly given his spinal cord injury and the strokes, clearly his ongoing
management will be more complicated. And so that is not the only primary care
visit needing. What I'm saying is, I'd apportion that at least one primary care
physician per year will be necessary to manage the cognitive and–and other
neurological complications that he has as a result."
        **************************************

"Q: Okay. Neuropsychological reevaluation, five of those in your plan?
A: Because it's common for– in situations such as this for a cognitive deficit to
worsen– to worsen over time as a person ages and— and therefore input as to how
that impacts his safety and the allowed assistance that he needs will be helpful.
        **************************************

" Okay. And the— what does the home– what will the home health aide be doing?
What types of activities?
A: That depends on the level that we've mentioned there. It could be helping him
so he doesn't fall. It could be helping with bathing, dressing, toileting. It could be
helping him with laundry. It could be helping him with shopping. It could be
helping him to get– to retrieve things from a —from a high shelf. Any basic
activity of daily living or any instrumental activity of daily living."
*See Exhibit 13* [Depo. Tr. of Richard Kaplan at p. 79, 86-87, 88-89, 89-90, 97-98]

Based on the aforementioned expert witness deposition testimony, a genuine issue of material fact exists with respect to the harm to Mr. Welch as a result of the identified breaches of the applicable standards of care, and therefore Defendants' Motion shall be denied.

***Conclusion***

For the reasons stated herein, Plaintiff respectfully requests that this Court deny Defendants' Motion for Summary Judgment.

Respectfully Submitted,

/s/ Kim Parker

_____

Kim Parker, Esquire
D.C. Bar No. 46980
LAW OFFICES OF KIM PARKER, P.A.
2123 Maryland Avenue
Baltimore, Maryland 21218
Office 410-234-2621
Facsimile 443-486-1691
Email: kp@kimparkerlaw.com

Governor E. Jackson, III, Esquire
D.C. Bar No. 1002797
LAW OFFICE OF GOVERNOR JACKSON, III LLC
400 E. Joppa Road, Suite 50
Towson, Maryland 21286
Office (410) 528-5150
Facsimile (410) 528-1055
Email gjackson@governorjacksonlaw.com

COUNSEL FOR PLAINTIFF

CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of December, 2024, I filed Plaintiff's Opposition to Defendants' Motion for Summary Judgment

/s/ Governor Jackson,