

# Transcript of Kaitlyn Marie Dunphy, MD

**Date:** May 23, 2024
**Case:** Hargrove -v- MedStar Washington Hospital, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

-----------------------------x

SHANA HARGROVE,              :

        Plaintiff,           :      Case No.

    vs.                      :      23-CV-03381-RJL

MEDSTAR WASHINGTON HOSPITAL,:

et al.,                      :

        Defendants.          :

-----------------------------x

DEPOSITION OF KAITLYN MARIE DUNPHY, MD

Washington, D.C.

Thursday, May 23, 2024

8:50 AM

Job No.: 538641

Pages: 1 - 35

Recorded By: Konly Harding

---

Deposition of KAITLYN MARIE DUNPHY, MD, held at the offices of:

NELSON MULLINS RILEY & SCARBOROUGH LLP (DC)

101 Constitution Avenue NW, Suite 900

Washington, D.C. 20001

Pursuant to Notice, before Konly Harding, Notary Public in and for the District of Columbia.

---

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

    GOVERNOR E. JACKSON, III, ESQUIRE

    LAW OFFICE OF GOVERNOR E. JACKSON, III, LLC

    400 East Joppa Road, Suite 50

    Towson, MD 21286

    410.528.5150

ON BEHALF OF THE DEFENDANTS:

    DONNA STURTZ, ESQUIRE

    NELSON MULLINS RILEY & SCARBOROUGH LLP

    100 S. Charles Street, Suite 1600

    Baltimore, MD 21201

    443.392.9408

---

C O N T E N T S

EXAMINATION OF KAITLYN MARIE DUNPHY, MD          PAGE

    By Mr. Jackson                                 5

E X H I B I T S

        (None marked.)

5

PROCEEDINGS

Whereupon,

KAITLYN MARIE DUNPHY, MD, being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. JACKSON:

Q   Thank you.  Good morning, Dr. Dunphy.

A   Good morning.

Q   We met informally off the record.  My name is Governor Jackson, III.  I represent the plaintiffs in this matter, Shana Hargrove, who is the power of returning on behalf of Kevin Welch, in a federal lawsuit that's been filed in the United States District Court for the District of Columbia in which you are a named Defendant.  This deposition is my one opportunity to ask you questions related to your treatment of Kevin Welch in June of 2022.  It's my only opportunity to ask you questions about that treatment.  It's not a memory test.  I believe your counsel probably has

6

the whole electronic record.  If you need to refer to anything to answer a question sufficiently, please feel free to do so.  If at any time you don't understand a question that I ask, just let me know that and I'll rephrase it and restate it so long and so many times as necessary for you to understand it.  If at any time you need a break, just let me know, so long as a question is impending, okay?

Have you ever been deposed prior to today?

A   No.

Q   Okay.  Other than speaking with your counsel, which I'm not entitled to know about, did you do anything in particular related to the preparation of your deposition here today?

A   No.  I only read the documents that she sent me.

Q   Okay.  Would those have been the medical records?

A   Yes.

Q   Anything other than the medical records?

7

MS. STURTZ:  Well, that would be privileged, but she hasn't -- she hasn't -- we've obviously had communication, but in terms of -- she has reviewed the medical records focusing on her notes, but nothing else.

BY MR. JACKSON:

Q   Okay.  Have you reviewed any peer reviewed literature in preparation for your deposition today?

A   No.

Q   Do you plan on, as you sit here now, plan on relying on any peer reviewed literature at the trial of this matter in support of any of the treatment that you participated in or recommended for Kevin Welch?

MS. STURTZ:  I'm just going to object because she's not here today as an expert, she's here as a fact and hybrid witness, but without objection, you can answer.

THE WITNESS:  Only if I'm, you know, advised to by my counselor.

BY MR. JACKSON:

8

Q   Okay.  Prior to your treatment of Mr. Welch in June of 2022, you were -- before then you were -- at that time in June of 2022, you were a resident; is that correct?

A   I was a resident at June, 2022, yes.

Q   Okay.  And what was your classification in residency at that time?

A   Can you give me --

MS. STURTZ:  Like, what year --

BY MR. JACKSON:

Q   Yeah.  What year?

MS. STURTZ:  What year of your residency you were in.

THE WITNESS:  A third year resident.

BY MR. JACKSON:

Q   And how long was the program that you were in, the residency program?

A   It's five years.

Q   As a third year resident in June of 2022, how were you assigned to patients in the ICU at MedStar?

A   Essentially, the ICU team, there's,

like, whatever number of patients, they split them amongst the residents and the physician assistants, and then we were all overseen by the attending physician for that team.

Q   Okay.  And was Dr. Luczycki the attending physician for your resident team?

MS. STURTZ:  On particular dates?

THE WITNESS:  Particular dates and times.

BY MR. JACKSON:

Q   Okay.  For the treatment for which you were involved for Kevin Welch, would Dr. Luczycki have been the attending physician responsible for your team?

A   Yes.

Q   For purposes of treatment given to Kevin Welch, so long as you were involved in his treatment, was there any other supervising attending physician for you as a resident?

A   After 4:00 p.m. it switched to the night attending physician.

Q   Do you -- do you recall who that was for Doctor -- for Mr. Welch?

A   No.

Q   Prior to Mr. Welch, had you ever been under the supervision of Dr. Luczycki for an ICU patient?

A   Yes.

Q   Okay.  For any of those patients, prior to Mr. Welch, had any of them been post type A aortic surgical patients?

A   I don't recall.

Q   Okay.  Prior to Mr. Welch, had you ever provided any ICU care for any surgical patients of Dr. Alassar?

A   I'm not 100 percent sure, but I believe so.  I -- I don't know.

Q   Okay.  Do you recall specifically if any of those patients of Dr. Alassar, for which you provided ICU care, had undergone post type aortic surgery?

A   I don't -- I don't recall.

Q   So can you explain for the members of the jury who may not be familiar with residency in terms of how much autonomy, if any, you would've been given for Kevin Welch specifically is who I'm asking, given that you had a supervising attending physician?  How would that work in terms of decision-making regarding drafting or coming up with a treatment plan or coming up with an assessment?  How much autonomy or leeway would you have been given as a resident?

A   In the ICU, it's very limited because we are -- it's considered an off service rotation, so essentially, it's not your main specialty.  So I would examine the patients and report those findings to the attending.  And then you can make plans, but you cannot -- basically, I couldn't do anything without it being cleared by the attending.

Q   Would the attending have been present while you examine the patient?

A   I would examine the patient independently in the morning and then as a team, we came back together and examined the patient together.

Q   Did you assist Dr. Alassar in his surgery of Kevin Welch in any way?

A   No.

MR. JACKSON:  Do you have a copy of her progress notes?  I didn't have a chance to print an extra copy.

MS. STURTZ:  Oh, okay.  Understood.  Let me see.

MR. JACKSON:  Or if you wanted to break, I could just make a copy of this pack right here if it's easier.

MS. STURTZ:  Oh.

MR. JACKSON:  It's only about 10 pages or so.

MS. STURTZ:  I apologize.  I didn't bring a separate set because you always had the --

MR. JACKSON:  I know.  I didn't have the time.  If you want to just break for a couple minutes so I can just make a quick copy of these, run upstairs and have her make a copy of them.

MS. STURTZ:  You know, I think these are fine.  I just -- the names, I think, are highlighted, but -- so just starting -- I think

they're back there. Let me see. So starting with the June 15th?

MR. JACKSON: Yes.

MS. STURTZ: Okay. It just goes backwards. Yeah.

BY MR. JACKSON:

Q Okay. We're looking here, for purposes of the record, your progress note dated June 15th, 2022 at 1:02 p.m.

A Okay.

Q Is that -- yeah. Are you there?

A I am there.

Q Okay. This would've been, and correct me if I'm wrong, would've been the first date that you had seen Mr. Welch, correct?

A I believe so, yes.

Q Okay. Did you have any discussion with Dr. Alassar before you authored this progress note?

A Yes.

Q Okay. Do you recall the substance of that discussion either by memory or anything in this note that would reference what the substance of that discussion with Dr. Alassar was?

A I know that we had discussed the confusion about -- because we -- essentially, the cardiac surgeons come to rounds when we round as a team, so with this physician, ICU physician, all the ICU PAs, all the nursing staff, and he was typically there as well, and I know that we discussed that, but I -- I don't remember the specifics.

Q Okay. When you talk about or use the term confusion, if you look under the assessment and plan section at, Neuro Exam GCS14, follows commands, delirious, are you using confusion interchangeably with delirious as it's stated in the record or are you referring to confusion as something different?

A No. I would say that -- I mean, delirious is probably the correct term.

Q What was the concern about the presence of delirium, given that he was, I guess, one day post-op from the type A surgery at this point? Why was it -- or was it of concern, medically or clinically, at this particular point?

A When patients have cardiac surgery, the first thing we typically want to find out is their neurologic status, so that was essentially establishing a baseline for what we noted immediately, postoperatively, at least immediately when I -- when we rounded on him that morning, I believe the surgery was the day before.

Q Okay. What were the clinical signs of the confusion on this date?

A You know, I -- I don't think I have any specifics here in my note, but typically, delirium refers to waxing and waning attention or, you know, an ability to know what time of day it is, things like that.

Q Was he still intubated at the time that you noted the assessment of his delirium?

A I do not believe so, but according to this note, he was on OxyMask, which is under pulmonary, so he was on a face mask for oxygen, he was not intubated. But, again, I don't know exactly in the morning, to be honest, if that had changed.

Q Did you have any type of professional opinion one way or another whether the intubation contributed to his delirium on this particular day?

MS. STURTZ: Objection to form and foundation and vagueness of the question, but you can answer if you're able.

THE WITNESS: According to this, he was not intubated when I wrote this note.

BY MR. JACKSON:

Q Okay. Okay. If you go over to your progress note for 6-16-2022 --

A Backwards. Yeah.

Q And it would be Page, I think, 317, if yours are numbered the same, but it's the second page in on the progress note.

MS. STURTZ: Is that the numbers down here? I see 317.

THE WITNESS: Oh, I see. Yeah. I'm looking at it right here. That's the added date. This is -- so this is the one for 6-16, yes?

17

MR. JACKSON: Yes.

THE WITNESS: Okay.

BY MR. JACKSON:

Q   At the top in the bold, the second paragraph rather, that first bold line, 24 hour events: DEX turned on due to agitation and attempting to injure bedside RN, PA cath removed. Do you recall the specifics about how he had attempted to injure the bedside nurse, if I'm interpreting that note correctly, or what that's referring to?

**A   From what I remember, the -- the nurse said he was so agitated that he tried -- he did kick her.  And so they were concerned about his safety, as well as her -- her -- I believe it was a female nurse.  Her safety.**

Q   Okay.  Is that the incident that was the impetus for the use of restraints?

**A   I -- I don't recall.  I -- I don't know.**

Q   Okay.  During the time in which you were involved in his treatment, was there any other incident where he tried to injure any other

18

type of member of staff or himself that you recall?

**A   I don't recall specifics.**

Q   Under Assessment and Plan, the bold at the neuro section, the bold language states at the end there, Concern for possible encephalopathy.

**A   Encephalopathy.**

Q   Encephalopathy.  Always gets me.  Given lack of improvement in delirium.  What was the basis for the -- for that statement, number one, and then I guess the highlighting of it in bold for emphasis, number two, if you -- if you did that?

**A   I bolded things that were either new or something that was, like, discussed on rounds, essentially, because these notes are so long.  And encephalopathy is a sort of general term given to any sort of, like, change in mentation and that can be secondary to multiple factors, especially in a very, like, critically ill postoperative patient.  But the -- so that is -- I -- I don't believe -- I don't remember specifics about that, but lack of improvement in delirium, meaning we**

19

**tried to put delirium precautions in place, like turning lights on, having people -- family at bedside, making sure he can see, making sure he has -- if his has hearing aids or other appliances at bedside.  If those things don't improve their mental status, then you can be concerned for encephalopathy.**

Q   Okay.  Do you recall any independent conversations that you had with Shana Hargrove, one of the family members that was present during his hospitalization?

**A   I -- I believe one morning and I don't know what day this was, she was there, and I probably spoke to her, but I don't remember any specifics.**

Q   Okay.  Do you recall any expression by the family of him being over-sedated or given the wrong medication?  Do you recall any complaint being voice by -- by a family member, either to you or any other hospital staff in your presence?

**A   I don't recall.  I don't remember any of that happening.**

20

Q   At the, #encephalopathy: Unclear etiology, toxic metabolic versus relative hypotension in S/O, strict BP control in hypertensive PT.  No concern for stroke given non-focal exam.  What was the basis of that statement in bold?

**A   So, again, we weren't sure -- from my recollection, we weren't sure that -- what the cause of the encephalopathy was.  Toxic metabolic can mean a number of things in a critically ill patient, whether that's electrolyte imbalance or it's like, you know, a combination of medications they've been given during anesthesia, things like that, but it's sort of a general term for some sort of metabolic issue of cause, not like a structural issue.  And then relative hypotension.  So when you -- they had -- they gave us strict blood pressure goals.  The surgeon's instructions were for strict blood pressure goals, but in patients who are baseline, have hypertension, if you have to lower their blood pressure, sometimes they can exhibit confusion because their brain is**

used to getting blood pressure at 200 and you are lowering it, you know, due to what the surgeon's instructions were.

Q   Okay.  The strict blood pressure goals are -- do you reference those in this progress note, what the pressure goals -- blood pressure goals from the surgeon were?

MS. STURTZ:  On that -- on that date.

THE WITNESS:  Yes.  It says, Cardiovascular: Strict SBP goal, less than 130.

BY MR. JACKSON:

Q   And that's referring to the reference that you just had at the hashtag, correct?

A   This is the -- the blood pressure goal that was instructed by the surgeon, the cardiovascular --

Q   The surgeon named Dr. Alassar?

A   Yes.

Q   Do you recall the basis for which Dr. Alassar gave that goal metric?  Did he ever explain that to you?

A   I don't remember him specifically explaining that.  However, as the ICU team rounded, the reasoning is to prevent bleeding from a suture line.

Q   Was there ever any disagreement or voiced concern by Dr. Luczycki that you can recall to Dr. Alassar's goal or was there always deference to the goal -- the blood pressure goal chosen by Dr. Alassar for Mr. Welch?

MS. STURTZ:  Objection to form and foundation, but you can answer if you know.

THE WITNESS:  I don't recall specifically if they had discussed something outside, but we usually referred to the surgeon, or deferred.  Excuse me.

BY MR. JACKSON:

Q   Was Dr. Alassar present when you rounded or treated Kevin Welch?

A   Yes.

Q   Do you know if Dr. Alassar observed the clinical signs of confusion and delirium that you had testified about?

A   He did.

Q   Okay.  The non-focal exam that you referenced at the hashtag and the assessment and plan section, did you perform that exam that you were relying on to rule out the concern for stroke?

A   I did in conjunction with the attending and the surgeon.

Q   Okay.  The attending being Dr. Luczycki and the surgeon being Dr. Alassar?

A   Yes, sir.

Q   Okay.  If you go over to your 617 note.

MS. STURTZ:  What's the page number?

BY MR. JACKSON:

Q   Or 314.  And at the 24-hour events, it says, Remains encephalopathic, not moving his lower left extremity.  From another note I saw in the note, I referenced a nurse was the -- it looks like on the overnight shift perhaps was the first individual to note that he was not moving his lower left extremity.  Is that consistent with your recollection or do you recall one way or another?

A   No.  It was me.

Q   Oh, okay.  Can you tell me what clinical assessment you performed to determine that he was unable to move his lower left extremity?  Was that on your first exam that was done this date or how was that determined?

A   I'm just got to check, make sure this is -- yes.  So I -- from my -- from my memory, I -- the -- I always had the nurse turn off any sedation before I did an exam, a neurologic exam on the patient, and I always did a full neurologic exam every morning, and that morning, I noted that his left leg was not moving compared to his right leg.

Q   Okay.  And at -- on that particular date, what was your differential for the lack of movement in his lower left extremity compared to his right?

A   I mean, we had a very broad differential.  It could have been when we -- you know, I just -- immediately I called the ICU attending to bedside and we discussed, you know, potentially could be a stroke, it could be some

sort of embolic phenomena. It could also just be the fact that he was encephalopathic. And so sometimes patients can have that change, even if it's just from, like, an electrolyte imbalance and they're just not following you because they can't follow commands because they're confused. So we also immediately alerted the surgeon.

Q Okay. And why was stroke on -- on the differential, specifically?

A Stroke is a known complication after any cardiac surgery, and due to the nature of clamping the vessels that feed the brain.

Q At the, #encephalopathy: Unclear etiology. Will consult neuro and get CTH and MRI brain today, in terms of understanding the context of that note, was it your understanding when you wrote that note that the MRI was going to be done that day? Is that why it's written that way, or is it meaning something different?

MS. STURTZ: Objection to form and foundation, but you can answer.

THE WITNESS: I -- I believe that we had discussed potentially doing that, doing those imaging studies. Again, I don't remember the specifics of the discussion on rounds, but we defer that to neurology.

BY MR. JACKSON:

Q Based on your treatment or involvement in the treatment of Mr. Welch up until this point, and I understand that this was before the consult done with neurology, but based on your understanding of his treatment course up until this time, did you believe that there were any contraindications for the performance of either the MRI or the CT of the head on this particular date, June 17th?

A I -- I -- the patient was on -- at some point that day was on high flow nasal cannula, which can make it extremely difficult to obtain imaging, but I was not aware of the other contraindications.

Q Were you present during the consult with neurology?

A No.

Q Okay. Did you ever have any discussions with Dr. Luczycki or Dr. Alassar about the recommendations from the neurology consult?

A I -- I don't recall the specific conversation. I can only reference what is written here.

Q Okay. Did you ever talk with Dr. Cai or Dr. Lin about Mr. Welch's condition?

A I don't believe so. I don't -- I don't believe so.

Q On June 17th, based on Mr. Welch's presentation of not being able to move his lower left extremities, were you aware on this date of any clinical or diagnostic procedure that could have been performed prior to the MRI that would have assisted with trying to reverse the course of his limited lower left extremity movement?

MS. STURTZ: I'm just going to object and instruct her not to answer. She was a resident at the time. That's some sort of expert opinion. She's not here as an expert in strokes and treatment for stroke. She's here to talk about the facts of what she did, so I don't think it's an appropriate question for this witness.

BY MR. JACKSON:

Q Was there -- was there a discussion on June 17th that you can recall between you and either Dr. Luczycki or Dr. Alassar about the performance of any type of clinical or diagnostic procedure to address the new onset of lower left extremity weakness in Mr. Welch prior to the performance of the MRI?

MS. STURTZ: Objection to form and foundation. And I'm assuming above and beyond what they're already doing for the patient?

MR. JACKSON: No, not -- I'm asking a specific question.

BY MR. JACKSON:

Q Do you recall any specific conversation with Dr. Alassar or Dr. Luczycki about the performance of a placement of a lumbar drain in Mr. Welch prior to the performance of an MRI to address his new onset of lower left extremity weakness?

A   No.

Q   Do you recall any conversation with Dr. Luczycki or Dr. Alassar prior to the consult with neurology and prior to the performance of the MRI about changing the SBP goal of less than 130 for Mr. Welch to address his new onset of lower left extremity weakness?

A   I -- I don't recall any discussion of changing the blood pressure goals prior to the neurology consult.

Q   Okay.  In looking at the record, your last critical care progress note from Mr. Welch would've been on June 17th; is that accurate?

A   Yes.

Q   What was the reason that you were no longer involved in his -- well, were you involved in his care after that day?

A   No.

Q   Okay.  What was the reason why you were no longer involved in his care after that day?

A   We work -- I was -- it's shift work, so I worked the Monday through Friday, 7:00 a.m. to 7:00 p.m. and then after 7:00 p.m. on Friday, I -- we sign on to a different team.

Q   Okay. Okay.  Prior to Mr. Welch, had you ever recommended, as part of the assessment and plan for the treatment of a patient, the placement of a lumbar drain?

MS. STURTZ:  Objection to form and foundation.  She was a resident at the time, but without qualification, you can answer.

THE WITNESS:  What do you mean by without qualification?

MS. STURTZ:  Without qualification. You can answer if you're able to answer his question.  I'm just making an objection for the record, because you were a resident and you don't set plans, so I don't think the question's proper, so --

BY MR. JACKSON:

Q   Yeah.  Have you ever -- yeah.  Have you ever been involved in a -- were you ever, prior to Mr. Welch, involved in a treatment plan, which was being set, obviously, by a supervising physician,

but involved in the treatment of a patient that was receiving a lumbar drain?

A   Yes.

Q   For any of those patients for which you were involved where there was a lumbar drain placement, were any of those patients post type aortic patients, if you recall?

A   Well, yes, but they were patients that had -- had stents placed in addition, so they were not -- that is true for some patients with type A, but a specific type that is also treated with a TEVAR graft, which is a type of stent, that was not used in this patient.

Q   Prior to you ceasing to be involved in Mr. Welch's treatment, were you ever made aware by either Dr. Luczycki or Dr. Alassar why the MRI was not performed on the 17th, June 17th?

A   I don't recall a specific conversation. However, in looking in the neurology notes, it had said to get a CT head first, so we followed their recommendations.

Q   Was there ever any discussion that you can recall as to whether or not alcohol withdrawal was the cause of his delirium?

A   I don't recall that and I don't believe I noted it in any of these notes that he was -- ever had an issue with that, so I don't recall.

Q   Was there ever -- when you all were -- when I say you all, you, the attending physician, and the surgeon were going through the differential we discussed with respect to his potential stroke, was there ever any discussion about alcohol withdrawal being a cause or contributor of his stroke condition?

A   Again, I don't remember a conversation, but it's not documented in any of my notes.

Q   Were you a member of the stroke team or was that a different set of individuals?

A   No.

Q   Okay.  Just bear with me, please. Okay, Doctor, that's all I have for you.  Do you have any questions for Counsel?

MS. STURTZ:  I don't have any questions at this time.  Thank you.

THE WITNESS: Thank you.

THE REPORTER: Counsel, would you like a copy of the transcript?

MR. JACKSON: Yeah. Just what our standard order is, the four to a page.

THE REPORTER: Ms. Sturtz, would you like a copy?

MS. STURTZ: Yes. Same order. Thank you.

(OFF THE RECORD AT 9:28 AM)

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, KONLY HARDING, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

_____

KONLY HARDING

NOTARY PUBLIC FOR THE DISTRICT OF COLUMBIA

CERTIFICATE OF TRANSCRIBER

I, Maliq Smith, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said proceedings were reduced to typewriting under my supervision; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

_____

Maliq Smith

Planet Depos, LLC

June 6, 2024

| A | al | 12:1, 13:17, | attempting |
|---|---|---|---|
| **ability** | 1:9 | 15:11, 16:2, | 17:7 |
| 15:14, 34:11, | **alassar** | 17:21, 17:22, | **attending** |
| 35:8 | 10:13, 10:17, | 18:17, 19:8, | 9:4, 9:6, 9:13, |
| **able** | 11:22, 13:18, | 19:14, 19:16, | 9:19, 9:21, |
| 16:7, 27:12, | 14:1, 21:17, | 19:18, 19:20, | 11:3, 11:13, |
| 30:13 | 21:20, 22:8, | 19:21, 22:4, | 11:15, 11:16, |
| **about** | 22:16, 22:19, | 24:8, 25:11, | 23:5, 23:7, |
| 5:21, 6:14, | 23:8, 27:2, | 26:11, 27:1, | 24:21, 32:7 |
| 12:12, 14:3, | 28:6, 28:18, | 27:14, 28:7, | **attention** |
| 14:10, 14:19, | 29:3, 31:16 | 28:17, 29:2, | 15:13 |
| 17:8, 17:14, | **alassar's** | 29:8, 31:4, | **audio** |
| 18:21, 22:21, | 22:6 | 31:6, 31:22, | 34:9, 35:4 |
| 27:2, 27:8, | **alcohol** | 32:4, 32:10, | **authored** |
| 28:1, 28:6, | 32:1, 32:11 | 32:14, 32:20, | 13:18 |
| 28:18, 29:5, | **alerted** | 32:21, 34:4, | **autonomy** |
| 32:11 | 25:7 | 34:13, 35:10 | 11:1, 11:7 |
| **above** | **all** | **anything** | **avenue** |
| 28:12 | 9:3, 14:5, | 6:2, 6:15, | 2:7 |
| **according** | 14:6, 32:6, | 6:22, 11:15, | **aware** |
| 15:18, 16:8 | 32:7, 32:19 | 13:21 | 26:18, 27:13, |
| **accurate** | **already** | **aortic** | 31:15 |
| 29:13, 34:10, | 28:13 | 10:9, 10:19, | B |
| 35:7 | **also** | 31:7 | **back** |
| **added** | 25:1, 25:7, | **apologize** | 11:20, 13:1 |
| 16:20 | 31:11 | 12:14 | **backwards** |
| **addition** | **always** | **appliances** | 13:5, 16:13 |
| 31:9 | 12:15, 18:7, | 19:4 | **baltimore** |
| **address** | 22:6, 24:8, | **appropriate** | 3:14 |
| 28:8, 28:21, | 24:10 | 28:2 | **based** |
| 29:6 | **amongst** | **asking** | 26:6, 26:9, |
| **advised** | 9:2 | 11:3, 28:14 | 27:11 |
| 7:21 | **anesthesia** | **assessment** | **baseline** |
| **affirmed** | 20:13 | 11:7, 14:11, | 15:5, 20:20 |
| 5:4 | **another** | 15:17, 18:3, | **basically** |
| **after** | 16:3, 23:15, | 23:2, 24:2, 30:4 | 11:14 |
| 9:20, 25:10, | 23:21 | **assigned** | **basis** |
| 29:17, 29:20, | **answer** | 8:20 | 18:9, 20:5, |
| 30:1 | 6:2, 7:19, | **assist** | 21:19 |
| **again** | 16:7, 22:10, | 11:22 | **bear** |
| 15:21, 20:7, | 25:21, 27:19, | **assistants** | 32:18 |
| 26:2, 32:13 | 30:9, 30:13 | 9:3 | **because** |
| **agitated** | **any** | **assisted** | 7:17, 11:9, |
| 17:13 | 6:3, 6:7, 7:7, | 27:16 | 12:15, 14:3, |
| **agitation** | 7:12, 7:13, | **assuming** | 18:15, 20:22, |
| 17:6 | 9:18, 10:7, | 28:12 | 25:5, 25:6, |
| **aids** | 10:8, 10:12, | **attempted** | 30:15 |
| 19:4 | 10:17, 11:1, | 17:9 | |

**bedside**
17:7, 17:9,
19:3, 19:5,
24:21
**been**
5:15, 6:10,
6:19, 9:13,
10:3, 10:8,
11:2, 11:8,
11:16, 13:13,
13:14, 20:13,
24:19, 27:15,
29:13, 30:20
**before**
2:12, 8:2,
13:18, 15:8,
24:9, 26:8, 34:3
**behalf**
3:3, 3:10, 5:14
**being**
5:4, 11:15,
19:17, 19:19,
23:7, 23:8,
27:12, 30:22,
32:11
**believe**
5:22, 10:14,
13:16, 15:8,
15:18, 17:15,
18:21, 19:12,
25:22, 26:11,
27:9, 27:10,
32:3
**best**
34:10, 35:7
**between**
28:5
**beyond**
28:12
**bleeding**
22:2
**blood**
20:18, 20:19,
20:21, 21:1,
21:4, 21:6,
21:14, 22:7,
29:9
**bold**
17:4, 17:5,

18:3, 18:4,
18:10, 20:6
**bolded**
18:13
**bp**
20:3
**brain**
20:22, 25:12,
25:15
**break**
6:7, 12:9,
12:17
**bring**
12:15
**broad**
24:18

### C

**cai**
27:7
**called**
24:20
**came**
11:20
**can't**
25:5
**cannot**
11:14
**cannula**
26:16
**cardiac**
14:4, 15:2,
25:11
**cardiovascular**
21:10, 21:16
**care**
10:12, 10:18,
29:12, 29:17,
29:20
**case**
1:6, 34:13,
35:10
**cath**
17:7
**cause**
20:9, 20:15,
32:2, 32:11
**ceasing**
31:14

**certificate**
34:1, 35:1
**certify**
34:4, 35:2
**chance**
12:4
**change**
18:17, 25:3
**changed**
16:1
**changing**
29:5, 29:9
**charles**
3:13
**check**
24:6
**chosen**
22:8
**civil**
1:3
**clamping**
25:12
**classification**
8:6
**cleared**
11:15
**clinical**
15:9, 22:20,
24:2, 27:14,
28:7
**clinically**
15:1
**columbia**
1:2, 2:14,
5:17, 34:21
**combination**
20:12
**come**
14:4
**coming**
11:5, 11:6
**commands**
14:13, 25:6
**communication**
7:3
**compared**
24:12, 24:16
**complaint**
19:18

**complication**
25:10
**concern**
14:19, 14:22,
18:5, 20:4,
22:5, 23:4
**concerned**
17:14, 19:6
**condition**
27:8, 32:12
**confused**
25:6
**confusion**
14:3, 14:11,
14:13, 14:15,
15:10, 20:22,
22:20
**conjunction**
23:5
**considered**
11:10
**consistent**
23:19
**constitution**
2:7
**consult**
25:14, 26:8,
26:20, 27:3,
29:3, 29:10
**context**
25:15
**contraindications**
26:12, 26:19
**contributed**
16:4
**contributor**
32:12
**control**
20:3
**conversation**
27:5, 28:17,
29:2, 31:18,
32:13
**conversations**
19:9
**copy**
12:3, 12:5,
12:9, 12:18,

12:19, 33:3,
33:7
**correct**
8:4, 13:13,
13:15, 14:18,
21:13
**correctly**
17:10
**could**
12:9, 24:19,
24:22, 25:1,
27:14
**couldn't**
11:14
**counsel**
5:7, 5:22,
6:14, 32:20,
33:2, 34:12,
35:9
**counselor**
7:21
**couple**
12:17
**course**
26:10, 27:16
**court**
1:1, 5:16, 34:1
**critical**
29:12
**critically**
18:19, 20:10
**ct**
26:13, 31:20
**cth**
25:14
**cv--rjl**
1:7

**D**

**date**
13:14, 15:10,
16:20, 21:8,
24:5, 24:15,
26:14, 27:13
**dated**
13:8
**dates**
9:7, 9:8

**day**
14:20, 15:8,
15:14, 16:4,
19:13, 25:18,
26:16, 29:17,
29:20
**dc**
2:6
**decision-making**
11:5
**defendant**
5:17
**defendants**
1:10, 3:10
**defer**
26:4
**deference**
22:7
**deferred**
22:14
**delirious**
14:13, 14:14,
14:18
**delirium**
14:20, 15:12,
15:17, 16:4,
18:8, 18:22,
19:1, 22:20,
32:2
**depos**
35:16
**deposed**
6:10
**deposition**
1:14, 2:1,
5:18, 6:16, 7:9
**determine**
24:2
**determined**
24:5
**dex**
17:6
**diagnostic**
27:14, 28:7
**different**
14:16, 25:19,
30:2, 32:16
**differential**
24:15, 24:19,

25:9, 32:9
**difficult**
26:17
**digital**
34:8, 35:3
**disagreement**
22:4
**discussed**
14:2, 14:8,
18:14, 22:12,
24:21, 26:1,
32:9
**discussion**
13:17, 13:21,
14:1, 26:3,
28:4, 29:8,
31:22, 32:10
**discussions**
27:2
**district**
1:1, 1:2, 2:14,
5:16, 34:21
**division**
1:3
**doctor**
10:1, 32:19
**documented**
32:14
**documents**
6:17
**doing**
26:1, 28:13
**done**
24:5, 25:17,
26:9
**donna**
3:11
**down**
16:17
**dr**
5:9, 9:5, 9:12,
10:4, 10:13,
10:17, 11:22,
13:18, 14:1,
21:17, 21:19,
22:5, 22:6,
22:8, 22:16,
22:19, 23:7,

23:8, 27:2,
27:7, 27:8,
28:6, 28:18,
29:2, 29:3,
31:16
**drafting**
11:5
**drain**
28:19, 30:6,
31:2, 31:5
**due**
17:6, 21:2,
25:11
**duly**
5:4
**dunphy**
1:14, 2:1, 4:2,
5:3, 5:9
**during**
17:20, 19:10,
20:13, 26:20

**E**

**easier**
12:10
**east**
3:6
**either**
13:21, 18:13,
19:19, 26:12,
28:6, 31:16
**electrolyte**
20:11, 25:4
**electronic**
6:1
**else**
7:5
**embolic**
25:1
**emphasis**
18:11
**employed**
34:12, 35:9
**encephalopathic**
23:14, 25:2
**encephalopathy**
18:5, 18:6,
18:7, 18:16,

19:7, 20:1,
20:9, 25:13
**end**
18:5
**entitled**
6:14
**especially**
18:18
**esquire**
3:4, 3:11
**essentially**
8:22, 11:11,
14:3, 15:4,
18:15
**establishing**
15:5
**et**
1:9
**etiology**
20:2, 25:14
**even**
25:3
**events**
17:6, 23:13
**ever**
6:10, 10:3,
10:11, 21:20,
22:4, 27:1,
27:7, 30:4,
30:19, 30:20,
31:15, 31:22,
32:5, 32:6,
32:10
**every**
24:11
**exactly**
15:22
**exam**
14:12, 20:5,
23:1, 23:3,
24:4, 24:9,
24:11
**examination**
4:2, 5:7
**examine**
11:12, 11:17,
11:18
**examined**
5:6, 11:20

**excuse**
22:14
**exhibit**
20:22
**expert**
7:17, 27:20,
27:21
**explain**
10:21, 21:21
**explaining**
22:1
**expression**
19:16
**extra**
12:5
**extremely**
26:17
**extremities**
27:13
**extremity**
23:15, 23:19,
24:4, 24:16,
27:17, 28:9,
28:21, 29:7

### F

**face**
15:20
**fact**
7:18, 25:2
**factors**
18:18
**facts**
28:1
**familiar**
10:22
**family**
19:2, 19:10,
19:17, 19:19
**federal**
5:15
**feed**
25:12
**feel**
6:3
**female**
17:16
**filed**
5:15

**financial**
34:14, 35:11
**find**
15:3
**findings**
11:13
**fine**
12:21
**first**
5:4, 13:14,
15:3, 17:5,
23:17, 24:4,
31:20
**five**
8:18
**flow**
26:16
**focusing**
7:4
**follow**
25:6
**followed**
31:20
**following**
25:5
**follows**
5:6, 14:12
**foregoing**
34:3, 34:5,
35:4
**form**
16:5, 22:9,
25:20, 28:11,
30:7
**foundation**
16:6, 22:10,
25:21, 28:12,
30:8
**four**
33:5
**free**
6:3
**friday**
29:22, 30:1
**full**
24:10
**fully**
34:5

### G

**gave**
20:17, 21:20
**gcs**
14:12
**general**
18:16, 20:14
**getting**
21:1
**give**
8:8
**given**
9:16, 11:2,
11:3, 11:8,
14:20, 18:7,
18:16, 19:17,
20:4, 20:13
**go**
16:11, 23:10
**goal**
21:10, 21:14,
21:20, 22:6,
22:7, 29:5
**goals**
20:18, 20:19,
21:4, 21:6,
21:7, 29:9
**goes**
13:4
**going**
7:16, 25:17,
27:18, 32:8
**good**
5:9, 5:10
**governor**
3:4, 3:5, 5:12
**graft**
31:12
**guess**
14:20, 18:10

### H

**happening**
19:22
**harding**
1:22, 2:13,
34:2, 34:20

**hargrove**
1:5, 5:13, 19:9
**hashtag**
21:13, 23:2
**head**
26:13, 31:20
**hearing**
19:4
**held**
2:2
**here**
6:16, 7:11,
7:17, 7:18,
12:10, 13:7,
15:12, 16:18,
16:20, 27:6,
27:21, 27:22
**hereby**
34:4, 35:2
**high**
26:16
**highlighted**
12:22
**highlighting**
18:10
**himself**
18:1
**honest**
15:22
**hospital**
1:8, 19:20
**hospitalization**
19:11
**hour**
17:5, 23:13
**however**
22:1, 31:19
**hybrid**
7:18
**hypertension**
20:20
**hypertensive**
20:4
**hypotension**
20:3, 20:16

**I**

**icu**
8:20, 8:22,

10:4, 10:12,
10:18, 11:9,
14:5, 14:6,
22:1, 24:20
**iii**
3:4, 3:5, 5:12
**ill**
18:19, 20:10
**imaging**
26:2, 26:18
**imbalance**
20:11, 25:4
**immediately**
15:6, 24:20,
25:7
**impending**
6:9
**impetus**
17:18
**improve**
19:5
**improvement**
18:8, 18:22
**incident**
17:17, 17:22
**independent**
19:8
**independently**
11:19
**individual**
23:18
**individuals**
32:16
**informally**
5:11
**injure**
17:7, 17:9,
17:22
**instruct**
27:19
**instructed**
21:15
**instructions**
20:18, 21:3
**interchangeably**
14:14
**interest**
34:14, 35:11

**interpreting**
17:10
**intubated**
15:16, 15:21,
16:9
**intubation**
16:3
**involved**
9:12, 9:17,
17:21, 29:16,
29:20, 30:20,
30:21, 31:1,
31:5, 31:14
**involvement**
26:6
**issue**
20:15, 20:16,
32:5

**J**

**jackson**
3:4, 3:5, 4:3,
5:8, 5:12, 7:6,
7:22, 8:10,
8:15, 9:10,
12:3, 12:8,
12:12, 12:16,
13:3, 13:6,
16:10, 17:1,
17:3, 21:11,
22:15, 23:12,
26:5, 28:3,
28:14, 28:16,
30:18, 33:4
**job**
1:20
**joppa**
3:6
**june**
5:20, 8:2, 8:3,
8:5, 8:19, 13:2,
13:8, 26:14,
27:11, 28:5,
29:13, 31:17,
35:17
**jury**
10:22

**K**

**kaitlyn**
1:14, 2:1, 4:2,

5:3
**kevin**
5:14, 5:19,
7:15, 9:12,
9:17, 11:2,
12:1, 22:17
**kick**
17:14
**know**
6:5, 6:8, 6:14,
7:20, 10:15,
12:16, 12:20,
14:2, 14:7,
15:11, 15:14,
15:21, 17:19,
19:13, 20:12,
21:2, 22:10,
22:19, 24:20,
24:21
**knowledge**
34:11, 35:8
**known**
25:10
**konly**
1:22, 2:13,
34:2, 34:20

**L**

**lack**
18:8, 18:22,
24:15
**language**
18:4
**last**
29:12
**law**
3:5
**lawsuit**
5:15
**least**
15:6
**leeway**
11:7
**left**
23:15, 23:19,
24:3, 24:12,
24:16, 27:13,
27:17, 28:8,

28:21, 29:6
**leg**
24:12, 24:13
**less**
21:10, 29:5
**lights**
19:2
**limited**
11:9, 27:17
**lin**
27:8
**line**
17:5, 22:3
**literature**
7:8, 7:12
**llc**
3:5, 35:16
**llp**
2:6, 3:12
**long**
6:6, 6:8, 8:16,
9:17, 18:15
**longer**
29:16, 29:20
**look**
14:11
**looking**
13:7, 16:20,
29:11, 31:19
**looks**
23:16
**lower**
20:21, 23:15,
23:19, 24:3,
24:16, 27:12,
27:17, 28:8,
28:21, 29:6
**lowering**
21:2
**luczycki**
9:5, 9:12,
10:4, 22:5,
23:7, 27:2,
28:6, 28:18,
29:3, 31:16
**lumbar**
28:19, 30:6,
31:2, 31:5

**M**

**made**
31:15
**main**
11:11
**make**
11:13, 12:9,
12:18, 12:19,
24:6, 26:17
**making**
19:3, 30:14
**maliq**
35:2, 35:15
**many**
6:6
**marie**
1:14, 2:1, 4:2,
5:3
**marked**
4:8
**mask**
15:20
**matter**
5:13, 7:13
**md**
1:14, 2:1, 3:7,
3:14, 4:2, 5:3
**mean**
14:17, 20:10,
24:18, 30:10
**meaning**
18:22, 25:19
**medical**
6:20, 6:22, 7:4
**medically**
14:22
**medication**
19:18
**medications**
20:12
**medstar**
1:8, 8:21
**member**
18:1, 19:19,
32:15
**members**
10:21, 19:10

**memory**
5:22, 13:21,
24:7
**mental**
19:6
**mentation**
18:17
**met**
5:11
**metabolic**
20:2, 20:9,
20:15
**metric**
21:20
**minutes**
12:18
**monday**
29:22
**morning**
5:9, 5:10,
11:19, 15:7,
15:22, 19:12,
24:11
**move**
24:3, 27:12
**movement**
24:16, 27:17
**moving**
23:14, 23:18,
24:12
**mri**
25:14, 25:17,
26:13, 27:15,
28:10, 28:20,
29:4, 31:16
**much**
11:1, 11:7
**mullins**
2:6, 3:12
**multiple**
18:18

**N**

**name**
5:12
**named**
5:17, 21:17
**names**
12:21

**nasal**
26:16
**nature**
25:11
**necessary**
6:6
**need**
6:1, 6:7
**neither**
34:12, 35:9
**nelson**
2:6, 3:12
**neuro**
14:12, 18:4,
25:14
**neurologic**
15:4, 24:9,
24:10
**neurology**
26:4, 26:9,
26:21, 27:3,
29:4, 29:10,
31:19
**new**
18:13, 28:8,
28:21, 29:6
**night**
9:21
**non-focal**
20:5, 23:1
**none**
4:8
**notary**
2:13, 34:1,
34:21
**note**
13:8, 13:18,
13:22, 15:12,
15:19, 16:9,
16:12, 16:16,
17:10, 21:6,
23:10, 23:15,
23:16, 23:18,
25:16, 25:17,
29:12
**noted**
15:5, 15:17,
24:11, 32:4

notes
7:5, 12:4,
18:15, 31:19,
32:4, 32:14
nothing
5:5, 7:5
notice
2:12
number
9:1, 18:9,
18:11, 20:10,
23:11
numbered
16:15
numbers
16:17
nurse
17:9, 17:12,
17:16, 23:16,
24:8
nursing
14:6
nw
2:7

**O**

object
7:16, 27:18
objection
7:19, 16:5,
22:9, 25:20,
28:11, 30:7,
30:14
observed
22:19
obtain
26:17
obviously
7:3, 30:22
office
3:5
officer
34:2
offices
2:2
oh
12:6, 12:11,
16:19, 24:1

okay
6:9, 6:13,
6:19, 7:7, 8:1,
8:6, 9:5, 9:11,
10:7, 10:11,
10:16, 12:6,
13:4, 13:7,
13:10, 13:13,
13:17, 13:20,
14:10, 15:9,
16:11, 17:2,
17:17, 17:20,
19:8, 19:16,
21:4, 23:1,
23:7, 23:10,
24:1, 24:14,
25:8, 27:1,
27:7, 29:11,
29:19, 30:3,
32:18, 32:19
one
5:18, 14:20,
16:3, 16:21,
18:9, 19:10,
19:12, 23:20
only
5:20, 6:17,
7:20, 12:12,
27:5
onset
28:8, 28:21,
29:6
opinion
16:3, 27:21
opportunity
5:18, 5:20
order
33:5, 33:8
other
6:13, 6:22,
9:18, 17:22,
19:4, 19:20,
26:18
otherwise
34:14, 35:11
out
15:3, 23:4
outcome
34:15, 35:11

outside
22:13
over
16:11, 23:10
over-sedated
19:17
overnight
23:17
overseen
9:3
oxygen
15:20
oxymask
15:19

**P**

pa
17:7
pack
12:9
page
4:2, 16:14,
16:16, 23:11,
33:5
pages
1:21, 12:12
paragraph
17:5
part
30:4
participated
7:14
particular
6:15, 9:7, 9:8,
15:1, 16:4,
24:14, 26:13
parties
34:13, 35:10
pas
14:6
patient
10:5, 11:17,
11:18, 11:20,
18:20, 20:11,
24:10, 26:15,
28:13, 30:5,
31:1, 31:13
patients
8:20, 9:1,

10:7, 10:9,
10:12, 10:17,
11:12, 15:2,
20:20, 25:3,
31:4, 31:6,
31:7, 31:8,
31:10
peer
7:7, 7:12
people
19:2
percent
10:14
perform
23:3
performance
26:12, 28:7,
28:10, 28:19,
28:20, 29:4
performed
24:2, 27:15,
31:17
perhaps
23:17
phenomena
25:1
physician
9:2, 9:4, 9:6,
9:13, 9:19,
9:21, 11:4,
14:5, 30:22,
32:7
place
19:1
placed
31:9
placement
28:19, 30:6,
31:6
plaintiff
1:6, 3:3, 5:7
plaintiffs
5:13
plan
7:11, 7:12,
11:6, 14:12,
18:3, 23:3,
30:5, 30:21

**planet**
35:16
**plans**
11:14, 30:16
**please**
6:3, 32:18
**point**
14:21, 15:1,
26:7, 26:16
**possible**
18:5
**post**
10:8, 10:18,
31:6
**post-op**
14:21
**postoperative**
18:19
**postoperatively**
15:6
**potential**
32:10
**potentially**
24:22, 26:1
**power**
5:14
**precautions**
19:1
**preparation**
6:16, 7:8
**prepared**
35:3
**presence**
14:19, 19:20
**present**
11:16, 19:10,
22:16, 26:20
**presentation**
27:12
**pressure**
20:18, 20:19,
20:21, 21:1,
21:4, 21:6,
21:14, 22:7,
29:9
**prevent**
22:2
**print**
12:4

**prior**
6:10, 8:1,
10:3, 10:7,
10:11, 27:15,
28:9, 28:20,
29:3, 29:4,
29:9, 30:3,
30:20, 31:14
**privileged**
7:2
**probably**
5:22, 14:18,
19:14
**procedure**
27:14, 28:8
**proceeding**
35:4
**proceedings**
34:3, 34:5,
34:6, 34:9,
35:5, 35:7
**professional**
16:2
**program**
8:16, 8:17
**progress**
12:4, 13:8,
13:18, 16:12,
16:16, 21:5,
29:12
**proper**
30:16
**provided**
10:12, 10:18
**pt**
20:4
**public**
2:13, 34:1,
34:21
**pulmonary**
15:20
**purposes**
9:16, 13:7
**pursuant**
2:12
**put**
19:1

**Q**

**qualification**
30:9, 30:11,

30:12
**qualified**
34:8
**question**
6:2, 6:4, 6:8,
16:6, 28:2,
28:15, 30:14
**question's**
30:16
**questions**
5:19, 5:21,
32:20, 32:21
**quick**
12:18

**R**

**rather**
17:5
**read**
6:17
**reason**
29:15, 29:19
**reasoning**
22:2
**recall**
9:22, 10:10,
10:16, 10:20,
13:20, 17:8,
17:19, 18:1,
18:2, 19:8,
19:16, 19:18,
19:21, 21:19,
22:5, 22:11,
23:20, 27:4,
28:5, 28:17,
29:2, 29:8,
31:7, 31:18,
32:1, 32:3, 32:5
**receiving**
31:2
**recollection**
20:8, 23:20
**recommendations**
27:3, 31:21
**recommended**
7:14, 30:4
**record**
5:11, 6:1,

13:8, 14:15,
29:11, 30:15,
33:10, 34:10,
35:7
**recorded**
1:22, 34:6
**recording**
34:9, 35:4
**records**
6:20, 6:22, 7:4
**reduced**
34:7, 35:5
**refer**
6:1
**reference**
13:22, 21:5,
21:12, 27:5
**referenced**
23:2, 23:16
**referred**
22:13
**referring**
14:15, 17:11,
21:12
**refers**
15:13
**regarding**
11:5
**related**
5:19, 6:15,
34:12, 35:9
**relative**
20:2, 20:16
**relying**
7:12, 23:4
**remains**
23:14
**remember**
14:8, 17:12,
18:21, 19:14,
19:21, 21:22,
26:2, 32:13
**removed**
17:7
**rephrase**
6:5
**report**
11:12

**reporter** 33:2, 33:6, 34:1
**represent** 5:12
**residency** 8:7, 8:13, 8:17, 10:22
**resident** 8:4, 8:5, 8:14, 8:19, 9:6, 9:19, 11:8, 27:20, 30:8, 30:15
**residents** 9:2
**respect** 32:9
**responsible** 9:13
**restate** 6:5
**restraints** 17:18
**returning** 5:14
**reverse** 27:16
**reviewed** 7:4, 7:7, 7:8, 7:12
**right** 12:9, 16:20, 24:12, 24:17
**riley** 2:6, 3:12
**rn** 17:7
**road** 3:6
**rotation** 11:10
**round** 14:4
**rounded** 15:7, 22:2, 22:17
**rounds** 14:4, 18:14,

26:3
**rule** 23:4
**run** 12:19

**S**

**safety** 17:15, 17:16
**said** 17:13, 31:20, 34:8, 34:9, 35:5, 35:6
**same** 16:15, 33:8
**saw** 23:15
**say** 14:17, 32:7
**says** 21:9, 23:14
**sbp** 21:10, 29:5
**scarborough** 2:6, 3:12
**second** 16:15, 17:4
**secondary** 18:18
**section** 14:12, 18:4, 23:3
**sedation** 24:9
**see** 12:7, 13:1, 16:18, 16:19, 19:3
**seen** 13:15
**sent** 6:18
**separate** 12:15
**service** 11:10
**set** 12:15, 30:16,

30:22, 32:16
**shana** 1:5, 5:13, 19:9
**shift** 23:17, 29:21
**sign** 30:2
**signature-5tm1q** 34:16
**signature-b7fzp** 35:12
**signs** 15:9, 22:20
**sir** 23:9
**sit** 7:11
**skills** 34:11, 35:8
**smith** 35:2, 35:15
**some** 20:14, 24:22, 26:15, 27:20, 31:10
**something** 14:16, 18:14, 22:12, 25:19
**sometimes** 20:21, 25:3
**sort** 18:16, 18:17, 20:14, 20:15, 25:1, 27:20
**speaking** 6:13
**specialty** 11:11
**specific** 27:4, 28:15, 28:17, 31:11, 31:18
**specifically** 10:16, 11:2, 21:22, 22:12, 25:9
**specifics** 14:9, 15:12,

17:8, 18:2, 18:21, 19:15, 26:3
**split** 9:1
**spoke** 19:14
**staff** 14:6, 18:1, 19:20
**standard** 33:5
**starting** 12:22, 13:1
**stated** 14:14
**statement** 18:9, 20:6
**states** 1:1, 5:16, 18:4
**status** 15:4, 19:6
**stent** 31:12
**stents** 31:9
**still** 15:16
**street** 3:13
**strict** 20:3, 20:17, 20:19, 21:4, 21:10
**stroke** 20:4, 23:4, 24:22, 25:8, 25:10, 27:22, 32:10, 32:12, 32:15
**strokes** 27:21
**structural** 20:16
**studies** 26:2
**sturtz** 3:11, 7:1,

7:16, 8:9, 8:12,
9:7, 12:6,
12:11, 12:14,
12:20, 13:4,
16:5, 16:17,
21:8, 22:9,
23:11, 25:20,
27:18, 28:11,
30:7, 30:12,
32:21, 33:6,
33:8
**substance**
13:20, 13:22
**sufficiently**
6:2
**suite**
2:7, 3:6, 3:13
**supervising**
9:18, 11:3,
30:22
**supervision**
10:4, 35:6
**support**
7:13
**sure**
10:14, 19:3,
20:7, 20:8, 24:6
**surgeon**
21:7, 21:15,
21:17, 22:13,
23:6, 23:8,
25:7, 32:8
**surgeon's**
20:18, 21:2
**surgeons**
14:4
**surgery**
10:19, 12:1,
14:21, 15:2,
15:8, 25:11
**surgical**
10:9, 10:12
**suture**
22:3
**switched**
9:20
**sworn**
5:4, 34:5

### T

**taken**
34:4
**talk**
14:10, 27:7,
27:22
**team**
8:22, 9:4, 9:6,
9:14, 11:19,
14:5, 22:1,
30:2, 32:15
**tell**
24:1
**term**
14:11, 14:18,
18:16, 20:14
**terms**
7:3, 11:1,
11:4, 25:15
**test**
5:22
**testified**
5:6, 22:21
**testify**
5:4
**tevar**
31:12
**th**
13:2, 13:8,
26:14, 27:11,
28:5, 29:13,
31:17
**thank**
5:9, 32:22,
33:1, 33:8
**thereafter**
34:7
**thing**
15:3
**things**
15:15, 18:13,
19:5, 20:10,
20:13
**think**
12:20, 12:21,
12:22, 15:11,
16:14, 28:1,

30:16
**third**
8:14, 8:19
**through**
29:22, 32:8
**thursday**
1:16
**time**
6:3, 6:7, 8:3,
8:7, 12:17,
15:14, 15:16,
17:20, 26:11,
27:20, 30:8,
32:22
**times**
6:6, 9:9
**today**
6:11, 6:16,
7:9, 7:17, 25:15
**together**
11:20, 11:21
**top**
17:4
**towson**
3:7
**toxic**
20:2, 20:9
**transcriber**
35:1
**transcript**
33:3, 35:3,
35:6
**transcriptionist**
34:8
**treated**
22:17, 31:11
**treatment**
5:19, 5:21,
7:14, 8:1, 9:11,
9:16, 9:18,
11:6, 17:21,
26:6, 26:7,
26:10, 27:22,
30:5, 30:21,
31:1, 31:15
**trial**
7:13
**tried**
17:13, 17:22,

19:1
**true**
31:10, 34:10,
35:6
**truth**
5:5, 5:6
**trying**
27:16
**turn**
24:8
**turned**
17:6
**turning**
19:2
**two**
18:11
**type**
10:8, 10:18,
14:21, 16:2,
18:1, 28:7,
31:6, 31:10,
31:11, 31:12
**typewriting**
34:7, 35:5
**typically**
14:7, 15:3,
15:12

### U

**unable**
24:3
**unclear**
20:1, 25:13
**under**
10:4, 14:11,
15:19, 18:3,
35:5
**undergone**
10:18
**understand**
6:4, 6:7, 26:8
**understanding**
25:15, 25:16,
26:10
**understood**
12:6
**united**
1:1, 5:16

| | | | |
|---|---|---|---|
| **until** 26:7, 26:10 | 7:15, 8:2, 9:12, 9:17, 10:1, 10:3, 10:8, 10:11, 11:2, 12:1, 13:15, 22:8, 22:17, 26:7, 28:9, 28:20, 29:6, 29:12, 30:3, 30:21 | **wrong** 13:14, 19:18 | **1600** 3:13 |
| **upstairs** 12:19 | | **wrote** 16:9, 25:17 | **17** 26:14, 27:11, 28:5, 29:13, 31:17 |
| **use** 14:10, 17:18 | | **Y** | |
| **using** 14:13 | | **yeah** 8:11, 13:5, 13:11, 16:13, 16:19, 30:19, 33:4 | **2** |
| **usually** 22:13 | | | **200** 21:1 |
| **V** | **welch's** 27:8, 27:11, 31:15 | **year** 8:9, 8:11, 8:12, 8:14, 8:19 | **20001** 2:8 |
| **vagueness** 16:6 | **weren't** 20:7, 20:8 | **years** 8:18 | **2022** 5:20, 8:2, 8:3, 8:5, 8:20, 13:9, 16:12 |
| **versus** 20:2 | **whatever** 9:1 | **.** | **2024** 1:16, 35:17 |
| **vessels** 25:12 | **whereupon** 5:2 | **.5150** 3:8 | **21201** 3:14 |
| **voice** 19:19 | **whether** 16:3, 20:11, 32:1 | **.9408** 3:15 | **21286** 3:7 |
| **voiced** 22:5 | **whole** 5:5, 6:1 | **0** | **23** 1:7, 1:16 |
| **vs** 1:7 | **withdrawal** 32:1, 32:11 | **00** 9:20, 29:22, 30:1 | **24** 17:5, 23:13 |
| **W** | **without** 7:18, 11:15, 30:9, 30:11, 30:12 | **02** 13:9 | **3** |
| **waning** 15:13 | **witness** 7:18, 7:20, 8:14, 9:8, 16:8, 16:19, 17:2, 21:9, 22:11, 25:22, 28:2, 30:10, 33:1 | **03381** 1:7 | **314** 23:13 |
| **want** 12:17, 15:3 | | **1** | **317** 16:14, 16:18 |
| **wanted** 12:8 | | **1** 13:9 | **35** 1:21 |
| **washington** 1:8, 1:15, 2:8 | | **10** 12:12 | **4** |
| **waxing** 15:13 | **witness(es** 34:4 | **100** 3:13, 10:14 | **4** 9:20 |
| **way** 12:1, 16:3, 23:20, 25:18 | **work** 11:4, 29:21 | **101** 2:7 | **400** 3:6 |
| **we're** 13:7 | **worked** 29:22 | **130** 21:10, 29:5 | **410.528** 3:8 |
| **we've** 7:2 | **would've** 11:1, 13:13, 13:14, 29:13 | **14** 14:12 | **443.392** 3:15 |
| **weakness** 28:9, 28:22, 29:7 | | **15** 13:2, 13:8 | **5** |
| **welch** 5:14, 5:19, | **written** 25:18, 27:6 | **16** 16:12, 16:22 | **50** 3:6 |

**538641**
1:20

**6**

**6**
16:22
**6-**
16:12
**617**
23:10

**7**

**7**
29:22, 30:1

**8**

**8:50 am**
1:17

**9**

**900**
2:7
**9:28 am**
33:10