

# Transcript of Stephen Luczycki, MD.

**Date:** May 9, 2024
**Case:** Hargrove -v- MedStar Washington Hospital, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Civil Division

------------------------------x

SHANA HARGROVE,                  :

    Plaintiff,            :   Civil Case No.

  vs.                          :   23-CV-03381-RJL

MEDSTAR WASHINGTON HOSPITAL,  :

et al.,                          :

    Defendants.          :

------------------------------x

Deposition of STEPHEN LUCZYCKI, MD

Washington, District of Columbia

Thursday, May 9, 2024

8:55 a.m.

Job No.: 534993

Pages: 1 - 52

Recorded By: Donte Robinson

---

Deposition of STEPHEN LUCZYCKI, MD,

held at the offices of:

NELSON MULLINS RILEY & SCARBOROUGH LLP

101 Constitution Avenue, NW, Suite 900

Washington, District of Columbia 20001

Pursuant to Notice, before

Donte Robinson, Notary Public in and for the

District of Columbia.

---

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF, SHANA HARGROVE:

  GOVERNOR E. JACKSON III, ESQUIRE

  LAW OFFICE OF GOVERNOR E. JACKSON, III, LLC

  400 East Joppa Road, Suite 50

  Towson, Maryland 21286

  410.528.5150

ON BEHALF OF THE DEFENDANT:

  DONNA STURTZ, ESQUIRE

  NELSON MULLINS RILEY & SCARBOROUGH, LLP

  101 Constitution Avenue, NW

  Suite 900

  Washington, District of Columbia 20001

  202.712.2800

---

C O N T E N T S

EXAMINATION OF STEPHEN LUCZYCKI, MD          PAGE

  By Mr. Jackson                               5

E X H I B I T S

    (Attached to transcript.)

DEPOSITION EXHIBIT                           PAGE

Exhibit           Description

Luczycki 01 - Collection of MedStar            9
        Progress Notes for Kevin Welch

Luczycki 02 - DC Municipal Regulations        10

Luczycki 03 - MedStar Consultation            33
        Notes for Kevin Welch

PROCEEDINGS

Whereupon,

STEPHEN LUCZYCKI, MD, being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. JACKSON:

Q Thank you. Good morning, Doctor.

A Good morning.

Q We met informally off the record. My name is Governor Jackson, III. I represent Shana Hargrove, who is the power of attorney for Kevin Welch, who has filed a civil lawsuit in the United States District Court for the District of Columbia, naming you as one of the defendants based on care and treatment he received in June of 2022 at MedStar Washington Hospital Center.

As you may know, this is my one opportunity to speak with you about what you understand about your entries in the medical record, your recollection about the treatment, prior to the trial of this matter, either later this year or early next year. If at any time you don't understand a question, this isn't a memory test or any type of exam or meant to trick you up, let me know and I will rephrase it to the extent that you need to, necessary to understand it.

Your counsel has brought your medical records. Feel free to look at anything that you want to to answer a question sufficiently. I'll also be showing you some of your own records. If at any time you need a break, just let me know. We'll get you that break. All that I ask is that, if there's a question pending, you just answer that before we take a break.

In addition to speaking with your lawyer, which I'm not entitled to know the substance of those conversations, did you do anything in particular to prepare for your deposition today?

A Other than reviewing the medical chart, no.

Q Prior to your treatment of Mr. Welch in June of 2022, had you ever been the attending physician for any post Type-A aortic surgical repair patient at ICU --

A Yes.

Q -- at MedStar? On how many occasions, sir?

A I don't know the answer to that.

Q Okay. Is it more than 50, you would say?

A Probably more than 50, yes.

Q Okay. Were any of those patients patients of Dr. Alassar?

A I don't recall.

Q Okay. For those 50 or so patients, maybe more, maybe a little bit less, did any of those patients have a spinal cord infarct diagnosis while in the ICU?

A I don't recall.

Q I was provided, prior to your deposition, a copy of your CV. We don't have to mark this. I just wanted to show you. This is a copy of the list of publications --

A Mm-hmm.

Q -- that may look familiar. Are any of those publications there that you either participated in writing, authoring, or editing, are any of those dealing with any type of issues related to the treatment or relevant to the treatment of Mr. Welch in your treatment of him in the ICU?

A I would say not directly, no.

Q Okay. Anything indirectly or tangentially deal with his condition or your treatment of his condition?

MS. STURTZ: I just object to the broad nature of the question.

MR. JACKSON: Sure.

MS. STURTZ: But if you can answer.

THE WITNESS: No, I don't think so.

MR. JACKSON: Okay. Okay. Your first exhibit here in your deposition, Doctor, is your progress notes, a set of your progress notes.

(EXHIBIT 1 MARKED FOR IDENTIFICATION)

BY MR. JACKSON:

Q They start with June 19th. So we'll be starting towards the back and then working our way towards the front. If you could turn to the 15th. Progress Note, which I believe is on 320. 320. Okay. 320, yeah.

At 320 is the progress note dated June 15th, 2022. In the Perform Information section, it lists Kaitlyn Dunphy, MD. At the time Dr. Dunphy provided care and treatment to Kevin Welch, she was a postgraduate physician that was enrolled in the clinical training program; is that correct?

A That's correct.

Q What was Dr. Dunphy's classification at the time that she provided treatment to Mr. Welch?

A I'm not sure I understand that question.

Q Well, do you know what year she was in her postgraduate year clinical study at the time that she was providing treatment?

A I don't recall.

Q On the second page, it indicates that she was an SICU, Surgical Intensive Care Unit, rotating resident. As a resident and postgraduate student, how much autonomy did she have in making decisions related to the care and treatment of Mr. Welch?

MS. STURTZ: Objection to the form of the question. But you can answer it.

THE WITNESS: I'm not sure what you mean by autonomy.

MR. JACKSON: Your second exhibit is a copy of --

(EXHIBIT 2 MARKED FOR IDENTIFICATION)

BY MR. JACKSON:

Q And you can take some time to review it. And I understand -- I don't -- are you a lawyer? I don't believe you're a lawyer.

A No.

Q Okay. So I'm not asking you to really interpret, for legal purposes, the document, but to try and frame my question a little bit better. These are the District of Columbia municipal -- municipal regulations dealing with pre-licensure practice by postgraduate physicians.

And if you look at 4611.7 on Page 2?

A Okay.

Q It says, A postgraduate physician shall do the following. And then if you go over to F on the following page, sub -- part F?

A Okay.

Q It says, Be supervised by a licensed physician who is, one, a member of the medical staff of the medical institution or medical facility through which the clinical training program takes place; and, two, approved by the clinical training program to be a supervising physician.

So my direct question is, would you have then considered her supervising physician for purposes of any treatment she provided to Mr. Welch?

A For the ICU rotation, yes.

Q Okay. Had you been a supervising physician for Dr. Dunphy for a patient prior to Mr. Welch in ICU?

A It's likely she had multiple patients that day, so probably, but I don't recall specifically.

Q Do you know if you had provided any care and treatment with her as a rotating resident prior to that day, the initial day?

A I -- I don't recall specifically. We have a lot of residents.

Q Is MedStar Washington Hospital Center considered a teaching hospital?

A Yes.

Q Do you recall whether you had provided care with Dr. Dunphy as a rotating resident for any patient who was a post Type-A surgical patient?

A I don't recall.

Q Going back specifically to your note, in the second paragraph on the second line, the --

A   Which -- which page are we on?

Q   Oh, I'm sorry.  Page 320.

A   Okay.

Q   Your note states, in the 24-hour events paragraph, beginning with 24-hour events, second paragraph, second line in that paragraph, two sentences in.  I guess it'd be in the A to F bundle/IMOC section: Pain controlled, CAM-ICU positive, PT/OT passive range of motion.  Will consult when appropriate.

What are you referring to in that sentence where it says, PT/OT passive range of motion.  Will consult when appropriate?

A   **Depending on the acuity of the patient and how many issues are going on, physical therapy can actively engage with the patient, and they come to the bedside, get them out of bed and so forth.  If they're unable to do that for medical reasons, then we make arrangements with nursing to do at least range of motion of the extremities in the bed.  And sometimes we even have family members assist with that.**

Q   Can you tell by looking at either your progress note or some other record, if necessary, whether Mr. Welch had passive range of motion in all of his extremities on this date?

A   **I cannot tell from this note.**

Q   Okay.  Would the nursing note reflect that?

A   **It's possible the nursing note would reflect that.**

Q   Okay.  Can you --

A   **But I don't know.**

Q   Okay.  Can you check the nursing note for 6-15 to determine if he had passive range of motion in all of his extremities, please?

MS. STURTZ:  Just to clarify, I don't -- I don't know that the note -- is that a -- is that a physical finding note that he had passive range of motion, or is that just a plan-of-care note?

THE WITNESS:  It could be a plan-of-care note.  It could be documented in the nursing assessments.  I'm not sure where it would

be.

MS. STURTZ:  I might not -- would it be -- you don't need to record.  I think this is off the record.  Just --

COURT REPORTER:  Stand by.

(OFF THE RECORD)

BY MR. JACKSON:

Q   So we did take a short break to allow you and your counsel an opportunity to determine whether there was a nursing note, Doctor, that would indicate whether Mr. Welch had full passive range of motion in all of his extremities on 6-15.

And can we agree that we were unable, you-all were unable to locate whether -- a note that would reflect that from a nursing perspective; is that accurate?

A   **Yes.**

Q   Okay.  Going back to your progress note from 6-15, under Assessment and Plan, at the neuro section, it states, Exam GCS14.  That's referring to the Glasgow Coma Scale score, correct?

A   **Yes.**

Q   And this test score scores verbal, motor, and ocular responses; is that accurate?

A   **Yes.**

Q   Am I correct in understanding that the lower the score, the less responsive a patient?

A   **Yes.**

Q   Based on your education, training, and experience, Doctor, would it be fair to state that a GCS score between 3 to 8 would usually be associated with a patient in a coma?

MS. STURTZ:  Objection to form and foundation.  But you can answer.

THE WITNESS:  Coma is a very general term to -- I guess to speculate, a GCS of 8 would be a less responsive patient.

BY MR. JACKSON:

Q   On this date, for Mr. Welch, were you concerned, from a clinical perspective, with his presentation of a GCS score of 14?

A   **The note also says that he was delirious at that point.  And so there would've**

been some concern, though, with this case after a major aortic repair. It is not uncommon for patients to be -- to have some delirium postoperatively.

Q    What did you attribute Mr. Welch's delirious state to on this particular date at 6-15?

A    I don't recall specifically. However, for the usual case like this, there are numerous potential causes.

Q    Such as what?

A    Such as intraoperatively. There's a -- a high likelihood of a neurologic event given the aortic reconstruction and a bypass run. Others factors, how long the patient was on the pump, certainly, temperature achieved, whether or not there was a circulatory arrest intraoperatively.

And immediately postoperatively, we look at the amount of pain medication the patient received, whether or not they have a fever. Disruption of sleep cycles can also cause delirium. That's not an all-inclusive list but those are a few of the things we would think about.

Q    So I just want to take some of those in turn. You -- the first one on your list was an intraoperative neurologic event. Would an Intraoperative neurologic event for an aortic dissection be considered a complication of that particular procedure?

MS. STURTZ: Objection to form of the question. But you can answer.

THE WITNESS: It's one of the risks of the procedure, certainly.

BY MR. JACKSON:

Q    Do -- do you know on 6-15, whether or not Mr. Welch had sustained an Intraoperative neurological event?

A    At which date? I'm sorry.

Q    On 6-15, were you aware of whether or not Mr. Welch suffered an Intraoperative neurological event during Dr. Alassar's operation?

MS. STURTZ: Objection to the form of the question. But you can answer.

THE WITNESS: In this particular case, it always -- it -- in a case like this with aortic reconstruction or any case that's done on bypass, it's always in our differential of neurologic changes.

BY MR. JACKSON:

Q    Okay. But I'm asking, I guess, a more pointed question in terms of, was there a specific neurologic event that you were able to identify that occurred -- that you know occurred to a degree of certainty during the operation by Dr. Alassar for Mr. Welch?

MS. STURTZ: Objection. Asked and answered. But you can answer again.

THE WITNESS: I can't specifically say if there was a specific event.

BY MR. JACKSON:

Q    What about with respect to circulatory arrest intraoperatively? Is there any indication in the record or from your recollection that Mr. Welch suffered a circulatory arrest during Dr. Alassar's procedure?

A    So the -- I believe the operative note for this points to the fact that there was a circulatory arrest as part of the aortic reconstruction. And that would be a standard event for a procedure like this.

Q    On 6-15, when you saw the patient and were developing the plan-of-care with Dr. Dunphy, was it with the premise that the circulatory arrest was the cause of his delirium?

MS. STURTZ: Objection. Asked and answered. But you can answer again.

THE WITNESS: Again, it would be a differential looking at what could cause his confusion, knowing that patients that undergo a cardiopulmonary bypass run do have a high likelihood of being -- having delirium postoperatively.

BY MR. JACKSON:

Q    On this date, was there anything about his medication regimen on this particular date that you felt was a cause of his delirium?

A   I don't recall specifically, and I -- I cannot ascertain that from this note.

Q   Okay.  On the next page, 321, if you go under the CCM Attending section at the bottom at the Neuro subsection, it states, Extubated this morning.  No focal deficit.

What did you mean by no focal deficit in this context?

A   That in general means there's no discreet deficits.  They seem to be moving everything, they're opening their eyes, they're responding, but it's a very vague, general, nonspecific term.

Q   At the cardiovascular section, CV, The mean arterial pressure goal of 70 to 85.  Did you set that or did Dr. Dunphy set that goal?

A   The immediate postoperative blood pressure goals in this usual practice for patients like this is really determined in consultation with a cardiac surgeon, Dr. Alassar, who I would suspect he was a very hands-on surgeon.  So I would -- I can't recall specifically, but typically he would be at the bedside and we'd have that discussion about what his blood pressure goals would be each day.

Q   Okay.  So this -- this was done in conjunction with consult with Dr. Alassar?

A   That would be the usual practice, yes.

Q   With respect to the systolic blood pressure, SVP being less than 130, would that also have been in consult with Dr. Alassar?

A   Yes.

Q   Do you recall what Dr. Alassar shared with you in consult in terms of his basis for keeping the systolic blood pressure at one third -- below 130 as a goal for Mr. Welch?

A   I don't recall any specific conversation about that, but the usual practice after a major aortic repair would be blood pressure control to some degree as specified by the surgeon, depending on how he or she did the repair and their concern for rupture of the repair if the blood pressure were to be too high.

Q   So would it have been your position then, as an attending physician for Mr. Welch, that you would have deferred to Dr. Alassar's determination with respect to augmentation of blood pressure for his condition?

A   The usual practice would be a discussion among the clinicians involved.  So in this case, immediately postoperatively, it would've been the cardiac surgeon and the ICU team.

Q   Okay.

A   It would be a discussion of the risks and benefits and where we would like the blood pressure to be.

Q   For two days post-op, would it still be a discussion between you and the cardiac surgeon or would that be more within your discretion to determine blood pressure augmentation?

A   For two days, typically, it would still be a discussion with a surgeon.

Q   What about three days post-op?

A   For three days?  Typically, as long as the patient remains in the ICU, it's a -- it's a discussion with the cardiac surgeon, the goals of blood pressure management.

Q   If you go to Page 316.  Okay.  And this is your progress note from June 16th, 2024.  Starting at the bottom and then going -- really the substance is over onto 317.

A   Okay.

Q   Under the Neuro Assessment and Plan section, it says, Exam GCS score 10.  What was your differential diagnosis from the decrease -- for the decrease from 14 to 10 for the GCS score?

A   I don't recall specifically in this time frame.  I do see in the 24-hour events, just above that, the -- the -- it says, Dex turned on due to agitation and attempting to injure the bedside nurse.

Q   And what is dex referring to?

A   That's referring to dexmedetomidine, which is a sedative and analgesic that we deploy commonly in the cardiac ICU, in most ICUs.

MR. JACKSON:  Can we just take a brief

moment, please?

COURT REPORTER: Stand by.

(OFF THE RECORD)

MR. JACKSON: Can you read the last -- his last question and response?

COURT REPORTER: Yes.

(The pending question was played back. )

BY MR. JACKSON:

Q In the Assessment and Plan section where it states, #encephalopathy. Colon. Unclear etiology. Toxic metabolic versus relative hypotension. N/O strict BP control in a hypertensive patient. No concern for stroke given non-focal exam. Will send pneumonia HIV TSH hepatitis panel.

Is that sentence in bold there, is that meant to depict your differential for his encephalopathic presentation? Is that why it's written in that manner?

A **This is the portion written by the resident.**

Q Okay.

A **I'm not sure why she bolded that, to be honest.**

Q Okay. Did you agree or --

A **Or the --**

Q Okay.

A **-- the or the hashtag thing is another thing that residents do these days.**

Q Okay. Okay. Did you -- did you -- do you recall a discussion with Dr. Dunphy about what she meant by that entry as it pertained to Mr. Welch's clinical presentation?

A **I don't recall a specific discussion from 2022, but typically we would have a discussion about the etiologies of an encephalopathy postoperatively and it would potentially include those two things, but it would be a longer differential.**

Q Okay. Do you -- did you have a different differential for his encephalopathic presentation?

A **I could -- in this specific case, the**

**differential for -- the differential for, in any case, really, is pretty broad for postoperative encephalopathy. So I would say different, I would say we would have more potential causes.**

Q What would those potential causes be?

A **Potential medication-induced infection. So fever, white count, presence or absence of liver disease, presence of kidney disease, disruption of sleep cycles, metabolism of sedation and analgesia relative to the ability of the patient to do so in the presence or absence of liver disease. That's a not all-inclusive list, but so those are some of the things that would come to mind.**

Q Is there anything in your clinical progress note for this date that would suggest any actions taken by you in terms of your plan for the care of Mr. Welch with respect to guarding against medication-induced encephalopathy -- encephalopathy, based on the sedatives that were a part of the assessment and plan?

MS. STURTZ: Objection to form and foundation of the question. But you can answer if you're able.

THE WITNESS: I think that's a challenging issue in patients that have postoperative delirium. I mentioned previously that the patient did injure a bedside nurse, apparently, that day. I don't recall that specifically, but that's what's documented here. We try to use infusions that are short-acting and we can turn on or off. That's what we can do.

But we can't control for medications that were given intraoperatively, potentially. Patient was on fentanyl. I see in a postoperative pain, for instance. It says PCA 0/20/6. Those are pretty low doses for fentanyl in general, for a normal-sized man. So we try to -- we use that drug because it's, in general, short-acting. However, not knowing the total amounts of fentanyl, I don't have that. It's hard to Judge from this record.

BY MR. JACKSON:

Q   You indicated that it was Dr. Dunphy's entry with the hashtag in all bold.  Part of that entry is, No concern for stroke given non-focal exam.  Did you have a separate opinion as to whether there was a concern for stroke on this date for Mr. Welch?

**A   I don't recall specifically, but that diagnosis could always be in the differential for a postoperative cardiopulmonary bypass patient.**

Q   Was stroke on your differential for Mr. Welch on this date --

MS. STURTZ:  Objection.  Asked --

BY MR. JACKSON:

Q   -- for -- for his encephalopathic clinical presentation?

MS. STURTZ:  Objection.  He just answered the question.

But you can answer again.

THE WITNESS:  I don't recall specifically, but again, that would be in a differential.

BY MR. JACKSON:

Q   But you don't recall specifically as it relates to Mr. Welch, correct?

**A   Correct.**

Q   At Page 313 is the beginning of the note for June 17th and going over to Page 314 at the Neuro section, in bold there, it states, BL, bilateral.  UE, moving equally.  Bilateral upper extremities moving equally.  RLE, right lower extremities, 3/5.  Weakness and withdrawals to pain.  LLE, lower left extremity, no withdrawal or movement.

Was that your entry or was that Dr. Dunphy's or can you tell?

**A   The way the notes are constructed, that would be Dr. Dunphy's entry.**

Q   If you go over to Page 315 under the Neuro section at CCM Attending, it lists, Spinal cord infarction.  Or let me read the note.  I'm sorry.  Neuro: confused.  Lower extremity weakness observed with sedation wean this morning - differential/spinal cord infarction.  Minimize sedation.  Will ask stroke team to evaluate.

And I guess my pointed question is, why was spinal cord infarction on your differential based on his neurological presentation on this date?

**A   Spinal cord infarction would potentially be included in a differential of any extremity weakness.  I also noted a differential of stroke, although I didn't specify what kind of stroke.**

Q   Why did you add -- why did you think it was appropriate for the stroke team to evaluate the patient?

**A   I don't recall specifically in this case, however, the usual practice would be any change in mental status we would immediately call the surgeon of record, discuss it with them and come up with a game plan as far as what would be the plan.  And we probably asked neurology to see the patient because there were numerous possibilities and it was unclear at that point. What the ideology of the weakness was.**

Q   If you go back to 314, the #encephalopathy in all bold, that line, and then the one word under that.  Is that Dr. Dunphy's entry with the hashtag, I presume?

**A   Yes, it is.**

Q   Okay.  Where she refers to CTH, is that a CT of the head or do you know?

**A   CTH, I believe, is CT of the head.**

Q   Okay.  And she also states, MRI brain today.  As the attending, and I guess her supervising physician, was it your understanding that the MRI that was going to be ordered for Mr. Welch going to be performed on this date, June 17th?

MS. STURTZ:  Objection to form and foundation.

THE WITNESS:  I don't recall specifically, but the usual practice would be for us to have a discussion with, in this case, neurology and the primary surgeon and really the whole ICU team at the bedside, what the risks and benefits would be of any travel that would be required for any of those studies.

And the other issue would be that this represents a single point in time, and we evaluate these patients typically continuously throughout the day. So when this note was written, may not reflect information that we may gather moving through the day.

MR. JACKSON: We'll mark this as the next exhibit.

(EXHIBIT 3 MARKED FOR IDENTIFICATION)

MS. STURTZ: Thank you.

BY MR. JACKSON:

Q Before we go to the next exhibit, Doctor, the -- your professional opinion, based on your training and education and experience, was there any risk to Mr. Welch, based on his clinical presentation on June 17th, of not performing the MRI on that day, given that spinal cord infarction was on the differential for his lower extremity weakness?

A As I look at that progress note for that day, I see a couple of things that would be potential issues. And we do, as a usual practice, discuss with the bedside nurses, well, how safe it would be for a patient to travel. MRI is in a different part of the hospital, requires a patient to be minimally monitored during that period, would have to lay flat.

So I see he was still -- had delirium and had to be frequently reoriented and did use dex. So the patient has to stay still for the exam to get a meaningful exam. So that would be one issue. The second one I see, looking at this note, would be his hypoxia. He was on a high-flow nasal cannula device at 60 liters of oxygen flow.

Dr. Dunphy writes 60 percent, so I assume that means an FIO2 of 60 percent. That's a significant oxygen supplementation. So the patient had issues with hypoxia. So we -- that would give us pause to travel with that patient after discussing the risks and benefits and how it would potentially change care.

Q Okay. So you listed the delirium, the -- the dex. You said, I guess, the dex amount that was being administered and the hypoxia?

A Mm-hmm.

Q Okay. Those were the three risk factors for performing an MRI on that day?

A And also the patient was on continuous infusions of blood pressure control medication. So we would also look at patients that travel for MRI have to be on a limited number of drips because the pumps have to be special for the MRI suite. So that's a challenge as well. We have to use a different pump and --

MS. STURTZ: I think it also said lead wires or no -- or was that --

THE WITNESS: Oh, yeah. Yeah, that's true as well. Where is that documented? The patient also had their epicardial leads in place as well. Those are contraindicated in MRI. And those would've stayed in place during this phase because of the blood pressure control that we required. And also because of the dexmedetomidine, which is known to slow heart rate. So we keep those in as a safety measure in case we have to pace the patient to maintain perfusion to avoid hypotension.

BY MR. JACKSON:

Q On this particular date, according to the note on 314, I'm looking in the cardiovascular section, it appears that his systolic pressure was in the 160s; is that accurate? SBPs?

A That's what -- what Dr. Dunphy is documenting.

Q Based on the entry three lines down at the Anti-HTN agents: nicardipine 5-15. Up-titrating for strict SBP goal of less than 130. If I'm reading this correctly, were those agents being -- those HTN agents being given to achieve the SBP goal of less than 130?

A Yes, I believe that's how I'd read that.

Q Why was that -- why were those agents being administered in that fashion with that purpose in mind, given his systolic pressure being in the 160s? I mean, was -- was the

purpose of the administration of these particular agents to drop the blood pressure from 160 down to under 130?

A   Again, that would be -- the blood pressure goal specifically would be in consultation with the -- the surgeon in -- in the context of the aortic repair.  So presumably that's why we had the patient on nicardipine.  It's a titratable drip, short-acting.  We can get control of the blood pressure.

It's not uncommon for these patients.  In fact, I believe I recall he -- he presented with pretty significant hypertension, so it's not uncommon for these patients to require blood pressure control postoperatively.

Q   And the ultimate goal here of that titration drip was to decrease that systolic number down to under 130, right?

A   I don't recall specifically, but that's what's documented in the note.

Q   I mean, is there any other way to interpret SBP goal less than 130?  I'm just trying to understand the entry in the context of this assessment plan?

A   That's what's documented for us, an SBP goal of less than 130.  So I assume that was our goal at the time.

Q   Okay.  If you go to now the neurological consult, which I believe was the next exhibit marked?

A   Okay.

Q   If you go to Page 45, under the Assessment and Plan section, paragraph?

A   45.  Okay.

MS. STURTZ:  You can read all of it if you need to.

MR. JACKSON:  Yes.  Certainly

MS. STURTZ:  Because he's directing you to a particular section.

THE WITNESS:  Okay.

BY MR. JACKSON:

Q   If you need to take a moment, that's fine, too.  But I'm directing your attention specifically to that last full sentence in the

first paragraph, beginning with etiology.  Etiology of BLE, weakness: higher C/F thoracic (watershed region) infarct; medium C/F ACA infarct; lower C/F cervical infarct.

And trying to characterize this consult note, would you agree, Doctor, that this is the etiology of Mr. Welch's bilateral -- bilateral extremity weakness as determined by Dr. Cai, based on his consult with the patient on June 17th?

MS. STURTZ:  Objection to form and foundation.  But you can answer.

THE WITNESS:  Can you repeat that question again?  I'm sorry.

BY MR. JACKSON:

Q   Yes.  This -- the -- that etiology finding that I just referred to, that comes from the assessment and plan based on Dr. Cai's neurological consult of Mr. Welch on 6-17, correct?

MS. STURTZ:  With Dr. Lin, I think, or --

THE WITNESS:  Yeah.  So then Dr. Cai is the neurology resident so that's his portion of the note.  So that's what he documented as a potential -- potential etiologies.

BY MR. JACKSON:

Q   Okay.  Would that --

A   That may not be all-inclusive.

Q   Okay.  Would Dr. Cai and/or Dr. Lin have informed you or discussed with you that etiology finding after this consult?

MS. STURTZ:  Objection to form and foundation.  But you can answer.

THE WITNESS:  I don't recall specifically, but the usual practice would be for us to have a discussion with the neurologist as well as the cardiac surgeon after this assessment.

BY MR. JACKSON:

Q   After this consultation with neurology, were you aware, as the attending physician, of any clinical or diagnostic procedures that could have been performed to address Kevin's -- Mr. Welch's lower extremity

weakness, given that the MRI had not been performed on this day?

MS. STURTZ: Objection to form and foundation. And I assume you mean above and beyond what they were already doing?

BY MR. JACKSON:

Q Yes. Was there any other clinical diagnostic -- or diagnostic procedure other than what was being documented as being done in the record that could have been done to address Mr. Welch's lower extremity weakness?

MS. STURTZ: Same objection. But you can answer if you're able.

THE WITNESS: There's a broad differential for that weakness. So other studies that could have been done -- okay. Potentially the patient did have -- I can't really think of any at the moment.

BY MR. JACKSON:

Q Okay. Did you ever consult with either Dr. Lin or Dr. Cai, from your recollection, as to whether Mr. Welch was an appropriate candidate for CSF drainage via lumbar drain placement?

A I don't specifically recall that discussion. That modality of treatment would be generally deployed -- considered to be deployed in a -- a descending thoracic repair, which covers the aorta after the takeoff of the left subclavian artery down to the abdomen, which can impede collateral blood flow to the spinal cord.

So we do consider that therapy in those cases, specifically. This case is notable to be a Type-A dissection with proximal aortic repair, so typically that's not done in this case.

Q Have you ever been involved, as attending physician of record, for an aortic repair, a Type-A aortic repair where CSF treatment was utilized in an ICU setting for a complication of a patient?

A I don't recall specifically.

Q All right. If you go back to the -- clinical notes, your progress notes, to the 6-18 entry on 312?

A 312? Okay.

Q And under the Neurologic component, that last phrase there, MRI not done for safety reasons. I think this can be deferred for now with much improved exam. What are the safety reasons that you are referring to in this note?

MS. STURTZ: Objection. I think it's asked and answered already with the list of risks. But you can answer again.

BY MR. JACKSON:

Q Is it that same set of five risks that you had listed earlier, or is there anything more to include in this list on this date?

A I think that's -- we -- if I look at my note and review it, again, the use of sedation, the use of continuous medications to control the blood pressure, the hypoxia and use of high-flow nasal cannula. Those are all things that potentially can lead to safety issues with an MRI.

Q You had indicated that --

A And the pacing wires.

Q You indicated in your earlier answer that the MRI would've been performed in a different part of the hospital and there would've been travel required for the patient. How far in distance are we talking? It another -- is it feet, another floor, another suite? I mean, I'm just trying to get an understanding of how far the travel would be?

A It depends on the time of day. There's several different MRIs, but they're all located in different buildings.

Q Okay.

A So it's -- and different floors. So it's a trip over, down -- down an elevator and to different buildings.

Q The MRI that was ultimately performed for Mr. Welch, where was that MRI performed?

A I -- I don't recall. I have no idea.

Q Okay. You don't know where it was in relation to the ICU suite that you were providing treatment?

A Correct.

**45**

Q   Okay.

A   For him specifically.  There are -- there are, like I said, several MRI Suites, so I don't know which one he went to.

Q   Do you know who would know that information or would it be --

A   I -- honestly, I don't know if that information is specifically documented.

MS. STURTZ:  I'm just going to look and see --

THE WITNESS:  Yeah.

MS. STURTZ:  -- if it's on the report.

THE WITNESS:  Yeah.

MS. STURTZ:  If it says a place and maybe you would know.

THE WITNESS:  It'll typically say what kind of MRI was used but --

MS. STURTZ:  Maybe not.

BY MR. JACKSON:

Q   In your note that I was just referring to, you said, I think this can be deferred for now with much improved exam.  What was the

**46**

improvement in the exam that you were referring to in that note?

A   I don't recall specifically.  Above that, however, there, I say, Now moves left lower extremity.  So I --

Q   In the 24-hour events, right?

A   No.  After I say, Neurologic colon. Still confused, but follows commands and now moves left lower extremity.

Q   Okay.

A   That may be in part what I was referring to but --

Q   Is there anything in your note that indicates that Mr. Welch had movement in his right lower extremity on this date?

A   I don't see anything documented in this note.

Q   But with respect to the CSF procedure we had discussed before, is it your answer that on this date, 6-18, Mr. Welch would not have been an appropriate candidate for the same reasons you had discussed before in your prior answer?

**47**

A   The usual practice would be to have a discussion, if -- if we thought we would consider that therapy.  Based on the kind of surgery where the aortic repair was, we would discuss it with the, again, the cardiac surgeon and the neurologist, looking at the risks and benefits of that procedure, potential injury during that procedure, to spinal cord is a possibility and -- and bleeding.

And so we would weigh those risks and benefits before doing that.  But in -- again, in this case, typically for a Type-A dissection, it's -- that therapy would not be indicated.

Q   And so that I understand correctly, was the decision -- did you make the affirmative decision to not have the MRI performed on this date?

A   Typically -- I don't recall specifically, but typically that's a group decision with the entire ICU team and a discussion with the surgeon and the neurologist. Do we need this study urgently?  Is it going to

**48**

change our care significantly?  Is there a -- those are the questions we would ask.

Q   Did you, as the attending provider, and I understand it was a group discussion, but did you, as the attending and supervising physician, believe that it was urgent to have the MRI done on June 18th?

A   On June 18th?

Q   Yes.

A   I don't recall specifically, but what I can say is that I -- I did say I think this can be deferred for now with a much improved exam, so.

Q   You have nothing more to add to what your note states, correct?

A   That's correct.

Q   On Page 310, the front page, this is the note from 6-19.

A   Mm-hmm.  Okay.

Q   Again, in the Neurologic section, the last sentence there, MRI not done for safety reasons.  That phrase, are -- is that still the same reasons that you've alluded to for the

49

previous dates with respect to the MRI not being done?

A   Yes.  I would also add I -- it looks like I included on my documentation that I discussed that with Dr. Alassar, the cardiac surgeon.

Q   There was medical literature produced by the plaintiffs in discovery in this case, peer reviewed literature.  Have you reviewed any of those articles prior to your deposition?

A   No, I have not.

MR. JACKSON: Okay.  Okay.  Pending any questions from your counsel, that's all I have for you this morning.  Thank you, Doctor, for your time.

THE WITNESS:  Thank you.

MS. STURTZ:  I do not have any questions at this time.  Thank you very much. You have the right to read and sign the deposition.  I'll recommend you do that.  We can just make sure everything is --

THE WITNESS:  Yes.

50

MS. STURTZ:  -- taken down accurately and you can --

THE WITNESS:  Yes.

MS. STURTZ:  -- send that transcript to me and I will get the errata sheet to the doctor.  Thank you.

(Off the record at 10:05 a.m.)

51

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Donte Robinson, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Donte Robinson, Notary Public in and for the District of Columbia.

52

CERTIFICATION OF TRANSCRIPT

I, Marti Schreiber, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said proceedings were reduced to typewriting under my supervision; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

Marti Schreiber,
Planet Depos, LLC
May 21, 2024

## A

**abdomen**
42:8
**ability**
27:10, 51:11,
52:8
**able**
19:10, 28:3,
41:13
**about**
5:20, 5:21,
5:22, 18:3,
19:19, 20:20,
22:2, 22:16,
23:21, 26:10,
26:15
**above**
24:15, 41:4,
46:3
**absence**
27:8, 27:12
**aca**
39:3
**according**
36:4
**accurate**
15:16, 16:3,
36:8, 51:10,
52:7
**accurately**
50:1
**achieve**
36:16
**achieved**
17:16
**actions**
27:17
**actively**
13:16
**acuity**
13:14
**add**
31:10, 48:13,
49:3
**addition**
6:17
**address**
40:22, 41:10

**administered**
35:1, 36:20
**administration**
37:1
**affirmative**
47:15
**affirmed**
5:4
**after**
17:1, 22:17,
34:19, 40:10,
40:16, 40:18,
42:7, 46:7
**again**
19:15, 20:12,
20:13, 29:18,
29:20, 37:4,
39:14, 43:9,
43:15, 47:5,
47:11, 48:19
**against**
27:19
**agents**
36:12, 36:15,
36:19, 37:2
**agitation**
24:16
**agree**
15:13, 26:4,
39:6
**al**
1:9
**alassar**
7:14, 19:13,
21:20, 22:5,
22:9, 22:11,
49:5
**alassar's**
18:21, 20:1,
23:2
**all**
6:14, 14:4,
14:14, 15:12,
29:2, 32:1,
38:13, 42:20,
43:18, 44:10,
49:13
**all-inclusive**
18:1, 27:13,

40:7
**allow**
15:8
**alluded**
48:22
**already**
41:5, 43:8
**also**
6:11, 16:21,
17:22, 22:9,
31:7, 32:8,
35:5, 35:7,
35:12, 35:16,
35:20, 49:3
**although**
31:8
**always**
19:3, 19:5,
29:8
**among**
23:6
**amount**
17:20, 34:22
**amounts**
28:20
**analgesia**
27:10
**analgesic**
24:20
**another**
26:7, 44:5,
44:6
**answer**
6:10, 6:15,
7:9, 8:18,
10:10, 16:13,
18:11, 19:1,
19:15, 20:12,
28:2, 29:18,
39:12, 40:12,
41:13, 43:9,
44:1, 46:19,
46:22
**answered**
19:15, 20:12,
29:17, 43:8
**anti-htn**
36:12

**any**
6:2, 6:4, 6:12,
7:4, 7:13, 7:17,
8:4, 8:7, 11:21,
12:8, 12:18,
19:4, 19:20,
22:15, 27:1,
27:17, 31:6,
31:14, 32:21,
32:22, 33:15,
37:21, 40:20,
41:7, 41:18,
49:9, 49:13,
49:17, 51:4,
51:12, 52:9
**anything**
6:9, 6:20,
8:12, 20:20,
27:15, 43:12,
46:13, 46:16
**aorta**
42:7
**aortic**
7:4, 17:2,
17:14, 18:7,
19:4, 20:4,
22:17, 37:7,
42:12, 42:15,
42:16, 47:4
**apparently**
28:8
**appears**
36:6
**appropriate**
13:10, 13:13,
31:11, 42:1,
46:21
**approved**
11:16
**arrangements**
13:19
**arrest**
17:17, 19:20,
19:22, 20:4,
20:10
**arterial**
21:15
**artery**
42:8

**articles**
49:10
**ascertain**
21:2
**asked**
19:14, 20:11,
29:12, 31:18,
43:8
**asking**
10:21, 19:8
**assessment**
15:19, 24:9,
25:10, 27:21,
38:2, 38:11,
39:18, 40:16
**assessments**
14:22
**assist**
13:22
**associated**
16:11
**assume**
34:15, 38:4,
41:4
**attached**
4:8
**attempting**
24:16
**attending**
7:3, 21:4,
23:1, 30:17,
32:9, 40:19,
42:15, 48:3,
48:5
**attention**
38:21
**attorney**
5:13
**attribute**
17:5
**audio**
51:8, 52:4
**augmentation**
23:3, 23:18
**authoring**
8:6
**autonomy**
10:6, 10:12

**avenue**
2:7, 3:14
**avoid**
36:2
**aware**
18:19, 40:19

---
**B**
---
**back**
9:4, 12:21,
15:18, 25:7,
31:22, 42:20
**based**
5:17, 16:8,
27:20, 31:3,
33:13, 33:15,
36:11, 39:9,
39:18, 47:3
**basis**
22:12
**because**
28:18, 31:19,
35:9, 35:19,
35:20, 38:16
**bed**
13:17, 13:21
**bedside**
13:17, 22:2,
24:17, 28:7,
32:20, 34:1
**been**
7:3, 12:2,
17:1, 22:9,
22:22, 23:8,
40:21, 41:1,
41:10, 41:16,
42:14, 44:2,
44:4, 46:20
**before**
2:13, 6:15,
33:12, 46:19,
46:22, 47:11,
51:3
**beginning**
13:5, 30:4,
39:1
**behalf**
3:3, 3:11

**being**
5:4, 20:17,
22:8, 35:1,
36:15, 36:20,
36:22, 41:9,
49:1
**believe**
9:6, 10:19,
20:2, 32:7,
36:17, 37:12,
38:7, 48:6
**below**
22:14
**benefits**
23:12, 32:21,
34:19, 47:6,
47:11
**best**
51:10, 52:7
**better**
11:1
**between**
16:10, 23:15
**beyond**
41:5
**bilateral**
30:7, 39:7,
39:8
**bit**
7:17, 11:1
**bl**
30:6
**ble**
39:2
**bleeding**
47:9
**blood**
21:17, 22:3,
22:7, 22:13,
22:17, 22:21,
23:4, 23:12,
23:17, 24:3,
35:6, 35:19,
37:2, 37:4,
37:10, 37:15,
42:9, 43:17
**bold**
25:17, 29:2,

**30:6, 32:1**
**bolded**
26:2
**bottom**
21:4, 24:6
**bp**
25:13
**brain**
32:8
**break**
6:13, 6:14,
6:16, 15:8
**brief**
24:22
**broad**
8:16, 27:2,
41:14
**brought**
6:8
**buildings**
44:11, 44:15
**bundle**
13:8
**bypass**
17:14, 19:5,
20:16, 29:9

---
**C**
---
**cai**
39:9, 40:1,
40:8, 41:21
**cai's**
39:18
**call**
31:15
**cam-icu**
13:8
**can't**
19:16, 21:22,
28:12, 41:17
**candidate**
42:1, 46:21
**cannot**
14:5, 21:2
**cannula**
34:12, 43:18
**cardiac**
21:20, 23:8,

23:15, 24:2,
24:21, 40:16,
47:5, 49:5
**cardiopulmonary**
20:16, 29:9
**cardiovascular**
21:14, 36:6
**care**
5:17, 9:11,
10:4, 10:7,
12:9, 12:17,
27:18, 34:20,
48:1
**case**
1:6, 17:1,
17:9, 19:2,
19:3, 19:4,
23:7, 26:22,
27:2, 31:14,
32:18, 36:1,
42:11, 42:13,
47:12, 49:8,
51:13, 52:10
**cases**
42:11
**cause**
17:22, 20:10,
20:14, 20:22
**causes**
17:10, 27:4,
27:5
**ccm**
21:4, 30:17
**center**
5:18, 12:13
**certainly**
17:16, 18:13,
38:15
**certainty**
19:12
**certificate**
51:1
**certification**
52:1
**certify**
51:4, 52:2
**cervical**
39:4

**challenge**
35:10
**challenging**
28:5
**change**
31:15, 34:20,
48:1
**changes**
19:6
**characterize**
39:5
**chart**
7:1
**check**
14:12
**circulatory**
17:17, 19:19,
19:22, 20:4,
20:9
**civil**
1:3, 1:6, 5:14
**clarify**
14:15
**classification**
9:16
**clinical**
9:13, 9:22,
11:15, 11:17,
16:19, 26:12,
27:15, 29:15,
33:16, 40:20,
41:7, 42:21
**clinicians**
23:6
**collateral**
42:9
**collection**
4:12
**colon**
25:11, 46:7
**columbia**
1:2, 1:15, 2:8,
2:15, 3:16,
5:16, 11:2,
51:19
**coma**
15:21, 16:11,
16:14

**come**
13:17, 27:14,
31:17
**comes**
39:17
**commands**
46:8
**commonly**
24:21
**complication**
18:8, 42:18
**component**
43:2
**concern**
17:1, 22:20,
25:14, 29:3,
29:5
**concerned**
16:19
**condition**
8:13, 8:14,
23:4
**confused**
30:19, 46:8
**confusion**
20:15
**conjunction**
22:5
**consider**
42:10, 47:2
**considered**
11:20, 12:14,
18:8, 42:5
**constitution**
2:7, 3:14
**constructed**
30:14
**consult**
13:10, 13:13,
22:5, 22:9,
22:12, 38:7,
39:6, 39:9,
39:19, 40:10,
41:20
**consultation**
4:15, 21:20,
37:6, 40:18
**context**
21:8, 37:7,

38:1
**continuous**
35:5, 43:16
**continuously**
33:3
**contraindicated**
35:17
**control**
22:18, 25:13,
28:12, 35:6,
35:19, 37:10,
37:15, 43:17
**controlled**
13:8
**conversation**
22:16
**conversations**
6:19
**copy**
7:22, 8:2,
10:14
**cord**
7:18, 30:18,
30:21, 31:2,
31:5, 33:18,
42:9, 47:8
**correct**
9:14, 9:15,
15:22, 16:5,
30:2, 30:3,
39:20, 44:22,
48:14, 48:15
**correctly**
36:14, 47:14
**could**
9:5, 14:20,
14:21, 20:14,
26:22, 29:8,
40:21, 41:10,
41:16
**counsel**
5:7, 6:8, 15:9,
49:13, 51:12,
52:9
**count**
27:7
**couple**
33:21

**court**
1:1, 5:15,
15:5, 25:2,
25:6, 51:1
**covers**
42:7
**csf**
42:1, 42:16,
46:18
**ct**
32:6, 32:7
**cth**
32:5, 32:7
**cv**
7:22, 21:14
**cv--rjl**
1:7
**cycles**
17:22, 27:9

**D**

**date**
14:4, 16:18,
17:6, 18:18,
20:20, 20:21,
27:16, 29:6,
29:11, 31:4,
32:12, 36:4,
43:13, 46:15,
46:20, 47:17
**dated**
9:8
**dates**
49:1
**day**
12:6, 12:10,
22:3, 28:8,
33:4, 33:6,
33:17, 33:21,
35:4, 41:2, 44:9
**days**
23:14, 23:19,
23:21, 23:22,
26:8
**dc**
4:14
**deal**
8:13

**dealing**
8:7, 11:3
**decision**
47:15, 47:16,
47:20
**decisions**
10:7
**decrease**
24:11, 24:12,
37:17
**defendant**
3:11
**defendants**
1:10, 5:16
**deferred**
23:2, 43:4,
45:21, 48:12
**deficit**
21:6, 21:8
**deficits**
21:10
**degree**
19:12, 22:18
**delirious**
16:22, 17:6
**delirium**
17:3, 18:1,
20:10, 20:17,
20:22, 28:6,
34:7, 34:21
**depending**
13:14, 22:19
**depends**
44:9
**depict**
25:18
**deploy**
24:20
**deployed**
42:5
**depos**
52:18
**deposition**
1:14, 2:1, 4:9,
6:21, 7:22,
8:21, 49:10,
49:20
**descending**
42:6

**description**
4:11
**determination**
23:3
**determine**
14:13, 15:9,
23:17
**determined**
21:19, 39:8
**developing**
20:8
**device**
34:12
**dex**
24:15, 24:18,
34:8, 34:22
**dexmedetomidine**
24:19, 35:21
**diagnosis**
7:19, 24:11,
29:8
**diagnostic**
40:20, 41:8
**different**
26:20, 27:3,
34:3, 35:11,
44:3, 44:10,
44:11, 44:13,
44:15
**differential**
19:5, 20:14,
24:11, 25:18,
26:18, 26:20,
27:1, 29:8,
29:10, 29:21,
30:21, 31:3,
31:6, 31:7,
33:18, 41:15
**digital**
51:8, 52:3
**direct**
11:19
**directing**
38:16, 38:21
**directly**
8:11
**discovery**
49:8

**discreet**
21:10
**discretion**
23:17
**discuss**
31:16, 34:1,
47:4
**discussed**
40:9, 46:19,
46:22, 49:5
**discussing**
34:19
**discussion**
22:2, 23:6,
23:11, 23:15,
23:20, 24:2,
26:10, 26:13,
26:15, 32:18,
40:15, 42:4,
47:2, 47:21,
48:4
**disease**
27:8, 27:9,
27:12
**disruption**
17:22, 27:9
**dissection**
18:8, 42:12,
47:12
**distance**
44:5
**district**
1:1, 1:2, 1:15,
2:8, 2:15, 3:16,
5:15, 11:2,
51:19
**division**
1:3
**doctor**
5:9, 8:21,
15:10, 16:9,
33:13, 39:6,
49:14, 50:6
**document**
10:22
**documentation**
49:4
**documented**
14:21, 28:9,

| | | | |
|---|---|---|---|
| 35:15, 37:20, 38:3, 40:3, 41:9, 45:8, 46:16 | **drop** 37:2 | 27:3, 27:20, 32:1 | 42:14 |
| **documenting** 36:10 | **drug** 28:18 | **engage** 13:16 | **everything** 21:11, 49:21 |
| **doing** 41:5, 47:11 | **due** 24:16 | **enrolled** 9:13 | **exam** 6:4, 15:20, 24:10, 25:15, 29:4, 34:9, 43:5, 45:22, 46:1, 48:12 |
| **done** 19:4, 22:4, 41:9, 41:10, 41:16, 42:13, 43:3, 48:7, 48:20, 49:2 | **duly** 5:4 | **entire** 47:20 | **examination** 4:2, 5:7 |
| | **dunphy** 9:10, 9:11, 12:3, 12:17, 20:8, 21:16, 26:10, 34:14, 36:9 | **entitled** 6:18 | **examined** 5:6 |
| **donna** 3:12 | **dunphy's** 9:16, 29:1, 30:13, 30:15, 32:2 | **entries** 5:21 | **exhibit** 4:9, 4:11, 8:21, 9:1, 10:13, 10:15, 33:8, 33:9, 33:12, 38:8 |
| **donte** 1:22, 2:14, 51:2, 51:18 | **during** 18:21, 19:12, 19:22, 34:5, 35:18, 47:7 | **entry** 26:11, 29:2, 29:3, 30:12, 30:15, 32:3, 36:11, 38:1, 42:22 | **experience** 16:9, 33:14 |
| **doses** 28:16 | **E** | **epicardial** 35:16 | **extent** 6:6 |
| **down** 36:11, 37:2, 37:18, 42:8, 44:14, 50:1 | **each** 22:3 | **equally** 30:7, 30:8 | **extremities** 13:21, 14:4, 14:14, 15:12, 30:8, 30:9 |
| **dr** 7:14, 9:11, 9:16, 12:3, 12:17, 18:21, 19:13, 19:22, 20:8, 21:16, 21:20, 22:5, 22:9, 22:11, 23:2, 26:10, 29:1, 30:13, 30:15, 32:2, 34:14, 36:9, 39:8, 39:18, 39:21, 40:1, 40:8, 41:21, 49:5 | **earlier** 43:12, 44:1 | **errata** 50:5 | **extremity** 30:10, 30:19, 31:7, 33:19, 39:8, 40:22, 41:11, 46:5, 46:9, 46:15 |
| | **early** 6:2 | **esquire** 3:4, 3:12 | |
| | **east** 3:6 | **et** 1:9 | **extubated** 21:5 |
| | **editing** 8:6 | **etiologies** 26:15, 40:4 | **eyes** 21:11 |
| | **education** 16:8, 33:14 | **etiology** 25:12, 39:1, 39:2, 39:7, 39:16, 40:10 | **F** |
| | **either** 6:1, 8:5, 14:1, 41:21 | **evaluate** 30:22, 31:12, 33:3 | **facility** 11:15 |
| **drain** 42:2 | **elevator** 44:14 | **even** 13:21 | **fact** 20:3, 37:12 |
| **drainage** 42:1 | **employed** 51:12, 52:9 | **event** 17:13, 18:6, 18:7, 18:17, 18:21, 19:10, 19:17, 20:6 | **factors** 17:15, 35:4 |
| **drip** 37:9, 37:17 | **encephalopathic** 25:19, 26:20, 29:14 | **events** 13:5, 24:14, 46:6 | **fair** 16:9 |
| **drips** 35:8 | **encephalopathy** 25:11, 26:16, | **ever** 7:3, 41:20, | **familiar** 8:4 |

family
13:22
far
31:17, 44:4,
44:7
fashion
36:20
feel
6:9
feet
44:6
felt
20:22
fentanyl
28:14, 28:16,
28:20
fever
17:22, 27:7
few
18:2
filed
5:14
financial
51:14, 52:11
finding
14:17, 39:17,
40:10
fine
38:21
fio2
34:15
first
5:4, 8:20,
18:5, 39:1
five
43:11
flat
34:5
floor
44:6
floors
44:13
flow
34:13, 42:9
focal
21:6, 21:7
following
11:9, 11:10

follows
5:6, 46:8
foregoing
51:3, 51:5,
52:4
form
10:9, 16:12,
18:10, 18:22,
28:1, 32:14,
39:11, 40:11,
41:3
forth
13:18
foundation
16:13, 28:2,
32:15, 39:12,
40:12, 41:4
frame
11:1, 24:14
free
6:9
frequently
34:7
front
9:5, 48:16
full
15:11, 38:22
fully
51:5

### G

game
31:17
gather
33:6
gcs
15:20, 16:10,
16:15, 16:20,
24:10, 24:12
general
16:14, 21:9,
21:12, 28:17,
28:18
generally
42:5
give
34:18
given
17:13, 25:15,

28:13, 29:3,
33:17, 36:15,
36:21, 41:1
glasgow
15:21
go
11:9, 21:4,
24:4, 30:16,
31:22, 33:12,
38:6, 38:10,
42:20
goal
21:15, 21:16,
22:14, 36:13,
36:16, 37:5,
37:16, 37:22,
38:4, 38:5
goals
21:18, 22:3,
24:2
going
12:21, 13:15,
15:18, 24:6,
30:5, 32:11,
32:12, 45:9,
47:22
good
5:9, 5:10
governor
3:4, 3:5, 5:12
group
47:19, 48:4
guarding
27:19
guess
13:7, 16:15,
19:8, 31:1,
32:9, 34:22

### H

hands-on
21:21
hard
28:21
hargrove
1:5, 3:3, 5:13
hashtag
26:7, 29:2,

32:3
head
32:6, 32:7
heart
35:21
held
2:2
hepatitis
25:16
here
8:21, 28:9,
37:16
hereby
51:4, 52:2
high
17:13, 20:16,
22:21
high-flow
34:12, 43:18
higher
39:2
hiv
25:15
honest
26:3
honestly
45:7
hospital
1:8, 5:18,
12:13, 12:14,
34:3, 44:3
hour
13:4, 13:5,
24:14, 46:6
however
17:8, 28:19,
31:14, 46:4
htn
36:15
hypertension
37:13
hypertensive
25:14
hypotension
25:13, 36:2
hypoxia
34:11, 34:17,
35:1, 43:17

| I | | |
|---|---|---|

**icu**
7:5, 7:19, 8:10, 12:1, 12:4, 23:8, 24:1, 24:21, 32:20, 42:17, 44:20, 47:20

**icus**
24:21

**idea**
44:18

**identification**
9:1, 10:15, 33:9

**identify**
19:11

**ideology**
31:21

**iii**
3:4, 3:5, 5:12

**immediate**
21:17

**immediately**
17:19, 23:7, 31:15

**imoc**
13:8

**impede**
42:9

**improved**
43:5, 45:22, 48:12

**improvement**
46:1

**include**
26:17, 43:13

**included**
31:6, 49:4

**indicate**
15:11

**indicated**
29:1, 43:21, 44:1, 47:13

**indicates**
10:3, 46:14

**indication**
19:20

**indirectly**
8:12

**infarct**
7:18, 39:3, 39:4

**infarction**
30:18, 30:21, 31:2, 31:5, 33:18

**infection**
27:7

**informally**
5:11

**information**
9:9, 33:5, 45:6, 45:8

**informed**
40:9

**infusions**
28:10, 35:6

**initial**
12:10

**injure**
24:16, 28:7

**injury**
47:7

**instance**
28:15

**institution**
11:14

**intensive**
10:4

**interest**
51:14, 52:10

**interpret**
10:22, 37:22

**intraoperative**
18:6, 18:7, 18:16, 18:20

**intraoperatively**
17:12, 17:18, 19:20, 28:13

**involved**
23:6, 42:14

**issue**
28:5, 33:1, 34:10

**issues**
8:7, 13:15,

33:22, 34:17, 43:19

**it'd**
13:7

**it'll**
45:16

| J | | |
|---|---|---|

**jackson**
3:4, 3:5, 4:3, 5:8, 5:12, 8:17, 8:20, 9:2, 10:13, 10:16, 15:7, 16:17, 18:14, 19:7, 19:18, 20:19, 24:22, 25:4, 25:9, 28:22, 29:13, 29:22, 33:7, 33:11, 36:3, 38:15, 38:19, 39:15, 40:5, 40:17, 41:6, 41:19, 43:10, 45:19, 49:12

**job**
1:20

**joppa**
3:6

**judge**
28:21

**june**
5:17, 7:3, 9:3, 9:9, 24:5, 30:5, 32:12, 33:16, 39:10, 48:7, 48:8

| K | | |
|---|---|---|

**kaitlyn**
9:10

**keep**
35:22

**keeping**
22:13

**kevin**
4:13, 4:16,

5:13, 9:12

**kevin's**
40:22

**kidney**
27:8

**kind**
31:8, 45:17, 47:3

**know**
5:19, 6:5, 6:13, 6:18, 7:9, 9:21, 12:8, 14:11, 14:16, 18:15, 19:11, 32:6, 44:19, 45:4, 45:5, 45:7, 45:15

**knowing**
20:15, 28:19

**knowledge**
51:10, 52:8

**known**
35:21

| L | | |
|---|---|---|

**last**
25:4, 25:5, 38:22, 43:3, 48:20

**later**
6:1

**law**
3:5

**lawsuit**
5:14

**lawyer**
6:18, 10:19

**lay**
34:5

**lead**
35:12, 43:19

**leads**
35:16

**least**
13:20

**left**
30:10, 42:7, 46:4, 46:9

legal
10:22
less
7:17, 16:6,
16:16, 22:8,
36:13, 36:16,
37:22, 38:4
licensed
11:12
likelihood
17:13, 20:17
likely
12:5
limited
35:8
lin
39:21, 40:8,
41:21
line
12:22, 13:6,
32:1
lines
36:11
list
8:2, 18:1,
18:5, 27:13,
43:8, 43:13
listed
34:21, 43:12
lists
9:10, 30:17
literature
49:7, 49:9
liters
34:13
little
7:17, 11:1
liver
27:8, 27:12
llc
3:5, 52:18
lle
30:10
llp
2:6, 3:13
locate
15:14
located
44:11

long
17:15, 23:22
longer
26:18
look
6:9, 8:4, 11:5,
17:20, 33:20,
35:7, 43:14,
45:9
looking
14:1, 20:14,
34:11, 36:5,
47:6
looks
49:3
lot
12:12
low
28:16
lower
16:6, 30:8,
30:10, 30:19,
33:19, 39:4,
40:22, 41:11,
46:4, 46:9,
46:15
luczycki
1:14, 2:1, 4:2,
4:12, 4:14,
4:15, 5:3
lumbar
42:1

**M**

maintain
36:1
major
17:2, 22:17
make
13:19, 47:15,
49:21
making
10:7
man
28:17
management
24:3
manner
25:20

many
7:7, 13:15
mark
8:1, 33:7
marked
9:1, 10:15,
33:9, 38:8
marti
52:2, 52:17
maryland
3:7
matter
6:1
maybe
7:17, 45:15,
45:18
md
1:14, 2:1, 4:2,
5:3, 9:10
mean
10:12, 21:7,
21:15, 36:22,
37:21, 41:4,
44:6
meaningful
34:9
means
21:9, 34:15
meant
6:4, 25:18,
26:11
measure
35:22
medical
5:21, 6:9,
6:22, 11:13,
11:14, 13:19,
49:7
medication
17:20, 20:21,
35:6
medication-induc-
ed
27:6, 27:19
medications
28:13, 43:16
medium
39:3

medstar
1:8, 4:12,
4:15, 5:18, 7:7,
12:13
member
11:13
members
13:22
memory
6:3
mental
31:15
mentioned
28:6
met
5:11
metabolic
25:12
metabolism
27:9
might
15:2
mind
27:14, 36:21
minimally
34:4
minimize
30:21
mm-hmm
8:3, 35:2,
48:18
modality
42:4
moment
25:1, 38:20,
41:18
monitored
34:4
more
7:10, 7:12,
7:17, 19:8,
23:16, 27:4,
43:12, 48:13
morning
5:9, 5:10,
21:6, 30:20,
49:14
most
24:21

motion
13:9, 13:13,
13:20, 14:3,
14:14, 14:18,
15:12
motor
16:3
movement
30:11, 46:14
moves
46:4, 46:9
moving
21:10, 30:7,
30:8, 33:6
mri
32:8, 32:11,
33:17, 34:3,
35:4, 35:8,
35:9, 35:17,
41:1, 43:3,
43:20, 44:2,
44:16, 44:17,
45:3, 45:17,
47:16, 48:7,
48:20, 49:1
mris
44:10
much
10:6, 43:5,
45:22, 48:12,
49:18
mullins
2:6, 3:13
multiple
12:5
municipal
4:14, 11:2,
11:3

**N**

name
5:12
naming
5:16
nasal
34:12, 43:18
nature
8:16

necessary
6:6, 14:2
need
6:6, 6:12,
15:3, 38:14,
38:20, 47:22
neither
51:11, 52:9
nelson
2:6, 3:13
neuro
15:20, 21:5,
24:9, 30:6,
30:17, 30:19
neurologic
17:13, 18:6,
18:7, 19:6,
19:10, 43:2,
46:7, 48:19
neurological
18:17, 18:21,
31:3, 38:7,
39:19
neurologist
40:15, 47:6,
47:21
neurology
31:18, 32:19,
40:2, 40:19
next
6:2, 21:3,
33:8, 33:12,
38:8
nicardipine
36:12, 37:8
non-focal
25:15, 29:3
nonspecific
21:13
normal-sized
28:17
notable
42:11
notary
2:14, 51:1,
51:18
note
9:6, 9:8,

12:21, 13:4,
14:2, 14:5,
14:6, 14:8,
14:12, 14:16,
14:17, 14:19,
14:21, 15:10,
15:15, 15:19,
16:21, 20:2,
21:2, 24:5,
27:16, 30:5,
30:18, 33:4,
33:20, 34:11,
36:5, 37:20,
39:6, 40:3,
43:6, 43:15,
45:20, 46:2,
46:13, 46:17,
48:14, 48:17
noted
31:7
notes
4:13, 4:16,
8:22, 30:14,
42:21
nothing
5:5, 48:13
notice
2:13
number
35:8, 37:18
numerous
17:9, 31:19
nurse
24:17, 28:7
nurses
34:1
nursing
13:20, 14:6,
14:8, 14:12,
14:22, 15:10,
15:15
nw
2:7, 3:14

**O**

object
8:15
objection
10:9, 16:12,

18:10, 18:22,
19:14, 20:11,
28:1, 29:12,
29:16, 32:14,
39:11, 40:11,
41:3, 41:12,
43:7
observed
30:20
occasions
7:7
occurred
19:11
ocular
16:3
office
3:5
officer
51:2
offices
2:2
oh
13:2, 35:14
okay
7:10, 7:13,
7:16, 8:12,
8:20, 9:7,
10:21, 11:7,
11:11, 12:2,
13:3, 14:6,
14:10, 14:12,
15:18, 19:8,
21:3, 22:4,
23:10, 24:4,
24:8, 26:1,
26:4, 26:6,
26:9, 26:19,
32:5, 32:8,
34:21, 35:3,
38:6, 38:9,
38:12, 38:18,
40:6, 40:8,
41:16, 41:20,
43:1, 44:12,
44:19, 45:1,
46:10, 48:18,
49:12
one
5:16, 5:19,

11:13, 18:5,
18:12, 22:13,
32:2, 34:10,
45:4
**opening**
21:11
**operation**
18:21, 19:12
**operative**
20:2
**opinion**
29:4, 33:13
**opportunity**
5:20, 15:9
**ordered**
32:11
**ot**
13:9, 13:12
**other**
6:22, 14:2,
33:1, 37:21,
41:7, 41:8,
41:15
**others**
17:15
**otherwise**
51:14, 52:11
**out**
13:17
**outcome**
51:14, 52:11
**over**
11:9, 24:7,
30:5, 30:16,
44:14
**own**
6:12
**oxygen**
34:13, 34:16

**P**

**pace**
36:1
**pacing**
43:22
**page**
4:2, 4:9, 10:3,
11:5, 11:10,

13:1, 13:2,
21:3, 24:4,
30:4, 30:5,
30:16, 38:10,
48:16
**pages**
1:21
**pain**
13:8, 17:20,
28:15, 30:10
**panel**
25:16
**paragraph**
12:22, 13:5,
13:6, 38:11,
39:1
**part**
11:10, 20:4,
27:21, 29:2,
34:3, 44:3,
46:11
**participated**
8:6
**particular**
6:20, 17:6,
18:9, 19:2,
20:21, 36:4,
37:1, 38:17
**parties**
51:13, 52:10
**passive**
13:9, 13:12,
14:3, 14:13,
14:17, 15:11
**patient**
7:5, 12:3,
12:18, 12:19,
13:14, 13:16,
16:6, 16:11,
16:16, 17:15,
17:21, 20:7,
24:1, 25:14,
27:11, 28:7,
28:14, 29:9,
31:12, 31:19,
34:2, 34:4,
34:8, 34:17,
34:19, 35:5,

35:16, 36:1,
37:8, 39:9,
41:17, 42:18,
44:4
**patients**
7:13, 7:14,
7:16, 7:18,
12:5, 17:3,
20:15, 21:19,
28:5, 33:3,
35:7, 37:12,
37:14
**pause**
34:18
**pca**
28:15
**peer**
49:8
**pending**
6:15, 25:7,
49:12
**percent**
34:14, 34:15
**perform**
9:9
**performed**
32:12, 40:21,
41:2, 44:2,
44:16, 44:17,
47:16
**performing**
33:17, 35:4
**perfusion**
36:2
**period**
34:5
**perspective**
15:16, 16:19
**pertained**
26:11
**phase**
35:18
**phrase**
43:3, 48:21
**physical**
13:15, 14:17
**physician**
7:4, 9:12,

11:8, 11:13,
11:18, 11:21,
12:3, 23:1,
32:10, 40:20,
42:15, 48:6
**physicians**
11:4
**place**
11:16, 35:16,
35:18, 45:14
**placement**
42:2
**plaintiff**
1:6, 3:3, 5:7
**plaintiffs**
49:8
**plan**
15:19, 24:9,
25:10, 27:17,
27:22, 31:17,
31:18, 38:2,
38:11, 39:18
**plan-of-care**
14:18, 14:21,
20:8
**planet**
52:18
**played**
25:7
**please**
14:14, 25:1
**pneumonia**
25:15
**point**
16:22, 31:20,
33:2
**pointed**
19:9, 31:1
**points**
20:3
**portion**
25:21, 40:2
**position**
22:22
**positive**
13:9
**possibilities**
31:20

**possibility**
47:8
**possible**
14:8
**post**
7:4, 12:18
**post-op**
23:14, 23:21
**postgraduate**
9:12, 9:22,
10:6, 11:4, 11:8
**postoperative**
21:17, 27:2,
28:6, 28:15,
29:9
**postoperatively**
17:4, 17:19,
20:18, 23:7,
26:16, 37:15
**potential**
17:10, 27:4,
27:5, 27:6,
33:22, 40:4,
47:7
**potentially**
26:17, 28:14,
31:6, 34:20,
41:16, 43:19
**power**
5:13
**practice**
11:4, 21:18,
22:6, 22:16,
23:5, 31:14,
32:17, 34:1,
40:14, 47:1
**pre-licensure**
11:3
**premise**
20:9
**prepare**
6:20
**prepared**
52:3
**presence**
27:7, 27:8,
27:11
**presentation**
16:20, 25:19,

26:12, 26:21,
29:15, 31:4,
33:16
**presented**
37:13
**pressure**
21:15, 21:18,
22:3, 22:8,
22:13, 22:18,
22:21, 23:4,
23:13, 23:17,
24:3, 35:6,
35:19, 36:7,
36:21, 37:2,
37:5, 37:10,
37:15, 43:17
**presumably**
37:7
**presume**
32:3
**pretty**
27:2, 28:16,
37:13
**previous**
49:1
**previously**
28:6
**primary**
32:19
**prior**
6:1, 7:2, 7:21,
12:3, 12:10,
46:22, 49:10
**probably**
7:12, 12:6,
31:18
**procedure**
18:9, 18:13,
20:1, 20:6,
41:8, 46:18,
47:7, 47:8
**procedures**
40:21
**proceeding**
52:4
**proceedings**
51:3, 51:5,
51:6, 51:9,

52:5, 52:7
**produced**
49:7
**professional**
33:13
**program**
9:14, 11:16,
11:17
**progress**
4:13, 8:22,
9:6, 9:8, 14:2,
15:18, 24:5,
27:16, 33:20,
42:21
**provided**
7:21, 9:11,
9:17, 11:22,
12:8, 12:16
**provider**
48:3
**providing**
10:1, 44:20
**proximal**
42:12
**pt**
13:9, 13:12
**public**
2:14, 51:1,
51:18
**publications**
8:2, 8:5
**pump**
17:16, 35:11
**pumps**
35:9
**purpose**
36:21, 37:1
**purposes**
10:22, 11:21
**pursuant**
2:13

**Q**

**qualified**
51:7
**question**
6:3, 6:10,
6:15, 8:16,

9:20, 10:10,
11:1, 11:19,
18:11, 19:1,
19:9, 25:5,
25:7, 28:2,
29:17, 31:1,
39:14
**questions**
48:2, 49:13,
49:18

**R**

**range**
13:9, 13:12,
13:20, 14:3,
14:13, 14:18,
15:12
**rate**
35:22
**read**
25:4, 30:18,
36:17, 38:13,
49:19
**reading**
36:14
**really**
10:21, 21:19,
24:6, 27:2,
32:19, 41:17
**reasons**
13:19, 43:4,
43:6, 46:21,
48:21, 48:22
**recall**
7:15, 7:20,
10:2, 12:6,
12:11, 12:16,
12:20, 17:8,
21:1, 21:22,
22:11, 22:15,
24:13, 26:10,
26:13, 28:8,
29:7, 29:19,
30:1, 31:13,
32:16, 37:12,
37:19, 40:13,
42:3, 42:19,
44:18, 46:3,

47:18, 48:10
**received**
5:17, 17:21
**recollection**
5:22, 19:21,
41:22
**recommend**
49:20
**reconstruction**
17:14, 19:4,
20:5
**record**
5:11, 5:22,
14:2, 15:3,
15:4, 15:6,
19:21, 25:3,
28:21, 31:16,
41:10, 42:15,
50:7, 51:10,
52:7
**recorded**
1:22, 51:6
**recording**
51:9, 52:4
**records**
6:9, 6:12
**reduced**
51:7, 52:5
**referred**
39:17
**referring**
13:11, 15:21,
24:18, 24:19,
43:6, 45:20,
46:1, 46:12
**refers**
32:5
**reflect**
14:6, 14:9,
15:15, 33:5
**regimen**
20:21
**region**
39:3
**regulations**
4:14, 11:3
**related**
8:8, 10:7,

51:12, 52:9
**relates**
30:2
**relation**
44:20
**relative**
25:13, 27:10
**relevant**
8:8
**remains**
24:1
**reoriented**
34:7
**repair**
7:5, 17:2,
22:17, 22:20,
22:21, 37:7,
42:6, 42:13,
42:16, 47:4
**repeat**
39:13
**rephrase**
6:5
**report**
45:12
**reporter**
15:5, 25:2,
25:6, 51:1
**represent**
5:12
**represents**
33:2
**require**
37:15
**required**
32:22, 35:20,
44:4
**requires**
34:4
**resident**
10:5, 12:10,
12:17, 25:22,
40:2
**residents**
12:12, 26:8
**respect**
19:19, 22:7,
23:3, 27:18,

46:18, 49:1
**responding**
21:12
**response**
25:5
**responses**
16:3
**responsive**
16:6, 16:16
**review**
10:17, 43:15
**reviewed**
49:9
**reviewing**
6:22
**right**
30:8, 37:18,
42:20, 46:6,
46:15, 49:19
**riley**
2:6, 3:13
**risk**
33:15, 35:3
**risks**
18:12, 23:11,
32:20, 34:19,
43:9, 43:11,
47:6, 47:10
**rle**
30:8
**road**
3:6
**robinson**
1:22, 2:14,
51:2, 51:18
**rotating**
10:5, 12:9,
12:17
**rotation**
12:1
**run**
17:14, 20:16
**rupture**
22:20

---
**S**
---
**s**
36:7

**safe**
34:2
**safety**
35:22, 43:3,
43:5, 43:19,
48:20
**said**
34:22, 35:12,
45:3, 45:21,
51:8, 51:9,
52:5, 52:6
**same**
41:12, 43:11,
46:21, 48:22
**saw**
20:7
**say**
7:11, 8:11,
19:16, 27:3,
27:4, 45:16,
46:4, 46:7,
48:11
**says**
11:8, 11:12,
13:12, 16:21,
24:10, 24:15,
28:15, 45:14
**sbp**
36:13, 36:16,
37:22, 38:4
**sbps**
36:8
**scale**
15:21
**scarborough**
2:6, 3:13
**schreiber**
52:2, 52:17
**score**
15:21, 16:2,
16:6, 16:10,
16:20, 24:10,
24:12
**scores**
16:2
**second**
10:3, 10:13,
12:22, 13:6,

34:10
**section**
9:10, 13:8,
15:20, 21:4,
21:14, 24:10,
25:10, 30:6,
30:17, 36:6,
38:11, 38:17,
48:19
**sedation**
27:10, 30:20,
30:22, 43:16
**sedative**
24:20
**sedatives**
27:21
**see**
24:14, 28:14,
31:18, 33:21,
34:6, 34:10,
45:10, 46:16
**seem**
21:10
**send**
25:15, 50:4
**sentence**
13:12, 25:17,
38:22, 48:20
**sentences**
13:7
**separate**
29:4
**set**
8:22, 21:16,
43:11
**setting**
42:17
**several**
44:10, 45:3
**shall**
11:9
**shana**
1:5, 3:3, 5:12
**shared**
22:11
**sheet**
50:5
**short**
15:8

**short-acting**
28:10, 28:19,
37:9
**show**
8:1
**showing**
6:11
**sicu**
10:4
**sign**
49:19
**signature-7dmpd**
51:16
**signature-onxrw**
52:15
**significant**
34:16, 37:13
**significantly**
48:1
**single**
33:2
**sir**
7:8
**skills**
51:11, 52:8
**sleep**
17:22, 27:9
**slow**
35:21
**some**
6:11, 10:17,
14:2, 17:1,
17:3, 18:4,
22:18, 27:13
**sometimes**
13:21
**sorry**
13:2, 18:18,
30:19, 39:14
**speak**
5:20
**speaking**
6:17
**special**
35:9
**specific**
19:10, 19:17,
22:15, 26:13,

26:22
**specifically**
12:7, 12:11,
12:21, 17:8,
19:16, 21:1,
22:1, 24:13,
28:9, 29:7,
29:20, 30:1,
31:13, 32:17,
37:5, 37:19,
38:22, 40:14,
42:3, 42:11,
42:19, 45:2,
45:8, 46:3,
47:19, 48:10
**specified**
22:18
**specify**
31:8
**speculate**
16:15
**spinal**
7:18, 30:17,
30:21, 31:2,
31:5, 33:17,
42:9, 47:8
**staff**
11:14
**stand**
15:5, 25:2
**standard**
20:5
**start**
9:3
**starting**
9:4, 24:6
**state**
16:9, 17:6
**states**
1:1, 5:15,
13:4, 15:20,
21:5, 25:11,
30:6, 32:8,
48:14
**status**
31:15
**stay**
34:8

**stayed**
35:18
**stephen**
1:14, 2:1, 4:2,
5:3
**still**
23:14, 23:20,
34:6, 34:8,
46:8, 48:21
**strict**
25:13, 36:13
**stroke**
25:14, 29:3,
29:5, 29:10,
30:22, 31:8,
31:9, 31:11
**student**
10:6
**studies**
32:22, 41:15
**study**
9:22, 47:22
**sturtz**
3:12, 8:15,
8:18, 10:9,
14:15, 15:2,
16:12, 18:10,
18:22, 19:14,
20:11, 28:1,
29:12, 29:16,
32:14, 33:10,
35:12, 38:13,
38:16, 39:11,
39:21, 40:11,
41:3, 41:12,
43:7, 45:9,
45:12, 45:14,
45:18, 49:17,
50:1, 50:4
**sub**
11:10
**subclavian**
42:8
**subsection**
21:5
**substance**
6:19, 24:7
**suffered**
18:20, 19:22

| | | | |
|---|---|---|---|
| **sufficiently** 6:11 | 37:17 | 49:14, 49:16, 49:18, 50:6 | **total** 28:19 |
| **suggest** 27:16 | **T** | **therapy** 13:16, 42:10, 47:3, 47:13 | **towards** 9:4, 9:5 |
| **suite** 2:7, 3:6, 3:15, 35:10, 44:6, 44:20 | **take** 6:16, 10:17, 15:8, 18:4, 24:22, 38:20 | **thereafter** 51:6 | **towson** 3:7 |
| **suites** 45:3 | **taken** 27:17, 50:1, 51:3 | **thing** 26:7, 26:8 | **toxic** 25:12 |
| **supervised** 11:12 | **takeoff** 42:7 | **things** 18:2, 26:17, 27:14, 33:21, 43:18 | **training** 9:13, 11:15, 11:17, 16:8, 33:14 |
| **supervising** 11:17, 11:20, 12:2, 32:10, 48:5 | **takes** 11:16 | **think** 8:19, 15:3, 18:2, 28:4, 31:10, 35:12, 39:21, 41:17, 43:4, 43:7, 43:14, 45:21, 48:11 | **transcript** 4:8, 50:4, 52:1, 52:3, 52:6 |
| **supervision** 52:6 | **talking** 44:5 | | **transcriptionist** 51:8 |
| **supplementation** 34:16 | **tangentially** 8:13 | | **travel** 32:21, 34:2, 34:18, 35:7, 44:4, 44:8 |
| **sure** 8:17, 9:19, 10:11, 14:22, 26:2, 49:21 | **teaching** 12:14 | **third** 22:13 | **treatment** 5:17, 5:22, 7:2, 8:8, 8:9, 8:14, 9:11, 9:17, 10:1, 10:8, 11:21, 12:9, 42:4, 42:17, 44:21 |
| **surgeon** 21:20, 21:22, 22:19, 23:8, 23:16, 23:20, 24:2, 31:16, 32:19, 37:6, 40:16, 47:5, 47:21, 49:6 | **team** 23:9, 30:22, 31:11, 32:20, 47:20 | **thoracic** 39:2, 42:6 | |
| | **tell** 14:1, 14:5, 30:13 | **thought** 47:2 | |
| | **temperature** 17:16 | **three** 23:21, 23:22, 35:3, 36:11 | |
| | **term** 16:15, 21:13 | **through** 11:15, 33:6 | **trial** 6:1 |
| **surgery** 47:3 | **terms** 19:9, 22:12, 27:17 | **throughout** 33:4 | **trick** 6:4 |
| **surgical** 7:4, 10:4, 12:18 | **test** 6:4, 16:2 | **thursday** 1:16 | **trip** 44:14 |
| **suspect** 21:21 | **testified** 5:6 | **time** 6:2, 6:12, 9:11, 9:17, 9:22, 10:17, 24:14, 33:2, 38:5, 44:9, 49:15, 49:18 | **true** 35:15, 51:9, 52:6 |
| **sustained** 18:16 | **testify** 5:4 | | **truth** 5:5, 5:6 |
| **svp** 22:8 | **th** 9:3, 9:6, 9:9, 24:5, 30:5, 32:13, 33:16, 39:10, 48:7, 48:8 | **titratable** 37:9 | **try** 11:1, 28:10, 28:17 |
| **sworn** 5:4, 51:5 | | **titration** 37:17 | **trying** 38:1, 39:5, 44:7 |
| **systolic** 22:7, 22:13, 36:7, 36:21, | **thank** 5:9, 33:10, | **today** 6:21, 32:9 | **tsh** 25:16 |

| | | | |
|---|---|---|---|
| **turn** 9:5, 18:5, 28:11 | 9:19, 10:18, 38:1, 47:14, 48:4 | **wanted** 8:1 | 15:10, 15:11, 15:14, 17:16, 17:21, 18:15, 18:19, 29:5, 41:22 |
| **turned** 24:15 | **understanding** 16:5, 32:10, 44:7 | **washington** 1:8, 1:15, 2:8, 3:16, 5:18, 12:13 | **white** 27:7 |
| **two** 11:16, 13:7, 23:14, 23:19, 26:17 | **unit** 10:4 | **watershed** 39:3 | **whole** 5:5, 32:20 |
| **type** 6:4, 8:7 | **united** 1:1, 5:15 | **way** 9:5, 30:14, 37:21 | **wires** 35:13, 43:22 |
| **type-a** 7:4, 12:18, 42:12, 42:16, 47:12 | **up-titrating** 36:13 | **we'll** 6:13, 9:3, 33:7 | **withdrawal** 30:10 |
| **typewriting** 51:7, 52:5 | **upper** 30:7 | **weakness** 30:9, 30:20, 31:7, 31:21, 33:19, 39:2, 39:8, 41:1, 41:11, 41:15 | **withdrawals** 30:9 |
| **typically** 22:1, 23:19, 23:22, 26:14, 33:3, 42:13, 45:16, 47:12, 47:18, 47:19 | **urgent** 48:6 | | **within** 23:16 |
| | **urgently** 47:22 | **wean** 30:20 | **witness** 8:19, 10:11, 14:20, 16:14, 18:12, 19:2, 19:16, 20:13, 28:4, 29:19, 32:16, 35:14, 38:18, 39:13, 40:1, 40:13, 41:14, 45:11, 45:13, 45:16, 49:16, 49:22, 50:3 |
| **U** | **use** 28:10, 28:18, 34:8, 35:11, 43:15, 43:16, 43:17 | **weigh** 47:10 | |
| **ue** 30:7 | **usual** 17:9, 21:18, 22:6, 22:16, 23:5, 31:14, 32:17, 33:22, 40:14, 47:1 | **welch** 4:13, 4:16, 5:14, 7:2, 8:9, 9:12, 9:18, 10:8, 11:22, 12:4, 14:3, 15:11, 16:18, 18:16, 18:20, 19:13, 19:22, 22:14, 23:1, 27:18, 29:6, 29:11, 30:2, 32:12, 33:15, 39:19, 41:22, 44:17, 46:14, 46:20 | |
| **ultimate** 37:16 | | | |
| **ultimately** 44:16 | | | |
| **unable** 13:18, 15:14 | **usually** 16:10 | | **witness(es** 51:4 |
| **unclear** 25:12, 31:20 | **utilized** 42:17 | | **word** 32:2 |
| **uncommon** 17:2, 37:11, 37:14 | **V** | | **working** 9:4 |
| **under** 15:19, 21:4, 24:9, 30:16, 32:2, 37:3, 37:18, 38:10, 43:2, 52:5 | **vague** 21:12 | **welch's** 17:5, 26:12, 39:7, 40:22, 41:11 | **would've** 16:22, 23:8, 35:18, 44:2, 44:3 |
| | **verbal** 16:2 | | **writes** 34:14 |
| | **versus** 25:12 | **went** 45:4 | **writing** 8:6 |
| | **via** 42:1 | **whereupon** 5:2 | **written** 25:20, 25:21, 33:5 |
| **undergo** 20:15 | **vs** 1:7 | **whether** 12:16, 14:3, | **Y** |
| **understand** 5:21, 6:3, 6:6, | **W** | | **yeah** 9:7, 35:14, |
| | **want** 6:10, 18:4 | | |

40:1, 45:11, 45:13

**year**
6:2, 9:21, 9:22

**you-all**
15:14

**.**

**.2800**
3:17

**.5150**
3:8

**0**

**01**
4:12

**02**
4:14

**03**
4:15

**03381**
1:7

**05**
50:7

**1**

**10**
4:14, 24:10, 24:12, 50:7

**101**
2:7, 3:14

**130**
22:8, 22:14, 36:14, 36:16, 37:3, 37:18, 37:22, 38:4

**14**
15:20, 16:20, 24:12

**15**
9:6, 9:9, 14:13, 15:12, 15:19, 17:7, 18:15, 18:19, 20:7, 36:12

**16**
24:5

**160**
36:7, 36:22,

37:2

**17**
30:5, 32:13, 33:16, 39:10, 39:19

**18**
42:21, 46:20, 48:7, 48:8

**19**
9:3, 48:17

**2**

**20**
28:16

**20001**
2:8, 3:16

**202.712**
3:17

**2022**
5:18, 7:3, 9:9, 26:14

**2024**
1:16, 24:5, 52:19

**21**
52:19

**21286**
3:7

**23**
1:7

**24**
13:4, 13:5, 24:14, 46:6

**3**

**310**
48:16

**312**
42:22, 43:1

**313**
30:4

**314**
30:5, 31:22, 36:5

**315**
30:16

**316**
24:4

**317**
24:7

**320**
9:6, 9:7, 9:8, 13:2

**321**
21:3

**33**
4:15

**4**

**400**
3:6

**410.528**
3:8

**45**
38:10, 38:12

**4611.7**
11:5

**5**

**5**
36:12

**50**
3:6, 7:10, 7:12, 7:16

**52**
1:21

**534993**
1:20

**55**
1:17

**6**

**6**
14:13, 15:12, 15:19, 17:7, 18:15, 18:19, 20:7, 39:19, 42:21, 46:20, 48:17

**60**
34:12, 34:14, 34:15

**7**

**70**
21:15

**8**

**8**
1:17

**85**
21:15

**9**

**900**
2:7, 3:15