

# Transcript of Maxwell A. Hockstein, M.D.

**Date:** April 23, 2024
**Case:** Hargrove -v- MedStar Washington Hospital, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

-----------------------------x

SHANA HARGROVE,                     :

        Plaintiff,          :   Civil Case No.:

    vs.                     :   23-CV-03381-RJL

MEDSTAR WASHINGTON HOSPITAL,  :

et al,                      :

        Defendants.         :

-----------------------------x

Deposition of MAXWELL A. HOCKSTEIN, M.D.

Washington, District of Columbia

Tuesday, April 23, 2024

12:58 p.m.

Job No.: 534992

Pages: 1 - 54

Recorded By: Konly Harding

---

Deposition of MAXWELL A. HOCKSTEIN, M.D.,

held at the offices of:

NELSON MULLINS RILEY & SCARBOROUGH LLP

101 Constitution Avenue, NW

Suite 900

Washington, District of Columbia 20001

Pursuant to Notice, before

Konly Harding, Notary Public in and for the

District of Columbia.

---

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

    GOVERNOR E. JACKSON, III, ESQUIRE

    LAW OFFICE OF GOVERNOR JACKSON, III LLC

    400 E. Joppa Road

    Suite 50

    Towson, Maryland 21286

    410.528.5150

ON BEHALF OF THE DEFENDANT:

    DONNA STURTZ, ESQUIRE

    DAVID STURTZ, ESUIRE

    NELSON MULLINS RILEY & SCARBOROUGH LLP

    100 S. Charles Street

    Suite 1600

    Baltimore, Maryland 21201

    443.392.9408

---

C O N T E N T S

EXAMINATION OF MAXWELL A. HOCKSTEIN, M.D.     PAGE

    By Mr. Jackson                              5

E X H I B I T S

    (Attached to transcript.)

DEPOSITION EXHIBIT                             PAGE

Exhibit#    Description

1    General Principles Post               11
        Operative Care Journal Chapter

2    Progress Notes                        23

PROCEEDINGS

Whereupon,

MAXWELL A. HOCKSTEIN, M.D.,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. JACKSON:

Q   Good afternoon, Dr. Hockstein.  My name is Governor Jackson, III.  We met informally off of the record.  I am an attorney representing Shana Hargrove, who is the power of attorney for Kevin Welch.  They have filed suit against you and other named providers, Ms. Dunphy and Mr. Luczycki, I may be mispronouncing his name, forgive me, in the United States District Court for the District of Columbia, based on treatment that Kevin Welch received in 2022 at the MedStar Washington Hospital Center.

Have you ever been deposed before today?

A   No.

Q   Okay.  As I'm sure your Counsel has informed you, this is our one opportunity to ask you questions about your treatment that you provided to Mr. Welch, based on your recollection as well as any of the medical records that are here and made available for you to review by your Counsel.  I will be going through some exhibits that are paper exhibits, but if you have a preference for reading them electronically, you may do so as well.

If at any time you don't understand a question that I ask you, just let me know and I'll rephrase or repeat it as much as necessary for you to understand it.  If you need a break at any time, just let me know and I will get you that break so long as a question is not pending; do you understand that?

A   Yes.

Q   Okay.  In preparation for your deposition today what, if anything, did you do other than speaking with your attorneys?  And I'm not interested in conversations with them.  I'm

not entitled to them.  Did you do anything besides speak with them?

MR. RANSONE:  I can represent to you that he has reviewed the medical records pertaining to his care in this case and everything that's been served upon him.  Everything else is at the direction of Counsel.

MR. JACKSON:  Okay.

BY MR. JACKSON:

Q   The records that have been produced in this case are quite voluminous.  Did you review all of the records in preparation or just your progress notes?

A   I reviewed the notes that I authored.

Q   Okay.  Did you speak with any healthcare providers outside of the presence of Counsel in preparation for today?

A   My chair knows that I am here, but not about the content of -- of this.

Q   Okay.  And your chair is whom?

A   Dr. Yohannes.

Q   Okay.  Other than medical records, there have been peer reviewed articles that have been produced by our office on behalf of the Plaintiff related to some of the areas of treatment that were at issue in Kevin Welch's Care; have you reviewed any of those peer reviewed articles?

A   No.

Q   Okay.  Have you reviewed the Answers to Interrogatories, which were prepared on your behalf by Counsel in this case, in preparation?

A   Yes.

Q   We were provided with your CV prior to your deposition.  You completed your fellowship at Emory University in 2020, correct?

A   Correct.

Q   Were you affiliated with any other hospitals between 2020 and 2022 at the time you treated Mr. Welch?

A   No.

Q   Did you apply for privileges at any institution between 2020 and 2022?

A   I think that with my hiring at MedStar

9

I may have privileges at Georgetown, but I don't recall.

Q   Okay.  Other than any MedStar-affiliated institutions, did you apply for any privileges at -- at any institution not affiliated with MedStar?

A   I don't believe so.

Q   Okay.  Is there any reason in particular why you only applied for privileges at MedStar?

A   Because they are my employer.

Q   Okay.  Prior to them becoming your employer, did you have an option to apply for privileges at any other institution?

A   No.  When I graduated fellowship, I went from fellowship at the Emory Healthcare system to MedStar.

Q   Okay.  Prior to joining the staff at MedStar, did you know Ms. Dunphy and Mr. Luczycki?

A   No.

Q   Between 2020 and 2022, when you began having privileges at MedStar, was your license

10

suspended, revoked, or acted unfavorably on, for any reason?

A   No.

Q   According to the CV that we were provided, it appears that you were a chapter contributor to the peer review journal, General Principles of Postoperative Intensive Care Unit Care is the entry on the CV.  Do you recall that --

A   Yes.

Q   -- contribution? Okay.  Were you requested to contribute to that particular publication?

A   Yes.

Q   Do you know why the request was made of you to contribute to that publication?

A   Yes.

Q   Why was that?

A   My father was the contributing -- the principal contributing author to the chapter.

MR. JACKSON: Okay.  I'm going to have this marked as the first Exhibit.

11

(EXHIBIT 1 MARKED FOR IDENTIFICATION)

BY MR. JACKSON:

Q   Can you pass that down.  And one copy is for your Counsel.  It's the same thing.  One copy is for him to follow along.

And you've been handed the first exhibit here in your deposition, which is a portion of the chapter -- a chapter from the journal that I just referenced, General Principles of Postoperative Intensive Care Unit Care.  On the first page, it has Michael J. Hockstein and Laura S. Johnson as the authors; is that your father?

A   Yeah.  Michael J. Hockstein is my father.

Q   Okay.  Did -- did you actually write anything that appears in the article or did you do research for what appears written in the --

A   I both did research and I wrote portions of it.  I don't recall which portions I wrote given how many years ago it was.

Q   Sure.  At the time that you

12

contributed to this article, what was your educational status at that time, if you recall?

A   I don't recall.

Q   If you go over to the last page, which states Best Practices, and in that first sentence there, do you see that, beginning with achieving?

A   Yes.

Q   It states "Achieving optimal outcomes should be pursued by providing optimal care."  As a board certified physician at the time that you were treating Mr. Welch, did you agree with that statement?

A   Yes.

Q   It states, the next sentence, "This is especially true for patients with longer length of stay;" do you recall, based on your contribution to this article, what longer length of stay meant in this context?

A   I don't recall.

Q   Okay.  The next sentence states "Effort should be expended pursuing interventions that have been shown to reduce complications,

cost, morbidity, and mortality risk." As a board certified physician at the time that you treated Kevin Welch, did you agree with that statement?

A Yes, sir.

Q Okay. Do you know the approximate date that your privileges began at MedStar? You can set that to the side.

A I don't recall the exact date.

Q Okay. Would it -- oh, go ahead.

A Early August. But again, I don't recall the exact date.

Q Do you know the year?

A 2020.

Q Okay. Between 2020 and 2022, were your functions as an attending physician primarily in the intensive care unit?

A Both the emergency department and the intensive care unit.

Q In terms of a split of your professional time during that period between those two units, how was that split divided? 50/50?

A Yes.

Q Do you recall, prior to Kevin Welch in June of 2022, how many patients you were deemed to be an attending physician for who were post Type A aortic surgical repair?

A I don't know the number.

Q Okay. Had there been patients prior to Kevin Welch for whom you were the attending physician that were post Type A aortic surgical repair?

A Yes.

Q For any of those patients prior to Mr. Welch for whom you were their attending physician who had undergone a Type A aortic surgical repair, did any of those patients sustain a spinal cord infarct, to your knowledge?

A I don't recall.

Q Okay. To your recollection, were any of those patients prior to Kevin Welch, again, this subset of Type A aortic surgical repair patients diagnosed with spinal cord ischemia, to your knowledge?

A I don't recall.

Q Based on your education, training, and experience, are you familiar with the process of cerebral fluid drainage?

A Yes.

Q How are you familiar with that?

A It -- it is done after certain types of aortic dissection repairs, in the postoperative period to -- to prevent or to mitigate the effects of spinal cord swelling.

Q And under what circumstances is it performed?

A It depends.

Q On what?

A The type of aortic dissection and the anatomy of the aortic dissection.

Q What about the anatomy of the aortic dissection would determine whether or not cerebral spinal fluid was drained or not?

A Typically in the type B distribution, like, a -- what is called a type B aortic dissection, where spinal arteries are compromised.

Q Are you aware of any circumstance where cerebral spinal fluid drainage would occur for a Type A aortic dissection?

A It would be unusual.

Q Why?

A Because Type A dissections typically do not involve the spinal arteries.

Q Would it still be considered unusual to perform a drainage of cerebral spinal fluid in a -- after a Type A aortic dissection if the patient is exhibiting lower limb weakness in their extremities post-surgery?

A In my experience, that would be unusual.

Q For the patients prior to Mr. Welch, do you recall any Type A aortic surgical repair patient exhibiting lower extremity weakness 72 hours post-surgery?

A It's possible.

Q Do you recall any specific patient where that occurred prior to Mr. Welch?

A I don't recall a specific patient.

Q    In your practice at MedStar prior to Mr. Welch, had you actually performed a cerebral spinal fluid drain on a patient?

A    It is not within my scope of practice to perform lumbar -- what you're referring to as CSF drainage, lumbar drains.  It's not within our scope of practice.

Q    In your scope of practice of MedStar, is that a procedure for which you would have to consult or order a neurologist to perform?

A    A neurologist is unlikely the profession to do a lumbar drain.

Q    Okay.  In your practice in June of 2022, who would have been the likely professional to perform the lumbar drain?

A    Either cardiac anesthesia, neurosurgery, or perhaps vascular surgery although I am not sure about vascular surgery.

Q    If either of those, in June of 2022, professionals were to perform a CSF drainage procedure, would that be done based on their own determination, or would you, as an attending physician, have to place an order for them to perform that procedure?

A    It would be done by consultation.

Q    Okay.  With you as the attending provider, right?  And the -- either one of these professionals that you just mentioned; is that accurate?  Or consultation with who?

A    Can I clarify that?

Q    Yes, please?

A    So when I place -- when another service is consulted, I as the attending or my team, I may not pick up the phone directly, but our team will call the team of cardiac anesthesia, or vascular surgery, or neurosurgery, whatever the other team may be, and we ask them to assess for appropriateness of a procedure.

Q    Okay. I understand.  Thank you for the clarification.  One moment, please.

Are you familiar with the term spinal cord perfusion pressure?

A    Yes.

Q    How would you define that term?

A    It is the difference between the pressure in the spinal cord and these arterial blood pressure.

Q    Is that something that you, as an attending physician in ICU, would monitor on a Type A aortic surgical patient?

A    Not typically.

Q    Why not?

A    Because Type A dissections don't typically involve the spinal cord -- or the -- the arteries that feed the spinal cord.

Q    Who would monitor that pressure?

A    Spinal cord perfusion pressure is not typically a target in patients who sustain a Type A dissection.

Q    Would the mean arterial pressure be necessary to know -- to calculate spinal cord perfusion pressure?

A    To calculate the value, yes.

Q    Okay.  Would it be relevant -- mean arterial pressure be relevant for determining anything else for purposes of caring for a patient based on what that calculation may be?

A    May I ask a -- a clarifying question?

Q    Yes.

A    Are you asking if mean arterial pressure is measured for all patients?

Q    No, not -- not whether it's measured for all patients, but does it have -- would it have had in June of 2022 any relevance to your -- to your diagnosis, or reading, or understanding of spinal cord perfusion pressure as it related to Mr. Welch?

MR. STURTZ: Objection.  You can answer.

BY MR. JACKSON:

Q    You can answer if you understand.  Do you understand the question?

A    The physiology, I understand.  It's the non-involvement of a Type A dissection with the spinal cord arteries.  It -- so mean arterial pressure is something that we target in the postoperative period, not just for spinal cord perfusion.  But spinal cord perfusion is not

typically compromised during or -- or after a Type A dissection or repair.

Q   Based on your education, training, and experience, can CSF drainage have any type of physiological effect on spinal cord pressure?

A   Yes.

Q   What type of an effect can it have?

A   If drained, the CSF -- the cerebral spinal fluid, the pressure can go down in the spinal column where the -- after the CSF is drained.

Q   In June of 2022, how were patients assigned to your care, including Mr. Welch?

A   When patients are -- come out of the operating room, they are placed into the intensive care unit, the surgical intensive care unit.  And the surgical intensive care unit is rounded on by several different physicians.  And there are different teams and the teams are defined geographically, for example, by -- by room number.

Q   Okay.  Geographically with respect to the hospital, is what you're saying?

A   Correct.  So the unit where Mr. Welch was has two teams, and the rounding physician rounds on of the two teams.

Q   Okay.  Who was the rounding physician responsible for delegating the patients that ended up in your care, including Mr. Welch, do you know?

A   I don't recall.

Q   Okay.  And it's fair to state on June 20th, and you may look at the record, 20 of '22, you were the attending physician for Kevin Welch; is that correct?

A   If that's what it says in the medical record.

MS. STURTZ:  On certain dates, right? I mean --

MR. JACKSON:  Yes.

BY MR. JACKSON:

Q   Well, we can agree that Mr. Welch's stay in ICU was for a time period longer than just your involvement, right?

A   Correct.

Q   Okay.  And so you were only his attending physician for a period of time while he was in ICU, right?

A   Correct.

Q   Okay.  Your next Exhibit that's been handed to you is a series of progress notes that you authored starting with June 20th, 2022, and going through June 22nd, 2022.  And I understand that there were others after this date for a short period of time, but these are the ones that I'm going to be focusing on.

(EXHIBIT 2 MARKED.)

BY MR. JACKSON:

Q   If you look on the first page under the Attestation by Janet Jumper, who is a CRNP on 2023, she lists you as ICU attending, Dr. Max Hockstein.  So that -- that designation would have been accurate, right?

A   Correct.

Q   And as attending physician, you had primary responsibility for the treatment and care of Mr. Welch from the date you began your treatment until the date he was released from your care on June 26; would that be accurate?

A   If those are the dates that he was in the intensive care unit.

Q   Prior to June 20th, when you begin as his attending physician or even on that date, if you recall, did you have any conversations with Dr. Alassar about his condition or the surgery that was performed?  Any conversation that's not documented in this chart?

A   I don't recall.

Q   Do you recall any conversations with Dr. Luczycki or Dr. Dunphy about Mr. Welch and his condition before you began providing treatment?

A   I don't --

Q   And again, that's anything that's not reflected in the record, obviously?

A   I don't recall if there was.

Q   Okay.  If you go to Page 308 and, referring to the Critical Care Progress note of

June 20th, 2022, the first sentence states :I have seen and examined the patient with ICU team;" who were the members of that team that you were referring to, if you recall?

A   It varies from day to day.

Q   Okay.  Would there have been a record of who were the members of the ICU team?

A   I'm sure there is.

Q   Was Dr. Luczycki a member of the ICU team?

A   I don't believe -- not -- on that day, I don't believe so.

Q   Was Dr. Dunphy, on that date, a member of the ICU team?

A   I don't recall.

Q   Under the neuro section after the colon, you have the word encephalopathic.  What was the basis of you putting that description now?

A   Followed in the rest of the neuro section.  He knew his name, but he was unsure of where he was -- his location.  He didn't know the identity of his cousin who was at his bedside.

Q   Okay.  Was there any other basis for your finding that he was encephalopathic?

A   The nurses perform a CAM-ICU score every day, and the result was positive, which is a screening test for encephalopathy.

Q   And encephalopathy refers to a damage or disease of the brain; is that accurate?

A   Not necessarily.

Q   What were you referring to in using the term in this context for Mr. Welch?

A   His state of confusion.

Q   Okay.  When you use the term confusion, is that the same as you using the term delirium in the records?

A   Encephalopathy and delirium are similar, but separate entities.

Q   How did you make that distinction here with respect to Mr. Welch?  Was -- was he one and the same?  Was he both encephalopathic and also delirious?

A   I don't recall --

MR. STURTZ: Objection.  You can

answer.

THE WITNESS:  I don't recall.  The -- the extent of what -- what I am able to tell you of the conversation we had is documented in my note.

BY MR. JACKSON:

Q   Conversation you had with whom?

A   Mr. Welch.

Q   Okay.  Based on the surgery that Dr. Alassar had performed on Mr. Welch, were you concerned, as his attending physician, that he was giving these type of physical manifestations of being encephalopathic?

A   It is not an uncommon finding in a post -- in -- in the postoperative state.

Q   Irrespective of the surgical procedure that was performed?

A   It depends.

Q   For a Type A procedure, did you find that encephalopathic presentation to be unusual in his case?

A   Not necessarily.

Q   Why not?

A   Patients who undergo relatively large surgeries, for example a Type A repair, get a fair amount of anesthesia, require a lot of pain medications, and have no exposure to day versus night.  And so encephalopathy is something that we see not uncommonly in the intensive care unit.

Q   But Mr. Welch wasn't on any sedation at this point; is that accurate?

A   No.

Q   Okay.  So given that he was not on any sedation, what would've been on your differential for his encephalopathic presentation if there was no sedation at the time?

A   He was -- he was not receiving sedation.  He was receiving analgesia, which can have a similar effect.

Q   For how long?

A   Depends on the half-life of the medicines.

Q   Do you know, based on your note, what the half-life of the medicines were in his case,

**29**

that were used for him?

A   Based on my note, I don't know what he received in the past 24 -- in the -- the antecedent 24 hours from this note.

Q   The cousin that you referred to at the bedside, was that Shana Hargrove, or do you recall?

A   I do not recall.

Q   Do you know whether it was a male or a female?

A   I -- I believe it was a male, but I -- but -- I -- I believe it was a male.

Q   Okay.  Under the neuro note, the third to last sentence says "LLE remains one out of five strength;" that's referring to lower left extremity, correct?

A   Yes.

Q   Based on the surgery that Mr. Welch had underwent, do you recall what your differential diagnosis was for his exhibited one out of five LLE strength, given that he was six days post-op at this point?

**30**

A   The differential -- my -- my concern was enumerated by the consultant notes already present in the chart.

Q   Which notes are you referring to?  You're saying consultant notes.  Which -- which consultant notes are you referring to?

A   neurology.

Q   Can you point me to those neuro notes that you're referring -- are you talking about what we just went -- went over or are there -- what are you talking about specifically?

A   I believe there was a neurology consultation.

Q   Okay.  Can you just -- and maybe it not be -- it might not be in this packet.  Your Counsel may have to locate it --

A   To -- to answer your question, the differential for someone who does not move there hand extremity is stroke.

Q   Okay.  So stroke was on your differential on this day?

A   Yes.

**31**

Q   What was your basis or was there a basis for you to rule out stroke on this day from your differential?

A   As in -- can you rephrase the question?

Q   Yes.  Did you rule out -- did you rule out stroke on your differential diagnosis for purposes of the treatment that you were intending to continue to provide for Mr. Welch?

A   No, we could not rule out stroke.

Q   When you use the term stroke as we're talking about it on your differential, it's a -- as you know, a very broad medical term, was there a more specific type of stroke that you had in mind when you were coming up with a differential for this treatment of this patient?

A   I don't recall.

Q   The next sentence after the RLE [sic] three out of five rating states "MRI is pending.  Order for today;" did you place the order for the MRI?

A   No.

Q   Do you know who did?

**32**

A   No, I don't recall.

Q   Was it your expectation that the MRI was going to be performed on this particular date.  6-20?

A   Not necessarily.

Q   Why not?

A   It was not an emergent MRI.

Q   Even though stroke was on your differential diagnosis?

A   Correct.

Q   Why not?

A   Because no treatment -- no action would follow from the diagnosis of stroke after MRI.

Q   What's your basis for that statement given Mr. Welch's presentation, particularly his encephalopathy?

A   Because encephalopathy is not necessarily -- is not a -- is not necessarily congruent with stroke in isolation.

Q   Okay.  Based on your training, and education, and experience, is an MRI considered

in the medical community to be the gold standard for diagnosing spinal cord ischemia or spinal cord infarct?

A  Yes.

Q  Okay.  So can you square for me then, based on that acknowledgement, why the performance of an MRI, had it been done on that day, would not have made any difference in terms of the treatment plan going forward for Mr. Welch?

A  Because the treatment plan for stroke commonly involves anticoagulation or thrombolysis for which he was not a candidate given his -- his recent large operation.

Q  What about the operation made it contraindicated for Mr. Welch?

A  Risk for bleeding.

Q  And what's your basis for that?  Or what was your basis for that at -- thinking that at that time?

A  What is my basis for --

Q  His risk for bleeding being a contraindication for the performance of the MRI?

A  The surgery --

MS. STURTZ:  No -- I'm sorry.

MR. JACKSON:  Go ahead.

MS. STURTZ:  It wasn't a contraindication for the performance of an MRI. It was contraindication for treatment, just to clarify.

MR. JACKSON:  Okay.

BY MR. JACKSON:

Q  Can you clarify please, with --

A  The --

Q  Go ahead.

A  The surgery that is involved for an ascending hemiarch is extensive.

Q  Yes.

A  It involves opening the chest and the -- and there's a lot of bleeding that is involved in this surgery.  Exposing a patient to anticoagulation in the post-op period risks postoperative hemorrhage.

Q  Based on Mr. Welch's presentation on 6-20, were there any contraindications to

performing the MRI on him on that day?

A  I believe he still had pacing wires in at the time.

Q  Okay.  The pacing wires were removed on 6-20, right?

A  If that's what's documented.

Q  Okay.  If you go over to 307, and that's where I'm getting this from, it states at the bottom there, "two NWCV ICU procedure note, wire and drain removal"?

A  Yes.

Q  So those are the wires you were referring to, right?

A  Correct.

Q  Okay.  And it looks like this note was entered by Jacob Miller on 15:07, on 6-20.  Other than the wire removal, that would have been the only contraindication for the performance of the MRI; is that accurate?

A  Correct.

Q  On this date, 6-20, were you aware of any clinical or diagnostic procedure that could

have been performed to address Mr. Welch's lower extremity paresis?

A  No.

Q  Okay.  If you go to the vascular section on 308 -- page 308, and there two sentences in is the "65 is less than goal, G-O-A-L, MAP, M-A-P, which is less than 85 millimeters of Mercury;" you see that?

A  Yes.

Q  Who is responsible for determining that MAP goal?

A  We have unit protocols, which are commonly enacted after surgeries.  And 65 to 85 is a very common postoperative MAP -- mean arterial pressure goal.

Q  Is there any written plan in this particular progress note authored by you of how that MAP goal was to be achieved for this patient?

A  Yes.

Q  Can you point me to that, please?

A  In the following sentence.

Q  Can you read the following sentence?

**37**

A    "PO," which means oral, "antihypertensives have been started. Amlodipine, hydralazine, labetalol.

Q    Other than the antihypertensives, were there any other diagnostic or clinical tools used to try and achieve that MAP goal?

A    No.

Q    Okay. If you go to Page 307, and I'm referring to the attestation section of the progress note authored by you on 6-21-2022. And on the fourth sentence in it states "awaiting MRI -- MRI to aid in diagnosis of LLE paresis, though anticipate spinal cord trespass." What was the basis for your anticipation of spinal cord trespass? Well, let me back up.

Can you define spinal cord trespass as referred to in this context?

A    Spinal cord pathology.

Q    Generally? When you say spinal cord pathology, what -- you -- you're just referring to the area of the spinal cord?

A    Correct. A disease that localizes to

**38**

the spinal cord.

Q    Okay. Was there a particular disease that you felt was localized to Mr. Welch's spinal cord at the time that you made this note of spinal cord trespass?

A    I don't recall.

Q    Was there any particular level of the spinal cord at which you thought the -- the disease state was occurring based on this note in reference to Mr. Welch's condition?

A    I don't recall.

Q    Do you know why the MRI was still pending on this date, June 21st, 2022?

A    I don't recall.

Q    Based on Mr. Welch's presentation on this date, and your progress note for this date actually begins on Page 303 and then goes through 307, so feel free to reference that. Based on Mr. Welch's progress note as documented, were there any contraindications to performing an MRI on 6-21?

A    No.

**39**

Q    On 6-21-2022, were you aware of any clinical or diagnostic procedure that could have been performed to address Mr. Welch's lower left extremity weakness?

A    Can you clarify when you say address?

Q    According to the attestation that I just read, it stated that there was a diagnosis of LLE paresis and that you were awaiting the MRI to aid in that diagnosis. So my specific question is, was there anything that you were aware of, clinically or diagnostically, that could have been done to improve his LLE paresis?

A    Not to my knowledge.

Q    If you go to Page 304, in the top left box, and this falls under the neuro/pain/sedation section of your progress note, the second hashtag says "# LLE weakness. Concern for SCI;" what is SCI referring to in this context?

A    Spinal cord ischemia.

Q    Okay. Would spinal cord ischemia be the same or similar to spinal cord trespass as you used that term in your progress note?

**40**

A    Yes.

Q    Why was there a -- other than the lower left extremity weakness, why was there a charted concern for spinal cord ischemia?

A    I don't recall.

Q    Would you consider based on your note for LLE weakness as this -- this term is used on Page 304 to be the same or similar to paresthesias?

A    No.

Q    What would be the difference?

A    A paresthesia is a -- is a -- is a feeling. Paresis is a muscular weakness. One involves sensation, one involves motor.

Q    Based on your education, training, and experience, does a spinal cord infarct -- can a spinal cord infarct cause paresis?

A    It depends.

Q    On what?

A    The degree.

Q    Of what?

A    The infarct.

Q   Okay.  Based on Mr. Welch's presentation on 6-21, did you have any professional opinion as to whether the -- a spinal cord infarct was in fact causing his lower left extremity weakness?

A   **If that's what's reflected in my note.**

Q   Did you ever consider whether Mr. Welch was suffering from myelopathy of any sort?

A   **Can you please define myelopathy?**

Q   Transverse myelitis?

A   **That would be an unusual differential.**

Q   Why would it be unusual for Mr. Welch in this -- based on his clinical presentation on this date?

A   **Most commonly symptoms or postoperative complications are from often the disease process itself.  Transverse myelitis is a completely separate axis of diagnosis.**

Q   As Mr. Welch's attending physician on 6-21, were you concerned about his prognosis going forward given that the MRI was still pending on this date?

A   **I don't recall.**

Q   The note also refers -- refers to a Brandon Glousman.  He is currently, I think, a PGY4; is that accurate?

A   **I don't know which postgraduate year he is.**

Q   Okay.  He was a postgrad during this time of treatment that you provided, right?

A   **Correct.**

Q   Okay.  Do you recall whether Dr. Glousman, as a post grad at this particular time, did anything in particular or specific with respect to Mr. Welch's care that you may have delegated or allowed him to do?

A   **I don't recall.**

Q   Okay.  Indulgence us for one moment, sir.

On Page 299, under the neuro section at the second hashtag, where it states "multifactorial delirium, two out of two stroke, hypernatremia, ICU delirium, "based on your having treated Mr. Welch for -- as his attending

for two days now upon this date, what did you attribute the cause of his ICU delirium to be?

A   **As documented in the note.**

Q   The -- where -- where in the note specifically?

A   **"Multifactorial delirium, secondary to stroke, hypernatremia, and ICU delirium."**

Q   Do you recall a specific conversation with a family member of Mr. Welch about your concern for his experiencing ICU delirium or what may have been causing that?

A   **I don't remember a specific conversation.**

Q   Do you remember any family member of Mr. Welch expressing their concern to you about the level of sedation that Mr. Welch was receiving?

A   **Yes.**

Q   What do you remember about that expression of concern by the family member?

A   **I remember that -- and I do not remember who the family member was.  I recall they were concerned that he was overly lethargic.**

Q   Do you know why they expressed that concern?  Was it something he did or said, or just their observation?

A   **I don't recall specifically what the precipitant for that was.**

Q   Do you recall your response to their expressed concern?

A   **I don't recall.**

Q   Okay.  Do you recall any discussion with a family member about a mistake in dosage related to care provided to Mr. Welch by nurses in the ICU?

MR. STURTZ:  Objection.  You can answer.

THE WITNESS:  I don't recall a specific mistake.

BY MR. JACKSON:

Q   Okay.  And I'm not asking you about the mistake specifically, but I'm just talking just the conversation with the family member about there being a concern about a mistake in

45

dosage; do you recall that communication?

MR. STURTZ: Same objection.

BY MR. JACKSON:

Q You may answer.

A I recall a conversation about a medicine that was given overnight.

Q And what was the medicine that was -- of concern?

A I believe -- I -- I'm not 100 percent sure what the medicine was. I believe it was a medicine called Seroquel.

Q Okay. Do you recall what the concern about the Seroquel was? Was it just the amount given to Mr. Welch or was there some other concern?

A I don't -- I don't recall what the specific concern was.

Q Okay. Do you have a recollection of apologizing to any member of Mr. Welch's family for any care that you provided?

MR. STURTZ: Objection. You can answer.

46

THE WITNESS: I don't remember apologizing for the care that I provided.

BY MR. JACKSON:

Q Okay. Do you recall any apology by any healthcare provider given to any member of Mr. Welch's family that you observed or witnessed?

MR. STURTZ: Objection. You can answer.

THE WITNESS: I don't recall seeing any member of the healthcare team apologizing for the care we delivered.

BY MR. JACKSON:

Q Okay. Do you recall there being a discussion between you and a member of Mr. Welch's family wherein you told them, and I'm not quoting you verbatim, but you shared with them your lack of knowledge about a holistic approach of treating Mr. Welch's condition going forward after the diagnosis of the spinal cord infarct?

MR. STURTZ: Objection. You can answer.

THE WITNESS: I've been informed that

47

that occurred.

BY MR. JACKSON:

Q Okay. Do you recall that occurred or do you have any reason to dispute that that occurred?

A I have no reason to dispute that occurred.

Q Prior to this note that I just referred to -- well, let me just ask this clarifying question, because you said that the ICU delirium was listed here as secondary to the stroke: did you believe on this date, 6-22, that Mr. Welch's lower left extremity weakness was due to ICU delirium?

A No.

Q Okay. Do you know whether -- based on either your recollection or your review of the note, whether prior to receiving the diagnosis from the MRI, any type of diffusion weighted imaging was done of Mr. Welch?

A I don't know. I don't believe -- I -- I don't have any recollection of that being

48

performed.

Q Okay. Do you recall any consult with any member of the neurology team about whether Mr. Welch was an appropriate candidate for diffusion weighted imaging?

A I don't recall that particular conversation.

Q Okay. If you could just bear with me for a moment, please.

And forgive me if I'd asked this previously, with respect to the lumbar drain, as of June 20th when you became Mr. Welch's attending physician what, based on your education, and training, and experience, were the potential complications for the placement of a lumbar drain? Was -- did you mention bleeding in your prior answer?

A I don't recall if I mentioned it.

Q Okay. Would you consider that to have been a potential complication?

A It's a potential complication.

Q Okay. Why did you consider -- why

would you consider bleeding to be a potential complication of lumbar drain placement for CSF drainage on 6-20 for Mr. Welch?

MR. STURTZ: Objection. Asked and -- asked and answered. You can answer again.

MR. JACKSON: That's fine.

THE WITNESS: Any time you put a needle into the body, there's a risk of bleeding.

BY MR. JACKSON:

Q Okay. As of June 20th, other than bleeding, were there any other potential complications for CSF drainage via lumbar placement?

A **Placing CSF -- placing lumbar drains is outside of my scope of practice.**

Q And with that caveat, would there be, based on your training, and experience, or education, any potential complications by the placement of a lumbar drain on Mr. Welch by someone who it would've been in their realm or expertise to do so? Are you aware of any potential complications had that been done?

MR. STURTZ: Objection. You can answer.

THE WITNESS: All procedures have complications.

BY MR. JACKSON:

Q Other than the specific ones that you discussed, the bleeding in particular, are there any other physiological complications that you are aware of that existed for Mr. Welch particularly?

MR. STURTZ: Objection. You can answer.

THE WITNESS: Injury to the spinal cord, for example, with a needle is something that people worry about with lumbar drains.

BY MR. JACKSON:

Q And what do you mean injury to -- what type of injury to the spinal cord?

A **When you're introducing a needle close to the spinal cord, there's a risk of the needle hitting the spinal cord.**

Q Okay. Okay. So the bleeding, injury

to the spinal cord due to the needle; any other potential complications for lumbar drain placement for Mr. Welch on 6-20?

A **No, with the understanding that I am not an expert in the placement of lumbar drains because it is not within my scope of practice.**

Q Understood. According to the chart, Brian Barry, M.D., was a neurology attending. That was the designation set for him; do you know whether or not he's a neurosurgeon?

A **I don't know. Dr. Barry's occupation.**

Q Do you recall consulting with any neurosurgeon for purposes of Kevin Welch's care and treatment while you were his attending physician?

A **Not that I recall.**

Q At trial, is there any peer review literature that you plan --

MR. JACKSON: And I know he's not an expert witness, Counsel.

BY MR. JACKSON:

Q But as a named defendant and prior treating provider, is there any peer reviewed literature that you plan on relying on to justify any of the courses of action that you took with respect to Mr. Welch's treatment in this case?

MR. STURTZ: Objection. You can answer.

THE WITNESS: I've not considered such.

BY MR. JACKSON:

Q Okay. If you do consider such, could you please let your Counsel know so that we can know what, if any, literature that you may consider prior to trial, okay?

A **Okay.**

MR. JACKSON: All right. Okay. Pending any questions from your Counsel, that's all I have, Dr. Hockstein. Thank you.

MR. STURTZ: No questions from us.

(Off the record at 2:02 p.m.)

53

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Konly Harding, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

_____

Konly Harding, Notary Public in and for the State of District of Columbia.

54

CERTIFICATION OF TRANSCRIPT

I, Marti Schreiber, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said proceedings were reduced to typewriting under my supervision; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

_____

Marti Schreiber,
Planet Depos, LLC
May 2, 2024

| **A** |
| --- |

**ability**
53:11, 54:8
**able**
27:3
**about**
6:3, 7:19,
15:17, 17:18,
24:9, 24:14,
30:9, 30:11,
31:11, 33:14,
41:20, 43:9,
43:15, 43:19,
44:11, 44:19,
44:22, 45:5,
45:13, 46:17,
48:3, 50:15
**according**
10:4, 39:6,
51:7
**accurate**
18:7, 23:19,
24:3, 26:7,
28:9, 35:19,
42:4, 53:10,
54:7
**achieve**
37:6
**achieved**
36:18
**achieving**
12:6, 12:8
**acknowledgement**
33:6
**acted**
10:1
**action**
32:12, 52:3
**actually**
11:16, 17:2,
38:17
**address**
36:1, 39:3,
39:5
**affiliated**
8:16, 9:6
**affirmed**
5:4

**after**
15:7, 16:10,
21:1, 21:10,
23:10, 25:16,
31:17, 32:13,
36:13, 46:19
**afternoon**
5:9
**again**
13:10, 14:19,
24:18, 49:5
**against**
5:13
**ago**
11:21
**agree**
12:11, 13:3,
22:20
**ahead**
13:9, 34:3,
34:12
**aid**
37:12, 39:9
**al**
1:9
**alassar**
24:9, 27:10
**all**
7:12, 20:5,
20:7, 50:3,
52:14, 52:16
**allowed**
42:14
**along**
11:5
**already**
30:2
**also**
26:19, 42:2
**although**
17:18
**amlodipine**
37:3
**amount**
28:4, 45:13
**analgesia**
28:16
**anatomy**
15:16, 15:17

**anesthesia**
17:16, 18:14,
28:4
**another**
18:10
**answer**
20:13, 20:15,
27:1, 30:17,
44:15, 45:4,
45:22, 46:8,
46:21, 48:17,
49:5, 50:2,
50:12, 52:6
**answered**
49:5
**answers**
8:8
**antecedent**
29:4
**anticipate**
37:13
**anticipation**
37:14
**anticoagulation**
33:11, 34:19
**antihypertensives**
37:2, 37:4
**any**
6:5, 6:11,
6:15, 7:15, 8:5,
8:16, 8:20, 9:3,
9:5, 9:8, 9:14,
10:2, 14:12,
14:15, 14:18,
16:1, 16:16,
16:20, 20:8,
21:4, 24:8,
24:10, 24:13,
26:1, 28:8,
28:11, 33:8,
34:22, 35:22,
36:16, 37:5,
38:7, 38:20,
39:1, 41:2,
41:8, 43:14,
44:10, 45:19,
45:20, 46:4,
46:5, 46:10,

47:4, 47:19,
47:22, 48:2,
48:3, 49:7,
49:11, 49:18,
49:21, 50:8,
51:1, 51:12,
51:17, 52:1,
52:3, 52:11,
52:15, 53:4,
53:12, 54:9
**anything**
6:20, 7:1,
11:17, 19:22,
24:18, 39:10,
42:12
**aortic**
14:5, 14:9,
14:14, 14:20,
15:8, 15:15,
15:16, 15:17,
15:21, 16:3,
16:10, 16:16,
19:6
**apologizing**
45:19, 46:2,
46:10
**apology**
46:4
**appears**
10:5, 11:17,
11:18
**applied**
9:9
**apply**
8:20, 9:4, 9:13
**approach**
46:17
**appropriate**
48:4
**appropriateness**
18:16
**approximate**
13:5
**april**
1:16
**area**
37:21
**areas**
8:3

| | | | |
|---|---|---|---|
| **arterial** 19:2, 19:16, 19:21, 20:4, 20:19, 36:15 **arteries** 15:22, 16:7, 19:11, 20:19 **article** 11:17, 12:1, 12:17 **articles** 8:1, 8:6 **ascending** 34:14 **asked** 48:10, 49:4, 49:5 **asking** 20:4, 44:19 **assess** 18:16 **assigned** 21:13 **attached** 4:8 **attending** 13:15, 14:4, 14:8, 14:13, 17:22, 18:4, 18:11, 19:5, 22:12, 23:3, 23:17, 23:21, 24:7, 27:11, 41:19, 42:22, 48:13, 51:8, 51:14 **attestation** 23:16, 37:9, 39:6 **attorney** 5:11, 5:12 **attorneys** 6:21 **attribute** 43:2 **audio** 53:8, 54:4 **august** 13:10 | **author** 10:20 **authored** 7:14, 23:8, 36:17, 37:10 **authors** 11:12 **available** 6:6 **avenue** 2:7 **awaiting** 37:11, 39:8 **aware** 16:1, 35:21, 39:1, 39:11, 49:21, 50:9 **axis** 41:18 _____B_____ **back** 37:15 **baltimore** 3:18 **barry** 51:8 **barry's** 51:11 **based** 5:17, 6:4, 12:16, 15:2, 17:21, 20:1, 21:3, 27:9, 28:21, 29:2, 29:18, 32:21, 33:6, 34:21, 38:9, 38:15, 38:18, 40:6, 40:15, 41:1, 41:13, 42:21, 47:16, 48:13, 49:17 **basis** 25:18, 26:1, 31:1, 31:2, 32:15, 33:17, 33:18, 33:20, | 37:14 **bear** 48:8 **became** 48:12 **because** 9:11, 16:6, 19:9, 32:12, 32:18, 33:10, 47:10, 51:6 **becoming** 9:12 **bedside** 25:22, 29:6 **been** 5:20, 7:6, 7:10, 8:1, 8:2, 11:6, 12:22, 14:7, 17:14, 23:6, 23:19, 25:6, 28:12, 33:7, 35:17, 36:1, 37:2, 39:3, 39:12, 43:11, 46:22, 48:20, 49:20, 49:22 **before** 2:13, 5:20, 24:15, 53:3 **began** 9:21, 13:6, 24:1, 24:15 **begin** 24:6 **beginning** 12:6 **begins** 38:17 **behalf** 3:3, 3:12, 8:2, 8:10 **being** 5:4, 27:13, 33:21, 44:22, 46:13, 47:22 **believe** 9:7, 25:11, | 25:12, 29:11, 29:12, 30:12, 35:2, 45:9, 45:10, 47:12, 47:21 **besides** 7:2 **best** 12:5, 53:10, 54:7 **between** 8:17, 8:21, 9:21, 13:14, 13:20, 19:1, 46:14 **bleeding** 33:16, 33:21, 34:17, 48:16, 49:1, 49:8, 49:11, 50:7, 50:22 **blood** 19:3 **board** 12:10, 13:1 **body** 49:8 **both** 11:19, 13:17, 26:19 **bottom** 35:9 **box** 39:15 **brain** 26:7 **brandon** 42:3 **break** 6:15, 6:16 **brian** 51:8 **broad** 31:12 _____C_____ **calculate** 19:17, 19:19 |

calculation
20:1
call
18:13
called
15:21, 45:11
cam-icu
26:3
candidate
33:12, 48:4
cardiac
17:16, 18:13
care
4:13, 7:5, 8:5,
10:7, 10:8,
11:10, 11:11,
12:9, 13:16,
13:18, 21:13,
21:16, 21:17,
22:7, 23:22,
24:3, 24:5,
24:22, 28:7,
42:13, 44:12,
45:20, 46:2,
46:11, 51:13
caring
19:22
case
1:6, 7:5, 7:11,
8:10, 27:21,
28:22, 52:4,
53:13, 54:10
cause
40:17, 43:2
causing
41:4, 43:11
caveat
49:16
center
5:19
cerebral
15:4, 15:19,
16:2, 16:9,
17:2, 21:8
certain
15:7, 22:16
certificate
53:1

certification
54:1
certified
12:10, 13:2
certify
53:4, 54:2
chair
7:18, 7:20
chapter
4:13, 10:5,
10:20, 11:8
charles
3:16
chart
24:11, 30:3,
51:7
charted
40:4
chest
34:16
circumstance
16:1
circumstances
15:11
civil
1:3, 1:6
clarification
18:18
clarify
18:8, 34:7,
34:10, 39:5
clarifying
20:2, 47:10
clinical
35:22, 37:5,
39:2, 41:13
clinically
39:11
close
50:19
colon
25:17
columbia
1:2, 1:15, 2:9,
2:15, 5:17,
53:19
column
21:10

come
21:14
coming
31:14
common
36:14
commonly
33:11, 36:13,
41:15
communication
45:1
community
33:1
completed
8:13
completely
41:18
complication
48:20, 48:21,
49:2
complications
12:22, 41:16,
48:15, 49:12,
49:18, 49:22,
50:4, 50:8, 51:2
compromised
15:22, 21:1
concern
30:1, 39:17,
40:4, 43:10,
43:15, 43:20,
44:3, 44:8,
44:22, 45:8,
45:12, 45:15,
45:17
concerned
27:11, 41:20,
44:1
condition
24:9, 24:15,
38:10, 46:18
confusion
26:11, 26:13
congruent
32:20
consider
40:6, 41:7,
48:19, 48:22,

49:1, 52:9,
52:12
considered
16:8, 32:22,
52:7
constitution
2:7
consult
17:10, 48:2
consultant
30:2, 30:5,
30:6
consultation
18:3, 18:7,
30:13
consulted
18:11
consulting
51:12
content
7:19
context
12:18, 26:10,
37:17, 39:18
continue
31:8
contraindicated
33:15
contraindication
33:22, 34:5,
34:6, 35:18
contraindications
34:22, 38:20
contribute
10:12, 10:16
contributed
12:1
contributing
10:19, 10:20
contribution
10:11, 12:17
contributor
10:6
conversation
24:10, 27:4,
27:7, 43:8,
43:13, 44:21,
45:5, 48:7

**conversations**
6:22, 24:8, 24:13
**copy**
11:3, 11:5
**cord**
14:16, 14:21, 15:10, 18:20, 19:2, 19:10, 19:11, 19:13, 19:17, 20:10, 20:19, 20:21, 20:22, 21:5, 33:2, 33:3, 37:13, 37:14, 37:16, 37:18, 37:19, 37:21, 38:1, 38:4, 38:5, 38:8, 39:19, 39:20, 39:21, 40:4, 40:16, 40:17, 41:4, 46:19, 50:14, 50:18, 50:20, 50:21, 51:1
**correct**
8:14, 8:15, 22:2, 22:13, 23:1, 23:5, 23:20, 29:16, 32:10, 35:14, 35:20, 37:22, 42:9
**cost**
13:1
**could**
31:9, 35:22, 39:2, 39:12, 48:8, 52:9
**counsel**
5:7, 6:1, 6:7, 7:7, 7:17, 8:10, 11:4, 30:16, 51:20, 52:10, 52:15, 53:12, 54:9
**courses**
52:3

**court**
1:1, 5:16, 53:1
**cousin**
25:22, 29:5
**critical**
24:22
**crnp**
23:17
**csf**
17:6, 17:20, 21:4, 21:8, 21:10, 49:2, 49:12, 49:14
**currently**
42:3
**cv**
8:12, 10:4, 10:8
**cv--rjl**
1:7

**D**

**damage**
26:6
**date**
13:6, 13:8, 13:11, 23:10, 24:1, 24:2, 24:7, 25:13, 32:4, 35:21, 38:13, 38:16, 41:14, 41:22, 43:1, 47:12
**dates**
22:16, 24:4
**david**
3:14
**day**
25:5, 25:11, 26:4, 28:5, 30:21, 31:2, 33:8, 35:1
**days**
29:22, 43:1
**deemed**
14:3
**defendant**
3:12, 51:22

**defendants**
1:10
**define**
18:22, 37:16, 41:9
**defined**
21:20
**degree**
40:20
**delegated**
42:14
**delegating**
22:6
**delirious**
26:20
**delirium**
26:14, 26:15, 42:20, 42:21, 43:2, 43:6, 43:7, 43:10, 47:11, 47:14
**delivered**
46:11
**department**
13:17
**depends**
15:13, 27:18, 28:19, 40:18
**depos**
54:18
**deposed**
5:20
**deposition**
1:14, 2:1, 4:9, 6:20, 8:13, 11:7
**description**
4:11, 25:18
**designation**
23:18, 51:9
**determination**
17:22
**determine**
15:18
**determining**
19:21, 36:10
**diagnosed**
14:21
**diagnosing**
33:2

**diagnosis**
20:9, 29:20, 31:6, 32:9, 32:13, 37:12, 39:7, 39:9, 41:18, 46:19, 47:18
**diagnostic**
35:22, 37:5, 39:2
**diagnostically**
39:11
**difference**
19:1, 33:8, 40:11
**different**
21:18, 21:19
**differential**
28:12, 29:20, 30:1, 30:18, 30:21, 31:3, 31:6, 31:11, 31:14, 32:9, 41:11
**diffusion**
47:19, 48:5
**digital**
53:8, 54:3
**direction**
7:7
**directly**
18:12
**discussed**
50:7
**discussion**
44:10, 46:14
**disease**
26:7, 37:22, 38:2, 38:9, 41:17
**dispute**
47:4, 47:6
**dissection**
15:8, 15:15, 15:16, 15:18, 15:22, 16:3, 16:10, 19:15, 20:18, 21:2

**dissections**
16:6, 19:9
**distinction**
26:17
**distribution**
15:20
**district**
1:1, 1:2, 1:15,
2:9, 2:15, 5:16,
5:17, 53:19
**divided**
13:21
**division**
1:3
**documented**
24:11, 27:4,
35:6, 38:19,
43:3
**done**
15:7, 17:21,
18:3, 33:7,
39:12, 47:20,
49:22
**donna**
3:13
**dosage**
44:11, 45:1
**down**
11:3, 21:9
**dr**
5:9, 7:21,
23:17, 24:9,
24:14, 25:9,
25:13, 27:9,
42:10, 51:11,
52:16
**drain**
17:3, 17:12,
17:15, 35:10,
48:11, 48:16,
49:2, 49:19,
51:2
**drainage**
15:4, 16:2,
16:9, 17:6,
17:20, 21:4,
49:3, 49:12
**drained**
15:19, 21:8,

21:11
**drains**
17:6, 49:14,
50:15, 51:5
**due**
47:13, 51:1
**duly**
5:4
**dunphy**
5:14, 9:19,
24:14, 25:13
**during**
13:20, 21:1,
42:7

**E**

**early**
13:10
**education**
15:2, 21:3,
32:22, 40:15,
48:14, 49:18
**educational**
12:2
**effect**
21:5, 21:7,
28:17
**effects**
15:10
**effort**
12:21
**either**
17:16, 17:19,
18:5, 47:17
**electronically**
6:9
**else**
7:7, 19:22
**emergency**
13:17
**emergent**
32:7
**emory**
8:14, 9:16
**employed**
53:12, 54:9
**employer**
9:11, 9:13

**enacted**
36:13
**encephalopathic**
25:17, 26:2,
26:19, 27:13,
27:20, 28:13
**encephalopathy**
26:5, 26:6,
26:15, 28:6,
32:17, 32:18
**ended**
22:7
**entered**
35:16
**entities**
26:16
**entitled**
7:1
**entry**
10:8
**enumerated**
30:2
**especially**
12:15
**esquire**
3:4, 3:13
**esuire**
3:14
**et**
1:9
**even**
24:7, 32:8
**ever**
5:20, 41:7
**every**
26:4
**everything**
7:6, 7:7
**exact**
13:8, 13:11
**examination**
4:2, 5:7
**examined**
5:6, 25:2
**example**
21:20, 28:3,
50:14
**exhibit**
4:9, 4:11,

10:22, 11:1,
11:7, 23:6,
23:13
**exhibited**
29:20
**exhibiting**
16:11, 16:17
**exhibits**
6:7, 6:8
**existed**
50:9
**expectation**
32:2
**expended**
12:21
**experience**
15:3, 16:13,
21:4, 32:22,
40:16, 48:14,
49:17
**experiencing**
43:10
**expert**
51:5, 51:20
**expertise**
49:21
**exposing**
34:18
**exposure**
28:5
**expressed**
44:2, 44:8
**expressing**
43:15
**expression**
43:20
**extensive**
34:14
**extent**
27:3
**extremities**
16:12
**extremity**
16:17, 29:16,
30:19, 36:2,
39:4, 40:3,
41:5, 47:13

**F**

**fact**
41:4

**fair**
22:10, 28:4
**falls**
39:15
**familiar**
15:3, 15:6,
18:19
**family**
43:9, 43:14,
43:20, 43:22,
44:11, 44:21,
45:19, 46:6,
46:15
**father**
10:19, 11:13,
11:15
**feed**
19:11
**feel**
38:18
**feeling**
40:13
**fellowship**
8:13, 9:15,
9:16
**felt**
38:3
**female**
29:10
**filed**
5:13
**financial**
53:14, 54:11
**find**
27:19
**finding**
26:2, 27:14
**fine**
49:6
**first**
5:4, 10:22,
11:6, 11:11,
12:5, 23:15,
25:1
**five**
29:15, 29:21,
31:18
**fluid**
15:4, 15:19,

16:2, 16:9,
17:3, 21:9
**focusing**
23:12
**follow**
11:5, 32:13
**followed**
25:19
**following**
36:21, 36:22
**follows**
5:6
**foregoing**
53:3, 53:5,
54:4
**forgive**
5:16, 48:10
**forward**
33:9, 41:21,
46:18
**fourth**
37:11
**free**
38:18
**fully**
53:5
**functions**
13:15

**G**

**g-o-a-l**
36:7
**general**
4:12, 10:6,
11:9
**generally**
37:19
**geographically**
21:20, 21:22
**georgetown**
9:1
**getting**
35:8
**given**
11:21, 28:11,
29:21, 32:16,
33:12, 41:21,
45:6, 45:14,

46:5
**giving**
27:12
**glousman**
42:3, 42:11
**go**
12:4, 13:9,
21:9, 24:21,
34:3, 34:12,
35:7, 36:4,
37:8, 39:14
**goal**
36:6, 36:11,
36:15, 36:18,
37:6
**goes**
38:17
**going**
6:7, 10:21,
23:9, 23:12,
32:3, 33:9,
41:21, 46:18
**gold**
33:1
**good**
5:9
**governor**
3:4, 3:5, 5:10
**grad**
42:11
**graduated**
9:15

**H**

**half-life**
28:19, 28:22
**hand**
30:19
**handed**
11:6, 23:7
**harding**
1:22, 2:14,
53:2, 53:18
**hargrove**
1:5, 5:12, 29:6
**hashtag**
39:16, 42:19
**healthcare**
7:16, 9:16,

46:5, 46:10
**held**
2:2
**hemiarch**
34:14
**hemorrhage**
34:20
**here**
6:6, 7:18,
11:7, 26:17,
47:11
**hereby**
53:4, 54:2
**hiring**
8:22
**hitting**
50:21
**hockstein**
1:14, 2:1, 4:2,
5:3, 5:9, 11:12,
11:14, 23:18,
52:16
**holistic**
46:17
**hospital**
1:8, 5:19, 22:1
**hospitals**
8:17
**hours**
16:18, 29:4
**hydralazine**
37:3
**hypernatremia**
42:21, 43:7

**I**

**icu**
19:5, 22:21,
23:4, 23:17,
25:2, 25:7,
25:9, 25:14,
35:9, 42:21,
43:2, 43:7,
43:10, 44:13,
47:11, 47:14
**identification**
11:1
**identity**
25:22

**iii**
3:4, 3:5, 5:10
**imaging**
47:20, 48:5
**improve**
39:12
**including**
21:13, 22:7
**indulgence**
42:16
**infarct**
14:16, 33:3,
40:16, 40:17,
40:22, 41:4,
46:19
**informally**
5:10
**informed**
6:2, 46:22
**injury**
50:13, 50:17,
50:18, 50:22
**institution**
8:21, 9:5, 9:14
**institutions**
9:4
**intending**
31:7
**intensive**
10:7, 11:10,
13:16, 13:18,
21:16, 21:17,
24:5, 28:7
**interest**
53:14, 54:10
**interested**
6:22
**interrogatories**
8:9
**interventions**
12:21
**introducing**
50:19
**involve**
16:7, 19:10
**involved**
34:13, 34:17
**involvement**
22:22

**involves**
33:11, 34:16,
40:14
**irrespective**
27:16
**ischemia**
14:21, 33:2,
39:19, 39:20,
40:4
**isolation**
32:20
**issue**
8:4
**itself**
41:17

**J**

**jackson**
3:4, 3:5, 4:3,
5:8, 5:10, 7:8,
7:9, 10:21,
11:2, 20:14,
22:18, 22:19,
23:14, 27:6,
34:3, 34:8,
34:9, 44:18,
45:3, 46:3,
46:12, 47:2,
49:6, 49:9,
50:5, 50:16,
51:19, 51:21,
52:8, 52:14
**jacob**
35:16
**janet**
23:16
**job**
1:20
**johnson**
11:12
**joining**
9:18
**joppa**
3:6
**journal**
4:13, 10:6,
11:9
**jumper**
23:16

**june**
14:3, 17:13,
17:19, 20:8,
21:12, 22:10,
23:8, 23:9,
24:3, 24:6,
25:1, 38:13,
48:12, 49:10
**justify**
52:2

**K**

**kevin**
5:13, 5:18,
8:4, 13:3, 14:2,
14:8, 14:19,
22:12, 51:13
**knew**
25:20
**know**
6:13, 6:15,
9:19, 10:15,
13:5, 13:12,
14:6, 19:17,
22:8, 25:21,
28:21, 29:2,
29:9, 31:12,
31:22, 38:12,
42:5, 44:2,
47:16, 47:21,
51:9, 51:11,
51:19, 52:10,
52:11
**knowledge**
14:16, 14:22,
39:13, 46:17,
53:10, 54:8
**knows**
7:18
**konly**
1:22, 2:14,
53:2, 53:18

**L**

**labetalol**
37:3
**lack**
46:17

**large**
28:2, 33:13
**last**
12:4, 29:14
**laura**
11:12
**law**
3:5
**left**
29:15, 39:3,
39:14, 40:3,
41:5, 47:13
**length**
12:15, 12:17
**less**
36:6, 36:7
**lethargic**
44:1
**level**
38:7, 43:16
**license**
9:22
**likely**
17:14
**limb**
16:11
**listed**
47:11
**lists**
23:17
**literature**
51:18, 52:2,
52:11
**llc**
3:5, 54:18
**lle**
29:14, 29:21,
37:12, 39:8,
39:12, 39:17,
40:7
**llp**
2:6, 3:15
**localized**
38:3
**localizes**
37:22
**locate**
30:16

location
25:21
long
6:16, 28:18
longer
12:15, 12:17,
22:21
look
22:11, 23:15
looks
35:15
lot
28:4, 34:17
lower
16:11, 16:17,
29:15, 36:1,
39:3, 40:3,
41:4, 47:13
luczycki
5:15, 9:19,
24:14, 25:9
lumbar
17:5, 17:6,
17:12, 17:15,
48:11, 48:16,
49:2, 49:12,
49:14, 49:19,
50:15, 51:2,
51:5

**M**

m-a-p
36:7
made
6:6, 10:15,
33:8, 33:14,
38:4
make
26:17
male
29:9, 29:11,
29:12
manifestations
27:12
many
11:21, 14:3
map
36:7, 36:11,

36:14, 36:18,
37:6
marked
10:22, 11:1,
23:13
marti
54:2, 54:17
maryland
3:8, 3:18
max
23:18
maxwell
1:14, 2:1, 4:2,
5:3
maybe
30:14
mean
19:16, 19:20,
20:4, 20:19,
22:17, 36:14,
50:17
means
37:1
meant
12:18
measured
20:5, 20:6
medical
6:5, 7:4, 7:22,
22:14, 31:12,
33:1
medications
28:5
medicine
45:6, 45:7,
45:10, 45:11
medicines
28:20, 28:22
medstar
1:8, 5:18,
8:22, 9:6, 9:10,
9:17, 9:19,
9:22, 13:6,
17:1, 17:8
medstar-affiliat-
ed
9:4
member
25:9, 25:13,

43:9, 43:14,
43:20, 43:22,
44:11, 44:21,
45:19, 46:5,
46:10, 46:14,
48:3
members
25:3, 25:7
mention
48:16
mentioned
18:6, 48:18
mercury
36:8
met
5:10
michael
11:11, 11:14
might
30:15
miller
35:16
millimeters
36:8
mind
31:14
mispronouncing
5:15
mistake
44:11, 44:17,
44:20, 44:22
mitigate
15:10
moment
18:18, 42:16,
48:9
monitor
19:5, 19:12
morbidity
13:1
more
31:13
mortality
13:1
most
41:15
motor
40:14

move
30:18
mri
31:18, 31:20,
32:2, 32:7,
32:14, 32:22,
33:7, 33:22,
34:5, 35:1,
35:19, 37:11,
37:12, 38:12,
38:20, 39:8,
41:21, 47:19
much
6:13
mullins
2:6, 3:15
multifactorial
42:20, 43:6
muscular
40:13
myelitis
41:10, 41:17
myelopathy
41:8, 41:9

**N**

name
5:10, 5:15,
25:20
named
5:14, 51:22
nd
23:9
necessarily
26:8, 27:22,
32:5, 32:19
necessary
6:14, 19:17
need
6:14
needle
49:8, 50:14,
50:19, 50:20,
51:1
neither
53:11, 54:9
nelson
2:6, 3:15

**neuro**
25:16, 25:19, 29:13, 30:8, 39:15, 42:18
**neurologist**
17:10, 17:11
**neurology**
30:7, 30:12, 48:3, 51:8
**neurosurgeon**
51:10, 51:13
**neurosurgery**
17:17, 18:14
**next**
12:14, 12:20, 23:6, 31:17
**night**
28:6
**non-involvement**
20:18
**notary**
2:14, 53:1, 53:18
**note**
24:22, 27:5, 28:21, 29:2, 29:4, 29:13, 35:9, 35:15, 36:17, 37:10, 38:4, 38:9, 38:16, 38:19, 39:16, 39:22, 40:6, 41:6, 42:2, 43:3, 43:4, 47:8, 47:18
**notes**
4:14, 7:13, 7:14, 23:7, 30:2, 30:4, 30:5, 30:6, 30:8
**nothing**
5:5
**notice**
2:13
**number**
14:6, 21:21
**nurses**
26:3, 44:12

**nw**
2:7
**nwcv**
35:9

**O**

**objection**
20:12, 26:22, 44:14, 45:2, 45:21, 46:7, 46:20, 49:4, 50:1, 50:11, 52:5
**observation**
44:4
**observed**
46:6
**obviously**
24:19
**occupation**
51:11
**occur**
16:2
**occurred**
16:21, 47:1, 47:3, 47:5, 47:7
**occurring**
38:9
**office**
3:5, 8:2
**officer**
53:2
**offices**
2:2
**often**
41:16
**oh**
13:9
**okay**
6:1, 6:19, 7:8, 7:15, 7:20, 7:22, 8:8, 9:3, 9:8, 9:12, 9:18, 10:11, 10:21, 11:16, 12:20, 13:5, 13:9, 13:14, 14:7, 14:18, 17:13,

18:4, 18:17, 19:20, 21:22, 22:5, 22:10, 23:2, 23:6, 24:21, 25:6, 26:1, 26:12, 27:9, 28:11, 29:13, 30:14, 30:20, 32:21, 33:5, 34:8, 35:4, 35:7, 35:15, 36:4, 37:8, 38:2, 39:20, 41:1, 42:7, 42:10, 42:16, 44:10, 44:19, 45:12, 45:18, 46:4, 46:13, 47:3, 47:16, 48:2, 48:8, 48:19, 48:22, 49:10, 50:22, 52:9, 52:12, 52:13, 52:14
**one**
6:2, 11:3, 11:4, 18:5, 18:18, 26:18, 29:14, 29:20, 40:13, 40:14, 42:16
**ones**
23:11, 50:6
**only**
9:9, 23:2, 35:18
**opening**
34:16
**operating**
21:15
**operation**
33:13, 33:14
**operative**
4:13
**opinion**
41:3
**opportunity**
6:2

**optimal**
12:8, 12:9
**option**
9:13
**oral**
37:1
**order**
17:10, 18:1, 31:19
**other**
5:14, 6:21, 7:22, 8:16, 9:3, 9:14, 18:15, 26:1, 35:16, 37:4, 37:5, 40:2, 45:14, 49:10, 49:11, 50:6, 50:8, 51:1
**others**
23:10
**otherwise**
53:14, 54:11
**out**
21:14, 29:14, 29:21, 31:2, 31:5, 31:6, 31:9, 31:18, 42:20
**outcome**
53:14, 54:11
**outcomes**
12:8
**outside**
7:16, 49:15
**over**
12:4, 30:10, 35:7
**overly**
44:1
**overnight**
45:6
**own**
17:21

**P**

**pacing**
35:2, 35:4
**packet**
30:15

| | | | |
|---|---|---|---|
| **page**<br>4:2, 4:9,<br>11:11, 12:4,<br>23:15, 24:21,<br>36:5, 37:8,<br>38:17, 39:14,<br>40:8, 42:18<br>**pages**<br>1:21<br>**pain**<br>28:4, 39:15<br>**paper**<br>6:8<br>**paresis**<br>36:2, 37:12,<br>39:8, 39:12,<br>40:13, 40:17<br>**paresthesia**<br>40:12<br>**paresthesias**<br>40:9<br>**particular**<br>9:9, 10:12,<br>32:3, 36:17,<br>38:2, 38:7,<br>42:11, 42:12,<br>48:6, 50:7<br>**particularly**<br>32:16, 50:10<br>**parties**<br>53:13, 54:10<br>**pass**<br>11:3<br>**past**<br>29:3<br>**pathology**<br>37:18, 37:20<br>**patient**<br>16:11, 16:17,<br>16:20, 16:22,<br>17:3, 19:6,<br>20:1, 25:2,<br>31:15, 34:18,<br>36:18<br>**patients**<br>12:15, 14:3,<br>14:7, 14:12,<br>14:15, 14:19, | 14:21, 16:15,<br>19:14, 20:5,<br>20:7, 21:12,<br>21:14, 22:6,<br>28:2<br>**peer**<br>8:1, 8:5, 10:6,<br>51:17, 52:1<br>**pending**<br>6:17, 31:18,<br>38:13, 41:22,<br>52:15<br>**people**<br>50:15<br>**percent**<br>45:9<br>**perform**<br>16:9, 17:5,<br>17:10, 17:15,<br>17:20, 18:2,<br>26:3<br>**performance**<br>33:7, 33:22,<br>34:5, 35:18<br>**performed**<br>15:12, 17:2,<br>24:10, 27:10,<br>27:17, 32:3,<br>36:1, 39:3, 48:1<br>**performing**<br>35:1, 38:20<br>**perfusion**<br>18:20, 19:13,<br>19:18, 20:10,<br>20:22<br>**perhaps**<br>17:17<br>**period**<br>13:20, 15:9,<br>20:21, 22:21,<br>23:3, 23:11,<br>34:19<br>**pertaining**<br>7:5<br>**pgy4**<br>42:4<br>**phone**<br>18:12 | **physical**<br>27:12<br>**physician**<br>12:10, 13:2,<br>13:15, 14:4,<br>14:9, 14:13,<br>18:1, 19:5,<br>22:3, 22:5,<br>22:12, 23:3,<br>23:21, 24:7,<br>27:11, 41:19,<br>48:13, 51:15<br>**physicians**<br>21:18<br>**physiological**<br>21:5, 50:8<br>**physiology**<br>20:17<br>**pick**<br>18:12<br>**place**<br>18:1, 18:10,<br>31:19<br>**placed**<br>21:15<br>**placement**<br>48:15, 49:2,<br>49:13, 49:19,<br>51:3, 51:5<br>**placing**<br>49:14<br>**plaintiff**<br>1:6, 3:3, 5:7,<br>8:3<br>**plan**<br>33:9, 33:10,<br>36:16, 51:18,<br>52:2<br>**planet**<br>54:18<br>**please**<br>18:9, 18:18,<br>34:10, 36:20,<br>41:9, 48:9,<br>52:10<br>**po**<br>37:1<br>**point**<br>28:9, 29:22, | 30:8, 36:20<br>**portion**<br>11:8<br>**portions**<br>11:20<br>**positive**<br>26:4<br>**possible**<br>16:19<br>**post**<br>4:12, 14:4,<br>14:9, 27:15,<br>42:11<br>**post-op**<br>29:22, 34:19<br>**post-surgery**<br>16:12, 16:18<br>**postgrad**<br>42:7<br>**postgraduate**<br>42:5<br>**postoperative**<br>10:7, 11:10,<br>15:9, 20:21,<br>27:15, 34:20,<br>36:14, 41:16<br>**potential**<br>48:15, 48:20,<br>48:21, 49:1,<br>49:11, 49:18,<br>49:22, 51:2<br>**power**<br>5:12<br>**practice**<br>17:1, 17:4,<br>17:7, 17:8,<br>17:13, 49:15,<br>51:6<br>**practices**<br>12:5<br>**precipitant**<br>44:6<br>**preference**<br>6:9<br>**preparation**<br>6:19, 7:12,<br>7:17, 8:10<br>**prepared**<br>8:9, 54:3 |

**presence**
7:16
**present**
30:3
**presentation**
27:20, 28:13,
32:16, 34:21,
38:15, 41:2,
41:13
**pressure**
18:20, 19:2,
19:3, 19:12,
19:13, 19:16,
19:18, 19:21,
20:5, 20:10,
20:20, 21:5,
21:9, 36:15
**prevent**
15:9
**previously**
48:11
**primarily**
13:16
**primary**
23:22
**principal**
10:20
**principles**
4:12, 10:7,
11:10
**prior**
8:12, 9:12,
9:18, 14:2,
14:7, 14:12,
14:19, 16:15,
16:21, 17:1,
24:6, 47:8,
47:18, 48:17,
51:22, 52:12
**privileges**
8:20, 9:1, 9:5,
9:9, 9:14, 9:22,
13:6
**procedure**
17:9, 17:21,
18:2, 18:16,
27:16, 27:19,
35:9, 35:22,

39:2
**procedures**
50:3
**proceeding**
54:4
**proceedings**
53:3, 53:5,
53:6, 53:9,
54:5, 54:7
**process**
15:3, 41:17
**produced**
7:10, 8:2
**profession**
17:12
**professional**
13:20, 17:14,
41:3
**professionals**
17:20, 18:6
**prognosis**
41:20
**progress**
4:14, 7:13,
23:7, 24:22,
36:17, 37:10,
38:16, 38:19,
39:16, 39:22
**protocols**
36:12
**provide**
31:8
**provided**
6:4, 8:12,
10:5, 42:8,
44:12, 45:20,
46:2
**provider**
18:5, 46:5,
52:1
**providers**
5:14, 7:16
**providing**
12:9, 24:15
**public**
2:14, 53:1,
53:18
**publication**
10:13, 10:16

**purposes**
19:22, 31:7,
51:13
**pursuant**
2:13
**pursued**
12:9
**pursuing**
12:21
**put**
49:7
**putting**
25:18

**Q**

**qualified**
53:7
**question**
6:12, 6:16,
20:2, 20:16,
30:17, 31:4,
39:10, 47:10
**questions**
6:3, 52:15,
52:17
**quite**
7:11
**quoting**
46:16

**R**

**ransone**
7:3
**rating**
31:18
**read**
36:22, 39:7
**reading**
6:9, 20:9
**realm**
49:20
**reason**
9:8, 10:2,
47:4, 47:6
**recall**
9:2, 10:8,
11:20, 12:2,
12:3, 12:16,

12:19, 13:8,
13:11, 14:2,
14:17, 15:1,
16:16, 16:20,
16:22, 22:9,
24:8, 24:12,
24:13, 24:20,
25:4, 25:15,
26:21, 27:2,
29:7, 29:8,
29:19, 31:16,
32:1, 38:6,
38:11, 38:14,
40:5, 42:1,
42:10, 42:15,
43:8, 43:22,
44:5, 44:7,
44:9, 44:10,
44:16, 45:1,
45:5, 45:12,
45:16, 46:4,
46:9, 46:13,
47:3, 48:2,
48:6, 48:18,
51:12, 51:16
**received**
5:18, 29:3
**receiving**
28:15, 28:16,
43:17, 47:18
**recent**
33:13
**recollection**
6:4, 14:18,
45:18, 47:17,
47:22
**record**
5:11, 22:11,
22:15, 24:19,
25:6, 52:18,
53:10, 54:7
**recorded**
1:22, 53:6
**recording**
53:9, 54:4
**records**
6:5, 7:4, 7:10,
7:12, 7:22,

26:14
**reduce**
12:22
**reduced**
53:7, 54:5
**reference**
38:10, 38:18
**referenced**
11:9
**referred**
29:5, 37:17,
47:9
**referring**
17:5, 24:22,
25:4, 26:9,
29:15, 30:4,
30:6, 30:9,
35:13, 37:9,
37:20, 39:18
**refers**
26:6, 42:2
**reflected**
24:19, 41:6
**related**
8:3, 20:10,
44:12, 53:12,
54:9
**relatively**
28:2
**released**
24:2
**relevance**
20:8
**relevant**
19:20, 19:21
**relying**
52:2
**remains**
29:14
**remember**
43:12, 43:14,
43:19, 43:21,
43:22, 46:1
**removal**
35:10, 35:17
**removed**
35:4
**repair**
14:5, 14:10,

14:15, 14:20,
16:16, 21:2,
28:3
**repairs**
15:8
**repeat**
6:13
**rephrase**
6:13, 31:4
**reporter**
53:1
**represent**
7:3
**representing**
5:11
**request**
10:15
**requested**
10:12
**require**
28:4
**research**
11:18, 11:19
**respect**
21:22, 26:18,
42:13, 48:11,
52:4
**response**
44:7
**responsibility**
23:22
**responsible**
22:6, 36:10
**rest**
25:19
**result**
26:4
**review**
6:6, 7:11,
10:6, 47:17,
51:17
**reviewed**
7:4, 7:14, 8:1,
8:5, 8:6, 8:8,
52:1
**revoked**
10:1
**right**
18:5, 22:16,

22:22, 23:4,
23:19, 35:5,
35:13, 42:8,
52:14
**riley**
2:6, 3:15
**risk**
13:1, 33:16,
33:21, 49:8,
50:20
**risks**
34:19
**rle**
31:17
**road**
3:6
**room**
21:15, 21:21
**rounded**
21:18
**rounding**
22:3, 22:5
**rounds**
22:4
**rule**
31:2, 31:5,
31:9

---

**S**

---

**said**
44:3, 47:10,
53:8, 53:9,
54:5, 54:6
**same**
11:4, 26:13,
26:19, 39:21,
40:8, 45:2
**say**
37:19, 39:5
**saying**
22:1, 30:5
**says**
22:14, 29:14,
39:17
**scarborough**
2:6, 3:15
**schreiber**
54:2, 54:17

**sci**
39:17, 39:18
**scope**
17:4, 17:7,
17:8, 49:15,
51:6
**score**
26:3
**screening**
26:5
**second**
39:16, 42:19
**secondary**
43:6, 47:11
**section**
25:16, 25:20,
36:5, 37:9,
39:16, 42:19
**sedation**
28:8, 28:12,
28:14, 28:16,
39:15, 43:16
**see**
12:6, 28:7,
36:8
**seeing**
46:9
**seen**
25:2
**sensation**
40:14
**sentence**
12:5, 12:14,
12:20, 25:1,
29:14, 31:17,
36:21, 36:22,
37:11
**sentences**
36:6
**separate**
26:16, 41:18
**series**
23:7
**seroquel**
45:11, 45:13
**served**
7:6
**service**
18:11

**set**
13:7, 51:9
**several**
21:18
**shana**
1:5, 5:12, 29:6
**shared**
46:16
**short**
23:11
**should**
12:9, 12:21
**shown**
12:22
**sic**
31:17
**side**
13:7
**signature-mig2k**
54:15
**signature-p1kal**
53:16
**similar**
26:16, 28:17,
39:21, 40:8
**sir**
13:4, 42:17
**six**
29:21
**skills**
53:11, 54:8
**some**
6:7, 8:3, 45:14
**someone**
30:18, 49:20
**something**
19:4, 20:20,
28:6, 44:3,
50:14
**sorry**
34:2
**sort**
41:8
**speak**
7:2, 7:15
**speaking**
6:21
**specific**
16:20, 16:22,

31:13, 39:9,
42:12, 43:8,
43:12, 44:17,
45:17, 50:6
**specifically**
30:11, 43:5,
44:5, 44:20
**spinal**
14:16, 14:21,
15:10, 15:19,
15:22, 16:2,
16:7, 16:9,
17:3, 18:20,
19:2, 19:10,
19:11, 19:13,
19:17, 20:10,
20:19, 20:21,
20:22, 21:5,
21:9, 21:10,
33:2, 37:13,
37:14, 37:16,
37:18, 37:19,
37:21, 38:1,
38:3, 38:5,
38:8, 39:19,
39:20, 39:21,
40:4, 40:16,
40:17, 41:4,
46:19, 50:13,
50:18, 50:20,
50:21, 51:1
**split**
13:19, 13:21
**square**
33:5
**st**
38:13
**staff**
9:18
**standard**
33:1
**started**
37:2
**starting**
23:8
**state**
22:10, 26:11,
27:15, 38:9,

53:19
**stated**
39:7
**statement**
12:12, 13:3,
32:15
**states**
1:1, 5:16,
12:5, 12:8,
12:14, 12:20,
25:1, 31:18,
35:8, 37:11,
42:19
**status**
12:2
**stay**
12:16, 12:18,
22:21
**still**
16:8, 35:2,
38:12, 41:21
**street**
3:16
**strength**
29:15, 29:21
**stroke**
30:19, 30:20,
31:2, 31:6,
31:9, 31:10,
31:13, 32:8,
32:13, 32:20,
33:10, 42:20,
43:7, 47:12
**sturtz**
3:13, 3:14,
20:12, 22:16,
26:22, 34:2,
34:4, 44:14,
45:2, 45:21,
46:7, 46:20,
49:4, 50:1,
50:11, 52:5,
52:17
**subset**
14:20
**suffering**
41:8
**suit**
5:13

**suite**
2:8, 3:7, 3:17
**supervision**
54:6
**sure**
6:1, 11:22,
17:18, 25:8,
45:10
**surgeries**
28:3, 36:13
**surgery**
17:17, 17:18,
18:14, 24:9,
27:9, 29:18,
34:1, 34:13,
34:18
**surgical**
14:5, 14:9,
14:14, 14:20,
16:16, 19:6,
21:16, 21:17,
27:16
**suspended**
10:1
**sustain**
14:15, 19:14
**swelling**
15:10
**sworn**
5:4, 53:5
**symptoms**
41:15
**system**
9:17

**T**

**taken**
53:3
**talking**
30:9, 30:11,
31:11, 44:20
**target**
19:14, 20:20
**team**
18:12, 18:13,
18:15, 25:3,
25:7, 25:10,
25:14, 46:10,

48:3
**teams**
21:19, 22:3, 22:4
**tell**
27:3
**term**
18:19, 18:22, 26:10, 26:12, 26:13, 31:10, 31:12, 39:22, 40:7
**terms**
13:19, 33:8
**test**
26:5
**testified**
5:6
**testify**
5:4
**th**
22:11, 23:8, 24:6, 25:1, 48:12, 49:10
**thank**
18:17, 52:16
**thereafter**
53:6
**thing**
11:4
**think**
8:22, 42:3
**thinking**
33:18
**third**
29:13
**thought**
38:8
**three**
31:18
**thrombolysis**
33:11
**through**
6:7, 23:9, 38:17
**time**
6:11, 6:15, 8:17, 11:22,

12:2, 12:10, 13:2, 13:20, 22:21, 23:3, 23:11, 28:14, 33:19, 35:3, 38:4, 42:8, 42:11, 49:7
**today**
5:21, 6:20, 7:17, 31:19
**told**
46:15
**took**
52:3
**tools**
37:5
**top**
39:14
**towson**
3:8
**training**
15:2, 21:3, 32:21, 40:15, 48:14, 49:17
**transcript**
4:8, 54:1, 54:3, 54:6
**transcriptionist**
53:8
**transverse**
41:10, 41:17
**treated**
8:18, 13:2, 42:22
**treating**
12:11, 46:18, 52:1
**treatment**
5:17, 6:3, 8:4, 23:22, 24:2, 24:16, 31:7, 31:15, 32:12, 33:9, 33:10, 34:6, 42:8, 51:14, 52:4
**trespass**
37:13, 37:15, 37:17, 38:5,

39:21
**trial**
51:17, 52:12
**true**
12:15, 53:9, 54:6
**truth**
5:5, 5:6
**try**
37:6
**tuesday**
1:16
**two**
13:21, 22:3, 22:4, 35:9, 36:5, 42:20, 43:1
**type**
14:5, 14:9, 14:14, 14:20, 15:15, 15:20, 15:21, 16:3, 16:6, 16:10, 16:16, 19:6, 19:9, 19:14, 20:18, 21:2, 21:4, 21:7, 27:12, 27:19, 28:3, 31:13, 47:19, 50:18
**types**
15:7
**typewriting**
53:7, 54:5
**typically**
15:20, 16:6, 19:7, 19:10, 19:14, 21:1

**U**

**uncommon**
27:14
**uncommonly**
28:7
**under**
15:11, 23:16, 25:16, 29:13, 39:15, 42:18,

54:5
**undergo**
28:2
**undergone**
14:14
**understand**
6:12, 6:14, 6:17, 18:17, 20:15, 20:16, 20:17, 23:9
**understanding**
20:9, 51:4
**understood**
51:7
**underwent**
29:19
**unfavorably**
10:1
**unit**
10:7, 11:10, 13:16, 13:18, 21:16, 21:17, 22:2, 24:5, 28:7, 36:12
**united**
1:1, 5:16
**units**
13:21
**university**
8:14
**unlikely**
17:11
**unsure**
25:20
**until**
24:2
**unusual**
16:4, 16:8, 16:14, 27:20, 41:11, 41:12
**use**
26:12, 31:10
**using**
26:9, 26:13

**V**

**value**
19:19

**varies**
25:5
**vascular**
17:17, 17:18,
18:14, 36:4
**verbatim**
46:16
**versus**
28:5
**via**
49:12
**voluminous**
7:11
**vs**
1:7

**W**

**washington**
1:8, 1:15, 2:9,
5:19
**we're**
31:10
**weakness**
16:11, 16:17,
39:4, 39:17,
40:3, 40:7,
40:13, 41:5,
47:13
**weighted**
47:19, 48:5
**welch**
5:13, 5:18,
6:4, 8:18,
12:11, 13:3,
14:2, 14:8,
14:13, 14:19,
16:15, 16:21,
17:2, 20:11,
21:13, 22:2,
22:7, 22:12,
24:1, 24:14,
26:10, 26:18,
27:8, 27:10,
28:8, 29:18,
31:8, 33:9,
33:15, 41:8,
41:12, 42:22,
43:9, 43:15,

43:16, 44:12,
45:14, 47:20,
48:4, 49:3,
49:19, 50:9,
51:3
**welch's**
8:4, 22:20,
32:16, 34:21,
36:1, 38:3,
38:10, 38:15,
38:19, 39:3,
41:1, 41:19,
42:13, 45:19,
46:6, 46:15,
46:18, 47:13,
48:12, 51:13,
52:4
**went**
9:16, 30:10
**whatever**
18:15
**wherein**
46:15
**whereupon**
5:2
**whether**
15:18, 20:6,
29:9, 41:3,
41:7, 42:10,
47:16, 47:18,
48:3, 51:10
**whole**
5:5
**wire**
35:10, 35:17
**wires**
35:2, 35:4,
35:12
**within**
17:4, 17:6,
51:6
**witness**
27:2, 44:16,
46:1, 46:9,
46:22, 49:7,
50:3, 50:13,
51:20, 52:7
**witness(es**
53:4

**witnessed**
46:6
**word**
25:17
**worry**
50:15
**would've**
28:12, 49:20
**write**
11:16
**written**
11:18, 36:16
**wrote**
11:19, 11:21

**Y**

**yeah**
11:14
**year**
13:12, 42:5
**years**
11:21
**yohannes**
7:21

**.**

**.5150**
3:9
**.9408**
3:19

**0**

**02**
52:18
**03381**
1:7
**07**
35:16

**1**

**100**
3:16, 45:9
**101**
2:7
**11**
4:12
**12**
1:17

**15**
35:16
**1600**
3:17

**2**

**2**
52:18
**20**
22:11, 23:8,
23:9, 24:6,
25:1, 32:4,
34:22, 35:5,
35:16, 35:21,
48:12, 49:3,
49:10, 51:3
**20001**
2:9
**2020**
8:14, 8:17,
8:21, 9:21,
13:13, 13:14
**2022**
5:18, 8:17,
8:21, 9:21,
13:14, 14:3,
17:14, 17:19,
20:8, 21:12,
23:8, 23:9,
25:1, 37:10,
38:13, 39:1
**2023**
23:17
**2024**
1:16, 54:19
**21**
37:10, 38:13,
38:21, 39:1,
41:2, 41:20
**21201**
3:18
**21286**
3:8
**22**
22:11, 23:8,
23:9, 25:1,
47:12
**23**
1:7, 1:16, 4:14

**24**
29:3, 29:4
**26**
24:3
**299**
42:18

**3**

**303**
38:17
**304**
39:14, 40:8
**307**
35:7, 37:8,
38:18
**308**
24:21, 36:5

**4**

**400**
3:6
**410.528**
3:9
**443.392**
3:19

**5**

**50**
3:7, 13:22
**534992**
1:20
**54**
1:21
**58**
1:17

**6**

**6**
32:4, 34:22,
35:5, 35:16,
35:21, 38:21,
41:2, 41:20,
47:12, 49:3,
51:3
**6–**
37:10, 39:1
**65**
36:6, 36:13

**7**

**72**
16:17

**8**

**85**
36:7, 36:13

**9**

**900**
2:8