Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA
Civil Division

- - - - - - - - - - - - - - - - x
SHANA HARGROVE AS POWER OF    :
ATTORNEY FOR KEVIN WELCH

                              :

        PLAINTIFF

                              :

   V.                             CIVIL ACTION NO.

                              :

MEDSTAR WASHINGTON HOSPITAL
CENTER, ET AL                 :   1:23-cv-3381

        DEFENDANTS.           :

- - - - - - - - - - - - - - - - x


VIDEOTAPED DEPOSITION OF

KEVIN WELCH

WASHINGTON, D.C.


Wednesday, April 10, 2024
9:05 a.m. - 11:02 a.m.


REPORTED BY:
         Okeemah S. Henderson, RPR



Page 2

APPEARANCES OF COUNSEL

ON BEHALF OF THE PLAINTIFF:

GOVERNOR E. JACKSON, III, ESQUIRE

LAW OFFICES OF GOVERNOR JACKSON, III LLC

10 G Street, NE

Suite 600

Washington, D.C. 2002

Gjackson@governorjacksonlaw.com

ON BEHALF OF THE DEFENDANTS:

DAVID STURTZ, ESQUIRE

DONNA P. STURTZ, ESQUIRE

NELSON MULLINS RILEY & SCARBOROUGH LLP

100 S. Charles Street

Suite 1600

Baltimore, Maryland 21202

Peter.sturtz@nelsonmullins.com

ALSO PRESENT:

JONATHAN PERRY, VIDEOGRAPHER

SHANA HARGROVE

Page 3

INDEX OF EXAMINATION

WITNESS: KEVIN WELCH                PAGE

DIRECT EXAMINATION

By Mr. Sturtz, Esquire        5, 99
By Mr. Jackson, Esquire       88

INDEX OF EXHIBITS
(Attached to the transcript)

EXHIBITS                        PAGE

Exhibit 1    Photograph              91

Page 4

PROCEEDINGS

THE VIDEOGRAPHER:  We are now on the record.  This begins media unit number 1 in the deposition of Kevin Welch taken in the matter of Shana Hargrove as power of attorney for Kevin Welch versus Medstar Washington Hospital Center, et al.

Case filed in the U.S. District Court for te District of Columbia, Case Number 1:23-cv-3381.  The date is April 10, 2024.  Time is 9:05 a.m.  We are at the offices of Nelson Mullins Riley and Scarborough, 101 Constitution Avenue, Northwest in Washington, D.C. This is being taken on behalf of counsel for the defendant.

The videographer is Jonathan Perry and the court reporter is Okeemah Henderson, both here on behalf of Magna Legal Services.  Would counsel present please introduce themselves and state whom they represent.

MR. JACKSON:  Good morning.  Governor Jackson, III on behalf of the plaintiffs in the matter.

Page 5

MR. STURTZ:  Good morning.  David Sturtz on behalf of the defendants.

MS. STURTZ:  And Donna Sturtz on behalf of the defendants.

THE VIDEOGRAPHER:  Will the reporter please swear in the witness.

KEVIN WELCH, was called as a witness, and having been first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANTS
BY MR. STURTZ:

Q. Good morning, Mr. Welch.  I'm David Sturtz on behalf of the defendants, and I'll be taking your deposition today.  Have you ever had your deposition taken before?

A. Yes.

Q. So you're familiar then with how this works but just for some reminders, let's do our best to try not to cut each other off.  I'll do my best to let you finish your answers.

2 (Pages 2 to 5)





MAGNA
LEGAL SERVICES

Page 6

Please do your best to let me finish your -- finish my questions so that we have a clean record. If you need to take a break at any time, please just let me or your counsel know. If you don't understand one of my questions, please let me know, and I would be happy to provide clarification, but if you don't, we'll assume that you understood the question.

Please also for the -- for the -- to help the court reporter, give a verbal answer to all my questions; nodding or shaking of the head won't work. Do you understand everything I've gone over?

A. Yes.

Q. Please state your full name for the record?

A. Kevin Glascoe Welch.

Q. What did you do to prepare for this deposition?

A. Just talk to my lawyer.

Q. Okay. Did you review any records?

A. No.

Page 7

Q. Okay. Have you ever been married?

A. No.

Q. Any children?

A. No.

Q. Are you currently single?

A. No.

Q. Okay. What's the name of your significant other?

A. Saskia Campbell.

Q. Okay. What is your current address?

A. 12615 Brandywine Road, Brandywine, Maryland 20613.

Q. Okay. How long have you resided at that address?

A. Two years.

Q. Okay. What is your association with 4706 Mary Beth Boulevard. Is that another property you own?

A. Yes, it's another property that I own.

Q. Is that where you lived before moving to the Brandywine Road address?

A. Yes.

Page 8

Q. Okay. Since you have been living at the Brandywine Road address, does anyone else live there with you?

A. Yes. Marvin Holland.

Q. Is that it, just Marvin Holland?

A. And Shana Hargrove.

Q. Daniel Hargrove does not live there?

A. He does live there now.

Q. He does. Okay. So those three but no one else?

A. No.

Q. Where is your bedroom located in the house at Brandywine Road?

A. It's located on the second floor.

Q. Second floor. Okay. Are you able to maneuver around the house?

A. Yes.

Q. Okay. So there are no areas of the house that you struggle to access?

A. Just the basement.

Q. You struggle to access the basement?

A. Yes.

Page 9

Q. Okay. Can you explain -- do you have difficulty going down the stairs?

A. Yes, going down the stairs.

Q. But outside of that, do you have any complaints with living at that location?

A. No.

Q. Have there been any major renovations while you have lived at that address?

A. No.

Q. Okay. Who owns that property?

A. Myself, Ms. Hargrove and Mr. Holland.

Q. Do you plan to return to living by yourself?

MR. JACKSON: Objection. You may respond.

BY MR. STURTZ:

Q. I'm sorry. Did you live by yourself before living with them at Brandywine Road?

A. No.

Q. Okay. So you've -- okay. Do you believe you would be able to live by yourself?

A. No.

Q. No. Do you believe that because you

3 (Pages 6 to 9)



MAGNA
LEGAL SERVICES

Page 10

wouldn't feel comfortable with that or has a doctor told you that?

A. I wouldn't feel comfortable with that.

Q. What are your concerns about living with yourself?

A. Just in case I fall or something.

Q. In case you fall. Have you fallen?

A. Yes, I've fallen.

Q. How many times have you fallen?

A. Twice.

Q. Both -- I assume both since the occurrence giving rise to this lawsuit?

A. Yes.

Q. Okay. When was the most recent fall?

A. I can't remember.

Q. Okay. And did you report those falls to your medical providers?

A. Yes.

Q. Okay. So just to clarify, before you moved to the Brandywine Road address who did you share a residence with?

A. Marvin Holland.

Page 11

Q. Just Marvin Holland?

A. Uh-huh.

Q. And how long had you all lived together?

A. Like six years.

Q. Okay. Six years. How are you related -- I'm sorry. Are you related to Marvin Holland and Shana Hargrove?

A. Yes.

Q. How are you related to them?

A. Marvin Holland is my cousin and Shana Hargrove is my niece.

Q. And Saskia Campbell is your girlfriend?

A. Yes.

Q. Okay. Shana Hargrove brought this lawsuit as your power of attorney, correct?

A. Yes.

Q. When did Shana officially become your power of attorney?

A. I want to say March of last year.

Q. Okay. Why was it Shana who took on the role of your power of attorney?

A. Because she's the closest to me.

Page 12

Q. And she's still your power of attorney presently?

A. Yes.

Q. Do you plan to end the power of attorney relationship at any point?

A. I do.

Q. You do? Okay. When do you plan on ending it?

A. I can't say.

Q. You can't say. Okay. Are there remaining concerns that are stopping you from ending it at this time?

A. Yes.

Q. What would those be?

A. Just my finances. Just things like that.

Q. But nothing -- nothing in terms of your functioning is a concern in terms of ending that relationship?

MR. JACKSON: Objection. You may respond.

A. Could you repeat the question?

BY MR. STURTZ:

Q. You said your finances were a reason for

Page 13

not ending the power of attorney relationship. Is there any other reason?

A. Certain functioning.

Q. Okay. Could you elaborate on that?

A. Say like me talking to my job.

Q. Okay. Anything else other than you talking to your job?

A. No.

Q. Okay. Has a medical professional told you you were unable to perform the tasks that Shana performs for you as your power of attorney?

A. No.

Q. Have you consulted with a medical professional about that?

A. No.

Q. Does Shana keep you informed about what is going on with your affairs?

A. Yes.

Q. She does. Okay. And she elicits your input on important decisions that she's making as your power of attorney?

A. Yes.



Page 14

Q. Do you plan to apply for disability?

A. Yes.

Q. You do?  Okay. But you haven't applied yet?

A. I haven't applied yet.

Q. Is that something you've discussed with Shana?

A. Yes.

Q. Okay.  Shana, Marvin and Daniel have -- they assisted you with your care and your day-to-day living after the occurrence giving rise to this lawsuit, correct?

A. Yes.

Q. And Saskia also assisted you?

A. Yes.

Q. Is there anyone -- anyone else who assisted you in the normal course?

A. No.

Q. How would you describe Shana's role in that aside from her efforts as your power of attorney?

A. She'd come over, make sure I had food.

Page 15

Q. Okay.

A. Take me to the grocery store.

Q. When you say she would come over, correct me if I'm getting mixed up, but I thought you said she lives with you.  Did she not live with you at the time --

A. No, she doesn't live with me now.

Q. She doesn't live with you now, but she did live at the Brandywine Road address originally?

A. No.

Q. No.  Okay.  Sorry if I'm confusing things. Did she ever live with you at the Brandywine Road address?

A. No.

Q. No.  Okay.  So it's just Marvin?

A. Just Marvin.

Q. And I believe you said it was also Daniel?

A. Daniel, yes.

Q. So they both live there with you now?

A. Uh-huh.

Q. But Shana's never lived there?

A. No.

Page 16

Q. Okay.  And Daniel didn't live there when you originally moved there?

A. No, he didn't.

Q. When did he start living there?

A. He started lived there when I got home from the hospital in September.

Q. Okay.  So you moved -- did you move there before or after the occurrence giving rise to the --

A. Before.

Q. You moved there before.  Okay.  How long was it before?

A. It was about a year.

Q. About a year.  Okay.  How would you describe Marvin's role in assisting you?

A. Marvin really doesn't assist me.

Q. He doesn't?  Okay.  How would you describe Saskia's role?

A. She comes around, helps me clean.

Q. Okay.  And how would you describe Daniel's role?

A. Daniel does everything else.

Page 17

Q. He does everything else?

A. Yes.

Q. What do you mean by everything else?

A. He does -- like, he helps me with my laundry, he helps me cook, he helps me clean.

Q. Okay.

A. He looks after my dogs.

Q. Okay.  At some point, did your family hire in-home nursing care at your current residence?

A. Yes, they did.

Q. Okay.  When did that start; was that as soon as you returned home from the hospital?

A. As soon as I returned.

Q. Okay.  How long did it last; is it still ongoing?

A. No.  It ended like January.

Q. Okay.  And why did that end?  Did you feel it was no longer necessary?

A. Right.  With Daniel being there, it wasn't necessary.

Q. Okay.  Gotcha.  Do you recall how many nurses it was?

5 (Pages 14 to 17)


MAGNA
LEGAL SERVICES

Page 18

A. Just one.

Q. Just one. How frequently were they at the house; was it around the clock or?

A. It was -- it was five days a week, eight hours a day.

Q. Okay. Do you recall their names?

A. Keyana Washington.

Q. Okay. Do you recall the name of the nursing service?

A. No.

Q. No. Okay. Can you please describe in I guess in detail of what -- the type of services they provided for you?

A. She did pretty much the cooking and helped with the cleaning.

Q. Anything else?

A. And just watched me.

Q. Did she assist you use the restroom or no?

A. No.

Q. No. Okay. Can you state the name of your parents?

A. Sharon Welch.

Page 19

Q. Okay.

A. And Ralph Welch.

Q. Are they still alive or --

A. No, they're both deceased.

Q. Did they have any significant medical conditions?

MR. JACKSON: Objection. You may respond.

A. My father had heart problems. That's all I knew. He died when I was six.

BY MR. STURTZ:

Q. You don't know anymore details than beyond that it was heart problems?

A. No.

Q. Okay. What was your parent's highest level of education?

A. They both graduated high school.

Q. Okay. Did they have any learning disabilities?

A. No.

Q. Do you have any siblings?

A. Yes.

Q. Can you state their names please?

Page 20

A. Lashawn Hargrove, Aaron Hargrove.

Q. Can you state their ages please?

A. Lashawn is 13 years older than me, so she's 57 and Aaron is 11 years older than me, so he's 55.

Q. Do they have any significant medical conditions?

A. No.

Q. What's their highest level of education?

A. Both high school.

Q. Okay. Do they have any learning disabilities?

A. No.

Q. So outside of your father, are you aware of any family history of cardiac conditions?

A. No.

Q. Your maternal grandfather didn't have a cardiac condition to your knowledge?

A. Not to my knowledge.

Q. Okay. Any family history of stroke?

A. No.

Q. What is your highest level of education?

Page 21

A. I have a college degree, bachelor's.

Q. Okay. What's the degree in?

A. Criminology criminal justice.

Q. From what institution?

A. University of Maryland College Park.

Q. So since 2006 you have worked for the National Geospatial-Intelligence Agency; is that correct?

A. Yes.

Q. If I refer to that as GEOINT will you understand that that's what I'm referring to?

A. Yes.

Q. Where did you work between your graduation from Maryland and when you started at GEOINT?

A. I worked for my brother at his real estate company, that was Prudential Mathis and after that I worked in Chugach as a contractor, that's how I got in GEOINT.

Q. At GEOINT what was your position at the time of the occurrence giving rise to this lawsuit?

A. Security manager.

6 (Pages 18 to 21)


MAGNA
LEGAL SERVICES

Page 22

Q. Was that a fully in-person role or was it -- sorry. Was it a fully in-person role?

A. What do you mean by that?

Q. Did you have -- did you go to the in-office location every day?

A. Yes.

Q. Okay. So you didn't have that -- did you have an option to report remote at all or no?

A. I did have the option to work remote.

Q. You did. Did you exercise that option?

A. Yes, I did.

Q. Okay. How many days a week?

A. Twice a week.

Q. Twice a week. So you were in the office three days a week and you were remote two days a week?

A. Yes.

Q. Okay. What were -- what were your hours like in this job?

A. 6 to 2:30.

Q. 6 to 2:30. Okay. And what were your duties and responsibilities in that position as a

Page 23

I believe you said it was a security manager?

A. Uh-huh. My duties were to oversee the team, make sure they were doing what they were supposed to do. Sit in on briefings and occasionally conduct them.

Q. What was the -- can you speak a little bit more about kind of the subject matter of these briefings?

A. I can't really.

Q. Okay. Is that like government classified?

A. It's classified.

Q. Okay. How long had you been in that position as a security manager?

A. Probably like eight months.

Q. Eight months. Okay. What was your salary in that position?

A. Like $120,000.

Q. What were your prospects to promotion for that position?

A. They were very good.

Q. Did you have a boss or a direct supervisor in that position?

Page 24

A. Yes, Mike Orca (ph).

Q. What positions did you hold at GEOINT prior to becoming security manager?

A. I was a staff officer for the NST chief. I was a -- I can't remember what it was called. I was a security -- I was a security -- area security officer. I was a security specialist for physical security.

Q. Okay. Can you describe for me -- were all those roles in-person roles?

A. Yes.

Q. And was it the same hours that you described before?

A. Yes.

Q. Okay. Can you describe for me your duties and responsibilities in those roles?

A. Yes. For staff officer role I pretty much did, like, her calender, arrange meetings, basically admin functions. From a physical security specialist role I managed the badge system. For the area security officer role, I did everything basically for security.

Page 25

Q. Okay. Can you -- what was your salary in those roles?

A. Going back to the ASO their security officer role is, like, 50, physical security specialist role is, like, 70, for the staff officer role it was like 102.

Q. Have you returned to work at GEOINT?

A. No.

Q. Do you plan to return to work?

A. No, not on the advice of my doctors.

Q. Okay. Sorry. I'm just looking at my notes for a second.

Did you have concerns about returning to work?

MR. JACKSON: Objection to form. You may answer.

A. Yes.

BY MR. STURTZ:

Q. Can you please state what those concerns were?

A. My cognitive abilities have gone down. It's like I have a hard time focusing in on



Page 26

things.

Q. Anything else?

A. My communication with people. I have a hard time doing that.

Q. Did you attempt to work with GEOINT to see if you could return in some sort of an altered role?

A. No, not yet.

Q. Do you plan on doing that?

A. Possibly.

Q. Did you ask them if they can make any accommodations for you?

A. I haven't done it yet.

Q. Okay. But you plan to do so. GEOINT provided you with paid medical leave, correct?

A. Yes.

Q. Is that still ongoing or has that creased?

A. It's still ongoing.

Q. Okay. What is the amount of that? Is that your full salary?

A. Full salary.

Q. Full salary. Is there a -- is there a

Page 27

point at which that's going to cease or?

A. June.

Q. June. Do you have any other sources of income other than that?

A. No.

Q. So I got into this a little bit before but you've never been on disability?

A. No.

Q. And you do plan on applying for disability?

A. Yes.

Q. Do you view yourself as disabled?

A. Yes.

Q. Do you view yourself as totally and permanently disabled?

A. Yes.

Q. Is that -- has a doctor used that term?

A. No.

Q. No. Who are your current health care providers?

A. MedStar.

Q. Medstar. Do you know the name of any of

Page 28

the specific providers at MedStar; doctors?

A. Dr. Bethany Gorter, Dr. -- I don't remember her first name -- Tripathi is my primary caregiver. Dr. Hegde, too.

Q. So you have a primary caregiver whose name you don't recall and Dr. Bethany Gorter is your neuropsychologist, correct?

A. Yes.

Q. And she works with Dr. Jessica Clark; is that right?

A. I guess so.

Q. Do you have a physical therapist?

A. No.

Q. Do you have a cardiologist?

A. I don't know.

Q. And starting -- going back to your primary -- sorry. So going back to your primary care doctor at MedStar, have you had a positive experience with them?

A. Yes.

Q. With Dr. Bethany Gorter have you had a -- she's with MedStar, correct?

Page 29

A. Yes.

Q. And you've had a positive experience with her?

A. Yes.

Q. Before the occurrence giving rise to this lawsuit, how often did you go to the doctor, sorry, go to a primary care provider?

A. Barely. I never went.

Q. You never went. Okay. If you got sick, would you go to urgent care or?

A. No.

Q. Did you use a pharmacy?

A. No.

Q. Okay. What current medications are you taking?

A. I'm taking Robeterol (ph), hydralazine, clonidine, folic acid, aspirin, baby aspirin and losartan.

Q. Can you please state the dosages for each of those and the reason you take it?

A. I can't.

Q. Can you state the reason you take it or



Page 30

you can't state either dosage or the reason?

A. I can't state the dosage.

Q. Okay. Can you state the reason you take those though?

A. Yes, so Robeterol (ph) is for my heart, the hydralazine is for my heart, the clonidine is for my heart, folic acid is for my heart, baby aspirin is for my heart and Sartan is for my kidneys.

Q. So all those medications are either for your heart or your kidneys, there's no other reason you're taking medications?

A. Right.

Q. And did you get the Covid vaccine?

A. No.

Q. No?

A. You mean since the incident?

Q. No. I mean just in general?

A. I did get it in general.

Q. You did. Okay. Was that -- that was one dose of the Pfizer, correct?

A. No. Two doses of the Johnson & Johnson.

Page 31

Q. Okay. Do you have any health problems or conditions before the occurrence giving rise to this lawsuit?

A. No.

Q. You didn't have any chest pain before the occurrence giving rise to this lawsuit?

A. No.

Q. You didn't have nonradiating midsternal chest discomfort occasionally after activity?

A. No.

Q. No. Has a -- prior to the occurrence giving rise to this lawsuit, had a doctor told you that you're obese?

A. No.

Q. Did you have Covid at any point?

A. Yes.

Q. Before -- sorry, before the lawsuit?

A. Yes.

Q. Do you have asthma when you were a child?

A. Yes, I did.

Q. Can you please list your current health problems?

Page 32

MR. JACKSON: Objection as to form. You may respond.

A. I have vision problems. My vision goes blurry from time to time.

MR. STURTZ: I'm sorry.

A. I have, like, a weakness on my left side of my body. I have, like, just I'm out of breath a lot and that's it.

BY MR. STURTZ:

Q. So you don't suffer from kidney disease?

A. I might suffer from it. We don't know yet.

Q. So are you undergoing testing for that?

A. Yes.

Q. You don't suffer from depression?

A. No.

Q. You don't suffer from -- you don't have difficulty swallowing foods or liquids?

A. No.

Q. You don't have any pain?

MR. JACKSON: Objection. You may respond.

A. I have some pains but not --

Page 33

BY MR STURTZ:

Q. Nothing chronic?

A. No, nothing chronic.

Q. Do you have any swelling?

A. I had swelling in my legs but not anymore.

Q. Not anymore. Do you have any urine incontinence or bowel dysfunction?

A. No.

Q. Do you have any apathy?

A. Yes, I have apathy.

Q. Do you have any sadness due to, like, social isolation?

A. Yes, I do.

Q. You do not currently use a gait aid; is that correct?

A. No, I don't.

Q. Did you ever use one?

A. I did when I first got home.

Q. Okay. When did you stop using that?

A. Probably like two months after.

Q. Okay. Can you describe what type of aide it was?

9 (Pages 30 to 33)



Page 34

A. It was a walker.

Q. A walker. Can you just describe the vision problems you had mentioned in a little bit more detail?

A. So yeah, when my blood pressure gets high, my vision gets blurry.

Q. Okay. But it's only when your blood pressure gets high?

A. Uh-huh.

Q. And you also said you have weakness on your left side. Can you describe that a little bit more for me?

A. Yeah, so when I do something that's physical, my left side just gets weak.

Q. Okay. And what do you mean by physical?

A. Like walking up and down the steps.

Q. So it doesn't necessarily have to be a strenuous activity; just any physical activity triggers it?

A. Yes.

Q. And you being out of breath is that -- is that just tied to those physical activities?

Page 35

A. Yes.

Q. So if you're not doing one of those physical activities you don't get out of breath?

A. No, I don't.

Q. Can you describe the apathy a little bit more for me?

A. So that's, like, when I'm sitting there, I just don't want to do anything.

Q. Okay. And you feel -- you're not in control of that?

A. No.

Q. Is that something you ever struggled with before the occurrence giving rise to this lawsuit?

A. No, I used to be a get-up-and-go guy.

Q. And is that the same in terms of the weakness and being out of breath; you didn't experience those before?

A. No.

Q. You didn't experience vision problems before?

A. No.

Q. Are there specific activities you feel

Page 36

like you're no longer able to do?

A. I can't do martial arts anymore.

Q. Can you tell me about your participation in martial arts before -- before the occurrence giving rise to this case?

A. Yeah, I used to teach martial arts twice a week at a community center.

Q. Have you attempted to resume martial arts?

A. I've tried at home.

Q. Oh, you've tried at home?

A. Uh-huh.

Q. Any other activities you're no longer able to do?

A. I can't bowl anymore.

Q. Can't bowl. Okay. Can you describe your bowling before the occurrence giving--

A. My gait won't allow me to walk up to the lane normally and throw the ball.

Q. Okay.

A. And I can't lift a 15 pound ball anymore.

Q. Any other activities you can't do?

A. Like, walk around the lake at Costco Park.

Page 37

Q. Is that a park near your house?

A. Yes.

Q. Are you able to drive?

A. No.

Q. Has a doctor told you or a medical professional told you -- advised you not to drive or do you just not feel comfortable?

A. My medical advisor advised me not to drive.

Q. Did you attempt to drive?

A. Oh, yeah, I did.

Q. Okay. And that -- can you describe how that went?

A. Just, it was normal.

Q. It wasn't normal or it was normal?

A. It was normal.

Q. You said it was normal?

A. It was normal.

Q. Okay. So you feel like you tried to drive and you could drive around perfectly fine?

A. Uh-huh.

Q. Okay. But then your doctor just told you



Page 38

you shouldn't drive?

A. Yes.

Q. Okay. So you do feel like you would be able to drive?

A. Uh-huh.

Q. Okay. So if you needed to go places, do you use Uber or Lyft or do family and friends give you a ride?

A. My nephew, Daniel, drives me around.

Q. Daniel drives you around. Do you cook?

A. I try to.

Q. Is that -- is that something that's improving?

A. No.

Q. I'll circle back to the martial arts. Do you think your ability to do that is improving at all?

A. No, it's not.

Q. Okay. In general is your ability to do physical tasks improving or no?

A. Somewhat.

Q. Somewhat. Okay. So do you think maybe

Page 39

you would be able to bowl at some point?

A. No.

Q. You mentioned you had dogs. Do you walk your dogs?

A. No, I can't walk them.

Q. Okay. Does Daniel walk them for you?

A. Yes, he does.

Q. You're not able to play video games?

A. No, not really.

Q. Why is that?

A. I can't look at it and work the buttons anymore.

Q. It's a coordination?

A. Coordination.

Q. Hand-eye coordination. Do you have any problems doing daily chores?

A. Sometimes.

Q. Sometimes. Which specific chores do you struggle with?

A. Like, washing the dishes, laundry, cleaning the bathrooms.

Q. Why do you have difficulties? If you can

Page 40

just go through those one by one and explain why you struggle to do those?

A. So washing the dishes is picking up the pots and the pans. The laundry, sometimes with the laundry basket it's too heavy and then cleaning the bathrooms is bending down.

Q. Okay. Have you -- I'm sorry. Excuse me. Are there any struggles with your social life?

A. Yes.

Q. Can you describe those for me?

A. So the lack of communication is a big one, like, I can't really focus in on what people are saying, it's difficult.

Q. And that wasn't a problem before the --

A. No.

Q. But you do -- you are still dating Saskia?

A. Yes.

Q. Did you all break up at some point?

A. No.

Q. No. Who would you say were your close friends at the time of the occurrence giving rise to this lawsuit?

Page 41

A. Olivia Levadas was a close friend, Mark Henderson, John Myers, Kate Davis. Those are about it.

Q. How has your relationship with those individuals changed as a result of -- or I'm sorry. Has it changed as a result of the occurrence giving rise to this lawsuit?

A. It's changed. They more, like, feel sorry for me.

Q. Has the relationships changed in any other ways?

A. No.

Q. Has the relationship with Saskia changed in any way?

A. Yes --

Q. Sorry.

A. We're not as intimate as we used to be.

Q. Has your relationship with your family changed in any way?

A. Yes. I find that some cousins don't want to be around me.

Q. Have they expressed that to you or is that

11 (Pages 38 to 41)



Page 42

just a feeling you --
A. Just a feeling.
Q. Had anyone prior to the -- I'm sorry. In general, has anyone ever given you feedback that you come off as cold?
A. Yes.
Q. Did that predate the occurrence giving rise to this lawsuit or is that only something you've heard since the occurrence?
A. It's predated.
Q. It predated it. Have you heard that more often since?
A. No.
Q. So on June 14, 2022 you returned from a road trip to Atlanta, right?
A. Right.
Q. How long were you in Atlanta for?
A. A day.
Q. A day. What was the nature of the trip?
A. To move Olivia's brother back in town.
Q. Was Olivia one of your friends?
A. Yes.

Page 43

Q. Okay. So it was to move her brother back. Okay. So who accompanied you on the trip other than Olivia's brother, was it just you?
A. And her mother.
Q. So it was you, Olivia's brother and her mother?
A. Uh-huh. And Olivia.
Q. And Olivia. So that was roughly -- sorry. It was a road trip?
A. Uh-huh.
Q. And that took roughly ten hours?
A. About.
Q. Were you consuming energy drinks on the drive?
A. I assume I was. Yes.
Q. You don't remember?
A. No, I don't remember.
Q. Prior to this occurrence, did you consume energy drinks just in the normal course?
A. No.
Q. Was this your first time ever having an energy drink?

Page 44

A. No, it wasn't.
Q. Okay. But it wasn't a regular habit for you to drink energy drinks?
A. It wasn't.
Q. Okay. What energy drinks had you had before this occurrence?
A. Five-hour energy.
Q. Anything else?
A. No.
Q. Is that what you -- well, I'm sorry. You said you don't remember. Was there any other caffeine -- sorry. Do you drink coffee or did you drink coffee?
A. No.
Q. So on the road trip you didn't have any coffee in your system?
A. I don't remember.
Q. You don't remember. Prior to the occurrence was it a habit of yours to drink coffee or no?
A. No.
Q. Do you drink any caffeine?

Page 45

A. Probably drink a Pepsi.
Q. A Pepsi. Okay. So when the ambulance arrived, you had not eaten for about 24 hours; is that right?
A. I don't remember.
Q. You don't remember. At what point does your memory stop? Do you remember any of the road trip?
A. No.
Q. Do you remember any of the Atlanta trip?
A. I remember stopping at a storage space in Atlanta, that's it.
Q. Okay. Prior to the occurrence giving rise to this case, was it normal for you to go long periods of time without a meal?
A. No.
Q. Do you have any idea why you would have gone that long without a meal, if you did go that long without a meal?
A. No, I don't.
Q. So you don't -- I'm sorry. Just give me a minute. Prior to the occurrence giving rise to



Page 46

this lawsuit, have you ever experienced chest pains or discomfort?

A. No.

Q. No. Had you ever experienced, you know, abnormal sweating, sweating that wasn't due to you just feeling hot or?

A. No.

Q. So you don't remember the ambulance arriving?

A. No.

Q. You don't remember who was there with you?

A. No.

Q. So what is -- so from your last memory in Atlanta, what is your next memory after that?

A. Waking up in the hospital.

Q. Waking up in the hospital. And that's MedStar Washington Hospital Center?

A. Yes.

Q. So you don't have any recollection of the ambulance ride?

A. No.

Q. You don't have any recollection of being

Page 47

at Southern Maryland Hospital?

A. No.

Q. No recollection of air transport to MedStar?

A. No.

Q. Looking back at it now in hindsight, you understand it was an emergency situation?

MR. JACKSON: Objection. You may respond.

A. Yes.

BY MR. STURTZ:

Q. And that you were going to -- you were likely going to die without medical intervention?

MR. JACKSON: Objection. You may respond.

A. Yes.

BY MR. STURTZ:

Q. Have you reviewed the medical consent form that you signed?

A. No.

Q. And sorry, I should ask, do you remember signing a medical consent form?

A. No.

Q. Do you recognize your signature on this

Page 48

document?

MR. JACKSON: For the record, this is Bates label 000038 of Washington Hospital Center production.

A. Yes. I recognize the signature.

BY MR. STURTZ:

Q. That's your signature?

A. Yes.

Q. But you don't remember signing it?

A. I don't remember signing it.

Q. Can you just take a minute and take your time to review that document for me, note the first page as well.

A. (The witness complies.) Okay.

Q. When you were at MedStar Washington Hospital Center, do you remember meeting Dr. Alassar?

A. No.

Q. No. And you don't remember based on reviewing that document, that medical consent form does it seem like they had a discussion with you about what was going on with your condition?

Page 49

A. No.

MR. JACKSON: Objection as to form. You may answer.

A. No.

BY MR. STURTZ:

Q. No. You don't think that document evidences that?

MR. JACKSON: Objection. You may respond.

A. No.

BY MR. STURTZ:

Q. Do you remember meeting any other health care providers whether it be doctors or nurses or anyone while you were at MedStar Washington Hospital Center?

A. There was a doctor. I can't remember his name though. Smultay (ph).

Q. You don't remember any of the nurses?

A. No.

Q. So do you remember being transferred to the ICU?

A. No.

Q. Do you remember anything about being in



MAGNA
LEGAL SERVICES

Page 50

the ICU from July 14 -- sorry. From June 14 to July 8th?

A. No.

Q. But you do remember waking up in the hospital at MedStar Washington Hospital Center?

A. Yes.

Q. But then that was -- that was on June 14th, but then you don't remember anything about being in the ICU from June 14th to July 8th?

A. No. Upon waking up, I felt like that was August.

Q. So you -- sorry. You think your first memory --

A. First memory was in August.

Q. -- is in August?

A. Uh-huh.

Q. Okay. Are you seeing any health care providers currently for rehabilitation purposes?

A. My neurological.

Q. How often are you seeing them?

A. Once every three weeks.

Q. How do you feel that's been progressing?

Page 51

A. Slowly.

Q. Slowly. But there is progress being made?

A. Yes.

Q. What areas are you seeing the biggest improvements in?

A. Speech and communication.

Q. Are there anything that you're frustrated with the rate that it's progressing?

A. Yes. My speech. I wish it was going a lot faster.

Q. Are you doing anything for purposes of physical rehabilitation?

A. Just the workouts I do with my nephew at home.

Q. Okay. Is that -- are those workouts that are being recommended to you by a health care provider?

A. Yes.

Q. Which provider is recommending those?

A. My physical therapists.

Q. Okay. So you do have a physical therapist. Do you know the name of your physical

Page 52

therapist?

A. No.

Q. Is that also with MedStar?

A. Yes.

Q. Okay. And you've had a positive experience with them?

A. Yes.

Q. Can you describe those workouts for me; what they usually entail?

A. Some leg exercises and then we walk on the treadmill for 15 minutes.

Q. Okay. So sorry if you already said this, how many days a week do you do those workouts?

A. Like three days a week.

Q. How long do they typically last for?

A. About half an hour.

Q. Outside of your martial arts, did you work out -- did you do workouts before the occurrence giving rise to this case?

A. Yes.

Q. Can you describe those for me?

A. It's usually just me working out on the

Page 53

bench, squats, leg lifts, stuff like that.

Q. About how many times did you say you did those workouts per week?

A. Twice a week.

Q. About how long was each workout roughly?

A. An hour and a half.

Q. Hour and a half. Okay. Do you see any work for improvements in following the recommendations or plans that are provided by your providers?

MR. JACKSON: Objection. You may respond.

A. How do you mean?

BY MR. STURTZ:

Q. Do you think there's anything that's within your control that you could be doing better to follow their recommendations?

A. No.

Q. No. Have you been showering every day?

A. Yes.

Q. Was there a time where after you returned -- after you got out of the hospital and you returned home, was there a time where you weren't

14 (Pages 50 to 53)



Page 54

showering every day?

A. Yes.

Q. When did you start showering every day?

A. Like three months ago.

Q. How -- have you been keeping up with other aspects of your hygiene outside of showering?

A. Yes.

Q. Were there ever issues with any of that or no?

A. No.

Q. There were not. Okay. So the only issue you had after returning home from the hospital in regards to hygiene was showering every day?

A. Yes.

Q. Have your health care providers provided you with recommendations in terms of your diet?

A. No.

Q. No. They haven't told you to limit high sodium foods from your diet?

A. Yes, they have.

Q. Okay. You can think about it for a moment. Do you remember anything else about any

Page 55

recommendations for your diet?

A. They told me to eat berries.

Q. How many home cooked meals do you eat on average per week?

A. Like seven.

Q. Who prepares these meals?

A. My nephew, Daniel.

Q. What do these meals typically consist of?

A. Usually salmon or lamb.

Q. Okay. What do you have with the salmon or lamb?

A. Sweet kale salad, potatoes.

Q. So beyond those on average seven home-cooked meals per week, the rest are carry out?

A. Uh-huh.

Q. What type of carry out do you typically get?

A. McDonald's.

Q. McDonald's. Anything else?

A. Eddie Leonard's.

THE COURT REPORTER: I'm sorry. Say that

Page 56

again.

A. Kodori.

THE COURT REPORTER: Again?

A. Kodori.

BY MR. STURTZ:

Q. What type of food is Eddie Leonard's and Kodori?

A. Kodori is a Japanese restaurant. Eddie Leonard's is like American fast food.

Q. You said you don't feel like you're able to walk your dog so Daniel does that?

A. Yes.

Q. So you're able to walk on the treadmill but you're not able to take your dog for a walk?

A. Right because he pulls. My big dog, he pulls a lot.

Q. Oh, okay. So you have big dogs?

A. One of them is big, one of them is small.

Q. Okay. What type of errands -- are you able to run errands outside of the house?

A. Not really.

Q. Okay. Do you go grocery shopping?

Page 57

A. With my nephew, yes.

Q. Yeah, okay. So you're -- you're not -- you don't run errands by yourself, but you do run some errands with your nephew?

A. Yes.

Q. Okay. Anything in addition to grocery shopping?

A. To pick up my prescription.

Q. Okay. Which pharmacy?

A. Walgreens.

Q. Okay. How often would you say you go grocery shopping with your nephew?

A. Like, once every three weeks.

Q. Do you recall someone from MedStar introducing you to the habit tracker tool?

A. Yes.

Q. Was that Dr. Gorter?

A. Yes.

Q. Can you describe the habit tracker tool for me and how it works and how you use it?

A. You put in a habit that you want -- that you want to get good at and then you just mark it

15 (Pages 54 to 57)


MAGNA
LEGAL SERVICES

Page 58

every day you do it.

Q. Do you think that tool has helped you?

A. It did.

Q. Can you describe why you think it's been beneficial for you to use?

A. Because it got me on a schedule.

Q. Okay. What are your habits in your free time?

A. Just basically sit around and watch TV.

Q. You don't read?

A. No.

Q. You didn't read half a nonfiction martial arts book?

A. I did.

Q. You did. But you don't normally read in your free time?

A. No, I don't.

Q. Did you normally read in your free time before the occurrences giving rise to this lawsuit?

A. Yes, I did.

Q. Okay, you did. How -- how often did you

Page 59

read in your free time before?

A. Like, two hours a day.

Q. Two hours a day. What type of books did you read?

A. Usually fantasy.

Q. Fantasy. So you feel like you're not able to read now or you just don't want to?

A. I just don't want to.

Q. Have you been provided with a handout on adaptive sports teams offered by MedStar rehabilitation hospitals?

A. Yes.

Q. Was it Dr. Gorter who provided that or?

A. Yes, it was Dr. Gorter.

Q. Have you attempted to participate in that?

A. No.

Q. Are you interested in participating in it?

A. No.

Q. Do you have some concerns that are preventing you from participating in that or you just don't want to?

A. Just don't feel like it.

Page 60

Q. Do you drink alcohol?

A. No.

Q. Prior to the occurrence giving rise to this lawsuit, did you consume alcohol?

A. Yes.

Q. What -- can you just describe those drinking habits for me. How many drinks per week or per day?

A. It wasn't per week, it was per month.

Q. Per month. Okay.

A. So like usually two drinks a month.

Q. Okay. So you didn't have five to seven drinks per day prior to the occurrence?

A. No.

Q. Your counsel produced some MedStar advertisements as a part of this lawsuit. Had you ever seen those before?

A. No.

Q. No. So you hadn't seen any MedStar advertisements prior to your hospitalization?

A. No.

Q. Had you seen -- you had not seen any

Page 61

MedStar advertisements prior to your surgery then?

A. No.

Q. Did you see any MedStar advertisements while you were at MedStar?

A. No.

Q. Without divulging any communication -- sorry, you said -- you said you've not seen the advertisements that were listed in the complaint of this lawsuit?

A. No.

Q. So you would have no personal opinion then over whether you think those advertisements were misleading?

MR. JACKSON: Objection. You may respond.

A. No, I wouldn't.

BY MR. STURTZ:

Q. Have you personally conducted any research on any medical articles that related to your condition?

A. No.

Q. Did anyone in your family do any research on that?

16 (Pages 58 to 61)


MAGNA
LEGAL SERVICES

Page 62

A. I believe Shana did.

Q. Did she share anything with you from that research?

A. A couple of things.

Q. Do you remember what those were?

A. No.

Q. When did you first think about contacting an attorney?

A. When I talked to Shana about it.

Q. Did someone recommend to you going to a lawyer or it's just kind of when you talked to Shana about it?

A. That's what we just came up with.

Q. Okay. So the attorney was first contacted -- sorry. When was the attorney first contacted?

A. I don't -- I don't know.

Q. But it was after you -- you said your first memories again were in August. It was after that point?

A. Yes.

Q. Have you discussed your case with any

Page 63

health care providers from a legal standpoint?

A. No.

Q. Have you ever filed any other civil lawsuit?

A. No.

Q. Have you ever been involved in a civil lawsuit as a defendant?

A. No.

Q. Have you ever been involved in a criminal case as a defendant?

A. No.

Q. So aside from your health care providers and Shana, Marvin, Saskia and Daniel, is there anyone else who has personal knowledge of your current condition and your conditions since the time of the occurrence giving rise to this case?

A. No.

Q. Is there anything else you would like me to know about your case?

A. No.

MR. STURTZ: If we can take a break and I'll review my notes.

Page 64

THE VIDEOGRAPHER: Off the record at 10:13. (A break was taken from 10:13 a.m. to 10:25 a.m.)

THE VIDEOGRAPHER: On the record at 10:25.

BY MR. STURTZ:

Q. All right, Mr. Welch, so I do have just a couple more questions for you. You mentioned that you had been deposed before. When was that and what was that for?

A. That was for Aaron Hargrove suing his broker (inaudible) Mathis, that was, like, in 2004.

Q. Sorry. Who's -- you said Aaron Hargrove?

A. Yes. Aaron Hargrove.

Q. Is that -- was that your brother?

A. Yes.

Q. So why -- why were you involved in that?

A. Because I was working for him and an issue of pay came up.

Q. What do you mean by an issue of pay?

A. Whether -- I was supposed to get paid for a real estate transaction I did and I didn't get paid for it.

Page 65

Q. Okay. So there was a dispute between you and your brother?

A. There was a dispute between me and the broker.

Q. Oh, okay. I see. You mentioned that you've had two prior falls. Do you remember when each of these was?

A. No.

Q. They were both after the occurrence?

A. Yes.

Q. You don't remember when they were but you do -- you remember falling?

A. Yes.

Q. What caused the falls?

A. The first one I slipped out of bed, I fell. The second one was my blood pressure got too low and I fell.

Q. Okay. And did you need assistance from family members -- or sorry. Let me back up. Was this still during the time when you had nursing care at the home?

A. Yes.

17 (Pages 62 to 65)



Page 66

Q. It was. Okay. So the nurse was there to assist you. So did you seek medical care immediately after any of those falls?

A. No.

Q. Do you have any -- can you clarify when the nurse -- did the nursing care stop in January, 2023?

A. Yes.

Q. Do you have any concerns about falling going forward?

A. Not really.

Q. So concerns about falling aren't a reason for -- let me back up. Would you feel comfortable living by yourself or no?

A. No.

Q. No. Are concerns about falling a part of that?

A. Yes.

Q. So you do have concerns about falling then?

A. Yes.

Q. Okay. Are your concerns about falling

Page 67

related to taking your blood pressure medication?

A. No. It's more my gait.

Q. It's connected to your gait. You just feel it's, like, due to clumsiness?

A. I just get wobbly.

Q. Wobbly. Going back to your work at GEOINT, in your current role, the role you were in at the time of the occurrence, can you just describe a little bit more for me your daily activities?

A. I can't really describe them.

Q. What is it, you said you were security management?

A. I was security management, yes.

Q. What is that?

A. I was responsible for a team of people and they did stuff.

Q. Okay. So is this a computer-based role. Would you be sitting at a desk computer working on a computer?

A. Sometimes.

Q. When you weren't sitting at the desk or

Page 68

computer what were you doing?

A. I was talking to the team, and I would assist them with briefings.

Q. Okay. But this is an office desk job, it's not a physical security role?

A. No, it's not a physical security role.

Q. Did you ever miss work for health prior to the occurrence giving rise to this case?

A. No.

Q. And so you were living at the Brandywine address at the time of the occurrence giving rise to this case?

A. Yes.

Q. And you're currently living there as well?

A. Yes.

Q. And at the time of the occurrence giving rise to this case, who else was living with you there?

A. Marvin Holland.

Q. So you weren't living by yourself --

A. No.

Q. -- prior to the occurrence giving rise to

Page 69

this case. Have you ever lived by yourself?

A. Yes.

Q. When was the last time you lived by yourself?

A. When I lived on -- off of or Ordway Street. That was 2004.

Q. So it's been roughly 20 years since you lived by yourself?

A. Yes.

Q. How many houses do you own?

A. Just two.

Q. You mentioned that you do intend on applying for disability. Why is that?

A. It's because I'm disabled.

Q. Has a medical professional advised you to apply for disability?

A. No.

Q. Have you discussed that with them?

A. Yes.

Q. So you have discussed it with them and they haven't -- but they haven't recommended that you apply?



MAGNA
LEGAL SERVICES

Page 70

A. No.

Q. But you view yourself as disabled?

A. Yes.

Q. You mentioned that you taught martial arts before the occurrence giving rise to this lawsuit. Where was that at?

A. It was at the community center off of Kentland.

Q. So what -- what was involved in teaching?

A. Just showing the students what to do.

Q. Do you have the name of whoever kind of ran that program or?

A. Yeah. Mark Henderson.

Q. Mark was one of the people you listed as one of your close friends?

A. Yes.

Q. You say the difficulty of walking your dogs is that one of your dogs is big and it pulls you?

A. Yeah, he pulls.

Q. Any other difficulties with that?

A. No.

Page 71

Q. How big is that dog?

A. He's, like, 70 pounds.

Q. Okay. What breed?

A. He's a mutt.

Q. So I believe you mentioned going to the park near your house. That was something you did before the occurrence?

A. Yes.

Q. And that's something you no longer do?

A. No.

Q. What's the reason for no longer doing that?

A. Just I can't walk around.

Q. Okay. What -- and you just -- what's the reason you can't walk around in your opinion?

A. Because my left side gets weak.

Q. So it's just a fatigue issue?

A. Yes.

Q. Are you doing anything to try to improve that?

A. Yes. I'm riding a bike.

Q. Okay.

Page 72

A. Like, a little pedal bike thing.

Q. Okay. So is that what you were referencing when you mentioned the light exercises earlier, the pedal --

A. Yes. And I'm walking the treadmill, too.

Q. Okay. Are you able -- as you continue to do those things are you able to ride the treadmill for longer before you get tired or do the pedal bike before --

A. I am.

Q. You mentioned some difficulties with doing household daily chores. You mentioned with doing the dishes you have difficulty with the pots and pans?

A. Uh-huh.

Q. Can you describe why that's difficult; is it too heavy or?

A. It's too heavy and my hands aren't coordinated enough.

Q. So have you tried and you've dropped them?

A. I've dropped them.

Q. I believe you also mentioned the

Page 73

difficulty doing laundry; is that right?

A. Yes.

Q. What was your difficulty with doing laundry?

A. The laundry basket was too heavy.

Q. So it's your testimony that you can't lift pots and pans, you can't lift the laundry basket?

A. Yes.

Q. And this is with both of your hands on the pot, both of your hands on the laundry basket you're not able to lift them?

A. Right.

Q. You mentioned that when you worked out before the occurrence giving rise to this case, you would do bench press --

A. Uh-huh.

Q. -- squats. Was it a back squat with free weights or?

A. Back squats with free weights.

Q. How much weight would you typically lift on those two exercises?

A. From the bench it would be like 175. On

19 (Pages 70 to 73)



Page 74

the squats it could be anywhere from like 225 to 300.

Q. Okay. So how many reps roughly at 175 could you do?

A. Ten.

Q. Ten. And what -- on the weight what did you say for the squats?

A. 225 to 300.

Q. How many reps, let's start at 225 you could do?

A. Ten.

Q. Ten. 300?

A. Six.

Q. Six. Any other exercises you'd do when you were lifting weights before the occurrence?

A. Leg extensions.

Q. And the weakness that you said you were experiencing, it's just limited to the left side?

A. Yes.

Q. Have any of your medical providers told you why you're experiencing that?

A. No.

Page 75

Q. Have you asked them?

A. No.

Q. Is that something you would like to know?

A. No.

Q. Why not?

A. Because it doesn't really bother me that much.

Q. It doesn't bother you that much, but you said it prevents you from being able to walk around the park?

A. It does.

Q. So it doesn't bother you that you can't walk around the park anymore?

A. No.

Q. It doesn't bother you you can't do the dishes anymore?

MR. JACKSON: Objection. You may respond.

A. I mean, it does bother me to some extent to do the dishes, but, you know, it's like this is the body I've been given, so.

BY MR. STURTZ:

Q. So does it bother you that you're not able

Page 76

to do martial arts anymore?

A. It does.

Q. In connection to -- with Shana being your power of attorney, do you pay your own bills or does she pay them?

A. I pay them.

Q. You pay them. I believe before you had indicated that the reason for Shana being your power of attorney was for financial reasons. So if you pay your own bills, why do you feel it's necessary for her to be your power of attorney?

A. She can back me up. She can be my -- she can be, like, my personal checker.

Q. Okay. Just check over your work essentially?

A. Yes.

Q. Do you feel someone needs to be someone's power of attorney to do that?

A. Yes.

Q. Why do you feel that way?

A. Because if I miss something, she can pay it.

Page 77

Q. Can you just have someone check to make sure the thing is correctly and if they realize you didn't they could just tell you to make the correction?

A. Probably.

Q. So you have her as your power of attorney in that role because if you think you missed something she just goes ahead and pays it rather than --

A. Yes.

Q. Describe for me just, you know, your daily routine a little bit each day. I know you said you watch TV and every three weeks you go to the grocery store. But your average day, wake up, what do you do all day?

A. Wake up, I go downstairs, let the dogs out. Let them back in, make myself breakfast and watch TV.

Q. So when you take the dogs outside in the morning, are they on a leash or are you just letting them out --

A. I let them out.

20  (Pages 74 to 77)



Page 78

Q. You let them out not on a leash and they just return by themselves?

A. Yes.

Q. And you said you made yourself breakfast. Do you cook yourself breakfast or is this --

A. It's not usually something I cook. It's like a bagel or something.

Q. Gotcha. Then you just watch TV for the remainder of the day?

A. Uh-huh.

Q. Do you take your medicine by yourself?

A. Yes.

Q. Do you ever forget to take any of your medicine?

A. No.

Q. In reference to potentially returning to work, did you try to ask your employer if you could potentially return part time or potentially return in the fully remote role, anything like that?

A. No, I haven't.

Q. Is that something you plan on discussing

Page 79

with them?

A. Yes.

Q. Do you think they would be amenable to those things?

MR. JACKSON: Objection. You may respond.

A. Yes.

BY MR. STURTZ:

Q. Why up until this point is that not something you've discussed with them?

A. Because it wasn't advised.

Q. By your medical professionals?

A. Yes.

Q. There's some notation in the medical records with Dr. Gorter that there's a plan to return to work in April. Do you not -- is it your testimony that you don't recall that or that didn't happen?

A. No. It's not going to happen.

Q. Not going to happen, but I mean, did you have a discussion with Dr. Gorter where you were potentially planning to return to work in April?

A. Yes.

Page 80

Q. So leading up to the potential plan to return to work, you hadn't had any conversations with your employer about potential accommodations or how that was going to work?

A. No.

Q. Why -- with that being a potential plan with Dr. Gorter, did you want that plan to succeed?

A. Yes.

Q. So if you wanted it to succeed, then why didn't you talk to your employer about maybe how they could make things easier, how they could get rid of any concerns you had?

A. I don't know.

Q. Do you remember telling Dr. Gorter that you were a 10 out of 10 confident that you would be able to return to work successfully in April?

A. No, I don't remember that.

Q. Were you gearing up in any way to try to return to work or no?

A. No.

Q. So if you didn't kind of start to try

Page 81

to -- do you have any plan to try to kind of ease yourself back into more let's call it intellectually-stimulating activities? Have you ever tested yourself by doing any more intellectually-stimulating activities since the occurrence?

A. Dr. Gorter had me doing these reports. That was it.

Q. Can you describe that for me? What was entailed in doing these reports?

A. I was supposed to read a journal article about security and then write a report about it.

Q. How often was this occurring?

A. Once a day.

Q. Once a day. And for how long were you doing this?

A. I did it for a week.

Q. For a week. Okay. How long were these journal articles?

A. Like three sentences -- the journal articles were about five pages.

Q. Okay. So the reports you would generate



Page 82

were about the sentences?

A. Uh-huh.

Q. How was that experience doing that?

A. It was hard.

Q. It was hard?

A. Yeah.

Q. What was hard about it?

A. Just gathering all the information and trying to condense it down to three sentences and put it on paper.

Q. Is that reading journal articles and summarizing them is that something you did in your job --

A. Yes.

Q. -- before the occurrence?

A. Yes, it was.

Q. And you didn't struggle with that beforehand?

A. No.

Q. So when you leave the house you mentioned you go to the grocery store about every three weeks and going to the pharmacy to pick up your

Page 83

prescriptions.  Is there anywhere else you go?

A. No.

Q. You don't go anywhere to see friends or?

A. No.

Q. Have you tried to initiate meeting up with some friends?

A. No.

Q. Is that something you did before the occurrence?

A. Yes.

Q. Is it -- so is that something you would like to be doing now?

A. Yes.

Q. So then why have you not reached out to them to try to set something up?

A. It's because my condition.

Q. Can you just elaborate on that?

A. It's like I get tired.

Q. That's the only reason you haven't reached out to them to try to see your friends is because you get tired?

A. My cognitive functions aren't there.

Page 84

Q. So are you just concerned about how they would perceive that?

A. Yes.

Q. Okay.  How often are your doctor's visits?

A. Like once every three weeks.

Q. And so you don't drive by yourself, so I assume somebody goes with you?

A. My nephew, Daniel drives me.

Q. Daniel drives you?  Does he attend?

A. No.

Q. Does Shana, as your power of attorney, attend any of these meetings?

A. She used to.

Q. She used to.   Why did she stop attending them?

A. She had a baby.

Q. When was that?

A. Like back in October.

Q. So that's October 2023?

A. Yes.

Q. But you feel comfortable now going to the doctor visits by yourself?

Page 85

A. Yes.

Q. So you feel like you're able to fully communicate with your doctors and fully understand what they're saying?

A. Yes.

Q. So going back to the Atlanta trip, can you please list the full names of -- I believe you said -- well, sorry.  Just to back up.  The people that were on trip with you were Olivia, her mother and her brother?

A. Yes.

Q. Can you please list all their full names?

A. Olivia Levadas, Paul Levadas, Nicholas Levadas.

Q. And do you have any idea if -- I know you said you don't remember the drive back, but do you have any idea if they were in the same car as you?

A. They were in the same car.

Q. Okay.  So everybody was in one car?

A. Yes.

Q. Were you all driving, like, a UHaul or it was just a standard car?



MAGNA
LEGAL SERVICES

Page 86

A. Standard car.

Q. Standard car. And so I believe you had said something like you -- you don't remember but you had some idea from -- did somebody tell you you were drinking energy drinks on the drive or did you just see that in the medical records?

A. Someone told me.

Q. Someone told you. Okay. Do you believe it was -- do you remember if it was Olivia, her mother or her brother who told you?

A. I think it was Olivia.

Q. Were you surprised, because I believe you said that wasn't really a normal thing for you. Were you surprised that you were drinking energy drinks?

A. No.

Q. If that wasn't a normal activity for you, why were you not surprised; just because of the circumstances?

A. Because the drive was long.

Q. Did they tell you -- did Olivia or mother or brother tell you anything else about the drive

Page 87

or your condition during it?

A. No.

Q. No. Have you asked them?

A. No.

Q. Just to back up, I believe it's your testimony that the last thing you remember is going to a storage place during the Atlanta trip or something?

A. Yes.

Q. So you don't remember anything between that and August of '22, that's your testimony?

A. Yes.

Q. Have you asked any health care providers why you have no memories of that time?

A. No.

Q. Would you be interested in finding that out?

A. Yes.

MR. STURTZ: I believe that's all the questions I have. Thank you for your time today.

THE WITNESS: Thank you.

MR. JACKSON: I just have a few follow-up

Page 88

questions, Mr. Welch, based on your testimony.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF
BY MR. JACKSON:

Q. Regarding your activities that you engaged in prior to the incident giving rise to this lawsuit, one of which you said playing video games, how frequently did you do that?

A. Every day.

Q. And for how long every day?

A. Like an hour.

Q. And you say you're unable to do that since the incident?

A. Yes.

Q. Are you unable to play them at all?

A. No, I can play them a little bit.

Q. How frequently do you play them now?

A. Like maybe a half hour every other day.

Q. Other than the difficulty in holding the controller is there any other reason why you're unable to play them as you did before?

A. My concentration.

Q. Does the attempt to concentrate while

Page 89

playing video games or even reading or engaging in any other activity cause you any physical pain in any way?

A. No.

Q. How frequently did you drive prior to the incident?

A. Like every day.

Q. Have you driven at all since the incident?

A. No.

Q. The walks around the lake that you referenced, how frequently would you take those by yourself?

A. Twice a week.

Q. Did you ever have any difficulty ambulating or during the walk keeping your breath or conditioning?

A. No.

Q. What are the difficulties that you would have now if you tried to take that walk?

A. I get weak.

Q. Have you been able to engage on that walk since the incident unassisted?


MAGNA
LEGAL SERVICES

Page 90

A. No.

Q. How frequently did you go bowling prior to the incident?

A. Once a week.

Q. Have you been able to bowl since the incident?

A. No.

Q. You had mentioned that one of your concerns for returning back to work that you had was because of the effect on your cognitive abilities; hard time focussing and communicating. Can you describe to what extent you relied on your cognitive abilities in the role that you had at GEOINT that you feel you're lacking now to be able to do those same duties and responsibilities?

A. I can't.

Q. What was it about your job at GEOINT that you did on a daily basis that you feel that you would have difficulty doing now since the incident?

A. It's basically the communication part.

Q. Any other part of your job other than your

Page 91

communicating?

A. I guess the walking around part, too.

Q. If you had to assign a rough percentage to it, how much of your job required you to walk around and how much of your job required you to communicate with others on a daily basis?

A. The walking around would be like 30 percent and the communicating with others would be 100 percent.

MR. JACKSON: Let me mark this as Exhibit 1 please.

(Exhibit 1 was marked.)

MS. STURTZ: Is that something that you used in document production or is this a new --

MR. JACKSON: No, this is a new document.

MS. STURTZ: So this is not something we've seen before.

MR. JACKSON: No.

MS. STURTZ: Do you have a copy for us?

MR. JACKSON: You can use this copy.

BY MR. JACKSON:

Q. Okay. You just been handed the first

Page 92

exhibit here in your deposition. Do you recognize what's depicted in this exhibit?

A. Yes.

Q. What is shown in this exhibit?

A. My house.

Q. And this is the house at the Brandywine address, correct?

A. Yes.

Q. And is this the way that your house looked on the date that you are hospitalized at MedStar?

A. Yes.

Q. And is it -- this is a picture taken during the day. Is this the way that your house currently looks since you've been discharged?

A. Yes.

Q. The lawn that is shown in the front of the home going to the back of the home, prior to the incident, did you mow that lawn?

A. Yes.

Q. When you mowed the lawn, did you have any assistance doing so?

A. No.

Page 93

Q. Were you able to do so without any problems with your conditioning or gait or anything of that sort?

A. Yes.

Q. How frequently did you mow the lawn prior to the incident?

A. Once every two weeks.

Q. Since your discharge from MedStar on the date of the incident that's given rise to this lawsuit, have you been able to mow the lawn since then?

A. Yes.

Q. Are you able to do it by yourself?

A. No.

Q. How are you requiring assistance to -- how did you require assistance to mow the lawn after the incident?

A. My nephew has to move the lawn mower for me.

Q. What problems do you have with the lawn power?

A. It's too big.

24 (Pages 90 to 93)


MAGNA
LEGAL SERVICES

Page 94

Q. And in terms of a percentage of the work, how much of the percent of work is done by you as compared to your nephew with regard to lawn maintenance?

A. About 50 percent.

Q. And how frequently is the lawn mowed now?

A. Once every three weeks.

Q. When it's mowed now once every three weeks, do you participate?

A. Yes.

Q. And what do you do when you participate?

A. I mow the backyard.

Q. When you're pushing the mower, are you requiring assistance from your nephew or cousin?

A. It's a riding lawnmower.

Q. You had testified that you struggle to access the basement. Is there access to the basement from the outside of the home?

A. Yes.

Q. And where is that -- is that access point shown in this photograph?

A. No.

Page 95

Q. Are you able to access the basement from the outside of the home without any problem?

A. I don't know. I haven't done it.

Q. So you have never tried to access the basement from the outside of the home?

A. Not since I been home.

Q. Meaning home from MedStar, correct?

A. Yes.

Q. Were you able to access it from the outside of the home prior to the incident?

A. Yes.

Q. And how frequently did you do that?

A. Every day.

Q. When you testified that you struggled to access the basement, what were you referring to?

A. Going down the steps in the house.

Q. That lead into the basement?

A. Yes.

Q. Is the basement fully finished?

A. Yes.

Q. Why would you be required to go down the steps?

Page 96

A. Basically to uncrate the dogs and to go to the movie room.

Q. Do you require assistance since your discharge going down those steps into the basement?

A. No.

Q. Have you ever fallen going down those steps?

A. No.

Q. Does the frequency with which you go down into the basement has that changed since after the incident as compared to before?

A. Yes.

Q. How so?

A. I don't go down there.

Q. At all?

A. Basically, no.

Q. Who was the health care provider who has most recently told you that you should refrain from returning to your old job?

A. Dr. Bethany Gorter.

Q. When was the last time that Dr. Gorter

Page 97

told you that?

A. Our last visit.

Q. When was that?

A. March 12th.

Q. Of this year, 2024?

A. 2024.

Q. Do you recall a specific discussion with Dr. Gorter during that visit about whether you were fit to return back to your old job at GEOINT?

A. Repeat the question.

Q. What do you recall during this last visit with Dr. Gorter about your discussion with her about whether you are able to return back to your old job at GEOINT?

A. She just said I wasn't ready.

Q. Did she say why she felt that you were not ready? Do you recall?

A. I don't recall.

Q. At this last visit, do you recall Dr. Gorter performing any tests to determine whether you were ready to return back to work?

A. No.

25 (Pages 94 to 97)


MAGNA
LEGAL SERVICES

Page 98

Q. When is your next visit with Dr. Gorter?

A. This month.

Q. Was there ever any time after your release from MedStar Hospital after the incident where you battled with bouts of what you thought was depression?

A. No.

Q. The medications that you previously testified that you are currently taking, did you take any of those medications prior to the incident?

A. No.

Q. Were you on any prescription medications prior to the incident?

A. No.

Q. You had testified also previously, I believe, that the last time that you lived alone was in 2004?

A. Yes.

Q. From 2004 up until 2022, the year of the incident, did any of your roommates have to assist you with any of the type of chores that we've been

Page 99

talking about today, for example, cleaning, doing laundry, cooking, lawn maintenance or any of those things. Did you require assistance from any of your roommates for those?

A. No.

MR. JACKSON: Pending any questions from him, that's all I have.

EXAMINATION BY COUNSEL FOR DEFENDANTS BY MR. STURTZ:

Q. Just a few more questions, Mr. Welch. When you meet with Dr. Gorter, are you honest with her about your condition?

A. Yes.

Q. When is the date of your next upcoming appointment with her that you referenced?

A. It's not set in stone but it's supposed to be this month.

MR. STURTZ: That's all. Thank you, Mr. Welch.

MR. JACKSON: We will waive reading and signing for this deposition.

THE VIDEOGRAPHER: Off the record at

Page 100

11:02. This ends media unit one and the end of the deposition.

MR. JACKSON: We'll just need a e-transcript, four to a page, mini transcript for this. No videotape.

(Deposition concluded at 11:02 a.m.)

Page 101

CERTIFICATE

I, Okeemah S. Henderson, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 24th day of April, 2024. My commission expires:
August 31, 2024

_____

Okeemah S. Henderson, LSR
Official Court Reporter



**A**

**a.m**
1:15,15 4:10 64:2,2
100:6
**Aaron**
20:1,4 64:9,12,13
**abilities**
25:21 90:11,13
**ability**
38:16,19
**able**
8:15 9:20 36:1,12
37:3 38:4 39:1,8
56:10,13,14,20 59:6
72:6,7 73:11 75:9
75:22 80:17 85:2
89:21 90:5,14 93:1
93:10,13 95:1,9
97:13
**abnormal**
46:5
**access**
8:19,21 94:17,17,20
95:1,4,9,15
**accommodations**
26:12 80:3
**accompanied**
43:2
**acid**
29:17 30:7
**ACTION**
1:6
**activities**
34:22 35:3,22 36:12
36:21 67:10 81:3,5
88:4
**activity**
31:9 34:18,18 86:17
89:2
**adaptive**
59:10
**addition**
57:6
**address**
7:10,14,21 8:2 9:8

10:20 15:9,13 68:11
92:7
**admin**
24:19
**advertisements**
60:16,20 61:1,3,8,12
**advice**
25:10
**advised**
37:6,8 69:15 79:10
**advisor**
37:8
**affairs**
13:17
**affirmed**
5:9
**affixed**
101:12
**Agency**
21:7
**ages**
20:2
**ago**
54:4
**ahead**
77:8
**aid**
33:14
**aide**
33:21
**air**
47:3
**al**
1:7 4:7
**Alassar**
48:17
**alcohol**
60:1,4
**alive**
19:3
**allow**
36:17
**altered**
26:6
**ambulance**
45:2 46:8,20

**ambulating**
89:15
**amenable**
79:3
**American**
56:9
**amount**
26:19
**answer**
6:10 25:16 49:3
**answers**
5:22
**anymore**
19:11 33:5,6 36:2,14
36:20 39:12 75:13
75:16 76:1
**apathy**
33:9,10 35:5
**APPEARANCES**
2:1
**applied**
14:3,5
**apply**
14:1 69:16,22
**applying**
27:9 69:13
**appointment**
99:15
**April**
1:14 4:10 79:15,21
80:17 101:12
**area**
24:6,21
**areas**
8:18 51:4
**arrange**
24:18
**arrived**
45:3
**arriving**
46:9
**article**
81:11
**articles**
61:18 81:19,21 82:11
**arts**

36:2,4,6,8 38:15
52:17 58:13 70:4
76:1
**aside**
14:20 63:12
**asked**
75:1 87:3,13
**ASO**
25:3
**aspects**
54:6
**aspirin**
29:17,17 30:8
**assign**
91:3
**assist**
16:16 18:18 66:2
68:3 98:21
**assistance**
65:18 92:21 93:15,16
94:14 96:3 99:3
**assisted**
14:10,14,17
**assisting**
16:15
**association**
7:16
**assume**
6:7 10:11 43:15 84:7
**asthma**
31:19
**Atlanta**
42:15,17 45:10,12
46:14 85:6 87:7
**Attached**
3:11
**attempt**
26:5 37:10 88:22
**attempted**
36:8 59:15
**attend**
84:9,12
**attending**
84:14
**attorney**
1:4 4:5 11:15,18,21


MAGNA
LEGAL SERVICES

12:1,4 13:1,11,21
14:21 62:8,14,15
76:4,9,11,18 77:6
84:11
**August**
50:11,14,15 62:19
87:11 101:14
**Avenue**
4:12
**average**
55:4,13 77:14
**aware**
20:14

---
**B**

**baby**
29:17 30:7 84:16
**bachelor's**
21:1
**back**
25:3 28:16,17 38:15
42:20 43:1 47:6
65:19 66:13 67:6
73:17,19 76:12
77:17 81:2 84:18
85:6,8,16 87:5 90:9
92:17 97:9,13,21
**backyard**
94:12
**badge**
24:20
**bagel**
78:7
**ball**
36:18,20
**Baltimore**
2:16
**Barely**
29:8
**based**
48:19 88:1
**basement**
8:20,21 94:17,18
95:1,5,15,17,19
96:5,11
**basically**

24:19,22 58:9 90:21
96:1,17
**basis**
90:18 91:6
**basket**
40:5 73:5,7,10
**Bates**
48:3
**bathrooms**
39:21 40:6
**battled**
98:5
**becoming**
24:3
**bed**
65:15
**bedroom**
8:12
**begins**
4:3
**behalf**
2:2,10 4:13,17,21 5:2
5:3,15
**believe**
9:19,22 15:17 23:1
62:1 71:5 72:22
76:7 85:7 86:2,8,12
87:5,19 98:17
**bench**
53:1 73:15,22
**bending**
40:6
**beneficial**
58:5
**berries**
55:2
**best**
5:21,22 6:1
**Beth**
7:17
**Bethany**
28:2,6,21 96:21
**better**
53:15
**beyond**
19:11 55:13

**big**
40:11 56:15,17,18
70:18 71:1 93:22
**biggest**
51:4
**bike**
71:21 72:1,9
**bills**
76:4,10
**bit**
23:6 27:6 34:3,12
35:5 67:9 77:12
88:15
**blood**
34:5,7 65:16 67:1
**blurry**
32:4 34:6
**body**
32:7 75:20
**book**
58:13
**books**
59:3
**boss**
23:21
**bother**
75:6,8,12,15,18,22
**Boulevard**
7:17
**bouts**
98:5
**bowel**
33:7
**bowl**
36:14,15 39:1 90:5
**bowling**
36:16 90:2
**Brandywine**
7:11,11,21 8:2,13
9:17 10:20 15:9,12
68:10 92:6
**break**
6:3 40:18 63:21 64:2
**breakfast**
77:17 78:4,5
**breath**

32:7 34:21 35:3,16
89:15
**breed**
71:3
**briefings**
23:4,8 68:3
**broker**
64:10 65:4
**brother**
21:15 42:20 43:1,3,5
64:14 65:2 85:10
86:10,22
**brought**
11:14
**buttons**
39:11

---
**C**

**C**
4:1
**caffeine**
44:12,22
**calender**
24:18
**call**
81:2
**called**
5:8 24:5
**Campbell**
7:9 11:12
**car**
85:17,18,19,22 86:1
86:2
**cardiac**
20:15,18
**cardiologist**
28:14
**care**
14:10 17:9 27:19
28:18 29:7,10 49:12
50:17 51:16 54:15
63:1,12 65:21 66:2
66:6 87:13 96:18
**caregiver**
28:4,5
**carry**


MAGNA
LEGAL SERVICES

55:14,17
**case**
4:8,9 10:6,7 36:5
45:14 52:19 62:22
63:10,16,19 68:8,12
68:17 69:1 73:14
101:9
**cause**
89:2
**caused**
65:14
**cease**
27:1
**center**
1:7 4:6 36:7 46:17
48:3,16 49:14 50:5
70:7
**Certain**
13:3
**CERTIFICATE**
101:1
**certify**
101:3
**changed**
41:5,6,8,10,13,19
96:11
**Charles**
2:14
**check**
76:14 77:1
**checker**
76:13
**chest**
31:5,9 46:1
**chief**
24:4
**child**
31:19
**children**
7:3
**chores**
39:16,18 72:12 98:22
**chronic**
33:2,3
**Chugach**
21:17

**circle**
38:15
**circumstances**
86:19
**civil**
1:2,6 63:3,6
**clarification**
6:7
**clarify**
10:19 66:5
**Clark**
28:9
**classified**
23:10,11
**clean**
6:2 16:19 17:5
**cleaning**
18:15 39:21 40:6
99:1
**clock**
18:3
**clonidine**
29:17 30:6
**close**
40:20 41:1 70:15
**closest**
11:22
**clumsiness**
67:4
**coffee**
44:12,13,16,19
**cognitive**
25:21 83:22 90:10,13
**cold**
42:5
**college**
21:1,5
**Columbia**
1:1 4:9
**come**
14:22 15:3 42:5
**comes**
16:19
**comfortable**
10:1,3 37:7 66:13
84:21

**commission**
101:13
**communicate**
85:3 91:6
**communicating**
90:11 91:1,8
**communication**
26:3 40:11 51:6 61:6
90:21
**community**
36:7 70:7
**company**
21:16
**compared**
94:3 96:12
**complaint**
61:8
**complaints**
9:5
**complies**
48:14
**computer**
67:19,20 68:1
**computer-based**
67:18
**concentrate**
88:22
**concentration**
88:21
**concern**
12:17
**concerned**
84:1
**concerns**
10:4 12:11 25:13,19
59:19 66:9,12,16,19
66:22 80:13 90:9
**concluded**
100:6
**condense**
82:9
**condition**
20:18 48:22 61:19
63:15 83:16 87:1
99:12
**conditioning**

89:16 93:2
**conditions**
19:6 20:7,15 31:2
63:15
**conduct**
23:5
**conducted**
61:17
**confident**
80:16
**confusing**
15:11
**connected**
67:3
**connection**
76:3
**consent**
47:16,20 48:20
**consist**
55:8
**Constitution**
4:12
**consulted**
13:13
**consume**
43:18 60:4
**consuming**
43:13
**contacted**
62:15,16
**contacting**
62:7
**continue**
72:6
**contractor**
21:17
**control**
35:10 53:15
**controller**
88:19
**conversations**
80:2
**cook**
17:5 38:10 78:5,6
**cooked**
55:3



**cooking**
18:14 99:2
**coordinated**
72:19
**coordination**
39:13,14,15
**copy**
91:19,20
**correct**
11:15 14:12 15:3
21:8 26:15 28:7,22
30:21 33:15 92:7
95:7 101:4
**correction**
77:4
**correctly**
77:2
**Costco**
36:22
**counsel**
2:1 4:14,17 5:12 6:4
60:15 88:2 99:8
101:8
**couple**
62:4 64:6
**course**
14:17 43:19
**court**
1:1 4:8,16 6:10 55:22
56:3 101:21
**cousin**
11:10 94:14
**cousins**
41:20
**Covid**
30:14 31:15
**creased**
26:17
**criminal**
21:3 63:9
**Criminology**
21:3
**current**
7:10 17:9 27:19
29:14 31:21 63:15
67:7

**currently**
7:5 33:14 50:18
68:14 92:14 98:9
**cut**
5:21

---

**D**

**D**
4:1
**D.C**
1:13 2:7 4:13
**daily**
39:16 67:9 72:12
77:11 90:18 91:6
**Daniel**
8:7 14:9 15:17,18
16:1,22 17:19 38:9
38:10 39:6 55:7
56:11 63:13 84:8,9
**Daniel's**
16:20
**date**
4:10 92:10 93:9
99:14
**dating**
40:16
**David**
2:11 5:1,14
**Davis**
41:2
**day**
18:5 22:5 42:18,19
53:18 54:1,3,13
58:1 59:2,3 60:8,13
77:12,14,15 78:9
81:14,15 88:8,9,17
89:7 92:13 95:13
101:12
**day-to-day**
14:11
**days**
18:4 22:12,15,15
52:13,14
**deceased**
19:4
**decisions**

**13:20
defendant**
4:14 63:7,10
**defendants**
1:8 2:10 5:2,4,12,15
99:8
**degree**
21:1,2
**depicted**
92:2
**deposed**
64:7
**deposition**
1:11 4:4 5:16,17 6:19
92:1 99:21 100:2,6
101:3
**depression**
32:15 98:6
**describe**
14:19 16:15,17,20
18:11 24:9,15 33:21
34:2,11 35:5 36:15
37:12 40:10 52:8,21
57:19 58:4 60:6
67:9,11 72:16 77:11
81:9 90:12
**described**
24:13
**desk**
67:19,22 68:4
**detail**
18:12 34:4
**details**
19:11
**determine**
97:20
**die**
47:12
**died**
19:9
**diet**
54:16,19 55:1
**difficult**
40:13 72:16
**difficulties**
39:22 70:21 72:11

89:18
**difficulty**
9:2 32:18 70:17
72:13 73:1,3 88:18
89:14 90:19
**direct**
3:5 23:21
**direction**
101:7
**disabilities**
19:18 20:12
**disability**
14:1 27:7,10 69:13
69:16
**disabled**
27:12,15 69:14 70:2
**discharge**
93:8 96:4
**discharged**
92:14
**discomfort**
31:9 46:2
**discussed**
14:6 62:22 69:18,20
79:9
**discussing**
78:22
**discussion**
48:21 79:20 97:7,12
**disease**
32:10
**dishes**
39:20 40:3 72:13
75:16,19
**dispute**
65:1,3
**District**
1:1,1 4:8,9
**Division**
1:2
**divulging**
61:6
**doctor**
10:2 27:17 28:18
29:6 31:12 37:5,22
49:15 84:22


MAGNA
LEGAL SERVICES

doctor's
84:4
doctors
25:10 28:1 49:12
85:3
document
48:1,12,20 49:6
91:14,15
dog
56:11,14,15 71:1
dogs
17:7 39:3,4 56:17
70:18,18 77:16,19
96:1
doing
23:3 26:4,9 35:2
39:16 51:11 53:15
68:1 71:11,19 72:11
72:12 73:1,3 81:4,7
81:10,16 82:3 83:12
90:19 92:21 99:1
Donna
2:12 5:3
dosage
30:1,2
dosages
29:19
dose
30:21
doses
30:22
downstairs
77:16
Dr
28:2,2,4,6,9,21 48:16
57:17 59:13,14
79:14,20 80:7,15
81:7 96:21,22 97:8
97:12,19 98:1 99:11
drink
43:22 44:3,12,13,19
44:22 45:1 60:1
drinking
60:7 86:5,14
drinks
43:13,19 44:3,5 60:7

60:11,13 86:5,15
drive
37:3,6,9,10,19,20
38:1,4 43:14 84:6
85:16 86:5,20,22
89:5
driven
89:8
drives
38:9,10 84:8,9
driving
85:21
dropped
72:20,21
due
33:11 46:5 67:4
duly
5:9
duties
22:22 23:2 24:15
90:15
dysfunction
33:7

---
**E**
---
E
2:3 4:1,1
e-transcript
100:4
earlier
72:4
ease
81:1
easier
80:12
eat
55:2,3
eaten
45:3
Eddie
55:21 56:6,8
education
19:15 20:9,22
effect
90:10
efforts

14:20
eight
18:4 23:14,15
either
30:1,10
elaborate
13:4 83:17
elicits
13:19
emergency
47:7
employed
101:9
employer
78:17 80:3,11
ended
17:16
ends
100:1
energy
43:13,19,22 44:3,5,7
86:5,14
engage
89:21
engaged
88:4
engaging
89:1
entail
52:9
entailed
81:10
errands
56:19,20 57:3,4
Esquire
2:3,11,12 3:7,8
essentially
76:15
estate
21:15 64:21
et
1:7 4:7
everybody
85:19
evidences
49:7

EXAMINATION
3:1,5 5:12 88:2 99:8
examined
5:11
example
99:1
Excuse
40:7
exercise
22:10
exercises
52:10 72:3 73:21
74:14
exhibit
3:14 91:11,12 92:1,2
92:4
EXHIBITS
3:10,12
experience
28:19 29:2 35:17,19
52:6 82:3
experienced
46:1,4
experiencing
74:18,21
expires
101:13
explain
9:1 40:1
expressed
41:22
extensions
74:16
extent
75:18 90:12

---
**F**
---
fall
10:6,7,14
fallen
10:7,8,9 96:7
falling
65:12 66:9,12,16,19
66:22
falls
10:16 65:6,14 66:3



**familiar**
5:19
**family**
17:8 20:15,20 38:7
41:18 61:21 65:19
**fantasy**
59:5,6
**fast**
56:9
**faster**
51:10
**father**
19:8 20:14
**fatigue**
71:17
**feedback**
42:4
**feel**
10:1,3 17:17 35:9,22
37:7,19 38:3 41:8
50:22 56:10 59:6,22
66:13 67:4 76:10,17
76:20 84:21 85:2
90:14,18
**feeling**
42:1,2 46:6
**fell**
65:16,17
**felt**
50:10 97:16
**filed**
4:8 63:3
**finances**
12:15,22
**financial**
76:9 101:10
**find**
41:20
**finding**
87:16
**fine**
37:20
**finish**
5:22 6:1,2
**finished**
95:19

**first**
5:8 28:3 33:18 43:21
48:13 50:12,14 62:7
62:14,15,19 65:15
91:22
**fit**
97:9
**five**
18:4 60:12 81:21
**Five-hour**
44:7
**floor**
8:14,15
**focus**
40:12
**focusing**
25:22
**focussing**
90:11
**folic**
29:17 30:7
**follow**
53:16
**follow-up**
87:22
**following**
53:8
**follows**
5:11
**food**
14:22 56:6,9
**foods**
32:18 54:19
**foregoing**
101:3,4
**forget**
78:13
**form**
25:15 32:1 47:16,20
48:20 49:2
**forward**
66:10
**four**
100:4
**free**
58:7,16,18 59:1

73:17,19
**frequency**
96:10
**frequently**
18:2 88:7,16 89:5,11
90:2 93:5 94:6
95:12
**friend**
41:1
**friends**
38:7 40:21 42:21
70:15 83:3,6,20
**front**
92:16
**frustrated**
51:7
**full**
6:15 26:20,21,22
85:7,12
**fully**
22:1,2 78:19 85:2,3
95:19
**functioning**
12:17 13:3
**functions**
24:19 83:22

---

**G**

**G**
2:5 4:1
**gait**
33:14 36:17 67:2,3
93:2
**games**
39:8 88:7 89:1
**gathering**
82:8
**gearing**
80:19
**general**
30:18,19 38:19 42:4
**generate**
81:22
**GEOINT**
21:10,14,18,19 24:2
25:7 26:5,14 67:7

90:14,17 97:9,14
**Geospatial-Intellig...**
21:7
**get-up-and-go**
35:14
**getting**
15:4
**girlfriend**
11:12
**give**
6:10 38:7 45:21
**given**
42:4 75:20 93:9
101:5
**giving**
10:12 14:11 16:8
21:20 29:5 31:2,6
31:12 35:13 36:5
40:21 41:7 42:7
45:13,22 52:19
58:19 60:3 63:16
68:8,11,16,22 70:5
73:14 88:5
**giving--**
36:16
**Gjackson@govern...**
2:8
**Glascoe**
6:17
**go**
22:4 29:6,7,10 38:6
40:1 45:14,18 56:22
57:11 77:13,16
82:21 83:1,3 90:2
95:21 96:1,10,15
**goes**
32:3 77:8 84:7
**going**
9:2,3 13:17 25:3 27:1
28:16,17 47:11,12
48:22 51:9 62:10
66:10 67:6 71:5
79:18,19 80:4 82:22
84:21 85:6 87:7
92:17 95:16 96:4,7
**good**



**Gorter**
4:20 5:1,14 23:20
57:22
28:2,6,21 57:17
59:13,14 79:14,20
80:7,15 81:7 96:21
96:22 97:8,12,20
98:1 99:11
**Gotcha**
17:21 78:8
**government**
23:10
**Governor**
2:3,4 4:20
**graduated**
19:16
**graduation**
21:13
**grandfather**
20:17
**grocery**
15:2 56:22 57:6,12
77:14 82:21
**guess**
18:12 28:11 91:2
**guy**
35:14

**H**

**habit**
44:2,19 57:15,19,21
**habits**
58:7 60:7
**half**
52:16 53:6,7 58:12
88:17
**hand**
101:11
**Hand-eye**
39:15
**handed**
91:22
**handout**
59:9
**hands**
72:18 73:9,10

**happen**
79:17,18,19
**happy**
6:6
**hard**
25:22 26:4 82:4,5,7
90:11
**Hargrove**
1:3 2:22 4:5 8:6,7
9:11 11:7,11,14
20:1,1 64:9,12,13
**head**
6:11
**health**
27:19 31:1,21 49:11
50:17 51:16 54:15
63:1,12 68:7 87:13
96:18
**heard**
42:9,11
**heart**
19:8,12 30:5,6,7,7,8
30:11
**heavy**
40:5 72:17,18 73:5
**Hegde**
28:4
**help**
6:9
**helped**
18:14 58:2
**helps**
16:19 17:4,5,5
**Henderson**
1:22 4:16 41:2 70:13
101:2,20
**hereunto**
101:11
**high**
19:16 20:10 34:5,8
54:18
**highest**
19:14 20:9,22
**hindsight**
47:6
**hire**

17:8
**history**
20:15,20
**hold**
24:2
**holding**
88:18
**Holland**
8:4,5 9:11 10:22 11:1
11:6,10 68:19
**home**
16:5 17:12 33:18
36:9,10 51:14 53:22
54:12 55:3 65:21
92:17,17 94:18 95:2
95:5,6,7,10
**home-cooked**
55:14
**honest**
99:11
**hospital**
1:7 4:6 16:6 17:12
46:15,16,17 47:1
48:3,16 49:14 50:5
50:5 53:21 54:12
98:4
**hospitalization**
60:20
**hospitalized**
92:10
**hospitals**
59:11
**hot**
46:6
**hour**
52:16 53:6,7 88:10
88:17
**hours**
18:5 22:18 24:12
43:11 45:3 59:2,3
**house**
8:12,16,18 18:3 37:1
56:20 71:6 82:20
92:5,6,9,13 95:16
**household**
72:12

**houses**
69:10
**hydralazine**
29:16 30:6
**hygiene**
54:6,13

**I**

**ICU**
49:20 50:1,9
**idea**
45:17 85:15,17 86:4
**III**
2:3,4 4:21
**immediately**
66:3
**important**
13:20
**improve**
71:19
**improvements**
51:5 53:8
**improving**
38:13,16,20
**in-home**
17:9
**in-office**
22:5
**in-person**
22:1,2 24:10
**inaudible**
64:10
**incident**
30:17 88:5,12 89:6,8
89:22 90:3,6,20
92:18 93:6,9,17
95:10 96:12 98:4,11
98:14,21
**income**
27:4
**incontinence**
33:7
**INDEX**
3:1,10
**indicated**
76:8



**individuals**
41:5
**information**
82:8
**informed**
13:16
**initiate**
83:5
**input**
13:20
**institution**
21:4
**intellectually-stim...**
81:3,5
**intend**
69:12
**interest**
101:10
**interested**
59:17 87:16
**intervention**
47:12
**intimate**
41:17
**introduce**
4:18
**introducing**
57:15
**involved**
63:6,9 64:16 70:9
**isolation**
33:12
**issue**
54:11 64:17,19 71:17
**issues**
54:8

**J**

**Jackson**
2:3,4 3:8 4:20,21
9:14 12:19 19:7
25:15 32:1,21 47:8
47:13 48:2 49:2,8
53:11 61:14 75:17
79:5 87:22 88:3
91:10,15,18,20,21

99:6,20 100:3
**January**
17:16 66:6
**Japanese**
56:8
**Jessica**
28:9
**job**
13:5,7 22:19 68:4
82:13 90:17,22 91:4
91:5 96:20 97:9,14
**John**
41:2
**Johnson**
30:22,22
**Jonathan**
2:21 4:15
**journal**
81:11,19,20 82:11
**July**
50:1,2,9
**June**
27:2,3 42:14 50:1,7,9
**justice**
21:3

**K**

**kale**
55:12
**Kate**
41:2
**keep**
13:16
**keeping**
54:5 89:15
**Kentland**
70:8
**Kevin**
1:4,12 3:3 4:4,5 5:7
6:17
**Keyana**
18:7
**kidney**
32:10
**kidneys**
30:9,11

**kind**
23:7 62:11 70:11
80:22 81:1
**knew**
19:9
**know**
6:4,6 19:11 27:22
28:15 32:11 46:4
51:22 62:17 63:19
75:3,19 77:11,12
80:14 85:15 95:3
**knowledge**
20:18,19 63:14
**Kodori**
56:2,4,7,8

**L**

**label**
48:3
**lack**
40:11
**lacking**
90:14
**lake**
36:22 89:10
**lamb**
55:9,11
**lane**
36:18
**Lashawn**
20:1,3
**laundry**
17:5 39:20 40:4,5
73:1,4,5,7,10 99:2
**LAW**
2:4
**lawn**
92:16,18,20 93:5,10
93:16,18,20 94:3,6
99:2
**lawnmower**
94:15
**lawsuit**
10:12 11:14 14:12
21:21 29:6 31:3,6
31:12,17 35:13

40:22 41:7 42:8
46:1 58:20 60:4,16
61:9 63:4,7 70:5
88:6 93:10
**lawyer**
6:20 62:11
**lead**
95:17
**leading**
80:1
**learning**
19:17 20:11
**leash**
77:20 78:1
**leave**
26:15 82:20
**left**
32:6 34:11,14 71:16
74:18
**leg**
52:10 53:1 74:16
**legal**
4:17 63:1
**legs**
33:5
**Leonard's**
55:21 56:6,9
**let's**
5:20 74:9 81:2
**letting**
77:21
**Levadas**
41:1 85:13,13,14
**level**
19:15 20:9,22
**life**
40:8
**lift**
36:20 73:6,7,11,20
**lifting**
74:15
**lifts**
53:1
**light**
72:3
**limit**


**MAGNA**
LEGAL SERVICES

54:18
**limited**
74:18
**liquids**
32:18
**list**
31:21 85:7,12
**listed**
61:8 70:14
**little**
23:6 27:6 34:3,11
35:5 67:9 72:1
77:12 88:15
**live**
8:2,7,8 9:16,20 15:5
15:7,8,9,12,19 16:1
**lived**
7:20 9:8 11:3 15:21
16:5 69:1,3,5,8
98:17
**lives**
15:5
**living**
8:1 9:5,12,17 10:4
14:11 16:4 66:14
68:10,14,17,20
**LLC**
2:4
**LLP**
2:13
**located**
8:12,14
**location**
9:5 22:5
**long**
7:13 11:3 16:11
17:14 23:12 42:17
45:14,18,19 52:15
53:5 81:15,18 86:20
88:9
**longer**
17:18 36:1,12 71:9
71:11 72:8
**look**
39:11
**looked**

92:9
**looking**
25:11 47:6
**looks**
17:7 92:14
**losartan**
29:18
**lot**
32:8 51:10 56:16
**low**
65:17
**LSR**
101:20
**Lyft**
38:7

---

**M**

**Magna**
4:17
**maintenance**
94:4 99:2
**major**
9:7
**making**
13:20
**managed**
24:20
**management**
67:13,14
**manager**
21:22 23:1,13 24:3
**maneuver**
8:16
**March**
11:19 97:4
**mark**
41:1 57:22 70:13,14
91:10
**marked**
91:12
**married**
7:1
**martial**
36:2,4,6,8 38:15
52:17 58:12 70:4
76:1

**Marvin**
8:4,5 10:22 11:1,6,10
14:9 15:15,16 16:16
63:13 68:19
**Marvin's**
16:15
**Mary**
7:17
**Maryland**
2:16 7:12 21:5,14
47:1
**maternal**
20:17
**Mathis**
21:16 64:10
**matter**
4:4,22 23:7
**McDonald's**
55:19,20
**meal**
45:15,18,19
**meals**
55:3,6,8,14
**mean**
17:3 22:3 30:17,18
34:15 53:12 64:19
75:18 79:19
**Meaning**
95:7
**media**
4:3 100:1
**medical**
10:17 13:9,13 19:5
20:6 26:15 37:5,8
47:12,16,20 48:20
61:18 66:2 69:15
74:20 79:11,13 86:6
**medication**
67:1
**medications**
29:14 30:10,12 98:8
98:10,13
**medicine**
78:11,14
**Medstar**
1:7 4:6 27:21,22 28:1

28:18,22 46:17 47:4
48:15 49:13 50:5
52:3 57:14 59:10
60:15,19 61:1,3,4
92:10 93:8 95:7
98:4
**meet**
99:11
**meeting**
48:16 49:11 83:5
**meetings**
24:18 84:12
**members**
65:19
**memories**
62:19 87:14
**memory**
45:7 46:13,14 50:13
50:14
**mentioned**
34:3 39:3 64:6 65:5
69:12 70:4 71:5
72:3,11,12,22 73:13
82:20 90:8
**midsternal**
31:8
**Mike**
24:1
**mini**
100:4
**minute**
45:22 48:11
**minutes**
52:11
**misleading**
61:13
**missed**
77:7
**mixed**
15:4
**moment**
54:22
**month**
60:9,10,11 98:2
99:17
**months**



23:14,15 33:20 54:4
**morning**
 4:20 5:1,14 77:20
**mother**
 43:4,6 85:9 86:10,21
**move**
 16:7 42:20 43:1
  93:18
**moved**
 10:20 16:2,7,11
**movie**
 96:2
**moving**
 7:20
**mow**
 92:18 93:5,10,16
  94:12
**mowed**
 92:20 94:6,8
**mower**
 93:18 94:13
**Mullins**
 2:13 4:11
**mutt**
 71:4
**Myers**
 41:2

---
**N**

**N**
 4:1
**name**
 6:15 7:7 18:8,20
  27:22 28:3,5 49:16
  51:22 70:11
**names**
 18:6 19:22 85:7,12
**National**
 21:7
**nature**
 42:19
**NE**
 2:5
**near**
 37:1 71:6
**necessarily**

34:17
**necessary**
 17:18,20 76:11
**need**
 6:3 65:18 100:3
**needed**
 38:6
**needs**
 76:17
**neither**
 101:8
**Nelson**
 2:13 4:11
**nephew**
 38:9 51:13 55:7 57:1
  57:4,12 84:8 93:18
  94:3,14
**neurological**
 50:19
**neuropsychologist**
 28:7
**never**
 15:21 27:7 29:8,9
  95:4
**new**
 91:14,15
**Nicholas**
 85:13
**niece**
 11:11
**nodding**
 6:11
**nonfiction**
 58:12
**nonradiating**
 31:8
**normal**
 14:17 37:14,15,15,16
  37:17,18 43:19
  45:14 86:13,17
**normally**
 36:18 58:15,18
**Northwest**
 4:12
**notarial**
 101:12

**notation**
 79:13
**note**
 48:12
**notes**
 25:12 63:22
**NST**
 24:4
**number**
 4:3,9
**nurse**
 66:1,6
**nurses**
 17:22 49:12,17
**nursing**
 17:9 18:9 65:20 66:6

---
**O**

**O**
 4:1
**obese**
 31:13
**Objection**
 9:14 12:19 19:7
  25:15 32:1,21 47:8
  47:13 49:2,8 53:11
  61:14 75:17 79:5
**occasionally**
 23:5 31:9
**occurrence**
 10:11 14:11 16:8
  21:20 29:5 31:2,6
  31:11 35:13 36:4,16
  40:21 41:7 42:7,9
  43:18 44:6,19 45:13
  45:22 52:18 60:3,13
  63:16 65:9 67:8
  68:8,11,16,22 70:5
  71:7 73:14 74:15
  81:6 82:15 83:9
**occurrences**
 58:19
**occurring**
 81:13
**October**
 84:18,19

**offered**
 59:10
**office**
 22:14 68:4
**officer**
 24:4,7,17,21 25:4,6
  101:2
**offices**
 2:4 4:11
**Official**
 101:21
**officially**
 11:17
**Oh**
 36:10 37:11 56:17
  65:5
**okay**
 6:21 7:1,7,10,13,16
  8:1,9,15,18 9:1,10
  9:19,19 10:14,16,19
  11:5,14,20 12:7,10
  13:4,6,9,19 14:3,9
  15:1,11,15 16:1,7
  16:11,14,17,20 17:6
  17:8,11,14,17,21
  18:6,8,11,20 19:1
  19:14,17 20:11,20
  21:2 22:7,12,18,21
  23:10,12,15 24:9,15
  25:1,11 26:14,19
  29:9,14 30:3,20
  31:1 33:19,21 34:7
  34:15 35:9 36:15,19
  37:12,19,22 38:3,6
  38:19,22 39:6 40:7
  43:1,2 44:2,5 45:2
  45:13 48:14 50:17
  51:15,21 52:5,12
  53:7 54:11,21 55:10
  56:17,19,22 57:2,6
  57:9,11 58:7,22
  60:10,12 62:14 65:1
  65:5,18 66:1,22
  67:18 68:4 71:3,14
  71:22 72:2,6 74:3
  76:14 81:18,22 84:4


MAGNA
LEGAL SERVICES

85:19 86:8 91:22
**Okeemah**
1:22 4:16 101:2,20
**old**
96:20 97:9,14
**older**
20:3,4
**Olivia**
41:1 42:21 43:7,8
85:9,13 86:9,11,21
**Olivia's**
42:20 43:3,5
**once**
50:21 57:13 81:14,15
84:5 90:4 93:7 94:7
94:8
**ongoing**
17:15 26:17,18
**opinion**
61:11 71:15
**option**
22:8,9,10
**Orca**
24:1
**Ordway**
69:5
**originally**
15:9 16:2
**outcome**
101:10
**outside**
9:4 20:14 52:17 54:6
56:20 77:19 94:18
95:2,5,10
**oversee**
23:2
**owns**
9:10

_____
**P**
_____
**P**
2:12 4:1
**page**
3:3,12 48:13 100:4
**pages**
81:21

**paid**
26:15 64:20,22
**pain**
31:5 32:20 89:2
**pains**
32:22 46:2
**pans**
40:4 72:14 73:7
**paper**
82:10
**parent's**
19:14
**parents**
18:21
**park**
21:5 36:22 37:1 71:6
75:10,13
**part**
60:16 66:16 78:18
90:21,22 91:2
**participate**
59:15 94:9,11
**participating**
59:17,20
**participation**
36:3
**parties**
101:9
**Paul**
85:13
**pay**
64:18,19 76:4,5,6,7
76:10,21
**pays**
77:8
**pedal**
72:1,4,8
**Pending**
99:6
**people**
26:3 40:12 67:16
70:14 85:8
**Pepsi**
45:1,2
**perceive**
84:2

**percent**
91:8,9 94:2,5
**percentage**
91:3 94:1
**perfectly**
37:20
**perform**
13:10
**performing**
97:20
**performs**
13:11
**periods**
45:15
**permanently**
27:15
**Perry**
2:21 4:15
**personal**
61:11 63:14 76:13
**personally**
61:17
**Peter.sturtz@nelso...**
2:17
**Pfizer**
30:21
**ph**
24:1 29:16 30:5
49:16
**pharmacy**
29:12 57:9 82:22
**photograph**
3:14 94:21
**physical**
24:8,19 25:4 28:12
34:14,15,18,22 35:3
38:20 51:12,20,21
51:22 68:5,6 89:2
**pick**
57:8 82:22
**picking**
40:3
**picture**
92:12
**place**
87:7

**places**
38:6
**PLAINTIFF**
1:5 2:2 88:2
**plaintiffs**
4:21
**plan**
9:12 12:4,7 14:1 25:9
26:9,14 27:9 78:22
79:14 80:1,6,7 81:1
**planning**
79:21
**plans**
53:9
**play**
39:8 88:14,15,16,20
**playing**
88:6 89:1
**please**
4:18 5:6 6:1,4,5,9,15
18:11 19:22 20:2
25:19 29:19 31:21
85:7,12 91:11
**point**
12:5 17:8 27:1 31:15
39:1 40:18 45:6
62:20 79:8 94:20
**position**
21:19 22:22 23:13,16
23:19,22
**positions**
24:2
**positive**
28:18 29:2 52:5
**Possibly**
26:10
**pot**
73:10
**potatoes**
55:12
**potential**
80:1,3,6
**potentially**
78:16,18,18 79:21
**pots**
40:4 72:13 73:7



**pound**
36:20
**pounds**
71:2
**power**
1:3 4:5 11:15,18,21
12:1,4 13:1,11,21
14:20 76:4,9,11,18
77:6 84:11 93:21
**predate**
42:7
**predated**
42:10,11
**prepare**
6:18
**prepares**
55:6
**prescription**
57:8 98:13
**prescriptions**
83:1
**present**
2:20 4:18
**presently**
12:2
**press**
73:15
**pressure**
34:5,8 65:16 67:1
**pretty**
18:14 24:17
**preventing**
59:20
**prevents**
75:9
**previously**
98:8,16
**primary**
28:3,5,17,17 29:7
**prior**
24:3 31:11 42:3
43:18 44:18 45:13
45:22 60:3,13,20
61:1 65:6 68:7,22
88:5 89:5 90:2
92:17 93:5 95:10

98:10,14
**Probably**
23:14 33:20 45:1
77:5
**problem**
40:14 95:2
**problems**
19:8,12 31:1,22 32:3
34:3 35:19 39:16
93:2,20
**produced**
60:15
**production**
48:4 91:14
**professional**
13:9,14 37:6 69:15
**professionals**
79:11
**program**
70:12
**progress**
51:2
**progressing**
50:22 51:8
**promotion**
23:18
**property**
7:17,19 9:10
**prospects**
23:18
**provide**
6:6
**provided**
18:13 26:15 53:9
54:15 59:9,13
**provider**
29:7 51:17,19 96:18
**providers**
10:17 27:20 28:1
49:12 50:18 53:10
54:15 63:1,12 74:20
87:13
**Prudential**
21:16
**pulls**
56:15,16 70:18,20

**purposes**
50:18 51:11
**pushing**
94:13
**put**
57:21 82:10

---
**Q**
---
**question**
6:8 12:20 97:10
**questions**
6:2,5,11 64:6 87:20
88:1 99:6,10

---
**R**
---
**R**
4:1
**Ralph**
19:2
**ran**
70:12
**rate**
51:8
**reached**
83:14,19
**read**
58:10,12,15,18 59:1
59:4,7 81:11
**reading**
82:11 89:1 99:20
101:7
**ready**
97:15,17,21
**real**
21:15 64:21
**realize**
77:2
**really**
16:16 23:9 39:9
40:12 56:21 66:11
67:11 75:6 86:13
**reason**
12:22 13:2 29:20,22
30:1,3,12 66:12
71:11,15 76:8 83:19
88:19

**reasons**
76:9
**recall**
17:21 18:6,8 28:6
57:14 79:16 97:7,11
97:17,18,19
**recognize**
47:22 48:5 92:1
**recollection**
46:19,22 47:3
**recommend**
62:10
**recommendations**
53:9,16 54:16 55:1
**recommended**
51:16 69:21
**recommending**
51:19
**record**
4:3 6:3,16 48:2 64:1
64:3 99:22 101:4
**records**
6:21 79:14 86:6
**reduced**
101:6
**refer**
21:10
**reference**
78:16
**referenced**
89:11 99:15
**referencing**
72:3
**referring**
21:11 95:15
**refrain**
96:19
**regard**
94:3
**Regarding**
88:4
**regards**
54:13
**regular**
44:2
**rehabilitation**


MAGNA
LEGAL SERVICES

50:18 51:12 59:11
**related**
11:5,6,9 61:18 67:1
101:8
**relationship**
12:5,18 13:1 41:4,13
41:18
**relationships**
41:10
**release**
98:3
**relied**
90:12
**remainder**
78:9
**remaining**
12:10
**remember**
10:15 24:5 28:3
43:16,17 44:11,17
44:18 45:5,6,7,10
45:11 46:8,11 47:19
48:9,10,16,19 49:11
49:15,17,19,22 50:4
50:8 54:22 62:5
65:6,11,12 80:15,18
85:16 86:3,9 87:6
87:10
**reminders**
5:20
**remote**
22:8,9,15 78:19
**renovations**
9:7
**repeat**
12:20 97:10
**report**
10:16 22:8 81:12
**REPORTED**
1:21
**reporter**
4:16 5:5 6:10 55:22
56:3 101:21
**reports**
81:7,10,22
**represent**

4:19
**reps**
74:3,9
**requested**
101:8
**require**
93:16 96:3 99:3
**required**
91:4,5 95:21
**requiring**
93:15 94:14
**research**
61:17,21 62:3
**resided**
7:13
**residence**
10:21 17:9
**respond**
9:14 12:19 19:7 32:2
32:21 47:8,13 49:8
53:11 61:14 75:17
79:5
**responsibilities**
22:22 24:16 90:15
**responsible**
67:16
**rest**
55:14
**restaurant**
56:8
**restroom**
18:18
**result**
41:5,6
**resume**
36:8
**return**
9:12 25:9 26:6 78:2
78:18,19 79:15,21
80:2,17,20 97:9,13
97:21
**returned**
17:12,13 25:7 42:14
53:20,22
**returning**
25:13 54:12 78:16

90:9 96:20
**review**
6:21 48:12 63:22
**reviewed**
47:16
**reviewing**
48:20
**rid**
80:13
**ride**
38:8 46:20 72:7
**riding**
71:21 94:15
**right**
17:19 28:10 30:13
42:15,16 45:4 56:15
64:5 73:1,12
**Riley**
2:13 4:11
**rise**
10:12 14:11 16:8
21:20 29:5 31:2,6
31:12 35:13 36:5
40:21 41:7 42:8
45:13,22 52:19
58:19 60:3 63:16
68:8,11,17,22 70:5
73:14 88:5 93:9
**road**
7:11,21 8:2,13 9:17
10:20 15:9,12 42:15
43:9 44:15 45:7
**Robeterol**
29:16 30:5
**role**
11:21 14:19 16:15,18
16:21 22:1,2 24:17
24:20,21 25:4,5,6
26:7 67:7,7,18 68:5
68:6 77:7 78:19
90:13
**roles**
24:10,10,16 25:2
**room**
96:2
**roommates**

98:21 99:4
**rough**
91:3
**roughly**
43:8,11 53:5 69:7
74:3
**routine**
77:12
**RPR**
1:22
**run**
56:20 57:3,3

――――――――――
S
――――――――――

**S**
1:22 2:14 4:1 101:2
101:20
**sadness**
33:11
**salad**
55:12
**salary**
23:15 25:1 26:20,21
26:22
**salmon**
55:9,10
**Sartan**
30:8
**Saskia**
7:9 11:12 14:14
40:16 41:13 63:13
**Saskia's**
16:18
**saying**
40:13 85:4
**Scarborough**
2:13 4:12
**schedule**
58:6
**school**
19:16 20:10
**seal**
101:12
**second**
8:14,15 25:12 65:16
**security**



MAGNA
LEGAL SERVICES

21:22 23:1,13 24:3
24:6,6,7,7,8,20,21
24:22 25:3,4 67:12
67:14 68:5,6 81:12
**see**
26:5 53:7 61:3 65:5
83:3,20 86:6
**seeing**
50:17,20 51:4
**seek**
66:2
**seen**
60:17,19,22,22 61:7
91:17
**sentences**
81:20 82:1,9
**September**
16:6
**service**
18:9
**services**
4:17 18:12
**set**
83:15 99:16 101:11
**seven**
55:5,13 60:12
**shaking**
6:11
**Shana**
1:3 2:22 4:5 8:6 11:7
11:10,14,17,20
13:10,16 14:7,9
62:1,9,12 63:13
76:3,8 84:11
**Shana's**
14:19 15:21
**share**
10:21 62:2
**Sharon**
18:22
**She'd**
14:22
**shopping**
56:22 57:7,12
**showering**
53:18 54:1,3,6,13

**showing**
70:10
**shown**
92:4,16 94:21
**siblings**
19:20
**sick**
29:9
**side**
32:6 34:11,14 71:16
74:18
**signature**
47:22 48:5,7
**signed**
47:17
**significant**
7:7 19:5 20:6
**signing**
47:20 48:9,10 99:21
101:7
**single**
7:5
**sit**
23:4 58:9
**sitting**
35:7 67:19,22
**situation**
47:7
**six**
11:4,5 19:9 74:13,14
**slipped**
65:15
**Slowly**
51:1,2
**small**
56:18
**Smultay**
49:16
**social**
33:12 40:8
**sodium**
54:19
**somebody**
84:7 86:4
**someone's**
76:17

**Somewhat**
38:21,22
**soon**
17:12,13
**sorry**
9:16 11:6 15:11 22:2
25:11 28:17 29:7
31:17 32:5 40:7
41:6,8,16 42:3 43:8
44:10,12 45:21
47:19 50:1,12 52:12
55:22 61:7 62:15
64:12 65:19 85:8
**sort**
26:6 93:3
**sources**
27:3
**Southern**
47:1
**space**
45:11
**speak**
23:6
**specialist**
24:7,20 25:5
**specific**
28:1 35:22 39:18
97:7
**speech**
51:6,9
**sports**
59:10
**squat**
73:17
**squats**
53:1 73:17,19 74:1,7
**staff**
24:4,17 25:5
**stairs**
9:2,3
**standard**
85:22 86:1,2
**standpoint**
63:1
**start**
16:4 17:11 54:3 74:9

80:22
**started**
16:5 21:14
**starting**
28:16
**state**
4:18 6:15 18:20
19:22 20:2 25:19
29:19,22 30:1,2,3
**STATES**
1:1
**stenographically**
101:6
**steps**
34:16 95:16,22 96:4
96:8
**stone**
99:16
**stop**
33:19 45:7 66:6
84:14
**stopping**
12:11 45:11
**storage**
45:11 87:7
**store**
15:2 77:14 82:21
**Street**
2:5,14 69:6
**strenuous**
34:18
**stroke**
20:20
**struggle**
8:19,21 39:19 40:2
82:17 94:16
**struggled**
35:12 95:14
**struggles**
40:8
**students**
70:10
**stuff**
53:1 67:17
**Sturtz**
2:11,12 3:7 5:1,1,3,3


MAGNA
LEGAL SERVICES

5:13,14 9:15 12:21
19:10 25:18 32:5,9
33:1 47:10,15 48:6
49:5,10 53:13 56:5
61:16 63:21 64:4
75:21 79:7 87:19
91:13,16,19 99:9,18
**subject**
23:7
**succeed**
80:8,10
**successfully**
80:17
**suffer**
32:10,11,15,17
**suing**
64:9
**Suite**
2:6,15
**summarizing**
82:12
**supervisor**
23:21
**supposed**
23:4 64:20 81:11
99:16
**sure**
14:22 23:3 77:2
**surgery**
61:1
**surprised**
86:12,14,18
**swallowing**
32:18
**swear**
5:6
**sweating**
46:5,5
**Sweet**
55:12
**swelling**
33:4,5
**sworn**
5:9
**system**
24:21 44:16

**T**

**take**
6:3 15:2 29:20,22
30:3 48:11,11 56:14
63:21 77:19 78:11
78:13 89:11,19
98:10
**taken**
4:4,13 5:17 64:2
92:12 101:3,5
**talk**
6:20 80:11
**talked**
62:9,11
**talking**
13:5,7 68:2 99:1
**tasks**
13:10 38:20
**taught**
70:4
**te**
4:9
**teach**
36:6
**teaching**
70:9
**team**
23:3 67:16 68:2
**teams**
59:10
**tell**
36:3 77:3 86:4,21,22
**telling**
80:15
**ten**
43:11 74:5,6,11,12
**term**
27:17
**terms**
12:16,17 35:15 54:16
94:1
**tested**
81:4
**testified**
5:11 94:16 95:14

98:9,16
**testify**
5:9
**testimony**
73:6 79:16 87:6,11
88:1 101:5,5
**testing**
32:13
**tests**
97:20
**Thank**
87:20,21 99:18
**therapist**
28:12 51:22 52:1
**therapists**
51:20
**thing**
72:1 77:2 86:13 87:6
**things**
12:15 15:11 26:1
62:4 72:7 79:4
80:12 99:3
**think**
38:16,22 49:6 50:12
53:14 54:21 58:2,4
61:12 62:7 77:7
79:3 86:11
**thought**
15:4 98:5
**three**
8:9 22:15 50:21
52:14 54:4 57:13
77:13 81:20 82:9,21
84:5 94:7,8
**throw**
36:18
**tied**
34:22
**time**
4:10 6:3 12:12 15:6
21:20 25:22 26:4
32:4,4 40:21 43:21
45:15 48:12 53:20
53:22 58:8,16,18
59:1 63:16 65:20
67:8 68:11,16 69:3

78:18 87:14,20
90:11 96:22 98:3,17
**times**
10:9 53:2
**tired**
72:8 83:18,21
**today**
5:16 87:20 99:1
**told**
10:2 13:9 31:12 37:5
37:6,22 54:18 55:2
74:20 86:7,8,10
96:19 97:1
**tool**
57:15,19 58:2
**totally**
27:14
**town**
42:20
**tracker**
57:15,19
**transaction**
64:21
**transcript**
3:11 100:4 101:4
**transferred**
49:19
**transport**
47:3
**treadmill**
52:11 56:13 72:5,7
**tried**
36:9,10 37:19 72:20
83:5 89:19 95:4
**triggers**
34:19
**trip**
42:15,19 43:2,9
44:15 45:8,10 85:6
85:9 87:7
**Tripathi**
28:3
**true**
101:4
**truth**
5:9,10,10


MAGNA
LEGAL SERVICES

**try**
5:21 38:11 71:19
  78:17 80:19,22 81:1
  83:15,20
**trying**
82:9
**TV**
58:9 77:13,18 78:8
**twice**
10:10 22:13,14 36:6
  53:4 89:13
**two**
7:15 22:15 30:22
  33:20 59:2,3 60:11
  65:6 69:11 73:21
  93:7
**type**
18:12 33:21 55:17
  56:6,19 59:3 98:22
**typewriting**
101:6
**typically**
52:15 55:8,17 73:20

---
**U**
---

**U.S**
4:8
**Uber**
38:7
**Uh-huh**
11:2 15:20 23:2 34:9
  36:11 37:21 38:5
  43:7,10 50:16 55:16
  72:15 73:16 78:10
  82:2
**UHaul**
85:21
**unable**
13:10 88:11,14,20
**unassisted**
89:22
**uncrate**
96:1
**undergoing**
32:13
**understand**

6:5,12 21:11 47:7
  85:3
**understood**
6:8
**unit**
4:3 100:1
**UNITED**
1:1
**University**
21:5
**upcoming**
99:14
**urgent**
29:10
**urine**
33:6
**use**
18:18 29:12 33:14,17
  38:7 57:20 58:5
  91:20
**usually**
52:9,22 55:9 59:5
  60:11 78:6

---
**V**
---

**V**
1:6
**vaccine**
30:14
**verbal**
6:10
**versus**
4:6
**video**
39:8 88:6 89:1
**videographer**
2:21 4:2,15 5:5 64:1
  64:3 99:22
**videotape**
100:5
**VIDEOTAPED**
1:11
**view**
27:12,14 70:2
**vision**
32:3,3 34:3,6 35:19

**visit**
97:2,8,11,19 98:1
**visits**
84:4,22

---
**W**
---

**waive**
99:20
**wake**
77:14,16
**waking**
46:15,16 50:4,10
**Walgreens**
57:10
**walk**
36:17,22 39:3,5,6
  52:10 56:11,13,14
  71:13,15 75:9,13
  89:15,19,21 91:4
**walker**
34:1,2
**walking**
34:16 70:17 72:5
  91:2,7
**walks**
89:10
**want**
11:19 35:8 41:20
  57:21,22 59:7,8,21
  80:7
**wanted**
80:10
**washing**
39:20 40:3
**Washington**
1:7,13 2:7 4:6,13
  18:7 46:17 48:3,15
  49:13 50:5
**wasn't**
17:19 37:15 40:14
  44:1,2,4 46:5 60:9
  79:10 86:13,17
  97:15
**watch**
58:9 77:13,18 78:8
**watched**

18:17
**way**
41:14,19 76:20 80:19
  89:3 92:9,13
**ways**
41:11
**we'll**
6:7 100:3
**We're**
41:17
**we've**
91:17 98:22
**weak**
34:14 71:16 89:20
**weakness**
32:6 34:10 35:16
  74:17
**Wednesday**
1:14
**week**
18:4 22:12,13,14,15
  22:16 36:7 52:13,14
  53:3,4 55:4,14 60:7
  60:9 81:17,18 89:13
  90:4
**weeks**
50:21 57:13 77:13
  82:22 84:5 93:7
  94:7,9
**weight**
73:20 74:6
**weights**
73:18,19 74:15
**Welch**
1:4,12 3:3 4:4,6 5:7
  5:14 6:17 18:22
  19:2 64:5 88:1
  99:10,19
**went**
29:8,9 37:13
**weren't**
53:22 67:22 68:20
**WHEREOF**
101:11
**wish**
51:9



**witness**
3:3 5:6,8 48:14 87:21
  101:11
**wobbly**
67:5,6
**work**
6:12 21:13 22:9 25:7
  25:9,14 26:5 39:11
  52:17 53:8 67:6
  68:7 76:14 78:17
  79:15,21 80:2,4,17
  80:20 90:9 94:1,2
  97:21
**worked**
21:6,15,17 73:13
**working**
52:22 64:17 67:19
**workout**
53:5
**workouts**
51:13,15 52:8,13,18
  53:3
**works**
5:20 28:9 57:20
**wouldn't**
10:1,3 61:15
**write**
81:12

---
**X**
---
**x**
1:3,9

---
**Y**
---
**yeah**
34:5,13 36:6 37:11
  57:2 70:13,20 82:6
**year**
11:19 16:13,14 97:5
  98:20
**years**
7:15 11:4,5 20:3,4
  69:7

---
**Z**
---

---
**0**
---
**000038**
48:3

---
**1**
---
**1**
3:14 4:3 91:11,12
**1:23-cv-3381**
1:7 4:9
**10**
1:14 2:5 4:10 80:16
  80:16
**10:13**
64:1,2
**10:25**
64:2,3
**100**
2:14 91:9
**101**
4:12
**102**
25:6
**11**
20:4
**11:02**
1:15 100:1,6
**120,000**
23:17
**12615**
7:11
**12th**
97:4
**13**
20:3
**14**
42:14 50:1,1
**14th**
50:8,9
**15**
36:20 52:11
**1600**
2:15
**175**
73:22 74:3

---
**2**
---

---
**2:30**
22:20,21
**20**
69:7
**2002**
2:7
**2004**
64:11 69:6 98:18,20
**2006**
21:6
**2022**
42:14 98:20
**2023**
66:7 84:19
**2024**
1:14 4:10 97:5,6
  101:12,14
**20613**
7:12
**21202**
2:16
**22**
87:11
**225**
74:1,8,9
**24**
45:3
**24th**
101:12

---
**3**
---
**30**
91:8
**300**
74:2,8,12
**31**
101:14

---
**4**
---
**4706**
7:16

---
**5**
---
**5**
3:7
**50**

---
**25:4 94:5**
**55**
20:5
**57**
20:4

---
**6**
---
**6**
22:20,21
**600**
2:6

---
**7**
---
**70**
25:5 71:2

---
**8**
---
**88**
3:8
**8th**
50:2,9

---
**9**
---
**9:05**
1:15 4:10
**91**
3:14
**99**
3:7

