Page 1

NORTHLAND REPORTING AGENCY (Laurie Austin)

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

Civil Division

SHANA HARGROVE AS POWER OF

ATTORNEY FOR KEVIN WELCH

Civil Action No. 1:23-cv-3381

Plaintiff,

vs.

MEDSTAR WASHINGTON HOSPITAL

CENTER, et al,

Defendants.

ZOOM DEPOSITION

The following is the Zoom deposition of AHMAD ELAKIL, M.D., taken before Laurie Austin, RPR, Notary Public, pursuant to Notice of Taking Deposition, all parties appearing remotely, commencing at approximately 12:06 p.m., Central Time, on May 29, 2024.



Page 2

APPEARANCES:
For the Plaintiff:
Law Office of Governor Jackson, III, LLC
Attorneys at Law
10 G Street Northeast
Suite 600
Washington, D.C. 20002
By: Governor E. Jackson, III, Esq.
Gjackson@governorjacksonlaw.com
For the Defendant:
Nelson Mullins Riley & Scarborough, LLP
Attorneys at Law
100 South Charles Street
Suite 1600
Baltimore, Maryland 21201
By: Donna P. Sturtz, Esq.
Donna.sturtz@nelsonmullins.com
David Sturtz, Esq.

-------------------------------------------

INDEX

Witness        Examination by        Page

AHMAD ELAKIL, M.D.
        by Ms. Sturtz        4
        by Mr. Jackson        119

        EXHIBITS*

Exhibit 1    Curriculum vitae        7
Exhibit 2    Articles        36

*Exhibits not attached at time of production.

Page 3

* * *

(DISCLAIMER: Words that are not fully spoken, words that are stuttered, words that are lost or cut off by technological difficulties, or words that are spoken over other words may not be reflected in this written transcript, but may be captured on the videotaped portion of this record if it is videotaped.)
        * * *
THE COURT REPORTER: Before we proceed, I will ask counsel to stipulate on the record that there is no objection to this deposition officer administering a binding oath to the deponent remotely and waiving in-person appearance.

Please state your agreement on the record.

MR. JACKSON: I agree.

MS. STURTZ: Donna Sturtz, agreed.

THE COURT REPORTER: Doctor, is there anyone else in the room with you?

THE WITNESS: No. Agree.

Page 4

* * *
PROCEEDINGS
(Whereupon, the deposition of AHMAD ELAKIL, M.D. was commenced at 12:06 p.m. as follows:)
(Witness sworn.)
AHMAD ELAKIL, M.D.,
called as a witness, being first duly sworn, was examined and testified as follows:
        * * *
DIRECT EXAMINATION
BY MS. STURTZ:

Q. Good afternoon, Doctor. My name, again, is Donna Sturtz, and I represent MedStar in this matter, and I'll be taking your deposition today.

Have you had your deposition taken before?

A. No.

Q. So just a few ground rules. So I'll just be asking questions. We're doing this remotely. So if at any point in time there's a glitch, you don't hear my full question, my voice fades out, let me know and I'll be happy to restate the question. If you go ahead and answer, I'm going to assume that you heard

Page 5

and understood the question as asked. Okay?

A. Okay.

Q. Also, it's sometimes hard remotely to tell if you finished your answer or if I finished my question. I don't ever mean to talk over you. So if at any point in time I inadvertently talk over you and you didn't finish your answer, please let me know and I'll be happy to give you that opportunity. If you don't let me know, I'm going to assume that your answer was a full and complete answer. Okay?

A. Sounds good. Thank you.

Q. All right. Also, the other thing that makes Laurie's job much easier is for you to just give verbal answers to my questions because she can't get down nods and shakes of the head. So it's a little bit different than a regular conversation; just try to give verbal answers. Okay?

A. Sounds good.

Q. And I don't know how long we'll be today, but if you need a break at any time, just let me know that and we can take a break.

A. Sounds good.



Page 6

Q. All right. And the last thing is opinions to -- to be admissible in court are given to a reasonable degree of probability. I will do my best to include that phrase in my questions, but do we have an understanding that when I ask for your opinions it is for an opinion to a reasonable degree of probability?

A. Yes.

Q. Okay. All right. Let's start by where are you today for this deposition? What -- what is your address?

A. At the hospital; 2525 South Michigan Avenue, Chicago, Illinois.

Q. Okay. Great.
And that is the Insight Hospital?

A. Correct.

Q. And I was provided prior to the deposition a copy of your CV, and it has an updated date of August 24, 2022.
Do you have any -- a more up-to-date CV than the one dated August 24, 2022?

A. I -- I need to -- I need to look into this. I'm sure I have an updated one. I can

Page 7

provide this after the interview.

Q. That -- no problem. That's fine. So I'm just going to have Laurie hold open the Deposition Exhibit 1, a copy of your updated CV. And we'll get that from you afterwards. You can send that to Governor Jackson, and he'll get it to me. Okay?

A. Sounds good. Thank you.

Q. In terms of what has transpired between August of 2022 and today, are you -- do you hold the same position as you did back then?

A. The same position. I am the chairman of the Department of Neurosurgery at Insight Hospital.

Q. Okay. So in terms of your professional responsibilities, they are the same today as they are reflected in your CV from 2022 --

A. True.

Q. -- is that accurate?

A. That's accurate.

Q. And have you authored any publications since August of 2022 that are included on an updated CV?

A. No.

Q. You are -- you said you were chairman of the

Page 8

Department of Neurosurgery at Insight Hospital?

A. Correct.

Q. And that started in what month in 2021?

A. August.

Q. And your CV uses the word "chief." Is there a difference between chairman and chief, or it's the same position?

A. The same -- the same position.

Q. And how many people are in the neurosurgery department at that hospital?

A. Four.

Q. And are all four neurosurgeons?

A. Yes.

Q. So when I went online, it only came up with your name. Have other surgeons --
But you're saying there are now four neurosurgeons in the department?

A. Yes. The website is under construction.

Q. When did the three other neurosurgeons join the department?

A. From the beginning.

Q. So all four -- four of you started together in August of 2021?

A. Yes.

Page 9

Q. And is that because the hospital was -- became under new management at that time?

A. That's correct.

Q. And the hospital had -- had the hospital -- strike that.
Was the hospital called Insight prior to August of 2021, or was it called something else?

A. It was called Mercy.

Q. And Mercy Hospital, did it close down prior to August of 2021?

A. That's correct.

Q. For how long was it closed as a hospital prior to August of 2021?

A. No. The -- the -- the -- that transfer between Mercy and Insight happened without a complete shutdown. So right away the management left, and then Insight took over that night.

Q. Was there a neurosurgery department prior to the incomplete shutdown --

A. No.

Q. -- in August of 2021?

A. No.

Q. So there were no neurosurgeons who were part



Page 10

of Mercy Hospital who left in 2021?
A. That's correct.
Q. When did you first consider coming to Insight Hospital? I know you started in August of 2021, but when did that process begin?
A. April.
Q. And in August of 2021, did Mercy Hospital have an ICU?
A. Sorry. What month?
Q. The summer -- let's say the summer of 2021. Did it have a functioning ICU?
A. That's correct.
Q. Did it have a cardiac surgery unit?
A. Not -- no cardiac surgery.
Q. Does it currently have a cardiac surgery unit?
A. No.
Q. So there are not patients {sic} at Insight Hospital who perform type A aortic dissection surgery; is that correct?
A. That's correct.
Q. And that is true from summer of 2022 through to today?
A. Correct.

Page 11

Q. Does Insight Hospital employ any cardiothoracic surgeons?
A. No. They are in the process of building the department.
Q. You do not perform cardiothoracic surgery, correct?
A. No. I'm a neurosurgeon.
Q. And you do not perform surgery on patients who are getting a repair for type A aortic dissection, correct?
A. No. I'm a neurosurgeon.
Q. Where were you working in April of 2022 when you were considering the position at Insight Hospital?
A. Louisiana.
Q. And what were you doing in Louisiana?
A. Private practice in neurosurgery.
Q. What was the name of the private practice?
A. Ahmad Elakil Medical Consul---
   Ahmad Elakil --
       I -- I forgot what it's called. My first name, last name, medical -- professional medical service, something like that.
Q. So when you were in Lafayette, were you

Page 12

working at a hospital?
A. It was a private practice, and I have -- I had credentials at the hospital.
Q. What was the name of the hospital where you had credentials in Lafayette?
A. Our Lady of Lourdes Hospital.
Q. And you were performing neurosurgery at Our Lady of Lourdes Hospital?
A. Correct.
Q. Did Our Lady of Lourdes Hospital have a cardiac surgery department that performed -- where type A aortic dissections were performed?
A. Yes.
Q. And was your office located in the hospital or outside of the hospital?
A. Outside the hospital.
Q. Was it located on Camellia Boulevard?
A. Yes.
Q. And was the name of the group Acadiana, A-c-a-d-i-a-n-a?
A. Yes. I was not part of the group.
Q. Okay. So you shared the same address as Acadiana --
A. Yes.

Page 13

Q. -- Neurosurgery, but you were not part of that group?
A. Correct.
Q. So you were just there as a solo practitioner?
A. Correct.
Q. And why did you go to Lafayette to practice as a solo practitioner?
A. I had a good opportunity with good -- what do you call it?
       Advanced loan to build my practice. And I found it really good opportunity to start there.
Q. You stopped working there in what month in 2021?
A. June.
Q. And when did you start working there?
A. January, 2020.
Q. So you were there about a year and a half?
A. Yes.
Q. What types of patients did you see in Lafayette?
A. All kinds of for brain and spinal surgical issues.
Q. Was there a breakdown in terms of your



MAGNA
LEGAL SERVICES

Page 14

surgery what percentage was brain versus what percentage was spine?

A. I would say, as any general practice, it's around 10 to 20 percent brain and 80 to 90 percent spine.

Q. How many surgeries would you say you performed when you were in Lafayette?

A. I would say around 200.

Q. And why did you leave your solo practiction---practice in Lafayette?

A. Because they wanted to give me a position in Chicago. Chicago is much bigger city, bigger program here. I had a really good opportunity with Insight. So I -- I -- I joined them here.

Q. So were you recruited for that position or were you out looking for a position?

A. Recruited.

Q. Looking at your CV, I see you are -- you are born in the United States, correct?

A. Correct.

Q. And then you went to college and medical school in Saudi Arabia; is that correct?

A. That's correct.

Q. And that's a combined program there?

Page 15

A. Yes.

Q. So did you move to Saudi Arabia in 2005, or did you move there sooner than that?

A. I don't recall exact year, but I -- I moved before my college starts.

Q. Okay. So how long did you live in the United States before you moved to Saudi Arabia?

A. I was nine.

Q. And then you did your residency in Canada after your medical training in Saudi Arabia; is that correct?

A. That's correct.

Q. Did you apply for residency in the United States?

A. Yes, but when I did the application process, right away the Canadian program accepted me. So I didn't want to wait for their -- until the American match.

Q. Okay. And the initials FRCSC after your name, is that for the Royal College of Surgeons in Canada?

A. That's correct.

Q. So that's signifying that you completed the residency program in Canada?

Page 16

A. That's correct.

Q. Did that include a need to pass an examination, or just the completion of the residency program?

A. It includes an examination -- written and oral examination.

Q. And did you pass that examination on your first attempt?

A. Yes.

Q. Did you then apply for fellowship in Canada?

A. No; the United States.

Q. And you -- so after your residency in Canada, you applied for a fellowship and accepted a position at the University of Miami?

A. Correct.

Q. And that was in neurosurgical oncology?

A. Correct.

Q. Are you a fellow in neurosurgical oncology?

A. I completed most the graduate training, but I did not continue my fellowship because I wanted to start in Lafayette in Louisiana.

Q. So is your testimony that you left the University of Miami fellowship before completing it to take the job in Lafayette?

A. Correct.

Page 17

Q. When did you leave -- or let me strike that.
You started the fellowship in July of 2019 --

A. Correct.

Q. -- is that correct?
And you left there in November --

A. That's correct.

Q. -- in November of 2019; is that correct?
And you didn't start -- and you started in Lafayette in January of 2020; is that right?

A. That's right.

Q. And why did you not complete the fellowship?

A. Because I got the job as general -- in general neurosurgery and it was good. So I -- I just wanted to start.

Q. Why were you looking for a job while you were in the middle --

A. Because financially I needed to start my practice.

Q. Were you asked to leave the University of Miami fellowship?

A. No.

Q. Did you have a dispute with the University of Miami fellowship because you left the program

5 (Pages 14 to 17)



MAGNA
LEGAL SERVICES

Page 18

early?

A.  Yes.  I -- before I leave, I wanted my certificate of the months that I did with them and -- because they did not give me something to prove that I did the four months with them.

Before I leave, they say they would give me that proof -- proof that I did the four months with them, but then after I left they did not because they said I didn't finish the fellowship.

So I had that dispute with them and it ended to my satisfaction and they gave me the bold {phonetic} letter.

Q.  I'm sorry.  What was the last thing you said?  They ended up giving you a letter?

A.  Yes.

Q.  And the letter does not indicate that you completed the fellowship, correct?

A.  No.  It says it's just the amount of time that I -- I did the fellowship there.

Q.  Okay.  Was that given to you after you filed a lawsuit against the University of Miami?

A.  Yes.

Q.  And did you indicate in that lawsuit that

Page 19

you -- you actually lost employment and did not have a job when you left the fellowship in November, 2019?

A.  I did not.  I did have another job at the beginning at -- in Cleveland, but then that, unfortunately, was the one that's left.

Q.  So when you announced you were leaving the fellowship in November of 2019, you did not have the job in Lafayette, correct?

A.  No.  I had it as a second -- second -- this -- I -- I interviewed with them, but it was not my first go.  I was going to Cleveland Clinic first.

Q.  And that was my next question to you.  Where was the job that you -- was with -- the job offer was withdrawn from Cleveland Clinic; is that correct?

A.  Yes, because they -- they wanted someone with some sort of postgraduate training letter and I didn't have at the time because they didn't give me that letter.

Q.  Okay.  And this was the Cleveland Clinic, and what was the position you applied for at Cleveland Clinic?

A.  A neurosurgeon.  A neurosurgeon -- general

Page 20

neurosurgeon.

Q.  Did you file any action against Cleveland Clinic for withdrawing that offer?

A.  No.

Q.  What happened with the lawsuit against the University of Miami?

A.  It ended with settlement and up to my satisfaction.

Q.  Do you advertise yourself as a fellow in neurosurgical oncology?

A.  No.  I just say postgraduate training as my certificate.

Q.  Do you practice neurosurgical oncology, or did you decide not to pursue that specialty?

A.  No.  I -- we -- we do general neurosurgery -- some of the general neurosurgical issues as -- as part of the oncology.  So yes.  I do some oncology neurosurgery.

Q.  In terms of your current practice, what percentage of it is neurosurgical oncology?

A.  I would say 1 to 2 percent.

Q.  And in terms of your current practice, what percentage is brain surgery?

A.  I would say around 10 percent.

Q.  And what is the remaining surgery?  Is it

Page 21

spine?

A.  Spine.

Q.  Do you specialize in minimally invasive surgeries?

A.  No.  Open surgery.

Q.  What percentage of the spine surgeries you do are min--- minimally invasive surgeries?

A.  I would say 5 to 10 percent.  They would be a simple minimally invasive laminectomy or discectomies.

Q.  The surgery that Mr. Welch underwent is not a minimally invasive surgery, correct?

A.  I don't know.  That's not my specialty.

Q.  You will not be offering any opinions in this case as to the standard of care regarding the performance of the surgical repair of Mr. Welch, correct?

A.  Correct.

Q.  And, in fact, you won't be offering any standard of care opinions in this case, correct?

A.  Correct.

Q.  You're -- you're currently licensed in Illinois; is that -- is that correct?

A.  That's correct.



MAGNA
LEGAL SERVICES

Page 22

Q. Any other states currently?
A. Michigan.
Q. Why Michigan?
A. That is an Insight main -- Insight Hospital main campus. So they try to license everyone there in case they needed some help there.
Q. Okay. It looks like in your CV that you took the USMLE in 2011, but you did not come to the United States for your residency training, correct?
A. Correct.
Q. Did you pass those examinations on the first attempt?
A. Yes.
Q. It indicates that you were board certified in neurosurgery, correct?
A. Correct.
Q. You don't hold any other board certifications?
A. No.
Q. And you became board certified in 2021?
A. Correct.
Q. Did you pass the board certification test on your first attempt?
A. Yes.

Page 23

Q. And why did that not take place until 2021?
A. The COVID situation.
Q. Meaning it wasn't offered for a period of time?
A. They stopped that because people in the states can't cross into Canada, and they needed to make a center that's -- for online situation, and that -- that's the....
Q. Okay. So you originally wanted to take the exam in 2020, but it was delayed until 2021 because you were in Canada?
A. Correct.
Q. Okay.
A. Because I wasn't in the U.S. as well.
Q. Okay. And you moved to the United States from Canada in 2019, though, to go to the University of Miami fellowship?
A. Correct.
Q. So you were in the United States when COVID started?
A. Yes.
Q. But it's still your testimony that you weren't able to take a board examination until 2021 because of COVID?
A. Yes. I did my written part when I was there,

Page 24

but the oral part we couldn't because of that situation.
Q. Okay. And what month in 2021 was your board certification completed?
A. The oral exam was completed, I think, in May or April -- April or May.
Q. And you don't have any subspecialty certification, correct?
A. Correct.
Q. And I looked at the publications on your CV, and am I correct that none of them postdate your time in training?
A. Sorry. I did not understand the question.
Q. Right.
       So the -- the -- the publications that are listed on your CV, those all date back to the time period when you were in medical school or residency training; is that correct?
A. That's correct.
Q. There haven't been any publications since that time, correct?
A. Correct.
Q. Insight Hospital, you mentioned that -- that there are different locations. Is your

Page 25

practice limited to the Chicago location only?
A. No. I have credentials in the main campus in Michigan, but they never needed me there.
Q. Okay. So in terms of your actual practice where you do surgery, it's all at the Chicago location?
A. Correct.
Q. And am I correct that that location only recently became accredited in 2023?
A. I don't -- I don't understand your question, accredited, because it was change management; that's it.
Q. Do you know anything about hospital accreditations?
A. That's not my specialty.
Q. So -- so if -- if the website indicates that Insight Hospital became accredited in 2023, that's not something you're aware of one way or the other?
A. No.
Q. How many beds are there at the current Insight Chicago Hospital?
A. Let's say around 300 to 400 beds.
Q. How many neurosurgery operating rooms are



Page 26

there?

A. We have around ten operating rooms.

Q. That's for all surgeries, or just neurosurgery?

A. For any surgery that's on the schedule. They all can hold neurosurgery.

Q. Is the Insight Hospital in Chicago a comprehensive stroke center, if you know?

A. Yes.

Q. Is it a -- a prime -- is comprehensive or primary, or do you not know the difference?

A. I don't know the difference, but I know that they have -- they fully certified in taking care of stroke patients.

Q. But in terms of what certification level the hospital has, that's not something you're familiar with?

A. I don't know.

Q. And you don't work in that stroke department at the Insight Hospital, correct?

A. We all work as a team. So the neurology stroke team, if they need surgical consultation, they consult me.

Q. But you're not part of the neurosurgery -- neurology stroke team, correct?

Page 27

A. I'm -- I'm -- we -- stroke team is not only based on -- on neurology or neurosurgery. Stroke team, if -- if -- if the neurologist need a neurosurgical consultation, then they call the neurosurgeon. You can't have a stroke center without a neurosurgery presence. So you can't take care of the patient without 24/7 neurosurgery coverage. So we were part of the stroke team.

Q. What type of spine neurosurgeries do you perform?

A. All kind of complex spine surgery.

Q. What percentage of the spine surgery you do is elective versus trauma?

A. I would say 70 percent elective, 30 percent trauma.

Q. Do you belong to any professional societies?

A. Yes. I'm a member of the American Association of Neurological Surgeons.

Q. Anything else? Any other professional associations?

A. No.

Q. As a neurosurgeon, what does no focal motor deficits indicate to you?

A. That there is no any -- no any weakness. No

Page 28

any appreciated weakness.

Q. Appreciated weakness?

A. Yes.

Q. That was it?

A. Yes.

Q. Okay.

A. One way abduction, that means his power is five over five.

Q. As a --

Okay. As a neurosurgeon, what does strength and sensation are intact without any focal deficit mean to you?

A. That this patient neurologically is normal.

Q. And you're not board certified in critical care, correct?

A. Correct.

Q. And you're not board certified in neurology, correct?

A. Correct.

Q. You didn't do a stroke fellowship, correct?

A. No.

Q. You have not performed any physical examination of Mr. Welch, correct?

Is that yes? Pardon?

A. No.

Page 29

Q. Okay.

A. Okay. No. I --

Q. You can't hear nods.

Okay. Are you aware of any recent neurological assessments of Mr. Welch in the year 2023 or 2024?

A. No.

Q. Have you reviewed any medical records for Mr. Welch from the year 2023 or 2024?

A. No.

Q. What medical records have you reviewed?

A. The hospital records when he was admitted for the surgery and the postoperative care.

Q. So just the one admission to MedStar Washington Hospital Center? Those are the only medical records you reviewed in this case?

A. Yes.

Q. Did you review any rehab records after that hospital admission?

A. (Shakes head from side to side.)

I was asked only for the causation.

Q. Okay. Have -- have you reviewed any deposition transcripts in this case?

A. Yes. I was sent recently a deposition.



Page 30

Q. What deposition were you sent?
A. The patient, I think his power of attorney, and the -- one of the doctors.
Q. Do you recall which doctor it was?
A. If you say the name, I would tell you.
Q. Was it Dr. Hockstein?
A. Yes.
Q. Did you take any notes from your review of either the medical records or those three depositions?
A. No.
Q. Have you reviewed any imaging?
A. Yes.
Q. What imaging have you reviewed?
A. The radiology images that was done when he was admitted. So his MRI brain and the MRI spine, as I remember, and the -- yeah. That's what I remember.
Q. Okay. And do you think that you reviewed the imaging from the CT of the brain that was done prior to the MRIs?
A. I don't remember.
Q. Did you review the reports that went along with the MRIs and the CT?
A. Yes.

Page 31

Q. Okay. Did you disagree with any of the findings that are set forth by the radiologist in those reports?
A. No.
Q. Do you agree with the findings that are set forth by the radiologist in those reports?
A. Yes.
Q. And, again, you -- you -- sitting here today, you don't have a recollection of reviewing the CT images?
A. Don't recall it.
Q. Anything else that you reviewed in the case other than the medical records, the three deposition transcripts, and the MRI imaging?
A. For the patient?
Q. Yes.
A. Not to my knowledge. I don't remember. No.
Q. I was provided with a copy of one article yesterday. That is an article you reviewed, correct?
A. Sorry. I remember I was sent the bills. Yes. That -- that's another thing. I was sent the bills that was charged by the -- to the patient from the hospital.
Q. Okay. So the bills were the MedStar

Page 32

Washington Hospital Center medical bills?
A. Yes.
Q. Have you been provided with any medical bills other than MedStar Washington Hospital Medical Center?
A. No.
Q. Okay. And that --
A. I think it was for the nurse -- nursing and -- and the hospital.
Q. Okay. But you -- you don't perform type A aortic dissection surgery, correct?
A. (Shakes head from side to side.)
Q. So in terms of what medical bills and services are provided for that service -- for those services, that's beyond your area of expertise, correct?
   MR. JACKSON: Objection.
   You may respond.
   THE WITNESS: So I'm -- I'm the chairman of the neurosurgery at Insight Hospital. We deal with a lot of the business side of general ICU admissions, general surgery collections, nursing, and so forth.
   And for these, I do have general

Page 33

knowledge of -- of these cares that's provided, but for type A dissection, specifically that surgery, how much it costs, no.
BY MS. STURTZ:
Q. Okay. And you agree that he needed surgery for the type A aortic dissection, correct?
A. Again, I'm not -- I'm not a -- specialize in that area. I can't say. That's outside my expertise.
Q. So you don't have a way of saying -- because the treatment for type A aortic dissection is beyond your area of expertise, you don't have a way of saying whether the bills incurred at MedStar Washington Hospital Center were necessary.
   MR. JACKSON: Objection.
   You may respond.
   THE WITNESS: I -- the only thing I can say is the general knowledge of -- that I have from my expertise dealing with the business side of neurosurgery, our billing department for general ICU, general operating room, nursing, nurse -- and nursing needs for the patients, they look -- they look

9 (Pages 30 to 33)



Page 34

reasonable.

However, how much is that surgery cost, that is something that I have not seen before.

BY MS. STURTZ:

Q. Okay. So the extent of your opinions on the bills -- bills from MedStar Washington Hospital Center is that, to you, in a general sense, they appear to be fair and reasonable billing for those services that were provided?

A. Yes.

Q. Anything else that you reviewed other than what you've told me about?

A. No.

Q. I was sent one article yesterday, and I'll go into that in more detail later. Is there -- are there any other articles that you pulled other than the one article that was sent to me yesterday?

A. There is two or three articles that I reviewed while I'm writing the report.

Q. Okay.

A. I have not share it yet.

Q. Have you not shared those with Mr. Jackson

Page 35

yet?

A. (Shakes head from side to side.)

Q. Okay. And the article that you sent yesterday is -- is an article that you found after writing the report?

A. Yes.

Q. And did you just start searching for that article in getting ready for your deposition today?

A. Yes. That's correct.

Q. And what search did you perform and where to obtain that article?

A. (Audio disturbance.)

THE COURT REPORTER: I'm sorry. Say again.

THE WITNESS: PubMed, B-u-b-m-e-d {sic}.

THE COURT REPORTER: Thank you.

BY MS. STURTZ:

Q. And what search did you put into BubMed to obtain that article?

A. Type A aortic dissection.

MR. JACKSON: And I think PubMed, P as in Paul. P-u-b-m-e-d.

Page 36

BY MS. STURTZ:

Q. So you put into PubMed type A aortic dissection. Anything else?

A. And the relationship -- and the relationship to spinal cord infarction. So plus spinal cord infarction, plus cerebrospinal fluid drainage.

Q. And was the article that you provided yesterday one of several articles that came up in response to that search on PubMed?

A. That was one of the areas. One that I just opened, and I start the search after this one.

Q. The two or three other articles, I'm going to go ahead and have Laurie hold that open as Deposition Exhibit 2. And if you could please give those articles to Mr. Jackson and he'll send those to me.

A. (Nods head up and down.)

Q. What -- were those articles also that you got through a search on PubMed?

A. Yes.

Q. And do you recall what the search was on PubMed for those two or three articles?

A. The same.

Page 37

Q. Okay.

A. I think I didn't say type A. It was general aortic dissection plus spinal cord infarction, plus cerebrospinal fluid drainage.

Q. Do you have an understanding that there's a difference between a type A aortic dissection and a type B aortic dissection?

A. I know there is a difference, but again, it's not my expertise.

Q. So would you defer to a cardiothoracic surgeon on the difference between a type A aortic dissection and a type B aortic dissection?

A. Yes.

MR. JACKSON: Objection. You may respond.

BY MS. STURTZ:

Q. I think your answer was yes?

A. Yes.

Q. Were any other articles provided to you that pertained to your review of this case?

A. Yes. There was articles by the counsel that was revealed to me recently.

Q. So recently Mr. Jackson provided you with a



MAGNA
LEGAL SERVICES

Page 38

packet of articles that he had gathered?

A. I don't know exactly who gathered those articles, but I did not review them.

Q. So you're not relying on the articles that Mr. Jackson provided to you in forming your opinions in this case?

A. No. Those were just recently. I think a week ago. And I did not review them.

Q. Any other research other than what we've talked about?

A. No.

Q. Are there sources that you consider reasonably reliable for research into issues such as spinal cord infarctions?

A. Yes.

Q. What are some of those sources that you consider reasonably reliable?

A. The American Association of Cardiology and the American Association of Neurosurgery; both together.

Q. And they had journ--- both of those associations had journals; is that --

A. That's correct.

Q. So what is the American Association of Cardiology journal called?

Page 39

A. That was one of the articles that I pulled, and I forgot what that journal called.

Q. Okay. So my question to you is just more a general one. If you were -- you know, are there certain sources that you use in your practice? If you have a question about something like spinal cord infarctions, what sources do you use to get some answers?

A. Usually the best thing to use is the main guidelines that's done, you know, after multiple studies, which is usually the guide--- the guidelines that's made by the American Association of Cardiology, the American Association of Neurosurgery.

If that -- if that disease that happened is extremely rare that there is not much under my studies to really decide which -- which way to proceed with, I look to several study -- the studies, and then I go -- you know, make -- make an opinion as -- after studying all these results.

Q. As a neurosurgeon, what does this neurological exam indicate to you: Awake, alert, and oriented to person, place, and time, cranial nerves 2 through 12 are grossly

Page 40

intact; sensation to light touch intact; normal focal motor deficits, strength and sensation are intact without any focal deficit?

A. That's a normal neurosurgical examination.

Q. Have you ever spoken to Mr. Welch?

A. No.

Q. Have you spoken to any of his treating health care providers?

A. No.

Q. Have you spoken to any other experts in this case?

A. No.

Q. There was a -- something --

Do you know what a life care plan is?

A. Yes. It was sent by Mr. Jackson to me. However, I didn't review it.

Q. Okay. And you've never spoken to Dr. Kaplan?

A. No.

Q. So you don't intend to offer opinions at trial as to what, if any, Mr. Welch's future care needs are; is that correct?

A. If I'm -- unless -- not up to this moment unless I'm asked to provide -- I'm asked this

Page 41

question later.

Q. Okay. But sitting here today, you haven't formed any opinion as to -- and don't intend to testify at trial as to Mr. Welch's future care needs; is that correct?

A. Sorry. Can you ask me the question again?

Q. Yeah.

Sitting -- you haven't, to date, formed any opinion as to Mr. Welch's current or future care needs, correct?

A. (Nods head up and down.)

Q. And that, in part, is because that would be outside your area of expertise; is that correct?

A. That's inside my area of expertise if I am asked that question. And that would depend on the facts as presented, his record that I didn't review yet.

So if I'm asked this question before the trial and I am provided with the fact -- all the facts that I need and all the medical records, I can provide that prognosis from neuro--- neurological perspective only.

Q. By a neurosurgical perspective only, correct?

A. And -- and -- I -- what do you mean? Sorry.

11 (Pages 38 to 41)


MAGNA
LEGAL SERVICES

Page 42

Q. Well, let me break it -- ask you this way: You are not a cardiologist or cardiac surgeon, correct?

A. Correct.

Q. So in terms of what, if any, future care needs Mr. Welch has --

A. Only --

Q. -- related to his aortic dissection and repair of that, that would be beyond your area of expertise, correct?

A. Correct.

Q. And you're not a neurologist, correct?

A. Correct.

Q. So to the extent Mr. Welch has any current or future care needs related to neurology, that would be beyond your area of expertise, correct?

A. It depends. What's -- what's the disease? Is it for on this example -- on this specific matter where spinal cord infarction led into his problem? Weak --
     Neurosurgeons are qualified to give opinions on a prognosis and -- and what's -- what's the need for this patient -- what's the future needs for this patient.

Page 43

However, I -- from -- from an aortic dissection perspective, for that, I don't know.

Q. Okay. But you don't, as part of your practice, follow patients after they undergo surgery for a type A aortic dissection, correct?

A. For -- for type A, no.

Q. For any aortic dissection -- you don't follow patients to see how they're doing and what their needs are after they've suffered an aortic dissection, correct?

A. I'm not a cardiothoracic surgeon.

Q. Okay. And as a neurosurgeon, your role with patients is you perform neurosurgery on them, correct?

A. Right.

Q. But you don't follow patients for years after they undergo neurosurgery, correct?

A. That's not true. They become my patients. In fact, I follow them -- I have -- one of my patients I have been following since I started here.

Q. And you would follow them from a neurosurgical perspective, but if they had

Page 44

other care needs, those would go to other specialists; is that correct?

A. That is correct.

Q. And you're not a -- well, strike that.
     Is there anything else --
     Because when I ask some questions then some other things pop out.
     Is there anything else about Mr. Welch that you have reviewed other than what we've talked about?

A. I don't feel we talked about anything yet.

Q. No; just in terms of what you reviewed. I'm just trying to get what you reviewed.
     I'll tell you -- the list I have so far is that you've reviewed the medical records only from his hospitalization at MedStar Washington Hospital Center. You reviewed three deposition transcripts. You've reviewed the MRI brain and spine imaging.
     You've reviewed bills from MedStar Washington Hospital Center. You have reviewed initially two or three articles and one more, and you had been provided with the life care plan and some other articles that

Page 45

you have not reviewed.
     Is there anything else that you've reviewed other than that?

A. You said the deposition, right?

Q. Right. Yes.

A. Yes. That's it.

Q. Okay. All right. I'm going to ask you before we get into the details of your report just some questions about your expert witness work.
     When did you start doing expert witness work?

A. This year.

Q. So in the beginning of 2024?

A. Yes. Yes. January.

Q. And why did you start expert witness work this year?

A. One of my friends told me that it's a -- it's something that's really good to increase our knowledge about.

Q. Okay. And since starting this work the beginning of this year, what -- how many cases have you reviewed?

A. Four.

Q. Were any of those cases also referred to you

12 (Pages 42 to 45)



MAGNA
LEGAL SERVICES

Page 46

by Mr. Jackson or --

A. No.

Q. -- anyone in his firm?

A. No.

Q. And do the other four cases involve an aortic dissection?

A. No.

Q. Are -- were the other three cases on behalf of the plaintiff or the defendant?

A. Three plaintiff and one defendant.

Q. Are the other three cases cases that are in Illinois, or are they outside of the State of Illinois?

A. One of them in Washington, D.C., and one in Wisconsin.

Q. And do you have --

A. And one in Illinois.

Q. Okay. And you have one -- so this case is in Washington, D.C. You have one other one that's in Washington, D.C.?

A. Yes.

Q. And what is the -- the -- in general, what is the subject of the other Washington, D.C., case?

A. It's -- I -- a bleeding pressing on the

Page 47

spinal cord.

Q. And is that case that you are reviewing on behalf of the plaintiff?

A. That is the defendant.

Q. Do you recall the name of the defense attorney you're working with?

A. No.

Q. Is it bleeding on the spinal cord after surgery?

A. Yes.

Q. Do you know if your deposition is scheduled in that case?

A. No. I just started reviewing it.

Q. Have you yet formed an opinion as to whether --

Well, let me ask you this: Is that -- in that case, is your -- were you asked to perform an opinion about standard of care, or causation?

A. Standard of care.

Q. And is that because that case involves a spine surgeon?

A. That's correct.

Q. And have you formed an opinion one way or the other yet as to whether there was

Page 48

compliance --

A. No.

Q. -- with the standard of care?

A. Not yet.

Q. Do you advertise your services with different groups?

A. Yes.

Q. And did that include SEAK?

A. Yes.

Q. And JurisPro?

A. Yes.

Q. And LexVisio?

A. Correct.

Q. Any--- anywhere else?

A. There is a -- one called Neurology -- Neurology Legal -- I'm sorry. I don't remember the name. They called me three days ago. They said if I would like to put my name with them.

Q. Do you pay each one of those groups a fee for them to list your name as an expert?

A. For the other -- for the three that you mentioned, yes, there's a fee. For the last one that I told you about, it was free.

Q. Okay. And what is the -- you have a

Page 49

recollection of what the fee is to list your name as an expert with SEAK?

A. It's between 200 to 500.

Q. And is that a similar range for JurisPro and LexVisio?

A. Yes.

THE WITNESS: May I please excuse myself for two minutes? I need to answer something for the hospital.

MS. STURTZ: 100 percent. We can just go ahead -- want to take a five-minute break? Everyone can take a quick bathroom break and we'll reconvene in five minutes. If you need longer, that's not a problem, Doctor.

THE WITNESS: Thank you.

(Whereupon, a brief recess was taken.)

BY MS. STURTZ:

Q. All right. Great.

Doctor, I believe your fee for review is $600 per hour; is that right?

A. Not -- $900 per hour.

Q. Oh. $900 per hour.

Okay. And do you charge a higher

13 (Pages 46 to 49)


MAGNA
LEGAL SERVICES

Page 50

rate for depositions than for review?

A. Yes.

Q. What is your rate for deposition?

A. 1500 an hour.

Q. And what is your rate for trial appearance?

A. I think it depends. There's half day and one day. For a half day -- if it's something that don't need travel, I just need to book a half day, then it's usually 6,000. And if it's one day that I need to travel somewhere and take my whole day, then it's 12,000.

Q. So if there was a trial in Washington, D.C., that would be one considered to take a whole day and your fee would be $12,000.

A. For -- for the trial itself, yes; without expenses of preparing for the trial and the traveling expense.

Q. Okay. And how many hours would you say you've spent reviewing the case to date?

A. I think it was 12 hours. So review the case and write a report.

Q. Okay. So you spent 12 hours. And I think the report was written in February of 2024 --

A. If that's --

Q. -- right?

Page 51

And so you -- what you're telling me is that the work leading up to and including the writing of the report was about 12 hours?

A. Yes.

Q. And how much time have you spent on the case since writing the report in February?

A. Preparing for this deposition, and I think it took, so far, around three hours.

Q. Okay. And then there was some time -- the three hours, does that include reviewing the additional material you were provided with, like the depositions?

A. Yes.

Q. Okay. So all total, about 15 hours you spent on the case so far?

A. Yes. Correct.

Q. And given the date of the report is February 29th of 2024, when did you think you were first contacted about this case?

A. I'm not sure about exact dates.

Q. Well, would it --

A. I would say --

Q. Would it be January because you started reviewing cases in January of 2024?

Page 52

A. No, it's not January yet. It was -- I would say around maybe two weeks before.

Q. Okay. So if the report is February 29th, you were probably contacted sometime earlier in February of 2024?

A. Yes. Around mid February.

Q. And were you contacted by Mr. Jackson?

A. Correct.

Q. And did you review the complaint in this case?

A. No.

Q. Did he tell you what the case was about when he contacted you?

A. He told me spinal cord infarction after an aortic dissection surgery.

Q. Okay. And, again, we've -- we've already figured out that you're not going to be offering any standard of care opinions in this case; is that correct?

A. That's correct.

Q. And were you asked by Mr. Governor {sic} to comment on causation related to the spinal infarct when he first contacted you?

A. Correct.

Q. And, so, your opinions in this case on

Page 53

causation and damages are limited to the spinal infarct; is that correct?

A. That's correct.

Q. Okay. And just bear with me for a moment. I'm looking through some notes.
So the one article, I don't know if you have that in front of you, that was just provided yesterday?

A. No, I don't have it.

Q. Okay. I can try to pull it up and share screen, but I don't know that that will be necessary.
This was an article that was published by the Society of Thoracic Surgeons. Do you recall that?

A. I review a lot of articles on a daily basis, but I don't remember this exactly.

Q. Okay. Assuming it was published by the Society of Thoracic Surgeons, you're not a member of that society, correct?

A. No.

Q. So it states here in patients with operated type A aortic dissection, irreversible spinal cord injury may result from several factors; prolonged circulatory arrest, extension of



Page 54

replacement, and hypoperfusion of segmental arteries, secondary to the aortic false lumen thrombosis.

Do you agree with that statement, Doctor?

A. Again, I can just provide opinions on -- on neurosurgical opinions. I can't provide anything about aortic dissection and how aortic dissection causes the spinal cord infarction. I can just provide that there is now spinal cord infarction; how we can manage that.

Q. Okay. Do you -- or if it's beyond your area of expertise, let me know, but do you agree that spinal cord infarction is a known and recognized complication of a type A aortic dissection?

A. Yes.

MR. JACKSON: Objection.

You can respond.

BY MS. STURTZ:

Q. Yes, you agree?

A. I -- I agree that spinal cord infarction is a widely known risk for aortic dissection.

Q. And do you agree in this case that the spinal

Page 55

cord infarction was a complication of aortic dissection in surgery?

MR. JACKSON: Objection.

You may respond.

THE WITNESS: I think it was -- it's hard to say whether it was a complication of the surgery or not because the -- the deficit of patient started to happen on June 17th, as I remember. And the surgery, I think it was June 15th or 14, around that time.

So it's hard to say whether this is an introverted complication or no, but when they examined him on June 17th, that's where -- where -- which is around two days from the surgery, that's where they discovered his weakness.

Q. Okay. Well, the whole -- one of the whole points of this article is there can be delayed onset of postoperative --

A. Yes.

Q. -- findings suggestive of a stroke after aortic dissection repair, correct?

A. Right.

Q. So just because the findings were after the

Page 56

surgery -- or a few days after surgery does not mean that the etiology of the stroke was not the surg--- the injury and the surgical repair, correct?

MR. JACKSON: Objection.

You may respond.

THE WITNESS: May you please repeat your question.

BY MS. STURTZ:

Q. The timing of the -- the finding, the lower leg weakness, being on June 17th does not mean that the spinal infarct etiology isn't the injury and the surgical repair for the dissection.

MR. JACKSON: Objection.

You may respond.

THE WITNESS: This is -- this is hard to say because I did not see on -- I did not see an appropriate neurological examination that was done right after the surgery due to the patient's status at the time. I think he was intubated. It was hard to get a really good neurologic examination from him right after the surgery.

The only really comprehensive

Page 57

neurological examination --

THE COURT REPORTER: Hold on. Hold on. Hold on.

MS. STURTZ: I can't -- somebody --

THE COURT REPORTER: Yeah.

MR. JACKSON: Sorry. That was my background. Yeah. It was a door opening. Reask the question. I apologize.

THE COURT REPORTER: Or if you can pick up from "The only really comprehensive neurological examination."

THE WITNESS: The only comprehensive neurological examination was -- that I remember I saw was on June 17th; that's where -- when they discovered extreme, severe weakness in his lower limbs. I didn't see any lower limbs examination that was done right after the surgery. So it's really hard to say.

MS. STURTZ: Yeah.

BY MS. STURTZ:

Q. Let me ask it this way: You don't have an opinion one way or the other as to when the spinal infarct occurred, correct?

MR. JACKSON: Objection.

15 (Pages 54 to 57)


MAGNA
LEGAL SERVICES

Page 58

You may respond.

THE WITNESS: Correct. To say a specific time when this happened, it's very hard to say.

BY MS. STURTZ:

Q. Okay.

A. This can be during the surgery or it can happen after the surgery.

Q. In this case, you don't have an opinion to a reasonable degree of probability one way or the other when the spinal infarct occurred, correct?

MR. JACKSON: Objection as to form.

You may answer.

THE WITNESS: The only thing we -- we have scientifically that he had this weakness on June 17th documented, and that is the only date that I can say that's likely he had a spinal infarction. More likely than not June 17th.

Now, whether he had it before or no, I can't provide a -- an opinion for that.

BY MS. STURTZ:

Q. Okay. And you are not going to come into trial and testify that the spinal infarct was

Page 59

not caused by the -- the type A aortic dissection and the surgical repair, correct?

A. So aortic dissection, in general, has risk to -- to do spinal cord infarction. So I don't understand your -- your question here.

Q. Right.

You're not going to tell the jury in this case that his spinal infarct was not caused by the dissection and the surgical repair, correct?

MR. JACKSON: Objection.

You may respond.

THE WITNESS: Spinal cord infarction was not caused by the surgical repair. That's -- I -- I think the spinal cord infarction happened with the postoperative care for the patient.

BY MS. STURTZ:

Q. I -- my question to you was -- and I thought you said you don't know, but let me back up again.

Do you agree to a reasonable degree of probability that Mr. Welch's spinal cord infarction was caused by the aortic dissection and the repair of that, or do you

Page 60

not know?

A. I don't -- I don't think you understand what's spinal cord infarction for him.

So the spinal cord infarction can happen due to so many reasons. One of them is aortic dissection because it will decrease what we call the spinal cord perfusion pressure.

Q. Okay.

A. And to say exactly when that spinal cord infarction perfusion pressure decreased, whether it's inside the surgery or after the surgery, it's really hard to tell because there is no neurological examination done on the patient until June 17th.

Q. Okay. So you agree that a spinal cord infarction is a well-known complication of surgery for an acute type A aortic dissection, correct?

A. It's a known rare complication.

Q. And, in this case, you agree that his --

Well, you agree that he had a spinal cord infarct, correct?

A. Correct.

Q. And you agree that the spinal cord infarct

Page 61

was a complication of the surgery for the acute type A aortic dissection, correct?

MR. JACKSON: Objection.

You may respond.

THE WITNESS: That's -- that's -- that's -- that's -- that happened during the postoperative care. Postoperative care is part of the -- of the surgery, in general. So if -- if that's what you mean, then yes.

BY MS. STURTZ:

Q. Okay. And I mean that in this case the spinal cord infarction is a -- was a complication of the aortic dissection and surgical repair that was detected during the ICU care, correct?

A. That's correct.

Q. The article that you sent has a sentence that says the patient underwent an emergency operation through a full sternotomy.

The -- do you agree the surgery in this case was an emergency operation through a full sternotomy?

A. Again, I can't comment about any approach of other specialities. All -- all -- my only knowledge is the spinal cord infarction and

16 (Pages 58 to 61)



Page 62

management.

Q. And, so, you don't even have an opinion as to whether the surgery he had underwent for the aortic dissection was an emergency surgery?

A. No. I can't provide an opinion for him what -- what is emergency and what is not emergency for other specialities.

Q. Okay. Do you agree that the aortic dissection was a catastrophic injury?

A. Aortic dissection is a known -- is a known live-or-die situation.

Q. What percentage of people who suffer an aortic dissection die?

A. I can't say that. I don't know.

Q. So you don't have any opinion as to what the mortality rate is for type A aortic dissection?

A. (Shakes head from side to side.)

Q. Do you have any opinion as to what the morbidity rate is for a type A aortic dissection?

A. No.

Q. Do you have an opinion as to what the complication rate is for a type A aortic dissection postoperatively?

Page 63

A. I -- I know about the spinal cord infarction part.

Q. You won't be commenting at all about any other complications that Mr. Welch suffered after the type A aortic dissection repair beyond the spinal cord infarct?

MR. JACKSON: Objection.
You may respond.
THE WITNESS: I can comment on the stroke in the brain that he had and the spinal cord infarction.

BY MS. STURTZ:

Q. Well, I asked you earlier if your opinions were going to be limited to the spinal cord infarct and you said correct because I'm a spine doctor.

A. I did not -- I did not say I'm a spine doctor. I'm a neurosurgeon.

Q. Okay.

A. Neurosurgery deals with the brain and spine. And infarction and the spinal cord, those are the same etiology that results in an infarction in the brain as well.

Q. So --

A. Sorry. I misunderstood your previous

Page 64

question.

Q. Right. I mean, I -- I said to you your causation in this -- opinions in this case will be limited to the -- the spinal cord infarct, and I believe your answer was yes.

A. That --

Q. Now you're going to testify about the spinal cord infarct and the brain infarct?

A. They both related. The cause of this infarct that happened in the brain and the spine, they related.

The one in the brain -- the one in the brain is different than the spine because the structure in the brain represent different areas than what the spine control, but they all related to each other. They the same causation.

Q. And -- and they all relate to the type A dissection and the surgical dissection, correct?

A. Yes.

Q. Do you have any understanding as to what the -- let me just make sure.

I thought I asked do you have any understanding what the complication rate is

Page 65

following the type A aortic dissection and surgical repair, and you said no, correct?

A. Yes. For infarction, brain or spine, especially the spinal cord infarction, it's more study in the literature, and for spinal cord infarction for type B -- type B and type C are more common than type A.

Q. So do you have a -- an opinion to a reasonable degree of probability as to what the complication rate is for infarctions after a type A aortic dissection and surgical repair?

A. It's between 1 to 3 percent. That's the last I read.

Q. Do you agree that the postoperative 30-day mortality rate for a type A aortic dissection and surgical repair is up to 35 percent?

A. Again, I can't -- I don't know -- I can't comment about type A dissection morbidity and mortality other than the one related to the spinal cord infarction itself.

Q. Do you agree that a type A aortic dissection is associated with a high morbidity rate with a range of postoperative sequelae, including stroke, prolonged intubation, ischemia, and



Page 66

renal failure?

A. I can't comment on that. Again, the only thing can I comment on is -- is the infarction.

Q. The spine infarction?

A. The brain and spinal infarction.

Q. Okay. Do you have an opinion as to -- or an understanding as to what the data suggests about the long-term survival rate after a type A aortic dissection with surgical repair?

A. No.

Q. Will you be offering any opinion in this case as to Mr. Welch's life expectancy having suffered a type A aortic dissection and surgical repair?

A. No. I only can provide prognosis on the spinal cord infarction itself.

Q. Did you review the imaging of the aortic dissection that, I believe, was through a CT scan?

A. No.

Q. Do you have any understanding as to the size of the aortic dissection?

A. No. I -- I have no knowledge or expertise in

Page 67

aortic dissection.

Q. So the article that you sent called Delayed Onset Postoperative Paraplegia in Acute Type A Aortic Dissection, why did you believe that this opinion -- this article supports your opinion?

A. No. It was -- one of the deposition that I reviewed was for the ICU doctor, and he said that aortic -- sorry.

That spinal cord infarction does not happen with type A aortic dissection. So that -- that's why this article is there.

Q. Did he say that infarction did not occur, or that they typically do not use a lumbar drain for type A aortic dissection?

A. No. He said it's unusual to have a type A dissection with a spinal cord infarction. That's what I --

Q. Do you have --

A. -- remember.

Q. Do you have -- do you have an opinion as to whether a spinal infarct is more or less -- with a complication rate -- strike that.

Do you have an opinion as to whether the complication rate of a spinal

Page 68

infarction is higher or lower with a type A compared to a type B?

A. Type B is more common to have spinal cord infarction than type A. However, it's a known complication that can happen after any aortic dissection. Recognizing this promptly can avoid a lot of harm to the patient.

Q. Okay. So the article that you provided includes the use of a cerebrospinal fluid drainage?

A. Cerebrospinal fluid drainage.

Q. And in this particular case study, that drainage was used, correct?

A. Correct.

Q. Is that the type of drainage that you believe may have provided some benefit in terms of sequelae from the spinal infarct?

A. Yes. You can drain the cerebrospinal fluid through -- through either the cranial part or the lumbar part. I think in that article is the lumbar part.

And that's what I agree with given the -- the spinal cord infarction that he had. So it's a lum---

Q. Okay.

Page 69

A. It's a lumbar drain.

Q. Okay. So, again, whether in lumbar -- whether the standard of care required the use of a lumbar drain in this case, is that something you're going to be testifying to? Correct?

A. Standard of -- standard of care -- I'm only -- asked by Mr. Jackson to provide an opinion on causation only.

Q. Correct.

So you're not going to testify at trial that the standard of care required the use of a lumbar drain. Your opinion at trial is going to be limited to that a lumbar drain may have provided some benefit in terms of the residual effects of the spinal infarct, correct?

MR. JACKSON: Objection.

You may respond.

THE WITNESS: That's up to the moment now. If I'm asked by the counsel later on to provide an opinion about standard of care, I can.

BY MS. STURTZ:

Q. Yeah. It doesn't really work that way. You

18 (Pages 66 to 69)


MAGNA
LEGAL SERVICES

Page 70

aren't -- you aren't designated as an expert on standard of care. And this is my one and only time to talk to you before trial.

A. Oh.

Q. So I just wanted to make sure that when you're talking about the lumbar drain, you are talking about it solely in the extent of that this may have been something that would have -- could have provided some benefit to the patient, correct?

A. Correct.

MR. JACKSON: Objection.

You may respond.

BY MS. STURTZ:

Q. But you cannot testify to a reasonable degree of probability that the placement of a lumbar drain would have led to a different outcome for Mr. Welch in terms of the spinal cord infarct. That's too speculative, correct?

A. Placement of cerebrospinal fluid, as indicated in many research and many of the culture and studies, prevent these worse outcomes for the patient, and that's why we place them.

Q. But you can't state in this case, to a

Page 71

reasonable degree of probability, that the placement of a lumbar drain would have prevented any residual deficit from the spinal cord infarct, correct?

MR. JACKSON: Objection.

You may respond.

THE WITNESS: To the degree of medical certainty, more likely than not it would have prevented.

BY MS. STURTZ:

Q. And what are you -- well, let me -- let me back up for one second.

The article that you provided, they placed a drain, correct?

A. Correct.

Q. And after four days, there was no improvement in the incomplete paraplegia for that patient, correct?

A. He -- he -- so the -- the -- the -- the placement of a lumbar drain and the outcome -- some -- it's like any surgery; some people do improve, some people partially improve, some people totally recover.

Q. Okay.

A. In this article, they partially im--- they

Page 72

ended partially improving. They did not improve completely. However, they partially did improve.

Q. Okay. Well, let me -- you don't disagree with this -- this sentence: They put the drain in. After four days, incomplete paraplegia persisted despite low intracranial pressures and the drain was removed, correct?

A. I -- I -- I don't recall all the -- all the facts of this article. And all I remember was the conclusion was partial improvement.

Can you read the conclusion for me?

Q. Sure. Let's see.

Oh. It says -- it says delayed paraplegia and partial arch placement is almost unpredictable.

Do you agree with that sentence?

A. Sorry. Can you repeat?

Q. Delayed paraplegia and partial arch replacement is almost unpredictable.

A. Partial what?

Q. Arch.

A. Partial arch --

Oh. The -- the -- from an aortic standpoint.

Page 73

Q. Yes.

MR. JACKSON: And for clarification, that's a sentence in the conclusion. That isn't the whole conclusion --

MS. STURTZ: Yeah.

MR. JACKSON: -- in the article.

MS. STURTZ: Right.

BY MS. STURTZ:

Q. I'm just asking if you agree with that sentence, or is that beyond your area of expertise?

A. That part is -- that part is beyond my area. My area is just the lumbar drain and the partial improvement that happened.

Q. Okay. And it does -- it says the CSF drain was immediately positioned at the onset of symptoms, but only with partial benefit.

A. Correct.

Q. So, in this case, is it -- you don't know whether a drain would have been full benefit, partial benefit, or no benefit, correct?

A. Anything in medicine we do after balancing risks versus benefit, we don't -- we can't ever -- there is -- no doctor would tell you

19 (Pages 70 to 73)


MAGNA
LEGAL SERVICES

Page 74

there is a 100 percent probability that someone can benefit with doing something.

We practice the science and what most likely going to help the patient. It's hard to say after that whether a patient 100 percent going to benefit or no.

Q. Right.

You don't -- it would be too speculative for you to say in this case that the placement of a lumbar drain would have been full -- full benefit, partial benefit, or no benefit, correct?

MR. JACKSON: Objection.

You may respond.

THE WITNESS: That -- that -- that's not true because now you are basing the fact on one article only. There was many articles in the literature that says the patient have complete resolution day one after placement of a lumbar drain.

And those articles not one or two. Those articles are many.

BY MS. STURTZ:

Q. Okay.

A. And they provided in the references in these

Page 75

articles -- two or three articles that I reviewed earlier, and they -- they talk about complete resolution of symptoms. So I can't base what would be the outcome on one article that they had partial improvement there. There's many --

Q. Okay.

A. -- in the literature with a complete resolution.

Q. So the other articles, are those the two and three that you haven't provided to me yet that you're referring to? And do those involve a type A aortic dissection, or do you not remember?

A. I don't remember. They talk in general about aortic dissection and spinal cord infarction, and how we manage spinal cord infarction if that happens.

Q. Okay. So my question to you is: In this case, you would agree with me that you cannot state to a reasonable degree of probability that the placement of a lumbar drain would have resulted in complete resolution of the -- of any lower extremity weakness for Mr. Welch, correct?

Page 76

MR. JACKSON: Objection.

You may respond.

THE WITNESS: Not true. That's not true. So the -- the -- the hole of the lumbar drain is to increase what we call the spinal perfusion pressure; increase the blood flow to the spinal cord.

And how you can reach that by decreasing the pressure inside the spinal cord; how you can do that by inserting the lumbar drain.

So inserting a lumbar drain will enhance the -- what we call is the spine perfusion pressure; the blood reaching all the tissue inside Mr. Welch's spinal cord.

And if we would have done that, I would think that to a medical -- to a reasonable degree of medical certainty, more likely than not, that he might have a complete resolution of his symptoms.

Given all the --

BY MS. STURTZ:

Q. He might have had no resolution of his symptoms, correct?

MR. JACKSON: Object to form.

Page 77

BY MS. STURTZ:

Q. Or only partial resolution, correct?

A. Very less likely because the articles and the literature, they do agree that insertion of lumbar drain does enhance the spinal cord perfusion and does result with resolution of patient's symptoms, and there was at least a partial improvement.

Q. Okay. What facts are you relying upon to state that, in your opinion, there would have been -- is it some resolution of his symptoms with a lumbar -- placement of a lumbar drain?

A. These articles that I refer to, they guidelines for -- for us doctors. Those are articles that they created. They got all their results from multiple and multiple studies that were done.

Q. Okay.

A. Those I can provide to you after -- after the -- I can provide to Mr. Jackson after the call, but those articles very clearly mention the benefit of lumbar drainage in patients with spinal infarction.

And many of these present many cases that shows complete resolution of



MAGNA
LEGAL SERVICES

Page 78

patient symptoms. The main fact that we produce articles got their basis on -- is based on this simple equation: Spinal perfusion pressure is equal to mean arterial pressure minus the intraspinal pressure.

As much as you can, whenever you decrease the intraspinal pressure by draining that fluid, the more -- the spinal perfusion of pressure is more, which is great. It can -- goes through all the tissue in the spinal cord and prevent that infarction from happening.

But when we do not decrease the intraspinal pressure, that means that number of the cerebral perfusion pressure in that equation goes low. When it goes low, infarction can happen.

Q. Okay.

A. That's the main basis fact; that equation for all these articles.

Q. Okay. And all these articles, just so we're clear, it's my one chance to find out everything, is the -- the one article you provided yesterday, and two or three articles that we are going to -- you're going to get

Page 79

to Mr. Jackson, correct?

MR. JACKSON: Objection.

You may respond.

THE WITNESS: I'm still working on the case. And I can -- if I'm asked to do more research and provide more articles, I would -- do provide more articles upon request.

BY MS. STURTZ:

Q. Okay. But sitting here today, when you say "the literature," what you're telling me is you have formed your opinion based on the literature, which is -- that you've done till today, which is the one article and then the other two or three articles that you're going to provide to me, correct?

A. That's correct.

MR. JACKSON: Objection.

BY MS. STURTZ:

Q. And how many times have you placed a lumbar drain in a patient after a type A aortic dissection and surgical repair? Have you ever done that?

A. Yes. We do -- we -- we do see patients with spinal cord infarction after multiple spinal

Page 80

cord injuries. And those are managed the same way as aortic dissection. That's now.

Before I join Insight, I did place one time, I -- I think, in -- as an attending, and the few times as a resident a drain for a aortic dissection specifically.

However, lumbar drain in general -- placement of a lumbar drain in general, whether after aortic dissection or no, this is a very common procedure that's done on a weekly basis for neurosurgeons.

Q. Okay. So are you, as a neurosurgeon, the one who actually places in the lumbar drain, or is that done by a different specialist?

A. Usually it's either the neurosurgeon himself or an interventional neurologist, who is trained to do that kind of procedure.

Q. Okay. And, so, at your current position at Insight where you have been since 2021, you have never placed a lumbar drain in a patient who suffered an aortic dissection and had surgical repair; is that correct?

A. Not at this hospital because this specific hospital we don't have a cardiothoracic surgeon.

Page 81

Q. Okay. And when you had your position in Lafayette from 2020 to 2021, you did not place a lumbar drain in any patient who suffered a type A aortic dissection and surgical repair, correct?

A. I did for one.

Q. You earlier said you did for one, you thought, back to -- at the time of your residency.

A. That's not true. I said -- you can go to my deposition writing. I said one earlier on before Insight, and a few in the residency.

Q. Okay. So one time when you were in Lafayette you placed a lumbar drain in a patient who had suffered a type A aortic dissection and had surgical repair for that --

A. Correct.

Q. -- correct?

And was that -- what was the -- the reason for the placement of the drain?

A. Spinal cord infarction.

Q. And what was the outcome of the -- did the patient have any residual neurologic deficits after --

A. Yes. He --

21 (Pages 78 to 81)



Page 82

Q.   Did the patient survive the surgery and postoperative time period?

A.   Yes, he did.  And he had a partial improvement, not full improvement; that specific patient.  I think he went from power one and two to three or four.  I don't remember exactly.

Q.   What does power one and power three to four mean?  Does that -- on the out-of-five scale?

A.   Yes.

Q.   Okay.  And, in this case, what was Mr. Welch's --
     Was it the left side of the lower extremity weakness that he had on June 17th?

A.   What I remember -- the notes are different, right?  Some people run the power one, some people run the power two, but, to my knowledge, what I remember, it was weaker on the left side.  He had weakness on the right as well, but the left was more dense.

Q.   Okay.

A.   I recall some of them calling it zero out of five and some of them called it one out of five.

Q.   And what was it by the time he left MedStar

Page 83

Washington Hospital Center on both the right and the left?

A.   I was not asked to review that.

Q.   But you reviewed the records, right?  You have the records from MedStar Washington Hospital Center.  Did you note anywhere in the records as to whether there was any improvement at any point in time in terms of the power of his lower extremities, right or left?

     MR. JACKSON:  Objection.
     And, Doctor, you can review the records.  There's over 4,000 pages of medical records.  It's not a memory test.  So if you need to review the records for a specific date, please do so.

BY MS. STURTZ:

Q.   So my question to you just -- Doctor, was do you recall whether you -- you -- when you reviewed the records whether you took any notes -- whether you noted whether his lower extremity weakness got worse, stayed the same, or got better during his time in the ICU?

A.   From what I remember, that he got better.  I

Page 84

don't remember how much better he got, but I remember he got better.

Q.   Do you -- your recollection from the review of the records is that his lower extremity weakness improved while he was in the ICU?

     MR. JACKSON:  Objection.
     You may respond.
     THE WITNESS:  Sorry.  Can you repeat the question again?

BY MS. STURTZ:

Q.   Your recollection from review of the MedStar Washington Hospital records is that his lower extremity weakness at the time of discharge was improved from June 17th of 2022.

A.   Before I do that, I need to review the -- I need to review it again.  I don't remember.

Q.   You don't remember.
     Okay.

A.   For the ICU, no.
     MR. JACKSON:  I'll object, Counsel.  If you want to show him the note from June 17th and the discharge summary, which I plan to do in my redirect to clear this up, again, it's not a memory test.  It's 4,000 records, but --

Page 85

     MS. STURTZ:  I didn't ask him to -- to memorize it.  With all due respect, you're --
     MR. JACKSON:  You're in the effect of asking him to recall from memory based on viewing 4,000 plus records in terms of different --
     MS. STURTZ:  I just asked if he remembered.

BY MS. STURTZ:

Q.   It's perfectly acceptable for you, Doctor, to say you don't remember; that's fine.  And then if I choose in my deposition to -- to pull that up, I'll do that.
     So I kind of got off track.  We can take a look at it.  What we were talking about was the one patient.  Now you said there were several patients, you think, during your residency where you placed a lumbar drain in a patient after a type A aortic dissection and repair.
     Do you recall what the reasons were -- do you recall how many times in your residency?

A.   No.

22  (Pages 82 to 85)


MAGNA
LEGAL SERVICES

Page 86

Q. Did you answer something? I'm sorry.
A. I said -- I answered.
Q. I'm sorry. I just didn't hear what you said.
   Did you say you don't recall how many?
A. I don't remember.
Q. Okay. And do you recall the -- the reasons for the placement of lumbar drain, or that -- you just don't recall?
A. The reason was spinal cord infarction.
Q. Okay. And do you recall if there was no improvement, partial improvement, or full improvement after the placement of those drains?
A. I don't remember what -- the specifics of the patient, but I recall most of them had improvement after the placement of the lumbar drain.
Q. But whether it was partial or full, you don't remember?
A. I don't remember because the main goal was to really measure the spinal perfusion pressure and enhancing the spinal perfusion pressure.
   It's the equation that I provided you before. Spinal perfusion pressure equals

Page 87

mean arterial blood pressure minus intraspinal pressure. And you can't really know the spinal perfusion pressure for a patient after aortic dissection unless you insert the lumbar drain.
   So the lumbar drain here serves as diagnostic management tool, and as a treatment for the patient.
Q. Perfect.
   And what are the risks of the placement of the lumbar drain in a patient who suffered an aortic dissection and surgical repair?
A. Lumbar drain, in general, is a very common procedure; carries a low risk, in general. The risks are like any procedure; comes from infection, bleeding, nerve injury, which is extremely rare. Those are the -- the common ones, but they -- in general, very extremely rare.
Q. Can the placement of a lumbar drain impact the fluid level to the brain?
A. So a placement of the drain enhances the perfusion of pressure to the nerve tissues.
   Now, what's your question?

Page 88

Q. Can the placement of a lumbar drain have a negative effect on infarctions in the brain?
A. No.
Q. Can it have a --
   Okay. Dr. Hamilton is the plaintiff's stroke expert in this case, and he testified that Mr. Welch was not a candidate for EBT or TPA therapy at any point in time postsurgery.
   Do you agree, or is that beyond your area of expertise?
A. I do agree with him.
Q. Okay. Do you have any opinion in this case as to what caused the dissection?
A. No.
Q. Did you answer?
A. No. Yes, I did.
Q. Okay. Sorry.
   Do you know what types of things can cause lower extremity weakness following a type A aortic dissection and surgical repair?
A. The first thing is -- is exactly what the doctors of his team thought. So you can't see it, as a neurologist, as I see a doctor

Page 89

looking at their notes that they think it's spinal cord infarction. I do agree with them. I do -- I would think it's spinal cord infarction.
Q. So what other things would be on the differential, or is that beyond your area of expertise?
A. Having upper limb -- his upper limb is strong, and his lower limb being the issue, that would be spinal infarction, by far, number one.
Q. Anything else on the differential?
   My question was -- I understand they had it on their differential, but is there anything else that would be on your differential --
A. No.
Q. -- as to what could cause lower extremity weakness following type A aortic dissection and surgical repair?
A. Stroke in the brain in an area that only controlled the lower limbs. And that -- that would be the -- the second one, but -- but due to -- you know, after aortic dissection was only lower extremity, by far is spinal



Page 90

cord infarction.

Q. Okay. So I did -- I do see the discharge documentation. It says motor mus--- musculoskeletal, four out of five BUE. That's bilateral upper extremity strength, right?

A. Yes.

Q. And two out of five for LLE strength, and four out of five for RLE strength.
Do you know whether the numbers of two and four are better than they were on the 17th?

A. Can you repeat the question?

MR. JACKSON: Objection.
You may respond.

THE WITNESS: Sorry. Please repeat it.

BY MS. STURTZ:

Q. It's two out of five on the left side and four out of five on the right side.

A. Okay.

Q. Do you recall -- do you know if that's better, the same, or worse than it was on the 17th?

A. What was --

Page 91

MR. JACKSON: Objection.
You may respond.

MS. STURTZ: Why is that an objection? I'm -- I mean, I think -- I'm trying to find the notes, but....

MR. JACKSON: If you would -- Counsel, the reason it's an objection is because you're admitting facts in evidence that are not a part of the question. So it's -- it's an unfair and improper question.
If you want to ask him if the numbers on June 17th are X, Y, the numbers on discharge date are X, Y, do you have an opinion as to they're better or worse, that's the question, I think, you want to ask him and want to know the answer to, but rather than trying to fumble through numbers in his head to what's better or worse is the basis of the objections.

MS. STURTZ: No. I'm just asking if he -- what --

BY MS. STURTZ:

Q. Well, do you remember what his -- his lower extremity scores were prior to the date of discharge?

Page 92

I understand -- and it's okay if the answer is no, you know, because I -- and I'll try to pull it up.

A. I don't remember.

Q. Okay. Do you recall if there's any variability in the medical records in terms of what his lower -- lower left-leg movement and level of strength were?
And if you don't --

MR. JACKSON: Objection.

BY MS. STURTZ:

Q. -- remember, that's fine.

A. Yes, I do remember. Some of them say it's zero, some of them say one, but, you know, zero, one, two, three, the bottom line is this is very weak leg, and that's what we care about here.

Q. Okay. What do you -- do you agree that in terms of the spinal infarct it was a single embolic stroke at T5?

A. Single -- single embolic stroke?

Q. (Nods head up and down.)

A. What do you mean?

Q. Well, what type of stroke did he have on the imaging that you reviewed in the spine?

Page 93

A. He had infarction due to lower in his spinal perfusion pressure. When you lower the spinal perfusion pressure, the blood that reaches the spinal cord goes very little and that causes the infarction.
It's simple equation. Spinal perfusion pressure equal the mean arterial pressure minus the intraspinal pressure.

Q. Right.
The -- what does cardioembolic etiology mean to you, if anything?

A. It's a stroke that happens because -- let's say the heart is pumping very fast and can send clot into the brain.

Q. And you agree that his strokes were -- the etiology of his strokes were cardioembolic?

A. I think it's the decrease in his spinal perfusion pressure. And that's what all these articles out there describing.

Q. And what caused the decrease in spinal perfusion pressure?

A. It's increase in his in--- he was not managed right because the spinal perfusion of pressure should be always very high. And if the intraspinal pressure is not decreased by



Page 94

inserting a drain, the spinal perfusion pressure is low.

However, if you insert the drain, the spinal perfusion pressure goes up, and then infarction would have managed, the blood flow would have reached that nerve tissue that's dead.

Q. My question to you is: What caused --

You said it was caused by a decrease in spinal perfusion pressure. What causes the decrease in spinal perfusion pressure?

A. Increase in the intraspinal pressure.

Q. And what caused an increase in the intraspinal pressure?

A. And the MAP. And the MAP and -- the mean arterial pressure.

So what happens is when you try to decrease the patient, let's say, systolic and diastolic blood pressure, that will decrease the MAP. The MAP is the mean arterial pressure. And that will decrease the spinal perfusion pressure.

So there's two -- two ways to enhance the spinal perfusion pressure. The

Page 95

first way is by enhancing the MAP, the mean arterial pressure, by allowing him to have higher than normal systolic and diastolic blood pressure.

If you do have higher than the normal systolic and diastolic, you can increase the spinal perfusion pressure.

In that case, though, when the stroke team saw him, they recommended actually decrease the systolic and diastolic, and -- instead of allowing a little bit of increase, which would increase the spinal perfusion pressure.

Now, if we can't increase the systolic or the diastolic due to some reason, then the only variable here we have as -- as his intraspinal pressure, which you need to decrease -- decrease it as much as you can. How you can do that by inserting a lumbar drain.

Q. Okay. So a lower MAP reduces spinal perfusion pressure?

A. Correct.

Q. And, so, the MAP is lowered intraoperatively, right? As necessitated by the surgical

Page 96

repair, correct?

A. I am not inside -- I am not inside the surgery. I can't talk about this.

Q. But do you have some understanding that the -- that the blood pressure and the MAP is lowered in order to perform the surgery, or you don't know?

MR. JACKSON: Objection.

THE WITNESS: I -- I am not a cardiothoracic surgeon.

BY MS. STURTZ:

Q. Okay. And then in terms of -- do you -- again, is this -- if it's outside of your area of expertise, that's fine, but in terms of what level the MAP goal should be following a type A aortic dissection and surgical repair, do you defer to the cardiothoracic surgeon on that?

MR. JACKSON: Objection.

You may respond.

THE WITNESS: Let's say -- let's say patient has no spinal cord infarction; then yes. I do defer to the -- the cardiothoracic surgeon, but when you tell me the patient has weakness and you consult me,

Page 97

you say, Hello, Dr. Elakil, you're the neurosurgeon. The patient has spinal cord infarction. What's the MAP?

Then I will tell you, I want the MAP in the 85 to 90 --

BY MS. STURTZ:

Q. And --

A. -- which is high.

Q. Okay. And do you have any understanding as to what risk there would be to Mr. Welch of having a MAP of 85 to 90 -- let's start first within the first three days postoperatively.

A. That's a great question.

So let's say the cardiothoracic tells me it's pretty high risk to have a very high MAP. Then I will be, That's okay. The lumbar drain -- we can really decrease the intraspinal pressure from the lumbar drain and increase the spinal perfusion of pressure with the current -- with that specific MAP that you want.

But the spinal perfusion pressure should be very high at all times regardless, and there's many ways to do so.

Q. Okay. So it's --

25 (Pages 94 to 97)



MAGNA
LEGAL SERVICES

Page 98

Okay.  So I think my question when we started this was asking --

I'm trying to pull up -- bear with me for a second while I see if I can find the imaging report.

Do the -- from your review of records, did the neurologist at any time rec--- recommended a lumbar drain?

A.  No.  But multiple times they say they think the patient has spinal cord infarction.

Q.  Right.

Okay.  So then the MRI states that for the thoracic spine there is dex--- dextro curvature.  What does that mean?

A.  That's --

MR. JACKSON:  If you're going to read, were you going to share your screen?

MS. STURTZ:  Oh.  You -- let me see if I can share my screen.  That's fine.

BY MS. STURTZ:

Q.  Can you see that, Doctor?

MR. JACKSON:  Thanks.

MS. STURTZ:  Everybody?  Yes?

THE WITNESS:  Yes.

Page 99

BY MS. STURTZ:

Q.  Okay.  So what does dextro curvature mean?

A.  So the curvature of the spine is not the normal way; not the normal kyphosis way.

Q.  It says vertebral body heights are maintained.  What does that indicate?

A.  No fractures.

Q.  There's no cord compression.  What does that indicate?

A.  There is no pressure on the spinal cord by a hematoma or a disc herniation.

Q.  On the sagittal images there's a questionable hyperdensity within the cord at the level of T5 versus artifact.  What does that mean?

A.  So hyper--- hyperintensity on the cord means that would -- can be a spinal cord infarction versus artifact; the patient is moving; the image is not perfect, and so forth.

Q.  So do you agree that the spinal cord infarct we are talking about is at the level T5?

A.  Yes.

Q.  Was it at any other levels?

A.  No.

Q.  Did you -- when you looked at the images, did you categorize it in any way as to whether it

Page 100

was small?  Medium?  Large?  Anything like that?

A.  Well, you just see the infarct.

Q.  Oh.  Here.

So, initially -- am I right from the MRI initially they weren't sure it was an infarct at T5 and then there was a further review?  Is that your understanding from what you reviewed?

A.  Yes.

Q.  And it says there was a DWI.  What does that mean?

A.  DWI is a signal -- signal sequence in the MRI that tell you for a fact, for a sure thing, that there is a stroke -- a new stroke.

Q.  Okay.

A.  And it can -- it can tell you is the stroke old stroke or new stroke.  Here, when you see a DWI hyperintensity, it's a new stroke.  That's like them happen a year ago.

Q.  Okay.  And it's at level T5, right?

A.  Yes.

Q.  Does the -- does the fact that it wasn't seen or was questionable initially and it took an addendum review indicate anything about the

Page 101

size of the infarct?

A.  No.  That's -- it was very obvious to me.

Q.  Okay.  Well, you knew it -- you were looking at this retrospectively when you reviewed the images, correct?

A.  No.  When you see DWI hyperintensity, right away you know this is a stroke.

Q.  Okay.  Understood.

You don't know sitting here today whether -- well, strike that.

You reviewed Mr. Welch's deposition, right?

A.  I reviewed it briefly.

Q.  Okay.

THE COURT REPORTER:  Are you done with the screen share?

MS. STURTZ:  Yeah.  Do you want me to take it down?

THE COURT REPORTER:  Yeah.  Please.

MS. STURTZ:  Does it make it hard for you?

Yeah.  Please wait.  Stop share.

BY MS. STURTZ:

Q.  Okay.  Do you have an understanding that Mr. Welch is able to walk?

26 (Pages 98 to 101)



Page 102

A. I don't know his current situation, but I read that in his deposition that he's -- he's able to walk with help.

Q. You think he needs help in order to walk?

A. I don't know. I never met him. So I -- I can't formulate an opinion about what I think now what he needs.

Q. Okay. You make reference in your report to -- we talked about the lumbar drain. You also make reference to volume loading. What did you mean by volume loading as an intervention?

A. That's -- that's a great question.

So remember the equation that I told you about? Spinal perfusion pressure equal mean arterial pressure minus intraspinal pressure. Any way to increase that spinal perfusion pressure will make the best outcome.

So increasing the volume will increase his systolic blood pressure up; means the MAP will be higher. So volume -- inserting lumbar drain, volume raises station, which is what you really want; to increase the perfusion pressure to avoid all

Page 103

this sequences that happened to him.

So yes, lumbar drain, volume raises station; those are the main big one.

Q. And when the -- when the stroke team consulted in this case, did they make any recommendations related to volume loading?

A. No.

Q. What was -- in terms of volume loading, what was being done for Mr. Welch postoperatively?

A. If I remember correctly, and please excuse me if I don't, I remember they actually asked for lower blood pressure. So less than 130 over 80, which is -- goes against the management of spinal cord infarction.

Q. Right.

And that -- that was the initial blood pressure goal set for him when he came to the ICU, correct?

A. I don't remember what was their setting and what was exactly the goal set by the intensive care unit, but regardless, for spinal cord infarction, you would need the MAP to be higher. If you can't, you need to really lower the -- the -- the intraspinal pressure. It was -- the only way to do that

Page 104

is a lumbar drain.

Q. Okay. And I understand that. And maybe this is me being thick-headed, but is volume loading something different than setting blood pressure goals?

A. Yes. Volume loading, you insert big IV bores in the patient and you load them with IV fluids.

Q. And I take it he was getting IV fluids while he was in the ICU.

A. Yes. However, IV fluids really resuscitate the patient to increase their MAP based on -- not at the maintenance rate, just on aggressively and a big amount.

Q. And what are the risks of doing an IV bolus in a patient like Mr. Welch postoperatively?

A. That -- with that, I would talk to the cardiothoracic surgeon --

Q. Okay.

A. -- and see if that's an okay thing to do. They did that in all the articles that I read with a aortic dissection after -- after -- with aortic dissection -- with a spinal cord infarction after aortic dissection.

Q. Okay.

Page 105

A. That specific case, I -- I -- I can't comment about the aortic dissection part, but remember that equation is all what you need to balance to get the spinal perfusion pressure that you want.

Q. And do you have -- did you study when you looked at the records, and if you didn't, it's fine, what his MAP scores were?

I know there was a goal, but did you -- did you study what his actual scores were and as to whether he was meeting the goal, under the goal, or above the goal?

A. I remember looking into this. I don't remember exactly each day what, where his MAP. And some days he had more increased blood pressure, then they reduced it and he had lower blood pressure.

It's really hard to recall specific hour-to-hour situation with his blood pressure, but a goal specific that was set, I don't recall.

Q. Okay. If, hypothetically, his MAP scores -- you mentioned a range --

Well, let me -- let me back that up and ask you this question first: Would it be



Page 106

reasonable, or is there an option for the provider in terms of potential benefit to this patient, of either raising the MAP goal, or doing the lumbar drain? Right? You can do one or the other, or both, depending?

MR. JACKSON: Object.

THE WITNESS: Both. Both. You need to do everything you can to help this patient.

BY MS. STURTZ:

Q. But if you can get them -- you testified earlier that I would want a MAP of 85 to 90, and if you can't do that, then do the lumbar drain.

Are you saying you would -- you would do both, or is there -- is there a risk to doing both? I guess that's my question.

A. Studies shows that both are very helpful.

Q. And in this case --

Okay. And -- and I think you already answered -- never mind. Strike that. I was going to ask you about --

Okay. Do you recall -- in your review of the records -- if you don't recall the specific numbers, but from your review

Page 107

the progress notes, were -- if they have concern that his -- he was hyp--- having issues with hypertension?

A. I -- I remember seeing one time hypertension. I remember seeing one time hypotension. I don't remember what date, and what time, or what so forth.

As I say, this is usually fluctuation. And the goal here is to make sure that the patient MAP always high with -- with the large volume to increase the cervical perfusion pressure, and with the lumbar drain to decrease the intraspinal blood pressure, and subsequently increase the spinal perfusion pressure.

Q. Okay. And is there any risk to the patient in terms of increasing the -- the spinal perfusion pressure? Is there any risk to the cardiac surgical repair that was done in doing that, or --

A. You --

Q. -- would you defer to a cardiothoracic surgeon on that?

A. You can ask a cardiothoracic surgeon for that, but I don't know any other way you can

Page 108

manage a spinal cord infarction without increasing the intraspinal perfusion pressure. That would be a death sentence to the patient ability to walk.

Q. Okay. And same question with the MAP scores and goals. Ask the cardiothoracic surgeon as to what the risks are for the repair, correct?

A. That's correct.

Q. All right. Then I think the next thing you mentioned is enhanced oxygen delivery to spinal cord. What did you mean by that?

A. That's the spinal perfusion pressure. So spinal perfusion pressure is how much oxygen -- a simple way, that's how much oxygen blood flow delivery you're doing the nerve tissue in the spinal cord. And that's what we mean by the spinal perfusion pressure.

Q. Okay. So it's not -- it's not some other intervention; that's what the result would be of increasing the spinal fluid?

A. Intervention is large volume resuscitation and lumbar drain. Those are your main interventions.

Page 109

Q. Okay. I was -- I just didn't know if enhancing the oxygen delivery was something different than those two things.

A. Those are how you enhance the oxygen delivery.

Q. Okay. I just wanted to make sure there wasn't some other mechanism to doing that that I needed to explore.

Okay. What treatment, if any, was Mr. Welch getting between June 17th and June 22nd that were directly or indirectly therapeutic for the spinal infarct?

A. I did not see any.

Q. How about aspirin? Was he getting aspirin?

A. Aspirin as a -- something that you -- you give to tend the clot -- the medicine you begin to tend the clot. If you have an infarction, it's an infarction because there was decrease in the spinal perfusion pressure, and that does not solve by the aspirin itself. So aspirin is not treatment for spinal cord infarction.

Q. Yeah. I -- I didn't mean to imply that it would solve it, but is there any benefit to the use of aspirin in a patient who has a



Page 110

spinal cord infarct?

A. It's beneficial for the brain stroke. The spinal cord infarction, the main benefit is, as I say, large volume resuscitation and lumbar drain. Aspirin is not indicated for the spinal cord -- the spinal infarction part. However, it's indicated for the brain part.

Q. Was he on aspirin between June 17th and 22nd that would have been of benefit for the brain infarct?

A. The brain, correct.

Q. Was there anything else that he was receiving between June 17th and the 22nd that would be of benefit to the brain infarct?

A. The brain?

Q. Yeah.

A. Other than the aspirin?

Q. Correct.

A. I did not see any.

Q. For either the brain or spinal cord infarct -- is management of the patient's temperature of benefit for either the brain or spinal infarct?

A. The pressure held flow, in general. However,

Page 111

the main two factors that's going to enhance your perfusion, that's well known, well recognized, and those are the mean arterial pressure and the -- and -- and the intraspinal pressure. Mean arterial pressure minus intraspinal pressure.

So low for intraspinal and increasing the MAP, that's what is going to help you here. The other things are all just a -- cofactors. They not the main two parts that really affects this patient's status.

Q. Okay. So what -- what are the cofactors, though, that are of some benefit that are not the -- the pain --

You already told me about the drain and the blood pressure, but would you --

A. I only --

Q. -- agree that temperature management is a cofactor that is of benefit?

A. That's for all ICU patient. It enhances all the ICU patients; just general thing that every ICU physician does for his patient.

Q. Okay. What about the glucose management? Does that provide some benefit for --

A. That --

Page 112

Q. -- an infarct?

A. It helps decreasing the risk of future infarcts. All of this, managing the blood pressure and the future -- managing the -- the -- the different lifestyle, that all helps in the future.

Q. How about antiplatelet medication?

A. Which is the aspirin. It does help with his brain infarct from having another infarct -- preventing him from having another infarct.

Q. Okay. In your report, you reference a couple times in the history section of the case summary that an MRI was -- was deemed to be unsafe.

So, again, it -- you're not testifying as the standard of care as to whether an MRI was safe or unsafe to do on a certain day, correct?

A. No. I don't know what was situation.

Q. Okay.

A. That's what I saw in the records.

Q. Okay. So you stated in your report -- you refer to the patient's current severe outcome of lower extremity weakness, bowel and bladder dysfunction, but you don't -- you're

Page 113

not -- you haven't reviewed any medical records to know whether he currently has bowel and bladder dysfunction, correct?

A. If he's currently. You're saying like at this time, no.

Q. When you wrote that in your report, were you referring to bowel and bladder dysfunction while he was a patient at MedStar Washington Hospital Center?

A. The records that Mr. Jackson sent to me.

Q. Which are the -- the ones from June of 2022?

A. Yes.

Q. So in terms of whether he had some --

You don't, sitting here today -- know what extent, if any, he has lower extremity weakness here today in 2024, correct?

A. No, I do not examine him.

Q. So if, hypothetically, Mr. -- if, hypothetically, Mr. Welch had been diagnosed with this spinal infarct on June 17th rather than on June 22nd, do you agree that he was likely to have some def--- residual deficits from that infarct?

A. So as I say, the studies in the literature,

29 (Pages 110 to 113)


MAGNA
LEGAL SERVICES

Page 114

some of them showed complete resolution, right away, next day, with no any deficit completely. Some of them did show partial improvement with residual. It's really hard to tell.

Q. So, in your report, let me make sure I understand this, you use the phrase the timing led to an exacerbation of his deficit. Is that your opinion?

A. Can you read the whole paragraph and remind me of the whole paragraph or sentence, or show it to us?

Q. Okay. I'll see if I can pull it up, but it says -- you talk about the delay spanning several days, which was a critical factor -- here we go.

Moreover, it's more likely than not the failure to implement measures aimed at optimizing the patient's physiological state, such as blood pressure management and installation of a cerebrospinal fluid drain, which is widely accepted and straightforward procedure to do, continued to -- the exacerbation of patient's deficits and adverse outcome.

Page 115

Is that your opinion?

A. Yes.

Q. Okay. So to what percentage or what degree was there an exacerbation of his deficits?

MR. JACKSON: Objection. You may respond.

THE WITNESS: So not -- not installing a lumbar drain and not doing a volume resuscitation, which are the two most common must measures that's taken for a spinal cord infarction.

Not having those two things done for this patient, they lead to this outcome. Had we done lumbar drain and we've done volume resuscitation, studies showed either complete resolution of all the symptoms, or at least partial improvement.

BY MS. STURTZ:

Q. Okay. And you used the phrase that this exacerbated it. So that means there were going to be some deficits, but this made the deficits exacerbated or worse, correct?

A. Permanent.

MR. JACKSON: Objection. You may respond.

Page 116

BY MS. STURTZ:

Q. To what -- to what extent were they made worse -- or are you able to quantify that in any way what you meant by exacerbation?

A. I meant it's now permanent and -- instead of likely temporary.

Q. Okay. So it's your opinion, to a reasonable degree of probability, that if there was a breach in the standard of care, that breach in the standard of care made Mr. Welch's deficits in his -- from the spinal infarct from a temporary deficit to a permanent deficit?

A. That's -- that's --

What do you mean? Sorry. In other words.

Q. I'm trying to find out what you mean.

How can you say to a reasonable degree of probability that his deficit would have been temporary versus permanent in nature of the spinal cord infarction?

A. All these articles in the literature says we need to enhance the spinal perfusion pressure. How we do that by inserting lumbar drain and volume resuscitation. If we do

Page 117

that, what happens complete resolution of symptoms or partial improvement.

For all these articles in the literature I base my opinion, and the facts present for that patient, medical records, to have that opinion for you.

Q. Okay. So your opinion is he would have -- with different interventions had either partial or complete resolution of deficits related to the spinal cord infarction?

A. Correct.

Q. And you can't say whether it would have been partial or complete, one or the other?

A. I can't.

Q. And sitting here today, you don't know whether or not he had partial or complete resolution of his lower extremity weakness, correct?

MR. JACKSON: Objection. You may respond.

THE WITNESS: From the deposition he say. I don't -- I don't -- I don't really recall how much improvement he had after all these years. It's really hard to say without a medical assessment, medical examination.



Page 118

All I can tell you that if -- if that lumbar drain and volume resuscitations would have done, he would have improved more than what he is now.

BY MS. STURTZ:

Q. What the -- my -- my question is: You don't know --

A. I don't know.

Q. You haven't seen any -- any physical examinations of him since 2022, correct?

A. That's correct. From a medical provider.

Q. You're not a vocational expert, correct? And you won't be offering any opinions as to whether or not Mr. Welch can work, correct?

A. I can provide an opinion from the neurology point of view whether he can work or not if I can examine him.

Q. But sitting here today --

But you don't have any expertise in vocational rehabilitation, correct?

A. In what?

Q. Vocational rehabilitation. Do you know what that is?

A. Vocational?

Q. Vocational.

Page 119

A. No. What's vocational rehabilitation?

Q. You're not an expert in vocational rehabilitation, correct?

A. Correct. I'm an expert in neurosurgery.

MS. STURTZ: Okay. All right. I think we can just take -- I think I'm probably done, but if we can just take a five-minute break so I can look at my notes, I'd appreciate it, and then I'll just come back in five minutes. Thank you.

(Discussion off the record.)

MS. STURTZ: I was going to say, I don't have any other questions.

CROSS-EXAMINATION

BY MR. JACKSON:

Q. Let me see if I can -- I just have a few questions, Doctor; just five or ten minutes. Trying to share my screen here. Let me see if I can get it. Give me a moment here.

MR. JACKSON: Well, I'm trying to save time, Doctor. And, Counsel, if you don't mind, at least stipulate to what a medical record said. I'm trying to share it, but I'm trying to pull -- unless you can pull

Page 120

it, Counsel, the operative report from Dr. Alassar.

MS. STURTZ: I'm happy to look for it if you just want to --

MR. JACKSON: Okay. There are --

BY MR. JACKSON:

Q. Well, I'm reading from the operative report, Doctor, which is part of the record, and that is Dr. Alassar's performance of the dissection on June 14th. And in the report, it states "Complications: None."

Based on that entry in the report --

And there was prior discussion during your deposition about whether the infarct occurred intraoperatively and -- was an intraoperative complication or occurred postoperatively. And I recall your testimony saying you couldn't pinpoint the exact time, but that it was noted on the 17th and, therefore, managed postoperatively.

Does this notation by Dr. Alassar of there being no complications intraoperatively affect your opinion one way or the other with respect to whether the

Page 121

infarct occurred intraoperatively or postoperatively?

MS. STURTZ: Objection to form and foundation.

But you can answer.

THE WITNESS: No. We usually write our operative note right after the surgery. We don't know what's really happened -- what's really going to happen, you know, after in the postoperative care; whether the patient will have an infarction or no.

So usually the common -- common thing with surgeons is if nothing happened really that we can't see inside the surgery, then we don't comment about that complication section.

BY MR. JACKSON:

Q. Okay. And -- but with this notation, is it still your opinion that the first indication of the infarct occurred on the 17th?

MS. STURTZ: Objection to form and foundation.

But you can answer.

THE WITNESS: No. He -- he, obviously, suffered the complication with the

31 (Pages 118 to 121)



MAGNA
LEGAL SERVICES

Page 122

brain strokes and spinal cord infarction.
BY MR. JACKSON:
Q.  Okay.  You were asked questions about whether you knew the specific MAP scores, and you said that you weren't able to recall them offhand.

Without knowing the specific MAP scores here in your deposition, how are you able to state to a reasonable degree of medical certainty that Mr. Welch's outcome would have been different had those therapeutic measures been taken from June 17th through the 22nd?

A.  May you please repeat your question, Mr. Jackson.

Q.  Yes.

Counsel asked you spec--- do you know what the specific MAP scores were -- not what the goals were, but what the actual scores were for June 17th up through the 22nd.  And you indicated that you weren't able to recollect what they exactly were.

Sitting here in your deposition, not knowing what those scores exactly were, how are you still able to state to a

Page 123

reasonable degree of medical certainty that Mr. Welch's outcome would have been different had those therapeutic measures been taken on June 17th, 18th, 19th, 20, and 21?

MS. STURTZ:  Objection.

But you can answer.

THE WITNESS:  That -- that -- that -- as I say, the main goal is the spinal perfusion pressure to be very high, to -- to enhance the delivery of oxygen to the brain and spine -- spinal cord.

Now, if -- if -- if the MAP --

I don't -- I don't really understand your question clearly, but let's say -- your question if they did not change the MAP, right?  If the MAP is very low --

BY MR. JACKSON:

Q.  Okay.

A.  If -- if the MAP is --

Q.  Yes.

A.  If the MAP is very low, then the spinal perfusion pressure will be low, and that would -- would affect the patient outcome. If -- if it's -- a lumbar drain is not done and the intraspinal -- intraspinal pressure

Page 124

is not decreased, then that will keep the spinal perfusion pressure very low and that will not help the patient.

So both measures, volume resuscitation and lumbar drain, were not -- not done to the patient between June 17th to June 22 -- or, actually, never done to the patient.  It was -- even after the discovery of spinal cord infarction, that was not done to the patient.

Neither -- neither a neurosurgeon or an expert in the field of managing spinal cord infarction were consulted in this case. So it's really -- I don't think any management for spinal cord infarction was done to this patient.

Q.  Okay.  And -- and just so the Court understands here your opinion, is that based on your review of the records and what you did not see in the records as opposed to what you did see in terms of notations and so forth?  Is that -- is that the basis of your opinion --

A.  Oh.

Q.  -- after you reviewed the record?

Page 125

MS. STURTZ:  And I'm just going to object it's -- just to clarify that he's not a standard of care expert, but with that --

MR. JACKSON:  Yeah.

MS. STURTZ:  -- objection --

BY MR. JACKSON:

Q.  I understand you're not a standard of care doctor, but my question is going to you -- referring to you reviewing the records and you not seeing the -- the -- the lumbar drain placement and you not seeing the MAP management.  It -- it --

And so my question in follow-up is: Is it the basis of your opinion that based on the -- based on your review of the records for June 17th, June 18th, June 19th, the 20th, and the 21st and the 22nd of 2022, do you have an opinion for those dates to a degree of certainty as to whether the entry in the medical records of a lumbar drain placement having been performed would have made a difference in Mr. Welch?

MS. STURTZ:  Objection.

THE WITNESS:  Correct.  Correct. And not -- not only that, my -- my opinion

32  (Pages 122 to 125)



MAGNA
LEGAL SERVICES

Page 126

also for afterwards -- after the discovery. Now they diagnosed him on June 22 and still nothing been done.

BY MR. JACKSON:

Q. Okay. And are you able to quantify for the Court, in any other terms other than what you've stated about partial recovery, complete recovery, about the extent of the difference in Mr. Welch's outcome had those therapeutic measures been taken in his case?

A. Yes.

Q. Please do so. How can -- how can you more quantify it for the court?

A. Your -- you mean by -- by -- what kind of quantification? Like percentage-wise?

Q. Any quantification. Percentage-wise, or number-wise, or how -- any way that you are able to educate the Court other than the terms of complete and partial, if there is one.

A. There is the disability -- disability quantification measure. I forgot the book, but it's the one that everyone uses when we say how much deficit or disability a patient after a neurological injury has. And that is

Page 127

more quantified toward a percentage of disability.

Q. And do you have an opinion for Mr. Welch as to what that quantification would be under that metric that you've referenced -- the source that you've referenced?

MS. STURTZ: I just have -- I thought you were asking him a quantification of what the difference -- the difference between no treatment and some treatment. Now it sounds like you're going to like a disability rating, which would not -- he hasn't seen the patient and can't give a disability rating.

So I'm confused by the question and the answer. And, for that reason, I object.

BY MR. JACKSON:

Q. I'm just trying to follow up, Doctor, on your basis for your opinion of -- about whether you can quantify the difference between his levels of -- of recovery.

And I'm -- I understood your answer to suggest that the way that you would be able to quantify it is based on the source that you mentioned that puts it into

Page 128

percentages.

Let me be -- let me lay the foundation. Would putting a percentage on it, in your view, be giving him a disability rating? Because that's not what I'm asking you to do.

A. Yeah. That -- that -- that -- I would need an actual examination, that's correct.

Q. Okay. Okay. So -- but other than a disability rating, the only way you could quantify it to his -- the -- the -- his potential for recovery would be complete or partial from the way that he was when the stroke was discovered; is that accurate?

A. Correct. Without examining the patient myself.

Q. Okay. Just a few more questions, Doctor. Based on the detection of the infarct on June 17th for Mr. Welch and it being postop from the dissection, at this point, would you defer to your treatment of -- management of the infarct, would you defer to a cardiothoracic surgeon in his case?

A. No. It's a neurosurgical problem. So spinal

Page 129

cord infarction is something we are very familiar with. We need to enhance the spinal perfusion pressure.

The only question would be to a cardiothoracic is it okay from your standpoint to increase his MAP. And that will just make that decision for me whether I need to volume resuscitate him or no.

If he says yes, then I will volume resuscitate him. If he says no, then I will hold on the volume resuscitation, but only thing that definitely I'm going to do, 100 percent regardless of the cardiothoracic surgeon opinion, is my inserting a lumbar drain.

Q. Okay. And how are you able to state these opinions to a reasonable degree of medical certainty based on your somewhat limited experience treating a type A aortic dissection postsurgical patient in clinical practice?

MS. STURTZ: Objection. But you can answer.

THE WITNESS: My experience is treating spinal cord infarction. Patient has



Page 130

spinal cord infarction here. And I know how to treat that.

MR. JACKSON: Very well. I don't have anymore questions. Thank you, Doctor.

MS. STURTZ: I don't either, Doctor. Thank you very much for your time.

And, Laurie, I'll take our usual order of a full size and mini.

Thank you.

MR. JACKSON: Hi, Laurie. We'll just need four to a page. Thank you.

(Whereupon, the deposition of AHMAD ELAKIL, M.D. was concluded at 2:46 p.m.)

* * *

Page 131

REPORTER'S CERTIFICATE

BE IT KNOWN that I, Laurie Austin, took the foregoing deposition of AHMAD ELAKIL, M.D.;

That the witness, before testifying, was first duly sworn to testify the whole truth and nothing but the truth relative to said cause;

That the testimony of said witness was recorded in shorthand by me and was reduced to typewriting under my direction;

That the foregoing deposition is a true record of the testimony given by said witness;

That the reading and signing of the foregoing deposition by the said witness was waived by the witness and respective counsel;

That I am not related to any of the parties hereto, nor an employee of them, nor interested in the outcome of the action;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

WITNESS my hand and seal this 4th day of June, 2024.

_____
LAURIE AUSTIN
Registered Professional Reporter




| A | | | |
|---|---|---|---|
| **A-c-a-d-i-a-n-a** 12:21 | **admitted** 29:12 30:16 | 120:9 | 89:19,24 96:16 |
| **abduction** 28:7 | **admitting** 91:8 | **alert** 39:24 | 104:22,23,24 105:2 129:19 |
| **ability** 108:4 | **Advanced** 13:11 | **allowing** 95:2,11 | **apologize** 57:8 |
| **able** 23:23 101:25 102:3 116:3 122:5,9,22,25 126:5,18 127:24 129:16 | **adverse** 114:25 | **American** 15:19 27:18 38:18,19 38:24 39:13,14 | **appear** 34:9 |
| **Acadiana** 12:20,24 | **advertise** 20:9 48:5 | **amount** 18:20 104:14 | **appearance** 3:18 50:5 |
| **acceptable** 85:11 | **affect** 120:24 123:23 | **announced** 19:7 | **APPEARANCES** 2:1 |
| **accepted** 15:17 16:13 114:22 | **afternoon** 4:12 | **answer** 4:25 5:4,8,11,12 37:19 49:8 58:14 64:5 86:1 88:16 91:16 92:2 121:5,23 123:6 127:16,22 129:23 | **appearing** 1:19 |
| **accreditations** 25:15 | **AGENCY** 1:1 | | **application** 15:16 |
| **accredited** 25:10,12,18 | **aggressively** 104:14 | | **applied** 16:13 19:23 |
| **accurate** 7:19,20 128:14 | **ago** 38:8 48:18 100:20 | **answered** 86:2 106:21 | **apply** 15:14 16:10 |
| **action** 1:8 20:2 131:14 | **agree** 3:21,25 31:5 33:6 54:4,14,22,23,25 59:22 60:16,21,22 60:25 61:20 62:8 65:15,22 68:22 72:17 73:10 75:20 77:4 88:10,12 89:2 92:18 93:15 99:19 111:18 113:22 | **answers** 5:16,20 39:8 | **appreciate** 119:9 |
| **actual** 25:5 105:10 122:19 128:8 | | **antiplatelet** 112:7 | **appreciated** 28:1,2 |
| **acute** 60:18 61:2 67:4 | | **Any---** 48:14 | **approach** 61:23 |
| **addendum** 100:25 | | **anymore** 130:4 | **appropriate** 56:19 |
| **additional** 51:12 | **agreed** 3:22 | **aortic** 10:20 11:9 12:12 32:11 33:7,12 35:22 36:2 37:3,7,8,13,13 42:8 43:2,6,9,12 46:5 52:15 53:23 54:2,8,9,16,24 55:1 55:23 59:1,3,24 60:6,18 61:2,13 62:4,8,10,13,16,20 62:24 63:5 65:1,11 65:16,22 66:10,15 66:19,24 67:1,4,9 67:11,15 68:6 72:24 75:13,16 79:21 80:2 80:6,9,21 81:4,15 85:21 87:4,12 88:21 | **approximately** 1:20 |
| **address** 6:12 12:23 | **agreement** 3:19 | | **April** 10:7 11:12 24:6,6 |
| **administering** 3:16 | **ahead** 4:24 36:15 49:11 | | **Arabia** 14:23 15:2,8,11 |
| **admissible** 6:2 | **Ahmad** 1:16 2:17 4:3,6 11:19 11:20 130:12 131:3 | | **arch** 72:15,19,22,23 |
| **admission** 29:14,20 | **aimed** 114:18 | | **area** 32:15 33:9,13 41:13 41:15 42:10,16 54:13 73:11,13,14 88:11 89:6,21 96:14 |
| **admissions** 32:22 | **al** 1:12 | | **areas** 36:11 64:15 |
| | **Alassar** 120:2,22 | | **arrest** 53:25 |
| | **Alassar's** | | **arterial** 78:4 87:1 93:7 94:17 |



94:21 95:2 102:16
111:3,5
**arteries**
54:2
**article**
31:18,19 34:16,19
35:3,4,8,12,21 36:8
53:6,13 55:19 61:17
67:2,5,12 68:8,20
71:13,25 72:10 73:7
74:17 75:4 78:23
79:14
**articles**
2:22 34:18,21 36:9
36:14,17,20,24
37:21,23 38:1,3,4
39:1 44:23,25 53:16
74:18,21,22 75:1,1
75:10 77:3,13,15,21
78:2,20,21,24 79:6
79:7,15 93:19
104:21 116:22
117:3
**artifact**
99:14,17
**asked**
5:1 17:21 29:22
40:25,25 41:16,19
47:18 52:21 63:13
64:24 69:8,21 79:5
83:3 85:8 103:11
122:3,17
**asking**
4:20 73:10 85:5
91:20 98:2 127:8
128:5
**aspirin**
109:14,14,15,21,21
109:25 110:5,9,18
112:8
**assessment**
117:25
**assessments**
29:5
**associated**
65:23

**Association**
27:19 38:18,19,24
39:13,14
**associations**
27:21 38:22
**assume**
4:25 5:10
**Assuming**
53:18
**attached**
2:23
**attempt**
16:8 22:13,24
**attending**
80:5
**attorney**
1:7 30:2 47:6
**Attorneys**
2:3,8
**Audio**
35:13
**August**
6:20,22 7:10,22 8:5
8:24 9:7,11,14,23
10:5,8
**Austin**
1:1,17 131:3,22
**authored**
7:21
**Avenue**
6:13
**avoid**
68:7 102:25
**Awake**
39:23
**aware**
25:19 29:4

————————
**B**
————————
**B**
37:8,13 65:6,6 68:2,3
**B-u-b-m-e-d**
35:16
**back**
7:11 24:17 59:20
71:12 81:8 105:24

119:10
**background**
57:7
**balance**
105:4
**balancing**
73:23
**Baltimore**
2:10
**base**
75:4 117:4
**based**
27:2 78:3 79:12 85:5
104:12 120:12
124:18 125:14,15
127:24 128:18
129:18
**basing**
74:16
**basis**
53:16 78:2,19 80:11
91:18 124:22
125:14 127:19
**bathroom**
49:12
**bear**
53:4 98:3
**beds**
25:22,24
**beginning**
8:22 19:5 45:14,22
**behalf**
46:8 47:3
**believe**
49:21 64:5 66:20
67:5 68:15
**belong**
27:17
**beneficial**
110:2
**benefit**
68:16 69:15 70:9
73:18,21,22,22,24
74:2,6,11,11,12
77:22 106:2 109:24
110:3,10,15,23

111:13,19,24
**best**
6:4 39:9 102:19
**better**
83:23,25 84:1,2
90:11,23 91:14,18
**beyond**
32:15 33:13 42:9,16
54:13 63:6 73:11,13
88:10 89:6
**big**
103:3 104:6,14
**bigger**
14:12,12
**bilateral**
90:5
**billing**
33:22 34:10
**bills**
31:21,23,25 32:1,3
32:13 33:14 34:7,7
44:21
**binding**
3:16
**bit**
5:18 95:11
**bladder**
112:25 113:3,7
**bleeding**
46:25 47:8 87:17
**blood**
76:6,14 87:1 93:3
94:5,20 95:4 96:5
102:21 103:12,17
104:5 105:16,17,19
107:14 108:16
111:16 112:3
114:20
**board**
22:15,18,21,23 23:23
24:3 28:14,17
**body**
99:5
**bold**
18:14
**bolus**



MAGNA
LEGAL SERVICES

104:15
**book**
50:8 126:22
**bores**
104:6
**born**
14:20
**bottom**
92:15
**Boulevard**
12:18
**bowel**
112:24 113:3,7
**brain**
13:23 14:1,4 20:23
30:16,20 44:19
63:10,20,23 64:8,10
64:12,13,14 65:3
66:6 87:22 88:2
89:21 93:14 110:2,7
110:10,12,15,16,21
110:23 112:9 122:1
123:10
**breach**
116:9,9
**break**
5:23,24 42:1 49:12
49:13 119:8
**breakdown**
13:25
**brief**
49:17
**briefly**
101:13
**BubMed**
35:20
**BUE**
90:4
**build**
13:11
**building**
11:3
**business**
32:22 33:22

_____
            **C**
_____

**C**
4:2 65:7 131:1,1
**call**
13:10 27:5 60:7 76:5
76:13 77:21
**called**
4:7 9:6,7,9 11:21
38:25 39:2 48:15,17
67:2 82:23
**calling**
82:22
**Camellia**
12:18
**campus**
22:5 25:3
**Canada**
15:10,22,25 16:10,12
23:6,11,16
**Canadian**
15:17
**candidate**
88:8
**captured**
3:9
**cardiac**
10:14,15,16 12:11
42:2 107:19
**cardioembolic**
93:10,16
**cardiologist**
42:2
**Cardiology**
38:18,25 39:13
**cardiothoracic**
11:2,5 37:11 43:13
80:24 96:10,18,24
97:14 104:18
107:22,24 108:6
128:23 129:5,13
**care**
21:15,20 26:14 27:7
28:15 29:13 40:9,15
40:23 41:5,10 42:5
42:15 44:1,25 47:19
47:20 48:3 52:18
59:17 61:7,7,15

69:3,7,12,23 70:2
92:17 103:21
112:16 116:9,10
121:10 125:3,7
**cares**
33:1
**carries**
87:15
**case**
21:15,20 22:6 29:17
29:24 31:12 37:22
38:6 40:12 46:18,24
47:2,12,17,21 50:19
50:20 51:6,16,20
52:10,12,19,25
54:25 58:9 59:8
60:21 61:11,21 64:3
66:13 68:12 69:4
70:25 73:20 74:9
75:20 79:5 82:11
88:6,13 95:8 103:5
105:1 106:19
112:12 124:13
126:10 128:24
**cases**
45:23,25 46:5,8,11
46:11 51:25 77:25
**catastrophic**
62:9
**categorize**
99:25
**causation**
29:22 47:19 52:22
53:1 64:3,17 69:9
**cause**
64:9 88:20 89:18
131:6
**caused**
59:1,9,14,24 88:14
93:20 94:8,9,14
**causes**
54:9 93:5 94:11
**center**
1:12 23:7 26:8 27:6
29:15 32:1,5 33:15
34:8 44:17,22 83:1

83:6 113:9
**Central**
1:20
**cerebral**
78:15
**cerebrospinal**
36:6 37:4 68:9,11,18
70:20 114:21
**certain**
39:5 112:18
**certainty**
71:8 76:18 122:10
123:1 125:19
129:18
**certificate**
18:3 20:12
**certification**
22:23 24:4,8 26:15
**certifications**
22:19
**certified**
22:15,21 26:13 28:14
28:17
**cervical**
107:12
**chairman**
7:12,25 8:7 32:20
**chance**
78:22
**change**
25:12 123:15
**charge**
49:25
**charged**
31:23 131:16,17
**Charles**
2:9
**Chicago**
6:14 14:12,12 25:1,6
25:23 26:7
**chief**
8:6,7
**choose**
85:13
**circulatory**
53:25



**city**
14:12
**Civil**
1:5,8
**clarification**
73:3
**clarify**
125:2
**clear**
78:22 84:23
**clearly**
77:21 123:14
**Cleveland**
19:5,13,17,22,24
20:3
**Clinic**
19:13,17,22,24 20:3
**clinical**
129:20
**close**
9:10
**closed**
9:13
**clot**
93:14 109:16,17
**cofactor**
111:19
**cofactors**
111:10,12
**collections**
32:23
**college**
14:22 15:5,21
**COLUMBIA**
1:4
**combined**
14:25
**come**
22:8 58:24 119:9
**comes**
87:16
**coming**
10:3
**commenced**
4:4
**commencing**

1:19
**comment**
52:22 61:23 63:9
65:19 66:2,3 105:1
121:15
**commenting**
63:3
**common**
65:7 68:3 80:10
87:14,18 115:10
121:12,12
**compared**
68:2
**complaint**
52:9
**complete**
5:11 9:17 17:13
74:19 75:3,8,23
76:20 77:25 114:1
115:16 117:1,9,13
117:16 126:8,19
128:12
**completed**
15:24 16:19 18:19
24:4,5
**completely**
72:2 114:3
**completing**
16:24
**completion**
16:3
**complex**
27:12
**compliance**
48:1
**complication**
54:16 55:1,7,13
60:17,20 61:1,13
62:24 64:25 65:10
67:23,25 68:5
120:17 121:15,25
**complications**
63:4 120:11,23
**comprehensive**
26:8,10 56:25 57:10
57:13

**compression**
99:8
**concern**
107:2
**concluded**
130:13
**conclusion**
72:11,12 73:4,5
**confused**
127:15
**consider**
10:3 38:12,17
**considered**
50:13
**considering**
11:13
**construction**
8:19
**Consul---**
11:19
**consult**
26:23 96:25
**consultation**
26:23 27:4
**consulted**
103:5 124:13
**contacted**
51:20 52:4,7,13,23
**continue**
16:20
**continued**
114:23
**control**
64:15
**controlled**
89:22
**conversation**
5:19
**copies**
131:17,17
**copy**
6:19 7:4 31:18
**cord**
36:5,6 37:3 38:14
39:7 42:20 47:1,8
52:14 53:24 54:9,11

54:15,23 55:1 59:4
59:13,16,23 60:3,4
60:7,10,16,23,25
61:12,25 63:1,6,11
63:14,21 64:4,8
65:4,6,21 66:18
67:10,17 68:3,23
70:18 71:4 75:16,17
76:7,10,15 77:5
78:11 79:25 80:1
81:21 86:10 89:2,3
90:1 93:4 96:22
97:2 98:10 99:8,10
99:13,15,16,19
103:14,22 104:23
108:1,12,17 109:22
110:1,3,6,21 115:11
116:21 117:10
122:1 123:11 124:9
124:13,15 129:1,25
130:1
**correct**
6:17 8:3 9:3,12 10:2
10:13,21,22,25 11:6
11:10 12:9 13:3,6
14:20,21,23,24
15:12,13,23 16:1,15
16:17,25 17:4,5,7,8
18:19 19:9,17 21:12
21:17,18,21,22,24
21:25 22:10,11,16
22:17,22 23:12,18
24:8,9,11,19,20,22
24:23 25:8,9 26:20
26:25 28:15,16,18
28:19,20,23 31:20
32:11,16 33:7 35:10
38:23 40:23 41:5,10
41:14,24 42:3,4,10
42:11,12,13,17 43:7
43:12,16,19 44:2,3
47:23 48:13 51:17
52:8,19,20,24 53:2
53:3,20 55:23 56:4
57:24 58:2,12 59:2
59:10 60:19,23,24



61:2,15,16 63:15
64:20 65:2 68:13,14
69:6,10,17 70:10,11
70:19 71:4,14,15,18
72:8 73:19,22 74:12
75:25 76:24 77:2
79:1,16,17 80:22
81:5,17,18 95:23
96:1 101:5 103:18
108:8,9 110:12,19
112:18 113:3,17
115:22 117:11,18
118:10,11,12,14,20
119:3,4 125:24,24
128:8,15
**correctly**
103:10
**cost**
34:3 131:15
**costs**
33:3
**counsel**
3:14 37:23 69:21
84:20 91:7 119:22
120:1 122:17
131:12
**couple**
112:11
**court**
1:3 3:13,23 6:2 35:14
35:18 57:2,5,9
101:15,19 124:17
126:6,13,18
**coverage**
27:8
**COVID**
23:2,19,24
**cranial**
39:25 68:19
**created**
77:15
**credentials**
12:3,5 25:3
**critical**
28:14 114:15
**cross**

23:6
**CROSS-EXAMIN...**
119:14
**CSF**
73:16
**CT**
30:20,24 31:10 66:21
**culture**
70:22
**current**
20:19,22 25:22 41:9
42:14 80:18 97:20
102:1 112:23
**currently**
10:16 21:23 22:1
113:2,4
**Curriculum**
2:21
**curvature**
98:14 99:2,3
**cut**
3:6
**CV**
6:19,22 7:5,17,23 8:6
14:19 22:7 24:10,16

———————————
**D**
———————————
**D**
4:2
**D.C**
2:5 46:14,19,20,23
50:12
**daily**
53:16
**damages**
53:1
**data**
66:8
**date**
6:19 24:16 41:8
50:19 51:18 58:18
83:16 91:13,24
107:6
**dated**
6:22
**dates**

51:21 125:18
**David**
2:11
**day**
50:6,7,7,9,10,11,14
74:19 105:14
112:18 114:2
131:19
**days**
48:17 55:15 56:1
71:16 72:6 97:12
105:15 114:15
**dead**
94:7
**deal**
32:21
**dealing**
33:21
**deals**
63:20
**death**
108:3
**decide**
20:14 39:17
**decision**
129:7
**decrease**
60:6 78:7,13 93:17
93:20 94:10,11,19
94:20,22 95:10,18
95:18 97:17 107:13
109:19
**decreased**
60:11 93:25 124:1
**decreasing**
76:9 112:2
**deemed**
112:13
**def---**
113:23
**defendant**
2:7 46:9,10 47:4
**Defendants**
1:13
**defense**
47:5

**defer**
37:11 96:17,23
107:22 128:21,23
**deficit**
28:12 40:4 55:8 71:3
114:2,8 116:12,13
116:19 126:24
**deficits**
27:24 40:2 81:23
113:23 114:24
115:4,21,22 116:11
117:9
**definitely**
129:12
**degree**
6:3,7 58:10 59:22
65:9 70:15 71:1,7
75:21 76:18 115:3
116:8,19 122:9
123:1 125:19
129:17
**delay**
114:14
**delayed**
23:10 55:20 67:3
72:14,19
**delivery**
108:11,16 109:2,5
123:10
**dense**
82:20
**department**
7:13 8:1,11,18,21
9:20 11:4 12:11
26:19 33:23
**depend**
41:16
**depending**
106:5
**depends**
42:18 50:6
**deponent**
3:17
**deposition**
1:14,16,18 3:16 4:3
4:14,16 6:11,18 7:4



MAGNA
LEGAL SERVICES

29:24,25 30:1 31:14
35:8 36:16 44:18
45:4 47:11 50:3
51:8 67:7 81:11
85:13 101:12 102:2
117:21 120:15
122:8,23 130:12
131:3,9,12,16
**depositions**
30:10 50:1 51:13
**describing**
93:19
**designated**
70:1
**despite**
72:7
**detail**
34:17
**details**
45:8
**detected**
61:14
**detection**
128:18
**dex---**
98:13
**dextro**
98:13 99:2
**diagnosed**
113:20 126:2
**diagnostic**
87:7
**diastolic**
94:20 95:3,6,10,15
**die**
62:13
**difference**
8:7 26:11,12 37:7,9
37:12 125:22 126:9
127:9,9,20
**different**
5:18 24:25 48:5
64:13,15 70:17
80:14 82:15 85:7
104:4 109:3 112:5
117:8 122:11 123:2

**differential**
89:6,12,14,16
**difficulties**
3:7
**DIRECT**
4:10
**direction**
131:8
**directly**
109:11
**disability**
126:21,21,24 127:2
127:12,14 128:4,10
**disagree**
31:1 72:4
**disc**
99:11
**discectomies**
21:10
**discharge**
84:13,22 90:2 91:13
91:25
**DISCLAIMER**
3:4
**discovered**
55:17 57:15 128:14
**discovery**
124:8 126:1
**discussion**
119:11 120:14
**disease**
39:15 42:18
**dispute**
17:24 18:12
**dissection**
10:20 11:10 32:11
33:2,7,12 35:22
36:3 37:3,7,8,13,14
42:8 43:2,6,9,12
46:6 52:15 53:23
54:8,9,17,24 55:2
55:23 56:14 59:2,3
59:9,25 60:6,19
61:2,13 62:4,9,10
62:13,17,21,25 63:5
64:19,19 65:1,11,16

65:19,22 66:10,15
66:20,24 67:1,4,11
67:15,17 68:6 75:13
75:16 79:22 80:2,6
80:9,21 81:4,15
85:21 87:4,12 88:14
88:21 89:19,24
96:16 104:22,23,24
105:2 120:10
128:20 129:20
**dissections**
12:12
**DISTRICT**
1:3,4
**disturbance**
35:13
**Division**
1:5
**doctor**
3:23 4:12 30:4 49:15
49:21 54:5 63:16,18
67:8 73:25 83:12,18
85:11 88:25 98:21
119:17,22 120:8
125:8 127:18
128:17 130:4,6
**doctors**
30:3 77:14 88:24
**documentation**
90:3
**documented**
58:17
**doing**
4:20 11:16 43:10
45:11 74:2 104:15
106:4,17 107:20
108:16 109:7 115:8
**Donna**
2:10 3:22 4:13
**Donna.sturtz@nel...**
2:11
**door**
57:7
**Dr**
30:6 40:19 88:5 97:1
120:2,9,22

**drain**
67:14 68:18 69:1,4
69:13,14 70:6,17
71:2,14,20 72:6,8
73:14,16,21 74:10
74:20 75:22 76:5,11
76:12 77:5,12 79:21
80:6,7,8,13,20 81:3
81:14,20 85:20 86:8
86:18 87:5,6,11,14
87:21,23 88:1 94:1
94:3 95:20 97:17,18
98:8 102:9,23 103:2
104:1 106:4,14
107:13 108:24
110:5 111:15
114:21 115:8,14
116:25 118:2
123:24 124:5
125:10,20 129:15
**drainage**
36:7 37:5 68:10,11
68:13,15 77:22
**draining**
78:7
**drains**
86:14
**due**
56:21 60:5 85:2
89:24 93:1 95:15
**duly**
4:7 131:5
**DWI**
100:11,13,19 101:6
**dysfunction**
112:25 113:3,7

---

**E**

**E**
2:5 4:2,2 131:1,1,1,1
**earlier**
52:4 63:13 75:2 81:7
81:11 106:12
**early**
18:1
**easier**



5:15
**EBT**
88:8
**educate**
126:18
**effect**
85:4 88:2
**effects**
69:16
**either**
30:9 68:19 80:15
106:3 110:21,23
115:15 117:8 130:5
**Elakil**
1:16 2:17 4:3,6 11:19
11:20 97:1 130:12
131:4
**elective**
27:14,15
**embolic**
92:20,21
**emergency**
61:18,21 62:4,6,7
**employ**
11:1
**employee**
131:14
**employment**
19:1
**ended**
18:13,16 20:7 72:1
**enhance**
76:13 77:5 94:25
109:4 111:1 116:23
123:10 129:2
**enhanced**
108:11
**enhances**
87:23 111:20
**enhancing**
86:23 95:1 109:2
**entry**
120:12 125:19
**equal**
78:4 93:7 102:16
**equals**

86:25
**equation**
78:3,16,19 86:24
93:6 102:14 105:3
**especially**
65:4
**Esq**
2:5,10,11
**et**
1:12
**etiology**
56:2,12 63:22 93:11
93:16
**Everybody**
98:23
**evidence**
91:8
**exacerbated**
115:20,22
**exacerbation**
114:8,24 115:4 116:4
**exact**
15:4 51:21 120:19
**exactly**
38:2 53:17 60:10
82:7 88:23 103:20
105:14 122:22,24
**exam**
23:10 24:5 39:23
**examination**
2:15 4:10 16:3,5,6,7
23:23 28:23 40:5
56:20,23 57:1,11,13
57:17 60:14 117:25
128:8
**examinations**
22:12 118:10
**examine**
113:18 118:17
**examined**
4:8 55:14
**examining**
128:15
**example**
42:19
**excuse**

49:7 103:10
**Exhibit**
2:21,22 7:4 36:16
**Exhibits**
2:20,23
**expectancy**
66:14
**expense**
50:17
**expenses**
50:16
**experience**
129:19,24
**expert**
45:9,11,16 48:21
49:2 70:1 88:6
118:12 119:2,4
124:12 125:3
**expertise**
32:16 33:10,13,21
37:10 41:13,15
42:10,16 54:14
66:25 73:12 88:11
89:7 96:14 118:19
**experts**
40:11
**explore**
109:8
**extension**
53:25
**extent**
34:6 42:14 70:7
113:15 116:2 126:8
**extreme**
57:15
**extremely**
39:16 87:18,19
**extremities**
83:9
**extremity**
75:24 82:14 83:22
84:4,13 88:20 89:18
89:25 90:5 91:24
112:24 113:16
117:17

**F**

**F**
131:1
**fact**
21:19 41:21 43:21
74:17 78:1,19
100:14,23
**factor**
114:15
**factors**
53:24 111:1
**facts**
41:17,21 72:10 77:9
91:8 117:4
**fades**
4:23
**failure**
66:1 114:18
**fair**
34:9
**false**
54:2
**familiar**
26:17 129:2
**far**
44:15 51:9,16 89:10
89:25
**fast**
93:13
**February**
50:23 51:7,19 52:3,5
52:6
**fee**
48:20,23 49:1,21
50:14
**feel**
44:11
**fellow**
16:18 20:9
**fellowship**
16:10,13,20,23 17:2
17:13,22,25 18:11
18:19,21 19:2,8
23:17 28:20
**field**


MAGNA
LEGAL SERVICES

| | | | |
|---|---|---|---|
| 124:12 | 108:22 114:21 | **friends** | 18:16 128:4 |
| **figured** | **fluids** | 45:18 | **Gjackson@govern...** |
| 52:17 | 104:8,9,11 | **front** | 2:6 |
| **file** | **focal** | 53:7 | **glitch** |
| 20:2 | 27:23 28:12 40:2,3 | **full** | 4:21 |
| **filed** | **follow** | 4:22 5:11 61:19,22 | **glucose** |
| 18:22 | 43:5,9,18,21,24 | 73:21 74:11,11 82:4 | 111:23 |
| **financially** | 127:18 | 86:12,19 130:8 | **go** |
| 17:19 | **follow-up** | **fully** | 4:24 13:7 19:12 |
| **find** | 125:13 | 3:5 26:13 | 23:16 34:16 36:15 |
| 78:22 91:5 98:4 | **following** | **fumble** | 39:20 44:1 49:11 |
| 116:17 | 1:15 43:22 65:1 | 91:17 | 81:10 114:16 |
| **finding** | 88:20 89:19 96:16 | **functioning** | **goal** |
| 56:10 | **follows** | 10:12 | 86:21 96:15 103:17 |
| **findings** | 4:4,8 | **further** | 103:20 105:9,12,12 |
| 31:2,5 55:22,25 | **foregoing** | 100:7 | 105:12,20 106:3 |
| **fine** | 131:3,9,12 | **future** | 107:9 123:8 |
| 7:2 85:12 92:12 | **forgot** | 40:22 41:4,10 42:5 | **goals** |
| 96:14 98:19 105:8 | 11:21 39:2 126:22 | 42:15,25 112:2,4,6 | 104:5 108:6 122:19 |
| **finish** | **form** | | **goes** |
| 5:8 18:11 | 58:13 76:25 121:3,21 | **G** | 78:10,16,16 93:4 |
| **finished** | **formed** | **G** | 94:4 103:13 |
| 5:4,4 | 41:3,9 47:14,24 | 2:4 4:2 | **going** |
| **firm** | 79:12 | **gathered** | 4:25 5:10 7:3 19:12 |
| 46:3 | **forming** | 38:1,2 | 36:14 45:7 52:17 |
| **first** | 38:5 | **general** | 58:24 59:7 63:14 |
| 4:7 10:3 11:22 16:8 | **formulate** | 14:3 17:14,15 19:25 | 64:7 69:5,11,14 |
| 19:12,13 22:12,24 | 102:6 | 20:15,16 32:22,23 | 74:4,6 78:25,25 |
| 51:20 52:23 88:23 | **forth** | 32:25 33:20,23,23 | 79:15 98:16,17 |
| 95:1 97:11,12 | 31:2,6 32:24 99:18 | 34:8 37:2 39:4 | 106:22 111:1,8 |
| 105:25 121:19 | 107:7 124:22 | 46:22 59:3 61:8 | 115:21 119:12 |
| 131:5 | **found** | 75:15 80:7,8 87:14 | 121:9 125:1,8 |
| **five** | 13:12 35:4 | 87:15,19 110:25 | 127:11 129:12 |
| 28:8,8 49:13 82:23 | **foundation** | 111:21 | **good** |
| 82:24 90:4,8,9,19 | 121:4,22 128:3 | **getting** | 4:12 5:13,21,25 7:8 |
| 90:20 119:10,17 | **four** | 11:9 35:8 104:9 | 13:9,9,12 14:13 |
| **five-minute** | 8:12,13,18,23,23 | 109:10,14 | 17:15 45:19 56:23 |
| 49:11 119:8 | 18:5,9 45:24 46:5 | **give** | **Governor** |
| **flow** | 71:16 72:6 82:6,8 | 5:9,16,19 14:11 18:4 | 2:3,5 7:6 52:21 |
| 76:7 94:6 108:16 | 90:4,9,11,20 130:11 | 18:8 19:21 36:17 | **graduate** |
| 110:25 | **fractures** | 42:22 109:16 | 16:19 |
| **fluctuation** | 99:7 | 119:19 127:13 | **great** |
| 107:9 | **FRCSC** | **given** | 6:15 49:20 78:9 |
| **fluid** | 15:20 | 6:2 18:22 51:18 | 97:13 102:13 |
| 36:6 37:4 68:9,11,18 | **free** | 68:22 76:21 131:10 | **grossly** |
| 70:20 78:8 87:22 | 48:24 | **giving** | 39:25 |



ground
4:19
group
12:20,22 13:2
groups
48:6,20
guess
106:17
guide---
39:12
guidelines
39:10,12 77:14

**H**

half
13:19 50:6,7,9
Hamilton
88:5
hand
131:18
happen
55:9 58:8 60:5 67:11
68:5 78:17 100:20
121:9
happened
9:16 20:5 39:16 58:3
59:16 61:6 64:10
73:15 103:1 121:8
121:13
happening
78:12
happens
75:18 93:12 94:18
117:1
happy
4:23 5:9 120:3
hard
5:3 55:6,12 56:18,22
57:18 58:4 60:13
74:5 101:20 105:18
114:4 117:24
HARGROVE
1:6
harm
68:7
he'll

7:7 36:18
head
5:18 29:21 32:12
35:2 36:19 41:11
62:18 91:18 92:22
health
40:8
hear
4:22 29:3 86:3
heard
4:25
heart
93:13
heights
99:5
held
110:25
Hello
97:1
help
22:6 74:4 102:3,4
106:8 111:9 112:8
124:3
helpful
106:18
helps
112:2,6
hematoma
99:11
hereto
131:14
herniation
99:11
Hi
130:10
high
65:23 93:24 97:8,15
97:16,23 107:10
123:9
higher
49:25 68:1 95:3,5
102:22 103:23
history
112:12
Hockstein
30:6

hold
7:3,11 22:18 26:6
36:15 57:2,2,3
129:11
hole
76:4
hospital
1:11 6:13,16 7:14 8:2
8:11 9:1,4,4,6,10,13
10:1,4,8,20 11:1,14
12:1,3,4,6,8,10,15
12:16,17 22:4 24:24
25:14,18,23 26:7,16
26:20 29:12,15,20
31:24 32:1,4,9,21
33:15 34:8 44:17,22
49:9 80:23,24 83:1
83:6 84:12 113:9
hospitalization
44:16
hour
49:22,23,24 50:4
hour-to-hour
105:19
hours
50:18,20,22 51:4,9
51:11,15
hyp---
107:2
hyper---
99:15
hyperdensity
99:13
hyperintensity
99:15 100:19 101:6
hypertension
107:3,4
hypoperfusion
54:1
hypotension
107:5
hypothetically
105:22 113:19,20

**I**

ICU

10:9,12 32:22 33:23
61:15 67:8 83:24
84:5,19 103:18
104:10 111:20,21
111:22
III
2:3,5
Illinois
6:14 21:24 46:12,13
46:17
im---
71:25
image
99:18
images
30:15 31:10 99:12,24
101:5
imaging
30:12,14,20 31:14
44:20 66:19 92:25
98:5
immediately
73:17
impact
87:21
implement
114:18
imply
109:23
improper
91:10
improve
71:22,23 72:2,3
improved
84:5,14 118:3
improvement
71:16 72:11 73:15
75:5 77:8 82:4,4
83:8 86:12,12,13,17
114:4 115:17 117:2
117:23
improving
72:1
in---
93:22
in-person



3:18
**inadvertently**
5:7
**include**
6:4 16:2 48:8 51:11
**included**
7:22
**includes**
16:5 68:9
**including**
51:3 65:24
**incomplete**
9:21 71:17 72:6
**increase**
45:19 76:5,6 93:22
94:13,14 95:7,12,12
95:14 97:19 102:17
102:21,25 104:12
107:11,14 129:6
**increased**
105:15
**increasing**
102:20 107:17 108:2
108:22 111:8
**incurred**
33:14
**INDEX**
2:13
**indicate**
18:18,25 27:24 39:23
99:6,9 100:25
**indicated**
70:21 110:5,7 122:21
**indicates**
22:15 25:17
**indication**
121:19
**indirectly**
109:11
**infarct**
52:23 53:2 56:12
57:24 58:11,25 59:8
60:23,25 63:6,15
64:5,8,8,9 67:22
68:17 69:16 70:19
71:4 92:19 99:19

100:3,7 101:1
109:12 110:1,11,15
110:22,24 112:1,9,9
112:10 113:21,24
116:11 120:16
121:1,20 128:19,22
**infarction**
36:5,6 37:4 42:20
52:14 54:10,11,15
54:23 55:1 58:19
59:4,14,16,24 60:3
60:4,11,17 61:12,25
63:1,11,21,23 65:3
65:4,6,21 66:4,5,6
66:18 67:10,13,17
68:1,4,23 75:16,17
77:23 78:11,17
79:25 81:21 86:10
89:2,4,10 90:1 93:1
93:5 94:5 96:22
97:3 98:10 99:16
103:14,22 104:24
108:1 109:18,18,22
110:3,6 115:11
116:21 117:10
121:11 122:1 124:9
124:13,15 129:1,25
130:1
**infarctions**
38:14 39:7 65:10
88:2
**infarcts**
112:3
**infection**
87:17
**initial**
103:16
**initially**
44:23 100:5,6,24
**initials**
15:20
**injuries**
80:1
**injury**
53:24 56:3,13 62:9
87:17 126:25

**insert**
87:5 94:3 104:6
**inserting**
76:10,12 94:1 95:19
102:23 116:24
129:14
**insertion**
77:4
**inside**
41:15 60:12 76:9,15
96:2,2 121:14
**Insight**
6:16 7:13 8:1 9:6,16
9:18 10:4,19 11:1
11:14 14:14 22:4,4
24:24 25:18,23 26:7
26:20 32:21 80:3,19
81:12
**installation**
114:21
**installing**
115:8
**intact**
28:11 40:1,1,3
**intend**
40:21 41:3
**intensive**
103:21
**interested**
131:14
**intervention**
102:12 108:21,23
**interventional**
80:16
**interventions**
108:25 117:8
**interview**
7:1
**interviewed**
19:11
**intracranial**
72:7
**intraoperative**
120:17
**intraoperatively**
95:24 120:16,24

121:1
**intraspinal**
78:5,7,14 87:2 93:8
93:25 94:13,15
95:17 97:18 102:17
103:24 107:13
108:2 111:5,6,7
123:25,25
**introverted**
55:13
**intubated**
56:22
**intubation**
65:25
**invasive**
21:3,7,9,12
**involve**
46:5 75:13
**involves**
47:21
**irreversible**
53:23
**ischemia**
65:25
**issue**
89:9
**issues**
13:24 20:16 38:13
107:3
**IV**
104:6,8,9,11,15

---

**J**

**Jackson**
2:3,5,18 3:21 7:6
32:17 33:17 34:25
35:23 36:17 37:16
37:25 38:5 40:17
46:1 52:7 54:19
55:3 56:5,15 57:6
57:25 58:13 59:11
61:3 63:7 69:8,18
70:12 71:5 73:2,7
74:13 76:1,25 77:20
79:1,2,18 83:11
84:6,20 85:4 90:14



91:1,6 92:10 96:8
96:19 98:16,22
106:6 113:10 115:5
115:24 117:19
119:15,21 120:5,6
121:17 122:2,15
123:17 125:4,6
126:4 127:17 130:3
130:10
**January**
13:18 17:10 45:15
51:24,25 52:1
**job**
5:15 16:24 17:14,17
19:2,4,9,15,16
**join**
8:20 80:3
**joined**
14:15
**journ---**
38:21
**journal**
38:25 39:2
**journals**
38:22
**July**
17:2
**June**
13:16 55:9,10,14
56:11 57:14 58:17
58:20 60:15 82:14
84:14,22 91:12
109:10,11 110:9,14
113:11,21,22
120:10 122:13,20
123:4 124:6,7
125:16,16,16 126:2
128:19 131:19
**JurisPro**
48:10 49:4
**jury**
59:7

— **K** —

**Kaplan**
40:19

**keep**
124:1
**KEVIN**
1:7
**kind**
27:12 80:17 85:15
126:14
**kinds**
13:23
**knew**
101:3 122:4
**know**
4:23 5:8,10,22,24
10:4 21:13 25:14
26:8,11,12,12,18
37:9 38:2 39:4,10
39:20 40:15 43:3
47:11 53:6,11 54:14
59:20 60:1 62:14
63:1 65:18 73:20
87:3 88:19 89:24
90:10,22 91:16 92:2
92:14 96:7 101:7,9
102:1,5 105:9
107:25 109:1
112:19 113:2,15
117:15 118:7,8,22
121:8,9 122:18
130:1
**knowing**
122:7,24
**knowledge**
31:17 33:1,20 45:20
61:25 66:25 82:18
**known**
54:15,24 60:20 62:10
62:10 68:5 111:2
131:3
**kyphosis**
99:4

— **L** —

**Lady**
12:6,8,10
**Lafayette**
11:25 12:5 13:7,22

14:7,10 16:21,24
17:10 19:9 81:2,13
**laminectomy**
21:9
**large**
100:1 107:11 108:23
110:4
**Laurie**
1:1,17 7:3 36:15
130:7,10 131:3,22
**Laurie's**
5:15
**Law**
2:3,3,8
**lawsuit**
18:23,25 20:5
**lay**
128:2
**lead**
115:13
**leading**
51:2
**leave**
14:9 17:1,21 18:2,7
**leaving**
19:7
**led**
42:20 70:17 114:8
**left**
9:18 10:1 16:22 17:6
17:25 18:9 19:2,6
82:13,19,20,25 83:2
83:10 90:19
**left-leg**
92:7
**leg**
56:11 92:16
**Legal**
48:16
**let's**
6:10 10:11 25:24
72:13 93:12 94:19
96:21,21 97:11,14
123:14
**letter**
18:14,16,18 19:19,21

**level**
26:15 87:22 92:8
96:15 99:13,20
100:21
**levels**
99:22 127:21
**LexVisio**
48:12 49:5
**license**
22:5
**licensed**
21:23
**life**
40:15 44:25 66:14
**lifestyle**
112:5
**light**
40:1
**limb**
89:8,8,9
**limbs**
57:16,17 89:22
**limited**
25:1 53:1 63:14 64:4
69:14 129:18
**line**
92:15
**list**
44:14 48:21 49:1
**listed**
24:16
**literature**
65:5 74:18 75:8 77:4
79:11,13 113:25
116:22 117:4
**little**
5:18 93:4 95:11
**live**
15:6
**live-or-die**
62:11
**LLC**
2:3
**LLE**
90:8
**LLP**



2:8
**load**
 104:7
**loading**
 102:10,11 103:6,8
  104:4,6
**loan**
 13:11
**located**
 12:15,18
**location**
 25:1,7,9
**locations**
 24:25
**long**
 5:22 9:13 15:6
**long-term**
 66:9
**longer**
 49:14
**look**
 6:24 33:25,25 39:18
  85:16 119:8 120:3
**looked**
 24:10 99:24 105:7
**looking**
 14:17,19 17:17 53:5
  89:1 101:3 105:13
**looks**
 22:7
**lost**
 3:6 19:1
**lot**
 32:21 53:16 68:7
**Louisiana**
 11:15,16 16:21
**Lourdes**
 12:6,8,10
**low**
 72:7 78:16,16 87:15
  94:2 111:7 123:16
  123:21,22 124:2
**lower**
 56:10 57:16,17 68:1
  75:24 82:13 83:9,21
  84:4,12 88:20 89:9

89:18,22,25 91:23
 92:7,7 93:1,2 95:21
 103:12,24 105:17
 112:24 113:15
 117:17
**lowered**
 95:24 96:6
**lum---**
 68:24
**lumbar**
 67:14 68:20,21 69:1
  69:2,4,13,14 70:6
  70:16 71:2,20 73:14
  74:10,20 75:22 76:5
  76:11,12 77:5,12,12
  77:22 79:20 80:7,8
  80:13,20 81:3,14
  85:20 86:8,17 87:5
  87:6,11,14,21 88:1
  95:19 97:17,18 98:8
  102:9,23 103:2
  104:1 106:4,13
  107:13 108:24
  110:5 115:8,14
  116:24 118:2
  123:24 124:5
  125:10,20 129:14
**lumen**
 54:2

_____
**M**
_____
**M.D**
 1:16 2:17 4:4,6
  130:13 131:4
**main**
 22:4,5 25:3 39:9 78:1
  78:19 86:21 103:3
  108:24 110:3 111:1
  111:10 123:8
**maintained**
 99:6
**maintenance**
 104:13
**manage**
 54:11 75:17 108:1
**managed**

80:1 93:22 94:5
 120:21
**management**
 9:2,18 25:12 62:1
  87:7 103:14 110:22
  111:18,23 114:20
  124:15 125:12
  128:22
**managing**
 112:3,4 124:12
**MAP**
 94:16,16,21,21 95:1
  95:21,24 96:5,15
  97:3,5,11,16,20
  102:22 103:23
  104:12 105:8,15,22
  106:3,12 107:10
  108:5 111:8 122:4,7
  122:18 123:12,16
  123:16,19,21
  125:11 129:6
**Maryland**
 2:10
**match**
 15:19
**material**
 51:12
**matter**
 4:14 42:20
**mean**
 5:5 28:12 41:25 56:2
  56:12 61:9,11 64:2
  78:4 82:9 87:1 91:4
  92:23 93:7,11 94:16
  94:21 95:1 98:14
  99:2,14 100:12
  102:11,16 108:12
  108:18 109:23
  111:3,5 116:15,17
  126:14
**Meaning**
 23:3
**means**
 28:7 78:14 99:15
  102:22 115:20
**meant**

116:4,5
**measure**
 86:22 126:22
**measures**
 114:18 115:10
  122:12 123:3 124:4
  126:10
**mechanism**
 109:7
**medical**
 11:19,22,23 14:22
  15:11 24:18 29:8,11
  29:16 30:9 31:13
  32:1,3,5,13 41:22
  44:15 71:8 76:17,18
  83:13 92:6 113:1
  117:5,25,25 118:11
  119:24 122:10
  123:1 125:20
  129:17
**medication**
 112:7
**medicine**
 73:23 109:16
**Medium**
 100:1
**MedStar**
 1:11 4:13 29:14
  31:25 32:4 33:15
  34:7 44:17,21 82:25
  83:5 84:11 113:8
**meeting**
 105:11
**member**
 27:18 53:20
**memorize**
 85:2
**memory**
 83:14 84:24 85:5
**mention**
 77:21
**mentioned**
 24:24 48:23 105:23
  108:11 127:25
**Mercy**
 9:9,10,16 10:1,8



met
102:5
metric
127:5
Miami
16:14,23 17:22,25
18:23 20:6 23:17
Michigan
6:13 22:2,3 25:4
mid
52:6
middle
17:18
min---
21:7
mind
106:21 119:23
mini
130:8
minimally
21:3,7,9,12
minus
78:5 87:1 93:8
102:16 111:6
minutes
49:8,13 119:10,17
misunderstood
63:25
moment
40:24 53:4 69:21
119:19
month
8:4 10:10 13:14 24:3
months
18:3,5,9
morbidity
62:20 65:19,23
mortality
62:16 65:16,20
motor
27:23 40:2 90:3
move
15:2,3
moved
15:4,7 23:15
movement

92:7
moving
99:17
MRI
30:16,17 31:14 44:19
98:12 100:6,13
112:13,17
MRIs
30:21,24
Mullins
2:8
multiple
39:11 77:16,16 79:25
98:9
mus---
90:3
musculoskeletal
90:4

---

**N**

N
4:2
name
4:12 8:16 11:18,22
11:22 12:4,20 15:21
30:5 47:5 48:17,19
48:21 49:2
nature
116:21
necessary
33:16 53:12
necessitated
95:25
need
5:23 6:24,24 16:2
26:22 27:4 41:21
42:24 49:8,14 50:8
50:8,10 83:15 84:15
84:16 95:17 103:22
103:23 105:3 106:8
116:23 128:7 129:2
129:8 130:11
needed
17:19 22:6 23:7 25:4
33:6 109:8
needs

33:24 40:23 41:5,10
42:6,15,25 43:11
44:1 102:4,7
negative
88:2
neither
124:11,11
Nelson
2:8
nerve
87:17,24 94:6 108:17
nerves
39:25
neuro---
41:23
neurologic
56:23 81:23
neurological
27:19 29:5 39:23
41:23 56:19 57:1,11
57:13 60:14 126:25
neurologically
28:13
neurologist
27:3 42:12 80:16
88:25 98:7
neurology
26:21,25 27:2 28:17
42:15 48:15,16
118:15
neurosurgeon
11:7,11 19:25,25
20:1 27:5,23 28:10
39:22 43:14 63:18
80:12,15 97:2
124:11
neurosurgeons
8:13,18,20 9:25
42:22 80:11
neurosurgeries
27:10
neurosurgery
7:13 8:1,10 9:20
11:17 12:7 13:1
17:15 20:15,18
22:16 25:25 26:4,6

26:24 27:2,6,8
32:20 33:22 38:19
39:14 43:15,19
63:20 119:4
neurosurgical
16:16,18 20:10,13,16
20:20 27:4 40:5
41:24 43:25 54:7
128:25
never
25:4 40:19 80:20
102:5 106:21 124:7
new
9:2 100:15,18,19
night
9:19
nine
15:9
nods
5:17 29:3 36:19
41:11 92:22
normal
28:13 40:2,5 95:3,6
99:4,4
Northeast
2:4
NORTHLAND
1:1
Notary
1:17
notation
120:22 121:18
notations
124:21
note
83:6 84:21 121:7
noted
83:21 120:20
notes
30:8 53:5 82:15
83:21 89:1 91:5
107:1 119:8
Notice
1:18
noticed
131:16


MAGNA
LEGAL SERVICES

**November**
17:6,8 19:3,8
**number**
78:14 89:11
**number-wise**
126:17
**numbers**
90:10 91:12,12,17
106:25
**nurse**
32:8 33:24
**nursing**
32:8,23 33:24,24

**O**

**O**
4:2 131:1
**oath**
3:17
**object**
76:25 84:20 106:6
125:2 127:16
**objection**
3:15 32:17 33:17
37:16 54:19 55:3
56:5,15 57:25 58:13
59:11 61:3 63:7
69:18 70:12 71:5
74:13 76:1 79:2,18
83:11 84:6 90:14
91:1,4,7 92:10 96:8
96:19 115:5,24
117:19 121:3,21
123:5 125:5,23
129:22
**objections**
91:19
**obtain**
35:12,21
**obvious**
101:2
**obviously**
121:25
**occur**
67:13
**occurred**

57:24 58:11 120:16
120:17 121:1,20
**offer**
19:16 20:3 40:21
**offered**
23:3
**offering**
21:14,19 52:18 66:13
118:13
**offhand**
122:6
**office**
2:3 12:15
**officer**
3:16
**Oh**
49:24 70:4 72:14,24
98:18 100:4 124:24
**okay**
5:1,2,12,20 6:10,15
7:7,15 12:23 15:6
15:20 18:22 19:22
22:7 23:9,13,15
24:3 25:5 28:6,10
29:1,2,4,23 30:19
31:1,25 32:7,10
33:6 34:6,23 35:3
37:1 39:3 40:19
41:2 43:4,14 45:7
45:21 46:18 48:25
49:25 50:18,22
51:10,15 52:3,16
53:4,10,18 54:13
55:18 58:6,24 60:9
60:16 61:11 62:8
63:19 66:7 68:8,25
69:2 71:24 72:4
73:16 74:24 75:7,19
77:9,18 78:18,21
79:10 80:12,18 81:1
81:13 82:11,21
84:18 86:7,11 88:5
88:13,18 90:2,21
92:1,5,18 95:21
96:12 97:9,16,25
98:1,12 99:2 100:16

100:21 101:3,8,14
101:24 102:8 104:2
104:19,20,25
105:22 106:20,23
107:16 108:5,20
109:1,6,9 111:12,23
112:11,20,22
114:13 115:3,19
116:7 117:7 119:5
120:5 121:18 122:3
123:18 124:17
126:5 128:9,9,17
129:5,16
**old**
100:18
**oncology**
16:16,18 20:10,13,17
20:18,20
**ones**
87:19 113:11
**online**
8:15 23:7
**onset**
55:20 67:3 73:17
**open**
7:3 21:5 36:15
**opened**
36:12
**opening**
57:7
**operated**
53:22
**operating**
25:25 26:2 33:23
**operation**
61:19,21
**operative**
120:1,7 121:7
**opinion**
6:7 39:20 41:3,9
47:14,18,24 57:23
58:9,22 62:2,5,15
62:19,23 65:8 66:7
66:13 67:5,6,21,24
69:9,13,22 77:10
79:12 88:13 91:14

102:6 114:9 115:1
116:7 117:4,6,7
118:15 120:24
121:19 124:18,23
125:14,18,25 127:3
127:19 129:14
**opinions**
6:1,6 21:14,20 34:6
38:6 40:21 42:23
52:18,25 54:6,7
63:13 64:3 118:13
129:17
**opportunity**
5:9 13:9,12 14:14
**opposed**
124:20
**optimizing**
114:19
**option**
106:1
**oral**
16:6 24:1,5
**order**
96:6 102:4 130:8
**ordered**
131:16
**oriented**
39:24
**original**
131:15
**originally**
23:9
**out-of-five**
82:9
**outcome**
70:17 71:21 75:4
81:22 102:19
112:23 114:25
115:13 122:10
123:2,23 126:9
131:14
**outcomes**
70:23
**outside**
12:16,17 33:9 41:13
46:12 96:13



**oxygen**
108:11,15,16 109:2,4 123:10

**P**

**P**
2:10 4:2 35:24 131:1
**P-u-b-m-e-d**
35:24
**p.m**
1:20 4:4 130:13
**packet**
38:1
**page**
2:15 130:11
**pages**
83:13
**pain**
111:14
**paragraph**
114:10,11
**paraplegia**
67:3 71:17 72:7,15 72:19
**Pardon**
28:24
**part**
9:25 12:22 13:1 20:17 23:25 24:1 26:24 27:9 41:12 43:4 61:8 63:2 68:19,20,21 73:13 73:13 91:9 105:2 110:7,8 120:8
**partial**
72:11,15,19,21,23 73:15,18,22 74:11 75:5 77:2,8 82:3 86:12,19 114:3 115:17 117:2,9,13 117:16 126:7,19 128:13
**partially**
71:22,25 72:1,2
**particular**
68:12

**parties**
1:19 131:14,16
**parts**
111:10
**party**
131:16
**pass**
16:2,7 22:12,23
**patient**
27:8 28:13 30:2 31:15,24 42:24,25 55:8 59:17 60:15 61:18 68:7 70:10,23 71:18 74:4,5,19 78:1 79:21 80:20 81:3,14,23 82:1,5 85:17,20 86:16 87:4 87:8,11 94:19 96:22 96:25 97:2 98:10 99:17 104:7,12,16 106:3,9 107:10,16 108:4 109:25 111:20,22 113:8 115:13 117:5 121:11 123:23 124:3,6,8,10,16 126:24 127:13 128:15 129:20,25
**patient's**
56:21 77:7 110:22 111:11 112:23 114:19,24
**patients**
10:19 11:8 13:21 26:14 33:25 43:5,10 43:15,18,20,22 53:22 77:22 79:24 85:18 111:21
**Paul**
35:24
**pay**
48:20
**people**
8:10 23:5 62:12 71:22,22,23 82:16 82:17

**percent**
14:4,5 20:21,24 21:8 27:15,15 49:10 65:13,17 74:1,6 129:13
**percentage**
14:1,2 20:20,23 21:6 27:13 62:12 115:3 127:1 128:3
**percentage-wise**
126:15,16
**percentages**
128:1
**perfect**
87:9 99:18
**perfectly**
85:11
**perform**
10:20 11:5,8 27:11 32:10 35:11 43:15 47:18 96:6
**performance**
21:16 120:9
**performed**
12:11,13 14:7 28:22 125:21
**performing**
12:7
**perfusion**
60:7,11 76:6,14 77:6 78:4,8,15 86:22,23 86:25 87:3,24 93:2 93:3,7,18,21,23 94:1,4,10,11,23,25 95:7,13,22 97:19,22 102:15,18,25 105:4 107:12,15,18 108:2 108:13,14,18 109:19 111:2 116:23 123:9,22 124:2 129:3
**period**
23:3 24:17 82:2
**permanent**
115:23 116:5,12,20
**persisted**

72:7
**person**
39:24
**perspective**
41:23,24 43:2,25
**pertained**
37:22
**phonetic**
18:14
**phrase**
6:4 114:7 115:19
**physical**
28:22 118:9
**physician**
111:22
**physiological**
114:19
**pick**
57:10
**pinpoint**
120:19
**place**
23:1 39:24 70:24 80:3 81:3
**placed**
71:14 79:20 80:20 81:14 85:19
**placement**
70:16,20 71:2,20 72:15 74:10,20 75:22 77:12 80:8 81:20 86:8,13,17 87:11,21,23 88:1 125:11,21
**places**
80:13
**plaintiff**
1:9 2:2 46:9,10 47:3
**plaintiff's**
88:6
**plan**
40:15 44:25 84:23
**please**
3:19 5:8 36:17 49:7 56:7 83:16 90:16 101:19,22 103:10


MAGNA
LEGAL SERVICES

122:14 126:12
**plus**
 36:5,6 37:3,4 85:6
**point**
 4:21 5:6 83:8 88:8
  118:16 128:21
**points**
 55:19
**pop**
 44:7
**portion**
 3:10
**position**
 7:11,12 8:8,9 11:13
  14:11,16,17 16:14
  19:23 80:18 81:1
**positioned**
 73:17
**postdate**
 24:11
**postgraduate**
 19:19 20:11
**postop**
 128:20
**postoperative**
 29:13 55:20 59:17
  61:7,7 65:15,24
  67:3 82:2 121:10
**postoperatively**
 62:25 97:12 103:9
  104:16 120:18,21
  121:2
**postsurgery**
 88:9
**postsurgical**
 129:20
**potential**
 106:2 128:12
**power**
 1:6 28:7 30:2 82:5,8
  82:8,16,17 83:9
**practice**
 11:17,18 12:2 13:7
  13:11 14:3,10 17:20
  20:13,19,22 25:1,5
  39:6 43:5 74:3

129:21
**practition---**
 14:9
**practitioner**
 13:5,8
**preparing**
 50:16 51:8
**presence**
 27:7
**present**
 77:24 117:5
**presented**
 41:17
**pressing**
 46:25
**pressure**
 60:8,11 76:6,9,14
  78:4,5,5,7,9,14,15
  86:22,23,25 87:1,2
  87:3,24 93:2,3,7,8,8
  93:18,21,24,25 94:2
  94:4,10,12,13,15,17
  94:20,22,23,25 95:2
  95:4,7,13,17,22
  96:5 97:18,19,22
  99:10 102:15,16,17
  102:18,21,25
  103:12,17,25 104:5
  105:5,16,17,20
  107:12,14,15,18
  108:3,13,14,19
  109:20 110:25
  111:4,5,5,6,16
  112:4 114:20
  116:24 123:9,22,25
  124:2 129:3
**pressures**
 72:8
**pretty**
 97:15
**prevent**
 70:22 78:11
**prevented**
 71:3,9
**preventing**
 112:10

**previous**
 63:25
**primary**
 26:11
**prime**
 26:10
**prior**
 6:18 9:7,10,14,20
  30:21 91:24 120:14
**private**
 11:17,18 12:2
**probability**
 6:3,8 58:10 59:23
  65:9 70:16 71:1
  74:1 75:21 116:8,19
**probably**
 52:4 119:7
**problem**
 7:2 42:21 49:14
  128:25
**procedure**
 80:10,17 87:15,16
  114:23
**proceed**
 3:14 39:18
**process**
 10:5 11:3 15:16
**produce**
 78:2
**production**
 2:23
**professional**
 7:15 11:23 27:17,20
  131:22
**prognosis**
 41:22 42:23 66:17
**program**
 14:13,25 15:17,25
  16:4 17:25
**progress**
 107:1
**prolonged**
 53:25 65:25
**promptly**
 68:6
**proof**

 18:8,8
**prove**
 18:5
**provide**
 7:1 40:25 41:22 54:6
  54:7,10 58:22 62:5
  66:17 69:8,22 77:19
  77:20 79:6,7,16
  111:24 118:15
**provided**
 6:18 31:18 32:3,14
  33:2 34:11 36:8
  37:21,25 38:5 41:20
  44:24 51:12 53:8
  68:8,16 69:15 70:9
  71:13 74:25 75:11
  78:24 86:24
**provider**
 106:2 118:11
**providers**
 40:9
**Public**
 1:17
**publications**
 7:21 24:10,15,21
**published**
 53:14,18
**PubMed**
 35:16,23 36:2,10,21
  36:24
**pull**
 53:10 85:14 92:3
  98:3 114:13 119:25
  119:25
**pulled**
 34:18 39:1
**pumping**
 93:13
**pursuant**
 1:18
**pursue**
 20:14
**put**
 35:20 36:2 48:18
  72:5
**puts**



127:25
**putting**
128:3

---

**Q**

**qualified**
42:22
**quantification**
126:15,16,22 127:4,8
**quantified**
127:1
**quantify**
116:3 126:5,13
127:20,24 128:11
**question**
4:22,24 5:1,5 19:14
24:13 25:11 39:3,6
41:1,6,16,19 56:8
57:8 59:5,19 64:1
75:19 83:18 84:9
87:25 89:13 90:13
91:9,10,15 94:8
97:13 98:1 102:13
105:25 106:17
108:5 118:6 122:14
123:14,15 125:8,13
127:15 129:4
**questionable**
99:12 100:24
**questions**
4:20 5:16 6:5 44:6
45:9 119:13,17
122:3 128:17 130:4
**quick**
49:12

---

**R**

**R**
4:2 131:1,1,1,1
**radiologist**
31:3,6
**radiology**
30:15
**raises**
102:23 103:2
**raising**

106:3
**range**
49:4 65:24 105:23
**rare**
39:16 60:20 87:18,20
**rate**
50:1,3,5 62:16,20,24
64:25 65:10,16,23
66:9 67:23,25
104:13 131:17
**rating**
127:12,14 128:5,10
**reach**
76:8
**reached**
94:6
**reaches**
93:4
**reaching**
76:14
**read**
65:14 72:12 98:17
102:2 104:21
114:10
**reading**
120:7 131:11
**ready**
35:8
**really**
13:12 14:13 39:17
45:19 56:23,25
57:10,18 60:13
69:25 86:22 87:2
97:17 102:24
103:24 104:11
105:18 111:11
114:4 117:22,24
121:8,9,14 123:13
124:14
**Reask**
57:8
**reason**
81:20 86:10 91:7
95:15 127:16
**reasonable**
6:3,7 34:1,9 58:10

59:22 65:9 70:15
71:1 75:21 76:18
106:1 116:7,18
122:9 123:1 129:17
**reasonably**
38:13,17
**reasons**
60:5 85:22 86:7
**rec---**
98:8
**recall**
15:4 30:4 31:11
36:23 47:5 53:15
72:9 82:22 83:19
85:5,22,23 86:4,7,9
86:11,16 90:22 92:5
105:18,21 106:23
106:24 117:23
120:18 122:5
**receiving**
110:13
**recess**
49:17
**recognized**
54:16 111:3
**Recognizing**
68:6
**recollect**
122:22
**recollection**
31:9 49:1 84:3,11
**recommendations**
103:6
**recommended**
95:9 98:8
**reconvene**
49:13
**record**
3:10,15,20 41:17
119:11,24 120:8
124:25 131:10
**recorded**
131:8
**records**
29:8,11,12,16,19
30:9 31:13 41:22

44:16 83:4,5,7,13
83:14,15,20 84:4,12
84:25 85:6 92:6
98:7 105:7 106:24
112:21 113:2,10
117:5 124:19,20
125:9,15,20
**recover**
71:23
**recovery**
126:7,8 127:21
128:12
**recruited**
14:16,18
**redirect**
84:23
**reduced**
105:16 131:8
**reduces**
95:21
**refer**
77:13 112:23
**reference**
102:8,10 112:11
**referenced**
127:5,6
**references**
74:25
**referred**
45:25
**referring**
75:12 113:7 125:9
**reflected**
3:8 7:17
**regarding**
21:15
**regardless**
97:23 103:21 129:13
**Registered**
131:22
**regular**
5:19
**rehab**
29:19
**rehabilitation**
118:20,22 119:1,3



**relate**
64:18
**related**
42:8,15 52:22 64:9
64:11,16 65:20
103:6 117:10
131:13
**relationship**
36:4,4
**relative**
131:6
**reliable**
38:13,17
**relying**
38:4 77:9
**remaining**
20:25
**remember**
30:17,18,22 31:17,21
48:17 53:17 55:9
57:14 67:20 72:10
75:14,15 82:7,15,18
83:25 84:1,2,16,17
85:12 86:6,15,20,21
91:23 92:4,12,13
102:14 103:10,11
103:19 105:3,13,14
107:4,5,6
**remembered**
85:9
**remind**
114:10
**remotely**
1:19 3:17 4:20 5:3
**removed**
72:8
**renal**
66:1
**repair**
11:9 21:16 42:9
55:23 56:4,13 59:2
59:10,15,25 61:14
63:5 65:2,12,17
66:11,16 79:22
80:22 81:5,16 85:21
87:13 88:22 89:20

96:1,17 107:19
108:7
**repeat**
56:7 72:18 84:9
90:13,16 122:14
**replacement**
54:1 72:20
**report**
34:22 35:5 45:8
50:21,23 51:3,7,18
52:3 98:5 102:8
112:11,22 113:6
114:6 120:1,7,10,13
**Reporter**
3:13,23 35:14,18
57:2,5,9 101:15,19
131:22
**REPORTING**
1:1
**reports**
30:23 31:3,6
**represent**
4:13 64:14
**request**
79:8
**required**
69:3,12
**research**
38:9,13 70:21 79:6
**residency**
15:10,14,25 16:4,12
22:9 24:18 81:9,12
85:19,24
**resident**
80:5
**residual**
69:16 71:3 81:23
113:23 114:4
**resolution**
74:19 75:3,9,23
76:20,23 77:2,6,11
77:25 114:1 115:16
117:1,9,17
**respect**
85:2 120:25
**respective**

131:12
**respond**
32:18 33:18 37:17
54:20 55:4 56:6,16
58:1 59:12 61:4
63:8 69:19 70:13
71:6 74:14 76:2
79:3 84:7 90:15
91:2 96:20 115:6,25
117:20
**response**
36:10
**responsibilities**
7:16
**restate**
4:24
**result**
53:24 77:6 108:21
**resulted**
75:23
**results**
39:21 63:22 77:16
**resuscitate**
104:11 129:8,10
**resuscitation**
108:23 110:4 115:9
115:15 116:25
124:5 129:11
**resuscitations**
118:2
**retrospectively**
101:4
**revealed**
37:24
**review**
29:19 30:8,23 37:22
38:3,8 40:18 41:18
49:22 50:1,20 52:9
53:16 66:19 83:3,12
83:15 84:3,11,15,16
98:6 100:8,25
106:24,25 124:19
125:15
**reviewed**
29:8,11,16,23 30:12
30:14,19 31:12,19

34:13,22 44:9,12,13
44:15,18,19,21,23
45:1,3,23 67:8 75:2
83:4,20 92:25 100:9
101:4,11,13 113:1
124:25
**reviewing**
31:9 47:2,13 50:19
51:11,25 125:9
**right**
5:14 6:1,10 9:17
15:17 17:11,12
24:14 43:17 45:4,5
45:7 49:20,22 50:25
55:24 56:20,24
57:18 59:6 64:2
73:8 74:7 82:16,19
83:1,4,9 90:6,20
93:9,23 95:25 98:11
100:5,21 101:6,12
103:15 106:4
108:10 114:2 119:5
121:7 123:16
**Riley**
2:8
**risk**
54:24 59:3 87:15
97:10,15 106:16
107:16,18 112:2
**risks**
73:24 87:10,16
104:15 108:7
**RLE**
90:9
**role**
43:14
**room**
3:24 33:24
**rooms**
25:25 26:2
**Royal**
15:21
**RPR**
1:17
**rules**
4:19


**MAGNA**
**LEGAL SERVICES**

**run**
82:16,17

### S

**S**
4:2 131:1
**safe**
112:17
**sagittal**
99:12
**satisfaction**
18:13 20:8
**Saudi**
14:23 15:2,8,11
**save**
119:22
**saw**
57:14 95:9 112:21
**saying**
8:17 33:11,14 106:15
113:4 120:19
**says**
18:20 61:18 72:14,14
73:16 74:18 90:3
99:5 100:11 114:14
116:22 129:9,10
**scale**
82:9
**scan**
66:21
**Scarborough**
2:8
**schedule**
26:5
**scheduled**
47:11
**school**
14:23 24:18
**science**
74:3
**scientifically**
58:16
**scores**
91:24 105:8,10,22
108:5 122:4,8,18,20
122:24

**screen**
53:11 98:17,19
101:16 119:18
**SEAK**
48:8 49:2
**seal**
131:18
**search**
35:11,20 36:10,12,21
36:23
**searching**
35:7
**second**
19:10,10 71:12 89:23
98:4
**secondary**
54:2
**section**
112:12 121:16
**see**
13:21 14:19 43:10
56:18,19 57:17
72:13 79:24 88:25
88:25 90:2 98:4,18
98:21 100:3,18
101:6 104:20
109:13 110:20
114:13 119:16,19
121:14 124:20,21
**seeing**
107:4,5 125:10,11
**seen**
34:3 100:23 118:9
127:13
**segmental**
54:1
**send**
7:6 36:18 93:14
**sensation**
28:11 40:1,3
**sense**
34:9
**sent**
29:25 30:1 31:21,23
34:16,19 35:3 40:17
61:17 67:2 113:10

**sentence**
61:17 72:5,17 73:3
73:11 108:3 114:11
**sequelae**
65:24 68:17
**sequence**
100:13
**sequences**
103:1
**serves**
87:6
**service**
11:23 32:14
**services**
32:14,15 34:10 48:5
**set**
31:2,5 103:17,20
105:20
**setting**
103:19 104:4
**settlement**
20:7
**severe**
57:16 112:23
**shakes**
5:17 29:21 32:12
35:2 62:18
**SHANA**
1:6
**share**
34:24 53:10 98:17,19
101:16,22 119:18
119:24
**shared**
12:23 34:25
**shorthand**
131:8
**show**
84:21 114:3,12
**showed**
114:1 115:15
**shows**
77:25 106:18
**shutdown**
9:17,21
**sic**

10:19 35:17 52:21
**side**
29:21,21 32:12,12,22
33:22 35:2,2 62:18
62:18 82:13,19
90:19,20
**signal**
100:13,13
**signifying**
15:24
**signing**
131:11
**similar**
49:4
**simple**
21:9 78:3 93:6
108:15
**single**
92:19,21,21
**sitting**
31:8 41:2,8 79:10
101:9 113:14
117:15 118:18
122:23
**situation**
23:2,8 24:2 62:11
102:1 105:19
112:19
**size**
66:23 101:1 130:8
**small**
100:1
**societies**
27:17
**society**
53:14,19,20
**solely**
70:7
**solo**
13:4,8 14:9
**solve**
109:20,24
**somebody**
57:4
**somewhat**
129:18



**sooner**
15:3
**sorry**
10:10 18:15 24:13
31:21 35:14 41:6,25
48:16 57:6 63:25
67:9 72:18 84:8
86:1,3 88:18 90:16
116:15
**sort**
19:19
**sounds**
5:13,21,25 7:8
127:11
**source**
127:6,24
**sources**
38:12,16 39:5,8
**South**
2:9 6:13
**spanning**
114:14
**spec---**
122:17
**specialist**
80:14
**specialists**
44:2
**specialities**
61:24 62:7
**specialize**
21:3 33:8
**specialty**
20:14 21:13 25:16
**specific**
42:19 58:3 80:23
82:5 83:15 97:20
105:1,18,20 106:25
122:4,7,18
**specifically**
33:3 80:6
**specifics**
86:15
**speculative**
70:19 74:9
**spent**

50:19,22 51:6,15
**spinal**
13:23 36:5,5 37:3
38:14 39:7 42:20
47:1,8 52:14,22
53:2,23 54:9,11,15
54:23,25 56:12
57:24 58:11,19,25
59:4,8,13,15,23
60:3,4,7,10,16,23
60:25 61:12,25 63:1
63:6,11,14,21 64:4
64:7 65:4,5,21 66:6
66:18 67:10,17,22
67:25 68:3,17,23
69:16 70:18 71:4
75:16,17 76:6,7,9
76:15 77:5,23 78:3
78:8,11 79:25,25
81:21 86:10,22,23
86:25 87:3 89:2,3
89:10,25 92:19 93:1
93:3,4,6,17,20,23
94:1,4,10,11,22,25
95:7,12,21 96:22
97:2,19,22 98:10
99:10,16,19 102:15
102:18 103:14,22
104:23 105:4
107:15,17 108:1,12
108:13,14,17,18,22
109:12,19,22 110:1
110:3,6,6,21,24
113:21 115:11
116:11,21,23
117:10 122:1 123:8
123:11,21 124:2,9
124:12,15 128:25
129:2,25 130:1
**spine**
14:2,5 21:1,2,6 27:10
27:12,13 30:17
44:19 47:22 63:16
63:17,20 64:10,13
64:15 65:3 66:5
76:13 92:25 98:13

99:3 123:11
**spoken**
3:5,7 40:6,8,11,19
**standard**
21:15,20 47:18,20
48:3 52:18 69:3,7,7
69:12,22 70:2
112:16 116:9,10
125:3,7
**standpoint**
72:25 129:6
**start**
6:10 13:13,17 16:21
17:9,16,19 35:7
36:12 45:11,16
97:11
**started**
8:4,23 10:4 17:2,10
23:20 43:23 47:13
51:24 55:8 98:2
**starting**
45:21
**starts**
15:5
**state**
3:19 46:12 70:25
75:21 77:10 114:19
122:9,25 129:16
**stated**
112:22 126:7
**statement**
54:4
**states**
1:3 14:20 15:7,15
16:11 22:1,9 23:6
23:15,19 53:22
98:12 120:11
**station**
102:24 103:3
**status**
56:21 111:11
**stayed**
83:22
**sternotomy**
61:19,22
**stipulate**

3:14 119:23
**Stop**
101:22
**stopped**
13:14 23:5
**straightforward**
114:22
**Street**
2:4,9
**strength**
28:11 40:2 90:5,8,9
92:8
**strike**
9:5 17:1 44:4 67:23
101:10 106:21
**stroke**
26:8,14,19,22,25
27:1,3,6,9 28:20
55:22 56:2 63:10
65:25 88:6 89:21
92:20,21,24 93:12
95:9 100:15,15,17
100:18,18,19 101:7
103:4 110:2 128:14
**strokes**
93:15,16 122:1
**strong**
89:9
**structure**
64:14
**studies**
39:11,17,19 70:22
77:17 106:18
113:25 115:15
**study**
39:19 65:5 68:12
105:6,10
**studying**
39:21
**Sturtz**
2:10,11,17 3:22,22
4:11,13 33:5 34:5
35:19 36:1 37:18
49:10,19 54:21 56:9
57:4,20,21 58:5,23
59:18 61:10 63:12


MAGNA
LEGAL SERVICES

69:24 70:14 71:10
73:6,8,9 74:23
76:22 77:1 79:9,19
83:17 84:10 85:1,8
85:10 90:18 91:3,20
91:22 92:11 96:11
97:6 98:18,20,23
99:1 101:17,20,23
106:10 115:18
116:1 118:5 119:5
119:12 120:3 121:3
121:21 123:5 125:1
125:5,23 127:7
129:22 130:5
**stuttered**
3:5
**subject**
46:23
**subsequently**
107:14
**subspecialty**
24:7
**suffer**
62:12
**suffered**
43:11 63:4 66:15
80:21 81:4,15 87:12
121:25
**suggest**
127:23
**suggestive**
55:22
**suggests**
66:8
**Suite**
2:4,9
**summary**
84:22 112:13
**summer**
10:11,11,23
**supports**
67:6
**sure**
6:25 51:21 64:23
70:5 72:13 100:6,14
107:10 109:6 114:6

**surg---**
56:3
**surgeon**
37:12 42:3 43:13
47:22 80:25 96:10
96:18,24 104:18
107:23,24 108:6
128:23 129:14
**surgeons**
8:16 11:2 15:22
27:19 53:15,19
121:13
**surgeries**
14:6 21:4,6,7 26:3
**surgery**
10:14,15,16,21 11:5
11:8 12:11 14:1
20:23,25 21:5,11,12
25:6 26:5 27:12,13
29:13 32:11,23 33:3
33:6 34:2 43:6 47:9
52:15 55:2,7,10,16
56:1,1,21,24 57:18
58:7,8 60:12,13,18
61:1,8,20 62:3,4
71:21 82:1 96:3,6
121:7,14
**surgical**
13:23 21:16 26:22
56:3,13 59:2,9,14
61:14 64:19 65:2,11
65:17 66:10,16
79:22 80:22 81:5,16
87:13 88:21 89:20
95:25 96:17 107:19
**survival**
66:9
**survive**
82:1
**sworn**
4:5,8 131:5
**symptoms**
73:18 75:3 76:20,24
77:7,11 78:1 115:16
117:2
**systolic**

94:19 95:3,6,10,15
102:21

**T**

**T**
131:1,1,1
**T5**
92:20 99:14,20 100:7
100:21
**take**
5:24 16:24 23:1,9,23
27:7 30:8 49:11,12
50:11,13 85:16
101:18 104:9 119:6
119:7 130:7
**taken**
1:16 4:16 49:18
115:10 122:12
123:3 126:10
**talk**
5:5,7 70:3 75:2,15
96:3 104:17 114:14
**talked**
38:10 44:10,11 102:9
**talking**
70:6,7 85:16 99:20
**team**
26:21,22,25 27:1,3,9
88:24 95:9 103:4
**technological**
3:6
**tell**
5:3 30:5 44:14 52:12
59:7 60:13 73:25
96:24 97:4 100:14
100:17 114:5 118:1
**telling**
51:1 79:11
**tells**
97:15
**temperature**
110:23 111:18
**temporary**
116:6,12,20
**ten**
26:2 119:17

**tend**
109:16,17
**terms**
7:9,15 13:25 20:19
20:22 25:5 26:15
32:13 42:5 44:12
68:16 69:15 70:18
83:8 85:6 92:6,19
96:12,14 103:8
106:2 107:17
113:13 124:21
126:6,19
**test**
22:23 83:14 84:24
**testified**
4:8 88:7 106:11
**testify**
41:4 58:25 64:7
69:11 70:15 131:5
**testifying**
69:5 112:16 131:5
**testimony**
16:22 23:22 120:18
131:7,10
**Thank**
5:13 7:8 35:18 49:16
119:10 130:4,6,9,11
**Thanks**
98:22
**therapeutic**
109:12 122:12 123:3
126:10
**therapy**
88:8
**thick-headed**
104:3
**thing**
5:14 6:1 18:15 31:22
33:19 39:9 58:15
66:3 88:23 100:14
104:20 108:10
111:21 121:13
129:12
**things**
44:7 88:19 89:5
109:3 111:9 115:12



think
24:5 30:2,19 32:8
35:23 37:2,19 38:7
50:6,20,22 51:8,19
55:5,10 56:22 59:15
60:2 68:20 76:17
80:4 82:5 85:18
89:1,3 91:4,15
93:17 98:1,9 102:4
102:6 106:20
108:10 119:6,6
124:14
thoracic
53:14,19 98:13
thought
59:19 64:24 81:8
88:24 127:8
three
8:20 30:9 31:13
34:21 36:14,24
44:18,23 46:8,10,11
48:17,22 51:9,11
75:1,11 78:24 79:15
82:6,8 92:15 97:12
thrombosis
54:3
till
79:13
time
1:20 2:23 4:21 5:6,23
9:2 18:20 19:20
23:4 24:12,17,22
39:25 51:6,10 55:11
56:22 58:3 70:3
80:4 81:8,13 82:2
82:25 83:8,23 84:13
88:9 98:7 107:4,5,6
113:5 119:22
120:19 130:6
times
79:20 80:5 85:23
97:23 98:9 112:12
timing
56:10 114:8
tissue
76:15 78:10 94:6

108:17
tissues
87:24
today
4:15 5:22 6:11 7:10
7:16 10:24 31:8
35:9 41:2 79:10,14
101:9 113:14,16
117:15 118:18
told
34:14 45:18 48:24
52:14 102:15
111:15
tool
87:7
total
51:15
totally
71:23
touch
40:1
TPA
88:8
track
85:15
trained
80:17
training
15:11 16:19 19:19
20:11 22:10 24:12
24:18
transcript
3:9
transcripts
29:24 31:14 44:18
transfer
9:15
transpired
7:9
trauma
27:14,16
travel
50:8,10
traveling
50:17
treat

130:2
treating
40:8 129:19,25
treatment
33:12 87:8 109:9,21
127:10,10 128:21
trial
40:22 41:4,20 50:5
50:12,15,16 58:25
69:12,13 70:3
true
7:18 10:23 43:20
74:16 76:3,4 81:10
131:10
truth
131:6,6
try
5:19 22:5 53:10 92:3
94:18
trying
44:13 91:5,17 98:3
116:17 119:18,21
119:24,25 127:18
two
34:21 36:14,24 44:23
49:8 52:2 55:15
74:21 75:1,10 78:24
79:15 82:6,17 90:8
90:11,19 92:15
94:24,24 109:3
111:1,10 115:9,12
type
10:20 11:9 12:12
27:10 32:10 33:2,7
33:12 35:22 36:2
37:2,7,8,12,13 43:6
43:8 53:23 54:16
59:1 60:18 61:2
62:16,20,24 63:5
64:18 65:1,6,6,7,7
65:11,16,19,22
66:10,15 67:4,11,15
67:16 68:1,2,3,4,15
75:13 79:21 81:4,15
85:20 88:21 89:19
92:24 96:16 129:19

types
13:21 88:19
typewriting
131:8
typically
67:14

———————— U ————————

U.S
23:14
undergo
43:5,19
understand
24:13 25:11 59:5
60:2 89:13 92:1
104:2 114:7 123:14
125:7
understanding
6:5 37:6 64:22,25
66:8,23 96:4 97:9
100:8 101:24
understands
124:18
understood
5:1 101:8 127:22
underwent
21:11 61:18 62:3
unfair
91:10
unfortunately
19:6
unit
10:14,17 103:21
United
1:3 14:20 15:7,15
16:11 22:9 23:15,19
University
16:14,23 17:21,24
18:23 20:6 23:17
unpredictable
72:16,20
unsafe
112:14,17
unusual
67:16
up-to-date



6:22
**updated**
6:19,25 7:4,23
**upper**
89:8,8 90:5
**use**
39:5,8,9 67:14 68:9
  69:3,13 109:25
  114:7
**uses**
8:6 126:23
**USMLE**
22:8
**usual**
130:7
**usually**
39:9,11 50:9 80:15
  107:8 121:6,12

———————————
**V**
**variability**
92:6
**variable**
95:16
**verbal**
5:16,19
**versus**
14:1 27:14 73:24
  99:14,17 116:20
**vertebral**
99:5
**videotaped**
3:10,11
**view**
118:16 128:4
**viewing**
85:6
**vitae**
2:21
**vocational**
118:12,20,22,24,25
  119:1,2
**voice**
4:22
**volume**
102:10,11,20,22,23

103:2,6,8 104:3,6
107:11 108:23
110:4 115:9,15
116:25 118:2 124:4
129:8,9,11
**vs**
1:10

———————————
**W**
**wait**
15:18 101:22
**waived**
131:12
**waiving**
3:17
**walk**
101:25 102:3,4 108:4
**want**
15:18 49:11 84:21
  91:11,15,16 97:4,21
  101:17 102:24
  105:5 106:12 120:4
**wanted**
14:11 16:21 17:16
  18:2 19:18 23:9
  70:5 109:6
**Washington**
1:11 2:5 29:15 32:1,4
  33:15 34:7 44:17,22
  46:14,19,20,23
  50:12 83:1,5 84:12
  113:8
**wasn't**
23:3,14 100:23 109:7
**way**
25:19 28:7 33:11,14
  39:18 42:1 47:24
  57:22,23 58:10
  69:25 80:2 95:1
  99:4,4,25 102:17
  103:25 107:25
  108:15 116:4
  120:24 126:17
  127:23 128:10,13
**ways**
94:24 97:24

**we'll**
5:22 7:5 49:13
  130:10
**we're**
4:20 78:21
**we've**
38:9 44:10 52:16,16
  115:14
**weak**
42:21 92:16
**weaker**
82:18
**weakness**
27:25 28:1,2 55:17
  56:11 57:16 58:17
  75:24 82:14,19
  83:22 84:5,13 88:20
  89:19 96:25 112:24
  113:16 117:17
**website**
8:19 25:17
**week**
38:8
**weekly**
80:11
**weeks**
52:2
**Welch**
1:7 21:11,17 28:23
  29:5,9 40:6 42:6,14
  44:9 63:4 70:18
  75:25 88:7 97:10
  101:25 103:9
  104:16 109:10
  113:20 118:14
  125:22 127:3
  128:19
**Welch's**
40:22 41:4,9 59:23
  66:14 76:15 82:12
  101:11 116:10
  122:10 123:2 126:9
**well-known**
60:17
**went**
8:15 14:22 30:23

82:5
**weren't**
23:23 100:6 122:5,21
**widely**
54:24 114:22
**Wisconsin**
46:15
**withdrawing**
20:3
**withdrawn**
19:16
**witness**
2:15 3:25 4:5,7 32:19
  33:19 35:16 45:9,12
  45:16 49:7,16 55:5
  56:7,17 57:12 58:2
  58:15 59:13 61:5
  63:9 69:20 71:7
  74:15 76:3 79:4
  84:8 90:16 96:9,21
  98:24 106:7 115:7
  117:21 121:6,24
  123:7 125:24
  129:24 131:5,7,10
  131:12,12,18
**word**
8:6
**words**
3:4,5,5,7,8 116:16
**work**
26:19,21 45:10,12,16
  45:21 51:2 69:25
  118:14,16
**working**
11:12 12:1 13:14,17
  47:6 79:4
**worse**
70:22 83:22 90:23
  91:14,18 115:22
  116:3
**write**
50:21 121:6
**writing**
34:22 35:5 51:3,7
  81:11
**written**



3:9 16:5 23:25
50:23
**wrote**
113:6

**X**

**X**
91:12,13

**Y**

**Y**
91:12,13
**yeah**
30:17 41:7 57:5,7,20
69:25 73:6 101:17
101:19,22 109:23
110:17 125:4 128:7
**year**
13:19 15:4 29:6,9
45:13,17,22 100:20
**years**
43:18 117:24
**yesterday**
31:19 34:16,20 35:4
36:9 53:8 78:24

**Z**

**zero**
82:22 92:14,15
**Zoom**
1:14,15

**0**

**1**

**1**
2:21 7:4 20:21 65:13
**1:23-cv-3381**
1:8
**10**
2:4 14:4 20:24 21:8
**100**
2:9 49:10 74:1,6
129:13
**119**
2:18

**12**
39:25 50:20,22 51:4
**12,000**
50:11,14
**12:06**
1:20 4:4
**130**
103:13
**14**
55:10
**14th**
120:10
**15**
51:15
**1500**
50:4
**15th**
55:10
**1600**
2:9
**17th**
55:9,14 56:11 57:14
58:17,20 60:15
82:14 84:14,22
90:12,24 91:12
109:10 110:9,14
113:21 120:20
121:20 122:13,20
123:4 124:6 125:16
128:19
**18th**
123:4 125:16
**19th**
123:4 125:16

**2**

**2**
2:22 20:21 36:16
39:25
**2:46**
130:13
**20**
14:4 123:4
**200**
14:8 49:3
**20002**

**2:5**
**2005**
15:2
**2011**
22:8
**2019**
17:3,8 19:3,8 23:16
**2020**
13:18 17:10 23:10
81:2
**2021**
8:4,24 9:7,11,14,23
10:1,5,8,11 13:15
22:21 23:1,10,24
24:3 80:19 81:2
**2022**
6:20,23 7:10,17,22
10:23 11:12 84:14
113:11 118:10
125:17
**2023**
25:10,18 29:6,9
**2024**
1:21 29:6,9 45:14
50:23 51:19,25 52:5
113:16 131:19
**20th**
125:17
**21**
123:4
**21201**
2:10
**21st**
125:17
**22**
124:7 126:2
**22nd**
109:11 110:9,14
113:22 122:13,21
125:17
**24**
6:20,22
**24/7**
27:8
**2525**
6:13

**29**
1:21
**29th**
51:19 52:3

**3**

**3**
65:13
**30**
27:15
**30-day**
65:15
**300**
25:24
**35**
65:17
**36**
2:22

**4**

**4**
2:17
**4,000**
83:13 84:24 85:6
**400**
25:24
**4th**
131:18

**5**

**5**
21:8
**500**
49:3

**6**

**6,000**
50:9
**600**
2:4 49:22

**7**

**7**
2:21
**70**
27:15



**80**
 14:4 103:13
**85**
 97:5,11 106:12

**9**

**90**
 14:5 97:5,11 106:12
**900**
 49:23,24

