Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA
Civil Division

- - - - - - - - - - - - - - - - x

SHANA HARGROVE AS POWER OF      :
ATTORNEY FOR KEVIN WELCH

                                :

        PLAINTIFF

                                :

    V.                             CIVIL ACTION NO.

                                :

MEDSTAR WASHINGTON HOSPITAL
CENTER, ET AL                   :    1:23-cv-3381

        DEFENDANTS.             :

- - - - - - - - - - - - - - - - x


VIDEOTAPED DEPOSITION OF

SHANA HARGROVE

WASHINGTON, D.C.


Wednesday, April 10, 2024
11:29 a.m. - 1:35 p.m.


REPORTED BY:
        Okeemah S. Henderson, RPR



Page 2

APPEARANCES OF COUNSEL

ON BEHALF OF THE PLAINTIFF:

GOVERNOR E. JACKSON, III, ESQUIRE

LAW OFFICES OF GOVERNOR JACKSON, III LLC

10 G Street, NE

Suite 600

Washington, D.C. 2002

Gjackson@governorjacksonlaw.com

ON BEHALF OF THE DEFENDANTS:

DAVID STURTZ, ESQUIRE

DONNA P. STURTZ, ESQUIRE

NELSON MULLINS RILEY & SCARBOROUGH LLP

100 S. Charles Street

Suite 1600

Baltimore, Maryland 21202

Peter.sturtz@nelsonmullins.com

ALSO PRESENT:

JONATHAN PERRY, VIDEOGRAPHER

Page 3

INDEX OF EXAMINATION

WITNESS: SHANA HARGROVE                PAGE

DIRECT EXAMINATION

By Mr. Sturtz, Esquire        5, 92
By Mr. Jackson, Esquire        68, 95

INDEX OF EXHIBITS
(Attached to the transcript.)

EXHIBITS                          PAGE

Exhibit 1    Excerpts of text messages    68
Exhibit 2    Hospital stay expense listing  88

Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on the record.  This begins video one in the deposition of Shana Hargrove taken in the matter of Shana Hargrove as power of attorney for Kevin Welch versus MedStar Washington Hospital Center, et al. Case filed in the US District Court for the District of Columbia.  Case Number 1:23-cv-3381.

The date is April 10, 2024.  The time is 11:29 a.m.  We are at the offices of Nelson Mullins Riley & Scarborough, 101 Constitution Avenue, Northwest in Washington, D.C. This is being taken on behalf of the defense.

The videographer is Jonathan Perry and the court reporter is Okeemah Henderson, both here on behalf of Magna Legal Services.  Would counsel please introduce themselves and state whom they represent.

MR. JACKSON:  Governor Jackson, III on behalf of the plaintiffs.

MR. STURTZ:  David Sturtz on behalf of the defendants.

Page 5

MS. STURTZ:  Donna Sturtz on behalf of the Defendants.

THE VIDEOGRAPHER:  And would the reporter please swear in the witness.

SHANA HARGROVE, was called as a witness, and having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MR. STURTZ:

Q. Ms. Hargrove, I'm David Sturtz on behalf of the defendants.  Nice to meet you. I'll be taking your deposition today.  I know you were in the room for Mr. Welch's deposition, but I'll just go over a couple of ground rules for depositions again.

Try our best not to interrupt each other, try to make sure you finish answering completely before saying anything, and please try to wait until I've asked my full question.  If you didn't understand a question, please ask for clarification, I'd be happy to provide clarification.



Page 6

If you don't do that and go ahead and answer, we'll assume that you understood the question. If you need a break at any time, please let me and your counsel know and we'll be happy to accommodate that.

And then also for the record we need verbal responses, so nodding of the head or shaking of the head not accompanied with a verbal response. Does that all make sense?

A. Yes.

Q. So please state your full name for the record?

A. Shana Hargrove -- Shana Rashawn (ph) Hargrove.

Q. Have you ever been deposed before?

A. No.

Q. What did you do to prepare for this deposition?

A. Spoke with my lawyers.

Q. Okay. You didn't review any records?

A. Medical records, no.

Q. Have you ever been married?

Page 7

A. No.

Q. Do you have any children?

A. Yes.

Q. How many children do you have?

A. Four.

Q. Four. And all those children live with you?

A. Yes.

Q. Can you state their ages?

A. 17, 9, 2 and 7 months.

Q. What is your current address?

A. 11450 Diantha Court, Dunkirk, Maryland.

Q. So you don't currently reside with Mr. Welch?

A. No.

Q. Have you ever resided with Mr. Welch?

A. Yes.

Q. When was that?

A. Back in 2008, Kevin Welch and Marvin Holland and I moved in in a roommate situation into our first home in Clinton, Maryland, we then had the home 4706 Mary Beth Boulevard built where

Page 8

we stayed. I was there for about four years, and I moved out on my own for three years and then we together were going to purchase the 12615 Brandywine Road address. I became pregnant and that's the only reason why I did not move in. However, I retain ownership, I contribute to the mortgage, and I do stay there when necessary to help with the care of Kevin.

Q. Okay. So you have not lived in the same residence as Mr. Welch since the occurrence giving rise to this case?

A. Well, I spend my time back and forth between Dunkirk and Brandywine with Kevin.

Q. But it's not --

A. My home address, no.

Q. So going back to -- I believe if I understand your testimony correctly you lived in the same residence as him for four years beginning in 2008?

A. Well as a child we also grew up together. His mother is my grandmother, my mom is his sister.

Page 9

Q. As adults, it was just those four years beginning in 2008 that you lived in the same residence as him?

A. No. From 2008 until 2016 when I purchased my own home.

Q. Okay. So when you said you were back and forth between the Diantha Court address and the Brandywine Road address, how much time roughly in the average week do you spend at each?

A. I spent my nights of course in Dunkirk with my children and during the week, once or twice I go to check on Kevin and help out.

Q. Okay. You said once or twice a week?

A. Yes.

Q. How long -- how many hours would you say you're there during those times once or twice a week?

A. Currently not more than an hour or two.

Q. Okay. How has that changed since Kevin originally returned from the hospital?

A. When he first came home, I was there probably 6 to 8 hours a day.

3 (Pages 6 to 9)



Page 10

Q. Seven days a week?

A. Yes.

Q. Was there a point at which that -- has it, kind of, just gradually decreased or was there a point at which you stopped being there more frequently?

A. It gradually decreased and then I became pregnant and then just, kind of, had to pull back and require more of my younger brother.

Q. When was that when you became pregnant and had to --

A. My son was born in August, so I would say about December or January, 2022 I started to pull back gradually.

Q. Okay.

A. I'm sorry. 2023, not 2022.

Q. So it would have been December 2022 to January of 2023?

A. I'm sorry. Correct.

Q. Okay. Do you have an opinion on -- has Kevin expressed a desire to you to live by himself or no?

Page 11

A. No.

Q. Do you have an opinion whether he would be able to live by himself?

A. I do not believe he would be able to live on his own.

Q. Okay. Why do you believe that?

A. Kevin struggles with his medication. That's something that he's -- Kevin takes over the course of a day 21 pills and they are throughout three or four times a day, different medications for each time.

So someone has to help him with medication management. He has to have help watching his diet. He knows what he should and should not have, but he lacks the mind control to stop himself from the addictive McDonald's or the sodas. The cleaning, contrary to what he says, is not occurring.

He's -- I mean, he's -- it really is a mess and then you just have to make sure that he hasn't really just sat down all day and done nothing.

Page 12

Q. I'll start with his diet. Before the occurrence giving rise to this case, how is his diet different?

A. Well, he was a phenomenal cook, so he cooked all of his food. He was very -- it was very rare that he ordered food like on GrubHub like he does now. He may have gone to restaurants but he didn't order takeout. He cooked food.

Q. But just to clarify, you hadn't -- when was the last time -- the last time you had lived with him though was 2016?

A. Correct.

Q. Okay. Would say before the occurrence giving rise to this lawsuit that he was a clean person?

A. Yes.

Q. Your counsel produced text messages between you and someone named Kimmy. Who is Kimmy?

A. Kimmy is Kevin's half sister who lives in Denmark.

Q. What's her full name?

Page 13

A. Kimmy Vido-Welch.

Q. Has Kimmy seen Kevin in person since the occurrence giving rise to this lawsuit?

A. Yes. Shortly after he came home she came in town for Thanksgiving.

Q. Is that the only time she's seen him?

A. In person, yes.

Q. Okay. And how many days?

A. She was here maybe two days.

Q. So you don't think -- do you think Kimmy is someone who has personal knowledge of Kevin's current condition?

MR. JACKSON: Objection to form. You may answer.

A. I'm not sure of today's date how often she speaks with him. When I was around more, she spoke with him often once he was home, and she was aware. I kept her abreast of what was going on the entire time he was hospitalized.

BY MR. STURTZ:

Q. When she would speak with Kevin after Kevin returned home from the hospital and Kimmy



Page 14

would speak with him, was this primarily via text messages or was it phone calls, FaceTime, video calls?

A. Phone call, FaceTime and phone calls.

Q. Okay. And how often do you think they would speak?

A. I'm not sure.

Q. And so you're still Kevin's power of attorney, correct?

A. Yes.

Q. Do you plan to end that power of attorney relationship at any point?

A. Only if he desires to.

Q. Okay. Do you feel like it's necessary for you to still be his power of attorney?

A. Absolutely.

Q. Why do you say that?

A. Kevin lacks executive summary -- executive functioning, my apologies, to make sure that he's, A, not taken advantage of. I do the majority of the communications with his job. I had to step in on his behalf.

Page 15

His mother passed a year ago, so for any dealings with the estate, I have to step in.

Q. So if I understand correctly, part of what you do as Kevin's power of attorney is you assist him with his finances and paying his bills and what not?

A. Originally I started out I did hand that over to him. I made a sheet to help him do that on his own, but I do have to check in because he does forget sometimes.

Q. Okay. So how -- how often would you say he forgets to pay one of his bills?

A. He can forget to pay his SMECO bill for two months straight and I'll go over there and see the mail and see the red slips and make sure he gets on it.

Q. So is the issue just him forgetting or is there -- are there also mistakes or no?

A. There's also a lack of initiation. He may in the moment go, yeah, I'm going to do that. I may remind him, but he has trouble with initiation, so past that moment, you know, he then

Page 16

forgets what he just constantly saying I'll do it, I'll do it, I'll do it and then loses it.

Q. As Kevin's power of attorney, since the occurrence giving rise to this lawsuit, have you attended medical appointments with him?

A. Yes.

Q. Do you still attend his medical appointments?

A. Yes. Myself and my brother.

Q. Okay. So he does not go to his medical appointments by himself?

A. Other than with Dr. Gorter where of course we're not allowed into all the sessions without his permission.

Q. Oh, okay. So can you -- how often are those sessions where Dr. Gorter where he doesn't give his permission for --

A. She only pulls me in when necessary.

Q. Okay.

A. So if she would like clarification or to discuss a family plan or if family needs to step in.

Page 17

Q. Has she or another medical professional told you it's necessary for Kevin to have a power of attorney assisting him?

A. No.

Q. Since Kevin returned home from the hospital, is there anyone outside of Marvin Holland, Daniel Hargrove, yourself and Saskia Campbell who have assisted him?

A. No.

Q. How would -- I know you got into this a little bit before, but how would you, kind of, describe your role beginning from when Kevin returned from the hospital to now?

A. When he first came home from the hospital he, I mean, meals had to be prepared. At that time he had issues with incontinence, bowel dysfunction. I had to change him.

He required being changed probably until about December of 2022. Living with two other men who may have been uncomfortable doing so, there were times I would have to leave my home to come over and change him.



Page 18

He needed assistance with bathing. Of course, all meal prep, the dogs, the plants, the fish. It's just his every day -- telling him what to do. Kevin was also very emotional when he came home. Each time he would see people for the first time he would just have these outbursts, so he would look to me for comfort.

Q. What do you mean by outbursts?

A. The doctors said it was something related to the stroke where they just -- I don't know what it is but they just see people and it just causes an emotion and he would just have crying spells. So I often just had to help comfort him through the crying spells.

Q. So it was sadness?

A. I don't know if they said it was -- it was some emotion again attributed to the stroke. I can't remember the exact term.

Q. Has that improved over time, that social reaction?

A. Yes, its gotten better. He can control it more, it doesn't happen as often.

Page 19

Q. And so I take it that Marvin hasn't had a super -- how would you describe Marvin's role?

A. So Marvin works two full-time jobs. And seeing as they're roommates and Kevin's income is due to stop soon, the goal was for Marvin to continue to work to -- so he could help out and that would be good.

Q. And then how about Saskia's role?

A. Saskia's role has completely changed. I'm not sure of their communication, but she went from staying over the house every other weekend and dating -- I believe they dated like once a week they would go out on dates, they vacation together, to now she just sees him maybe once a month she'll reach out or she'll come over and get him, maybe take him out to eat or something for a few hours and then she leaves.

Q. But does she still hold herself out as Kevin's girlfriend?

A. She told me that she did not and that she had told them that they were very good friends now.

Page 20

Q. When -- do you recall when she told you that?

A. That was back in 2022. She just -- she had a hard time dealing with everything.

Q. And how would you describe Daniel's role?

A. I told him to go move in September of 2022 when he came home with the role of A, making sure Kevin wasn't falling, passes out, the night shift, you know, listening out to make sure he's not fall -- you know, falling out of bed or to also help with the hygiene or the changing if necessary.

Monitor him, food intake, and let me know what's going on when I'm not there. He's also my eyes and he does do all of the driving, you know, to pick up the medication or if I tell him take him to the store or things of that nature.

Q. Okay. So Daniel wasn't living at that residence -- the Brandywine Road residence when Kevin originally returned home from the hospital but he moved in later?

A. No, he moved in -- he was there the night Kevin came home. I had him move in a week prior.

Page 21

Q. Okay. You had him move in in anticipation of Kevin coming home. Okay.

A. Yes.

Q. The family hired nursing care at some point for Kevin?

A. I hired nursing care.

Q. So you were the one who hired them. Do you recall the name of the nursing service?

A. It was either HomeHearts and forgive me because I had my grandmother in hospice and I don't want to mix up the two cares, but that can be produced. It may have been HomeHearts.

Q. Do you recall the names of any of the nurses?

A. It was only one and it was Keyona Washington and she was an aide.

Q. Okay. Did that start -- that started as soon as Kevin returned home?

A. Yes.

Q. Okay. Did that end at some point?

A. We stopped it the end of December of 2022.

Q. So it was just the one nurse. How



Page 22

frequently was she there?

A. Monday through Friday, 6 to 8 hours.

Q. Okay.  So can you just describe for me the services that they would provide?

A. She did cooking, she did cleaning, toileting, she took him to some appointments, and she was there to monitor him.  If I felt there was like light exercise, she did do some light exercise with him as well.

Q. How much did this nursing service cost?

A. Well, it was $20 something an hour.

Q. Is there any family history that you're aware of cardiac conditions or heart attacks?

A. No heart attacks.  His father had diabetes.  I was told that ultimately led to other conditions and I did hear something about a heart, but he passed when I was born, so I'm not sure.

Q. Are you -- did Kevin's maternal grandfather -- are you aware of Kevin's maternal grandfather having heart disease?

A. I believe so.

Q. Any family history of stroke that you're

Page 23

aware of?

A. No.

Q. What's your highest level of education?

A. Bachelor's degree.

Q. What's that in?

A. Human resources management.

THE COURT REPORTER:  I'm sorry.  Can you --

THE WITNESS: Human resource management.

BY MR. STURTZ:

Q. Where is that from?

A. University of Maryland.

Q. Where are you currently employed?

A. District of Columbia Courts.

Q. What's your role there, position there?

A. Human resources specialist.

Q. When did you start on that job?

A. July, 2019.

Q. What did you do before that?

A. I've always been human resources.  Previously before that I worked for the airports authority.

Page 24

Q. So you weren't -- you weren't self-employed with your own business --

A. No.

Q. -- before that?

A. No.

Q. Has Kevin discussed returning to work at GEOINT with you?

A. He desires to, yes.

Q. When did he first express a desire to do that?

A. Immediately probably about January or February of 2023 after the nursing stopped or the home health aide stopped.

Q. Has he expressed concerns with you about returning to work?

A. No.  Due to his apathy, he is not completely aware of his -- of all of his deficiencies, and so he believes that he can still do a job that he does not know what he did.

Q. It's your position that he doesn't know what he did previously for work?

A. No.

Page 25

Q. Do you know what he did previously?

A. No.

Q. Can you just elaborate more -- a little bit more what your concerns are about Kevin returning to work?

A. The lack of initiation, the lack of executive functioning.  He works for an intelligence agency.  I do know that he would always say he messes up, someone could die.  I have been told by his medical professionals, and I also believe he is not in position to supervise a team of employees.

When he gets stuck, he does not always initiate asking for a way forward, and at the level that he worked, it's just apparent he would not be able to return to that position.

Q. Has a medical professional advised you that they believe he cannot return to work?

A. Dr. Gorter has said that she does not believe that it would be a positive experience and that she would not want to see Kevin get fired due to performance because of a lack of being able to



Page 26

do things. And that she was pretty sure that her report that she did, her neuropsychological evaluation would also state that, you know, with the issues he has, he would not be able to return to that position.

Q. Has Kevin discussed with you or have you discussed with Kevin the possibility of him returning to work in a modified role?

A. So in order to even consider disability he has to first go through the accommodations process. That is a part of the step to disability, so there is a point where discussions need to occur with his job to at least seek a --

THE VIDEOGRAPHER: Please don't touch the microphone. If you can just repeat that last part.

A. So in order to move forward with disability he has to go through the process of accommodations and that will involve a lot of documentation with the doctors, going back and forth, and then them engaging Kevin to see what he can and cannot do.

Page 27

BY MR. STURTZ:

Q. Leaving the potential disability issue aside for a moment, there haven't been any discussions leading up to this date about a potential modified role?

A. No.

Q. So you haven't discussed that with Kevin?

A. I told him that I did not think that he would need -- that he would be able to return full time and that, you know, if ever there was an opportunity for him to go back to work he would need to take it slow.

Q. Okay. But you didn't talk to him about how open he would be or how comfortable he would feel with returning to work part time or in a remote role or a hybrid role, any of those things?

A. I mean, I told him I work in human resources so with my understanding of how accommodations work, I've given him what typical options are which include remote work or modified work schedules.

Q. Have you been present for meetings with

Page 28

Dr. Gorter or another medical professional where those possibilities were discussed?

A. No.

Q. Have you raised any of those ideas with Dr. Gorter or any other medical professionals?

A. No.

Q. Have you had direct communications with his human resources department at GEOINT?

A. Yes.

Q. Can you tell me about those communications; when they first occurred?

A. I reached out to his supervisor when everything happened just to let him know that he would be out. He immediately responded back with the steps or what he would need to do for the medical situation, what paperwork I need to fill out and that was about it.

Q. Of those communications -- so sorry if you said this, I might not have been listening. When was that initial communication?

A. That was back in June of 2022 when everything happened. So I may have reached out to

Page 29

his job the next day. If that was a business day, I know how important his job was to him, I reached out the next day.

Q. How many times would you say roughly you communicated with them throughout this process?

A. Maybe 20 or 30.

Q. Okay. Are you still in communications with them?

A. Yes.

Q. Okay. Have they expressed a willingness to accommodate him?

A. As far as time goes. I mean, it's just -- our communication really is just about leave. Kevin had a 700 something hours going into this of leave and so from there we went to leave donation, leave bank and so the majority of my conversation is just around why -- what's needed to continue these leave donations and this leave bank.

Q. So you're communications with them have -- you haven't communicated with them about potential accommodations returning to work, you've just communicated with them about --



MAGNA
LEGAL SERVICES

Page 30

A. I requested who the contact was for when that time comes.

Q. Okay. But --

A. But engaging in the conversation moving forward, beyond that, no.

Q. Okay. So Kevin is still on paid medical leave?

A. Kevin is on leave bank right now. So he's still receiving full pay through the leave bank program his job offers.

Q. Okay. So I'm not familiar with what the leave bank program is --

A. So it's a program where if you put in I believe 8 to 16 hours of sick or annual leave each year you're open to this program where due to a medical condition, depending on how many people have contributed to the leave bank, you can receive up to so many hours.

I believe their cap is about 700. Kevin received 700 hours from the leave bank last year and has been granted about 350 currently that he's using right now.

Page 31

Q. Okay. And do you know how much of that is still left unused?

A. He should be down to maybe 150 or 200. It's getting ready to exhaust.

Q. Okay. So while he's been in that program he's been paid his full annual salary?

A. He's been paid his full salary since the incident.

Q. Okay. And does he have any other sources of income?

A. No.

Q. Okay. So he hasn't applied for disability yet?

A. No, I haven't pushed that forward because he's receiving full pay.

Q. So you plan to apply for disability when the leave expires?

A. Yes.

Q. Do you view Kevin as totally and permanently disabled?

A. Yes.

Q. Do you believe Kevin will be able to -- do

Page 32

you believe Kevin is able to drive?

A. Yes and no. Can he operate a vehicle? Yes. When mistakes occur, does he do what he's supposed to? Absolutely not. Could he react timely and quickly if he were approaching an accident? Absolutely not.

Q. Have you seen -- has Kevin made progress in terms of -- I'll ask this first. What issues have you seen since the occurrence in terms of Kevin's ability to do daily chores?

A. He lacks initiation in doing them. This morning I got to the house and went to his room, he has about 12 glasses sitting on his bed, it's full of crumbs with food, sheets are a bit soiled, there's clothes all over the place and there's dog hair all throughout the home.

Q. So it's -- it's just that the daily chores piece is just an initiation issue?

A. Just -- it's an initiation issue. Yeah.

Q. Okay. There's no physical component?

MR. JACKSON: Objection.

A. Oh, certainly. Certainly a physical

Page 33

component as well. Like he said, he has issues bending. I believe sometimes he gets dizzy if he bends down too far. For example, for all this takeout food I had to put a flower pot up high outside so that he doesn't have to bend over and possibly fall over.

Vacuuming would be a thing for him that would make him be out of breath. Pushing it every now is a thing -- is task for him. He's not able to, for example, change the fire -- the batteries in the fire detector.

He -- I've been looking at dead fish in the tank for almost three years that he refuses to put away, all the plants are dead, he just doesn't want to do it but he also does not feel that it's a problem and that's the apathy.

BY MR. STURTZ:

Q. How many close friends would you say -- beyond Saskia, how many close friends would you say Kevin had before the occurrence giving rise to this lawsuit?

A. Close friends, about four or five.


MAGNA
LEGAL SERVICES

Page 34

Q. Do you know the identity of those individuals?

A. Yes.

Q. Can you state their names please?

A. Mark Henderson, John Myers, Olivia Levadas, Katy -- I don't know Katy's last name, and Matt -- I don't know Matt's last name.

Q. I believe it was Mark Henderson was the gentleman from Kevin -- the place he would go to do martial arts; is that right?

A. Correct.

Q. Do you know how he knew the other individuals; how he met them?

A. John Myers and Katy went to high school with him. Matt worked with him. Olivia also went to high school with him.

Q. Have you seen his relationships with them change?

A. Yes. He used to be very active, him and John heavily into sports, they always went to football games, baseball games. Matt, the same; they would get together after work or on weekends

Page 35

sometimes and go to bars and watch the games. Olivia who lives in Georgia, he would go visit often. I don't think he's comfortable getting on a plane anymore.

Q. And so why do you think that relationship has changed?

A. Well, again, he doesn't initiate reaching out so it's a matter of waiting for them to reach out to him. He's not able to do the things that he used to do with them as far as the physical activity, it will be a strenuous thing for him to walk around Nats Park and football stadium.

Q. Have you had any communications directly with those friends about trying to arrange a way for them to see Kevin more often?

A. Oh, yes. Initially, I'm the one who let all of them know what was going on and so they would reach out to me if they wanted to visit and come by the house or if they wanted to take him somewhere.

Q. And so have they -- have they expressed a willingness to you to see him more?

Page 36

A. Well, now I'm not needed to help facilitate it, so I haven't been back in communication with them in a while.

Q. When you spoke with them, your last communication with them, did it seem like they were still willing to spend time with Kevin?

A. They were scared in the sense they didn't know what to do, what he could or couldn't eat, what he could or couldn't do.

So John in particular, that would have been his closest friend, it was just very hard for him to see, very emotional on both of their ends. So John kind of fell back.

Q. How has Kevin's relationship with his family members changed?

A. They just don't come around. In the beginning everyone wanted to help but when you're physically sitting with Kevin and there's no conversation, a lot of people don't know how to handle that situation and then again they just -- there's no conversation. What can we do.

Physically it's not much walking around he

Page 37

can do, so they just don't know what to do with him.

Q. When Kevin returned from the Atlanta trip that was leading up to his hospitalization, were you there at the residence when he returned?

A. No.

Q. Was anyone there?

A. Marvin Holland was there. Trip was to Savannah, Georgia not Atlanta.

Q. Oh, it was Savannah.

A. Olivia lives in Savannah, Georgia.

Q. Okay. So what do you know about the nature of Kevin's trip down there to Savannah?

A. Olivia's younger brother was having a -- had been having mental episodes in the previous weeks leading up to this and she was constantly reaching out to Kevin letting him know what was going on.

I believe the younger brother became violent towards her and she desperately wanted to bring him back to D.C. so that he can be seen by his doctor and get more medication. However, he



Page 38

was becoming physically violent with her.

So Kevin flew down after work one day, and so this is the whole 24 hour story, Kevin wakes up at quarter to 5 to go to work.

So he went to work and after work he headed I think on a 5 o'clock flight to Savannah and they were supposed to take a plane back. However, the younger brother lost his license so at that point they said let's just rent a car and so they immediately rented a car and began driving back.

There was no break for Kevin, so there's this 5 a.m. that's on my way to work, 5 p.m. on a flight to Savannah, within four hours or so later they're on the road heading back, Kevin had a 9 a.m. briefing at work that he was trying to get back to.

Q. So could you please state the name -- the full names of Olivia, her younger brother and -- was Olivia's mother also there?

A. I don't know their full names. I just know her by name.

Page 39

Q. Okay. Have you spoken to -- so to your knowledge, were those three individuals, Olivia, her younger brother, and her mother were in the car with Kevin driving back?

A. Yes.

Q. Have you spoken to them about Kevin's condition during the car ride?

A. I have not spoken with Olivia at all.

Q. Okay. Or the other two?

A. Not at all.

Q. Where was the -- do you know where the -- where did the information about the energy drinks that Kevin consumed?

A. I believe Kevin stated that when he first went to Southern Maryland Hospital he was still aware. I'm pretty sure it came from Kevin.

Q. Okay. And prior to this occurrence it wouldn't have been normal for Kevin to go roughly 24 hours without a meal?

A. No.

Q. Did Kevin -- do you know if Kevin regularly drank energy drinks before this

Page 40

occurrence?

A. No.

Q. No, he did not?

A. I'm sorry. No, he did not.

Q. So when -- you said Marvin was there when he returned. Was Marvin with him during the ambulance ride and --

A. Marvin didn't go in the ambulance. Marvin was there the morning he went to the hospital. He followed the ambulance to the hospital.

Q. Okay. And so was the first time -- so you saw Kevin -- you went to Southern Maryland Hospital and he went there --

A. No. By the time I was contacted they were in Southern Maryland and the air lift had been called, so I immediately went to MedStar Washington Hospital Center.

Q. Okay. So what do you remember about when you arrived to MedStar? What health professionals you saw? What did they say to you?

A. I didn't see any doctors, it was only a nurse with him who guided me back to him. He was

Page 41

still -- he was awake. He was crying. He was laying in the bed and he was able to tell me what happened.

Q. Do you remember -- do you remember what he told you?

A. He said that, you know, he explained that he had to go to Savannah to help bring Olivia's brother back here and that he had Pepsi, some energy drinks to stay awake for the ride back.

Q. So then beyond when you initially arrived there for the remainder of the time that Kevin was hospitalized, which doctors do you remember meeting if any?

A. Dr. Hogstein, Luczycki.

THE COURT REPORTER: I'm sorry.

THE WITNESS: Luczycki, Murphy, there was a Brandon -- an Asian male by the name of Brandon, quite a few nurses. The only nurse's name that stands out is Nadia that was the -- that's just because that was the first nurse that I met the very next day after his surgery and the first couple of days that she was on shift.



Page 42

BY MR. STURTZ:

Q. So do you remember what these providers, what did they inform you about Kevin's condition?

A. That his blood pressure was extremely high, the heart was actually doing well after surgery; that was never really the concern. What his concern was the blood pressure, and then noticing the weakness.

He was in a very bad state of delirium for quite some time. So a lot of the communications were around them wondering what was going on or them trying to see what was the root cause of the state that he was in.

Q. Before the surgery, when you first got to the hospital, were you informed that it was an emergency situation?

A. Yes. I was told that his aorta had split or burst, I can't remember right now, but that there was no blood -- the blood supply was not pumping through his body the way it should.

Q. And so were you told that it was a life-threatening situation and that he would

Page 43

likely die without the surgery?

A. Yes.

Q. Was there anything else -- I know you just said a little bit, but anything else about the nature of the surgery that was described to you?

A. I was told that he was on bypass for some parts of it but that surgery was successful.

Q. Was it communicated to you that stroke was a risk associated with the surgery?

A. No.

Q. Were you there when Kevin signed the consent form?

A. No -- can I see it. Where is this? No.

Q. Do you remember Kevin saying anything else to you prior to the surgery?

A. No. Oh, yes, I do. He was due to go to Denmark in like a couple of days from there and he wanted me to reach out to his sister and let her know what was going on, and he did not want me to tell his mother what was going on until he was okay.

Q. And then do you remember anything else the

Page 44

day of the surgery that was communicated by healthcare providers to you?

A. When he came out of surgery Dr. Alassar came and said that surgery was a success, he pulled through, that it didn't take as long as he thought it would and that they wanted him to sleep through the night and that they would check back in the morning.

Q. How about on June 15, 2022, I believe that's the day after the surgery. Do you remember anything about that day?

A. Yes. When I walked in, Kevin wasn't talking. I mean, of course, he had all sorts of tubes and everything hooked up to him, his blood pressure was high and he just mumbled.

Q. Do you remember the June 16, 2022, how was the day after that?

A. Not much change. I think they may have just started asking him more questions to see what he could respond to and that didn't go so well. Just, I mean, he wasn't speaking. In fact, his eyes were not even open for a few days.

Page 45

Q. Do you remember when his eyes -- how long his eyes weren't open for and when -- when that ended?

A. No, I don't remember specifically how long.

Q. Did you take any photos while you were in the hospital with Kevin?

A. Yes.

Q. What did you photograph?

A. Him in the bed. His legs not moving, I believe my grandmother came up there one time, stood over him, I got that picture. When he was in delirium and they just kept saying oh, he just needs to get out the ICU. There was a time where they actually took the hospital bed outside so that he could get some sun. I got a picture of that.

Q. Did you photograph the monitor at Kevin's bedside at any point?

A. Yeah.

Q. Why did you do that?

A. To keep track of the blood pressure.

12 (Pages 42 to 45)


MAGNA
LEGAL SERVICES

Page 46

Q. Did you photograph the label on the IV bag that he was hooked up to?

A. I may have.

Q. Is there anyone else who could have potentially taken that photo or were you the only person taking photos in the --

A. That I'm aware of, I was the only one who took a picture.

Q. Do you have any idea why you may have done that?

A. Absolutely.  To research the medication.

Q. Did you take any of those pictures because you thought it might be helpful for a lawsuit?

A. No.  I took pictures for when he recovered to show him where he had been or if there was ever a time he wasn't motivated to show him where he had been and where he was now.

Q. How has Kevin's rehabilitation now been progressing?

MR. JACKSON:  Objection as to form.  You can answer.

A. It ebbs and wanes, it goes up and down.

Page 47

BY MR. STURTZ:

Q. What are the biggest improvements you've seen in Kevin's condition and ability to function?

MR. JACKSON:  Objection as to form.  You can answer.

A. He doesn't struggle with the incontinence anymore.

BY MR. STURTZ:

Q. Is there anything that you feel is not progressing?

A. His initiation, his awareness of his mental deficiencies.

Q. So you testified earlier about how you accompanied Kevin to his medical appointments and you're there except for the times when you're not needed or that he doesn't give you consent with Dr. Gorter, but are you informed -- you were informed of the recommendations that Kevin's providers are continuing to make?

A. As far as what, as far as his health or...

Q. The recommendations in terms of the things he could be doing to hopefully continue to improve

Page 48

his condition?

A. Yes.

Q. Do you see any room for improvement in terms of, you know, Kevin following those recommendations?

MR. JACKSON:  Objection as to form.  You can answer.

A. Can you repeat the question.

BY MR. STURTZ:

Q. Do you see any room for improvement in terms of Kevin following the recommendations of his medical providers?

MR. JACKSON:  Same objection.  You can answer.

A. No.  According to Dr. Gorter, kind of, with stroke patients, after a certain point there really is no improvement.  It just kind of is what it is and the building habits but he has to -- he needs initiation in order to build the habits and he lacks the initiation.

BY MR. STURTZ:

Q. Do you know if Kevin's been showering

Page 49

every day?

A. He does not shower every day.

Q. How many home-cooked meals --

THE VIDEOGRAPHER:  You have to repeat.  I can't hear.

BY MR. STURTZ:

Q. I'm sorry.  How many home -- sorry.  I'll back up.  Are you aware of the recommendations that have been made in terms of Kevin's diet?

A. Low sodium diet, I believe he's supposed to stay away from tomato sauce.  He's on Lipitor, so he can't have potassium.  He needs a lot more water.  He's in stage 3 kidney failure.

Q. Are you aware of how many home-cooked meals Kevin has in the average week?

A. In the average week as of late I've been forcing him more, so maybe once or twice.  Other than that he is absolutely ordering from GrubHub.

Q. Okay.  Do you know which places he typically orders from?

A. No.

Q. Okay.  Has there been any attempt to

13  (Pages 46 to 49)



Page 50

monitor the things that he's ordering?

A. Yes, there's been attempts to monitor. He then tries to hide stuff. When I can, I cook and I send food over there but he doesn't always eat it.

Q. So who was monitoring --

A. I monitor and Marvin may say, you know, what's in there or I may ask him what's in there.

Q. So while you're monitoring it, did -- what were generally speaking the types of things you saw him ordering?

A. From the take out?

Q. Yeah.

A. McDonald's or Bonefish Grill.

Q. To your knowledge, has Kevin been including regular aerobic exercise in his routine?

A. He says he does, but I haven't -- I haven't seen it.

Q. Prior to the occurrence giving rise to this lawsuit, are you aware of what Kevin's caffeine consumption habits generally were?

A. He likes Pepsi. (Inaudible) on Pepsi a

Page 51

day.

Q. Are you aware of what his alcohol habits were before?

A. It was occasional. Again, if there was, like, a Nats game and he went out, he may have had a few beers or like on the weekends if they went out, maybe a beer.

Q. Have you done any research into medical literature connected with Kevin's condition?

A. Yes. With the stroke and what's happening there and how to rebuild neurons, stuff like that.

Q. Do you recall the sources or the names of any of those?

A. I mean, I was just Googling.

Q. When did you first -- well, I guess I'll ask this: As Kevin's power of attorney were you the one who reached out to -- about contacting an attorney?

A. Yes.

Q. Okay. When did you first think about contacting an attorney?

A. Probably around October or November maybe

Page 52

December of 2022. Some time in 2022, the end of 2022, of course.

Q. Did someone recommend the idea to you of going to a lawyer?

A. No.

Q. Have you discussed Kevin's legal case with any healthcare providers?

A. No.

Q. Have you ever filed any other civil lawsuits before?

A. No.

Q. Have you ever been involved in a civil case as a defendant?

A. No.

Q. Ever involved in a criminal case as a defendant?

A. No.

Q. Aside from Kevin's healthcare providers, is there anyone outside of yourself, Marvin, Saskia and Daniel that you believe has personal -- personal knowledge of Kevin's condition currently and since the occurrence giving rise to this

Page 53

lawsuit?

A. No.

Q. Is there anything else that you would like me to know about this case?

A. No.

MR. STURTZ: Just have a few moments.

(Pause in the proceedings.)

BY MR. STURTZ:

Q. Just a few more questions. Going back to the time in the ICU, you mentioned Dr. Hogstein. What do you remember about your interactions with Dr. Hogstein and when did he enter the picture? When did you communicate with him? What was communicated?

A. The first time I recall Dr. Hogstein I had gotten a call that they -- I think they were attempting -- was it a -- I remember Kevin was sedated -- I don't know if someone -- I don't know if maybes Saskia told me but where Kevin had started waking up more.

He then had a day where he slept all day and they could not get him up, and I then learned



Page 54

it's because they sedated him after telling us that they were no longer going to sedate him because they needed him to wake up more and be more alert to really get a good grasp of his -- his mental capacity and what was going on up top.

And just a day or two after that they sedated him and when I got to the hospital, the first doctor I requested to meet with whomever the doctor was on call and it was Hogstein.

And I told him that, you know, I got a call that Kevin had been out all day and that he's heavily sedated and having a hard time waking up from it and some doctor gave them the okay to give medication that they said they were pulling from him. And he goes, that was me, and, like, okay. So that's Dr. Hogstein.

Q. So do you remember whom it was who told you that they weren't going to sedate him any longer?

A. No, just in -- between the nurses and doctors, the goal or the plan was always to start removing him off of sedation; that was what the

Page 55

plan was at least for two or three days, and then all of a sudden the sedation medication gets introduced back in.

Q. Okay. And you mentioned something about he wasn't supposed to have a certain medication and then they gave it to him. Do you remember what that medication was?

A. Siloquel (sic) maybe -- I don't.

Q. Do you remember who it was who told you he wasn't supposed to have that specific medication?

A. I don't.

Q. Was there anything else in terms of Dr. Hogstein?

A. I mean, just every -- after a while you see his condition wasn't much to keep asking. Kevin was sedated, it's here we are again, so we're just waiting for him -- that to wear off.

Q. And then Dr. Luczycki you also mentioned. What do you remember about your communications with Dr. Luczycki; when that was? What was communicated?

A. I just -- I don't remember exactly when

Page 56

but just asking when could I anticipate like the delirium to wear off or, you know, at what point were we going to -- how long was it going to be that we were going to go in this state before we wonder what else could possibly be going on.

Q. But in terms of doctor, I believe you also mentioned Dr. Murphy. What were the communications there? When was the communications with Mr. Murphy?

A. I don't recall. I mean, often several of the doctors came around, so Murphy could have just been there with the other doctors.

Q. Then was there -- was there a Dr. Brandon?

A. That's who called after the MRI was done, I believe, and told me that he had -- Kevin had an infarct in the lumbar area and in the brain.

Q. Do you remember anything beyond that that was communicated?

A. No.

Q. Were there discussions with any other providers that we haven't covered here?

A. No.

Page 57

Q. So I think you just mentioned Brandon -- Dr. Brandon was the one who called you -- you remember Dr. Brandon was the one who called you to inform you about the stroke?

A. I don't know if I heard it from him first or if he said that that was what was going on but I do remember Hogstein telling me that Brandon doesn't know what he's talking about. I do remember that detail.

Q. Why do you think -- did you ask him what he meant by that?

A. I don't recall.

Q. Do you recall any other discussions about the stroke specifically?

A. I was told he had a basal ganglia.

THE COURT REPORTER: I'm sorry.

THE WITNESS: A basal ganglia stroke in his brain and one in the lumbar area that was the cause of the paralysis on the left side of his leg, his left leg wasn't moving.

I was told the basal ganglia stroke affects both sides of the brain, and that it -- it




MAGNA
LEGAL SERVICES

Page 58

was one -- it's one of the major strokes that you could have. I was told that he had a misfire of stroke, meaning that he had several strokes.

Q. Were you told before Kevin's surgery that stroke was a risk associated with the surgery?

A. No. No. I literally did not speak to anyone prior to the surgery, it was too emergent.

Q. Did anyone explain that to you after the surgery?

A. After I believe Dr. Alassar just said, you know, we're just going to monitor him because of course with any surgery, there are a lot of, you know, there's some complications that can occur.

I think he may have stressed the whole -- the bypass, you know, watching for any complications that could come from that but otherwise he said it was successful.

Q. You also mentioned some issues with Kevin's blood pressure. What do you recall -- so what do you recall specifically about those communications with the blood pressure?

A. Just that they were trying to get it down.

Page 59

Specifically the MAP number as well, which was also another reason I took a picture of the monitor because it showed what the MAP number is which is a calculation somewhere there like we went in there they said, we're not just monitoring blood pressure it's also the MAP number that we're concerned about as well.

Q. Did they tell you what the MAP number --

A. It was a calculation and they just -- it shouldn't go over I believe 90, 80 or 90 and his was typically up there and it was just a goal of getting it below a certain number.

Q. And do you recall when -- when the blood pressure ceased to be an issue?

A. Its never ceased to be an issue since.

Q. Is there anything else that you specifically recall about the time in the ICU?

A. Yeah, I recall it being extremely busy there. I recall nurses not being able to take lunches, nursing waiting until the end of the shift to chart the whole day.

There was a time one nurse was audited

Page 60

while I was there, another nurse came in and asked her the dosage of a medication she had put in the IV and then she asked her why and she said, where did you get those numbers from and she told her that the dosage was incorrect.

Q. Do you have personal knowledge of how nurses chart things over the course of their job?

MR. JACKSON: Objection. You can respond.

A. Can you repeat the question? Do I have personal knowledge --

BY MR. STURTZ:

Q. You talked about how nurses were charting things. Are you aware of how nurses are supposed to be charting things during the course of their job?

A. Well, the -- what occurred was she seemed a bit frantic, it was the end of her shift and she said, I haven't been able to chart all day. I need to chart before I go home. So I assume that in the ICU with patients critically ill and I believe they had two to three patients per nurse, I just was, like, wow, do you remember everything

Page 61

that happened from the beginning of your shift 12 hours ago?

Q. But you don't know one way or the other whether that's something that's out of the ordinary for being an ICU nurse?

A. No.

Q. And you don't have any knowledge of the auditing process of nurses and how that works, correct?

A. No. I was surprised that that occurred.

Q. When Kevin left MedStar and went to the rehabilitation facility, do you remember how he was at that point?

A. Yes. He was still -- he was a bit I would say delusions, but in fact, the first day that he got there, I believe they transported him -- no, they transported him with me there and maybe the next day I got there Kevin was of the belief that he had been out in the alley and some Russian male had beat him up. He also thought that he had gotten shot, that someone had shot him and that's why he was there.



Page 62

Q. So that was when he arrived at the rehabilitation facility?

A. Yes.

Q. But when he left the rehabilitation facility, was he awake?

A. He was awake. He was not awake long. He would have spurts of being awake and then he would be out. He could be saying something and then he would just go out.

Q. Was Kevin speaking when he was in the ICU?

A. He would respond to the questions -- the test questions the doctors would give him. Sometimes very incoherently and then if he was coherent it may have been one or two words or the wrong answer.

Q. Would he respond to you or -- and other family members?

A. Yes. I asked him do you want Ginger Ale he may say yes or nod his head.

Q. Okay. Do you recall anything else that he said to you while he was in the ICU?

A. A lot of it was gibberish. Again, the

Page 63

delirium, he was having nightmares, so he may have just randomly said things were fighting or he just wasn't coherent in the ICU at all.

Q. Do you recall him being agitated in the ICU?

A. I believe he kept trying to pull his line out of his arm and one day they said he tried to get undressed.

Q. Would you say that leading up to the time that he was transferred from the ICU to the rehabilitation facility was his condition improving?

MR. JACKSON: Objection. You may respond.

A. Well, he had a lot of things going on, so what part?

BY MR. STURTZ:

Q. We can start with his -- was his cognitive function improving?

MR. JACKSON: Objection. You can respond.

A. He may have responded to more questions, but he did not initiate any conversation. You just had to ask him something and he may nod and

Page 64

say a word.

BY MR. STURTZ:

Q. Was the delirium improving?

MR. JACKSON: Objection. You may respond.

A. Once he was transported over, yes, that began to improve.

BY MR. STURTZ:

Q. Did you speak with Dr. Alassar or anyone else after he left MedStar?

A. Not Dr. Alassar. I didn't see him past the night of the surgery.

Q. Did you speak with any other doctors from MedStar?

A. I think his therapist because Dr. Gorter was still located in NRH, so if we saw a therapist walking around the hall we may say hello.

Q. Did any health professionals at any point tell you what caused the strokes?

A. I think it was told that it could have been a complication of surgery.

Q. Did any health professionals tell you when they believed the strokes occurred?

Page 65

A. No, they didn't pinpoint exactly when.

Q. Did you ask them?

A. I don't -- I don't remember if I asked them exactly when. I think that once we -- once I was told it was a stroke it became clear around when it could have occurred.

Q. What were -- did anyone communicate with you about a CT scan?

A. Yes. I believe they said that was clear. It didn't show a stroke.

Q. Did anyone talk to you about the reason for -- or the need for a CT scan?

A. The cognitive -- his cognitive, the delirium of why he was in the state that he was in. And they were trying to rule out a stroke.

Q. And then once the stroke was discovered, did they -- did anyone else talk to you about the treatment for the stroke and the outlook?

A. The treatment was just aggressive rehabilitation and as far as outlook, I don't recall if that's something that they said in the ICU or if that's what NRH talked to me more.

17  (Pages 62 to 65)


MAGNA
LEGAL SERVICES

Page 66

Q. Do you remember what at NRH what they told you about outlook?

A. Yes. That the first year Kevin would need 24/7 care, that the chances of Kevin returning back to his normal function were slim. It was predicted that he would be in a wheelchair for a year.

In fact, they had actually ordered a wheelchair for him to even come home in. I was told that after a certain amount of time, stroke -- you typically don't recover -- I think after the first six months of a stroke you don't recover as fast or it slows down but you could possibly regain.

Q. Of the medications that Kevin's currently taking, is it your understanding that all of them are related to his cardiac condition?

A. No, they're related to the blood pressure.

Q. Are there any that you're aware of that aren't related to the blood pressure?

A. The baby aspirin, the Lipitor is for kidney. I believe Lipitor is for kidney. I think

Page 67

Losartan is for kidney, roberterol, clonidine, hydralazine are all for blood pressure.

MR. STURTZ: I think that's probably it. Can I just have a moment to --

(Pause in the proceedings.)

BY MR. STURTZ:

Q. You mentioned a wheelchair. Did he end up using a wheelchair at all?

A. Yeah. When he first came home would assist him up and down the steps and immediately to the wheelchair.

Q. When did he stop using the wheelchair?

A. In about October or Novemberish.

Q. Are you aware of the -- did anyone communicate to you the source of the blood pressure issues?

A. Being out of the what was going on with the aorta and all of that that just -- I guess the blood not pumping through his body just started affecting other things.

Q. The blood pressure issues, to your knowledge, are all related to his aortic injury?

Page 68

A. And the hospitalization and all that. He didn't have any issues prior to that.

Q. Do you recall who told you that the stroke was a complication of the surgery?

A. It could have been either Hogstein, one of three, only three of them actually showed face. I know there was a team of doctors on his care but only a few of them actually spoke with us.

MR. STURTZ: I believe that's everything. Thank you for your time, Ms. Hargrove.

MR. JACKSON: Ms. Hargrove, I have a few follow-up questions. Are you fine or do you need a break?

THE WITNESS: I'm fine.

MR. JACKSON: Okay.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. JACKSON:

Let's have this marked as your first exhibit.

(Exhibit 1 was marked.)

MS. STURTZ: These were produced to us?

MR. JACKSON: These were the ones

Page 69

produced --

MR. STURTZ: Are these -- were they produced to us in this format or you did transcription of them?

MR. JACKSON: No, there's a transcription of certain portions of the thousands of lines of text message that were reproduced that were produced earlier.

MS. STURTZ: Okay. So we've gotten the text messages but not in this format. This is a new format?

MR. JACKSON: Right.

MS. STURTZ: Okay. And we'll mark this as Exhibit 2 so that we have it after that and then would you just provide him before you ask questions for a few moments to read it over.

MR. JACKSON: Oh, yes, certainly.

MS. STURTZ: Okay. So you can just read it.

THE COURT REPORTER: So we're marking this as 2?

MR. JACKSON: This should be 1. I think

18 (Pages 66 to 69)





Page 70

this is her first exhibit.

MS. STURTZ: Oh, okay. Sorry.

BY MR. JACKSON:

Q. Ms. Hargrove, I've handed you your first exhibit which are certain excerpts from the text messages that you've produced in this case, and as we go through I'll just be referring in my questions as they're labeled here excerpt 1, excerpt 2 as we go forward. Do these -- having reviewed this exhibit, do these text messages look familiar to you as those that you produced in this case?

A. Yes.

Q. Okay. As to excerpt 1, if you look at the first entry from the 6/20/22, 4:07:40 p.m. [As read] "Shana," which is referring to you as you're typing, "I did just get a call from a doctor confirming that all of the cords were taken out; that they were prepping him for the MRI. The purpose of the MRI is to see why his left side is so weak. So they need a good look at the spine." Who were you writing this text message to?

Page 71

A. To Kimmy Welch.

Q. The doctor that you referred to that you got a call from in this message, do you know who that doctor was?

A. That was either the Brandon or the Hogstein.

Q. You said you got a call, was that a call to your cell phone?

A. Yes.

Q. Did you give your cell phone number to Doctor -- do you remember specifically giving your cell phone number to Dr. Hogstein, Murphy, Luczycki or any other healthcare provider?

A. It was written in his charts.

Q. The sentence that you write, The purpose of the MRI is to see why his left side is so weak, what was the basis of that statement?

A. I think a couple of days prior to that we noticed that Kevin stopped moving his left leg. Maybe on the 15th and 16th Kevin constantly would pull both of his legs up to him and then bring them down and then after a while, he just stopped

Page 72

moving that left side and it was noticeable.

Q. Did you make a complaint or voice a observation to any of the health care providers about how you saw his left side being affected?

A. Yes. I said it to the nurse and requested to have a doctor come in and have that viewed or speak with me about it.

Q. Do you remember who the nurse was that you spoke with?

A. It may have been Nadia, that's just the name that stands out, and I remember the first couple of days that was who was on shift during visiting hours.

Q. Based on that request that you made to speak with a healthcare provider about his left-sided weakness, did you have you ever have a conversation specifically with the healthcare provider based on your request?

A. Yes. I believe they said they would have neuro come in and give a look at it and see what was going on.

Q. Do you remember speaking with any

Page 73

healthcare provider who was affiliated with the neuro team that came in and looked at him on the neuro department?

A. I was present during one of the evaluations, and I don't recall the conversation -- if there was conversation or they just reported back to the doctors.

Q. Was either Dr. Hogstein, Dr. Murphy or Dr. Luczycki present during this evaluation, do you recall, by neuro?

A. Not that I recall.

Q. If you look at the next entry at 6/20/22, 4:08:38 p.m. It states, [As read] "Shana: I asked about his neurological state and get this, he said he thinks it only has to do with being in the ICU." Stop there. Who are you referring to when you said he said he thinks?

A. Hogstein.

Q. Was anyone else present when Dr. Hogstein made that statement to you?

A. Usually it was Katherine, the woman, the female doctor.



Page 74

Q. Did Katherine make any comment or observation based on Dr. Hogstein telling you this information?

A. She would often just concur with what he was saying.

Q. When you say, [As read] "He thinks it only has to do with being in the ICU," did Dr. Hogstein elaborate on the connection between Kevin's present -- then present neurological state as you were observing it and being in the ICU; did he say what the connection was between the two or was it just the kind of as simple as you state it here that he is the way he is because he's here? Is that all you recall?

A. He said that -- I'm sorry. That was -- say that again.

Q. Do you recall Dr. Hogstein explaining more in depth the connection that he believed existed between Kevin's then existing neurological state and Kevin's presence in the ICU?

A. Yes. He called the ICU delirium and said that it was common.

Page 75

Q. Okay. Well, that was going to be my next question actually in the next sentence, the ICU delirium. That wasn't your phrase, that was Dr. Hogstein's phrase?

A. Yes.

Q. At 6/20 at the time that you wrote this text messages, had you ever heard Dr. Hogstein or any of other Kevin's healthcare providers at MedStar up to this point, during this particular hospitalization, refer to ICU delirium as it related to Kevin's condition?

A. No.

Q. Your statement in the text messages says that ICU delirium is a real condition and it's almost hard to avoid. The almost hard to avoid, what was the basis of that or is the source of that information?

A. I was told that most patients, not all patients experience some form of ICU delirium in the ICU and it has to do with the machines, the sleep-wake cycle, not having sunlight.

Q. Did Dr. Hogstein or any other healthcare

Page 76

-- excuse me -- healthcare provider make any statement or conclusion that the ICU delirium was a complication of the surgery that you recall?

A. No.

Q. Do you recall Dr. Hogstein or any other treatment provider stating that there was a cure or treatment regimen for ICU delirium that Kevin was a candidate for?

A. No, just getting out of the ICU.

Q. At the time that Dr. Hogstein told you about what he thought was ICU delirium, had there been an MRI performed on Kevin, to your knowledge, at that time?

A. Not at that time.

Q. At that time had there been a CT scan performed on Kevin at that time, to your knowledge?

A. I do believe the CT scan had occurred already.

Q. Did Dr. Hogstein before telling you about his conclusion about ICU delirium have any discussions with you about the findings of the CT

Page 77

scan?

A. I was told the CT scan was clear; it didn't show anything.

Q. When you received the call from the doctor that they were prepping Kevin for an MRI, were there any comments made by that doctor that you received the call from that they had any safety concerns about performing the MRI?

A. Just that hoping that he would stay still and the biggest thing being that he needed to stay still for an MRI.

Q. When you received this call, did the health-care provider or the doctor you received the call from tell you when the MRI was going to be performed?

A. No. Just that they were prepping him. I assumed that it was getting ready to occur in that moment.

Q. If you go to excerpt 2, you look at the second paragraph there starting with however, and it states, [As read] "However, the medicine they give him Seroquel was too strong and had the same



Page 78

horrible effect the other sedation meds had on him."  What was the basis of that statement in your text messages?

A. That Kevin was just out.  I guess -- let me look at it again.

Q. So let me ask a better question, it may help.  The conclusion that the medicine that was given, the Seroquel was too strong, whose conclusion was that; was that your assumption or was that a conclusion voiced to you by a healthcare provider?

A. I believe by the healthcare -- I believe Mr. -- I believe Dr. Hogstein said that, admitted that.

Q. And the second clause -- second latter part of the sentence rather, [As read] "Had the same horrible effect the other sedition meds had on him."  What effect are you referring to?

A. Keeping him sleepy and sluggish and unable to speak coherently.

Q. And was that your conclusion or was that a healthcare provider's conclusion about the effects

Page 79

the sedation meds had on him?

A. That was my conclusion.

Q. If you move down to the fourth line up from the top, the sentence beginning with, The doctor and physicians assistant.  Do you see that?

A. Yes.

Q. And that sentence reads [As read] "The doctors and physicians assistant spent 30 to 40 minutes apologizing and trying to explain every bit of everything in the plan going forward."

Do you recall who the doctor and physician's assistant is that you're referring to in this text?

A. Hogstein and Katherine -- (inaudible) I switch it up, it's the female.

Q. Okay.  And you can just tell me based on your recollection.  So the physician's assistant you believe you were referring to was?

A. Katherine.

Q. Katherine.  Okay.  And the doctor was Dr. Hogstein you believe?

A. Yes.

Page 80

Q. Can you specifically recall what they were apologizing for?

MS. STURTZ:  I'm just going to state an objection but you can answer.

A. Giving him more sedation meds after being told that the plan going forward was to get him off of sedition meds.  The goal was always to get him out of the ICU but they couldn't do that until he was at baseline what they call.

Once he was out for a whole 24 hours and his numbers were off, that just pushed everything -- that just added a day, another day to him being in the ICU however long was going to be there.  It just set us back.

BY MR. JACKSON:

Q. You described a time of 30 to 40 minutes; you characterize it as them apologizing.  Were they just talking during this whole time or was there an exchange --

MS. STURTZ:  Same objection but you can answer.

MR. JACKSON:  You can have a continuing to

Page 81

this line, Counsel.

A. They were rounding and his team is a teaching hospital, so they spent 30, 40 minutes with their team in a room discussing the case and allowed me to ask any questions that I had, you know, regarding the steps and what they were talking about and anything going forward.

BY MR. JACKSON:

Q. The apology that was made, was that made in front of the whole team to you?

MS. STURTZ:  Same objection.

A. I believe so.

BY MR. JACKSON:

Q. And what was your response when Dr. Hogstein and/or Katherine made the apology?

A. Please don't do it again.

Q. If you go over to excerpt 3 on page 2 and the date of this excerpt is from 6/24/22 beginning at 4:51:46 p.m.  If you look at the fourth hash mark where it states, [As read] "PT/OT ordered but they haven't come by yet."

A. Uh-huh.



Page 82

Q. What are you referring to at that particular text?

A. Physical therapy and occupational therapy would come around and move his body or adjust him but he wasn't like a participant in any therapy at that time.

Q. Did they ever -- physical therapy, occupational therapy, do you recall them working with him on this particular day? Do you have an independent recollection of that occurring on the 24th; I know it was two years ago?

A. No.

Q. The hash mark underneath that beginning with reading Dr. Max. It reads, [As read] "Dr. Max is open to holistic approach - meaning adding things to his medication regime-but he doesn't know what to add into the mix." What was the basis of that text?

A. We were just looking for other options that weren't medication or natural remedies that could be incorporated into his care that could possibly help.

Page 83

Q. Did he tell you that he didn't know -- you say he doesn't know what to add into the mix. Is that your speculation about his --

A. No. He said that he didn't have any training on it. He was open to anything but he didn't have any specific training on holistic medicine or medication or holistic approach.

Q. Okay. So back up. Can you just -- to the extent you can recall, tell me about that exchange; what did you say to him to prompt that response and what, as close as you can recall it, was his response?

A. I believe Saskia actually asked that question about the holistic approach. That being she had just gotten over breast cancer and I guess that's something that was incorporated into her treatment. So that question actually came from her.

Q. So it was Saskia, you, and Dr. Hogstein?

A. No, it was Saskia had -- I believe Saskia had the conversation with him, she told me about it and I reported that to Kimmy.

Page 84

Q. Do you know when Saskia had the conversation with Dr. Hogstein relative to this report to Kimmy via text?

A. I don't know exactly when.

Q. Was it a personal communication or was it over the phone, do you know?

A. It was personal.

Q. And moving through now, what do you know about the nature of that exchange between -- other than what you've already said Saskia and Dr. Hogstein; that she had the concern about holistic approach and his response to her was what?

A. Just that he was open to what we would, you know, bring to the -- that he was not well versed on it; he didn't have the training into holistic care.

Q. Did you ever independently and personally have a conversation with Dr. Hogstein about his professed level or lack of training?

A. No.

MS. STURTZ: Objection to the form of that question. Limited -- not limited to holistic.

Page 85

BY MR. JACKSON:

Q. Okay. Let me ask it again to try to get around the objection. Did you ever have any follow-up conversation with Dr. Hogstein about what you understood the communication between him and Saskia was about the holistic training?

A. I don't believe so.

Q. The last -- next sentence rather [As read] "I asked if there was an integrative doctor on the hospital staff that he would consult with and he said not that he knew of."

A. Okay.

Q. Well, let me ask you --

A. Okay. I apol- I would like to correct my response.

Q. What would you like to correct about your response?

A. I think -- she may have said it to me. She may have said it to Dr. Max, too, but I think she did ask me to ask that question.

Q. Do you recall what his response was?

A. Same that I have down here, that he just

22 (Pages 82 to 85)



Page 86

didn't have the training.

Q. The last section -- sentence there said, He would be open to trying things I/we suggest. Did you make any suggestions to Dr. Hogstein?

A. No.

Q. In excerpt four, the second to last sentence, and this is from 8/20/22, 1:52:43 p.m. [As read] "He would go to a skilled nursing center then and home in two to four weeks after."  And you're referring to the discharge date you have there 8/31/22.

What was the basis of your statement that he was going to go to a skilled nursing center and then home four weeks after?

A. His primary while in NRH was just -- just always felt that he was going to be too much for us to handle on our own without professional care and that going to a skilled nursing center was not saying that was going to help with rehabilitation but give us more time to prep and be ready to receive Kevin at home.

Q. Do you know as you sit here today the

Page 87

total amount that either was paid out of pocket or billed to his insurance for the in-home nurse aide that you all hired?

A. I don't know those exact numbers right now but it may have been close to $7 or $8,000.

Q. As the power of attorney, in the power of attorney capacity that you brought this lawsuit, what damages are you seeking in this lawsuit on behalf of Kevin?  You can refer to -- what is it that you're referring?

A. I'm referring to my notes that specifically they were large numbers.  I have them written down.

MS. STURTZ:  Well, first of all, I've never seen this.

MR. JACKSON:  We can mark it.

MR. STURTZ:  So we have to mark it as an exhibit.

MR. JACKSON:  Yeah, that's fine.

MS. STURTZ:  And she certainly isn't the determining factor of damages in the case, so I object to the line of questioning.

Page 88

MR. JACKSON:  Let's mark that and show it to counsel and I'll ask you a few questions on it.

(Exhibit 2 was marked.)

BY MR. JACKSON:

Q. And for the record, can you state what appears on this exhibit before you?

A. What appears on this exhibit was the total for the ICU bills, the NRH bills and radiology bills associated with Kevin's hospital stay.

Q. What are those?  Do you have the amounts on that note?

A. Yes.  So for his medical bills related to negligence defendants I have $584,124.56 that breaks down to the ICU bills of $570,344.60, NRH bills in the amount of $12,041, radiology bills in the amount of $1,738.00.

Q. And what is it with respect to those bills that you are seeking to accomplish if anything with this lawsuit?

MS. STURTZ:  Objection.

MR. JACKSON:  You may respond.

A. Seeking compensation for future lost

Page 89

wages, future medical care cost, pain and suffering and the medical bills related to the negligence of the defendants.

MS. STURTZ:  Objection.  Move to strike.

BY MR. JACKSON:

Q. Have you filed any other civil suit in the capacity of personal representative or not personal representative but power of attorney on Kevin's behalf?

A. No.

Q. To date, have you been compensated or paid in any way, shape or form for operating in the capacity of power of attorney on behalf of Kevin?

A. No.

MS. STURTZ:  Objection.

BY MR. JACKSON:

Q. Is there any reason in particular why you as opposed to Daniel Hargrove or Marvin Holland has been designated or was chosen by Kevin to be designated as his power of attorney?

A. I believe for one, Kevin trusts me, and I have been -- I handled more of the medical care.


MAGNA
LEGAL SERVICES

Page 90

Daniel is young, Marvin works all the time, he's not apprised of everything going on.

MR. JACKSON: Just bear with me.

BY MR. JACKSON:

Q. In your testimony in your deposition thusfar, have you stated all of the complaints that you have related to the medical care and treatment that Kevin received at MedStar?

MS. STURTZ: Objection.

A. No.

BY MR. JACKSON:

Q. What else have you, other than what you've testified to, what concerns or critiques do you have of the medical team?

MS. STURTZ: Objection.

A. Specifically that he had several strokes in the ICU that went undetected, and in the ICU there was usually someone in the room with him all the time. I think there were certain -- a certain amount of time that he had to have these neuro exams to see what was going on, and I just -- I didn't feel that they did their due diligence in

Page 91

getting to him having several strokes while he's in an intensive care unit where they're supposed to be watching him, like, around the clock and I just -- I don't understand how that was -- how several strokes were missed.

MS. STURTZ: Objection and move to strike. She's obviously not an expert in strokes.

BY MR. JACKSON:

Q. Were you present at the house when he fell out of the bed?

A. No.

Q. Do you know if he was injured as a result of falling out of the bed?

A. I think he just was in pain for a while.

MR. JACKSON: Pending his questions, I have nothing further.

THE VIDEOGRAPHER: We need to go off the record for a minute so I can change video files.

MS. STURTZ: Okay. That's fine.

THE VIDEOGRAPHER: Off the record at 1:23. This ends media unit number 1.

(A break was taken from 1:23 p.m. to 1:30 p.m.)

Page 92

THE VIDEOGRAPHER: On the record at 1:30 p.m. This begins the media unit 2 in the deposition of Shana Hargrove.

EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MR. STURTZ:

Q. Ms. Hargrove, just a few more questions. In regard to Exhibit 2, when was this document prepared?

A. Yesterday.

Q. It was prepared yesterday. What is the source of the information contained in this document for these medical bill amounts?

A. His medical bills. That's something I can access online.

Q. Do you understand that these amounts reflect the billed amounts and not the paid amounts?

MR. JACKSON: Objection. You can respond.

A. Yes.

BY MR. STURTZ:

Q. Do you have an understanding that without the surgery for the aortic repair Kevin Welch

Page 93

likely would have died?

MR. JACKSON: Objection. You can respond.

A. I was told that.

BY MR. STURTZ:

Q. Do you understand that it was always the plan after the surgery for Kevin to go to the ICU?

A. Yes.

Q. Do you understand that regardless of whether or not there were any complications from the surgery he was going to require ICU care?

MR. JACKSON: Objection. You can respond.

A. For the next day, that's what the doctor said.

BY MR. STURTZ:

Q. Counsel -- as part of Exhibit 1, counsel showed you some texts, but you understand that those were not all the text messages from those conversations?

A. Yes.

Q. Earlier in your testimony you told me that you first decided to go to an attorney in October of 2022. However these text messages demonstrate

24 (Pages 90 to 93)



Page 94

that you were already thinking about going to an attorney when Kevin was still in the ICU, correct?

MR. JACKSON: Objection. You can respond.

A. According to these text messages. Is that something that I stated here, in here?

BY MR. STURTZ:

Q. Do you recall texting about a lawyer while he was still in the ICU?

A. I don't recall.

Q. And there's no basis for you to be considered an expert in stroke care or any element of medical care for that matter?

A. I'm not an expert in any medical care.

THE COURT REPORTER: I'm sorry. Can you speak up?

A. I'm not a medical expert.

BY MR. STURTZ:

Q. Is it your testimony that someone told you that Mr. Welch would only need to be in the ICU for one day following this major heart surgery?

A. It's my testimony that he was expected to -- yes, just be in the ICU until he woke up the

Page 95

next day and they see where he was. He was expected to be discharged from the hospital within a week.

Q. Do you remember who told you that?

A. Dr. Alassar, the surgeon.

Q. Do you remember when he told you that?

A. After the surgery.

MR. STURTZ: That's all. Thank you, Ms. Hargrove.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. JACKSON:

Q. Did you ever see Dr. Alassar visit with Kevin when he was in ICU?

A. I don't recall.

Q. Did Dr. Hogstein ever tell you that he spoke with Dr. Alassar prior to your conversation with him about this what we'll call holistic approach on 6/24/22 according to your text messages?

A. I recall Dr. Hogstein mentioning being in communication with Dr. Alassar, I just don't remember on what exactly.

Page 96

MR. JACKSON: Okay. I have nothing further.

MS. STURTZ: Thank you.

MR. JACKSON: We'll read and sign this transcript. We just need the same, just the transcript, no video.

THE VIDEOGRAPHER: All right. Off the record at 1:35 and this ends the deposition.

(Deposition concluded at 1:35 p.m.)

Page 97

CERTIFICATE

I, Okeemah S. Henderson, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 24th day of April, 2024. My commission expires: August 31, 2024

_____
Okeemah S. Henderson, LSR
Official Court Reporter

25 (Pages 94 to 97)





## A

**a.m**
1:15 4:10 38:13,16
**ability**
32:10 47:3
**able**
11:3,4 25:16,22 26:4
27:9 31:22 32:1
33:9 35:9 41:2
59:19 60:18
**abreast**
13:18
**absolutely**
14:16 32:4,6 46:11
49:18
**access**
92:14
**accident**
32:6
**accommodate**
6:5 29:11
**accommodations**
26:10,19 27:19 29:21
**accompanied**
6:8 47:14
**accomplish**
88:18
**ACTION**
1:6
**active**
34:19
**activity**
35:11
**add**
82:17 83:2
**added**
80:12
**addictive**
11:16
**adding**
82:15
**address**
7:11 8:4,15 9:7,8
**adjust**
82:4

**admitted**
78:13
**adults**
9:1
**advantage**
14:20
**advised**
25:17
**aerobic**
50:16
**affiliated**
73:1
**affixed**
97:12
**agency**
25:8
**ages**
7:9
**aggressive**
65:19
**agitated**
63:4
**ago**
15:1 61:2 82:11
**ahead**
6:1
**aide**
21:16 24:13 87:2
**air**
40:15
**airports**
23:21
**al**
1:7 4:6
**Alassar**
44:3 58:10 64:8,10
95:5,12,16,21
**alcohol**
51:2
**Ale**
62:18
**alert**
54:4
**alley**
61:19
**allowed**

16:13 81:5
**ambulance**
40:7,8,10
**amount**
66:10 87:1 88:15,16
90:20
**amounts**
88:10 92:12,15,16,17
**and/or**
81:15
**annual**
30:14 31:6
**answer**
6:2 13:14 46:21 47:5
48:7,14 62:15 80:4
80:21
**answering**
5:17
**anticipate**
56:1
**anticipation**
21:1
**anymore**
35:4 47:7
**aorta**
42:17 67:18
**aortic**
67:22 92:22
**apathy**
24:16 33:16
**apol-**
85:14
**apologies**
14:19
**apologizing**
79:9 80:2,17
**apology**
81:9,15
**apparent**
25:15
**APPEARANCES**
2:1
**appears**
88:6,7
**applied**
31:12

**apply**
31:16
**appointments**
16:5,8,11 22:6 47:14
**apprised**
90:2
**approach**
82:15 83:7,14 84:12
95:18
**approaching**
32:5
**April**
1:14 4:9 97:12
**area**
56:16 57:18
**arm**
63:7
**arrange**
35:14
**arrived**
40:19 41:10 62:1
**arts**
34:10
**Asian**
41:17
**aside**
27:3 52:18
**asked**
5:19 60:1,3 62:18
65:3 73:14 83:13
85:9
**asking**
25:14 44:19 55:15
56:1
**aspirin**
66:21
**assist**
15:4 67:10
**assistance**
18:1
**assistant**
79:5,8,12,17
**assisted**
17:8
**assisting**
17:3


MAGNA
LEGAL SERVICES

**associated**
43:9 58:5 88:9
**assume**
6:2 60:19
**assumed**
77:17
**assumption**
78:9
**Atlanta**
37:3,9
**Attached**
3:11
**attacks**
22:13,14
**attempt**
49:22
**attempting**
53:17
**attempts**
50:2
**attend**
16:7
**attended**
16:5
**attorney**
1:4 4:5 14:9,11,15
15:4 16:3 17:3
51:16,18,21 87:6,7
89:8,13,20 93:21
94:2
**attributed**
18:17
**audited**
59:22
**auditing**
61:8
**August**
10:12 97:14
**authority**
23:22
**Avenue**
4:12
**average**
9:9 49:15,16
**avoid**
75:15,15

**awake**
41:1,9 62:5,6,6,7
**aware**
13:18 22:13,19 23:1
24:17 39:16 46:7
49:8,14 50:20 51:2
60:13 66:19 67:14
**awareness**
47:11

**B**

**baby**
66:21
**Bachelor's**
23:4
**back**
7:19 8:12,16 9:6 10:8
10:14 20:3 26:20
27:11 28:14,21 36:2
36:13 37:21 38:7,11
38:15,17 39:4 40:22
41:8,9 44:7 49:8
53:9 55:3 66:5 73:7
80:14 83:8
**bad**
42:9
**bag**
46:1
**Baltimore**
2:16
**bank**
29:16,18 30:8,9,12
30:17,20
**bars**
35:1
**basal**
57:15,17,21
**baseball**
34:21
**based**
72:14,18 74:2 79:16
**baseline**
80:9
**basis**
71:17 75:16 78:2
82:18 86:12 94:10

**bathing**
18:1
**batteries**
33:10
**bear**
90:3
**beat**
61:20
**becoming**
38:1
**bed**
20:10 32:13 41:2
45:10,15 91:10,13
**bedside**
45:19
**beer**
51:7
**beers**
51:6
**began**
38:10 64:6
**beginning**
8:18 9:2 17:12 36:17
61:1 79:4 81:18
82:13
**begins**
4:3 92:2
**behalf**
2:2,10 4:13,16,20,21
5:1,10 14:22 87:9
89:9,13
**belief**
61:18
**believe**
8:16 11:4,6 19:12
22:21 25:11,18,20
30:14,19 31:22 32:1
33:2 34:8 37:19
39:14 44:9 45:11
49:10 52:20 56:6,15
58:10 59:10 60:21
61:16 63:6 65:9
66:22 68:9 72:19
76:18 78:12,12,13
79:18,21 81:12
83:13,20 85:7 89:21

**believed**
64:22 74:18
**believes**
24:18
**bend**
33:5
**bending**
33:2
**bends**
33:3
**best**
5:16
**Beth**
7:22
**better**
18:21 78:6
**beyond**
30:5 33:19 41:10
56:17
**biggest**
47:2 77:10
**bill**
15:13 92:12
**billed**
87:2 92:16
**bills**
15:5,12 88:8,8,9,12
88:14,15,15,17 89:2
92:13
**bit**
17:11 25:4 32:14
43:4 60:17 61:14
79:10
**blood**
42:4,7,19,19 44:14
45:22 58:19,21 59:6
59:13 66:18,20 67:2
67:15,19,21
**body**
42:20 67:19 82:4
**Bonefish**
50:14
**born**
10:12 22:17
**Boulevard**
7:22



**bowel**
17:16
**brain**
56:16 57:18,22
**Brandon**
41:17,17 56:13 57:1
57:2,3,7 71:5
**Brandywine**
8:4,13 9:8 20:18
**break**
6:3 38:12 68:13
91:22
**breaks**
88:14
**breast**
83:15
**breath**
33:8
**briefing**
38:16
**bring**
37:21 41:7 71:21
84:14
**brother**
10:9 16:9 37:14,19
38:8,19 39:3 41:8
**brought**
87:7
**build**
48:19
**building**
48:18
**built**
7:22
**burst**
42:18
**business**
24:2 29:1
**busy**
59:18
**bypass**
43:6 58:15

_____
**C**
_____
**C**
4:1

**caffeine**
50:21
**calculation**
59:4,9
**call**
14:4 53:16 54:9,11
70:17 71:3,7,7 77:4
77:7,12,14 80:9
95:17
**called**
5:6 40:16 56:14 57:2
57:3 74:21
**calls**
14:2,3,4
**Campbell**
17:8
**cancer**
83:15
**candidate**
76:8
**cap**
30:19
**capacity**
54:5 87:7 89:7,13
**car**
38:9,10 39:4,7
**cardiac**
22:13 66:17
**care**
8:8 21:4,6 66:4 68:7
72:3 82:21 84:16
86:17 89:1,22 90:7
91:2 93:10 94:11,12
94:13
**cares**
21:11
**case**
4:7,8 8:11 12:2 52:6
52:13,15 53:4 70:6
70:12 81:4 87:21
97:9
**cause**
42:12 57:19
**caused**
64:18
**causes**

18:11
**ceased**
59:14,15
**cell**
71:8,10,12
**center**
1:7 4:6 40:17 86:8,13
86:18
**certain**
48:16 55:5 59:12
66:10 69:6 70:5
90:19,19
**certainly**
32:22,22 69:17 87:20
**CERTIFICATE**
97:1
**certify**
97:3
**chances**
66:4
**change**
17:17,22 33:10 34:18
44:18 91:18
**changed**
9:19 17:18 19:9 35:6
36:15
**changing**
20:11
**characterize**
80:17
**Charles**
2:14
**chart**
59:21 60:7,18,19
**charting**
60:12,14
**charts**
71:14
**check**
9:12 15:9 44:7
**child**
8:20
**children**
7:2,4,6 9:11
**chores**
32:10,17

**chosen**
89:19
**civil**
1:2,6 52:9,12 89:6
**clarification**
5:21,22 16:20
**clarify**
12:9
**clause**
78:15
**clean**
12:14
**cleaning**
11:17 22:5
**clear**
65:5,9 77:2
**Clinton**
7:21
**clock**
91:3
**clonidine**
67:1
**close**
33:18,19,22 83:11
87:5
**closest**
36:11
**clothes**
32:15
**cognitive**
63:17 65:13,13
**coherent**
62:14 63:3
**coherently**
78:20
**Columbia**
1:1 4:8 23:14
**come**
17:21 19:15 35:19
36:16 58:16 66:9
72:6,20 81:21 82:4
**comes**
30:2
**comfort**
18:7,13
**comfortable**



27:14 35:3
**coming**
21:2
**comment**
74:1
**comments**
77:6
**commission**
97:13
**common**
74:22
**communicate**
53:13 65:7 67:15
**communicated**
29:5,20,22 43:8 44:1
53:14 55:21 56:18
**communication**
19:10 28:20 29:13
36:3,5 84:5 85:5
95:21
**communications**
14:21 28:7,11,18
29:7,19 35:13 42:10
55:19 56:8,8 58:21
**compensated**
89:11
**compensation**
88:22
**complaint**
72:2
**complaints**
90:6
**completely**
5:17 19:9 24:17
**complication**
64:20 68:4 76:3
**complications**
58:13,16 93:9
**component**
32:20 33:1
**concern**
42:6,7 84:11
**concerned**
59:7
**concerns**
24:14 25:4 77:8

90:13
**concluded**
96:9
**conclusion**
76:2,21 78:7,9,10,21
78:22 79:2
**concur**
74:4
**condition**
13:12 30:16 39:7
42:3 47:3 48:1 51:9
52:21 55:15 63:11
66:17 75:11,14
**conditions**
22:13,16
**confirming**
70:18
**connected**
51:9
**connection**
74:8,11,18
**consent**
43:12 47:16
**consider**
26:9
**considered**
94:11
**constantly**
16:1 37:16 71:20
**Constitution**
4:11
**consult**
85:10
**consumed**
39:13
**consumption**
50:21
**contact**
30:1
**contacted**
40:14
**contacting**
51:17,21
**contained**
92:11
**continue**

19:6 29:17 47:22
**continuing**
47:19 80:22
**contrary**
11:17
**contribute**
8:6
**contributed**
30:17
**control**
11:15 18:21
**conversation**
29:16 30:4 36:19,21
63:21 72:17 73:6,6
83:21 84:2,18 85:4
95:16
**conversations**
93:18
**cook**
12:4 50:3
**cooked**
12:5,8
**cooking**
22:5
**cords**
70:18
**correct**
10:19 12:12 14:9
34:11 61:9 85:14,16
94:2 97:4
**correctly**
8:17 15:3
**cost**
22:10 89:1
**counsel**
2:1 4:16 5:8 6:4
12:17 68:16 81:1
88:2 92:4 93:15,15
95:10 97:8
**couple**
5:14 41:22 43:17
71:18 72:12
**course**
9:10 11:9 16:12 18:2
44:13 52:2 58:12
60:7,14

**court**
1:1 4:7,15 7:12 9:7
23:7 41:15 57:16
69:20 94:14 97:21
**Courts**
23:14
**covered**
56:21
**criminal**
52:15
**critically**
60:20
**critiques**
90:13
**crumbs**
32:14
**crying**
18:12,14 41:1
**CT**
65:8,12 76:15,18,22
77:2
**cure**
76:6
**current**
7:11 13:12
**currently**
7:13 9:18 23:13
30:21 52:21 66:15
**cycle**
75:21

---

**D**

**D**
4:1
**D.C**
1:13 2:7 4:12 37:21
**daily**
32:10,17
**damages**
87:8,21
**Daniel**
17:7 20:17 52:20
89:18 90:1
**Daniel's**
20:5
**date**



4:9 13:15 27:4
81:18 86:10 89:11
**dated**
19:12
**dates**
19:13
**dating**
19:12
**David**
2:11 4:21 5:10
**day**
9:22 11:9,10,21 18:3
29:1,1,3 38:2 41:21
44:1,10,11,17 49:1
49:2 51:1 53:21,21
54:6,11 59:21 60:18
61:15,18 63:7 80:12
80:13 82:9 93:12
94:20 95:1 97:12
**days**
10:1 13:8,9 41:22
43:17 44:22 55:1
71:18 72:12
**dead**
33:12,14
**dealing**
20:4
**dealings**
15:2
**December**
10:13,17 17:19 21:21
52:1
**decided**
93:21
**decreased**
10:4,7
**defendant**
52:13,16
**defendants**
1:8 2:10 4:22 5:2,8
5:11 88:13 89:3
92:4
**defense**
4:13
**deficiencies**
24:18 47:12

**degree**
23:4
**delirium**
42:9 45:13 56:2 63:1
64:3 65:14 74:21
75:3,10,14,19 76:2
76:7,11,21
**delusions**
61:15
**demonstrate**
93:22
**Denmark**
12:21 43:17
**department**
28:8 73:3
**depending**
30:16
**deposed**
6:15
**deposition**
1:11 4:3 5:12,13 6:18
90:5 92:3 96:8,9
97:3
**depositions**
5:14
**depth**
74:18
**describe**
17:12 19:2 20:5 22:3
**described**
43:5 80:16
**designated**
89:19,20
**desire**
10:21 24:9
**desires**
14:13 24:8
**desperately**
37:20
**detail**
57:9
**detector**
33:11
**determining**
87:21
**diabetes**

22:15
**Diantha**
7:12 9:7
**die**
25:9 43:1
**died**
93:1
**diet**
11:14 12:1,3 49:9,10
**different**
11:10 12:3
**diligence**
90:22
**direct**
3:5 28:7
**direction**
97:7
**directly**
35:13
**disability**
26:9,12,18 27:2
31:12,16
**disabled**
31:20
**discharge**
86:10
**discharged**
95:2
**discovered**
65:16
**discuss**
16:21
**discussed**
24:6 26:6,7 27:7 28:2
52:6
**discussing**
81:4
**discussions**
26:12 27:4 56:20
57:13 76:22
**disease**
22:20
**District**
1:1,1 4:7,8 23:14
**Division**
1:2

**dizzy**
33:2
**doctor**
37:22 54:8,9,13 56:6
70:17 71:2,4,11
72:6 73:22 77:4,6
77:13 79:5,11,20
85:9 93:12
**doctors**
18:9 26:20 40:21
41:12 54:21 56:11
56:12 62:12 64:12
68:7 73:7 79:8
**document**
92:7,12
**documentation**
26:20
**dog**
32:15
**dogs**
18:2
**doing**
17:20 32:11 42:5
47:22
**donation**
29:15
**donations**
29:18
**Donna**
2:12 5:1
**dosage**
60:2,5
**Dr**
16:12,16 25:19 28:1
28:5 41:14 44:3
47:17 48:15 53:10
53:12,15 54:16
55:12,18,20 56:7,13
57:2,3 58:10 64:8
64:10,14 71:12 73:8
73:8,8,19 74:2,7,17
75:3,7,22 76:5,10
76:20 78:13 79:20
81:14 82:14,14
83:19 84:2,10,18
85:4,19 86:4 95:5



MAGNA
LEGAL SERVICES

95:12,15,16,20,21
**drank**
39:22
**drinks**
39:12,22 41:9
**drive**
32:1
**driving**
20:14 38:10 39:4
**due**
19:5 24:16 25:21
30:15 43:16 90:22
**duly**
5:7
**Dunkirk**
7:12 8:13 9:10
**dysfunction**
17:17

**E**

**E**
2:3 4:1,1
**earlier**
47:13 69:8 93:20
**eat**
19:16 36:8 50:4
**ebbs**
46:22
**education**
23:3
**effect**
78:1,17,18
**effects**
78:22
**either**
21:9 68:5 71:5 73:8
87:1
**elaborate**
25:3 74:8
**element**
94:11
**emergency**
42:16
**emergent**
58:7
**emotion**

18:12,17
**emotional**
18:4 36:12
**employed**
23:13 97:8
**employees**
25:12
**ended**
45:3
**ends**
36:12 91:21 96:8
**energy**
39:12,22 41:9
**engaging**
26:21 30:4
**enter**
53:12
**entire**
13:19
**entry**
70:15 73:12
**episodes**
37:15
**Esquire**
2:3,11,12 3:7,8
**estate**
15:2
**et**
1:7 4:6
**evaluation**
26:3 73:9
**evaluations**
73:5
**exact**
18:18 87:4
**exactly**
55:22 65:1,4 84:4
95:22
**EXAMINATION**
3:1,5 5:8 68:16 92:4
95:10
**examined**
5:7
**example**
33:3,10
**exams**

90:21
**excerpt**
70:8,9,14 77:19
81:17,18 86:6
**excerpts**
3:15 70:5
**exchange**
80:19 83:10 84:9
**excuse**
76:1
**executive**
14:18,18 25:7
**exercise**
22:8,9 50:16
**exhaust**
31:4
**exhibit**
3:15,16 68:19,20
69:14 70:1,5,10
87:18 88:3,6,7 92:7
93:15
**EXHIBITS**
3:10,13
**existed**
74:18
**existing**
74:19
**expected**
94:21 95:2
**expense**
3:16
**experience**
25:20 75:19
**expert**
91:7 94:11,13,16
**expires**
31:17 97:13
**explain**
58:8 79:9
**explained**
41:6
**explaining**
74:17
**express**
24:9
**expressed**

10:21 24:14 29:10
35:21
**extent**
83:9
**extremely**
42:4 59:18
**eyes**
20:14 44:22 45:1,2

**F**

**face**
68:6
**FaceTime**
14:2,4
**facilitate**
36:2
**facility**
61:12 62:2,5 63:11
**fact**
44:21 61:15 66:8
**factor**
87:21
**failure**
49:13
**fall**
20:9 33:6
**falling**
20:8,10 91:13
**familiar**
30:11 70:11
**family**
16:21,21 21:4 22:12
22:22 36:15 62:17
**far**
29:12 33:3 35:10
47:20,20 65:20
**fast**
66:13
**father**
22:14
**February**
24:12
**feel**
14:14 27:15 33:15
47:9 90:22
**fell**



36:13 91:9
**felt**
22:7 86:16
**female**
73:22 79:15
**fighting**
63:2
**filed**
4:7 52:9 89:6
**files**
91:18
**fill**
28:16
**finances**
15:5
**financial**
97:10
**findings**
76:22
**fine**
68:12,14 87:19 91:19
**finish**
5:17
**fire**
33:10,11
**fired**
25:21
**first**
5:6 7:21 9:21 17:14
  18:5 24:9 26:10
  28:11 32:8 39:14
  40:11 41:20,21
  42:14 51:15,20
  53:15 54:8 57:5
  61:15 66:3,12 67:9
  68:18 70:1,4,15
  72:11 87:14 93:21
**fish**
18:3 33:12
**five**
33:22
**flew**
38:2
**flight**
38:6,14
**flower**

33:4
**follow-up**
68:12 85:4
**followed**
40:10
**following**
48:4,11 94:20
**follows**
5:7
**food**
12:5,6,8 20:12 32:14
  33:4 50:4
**football**
34:21 35:12
**forcing**
49:17
**foregoing**
97:3,4
**forget**
15:10,13
**forgets**
15:12 16:1
**forgetting**
15:17
**forgive**
21:9
**form**
13:13 43:12 46:20
  47:4 48:6 75:19
  84:21 89:12
**format**
69:3,10,11
**forth**
8:12 9:7 26:21
**forward**
25:14 26:17 30:5
  31:14 70:9 79:10
  80:6 81:7
**four**
7:5,6 8:1,18 9:1
  11:10 33:22 38:14
  86:6,9,14
**fourth**
79:3 81:19
**frantic**
60:17

**frequently**
10:6 22:1
**Friday**
22:2
**friend**
36:11
**friends**
19:21 33:18,19,22
  35:14
**front**
81:10
**full**
5:19 6:11 12:22 27:9
  30:9 31:6,7,15
  32:14 38:19,21
**full-time**
19:3
**function**
47:3 63:18 66:5
**functioning**
14:19 25:7
**further**
91:16 96:2
**future**
88:22 89:1

--- **G** ---

**G**
2:5 4:1
**game**
51:5
**games**
34:21,21 35:1
**ganglia**
57:15,17,21
**generally**
50:10,21
**gentleman**
34:9
**GEOINT**
24:7 28:8
**Georgia**
35:2 37:9,11
**getting**
31:4 35:3 59:12 76:9
  77:17 91:1

**gibberish**
62:22
**Ginger**
62:18
**girlfriend**
19:19
**give**
16:17 47:16 54:13
  62:12 71:10 72:20
  77:22 86:20
**given**
27:19 78:8 97:5
**giving**
8:10 12:2,14 13:3
  16:4 33:20 50:19
  52:22 71:11 80:5
**Gjackson@govern...**
2:8
**glasses**
32:13
**go**
5:14 6:1 9:12 15:14
  15:20 16:10 19:13
  20:6 26:10,18 27:11
  34:9 35:1,2 38:4
  39:18 40:8 41:7
  43:16 44:20 56:4
  59:10 60:19 62:9
  70:7,9 77:19 81:17
  86:8,13 91:17 93:6
  93:21
**goal**
19:5 54:21 59:11
  80:7
**goes**
29:12 46:22 54:15
**going**
8:3,16 13:18 15:20
  20:13 26:20 29:14
  35:17 37:18 42:11
  43:19,20 52:4 53:9
  54:2,5,18 56:3,3,4,5
  57:6 58:11 63:14
  67:17 72:21 75:1
  77:14 79:10 80:3,6
  80:14 81:7 86:13,16


MAGNA
LEGAL SERVICES

86:18,19 90:2,21
93:10 94:1
**good**
19:7,21 54:4 70:21
**Googling**
51:14
**Gorter**
16:12,16 25:19 28:1
28:5 47:17 48:15
64:14
**gotten**
18:21 53:16 61:21
69:9 83:15
**Governor**
2:3,4 4:19
**gradually**
10:4,7,14
**grandfather**
22:19,20
**grandmother**
8:21 21:10 45:11
**granted**
30:21
**grasp**
54:4
**grew**
8:20
**Grill**
50:14
**ground**
5:14
**GrubHub**
12:6 49:18
**guess**
51:15 67:18 78:4
83:15
**guided**
40:22

---

**H**

**habits**
48:18,19 50:21 51:2
**hair**
32:16
**half**
12:20

**hall**
64:16
**hand**
15:7 97:11
**handed**
70:4
**handle**
36:20 86:17
**handled**
89:22
**happen**
18:22
**happened**
28:13,22 41:3 61:1
**happening**
51:10
**happy**
5:21 6:4
**hard**
20:4 36:11 54:12
75:15,15
**Hargrove**
1:3,12 3:3 4:4,5 5:5
5:10 6:13,14 17:7
68:10,11 70:4 89:18
92:3,6 95:9
**hash**
81:19 82:13
**head**
6:7,8 62:19
**headed**
38:6
**heading**
38:15
**health**
24:13 40:19 47:20
64:17,21 72:3
**health-care**
77:13
**healthcare**
44:2 52:7,18 71:13
72:15,17 73:1 75:8
75:22 76:1 78:11,12
78:22
**hear**
22:16 49:5

**heard**
57:5 75:7
**heart**
22:13,14,16,20 42:5
94:20
**heavily**
34:20 54:12
**hello**
64:16
**help**
8:8 9:12 11:12,13
15:8 18:13 19:6
20:10 36:1,17 41:7
78:7 82:22 86:19
**helpful**
46:13
**Henderson**
1:22 4:15 34:5,8 97:2
97:20
**hereunto**
97:11
**hide**
50:3
**high**
33:4 34:14,16 42:5
44:15
**highest**
23:3
**hired**
21:4,6,7 87:3
**history**
22:12,22
**Hogstein**
41:14 53:10,12,15
54:9,16 55:13 57:7
68:5 71:6,12 73:8
73:18,19 74:2,7,17
75:7,22 76:5,10,20
78:13 79:14,21
81:15 83:19 84:2,11
84:18 85:4 86:4
95:15,20
**Hogstein's**
75:4
**hold**
19:18

**holistic**
82:15 83:6,7,14
84:11,16,22 85:6
95:17
**Holland**
7:20 17:7 37:8 89:18
**home**
7:21,22 8:15 9:5,21
13:4,17,22 17:5,14
17:21 18:5 20:7,19
20:22 21:2,18 24:13
32:16 49:7 60:19
66:9 67:9 86:9,14
86:21
**home-cooked**
49:3,14
**HomeHearts**
21:9,12
**hooked**
44:14 46:2
**hopefully**
47:22
**hoping**
77:9
**horrible**
78:1,17
**hospice**
21:10
**hospital**
1:7 3:16 4:6 9:20
13:22 17:6,13,14
20:19 39:15 40:9,10
40:13,17 42:15 45:7
45:15 54:7 81:3
85:10 88:9 95:2
**hospitalization**
37:4 68:1 75:10
**hospitalized**
13:19 41:12
**hour**
9:18 22:11 38:3
**hours**
9:15,22 19:17 22:2
29:14 30:14,18,20
38:14 39:19 61:2
72:13 80:10



**house**
19:11 32:12 35:19
  91:9
**human**
23:6,9,16,20 27:17
  28:8
**hybrid**
27:16
**hydralazine**
67:2
**hygiene**
20:11

---

**I**

**I/we**
86:3
**ICU**
45:14 53:10 59:17
  60:20 61:5 62:10,21
  63:3,5,10 65:22
  73:16 74:7,10,20,21
  75:2,10,14,19,20
  76:2,7,9,11,21 80:8
  80:13 88:8,14 90:17
  90:17 93:6,10 94:2
  94:8,19,22 95:13
**idea**
46:9 52:3
**ideas**
28:4
**identity**
34:1
**III**
2:3,4 4:19
**ill**
60:20
**immediately**
24:11 28:14 38:10
  40:16 67:10
**important**
29:2
**improve**
47:22 64:6
**improved**
18:19
**improvement**

48:3,10,17
**improvements**
47:2
**improving**
63:12,18 64:3
**in-home**
87:2
**inaudible**
50:22 79:14
**incident**
31:8
**include**
27:20
**including**
50:16
**incoherently**
62:13
**income**
19:4 31:10
**incontinence**
17:16 47:6
**incorporated**
82:21 83:16
**incorrect**
60:5
**independent**
82:10
**independently**
84:17
**INDEX**
3:1,10
**individuals**
34:2,13 39:2
**infarct**
56:16
**inform**
42:3 57:4
**information**
39:12 74:3 75:17
  92:11
**informed**
42:15 47:17,18
**initial**
28:20
**initially**
35:16 41:10

**initiate**
25:14 35:7 63:21
**initiation**
15:19,22 25:6 32:11
  32:18,19 47:11
  48:19,20
**injured**
91:12
**injury**
67:22
**insurance**
87:2
**intake**
20:12
**integrative**
85:9
**intelligence**
25:8
**intensive**
91:2
**interactions**
53:11
**interest**
97:9
**interrupt**
5:16
**introduce**
4:17
**introduced**
55:3
**involve**
26:19
**involved**
52:12,15
**issue**
15:17 27:2 32:18,19
  59:14,15
**issues**
17:16 26:4 32:8 33:1
  58:18 67:16,21 68:2
**IV**
46:1 60:3

---

**J**

**Jackson**
2:3,4 3:8 4:19,19

13:13 32:21 46:20
  47:4 48:6,13 60:8
  63:13,19 64:4 68:11
  68:15,17,22 69:5,12
  69:17,22 70:3 80:15
  80:22 81:8,13 85:1
  87:16,19 88:1,4,21
  89:5,16 90:3,4,11
  91:8,15 92:18 93:2
  93:11 94:3 95:11
  96:1,4
**January**
10:13,18 24:11
**job**
14:21 23:17 24:19
  26:13 29:1,2 30:10
  60:7,15
**jobs**
19:3
**John**
34:5,14,20 36:10,13
**Jonathan**
2:21 4:14
**July**
23:18
**June**
28:21 44:9,16

---

**K**

**Katherine**
73:21 74:1 79:14,19
  79:20 81:15
**Katy**
34:6,14
**Katy's**
34:6
**keep**
45:22 55:15
**Keeping**
78:19
**kept**
13:18 45:13 63:6
**Kevin**
1:4 4:5 7:19 8:8,13
  9:12,19 10:21 11:7
  11:8 13:2,21,22



MAGNA
LEGAL SERVICES

14:18 17:2,5,12 18:4 20:8,19,22 21:2,5,18 24:6 25:4 25:21 26:6,7,21 27:7 29:14 30:6,8 30:19 31:19,22 32:1 32:7 33:20 34:9 35:15 36:6,18 37:3 37:17 38:2,3,12,15 39:4,13,14,16,18,21 39:21 40:12 41:11 43:11,14 44:12 45:7 47:14 48:4,11 49:15 50:15 53:17,19 54:11 55:16 56:15 61:11,18 62:10 66:3 66:4 71:19,20 76:7 76:12,16 77:5 78:4 86:21 87:9 89:13,19 89:21 90:8 92:22 93:6 94:2 95:13

**Kevin's**
12:20 13:11 14:8 15:4 16:3 19:4,19 22:18,19 32:10 36:14 37:13 39:6 42:3 45:18 46:18 47:3,18 48:22 49:9 50:20 51:9,16 52:6 52:18,21 58:4,19 66:15 74:8,19,20 75:8,11 88:9 89:9

**Keyona**
21:15

**kidney**
49:13 66:22,22 67:1

**Kimmy**
12:18,19,20 13:1,2 13:10,22 71:1 83:22 84:3

**kind**
10:4,8 17:11 36:13 48:15,17 74:12

**knew**
34:12 85:11

**know**

5:12 6:4 15:22 17:10 18:10,16 20:9,10,12 20:14 24:19,20 25:1 25:8 26:3 27:10 28:13 29:2 31:1 34:1,6,7,12 35:17 36:8,19 37:1,12,17 38:21,22 39:11,21 41:6 43:3,19 48:4 48:22 49:19 50:7 53:4,18,18 54:10 56:2 57:5,8 58:11 58:13,15 61:3 68:7 71:3 81:6 82:11,17 83:1,2 84:1,4,6,8,14 86:22 87:4 91:12

**knowledge**
13:11 39:2 50:15 52:21 60:6,10 61:7 67:22 76:12,17

**knows**
11:14

---

**L**

**label**
46:1

**labeled**
70:8

**lack**
15:19 25:6,6,22 84:19

**lacks**
11:15 14:18 32:11 48:20

**large**
87:12

**late**
49:16

**LAW**
2:4

**lawsuit**
12:14 13:3 16:4 33:21 46:13 50:20 53:1 87:7,8 88:19

**lawsuits**
52:10

**lawyer**
52:4 94:7

**lawyers**
6:19

**laying**
41:2

**leading**
27:4 37:4,16 63:9

**learned**
53:22

**leave**
17:21 29:13,15,15,16 29:18,18 30:7,8,9 30:12,14,17,20 31:17

**leaves**
19:17

**Leaving**
27:2

**led**
22:15

**left**
31:2 57:19,20 61:11 62:4 64:9 70:20 71:16,19 72:1,4

**left-sided**
72:16

**leg**
57:20,20 71:19

**legal**
4:16 52:6

**legs**
45:10 71:21

**let's**
38:9 68:18 88:1

**letting**
37:17

**Levadas**
34:6

**level**
23:3 25:15 84:19

**license**
38:8

**life-threatening**
42:22

**lift**

40:15

**light**
22:8,8

**likes**
50:22

**limited**
84:22,22

**line**
63:6 79:3 81:1 87:22

**lines**
69:6

**Lipitor**
49:11 66:21,22

**listening**
20:9 28:19

**listing**
3:16

**literally**
58:6

**literature**
51:9

**little**
17:11 25:3 43:4

**live**
7:6 10:21 11:3,4

**lived**
8:9,17 9:2 12:10

**lives**
12:20 35:2 37:11

**living**
17:19 20:17

**LLC**
2:4

**LLP**
2:13

**located**
64:15

**long**
9:15 44:5 45:1,5 56:3 62:6 80:13

**longer**
54:2,19

**look**
18:7 70:10,14,21 72:20 73:12 77:19 78:5 81:19


MAGNA
LEGAL SERVICES

looked
73:2
looking
33:12 82:19
Losartan
67:1
loses
16:2
lost
38:8 88:22
lot
26:19 36:19 42:10
49:12 58:12 62:22
63:14
Low
49:10
LSR
97:20
Luczycki
41:14,16 55:18,20
71:13 73:9
lumbar
56:16 57:18
lunches
59:20

**M**

machines
75:20
Magna
4:16
mail
15:15
major
58:1 94:20
majority
14:20 29:16
making
20:7
male
41:17 61:19
management
11:13 23:6,9
MAP
59:1,3,6,8
mark

34:5,8 69:13 81:20
82:13 87:16,17 88:1
marked
68:18,20 88:3
marking
69:20
married
6:22
martial
34:10
Marvin
7:19 17:6 19:1,3,5
37:8 40:5,6,8,8 50:7
52:19 89:18 90:1
Marvin's
19:2
Mary
7:22
Maryland
2:16 7:12,21 23:12
39:15 40:12,15
maternal
22:18,19
Matt
34:7,15,21
Matt's
34:7
matter
4:4 35:8 94:12
Max
82:14,15 85:19
maybes
53:19
McDonald's
11:16 50:14
meal
18:2 39:19
meals
17:15 49:3,15
mean
11:19 17:15 18:8
27:17 29:12 44:13
44:21 51:14 55:14
56:10
meaning
58:3 82:15

meant
57:11
media
91:21 92:2
medical
6:21 16:5,7,10 17:1
25:10,17 28:1,5,16
30:6,16 47:14 48:12
51:8 88:12 89:1,2
89:22 90:7,14 92:12
92:13 94:12,13,16
medication
11:7,12 20:15 37:22
46:11 54:14 55:2,5
55:7,10 60:2 82:16
82:20 83:7
medications
11:10 66:15
medicine
77:21 78:7 83:7
meds
78:1,17 79:1 80:5,7
MedStar
1:7 4:6 40:16,19
61:11 64:9,13 75:9
90:8
meet
5:11 54:8
meeting
41:13
meetings
27:22
members
36:15 62:17
men
17:19
mental
37:15 47:12 54:5
mentioned
53:10 55:4,18 56:7
57:1 58:18 67:7
mentioning
95:20
mess
11:20
message

69:7 70:22 71:3
messages
3:15 12:17 14:2
69:10 70:6,10 75:7
75:13 78:3 93:17,22
94:4 95:19
messes
25:9
met
34:13 41:20
microphone
26:15
mind
11:15
minute
91:18
minutes
79:9 80:16 81:3
misfire
58:2
missed
91:5
mistakes
15:18 32:3
mix
21:11 82:17 83:2
modified
26:8 27:5,20
mom
8:21
moment
15:20,22 27:3 67:4
77:18
moments
53:6 69:16
Monday
22:2
monitor
20:12 22:7 45:18
50:1,2,7 58:11 59:3
monitoring
50:6,9 59:5
month
19:15
months
7:10 15:14 66:12



**morning**
32:12 40:9 44:8
**mortgage**
8:7
**mother**
8:21 15:1 38:20 39:3
43:20
**motivated**
46:16
**move**
8:5 20:6,22 21:1
26:17 79:3 82:4
89:4 91:6
**moved**
7:20 8:2 20:20,21
**moving**
30:4 45:10 57:20
71:19 72:1 84:8
**MRI**
56:14 70:19,20 71:16
76:12 77:5,8,11,14
**Mullins**
2:13 4:11
**mumbled**
44:15
**Murphy**
41:16 56:7,9,11
71:12 73:8
**Myers**
34:5,14

**N**

**N**
4:1
**Nadia**
41:19 72:10
**name**
6:11 12:22 21:8 34:6
34:7 38:18,22 41:17
41:18 72:11
**named**
12:18
**names**
21:13 34:4 38:19,21
51:12
**Nats**

35:12 51:5
**natural**
82:20
**nature**
20:16 37:13 43:5
84:9
**NE**
2:5
**necessary**
8:7 14:14 16:18 17:2
20:11
**need**
6:3,6 26:13 27:9,12
28:15,16 60:19
65:12 66:3 68:12
70:21 91:17 94:19
96:5
**needed**
18:1 29:17 36:1
47:16 54:3 77:10
**needs**
16:21 45:14 48:19
49:12
**negligence**
88:13 89:3
**neither**
97:8
**Nelson**
2:13 4:10
**neuro**
72:20 73:2,3,10
90:20
**neurological**
73:14 74:9,19
**neurons**
51:11
**neuropsychological**
26:2
**never**
42:6 59:15 87:15
**new**
69:11
**Nice**
5:11
**night**
20:8,21 44:7 64:11

**nightmares**
63:1
**nights**
9:10
**nod**
62:19 63:22
**nodding**
6:7
**normal**
39:18 66:5
**Northwest**
4:12
**notarial**
97:12
**note**
88:11
**notes**
87:11
**noticeable**
72:1
**noticed**
71:19
**noticing**
42:8
**November**
51:22
**Novemberish**
67:13
**NRH**
64:15 65:22 66:1
86:15 88:8,14
**number**
4:8 59:1,3,6,8,12
71:10,12 91:21
**numbers**
60:4 80:11 87:4,12
**nurse**
21:22 40:22 41:20
59:22 60:1,21 61:5
72:5,8 87:2
**nurse's**
41:18
**nurses**
21:14 41:18 54:20
59:19 60:7,12,13
61:8

**nursing**
21:4,6,8 22:10 24:12
59:20 86:8,13,18

**O**

**O**
4:1
**o'clock**
38:6
**object**
87:22
**objection**
13:13 32:21 46:20
47:4 48:6,13 60:8
63:13,19 64:4 80:4
80:20 81:11 84:21
85:3 88:20 89:4,15
90:9,15 91:6 92:18
93:2,11 94:3
**observation**
72:3 74:2
**observing**
74:10
**obviously**
91:7
**occasional**
51:4
**occupational**
82:3,8
**occur**
26:13 32:3 58:13
77:17
**occurred**
28:11 60:16 61:10
64:22 65:6 76:18
**occurrence**
8:10 12:2,13 13:3
16:4 32:9 33:20
39:17 40:1 50:19
52:22
**occurring**
11:18 82:10
**October**
51:22 67:13 93:21
**offers**
30:10


MAGNA
LEGAL SERVICES

| | | | |
|---|---|---|---|
| **officer** | **32:2** | **89:11 92:16** | **performing** |
| 97:2 | **operating** | **pain** | 77:8 |
| **offices** | 89:12 | 89:1 91:14 | **permanently** |
| 2:4 4:10 | **opinion** | **paperwork** | 31:20 |
| **Official** | 10:20 11:2 | 28:16 | **permission** |
| 97:21 | **opportunity** | **paragraph** | 16:14,17 |
| **oh** | 27:11 | 77:20 | **Perry** |
| 16:15 32:22 35:16 | **opposed** | **paralysis** | 2:21 4:14 |
| 37:10 43:16 45:13 | 89:18 | 57:19 | **person** |
| 69:17 70:2 | **options** | **Park** | 12:15 13:2,7 46:6 |
| **okay** | 27:20 82:19 | 35:12 | **personal** |
| 6:20 8:9 9:6,13,19 | **order** | **part** | 13:11 52:20,21 60:6 |
| 10:15,20 11:6 12:13 | 12:8 26:9,17 48:19 | 15:3 26:11,16 27:15 | 60:10 84:5,7 89:7,8 |
| 13:8 14:5,14 15:11 | **ordered** | 63:15 78:16 93:15 | **personally** |
| 16:10,15,19 20:17 | 12:6 66:8 81:20 | **participant** | 84:17 |
| 21:1,2,17,20 22:3 | **ordering** | 82:5 | **Peter.sturtz@nelso...** |
| 27:13 29:7,10 30:3 | 49:18 50:1,11 | **particular** | 2:17 |
| 30:6,11 31:1,5,9,12 | **orders** | 36:10 75:9 82:2,9 | **ph** |
| 32:20 37:12 39:1,9 | 49:20 | 89:17 | 6:13 |
| 39:17 40:11,18 | **ordinary** | **parties** | **phenomenal** |
| 43:21 49:19,22 | 61:5 | 97:9 | 12:4 |
| 51:20 54:13,15 55:4 | **originally** | **parts** | **phone** |
| 62:20 68:15 69:9,13 | 9:20 15:7 20:19 | 43:7 | 14:2,4,4 71:8,10,12 |
| 69:18 70:2,14 75:1 | **outbursts** | **passed** | 84:6 |
| 79:16,20 83:8 85:2 | 18:6,8 | 15:1 22:17 | **photo** |
| 85:12,14 91:19 96:1 | **outcome** | **passes** | 46:5 |
| **Okeemah** | 97:10 | 20:8 | **photograph** |
| 1:22 4:15 97:2,20 | **outlook** | **patients** | 45:9,18 46:1 |
| **Olivia** | 65:18,20 66:2 | 48:16 60:20,21 75:18 | **photos** |
| 34:5,15 35:2 37:11 | **outside** | 75:19 | 45:6 46:6 |
| 38:19 39:2,8 | 17:6 33:5 45:15 | **Pause** | **phrase** |
| **Olivia's** | 52:19 | 53:7 67:5 | 75:3,4 |
| 37:14 38:20 41:7 | **ownership** | **pay** | **physical** |
| **once** | 8:6 | 15:12,13 30:9 31:15 | 32:20,22 35:10 82:3 |
| 9:11,13,16 13:17 | | **paying** | 82:7 |
| 19:12,14 49:17 64:5 | ___ **P** ___ | 15:5 | **physically** |
| 65:4,4,16 80:10 | **P** | **Pending** | 36:18,22 38:1 |
| **ones** | 2:12 4:1 | 91:15 | **physician's** |
| 68:22 | **p.m** | **people** | 79:12,17 |
| **online** | 1:15 38:13 70:15 | 18:5,11 30:16 36:19 | **physicians** |
| 92:14 | 73:13 81:19 86:7 | **Pepsi** | 79:5,8 |
| **open** | 91:22,22 92:2 96:9 | 41:8 50:22,22 | **pick** |
| 27:14 30:15 44:22 | **page** | **performance** | 20:15 |
| 45:2 82:15 83:5 | 3:3,13 81:17 | 25:22 | **picture** |
| 84:13 86:3 | **paid** | **performed** | 45:12,16 46:8 53:12 |
| **operate** | 30:6 31:6,7 87:1 | 76:12,16 77:15 | 59:2 |


MAGNA
LEGAL SERVICES

pictures
46:12,14
piece
32:18
pills
11:9
pinpoint
65:1
place
32:15 34:9
places
49:19
PLAINTIFF
1:5 2:2 68:16 95:10
plaintiffs
4:20
plan
14:11 16:21 31:16
54:21 55:1 79:10
80:6 93:6
plane
35:4 38:7
plants
18:2 33:14
please
4:17 5:4,18,20 6:3,11
26:14 34:4 38:18
81:16
pocket
87:1
point
10:3,5 14:12 21:5,20
26:12 38:9 45:19
48:16 56:2 61:13
64:17 75:9
portions
69:6
position
23:15 24:20 25:11,16
26:5
positive
25:20
possibilities
28:2
possibility
26:7

possibly
33:6 56:5 66:14
82:22
pot
33:4
potassium
49:12
potential
27:2,5 29:20
potentially
46:5
power
1:3 4:5 14:8,11,15
15:4 16:3 17:2
51:16 87:6,6 89:8
89:13,20
predicted
66:6
pregnant
8:4 10:8,10
prep
18:2 86:20
prepare
6:17
prepared
17:15 92:8,10
prepping
70:19 77:5,16
presence
74:20
present
2:20 27:22 73:4,9,19
74:9,9 91:9
pressure
42:4,7 44:15 45:22
58:19,21 59:6,14
66:18,20 67:2,16,21
pretty
26:1 39:16
previous
37:15
previously
23:21 24:21 25:1
primarily
14:1
primary

86:15
prior
20:22 39:17 43:15
50:19 58:7 68:2
71:18 95:16
probably
9:22 17:18 24:11
51:22 67:3
problem
33:16
proceedings
53:7 67:5
process
26:11,18 29:5 61:8
produced
12:17 21:12 68:21
69:1,3,8 70:6,11
professed
84:19
professional
17:1 25:17 28:1
86:17
professionals
25:10 28:5 40:19
64:17,21
program
30:10,12,13,15 31:5
progress
32:7
progressing
46:19 47:10
prompt
83:10
provide
5:21 22:4 69:15
provider
71:13 72:15,18 73:1
76:1,6 77:13 78:11
provider's
78:22
providers
42:2 44:2 47:19
48:12 52:7,18 56:21
72:3 75:8
PT/OT
81:20

pull
10:8,13 63:6 71:21
pulled
44:5
pulling
54:14
pulls
16:18
pumping
42:20 67:19
purchase
8:3
purchased
9:4
purpose
70:20 71:15
pushed
31:14 80:12
Pushing
33:8
put
30:13 33:4,14 60:2

_____

Q

quarter
38:4
question
5:19,20 6:3 48:8 60:9
75:2 78:6 83:14,17
84:22 85:20
questioning
87:22
questions
44:19 53:9 62:11,12
63:20 68:12 69:16
70:8 81:5 88:2
91:15 92:6
quickly
32:5
quite
41:18 42:10

_____

R

R
4:1
radiology



88:8,15
**raised**
28:4
**randomly**
63:2
**rare**
12:6
**Rashawn**
6:13
**reach**
19:15 35:8,18 43:18
**reached**
28:12,22 29:2 51:17
**reaching**
35:7 37:17
**react**
32:4
**reaction**
18:20
**read**
69:16,18 70:16 73:13
74:6 77:21 78:16
79:7 81:20 82:14
85:8 86:8 96:4
**reading**
82:14 97:7
**reads**
79:7 82:14
**ready**
31:4 77:17 86:20
**real**
75:14
**really**
11:19,21 29:13 42:6
48:17 54:4
**reason**
8:5 59:2 65:11 89:17
**rebuild**
51:11
**recall**
20:1 21:8,13 51:12
53:15 56:10 57:12
57:13 58:19,20
59:13,17,18,19
62:20 63:4 65:21
68:3 73:5,10,11

74:14,17 76:3,5
79:11 80:1 82:8
83:9,11 85:21 94:7
94:9 95:14,20
**receive**
30:18 86:21
**received**
30:20 77:4,7,12,13
90:8
**receiving**
30:9 31:15
**recollection**
79:17 82:10
**recommend**
52:3
**recommendations**
47:18,21 48:5,11
49:8
**record**
4:3 6:6,12 88:5 91:18
91:20 92:1 96:8
97:4
**records**
6:20,21
**recover**
66:11,13
**recovered**
46:14
**red**
15:15
**reduced**
97:6
**refer**
75:10 87:9
**referred**
71:2
**referring**
70:7,16 73:16 78:18
79:12,18 82:1 86:10
87:10,11
**reflect**
92:16
**refuses**
33:13
**regain**
66:14

**regard**
92:7
**regarding**
81:6
**regardless**
93:8
**regime-but**
82:16
**regimen**
76:7
**regular**
50:16
**regularly**
39:22
**rehabilitation**
46:18 61:12 62:2,4
63:11 65:20 86:19
**related**
18:9 66:17,18,20
67:22 75:11 88:12
89:2 90:7 97:8
**relationship**
14:12 35:5 36:14
**relationships**
34:17
**relative**
84:2
**remainder**
41:11
**remedies**
82:20
**remember**
18:18 40:18 41:4,4
41:12 42:2,18 43:14
43:22 44:10,16 45:1
45:4 53:11,17 54:17
55:6,9,19,22 56:17
57:3,7,9 60:22
61:12 65:3 66:1
71:11 72:8,11,22
95:4,6,22
**remind**
15:21
**remote**
27:16,20
**removing**

54:22
**rent**
38:9
**rented**
38:10
**repair**
92:22
**repeat**
26:15 48:8 49:4 60:9
**report**
26:2 84:3
**reported**
1:21 73:7 83:22
**reporter**
4:15 5:3 23:7 41:15
57:16 69:20 94:14
97:21
**represent**
4:18
**representative**
89:7,8
**reproduced**
69:7
**request**
72:14,18
**requested**
30:1 54:8 72:5 97:7
**require**
10:9 93:10
**required**
17:18
**research**
46:11 51:8
**reside**
7:13
**resided**
7:16
**residence**
8:10,18 9:3 20:18,18
37:5
**resource**
23:9
**resources**
23:6,16,20 27:18
28:8
**respect**


MAGNA
LEGAL SERVICES

| | | | |
|---|---|---|---|
| 88:17 | **robeterol** | 11:21 | 42:12 43:13 44:19 |
| **respond** | 67:1 | **sauce** | 48:3,10 55:15 64:10 |
| 44:20 60:8 62:11,16 | **role** | 49:11 | 70:20 71:16 72:20 |
| 63:13,19 64:4 88:21 | 17:12 19:2,8,9 20:5,7 | **Savannah** | 79:5 90:21 95:1,12 |
| 92:18 93:2,11 94:3 | 23:15 26:8 27:5,16 | 37:9,10,11,13 38:6 | **seeing** |
| **responded** | 27:16 | 38:14 41:7 | 19:4 |
| 28:14 63:20 | **room** | **saw** | **seek** |
| **response** | 5:13 32:12 48:3,10 | 40:12,20 50:11 64:15 | 26:13 |
| 6:9 81:14 83:11,12 | 81:4 90:18 | 72:4 | **seeking** |
| 84:12 85:15,17,21 | **roommate** | **saying** | 87:8 88:18,22 |
| **responses** | 7:20 | 5:18 16:1 43:14 | **seen** |
| 6:7 | **roommates** | 45:13 62:8 74:5 | 13:2,6 32:7,9 34:17 |
| **restaurants** | 19:4 | 86:19 | 37:21 47:3 50:18 |
| 12:7 | **root** | **says** | 87:15 |
| **result** | 42:12 | 11:17 50:17 75:13 | **sees** |
| 91:12 | **roughly** | **scan** | 19:14 |
| **retain** | 9:8 29:4 39:18 | 65:8,12 76:15,18 | **self-employed** |
| 8:6 | **rounding** | 77:1,2 | 24:2 |
| **return** | 81:2 | **Scarborough** | **send** |
| 25:16,18 26:4 27:9 | **routine** | 2:13 4:11 | 50:4 |
| **returned** | 50:16 | **scared** | **sense** |
| 9:20 13:22 17:5,13 | **RPR** | 36:7 | 6:9 36:7 |
| 20:19 21:18 37:3,5 | 1:22 | **schedules** | **sentence** |
| 40:6 | **rule** | 27:21 | 71:15 75:2 78:16 |
| **returning** | 65:15 | **school** | 79:4,7 85:8 86:2,7 |
| 24:6,15 25:5 26:8 | **rules** | 34:14,16 | **September** |
| 27:15 29:21 66:4 | 5:14 | **seal** | 20:6 |
| **review** | **Russian** | 97:12 | **Seroquel** |
| 6:20 | 61:19 | **second** | 77:22 78:8 |
| **reviewed** | | 77:20 78:15,15 86:6 | **service** |
| 70:10 | ——— S ——— | **section** | 21:8 22:10 |
| **ride** | **S** | 86:2 | **services** |
| 39:7 40:7 41:9 | 1:22 2:14 4:1 97:2,20 | **sedate** | 4:16 22:4 |
| **right** | **sadness** | 54:2,18 | **sessions** |
| 30:8,22 34:10 42:18 | 18:15 | **sedated** | 16:13,16 |
| 69:12 87:4 96:7 | **safety** | 53:18 54:1,7,12 | **set** |
| **Riley** | 77:7 | 55:16 | 80:14 97:11 |
| 2:13 4:11 | **salary** | **sedation** | **Seven** |
| **rise** | 31:6,7 | 54:22 55:2 78:1 79:1 | 10:1 |
| 8:11 12:2,14 13:3 | **Saskia** | 80:5 | **shaking** |
| 16:4 33:20 50:19 | 17:7 33:19 52:20 | **sedition** | 6:8 |
| 52:22 | 53:19 83:13,19,20 | 78:17 80:7 | **Shana** |
| **risk** | 83:20 84:1,10 85:6 | **see** | 1:3,12 3:3 4:4,4 5:5 |
| 43:9 58:5 | **Saskia's** | 15:14,15 18:5,11 | 6:13,13 70:16 73:13 |
| **road** | 19:8,9 | 25:21 26:21 35:15 | 92:3 |
| 8:4 9:8 20:18 38:15 | **sat** | 35:22 36:12 40:21 | **shape** |


MAGNA
LEGAL SERVICES

89:12

**she'll**
19:15,15

**sheet**
15:8

**sheets**
32:14

**shift**
20:8 41:22 59:21
60:17 61:1 72:12

**Shortly**
13:4

**shot**
61:21,21

**show**
46:15,16 65:10 77:3
88:1

**showed**
59:3 68:6 93:16

**shower**
49:2

**showering**
48:22

**sic**
55:8

**sick**
30:14

**side**
57:19 70:20 71:16
72:1,4

**sides**
57:22

**sign**
96:4

**signed**
43:11

**signing**
97:7

**Siloquel**
55:8

**simple**
74:12

**sister**
8:22 12:20 43:18

**sit**
86:22

**sitting**
32:13 36:18

**situation**
7:20 28:16 36:20
42:16,22

**six**
66:12

**skilled**
86:8,13,18

**sleep**
44:6

**sleep-wake**
75:21

**sleepy**
78:19

**slept**
53:21

**slim**
66:5

**slips**
15:15

**slow**
27:12

**slows**
66:13

**sluggish**
78:19

**SMECO**
15:13

**social**
18:19

**sodas**
11:17

**sodium**
49:10

**soiled**
32:14

**son**
10:12

**soon**
19:5 21:18

**sorry**
10:16,19 23:7 28:18
40:4 41:15 49:7,7
57:16 70:2 74:15
94:14

**sorts**
44:13

**source**
67:15 75:16 92:11

**sources**
31:9 51:12

**Southern**
39:15 40:12,15

**speak**
13:21 14:1,6 58:6
64:8,12 72:7,15
78:20 94:15

**speaking**
44:21 50:10 62:10
72:22

**speaks**
13:16

**specialist**
23:16

**specific**
55:10 83:6

**specifically**
45:4 57:14 58:20
59:1,17 71:11 72:17
80:1 87:12 90:16

**speculation**
83:3

**spells**
18:12,14

**spend**
8:12 9:9 36:6

**spent**
9:10 79:8 81:3

**spine**
70:21

**split**
42:17

**spoke**
6:19 13:17 36:4 68:8
72:9 95:16

**spoken**
39:1,6,8

**sports**
34:20

**spurts**
62:7

**stadium**
35:12

**staff**
85:10

**stage**
49:13

**stands**
41:19 72:11

**start**
12:1 21:17 23:17
54:21 63:17

**started**
10:13 15:7 21:17
44:19 53:20 67:19

**starting**
77:20

**state**
4:17 6:11 7:9 26:3
34:4 38:18 42:9,13
56:4 65:14 73:14
74:9,12,19 80:3
88:5

**stated**
39:14 90:6 94:5

**statement**
71:17 73:20 75:13
76:2 78:2 86:12

**states**
1:1 73:13 77:21
81:20

**stating**
76:6

**stay**
3:16 8:7 41:9 49:11
77:9,10 88:9

**stayed**
8:1

**staying**
19:11

**stenographically**
97:6

**step**
14:21 15:2 16:21
26:11

**steps**
28:15 67:10 81:6



**stood**
45:12
**stop**
11:15 19:5 67:12
73:16
**stopped**
10:5 21:21 24:12,13
71:19,22
**store**
20:16
**story**
38:3
**straight**
15:14
**Street**
2:5,14
**strenuous**
35:11
**stressed**
58:14
**strike**
89:4 91:6
**stroke**
18:10,17 22:22 43:8
48:16 51:10 57:4,14
57:17,21 58:3,5
65:5,10,15,16,18
66:11,12 68:3 94:11
**strokes**
58:1,3 64:18,22
90:16 91:1,5,7
**strong**
77:22 78:8
**struggle**
47:6
**struggles**
11:7
**stuck**
25:13
**stuff**
50:3 51:11
**Sturtz**
2:11,12 3:7 4:21,21
5:1,1,9,10 13:20
23:10 27:1 33:17
42:1 47:1,8 48:9,21

49:6 53:6,8 60:11
63:16 64:2,7 67:3,6
68:9,21 69:2,9,13
69:18 70:2 80:3,20
81:11 84:21 87:14
87:17,20 88:20 89:4
89:15 90:9,15 91:6
91:19 92:5,20 93:4
93:14 94:6,17 95:8
96:3
**success**
44:4
**successful**
43:7 58:17
**sudden**
55:2
**suffering**
89:2
**suggest**
86:3
**suggestions**
86:4
**suit**
89:6
**Suite**
2:6,15
**summary**
14:18
**sun**
45:16
**sunlight**
75:21
**super**
19:2
**supervise**
25:11
**supervisor**
28:12
**supply**
42:19
**supposed**
32:4 38:7 49:10 55:5
55:10 60:13 91:2
**sure**
5:17 11:20 13:15
14:7,19 15:15 19:10

20:7,9 22:17 26:1
39:16
**surgeon**
95:5
**surgery**
41:21 42:6,14 43:1,5
43:7,9,15 44:1,3,4
44:10 58:4,5,7,9,12
64:11,20 68:4 76:3
92:22 93:6,10 94:20
95:7
**surprised**
61:10
**swear**
5:4
**switch**
79:15
**sworn**
5:7

---
**T**
---
**take**
19:1,16 20:15 27:12
35:19 38:7 44:5
45:6 46:12 50:12
59:19
**taken**
4:4,13 14:20 46:5
70:18 91:22 97:3,5
**takeout**
12:8 33:4
**takes**
11:8
**talk**
27:13 65:11,17
**talked**
60:12 65:22
**talking**
44:13 57:8 80:18
81:7
**tank**
33:13
**task**
33:9
**teaching**
81:3

**team**
25:12 68:7 73:2 81:2
81:4,10 90:14
**tell**
20:15 28:10 41:2
43:20 59:8 64:18,21
77:14 79:16 83:1,9
95:15
**telling**
18:3 54:1 57:7 74:2
76:20
**term**
18:18
**terms**
32:8,9 47:21 48:4,11
49:9 55:12 56:6
**test**
62:12
**testified**
5:7 47:13 90:13
**testimony**
8:17 90:5 93:20
94:18,21 97:5,5
**text**
3:15 12:17 14:1 69:7
69:10 70:5,10,22
75:7,13 78:3 79:13
82:2,18 84:3 93:17
93:22 94:4 95:18
**texting**
94:7
**texts**
93:16
**Thank**
68:10 95:8 96:3
**Thanksgiving**
13:5
**therapist**
64:14,15
**therapy**
82:3,3,5,7,8
**thing**
33:7,9 35:11 77:10
**things**
20:16 26:1 27:16
35:9 47:21 50:1,10



60:7,13,14 63:2,14
67:20 82:16 86:3
**think**
13:10,10 14:5 27:8
35:3,5 38:6 44:18
51:20 53:16 57:1,10
58:14 64:14,19 65:4
66:11,22 67:3 69:22
71:18 85:18,19
90:19 91:14
**thinking**
94:1
**thinks**
73:15,17 74:6
**thought**
44:6 46:13 61:20
76:11
**thousands**
69:6
**three**
8:2 11:10 33:13 39:2
55:1 60:21 68:6,6
**thusfar**
90:6
**time**
4:9 6:3 8:12 9:8
11:11 12:10,10 13:6
13:19 17:16 18:5,6
18:19 20:4 27:10,15
29:12 30:2 36:6
40:11,14 41:11
42:10 45:11,14
46:16 52:1 53:10,15
54:12 59:17,22 63:9
66:10 68:10 75:6
76:10,13,14,15,16
80:16,18 82:6 86:20
90:1,19,20
**timely**
32:5
**times**
9:16 11:10 17:21
29:4 47:15
**today**
5:12 86:22
**today's**

13:15
**toileting**
22:6
**told**
17:2 19:20,21 20:1,6
22:15 25:10 27:8,17
41:5 42:17,21 43:6
53:19 54:10,17 55:9
56:15 57:15,21 58:2
58:4 60:4 64:19
65:5 66:1,10 68:3
75:18 76:10 77:2
80:6 83:21 93:3,20
94:18 95:4,6
**tomato**
49:11
**top**
54:5 79:4
**total**
87:1 88:7
**totally**
31:19
**touch**
26:14
**town**
13:5
**track**
45:22
**training**
83:5,6 84:15,19 85:6
86:1
**transcript**
3:11 96:5,6 97:4
**transcription**
69:4,5
**transferred**
63:10
**transported**
61:16,17 64:5
**treatment**
65:18,19 76:6,7
83:17 90:8
**tried**
63:7
**tries**
50:3

**trip**
37:3,8,13
**trouble**
15:21
**true**
97:4
**trusts**
89:21
**try**
5:16,17,18 85:2
**trying**
35:14 38:16 42:12
58:22 63:6 65:15
79:9 86:3
**tubes**
44:14
**twice**
9:12,13,16 49:17
**two**
9:18 13:9 15:14
17:19 19:3 21:11
39:9 54:6 55:1
60:21 62:14 74:11
82:11 86:9
**types**
50:10
**typewriting**
97:6
**typical**
27:19
**typically**
49:20 59:11 66:11
**typing**
70:17

---
**U**

**Uh-huh**
81:22
**ultimately**
22:15
**unable**
78:19
**uncomfortable**
17:20
**underneath**
82:13

**understand**
5:20 8:17 15:3 91:4
92:15 93:5,8,16
**understanding**
27:18 66:16 92:21
**understood**
6:2 85:5
**undetected**
90:17
**undressed**
63:8
**unit**
91:2,21 92:2
**UNITED**
1:1
**University**
23:12
**unused**
31:2
**usually**
73:21 90:18

---
**V**

**V**
1:6
**vacation**
19:13
**Vacuuming**
33:7
**vehicle**
32:2
**verbal**
6:7,8
**versed**
84:15
**versus**
4:6
**video**
4:3 14:2 91:18 96:6
**videographer**
2:21 4:2,14 5:3 26:14
49:4 91:17,20 92:1
96:7
**VIDEOTAPED**
1:11
**Vido-Welch**



**13:1**
**view**
31:19
**viewed**
72:6
**violent**
37:20 38:1
**visit**
35:2,18 95:12
**visiting**
72:13
**voice**
72:2
**voiced**
78:10

---
**W**
---

**wages**
89:1
**wait**
5:18
**waiting**
35:8 55:17 59:20
**wake**
54:3
**wakes**
38:3
**waking**
53:20 54:12
**walk**
35:12
**walked**
44:12
**walking**
36:22 64:16
**wanes**
46:22
**want**
21:11 25:21 33:15
  43:19 62:18
**wanted**
35:18,19 36:17 37:20
  43:18 44:6
**Washington**
1:7,13 2:7 4:6,12
  21:16 40:17

**wasn't**
20:8,17 44:12,21
  46:16 55:5,10,15
  57:20 63:3 75:3
  82:5
**watch**
35:1
**watching**
11:13 58:15 91:3
**water**
49:13
**way**
25:14 35:14 38:13
  42:20 61:3 74:13
  89:12
**we'll**
6:2,4 69:13 95:17
  96:4
**we're**
16:13 55:17 58:11
  59:5,6 69:20
**we've**
69:9
**weak**
70:21 71:16
**weakness**
42:8 72:16
**wear**
55:17 56:2
**Wednesday**
1:14
**week**
9:9,11,13,17 10:1
  19:12 20:22 49:15
  49:16 95:3
**weekend**
19:11
**weekends**
34:22 51:6
**weeks**
37:16 86:9,14
**Welch**
1:4 4:5 7:14,16,19
  8:10 71:1 92:22
  94:19
**Welch's**

**5:13**
**went**
19:10 29:15 32:12
  34:14,15,20 38:5
  39:15 40:9,12,13,16
  51:5,6 59:5 61:11
  90:17
**weren't**
24:1,1 45:2 54:18
  82:20
**wheelchair**
66:6,9 67:7,8,11,12
**WHEREOF**
97:11
**willing**
36:6
**willingness**
29:10 35:22
**witness**
3:3 5:4,6 23:9 41:16
  57:17 68:14 97:11
**woke**
94:22
**woman**
73:21
**wonder**
56:5
**wondering**
42:11
**word**
64:1
**words**
62:14
**work**
19:6 24:6,15,21 25:5
  25:18 26:8 27:11,15
  27:17,19,20,21
  29:21 34:22 38:2,4
  38:5,5,13,16
**worked**
23:21 25:15 34:15
**working**
82:8
**works**
19:3 25:7 61:8 90:1
**wouldn't**

**39:18**
**wow**
60:22
**write**
71:15
**writing**
70:22
**written**
71:14 87:13
**wrong**
62:15
**wrote**
75:6

---
**X**
---

**x**
1:3,9

---
**Y**
---

**yeah**
15:20 32:19 45:20
  50:13 59:18 67:9
  87:19
**year**
15:1 30:15,20 66:3,7
**years**
8:1,2,18 9:1 33:13
  82:11
**yesterday**
92:9,10
**young**
90:1
**younger**
10:9 37:14,19 38:8
  38:19 39:3

---
**Z**
---

---
**0**
---

---
**1**
---

**1**
3:15 68:20 69:22
  70:8,14 91:21 93:15
**1,738.00**
88:16



**1:23**
91:20,22
**1:23-cv-3381**
1:7 4:8
**1:30**
91:22 92:2
**1:35**
1:15 96:8,9
**1:52:43**
86:7
**10**
1:14 2:5 4:9
**100**
2:14
**101**
4:11
**11:29**
1:15 4:10
**11450**
7:12
**12**
32:13 61:1
**12,041**
88:15
**12615**
8:3
**15**
44:9
**150**
31:3
**15th**
71:20
**16**
30:14 44:16
**1600**
2:15
**16th**
71:20
**17**
7:10

**2**

**2**
3:16 7:10 69:14,21
    70:9 77:19 81:17
    88:3 92:2,7

**20**
22:11 29:6
**200**
31:3
**2002**
2:7
**2008**
7:19 8:19 9:2,4
**2016**
9:4 12:11
**2019**
23:18
**2022**
10:13,16,17 17:19
    20:3,6 21:21 28:21
    44:9,16 52:1,1,2
    93:22
**2023**
10:16,18 24:12
**2024**
1:14 4:9 97:12,14
**21**
11:9
**21202**
2:16
**24**
38:3 39:19 80:10
**24/7**
66:4
**24th**
82:11 97:12

**3**

**3**
49:13 81:17
**30**
29:6 79:8 80:16 81:3
**31**
97:14
**350**
30:21

**4**

**4:07:40**
70:15
**4:08:38**

73:13
**4:51:46**
81:19
**40**
79:8 80:16 81:3
**4706**
7:22

**5**

**5**
3:7 38:4,6,13,13
**570,344.60**
88:14
**584,124.56**
88:13

**6**

**6**
9:22 22:2
**6/20**
75:6
**6/20/22**
70:15 73:12
**6/24/22**
81:18 95:18
**600**
2:6
**68**
3:8,15

**7**

**7**
7:10 87:5
**700**
29:14 30:19,20

**8**

**8**
9:22 22:2 30:14
**8,000**
87:5
**8/20/22**
86:7
**8/31/22**
86:11
**80**

59:10
**88**
3:16

**9**

**9**
7:10 38:16
**90**
59:10,10
**92**
3:7
**95**
3:8

