IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| SHANA HARGROVE as Power of | ) | |
| Attorney for KEVIN WELCH, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| | ) | |
| vs. | ) | NO. 1:23-cv-3381 |
| | ) | |
| MEDSTAR WASHINGTON HOSPITAL | ) | |
| CENTER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

- - -

Remote Videoconference Deposition of ROLAND HAMILTON, JR., MD, located in Decatur, Georgia, taken on behalf of the Defendants, before Kimberly S. Bennett, RPR, CRR, CRC, Certified Court Reporter, on the 17th day of May 2024, commencing at the hour of 1:00 p.m. Eastern.

- - -

Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 2

INDEX TO EXAMINATIONS
ROLAND HAMILTON, JR., MD                       PAGE
Examination by Ms. Sturtz..................    5
Examination by Mr. Jackson..................   46
Further Examination by Ms. Sturtz...........   60
Further Examination by Mr. Jackson..........   65

(No exhibits were marked for identification.)

Page 3

APPEARANCES OF COUNSEL:
On behalf of the Plaintiff:
    GOVERNOR E. JACKSON, III, ESQ.
    Law Office of Governor Jackson, III LLC
    10 G Street NE
    Suite 600
    Washington, DC 20002
    (410) 528-5150
    gjackson@governorjacksonlaw.com

On behalf of the Defendants:
    DONNA P. STURTZ, ESQ.
    Nelson Mullins Riley & Scarborough LLP
    100 South Charles Street
    Suite 1600
    Baltimore, Maryland 21201
    (443) 392-9400
    donna.sturtz@nelsonmullins.com

Page 4

(Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, the court reporter disclosure statement is tendered at the end of the transcript.)

- - -

COURT REPORTER:  Counsel, can you let me know your preference for ordering the transcript: hard copy, electronic or some combination?

MR. JACKSON:  Just electronic, the condensed form, please, four to a page.

MS. STURTZ:  I would like the original full size and also a mini.

COURT REPORTER:  In electronic?

MS. STURTZ:  Yep.

- - -

COURT REPORTER:  Do all counsel agree to the remote swearing of the witness?

MR. JACKSON:  Agreed.

MS. STURTZ:  Yes.

- - -

ROLAND HAMILTON, JR., MD, having been first duly sworn remotely, was examined and testified as follows:

- - -

Page 5

EXAMINATION
BY MS. STURTZ:
    Q   Good afternoon, Dr. Hamilton.  My name is Donna Sturtz and I will be taking your deposition today.
        Have you had your deposition taken before?
    A   Not in this matter.  When I -- I had a car accident back in college and that was a deposition.
    Q   Okay.  So just let me go over a few of the basic ground rules.  I'm just going to be asking you questions.
        If at any point in time, especially since we're doing this remotely and there can be glitches, if you don't hear or understand a question I've asked, if you would please let me know.  If you go ahead and answer my question, I'm going to assume that you both heard and understood it as asked.  Okay?
    A   Yes, ma'am.
    Q   And also, another thing that's hard with remote depositions is I at no time mean to talk over you.  So if you haven't finished your answer and I launch into the next question, let me know so that you can give a full and complete answer to my question.
        If you don't tell me that I did that, I'm going to assume that your answer to my question was full and complete.  Okay?



Page 6

A    Okay.

Q    The other thing that will make Kimberly's job much easier is if you just can keep in mind to give verbal answers to my questions.  It's hard for her to get down things like nods and shakes of the head.  So just try your best to give verbal answers.

A    Okay.

Q    And the last thing is if you need a break at any time, I'm happy to take a break.  I don't think we'll be too terribly long today, but just let me know if you need a break for any reason.  Okay?

A    Yes, ma'am.

Q    All right.  Great.  So will you just start by telling me what is your current business address.

A    My current business address is 2107 North Decatur Road, Decatur, Georgia.

Q    Okay.  And is that a hospital address or a business office?

A    That is my business address.

Q    Okay.  And do you -- where do you currently practice medicine?

A    I currently practice medicine at Northside Hospital, Atlanta campus.

Q    And how far is Dakota [sic], Georgia, from the Northside Hospital in Atlanta?

Page 7

A    It's Decatur, Georgia.  It's D-e-c-a-t-u-r.  And it is about 9 to 10 miles.

Q    And so your business address, do you see patients at that address?

A    No.  That's for my expert witnessing business.

Q    Okay.  And who else is employed at your business address for your expert witness business?

A    Myself and my wife.

Q    And is your wife also a medical doctor, or does she do the administrative work for your expert witness business?

A    She's a medical physician.

Q    Okay.  And so she does expert witness work as well?

A    No.  She does other telemedicine type of work.  She doesn't do any expert work.  But we both have the business together.

Q    Okay.  And what type of medical physician is she?

A    Family medicine, general practice.

Q    And what is the name of your expert witness business?

A    Hamilton Healthcare Associates LLC.

Q    And when did you start Hamilton Healthcare Associates LLC?

Page 8

A    It would be -- when did I graduate med school?  Probably 2012ish.  I'm not a hundred percent.  I don't remember exactly when.

Q    Okay.  I have from your r?sum? looks like you graduated medical school in May of 2010.

A    Correct.

Q    Does that -- do you still then, given that reference point, believe you formed Hamilton Healthcare Associates in 2012?

A    Correct.  I started during training when I started to moonlight and see patients outside of the hospital, outside of my academic responsibilities.

Q    Okay.  So when you first formed Hamilton Healthcare Associates, was it for the purpose of providing treatment to patients or was it for the purpose of providing expert witness services?

A    I was performing disability examinations.

Q    Okay.  Were you also, in addition to disability examinations, providing expert witness services in medical malpractice cases?

A    Not at that time.

Q    Okay.  How long were you exclusively doing disability examinations with Hamilton Healthcare Associates?

A    So from about 2012 to about 2015.

Page 9

Q    And were the disability examinations you were doing from 2012 to 2015 all on behalf of the injured party?

A    It was a third party that had a contract with the state of South Carolina and the claimants had various issues, and I wasn't privy to the issues.  My job was to do a -- perform an examination, give an opinion on the examination.

Q    And you were asked to do this as in your capacity as a neurologist?

A    As a physician.  Multiple specialties could perform these disability examinations.

Q    Did you perform disability examinations on patients whose disability was unrelated to neurology?

A    I performed exams on claimants who did not have -- if I recall correctly, not all had neurologic issues, no.  Some might have other issues besides neurologic issues.

Q    Okay.  And did you continue to do the disability examinations for a third party after 2015, or did it stop in 2015?

A    It stopped in 2015 because I relocated to Georgia at the time.  So I was no longer in the state of South Carolina.

Q    And so when you moved to Georgia in 2015, did



MAGNA
LEGAL SERVICES

Page 10

Hamilton Healthcare Associates start to do work as an expert witness work instead of disability evaluations?

A    No, not at the time.  At the time I think I had no business through Hamilton Healthcare Associates.

And I recently started expert witnessing in the third quarter of last year.  That would be the first time I ever did expert witnessing.

Q    Okay.  So you had the disability work until 2015, and then from 2016 to the middle of 2023 you weren't doing any work through Hamilton Healthcare Associates; is that correct?

A    No, that is not correct.  I did some moonlighting for the hospitals.  If I recall correctly, I -- yes.  I worked for a hospital at the time called WellStar Hospital, and I moonlight -- I moonlighted, I worked on the side at Northside Hospital, and then I did that for perhaps -- I don't recall exactly when I started that.  But then I transitioned from WellStar to Northside as a full-time job.

And when I started working at Northside in perhaps 2017 I didn't have any work through Hamilton Healthcare Associates, although I kept the business active.

Q    Okay.  And so you were full-time with Northside starting in 2017, and then sometime in 2023

Page 11

you became active as an expert witness through Hamilton Healthcare Associates?

A    Actually, I might have at WellStar as well too I did some chart reviews, independent medical reviews. But that didn't last very long at all.

Q    Okay.  So when in 2023 did you start doing expert witness work, if you recall?

A    It was definitely after September, between September or October.

Q    And how many cases have you reviewed since September or October of 2023 as an expert witness?

A    I don't recall the exact number, but I would say more than ten.

Q    Have any of those cases been on behalf of the defendant or the hospital?

A    In this particular -- could you rephrase the question, please?

Q    Yes.  You said that since starting this expert witness work in 2023 you believe you have reviewed more than ten cases.

And my question to you is:  How many or what percentage of those cases were on behalf of the plaintiff or injured party and what percentage, if any, were on behalf of a hospital or a doctor?

A    I don't recall the exact percentage.  I have

Page 12

reviewed on both sides.

Q    Do you keep a case list of those ten cases that you've reviewed?

A    I do have a master list, but I don't have it broken down into plaintiff/defense.

Q    And of those ten or so cases, none of those have required yet for you to give deposition testimony?

A    This will be the first one.

Q    And you've then also never testified in court as an expert witness?

A    Correct.  Not yet.

Q    With your disability work did you ever testify in court or deposition through the disability evaluation work you did?

A    I did not.

Q    Do any of the other ten or so cases involve sequelae following an aortic dissection?

A    No.

Q    Do you know when you were first contacted in this case?

A    Either September or October, but I don't remember exactly the exact date.

Q    Okay.  So it looks to me like the report is dated February of 2024.  With that quidepost, does that give you an estimate of when you think you were

Page 13

contacted in this case?

A    It was definitely before February 2024.  It was definitely within 2023 of last year.

Q    Have you worked with the plaintiff's attorney in any of your other cases where you've provided expert witness review?

A    I have not.

Q    Do you know if you have reviewed any other cases that involve care provided in Washington, D.C.?

A    No.

Q    You've never practiced medicine in Washington, D.C., correct?

A    I have not.

Q    And you're not testifying in this case as to the standard of care of any of the providers who provided care to Mr. Welch, correct?

A    That is correct.

Q    And you're not offering any opinion in this case that the infarcts suffered by Mr. Welch are unrelated to the aortic dissection, correct?

A    Correct.

Q    It is your opinion that the strokes are related to the aortic dissection, correct?

A    Repeat that, please.

Q    Is that me?



MAGNA
LEGAL SERVICES

Page 14

A   Could you repeat your question, please, ma'am.

Q   Yeah.  I just don't know where that noise is coming from.

MR. JACKSON:  There's a cleaning crew here in the main area that the humming is probably the vacuum noise, but it should stop momentarily.

MS. STURTZ:  Okay.

Q   (By Ms. Sturtz) It is your opinion to a reasonable degree of probability that the infarcts are related to the aortic dissection, correct?

A   Yes.

MR. JACKSON:  Object.  You may respond.

MS. STURTZ:  I think -- did you hear it, Kimberly?  Did you hear his answer?  Answer was "yes"?

COURT REPORTER:  Yes, that's what I heard.  If the doctor wants to repeat it.

THE WITNESS:  Yes.  That is correct.

Q   (By Ms. Sturtz) And you agree, Doctor, that strokes are a known and recognized complication of an aortic dissection, correct?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  They can be complications.

Q   (By Ms. Sturtz) And you are not offering any

Page 15

opinion in this case that the infarcts Mr. Welch suffered would have been different with some different medical intervention, correct?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  Repeat the question, please.

Q   (By Ms. Sturtz) You are not offering an opinion in this case that to a reasonable degree of probability that Mr. Welch's strokes or infarcts would have been different with some different type of medical intervention, correct?

A   Yes.

MR. JACKSON:  Same objection.  You may respond.

Q   (By Ms. Sturtz) "Yes"?

A   Yes.  Correct.

COURT REPORTER:  Doctor, when there's an objection, you may have to wait just a second because if you both speak at the same time only one of you may come across.  That's why we may not hear your answer.

THE WITNESS:  Noted.

Q   (By Ms. Sturtz) In terms of your current practice, Doctor, you work full-time as a

Page 16

neurohospitalist at Northside in Atlanta; is that right?

A   I do.

Q   Okay.  So can you tell me what your practice involves as a neurohospitalist.

A   As a neurohospitalist I see patients that are strictly hospitalized inside the hospital.  They can be in the emergency room, in the intensive care unit, on the regular medical floors.

The vast majority of my patients have strokes.  When it comes to strokes, they can be acute, subacute, chronic treatment management.  And then I see a various array of other neurologic conditions.

I'm not sure if you want me to give you an example.  Seizures, epilepsy, neuromuscular disorders, altered sensorium, altered mental status, any type of spinal cord weakness related issues, neuropathies.

Q   Okay.  So your practice is -- I'm just trying to make sure I understand -- is when a patient is admitted to the hospital you provide, like, a consulting role to come in if there is a neurologic issue that needs to be evaluated?

A   Yes.  Correct.

Q   And then your practice is limited to that of a hospitalist; so you are not a neurologist who follows patients, outpatients after their admission in the

Page 17

hospital?

A   Correct.

Q   For example, if a patient has an aortic dissection, has some neurologic sequelae in the hospital, you would not be -- you don't have experience as a neurologist who follows that patient outpatient for care after the hospitalization?

A   Well, to answer your question, I currently don't practice -- I currently do not have an outpatient practice.

But all neurologists know the long-term sequelae.  And I'm not far removed from training where I did a bunch of outpatient follow-up.  So that would be the best way for me to answer that question.

Q   Okay.  But you haven't done outpatient follow-up since your medical training which dates back to 2015?

A   Yes.

Q   And of the -- how many shifts do you work per month for Northside Hospital?

A   At least 20 shifts.

Q   And how long is each shift?

A   8:00 a.m. to 5:00 p.m.

Q   And in addition to shifts, are you on call a set time per month?

5 (Pages 14 to 17)



Page 18

A   Not a set time a month, but I do take call multiple times per month.  On average anywhere from five to ten.

Q   Of your practice as a hospitalist, what percentage of the patients you see involve a stroke versus other neurologic conditions?

A   Probably greater than 60 to 70 percent. Strokes by far is the vast majority of my practice.

Q   Is Northside Hospital a Level 1 trauma center?

A   It is not.

Q   What level center is it, if you know?

A   It is a -- we are not a trauma center.  We are a primary stroke center.

Q   Okay.  How do you -- can you explain to me what it means to be a primary stroke center.

A   So when it comes to strokes, you have -- comprehensive stroke centers can offer patients all stroke interventions and in particular endovascular treatment similar to a cardiac catheterization.  They can remove a blood clot.

We do not have endovascular capabilities at our hospital.  So if you're not a comprehensive stroke center, the level underneath that is a primary stroke center.  And that's what we are.

Q   Do you have any understanding as to whether

Page 19

MedStar Washington Hospital Center is a Level 1 trauma center?

A   I do not.

Q   Do you have any understanding if MedStar Washington Hospital Center is a comprehensive stroke center?

A   No.

Q   Other than this case, do you have any familiarity with MedStar Washington Hospital Center?

A   I heard about it as a child visiting Washington, D.C.  Like visit a family there.  Yeah.

Q   Okay.  You mentioned some different categories of strokes.  And I think you mentioned subacute.  How do you define a subacute stroke?

A   So subacute would be within the three- to seven-day range.

Q   And acute would be -- how do you define acute stroke?

A   Zero to three days.

Q   And then chronic stroke you mentioned, how do you define chronic?

A   I guess literature sort of varies like after seven or after 14 days.  I guess the subacute range could go from three to seven or three to 14, but definitely after 14 days you get into the chronic range.

Page 20

Q   Does the Northside Hospital have a cardiac surgery department?

A   So not my particular hospital.  Atlanta campus, no.

Q   So at the Atlanta campus there are not surgeons who perform surgery for aortic dissections?

A   We -- I do not know.  We do have thoracic surgeons, but my understanding is that the majority of CT surgery is done at a different campus.

And I do not know the scope of the thoracic surgeons at my hospital, all of the surgeries that they perform.

Q   Okay.  Have you at Northside Hospital provided services to a patient following surgery for an aortic dissection at Northside?

A   No.

Q   Have you at Northside Hospital had experience with following a patient following surgery for aortic dissection that was performed at a different hospital?

A   I do not.

Q   Do you have any experience following a patient in the hospital who suffered an aortic dissection?

A   I do.

Q   What is your experience with a patient who suffered an aortic dissection?

Page 21

A   That's a very broad question.  How would you like me to answer that question?

Q   Okay.  So I just want to clarify your experience.  That's all I'm trying to find out.

So my understanding is you don't have experience following a patient after the performance of surgery for an aortic dissection, correct?

A   Not at Northside.  I have seen throughout my career multiple patients that have had neurologic complications after cardiothoracic surgery, aortic dissections.

I have seen more than I can count patients that have suffered spinal cord infarcts after an aortic dissection as well.

And this would go back to my years in training and also in my early career when I worked at WellStar Hospital.

Q   Okay.  So your training dates back to 2015, correct?

A   That's when it ended.

Q   Right.  And your work at WellStar ended in 2017, correct?

A   Correct.

Q   So if I add the qualification of you have not -- you do not have experience caring for patients



Page 22

after aortic dissection surgery since 2017; is that correct?

A   I'm trying to see if anybody came into the hospital in my shift.  To the best of my knowledge that is correct, yes.

Q   Does Northside Hospital have a cardiac ICU?

A   So when you say Northside Hospital, we have multiple campuses.  So my Northside Atlanta Hospital does not.

Q   Okay.  And am I correct that you only work at the Northside Atlanta campus?

A   Technically yes, but I do cover other hospitals, but I'm not there in person.  And those hospitals do not have a -- to the best of my knowledge they do not have a cardiac ICU.

Q   I take it you don't have any publications that you have authored that relate to neurologic sequelae from an aortic dissection?

A   No.

Q   You attached two articles to your report.  Neither one of those are specific to sequelae from an aortic dissection, correct?

A   I'd have to go back and look at them.  I believe that is correct.

Q   Did you do any other research in this case

Page 23

related to aortic dissections?

A   That was out of the scope of the question I was asked by Mr. Governor.

Q   What was the question you were asked by Mr. Governor?

A   To comment on the neurologic injury Mr. Welch suffered from the stroke.

Q   And you in performing that -- or answering that question reviewed the medical records from the MedStar Washington Hospital admission in June of 2022, correct?

A   Yes, I did.

Q   And have you reviewed any other medical records since that point in time?

A   I have not.

Q   So you have not seen any --

A   I take that back.  Mr. Jackson sent me some depositions, and I reviewed those records.

Q   Okay.  But in terms of medical records, you have not reviewed any medical records that postdate the admission to MedStar Washington Hospital Center in June of 2022, correct?

A   Correct.

Q   So you haven't seen any of Mr. Welch's care records from 2023 or 2024, correct?

Page 24

A   I believe that's correct.

Q   And you haven't spoken to any of his treating healthcare providers, whoever they may be?

A   I have not.

Q   And you've never spoken to Mr. Welch?

A   I have not.

Q   And you haven't performed any evaluation of him either in person or through telemedicine, correct?

A   I have not.

Q   And the depositions that you reviewed, do those include the depositions of Mr. Welch and Shana Hargrove?

A   Yes.

Q   Have you reviewed any depositions besides the depositions of Mr. Welch and Shana Hargrove?

A   I do not recall all of the files that I reviewed, but I reviewed files that were sent to me.

Q   Okay.  It's sort of important for me just to know what you reviewed.  Do you think other than the medical record we talked about and these two depositions you've reviewed anything else in this case that was provided to you by Mr. Jackson?

A   There were the reports from other experts.  I do not recall the physicians' names.

Q   So those would maybe be reports of other

Page 25

plaintiff experts?

A   Possibly.

Q   And do you know if you reviewed a report with someone named Kaplan?

A   I do not recall names.

Q   Have you ever spoken to someone named Kaplan?

A   I have not.

Q   Do you know if you reviewed a report by someone named Schulman?

A   I want to say yes.  I mean, I know we're technically in court.  Can I pull up my files?

Q   Yes.

A   So from Dr. Ahmad Elakil E-l-a-k-i-l, Dr. Schulman, Shana Hargrove, Kevin Welch.

Q   So the items that you have reviewed do not include a report of someone with the last name Kaplan K-a-p-l-a-n?

A   No.  No, ma'am.  There also is a report from Maxwell Hockstein.

Q   And does that complete everything that you have been provided with to review?

A   Yes, ma'am.

Q   You have not reviewed any medical bills in this case, correct?

A   No.




Page 26

Q   And given what you told me that you haven't followed a patient who suffered an aortic dissection and surgery for an aortic dissection since 2017, do you -- I take it, then, you don't have an understanding as to what is the expected length of stay in the ICU following that surgery?

MR. JACKSON:  Objection.

Q   (By Ms. Sturtz) You can answer.

A   Out of my scope of practice.

Q   I know that I have your report from February. Did you handwrite or type out any notes based on anything you reviewed in this case?

A   I recall that I gave to Mr. Jackson.

Q   No other notes beyond that?

A   No, ma'am.

Q   Okay.  You are board-certified in what area, sir?

A   Neurology.

Q   Is there any subspecialty underneath a neurology in which you are board-certified?

A   No.

Q   Are there subspecialties within that board that exist?

A   Within neurology?

Q   Yes.

Page 27

A   Yes.

Q   Is there a subspecialty within the board of neurology that focuses on strokes?

A   Yes.

Q   And you don't have that specialty board certification, correct?

A   Correct.

Q   You became board-certified in what year?

A   I do not remember.

Q   I think it indicates you graduated from medical school in 2010 and became board-certified in 2016.  Does that sound accurate?

A   Yes.

Q   Did you pass the board certification on your first attempt?

A   No.  On my second attempt.

Q   And there's a written and oral portion to that certification; is that correct?

A   That is incorrect.  There's a written examination.  No oral component.

Q   So when did you take the examination the first time?  If you passed in 2016, do you know when you took it the first time?

A   It would -- I don't remember.  It would probably be either 2014 or 2015.

Page 28

Q   As a neurologist, what does the phrase "no focal motor deficits" indicate to you?

A   Patient has no weakness.

Q   As a neurologist, what does the phrase "strength and sensation are intact without any focal deficit" mean to you?

A   The patient can move all of the extremities and can feel all sensation.

Q   You are not a radiologist, correct?

A   Correct.

Q   Did you review any of the imaging in this case that was done during the MedStar Washington Hospital Center admission?

A   No.

Q   Have you reviewed any imaging that was done after the MedStar Washington Hospital admission?

A   No.

Q   As a neurologist, what does the phrase "cranial nerves II to XII are grossly intact" mean?

A   That means you can smell for number II, the III through -- third nerve, fourth nerve, the sixth nerve deal with eye movement.  You can move vertically, horizontally.  You can smile symmetrically, activate both facial muscles equally.  You have full tongue movement.  Your uvula does not deviate to one side.  And

Page 29

you can also shrug your shoulders.

Q   What does the phrase "awake, alert and oriented to person, place and time" mean to you?

A   That means that the individual is alert, fully alert, not sedated.  They are aware of who they are as an individual, where they physically are located, the building, the state, the time of year.

Q   You have not either in person or remotely observed Mr. Welch's gait or the way he walks, correct?

A   I have not.

Q   You don't have any understanding of what, if any, medications Mr. Welch currently takes, correct?

A   I do not.

Q   You agree that an expert witness's role is to look at material they have reviewed in an objective manner?

A   Yes.

Q   And you agree it would be inappropriate for an expert to cherry pick material and to only consider some things that support an opinion and to not consider other things that do not support the opinion?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  Yes.

Q   (By Ms. Sturtz) I believe, Doctor, I was

8 (Pages 26 to 29)


MAGNA
LEGAL SERVICES

Page 30

provided with your fee schedule for expert witness work, which you charge $600 per hour for review.

MS. STURTZ: I think, Mr. Governor, I may have to ask you to mute your -- it's very noisy. Thank you.

Q (By Ms. Sturtz) You charge $600 an hour for expert review, correct?

A Yes, ma'am.

Q And then for an IME is $800 an hour?

A Yes, ma'am.

Q Okay. And depositions are $800 an hour with a three-hour minimum and trial testimony is $4,000 per day, correct?

A I would have to take a look at my fee schedule, but if that's what it says.

Q Okay. And do you know -- I don't think I was given any invoices. Do you know if you've generated an invoice in this case yet?

A I have.

Q And do you know -- I guess I'll ask counsel to provide me with a copy of your invoice.

But do you know how many hours you've spent on the case to date?

A I do not recall.

Q Okay.

Page 31

MS. STURTZ: So, counsel, I'll just ask for a copy of that invoice or any other invoices that you send to him I'd appreciate it.

Q (By Ms. Sturtz) When you reviewed the medical records, did you recognize the names of any of the treating neurologists in the records?

A No.

Q You agree from your review of the records that Mr. Welch required surgery for his aortic dissection?

A Outside my scope of practice.

Q Is also the cause of the aortic dissection outside of your scope of practice and not something you will be testifying about at trial?

A Correct.

Q Will you be offering an opinion at trial as to when exactly the infarcts happened?

A Repeat the question, please.

Q Will you be offering an opinion at trial to a reasonable degree of probability as to when exactly the infarcts happened?

A I will not.

Q In your report -- and you're welcome to look at it if you have a copy of it there. You have a background of the case section. And are these items that you just put in there based on things that you

Page 32

found in the medical records?

A Yes, ma'am.

Q And can you tell me why you made a note that his intensive care unit course was complicated by cardiogenic shock?

A Because it's a very important medical event.

Q And when did he have the complication of a cardiogenic shock?

A I'd have to go back. It's in my report. I don't remember the exact date. It had to be after surgery when he came to the -- I'm not sure of the -- I'd have to go back and look at my records.

Q Okay. And that is a complication that can occur after aortic dissection surgery?

A Cardiogenic shock can happen at any time. Cardiogenic shock can happen secondary to having aortic dissection. It can happen after surgery. The causal etiology is quite broad.

Q Okay. So will you be offering any opinions at trial as to the etiology of the cardiogenic shock and the respiratory failure that you mention here in the background, or are those just in your report as background information?

A I will not. They are in my report as background information.

Page 33

Q Same question with the agitation that you mention. Will you be offering any opinion at trial as to what the cause was of the agitation, or is it just in your report as background information?

A I will not. It is in my report as background information.

Q And same with delirium and confusion. Will you be offering any opinion at trial as to what was the cause of delirium or confusion, or is that in your report as background information?

A It is in my report as background information.

Q Do you agree that Mr. Welch was not a candidate for thrombolytic therapy or endovascular intervention, correct?

A That is correct.

Q At any point in time following the surgery, correct?

A Correct.

Q You mention the neurology team recommended blood pressure treatment. Do you recall what the recommendation was and will you be offering any opinion that -- or do you agree that that recommendation was reasonable?

A Yes. The after stroke care we do recommend a specific blood pressure parameter. So I agree with



Page 34

their recommendation. I don't recall exactly what their recommendation was, but that is the standard of care.

Q Okay. And in terms of what the blood pressure recommendation would be following aortic dissection surgery, that is outside your area of expertise?

A Yes. Correct. When it's an aortic dissection.

Q And so it's your opinion to a reasonable degree of probability that Mr. Welch suffered spinal cord infarct and cerebral infarcts after the Type A aortic dissection, correct?

A Correct.

Q And it's your opinion that those infarcts are permanent?

A Yes.

Q And what exactly are Mr. Welch's deficits that you attribute to his aortic dissection and related infarcts?

A So the deficits I attributed to his infarcts are -- starting in the brain. He would have balance issues. He will have long-term cognitive issues. The ability to perform executive functioning. Planning for himself. Caring for himself.

When we then look at the spinal cord infarcts, he should have leg weakness, lower extremity weakness.

Page 35

Q How would you categorize the spine infarct in terms of severity?

A If I could rephrase that question for you. I understand what you're trying to ask. But a spinal cord infarct is nothing good. It's always severe.

Q Well, are there spinal infarcts that are more intensive in terms of levels of the spine?

A Well, that was based -- that would be based on the location of the spinal cord infarct. But if you have a spinal cord injury at any level -- if it's, for example, in the cervical spine, that is also -- that's pretty devastating because now you have upper extremity and lower extremity weakness potentially. But in the lower part of the spine you have lower extremity weakness.

Q How do you define -- go ahead. Sorry.

A And other ramifications that come along with it.

Q So how do you define a T5 in terms of the level of the spine?

A So when we get to T5 that's in between your belly button and your nipple line. So it's right above there. And it would basically cause you to have neurologic deficits from the middle of your chest downwards.

Page 36

So those individuals can have lower extremity weakness, lower extremity numbness, permanent gait instability, bowel and bladder incontinence.

Q And you don't know currently whether a neurologic exam -- Mr. Welch has any lower extremity weakness?

A I do not.

Q In terms of a neurologist discussing the lower extremities, what is -- does the initials WE indicate anything to you?

A WE. With effort? I do not know. I don't know.

Q What about HS or QD or GN?

A No, ma'am.

MR. JACKSON: Objection.

THE WITNESS: No, ma'am.

Q (By Ms. Sturtz) Are scores of 5 normal in assessing extremity strength?

MR. JACKSON: Objection.

THE WITNESS: 5 is normal.

Q (By Ms. Sturtz) Based on the records that you reviewed, was it your expectation that Mr. Welch's lower extremity weakness would improve?

A No.

Q Do you have a recollection of what his lower

Page 37

extremity weakness was when he was at MedStar Washington Hospital Center?

A I think it was probably at a 3 out of 5. He definitely -- he definitely went to rehabilitation and he had difficulties ambulating when he left the hospital.

Q And again, you don't know whether his condition improved after he went to rehabilitation in terms of his extremity, lower extremity weakness?

A I do not.

Q Do you know if he had any upper extremity weakness?

A I do not recall.

Q Is it your expectation on what you reviewed that Mr. Welch would be able to walk without gait assistance?

A Repeat the question, please.

Q Is it -- did you have an expectation based on the records you reviewed that Mr. Welch would not thereafter be able to walk without gait assistance?

A According to the records, I expected Mr. Welch to not return to full strength and have long-term lower extremity weakness and require the use of a device, probably a front wheel walker or cane.

Q But you reviewed his deposition, correct?



MAGNA
LEGAL SERVICES

Page 38

A    Yes.

Q    Do you understand from his deposition that he doesn't use any gait assistance like a walker?

A    I am not aware of that.  I don't know his current state.

Q    And then in terms of -- we talked about the spine infarct in terms of its location.

A    Correct.

Q    What about did you assess anything in terms of the condition of the arteries leading to that area of the spine and whether they were open or not?

A    There was no picture that -- the report didn't comment on that, the radiology report.

Q    And if -- to the extent the report did comment on that, I take it you're not at trial going to disagree with anything that was written by the radiologist in the radiology report, correct?

A    Correct.

Q    How about do you recall if there was any indication about whether there was any compression to the spine related to the infarct?

A    No compression to the spine.

Q    The brain infarcts, again you won't be testifying at trial disagreeing with anything that's in -- anything that's in any of the radiology reports,

Page 39

correct?

A    Correct.

Q    And how do you -- I know there's different types of strokes.  How do you define the strokes that were present following the aortic dissection?

A    They were located in the cerebellum and in the -- in the cerebellum and also in the brain cortex. I do not recall exactly what part of the brain.

Q    Do you see any reference to basal ganglion?

A    That sounds familiar, but I'd have to take a look at the report again.

Q    So the exact location of the strokes are not significant to you in terms of what in your opinion are likely residual deficits from those strokes?

A    Repeat the question, please.

Q    The location, the exact location of the strokes is not important to you in terms of your opinion regarding residual deficits from the dissection and the strokes?

A    The location does matter.

Q    But you just can't recall right now what the location is?

A    I remember the thoracic level and I remember the cerebella, but I'd have to -- in my report I just said cerebral infarct.  I didn't put the actual MRI

Page 40

report.

Q    What is your experience with a basal ganglia infarction?

A    I see it on a regular basis.

Q    And define for me what a basal ganglia infarction is and how that may impact the patients.

A    The basal ganglia is responsible for controlling controlled motor movement, coordination. And a damage to this area will lead to lack of motor control.

Now, you also can have other clinical symptoms as well too in terms of speech issues.  You might have purely weakness or purely sensory issues.

Q    And you use the term in your report of cerebellar infarcts.  What did you mean by that term and what can the potential sequelae be from that?

A    Cerebellum refers -- cerebella refers to the cerebellum of the brain.  And that is a control center of the brain.

Patients can have a lot of balance issues and sometimes, unfortunately, during the acute phase of a stroke if there is some temporary swelling there can be increased pressure inside the brain and patients sometimes have some cognitive issues related to that as well too.

Page 41

Q    Are you aware of whether there were reports in the literature of patients having sequelae in terms of cognitive issues and balance issues following a Type A aortic dissection without strokes stemming from that dissection?

A    I am not aware.

Q    Do you agree that Mr. Welch did not suffer a large vessel occlusion?

A    I agree.

Q    And again you agree that embolic and spinal strokes are known and recognized complications of an aortic dissection, correct?

A    Agree.

Q    You are not a vocational expert, correct?

A    Define vocational.

Q    Right.  Will you be offering any opinion in this case as to whether and to what extent Mr. Welch is able to work, or do you defer to a vocational expert on that?

A    I defer to a vocational expert.

Q    What is your understanding, if any, as to what activities of daily living Mr. Welch is able to perform today?

A    I am not familiar.

Q    You have no understanding as to whether



Page 42

Mr. Welch is able to today manage his finances, prepare meals, do housework, take his medications, et cetera, right?

A   I do not.

Q   Do you have an understanding as to the life expectancy of someone who has suffered a Type A aortic dissection with surgical repair, or is that outside your area of expertise?

A   Outside my area of expertise.

Q   So you at trial will not be offering any opinion as to Mr. Welch's life expectancy, correct?

A   Correct.

Q   The two articles that you attach to your report -- I don't know if you have access to those. One, the first one is by Langhorne and it is an article from 2000 and it's entitled Medical Complications After Stroke.

Can you tell me why it is you referenced this report, this article in your report?

A   Because it talks about the medical deficits after having a stroke.

Q   Okay.  But it's not -- it's related to acute strokes, not strokes after Type A aortic dissection; is that right?

A   I'd have to look back closely at the article.

Page 43

Yes, ma'am.

Q   Are there any sort of neurology scales or formulas that are used to categorize stroke severity?

A   Yes, there are.

Q   And do you use some of those tools in your practice?

A   I do.

Q   And are you aware of any of those tools being used with Mr. Welch?

A   I am not sure.

Q   Based on what you reviewed -- what tools do you use in terms of assessing stroke severity?

A   The Modified Rankin Scale is one of the most universal scales used.  And we document it particularly on admission.  And it's useful -- the next time it's useful is during rehab when it comes time to discharge at rehab.

Q   In this case you don't know if there was any Rankin scoring done during rehab of Mr. Welch?

A   No, I do not.

Q   And you don't know if there was any Rankin scoring or you don't recall if there was one done while he was admitted to MedStar Washington Hospital Center?

A   I do not recall.

Q   Will you be offering an opinion in this case

Page 44

as to where on a Rankin score Mr. Welch's strokes fall, or will you not be offering that opinion?

A   It's based on if it's in the records.  I'd have to look at the records.

Q   So you would just defer to whatever stroke scoring is or is not contained in the records; you will not be coming in to trial and saying "I'm going to apply the Rankin score and here is the score I came up with"; is that correct?

A   That's correct.

Q   Have you ever heard of an NIH Stroke Scale?

A   Yes.  Yes.

Q   Is that one that you use in your practice?

A   I do.

Q   The medical records state that Mr. Welch suffered infarcts with an etiology as cardioembolic and anoxic secondary to aortic dissection and repair.

Do you agree with that categorization as to what's in the medical records?

A   Repeat, please.

Q   Yes.  The medical records state that Mr. Welch suffered infarcts with an etiology of cardioembolic secondary to aortic dissection and repair.  Do you agree with that?

A   Not -- I agree that he suffered strokes

Page 45

related to the aortic dissection.  Whether they are cardioembolic is -- I'm not sure about that.

Q   Okay.  So you would agree with the statement that his infarcts are secondary to aortic dissection and repair?

A   Yes.

Q   Bear with me for one minute.  I'm almost done, I promise.

(Brief pause)

Q   The second article that you reference is an Ingeman article from 2011 entitled In-Hospital Medical Complications, Length of Stay, and Mortality Among Stroke Unit Patients.  Can you tell me why it is you reference that article?

A   Because Mr. Welch was hospitalized.  It's a pretty comprehensive article.

Q   And do you agree this article, though, does not -- do you recall one way or the other as to whether this article relates to acute strokes versus strokes stemming from an aortic dissection?

A   I do not recall if it commented on aortic dissections.  But to the best of my ability acute strokes are covered.

Q   To the best of your ability -- what was the end?  I'm sorry.  I didn't hear you.

12  (Pages 42 to 45)


MAGNA
LEGAL SERVICES

Page 46

A   I don't recall the article exactly, but acute strokes should be covered.

Q   Are there any other articles that you reviewed other than the two set forth in your report?

A   No.

Q   Has Mr. Jackson -- he hasn't provided you with any other medical articles to review; is that correct?

A   Correct.

Q   Have we discussed all the opinions you intend to render in this case between what we talked about today and what is set forth in your report?

A   Yes.

Q   I don't have any other questions today, Doctor.  Thank you very much for your time.

A   Thank you.

MR. JACKSON:  I have some brief follow-up.

EXAMINATION
BY MR. JACKSON:

Q   Doctor, is a basal ganglia part of the brain?

A   Yes, ma'am -- yes, sir.  Yes, sir.

Q   What is the basal ganglia responsible for as part of the brain?

A   Coordinated movement, deals with motor function, sensory function, speech coordination.

Page 47

Q   And what is your understanding from looking at Mr. Welch's MRI report as to whether or not there was a basal ganglia infarct from which he sustained?

A   I'd have to take a look back at the MRI.  I wrote down cerebral infarcts in mine, but I definitely remember cerebella, but based on what you guys are telling me I assume it's basal ganglia as well too.

Q   Okay.  Can you look at the MRI report?  Can you pull that up, please?

A   Yes.

(Brief pause)

MS. STURTZ:  I'm looking for it too.  If I can find it faster, I'm happy to try to share my screen.

THE WITNESS:  I found it.  Yep.  So bilateral cerebellum, cerebral hemispheres with bilateral basal ganglia predominance.

Q   (By Mr. Jackson) Okay.  Can you state based on that finding of the MRI to a reasonable degree of professional certainty, can you state in your opinion which areas of the brain were affected by the infarcts based on that MRI finding with certainty, professional certainty?

A   Both bilateral basal ganglia, both cerebellums, and the thoracic fifth level of the spinal

Page 48

cord.

Q   And based on your training and experience as a board-certified neurologist, what is your opinion to a reasonable degree of certainty as to the effects, long-term sequelae that would bear out for Mr. Welch based on sustaining an infarct to the bilateral basal ganglia, both cerebellums, and the thoracic level at the fifth level?

MS. STURTZ:  I object to the form and foundation, but you may answer.

THE WITNESS:  So with the basal ganglia Mr. Welch might have weakness, motor weakness, sensory deficits, coordination issues.  He might have slurred speech or dysarthria.

With the cerebellum he would have gait dysfunction, balance issues.

And with the thoracic spine he may have lower extremity weakness, numbness.

Q   (By Mr. Jackson) Okay.  And do you believe that he would exhibit those sequelae more likely than not in your opinion?

MS. STURTZ:  Objection to form and foundation, but you can answer.

THE WITNESS:  Yes, I do.

Q   (By Mr. Jackson) Can you pull up Mr. Welch's

Page 49

transcript that you received and reviewed.  And when you pull it up, go to page 31 -- I'm sorry -- page 29.

A   Page 29.  Yes.

Q   Okay.

A   Page 29 of the -- in the --

Q   Go to page -- little page 29.  Yeah.  Okay.  Did you review this transcript before your deposition today?

A   Actually, this one I did not.  I reviewed the one from -- Kevin Welch.  There was one from Ms. Hargrove.  This one I actually need to -- so this one, no.  I did review the Hargrove one and everything else.  This one I did not, no.  Page 29.

Q   If we look at page 29, this is taken from Mr. Welch's transcript.  He's asked at line 14, "Okay.  What current medications are you taking?"  Answer: "I'm taking Robeterol (ph), hydralazine, clonidine, folic acid, aspirin, baby aspirin, and losartan."  Question: "Can you please state the dosages for each of those and the reason you take it?"  Answer: "I can't."

Counsel had asked you whether or not you were familiar with the current medications that Mr. Welch was taking.

After seeing this testimony, does this testimony of his current medications affect one way or


MAGNA
LEGAL SERVICES

Page 50

another your opinions that you've expressed in your report or here today in your deposition about the long-term sequelae that you anticipate for him to experience?

A   Rephrase the question, please.

Q   Based on the medications that Mr. Welch testified that he is currently taking, does his testimony in any way affect one way or the other your opinions regarding his long-term sequelae based on the infarct that he sustained?

A   No.

Q   If you can go to -- stay on the transcript. Go to page 31. Little page 31, line 22.

A   Yes.

Q   And there at 31, line 21 actually, question: "Can you please list your current health problems?" Over to page 32. "Mr. Jackson: Objection as to form. You may respond." Line 3, answer: "I have vision problems. My vision goes blurry from time to time." "Mr. Sturtz: I'm sorry." Answer: "I have, like, a weakness on my left side of my body. I have, like, just I'm out of breath a lot and that's it."

Based on that portion of testimony that I've just read, does that testimony in any way affect one way or another your opinion to a reasonable degree of

Page 51

medical certainty as to the long-term sequelae that you opine Mr. Welch would exhibit as a result of sustaining the infarcts you discuss?

MS. STURTZ:  Objection.

THE WITNESS:  Yes, it does.

MS. STURTZ:  I'm sorry.  Objection but you can answer and then go ahead.  Sorry.

THE WITNESS:  Yes, sir.  It supports that he will have long-term sequelae.

Q   (By Mr. Jackson) How does it support it?  Can you explain for the court specifically how that testimony supports your opinion to a reasonable degree of medical certainty.

MS. STURTZ:  Same objection.

THE WITNESS:  So he states that, "I have vision problems."  The vision problems with a certain degree of medical certainty stem from the cerebral, the brain infarcts/strokes.

His weakness on the left side of the body stems from a combination of the thoracic, the spinal strokes and possibly even the brain strokes as well.

Q   (By Mr. Jackson) How is that -- how does that combination, based on your review of Mr. Welch's medical records, how would that combination lead to this

Page 52

exhibition of weakness on his left side?

MS. STURTZ:  Objection but you can answer.

THE WITNESS:  Because both the brain and the spinal cord control motor movement.  So he sort of was impacted from two different aspects.

The brain controls the motor center of the body.  Signals are transmitted down to the spine.  So he has damage where the signal starts and also where it transmits through.

Q   (By Mr. Jackson) If you go to page 35 in the transcript, if you look at starting at line 15. Question:  "And is that the same in terms of the weakness and being out of breath; you didn't experience those before?"  Answer:  "No."  Question:  "You didn't experience vision problems before?"  Answer:  "No." Question:  "Are there specific activities you feel like you're no longer able to do?"  Answer:  "I can't do martial arts anymore."  Question:  "Can you tell me about your participation in martial arts before -- before the occurrence giving rise to this case?" Answer:  "Yeah, I used to teach martial arts twice a year -- twice a week at a community center."  Question: "Have you attempted to resume martial arts?"  Answer: "I've tried at home."  Question:  "Oh, you've tried at

Page 53

home?"  Answer:  "Uh-huh."  Question:  "Any other activities you're no longer able to do?"  Answer:  "I can't bowl anymore."  Question:  "Can't bowl.  Okay. Can you describe your bowling before the occurrence giving --"  Answer:  "My gait won't allow me to walk up to the lane normally and throw the ball."  Question: "Okay."  Answer:  "And I can't lift a 15 pound ball anymore."  Question:  "Any other activities you can't do?"  Answer:  "Like, walk around the lake at Costco Park."  Question:  "Is that a park near your house?" Answer:  "Yes."  Question:  "Are you able to drive?" Answer:  "No."

And then if you go to page 39 -- a question is coming, counsel, I'm promise you.  I'm trying to put it in context.

Line 15 on page 39, Doctor.  Question: "Hand-eye coordination.  Do you have any problems doing daily chores?"  Answer:  "Sometimes."  Question: "Sometimes.  Which specific chores do you struggle with?"  Answer:  "Like, washing the dishes, laundry, cleaning the bathrooms."  Question:  "Why do you have difficulties?  If you can just go through those one by one and explain why you struggle to do those?"  Answer: "So washing the dishes is picking up the pots and the pans.  The laundry, sometimes with the laundry basket



MAGNA
LEGAL SERVICES

Page 54

it's too heavy and then cleaning the bathrooms is bending down." "Okay. Have you -- I'm sorry. Excuse me. Are there any struggles with your social life?" "Yes."

Based on the testimony that I've just read from Mr. Welch's deposition on page 35, 36, 37, and 39 and 40, does this testimony in any way affect one way or another your opinion that you've expressed in your report, in your deposition regarding the long-term sequelae that you opine Mr. Welch would expect to experience based on him sustaining the infarcts?

MS. STURTZ: Objection to form and foundation, but you can answer.

THE WITNESS: Yes, Mr. Jackson. Those statements support my opinion, Mr. Jackson.

Q   (By Mr. Jackson) How did you -- okay. If you can walk the court through, please, how these statements support your opinion that you've expressed in your report and in this deposition.

MS. STURTZ: Same objection, but you can answer.

THE WITNESS: When it comes to his inability to perform martial arts and bowl, he has inability to coordinate coordinated movement. So he probably cannot perform the martial arts

Page 55

techniques and also with the bowling on top of weakness. So his coordination issues and weakness issues make it difficult for him to perform those activities.

Same thing with walking. He has -- appears as if he has exercise intolerance. He can't lift a 15-pound ball anymore. He has signs of weakness.

He also no longer drives. That could be due to cognitive issues. The cognitive capacity it takes to operate a motor vehicle, his visual impairments, his ability to depth perception which is critical to driving puts him at risk for having motor vehicle accidents.

Q   (By Mr. Jackson) Is there anything else, Doctor, that based on this testimony either supports or conflicts your opinions expressed in this case?

A   No, sir.

Q   You were questioned earlier in your deposition about your lack of certification in a subspecialty of neurology.

Given that you do not have that certification, how is it that you feel that you are qualified to opine as to the issues regarding sequela from infarct in Mr. Welch's case?

Page 56

A   As a neurologist we are all extensively trained in stroke medicine. It's bread and butter neurology.

THE WITNESS: Do you have an objection, counselor?

MS. STURTZ: Oh, no. No.

THE WITNESS: Okay. Got you.

MS. STURTZ: Thank you for checking.

THE WITNESS: No problem. It's bread and butter neurology. I do it all day every day. I am well versed in ischemic strokes, hemorrhagic strokes, complications of strokes. I have patients transferred into my hospital for strokes; I transfer patients out for strokes.

The vast majority of neurologists in the country, in the world treat stroke patients on a regular basis and the vast majority of us do not have stroke fellowships.

Q   (By Mr. Jackson) Okay. To be clear, you are not going to be offering any opinions on whether or not any of the named defendants violated the standard of care in their treatment of Mr. Welch; is that accurate?

A   Correct. That is accurate.

Q   You were asked also by counsel whether or not you had an opinion as to whether the infarcts were

Page 57

cardioembolic. And you stated that you were not sure.

Why were you not sure about the classification of the infarcts as cardioembolic?

A   Yes, sir. Because based on my experience, most of the infarcts that occur in the setting of vascular surgery may be hypoperfusion, meaning low blood pressure.

Now, and also the fact that -- so when strokes are cardioembolic, they tend to be in the brain on both sides. But when I see a stroke that occurs in both the brain and the spinal cord, it makes me think about a different etiology.

Q   What was the etiology that you believed was appropriate to apply to determining whether Mr. Welch's strokes would be considered cardioembolic?

A   Repeat the question, please.

Q   Yes. You said based on the etiology that is kind of the determining factor as to whether or not you believe a stroke can be categorized as cardioembolic.

What specifically related to Mr. Welch's treatment or anything in the records would suggest to you as a physician or give you pause even as a physician to classify his infarcts as cardioembolic?

MS. STURTZ: Objection to form and foundation.

15  (Pages 54 to 57)



MAGNA
LEGAL SERVICES

Page 58

THE WITNESS: The fact that they occurred in both the brain and the spinal cord. And the nature of aortic dissections as well too. Patients are at high risk for low blood pressure and hypoperfusion.

So I think it's quite -- it is medically possible that Mr. Welch had a cardioembolic stroke, but I do not feel as though that's the definitive etiology.

I feel as though, particularly if he didn't -- there's a condition called atrial fibrillation, AFib, which Mr. Welch did not have based on my review of the records.

So it's quite possible that, you know, his hypoperfusion -- and to answer your question, cardioembolic strokes if they were all in the brain, I would -- I would feel more confident in a cardioembolic etiology.

But also based on the locations of the strokes when patients have low blood pressure those areas tend to be affected. The basal ganglia.

And also the fact that the spinal cord stroke. Most patients don't have both a brain stroke and spinal cord stroke.

Q   (By Mr. Jackson) If you look at the first page

Page 59

of Mr. Welch's deposition, you will note that it was taken on Wednesday, April 10, 2024, which is almost about two years out from his hospitalization at MedStar in June of 2022.

Given that his testimony about his current difficulties physically and cognitively are occurring based on the date of this deposition in 2024, does the fact that he's having these deficits almost two years from his hospitalization at MedStar affect one way or the other your opinion regarding the long-term sequelae that you have anticipated Mr. Welch to exhibit as a result of the infarcts?

MS. STURTZ: Objection to form, but you can answer.

THE WITNESS: Yes, sir. They support my opinion. It's been two years out. Mr. Welch still demonstrates cognitive disability, physical disability.

It's unlikely that he will have any meaningful improvement and that his current physical and cognitive states are permanent for the foreseeable future.

Q   (By Mr. Jackson) You said "unlikely." Do you hold that opinion to a reasonable degree of medical certainty?

Page 60

A   I do.

Q   Okay.

MR. JACKSON: I have no further questions pending questions from counsel. Thank you.

MS. STURTZ: I have just a few, Dr. Hamilton.

FURTHER EXAMINATION
BY MS. STURTZ:

Q   In terms of this discussion about the etiology and cardioembolic, I am correct that it's your opinion to a reasonable degree of probability that the etiology of the strokes that Mr. Welch suffered is the dissection and the repair of the dissection, correct?

A   Correct.

Q   And you were asked about pages 29 and then I think 35 of the deposition. Can I direct you to page 34 of the deposition. Let me know when you've gotten there.

A   Yes, ma'am.

Q   Okay. So I believe in answer to Mr. Jackson's questions about vision you were linking his complaints earlier in the deposition about having some vision problems to the infarcts. Do you recall saying that?

A   Yes, ma'am.

Q   And do you see here on page 34 that was

Page 61

skipped by Mr. Jackson where Mr. Welch links the vision to when his blood pressure gets too high? Do you see that?

A   I do, yes, ma'am.

Q   So and certainly hypertension can cause problems with vision; do you agree?

A   I agree.

Q   And you don't know sitting here today one way or the other as to whether Mr. Welch currently suffers from hypertension, correct?

A   I don't.

Q   The medications that you were shown which I believe is on page 29 of the deposition, do you have any understanding at all as to what those medications are for?

A   Yes. It's probably albuterol with a 'A' which is a respiratory medication. Hydralazine, clonidine, losartan for blood pressure issues. So he does have high blood pressure, hypertension. The folic acid is a vitamin. The aspirin is for vascular health prevention, stroke, cardiac disease.

Q   And what's the losartan?

A   Losartan is a blood pressure medication. So he's on hydralazine, clonidine, losartan which are blood pressure medications.

16 (Pages 58 to 61)



Page 62

Q   So you would agree from that list of medications that he's on several blood pressure medications currently?

A   Yes, ma'am.

Q   And that one of the side effects of that medication can be vision problems when his blood pressure goes too high?

MR. JACKSON: Objection. You can answer.

THE WITNESS: Well, I wouldn't say -- I can't comment on the side effect of the medication causing blood pressure issues. But elevated blood pressure in itself causing vision problems is possible.

Q   (By Ms. Sturtz) And in terms of what side effects, if any, there are with those medications, you would defer to a different expert on that?

A   I am familiar with these medications.

Q   Okay. So do you know what, if any, the side effects are of albuterol?

A   I do.

Q   What are the potential side effects of albuterol?

A   Fast heart rate.

Q   How about of hydralazine?

A   It can actually cause a reflex, so a fast

Page 63

heart rate as well too.

Q   Can dizziness be a side effect of hydralazine?

A   It can, yes.

Q   Can balance issues be a side effect of hydralazine?

A   Yes.

Q   How about with albuterol, can dizziness be a side effect of hydralazine -- I mean of albuterol?

A   A vague -- I mean not a common side effect, but yes.

Q   Can fatigue be a side effect of hydralazine or albuterol?

A   Yes.

Q   How about -- the next one is clonidine. What are the side effects of clonidine?

A   It can cause your blood pressure to drop too low.

Q   Can fatigue be a side effect of clonidine?

A   It can. But with fatigue, fatigue is a very common side effect listed in all medications. It's not -- my patients often will complain about fatigue with clonidine.

Q   How about dizziness, is that a side effect of clonidine?

A   No.

Page 64

Q   How about folic acid. Any side effects of that with which you are aware?

A   No.

Q   And then did we do the losartan?

A   It's a blood pressure medication as well too. So the same -- people can have cough, dizziness which is a uncommon side effect.

Q   Do you know one way or the other as to whether -- well, you said you reviewed Ms. Hargrove's deposition?

A   I did. I did review that.

Q   Do you recall her indicating he takes many medications every day related to his heart?

A   I know he takes many medications. Yes, she did comment on his medications, yeah.

Q   And those --

A   Saying for the heart, I don't recall that.

Q   Is it your understanding, if you have one, that those medications are required because of the aortic dissection and repair?

A   Based on the meds listed, they are required based on high blood pressure, hypertension.

Q   Do you have an understanding one way or the other as to whether patients who suffer an aortic dissection and surgical repair need to be on medications

Page 65

after the surgical repair because of their injury?

A   Out of my scope of practice.

Q   Okay. Do you know one way or the other as to whether Mr. Welch suffers from anemia?

A   I do not.

Q   Okay. You agree that anemia can cause things such as fatigue and weakness?

A   Yes.

MS. STURTZ: I don't have any other questions. Thank you.

MR. JACKSON: One more question, Doctor.

FURTHER EXAMINATION

BY MR. JACKSON:

Q   Based on your familiarity with the medications that you just testified and also taking into consideration the testimony of Mr. Welch that counsel pointed out to you on page 34, is it still your opinion to a reasonable degree of medical certainty that the vision problems that Mr. Welch had testified to in his transcript, that you are attributing those vision problems to the sequelae as sustained by the infarcts as you have opined in your report and here in your testimony?

MS. STURTZ: Objection to form and foundation, but you can answer.



Page 66

THE WITNESS: Yes.

MR. JACKSON: Okay. Nothing further. Thank you, counsel.

MS. STURTZ: Thank you, Doctor, so much. Appreciate your time.

(Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e), neither a party nor the deponent having requested right of review of the deposition, the reading and signing of the deposition is waived.)

(Deposition concluded at 2:45 p.m.)

Page 67

DISCLOSURE

Deposition of: Roland Hamilton, Jr., MD

Date: May 17, 2024

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of Magna Legal Services.

Magna Legal Services was contacted by the offices of Nelson Mullins Riley & Scarborough LLP to provide court reporting services for the deposition.

Magna Legal Services will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b).

Magna Legal Services has no exclusive contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

Magna Legal Services will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

This, the 17th day of May 2024.

_____
Kimberly S. Bennett, RPR, CRR, CRC
CCR No. B-1172

_____
Magna Legal Services

Page 68

CERTIFICATE

I hereby certify that the foregoing transcript was taken down, as stated in the caption, that the witness was first duly sworn, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 67 represent a true, correct, and complete transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case. The witness did not reserve the right to read and sign the transcript.

Pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia and O.C.G.A. 15-14-37 (a) and (b), written disclosure is attached herein.

This, the 17th day of May 2024.

_____
Kimberly S. Bennett, CCR-B-1172
My commission expires the
1st of April 2025




| A |
| --- |

**A'**
61:16
**a.m**
17:23
**ability**
34:22 45:22,24 55:12
**able**
37:15,20 41:18,22
42:1 52:18 53:2,11
**academic**
8:12
**access**
42:14
**accident**
5:7
**accidents**
55:14
**accurate**
27:12 56:22,23
**acid**
49:18 61:19 64:1
**ACTION**
1:5
**activate**
28:23
**active**
10:23 11:1
**activities**
41:22 52:17 53:2,8
55:4
**actual**
39:25
**acute**
16:10 19:17,17 40:21
42:22 45:19,22 46:1
**add**
21:24
**addition**
8:18 17:24
**address**
6:14,15,17,19 7:3,4,7
**administrative**
7:10
**admission**

16:25 23:10,21 28:13
28:16 43:15
**admitted**
16:19 43:23
**affect**
49:25 50:8,24 54:7
59:9
**AFib**
58:12
**afternoon**
5:3
**agency**
67:13
**agitation**
33:1,3
**agree**
4:17 14:19 29:14,18
31:8 33:12,22,25
41:7,9,10,13 44:18
44:23,25 45:3,17
61:6,7 62:1 65:6
**Agreed**
4:19
**ahead**
5:14 35:16 51:7
**Ahmad**
25:13
**al**
1:8
**albuterol**
61:16 62:19,22 63:7
63:8,12
**alert**
29:2,4,5
**allow**
53:5
**altered**
16:15,15
**ambulating**
37:5
**and/or**
66:7
**anemia**
65:4,6
**anoxic**
44:17

**answer**
5:15,20,22,24 14:14
14:14 15:22 17:8,14
21:2 26:8 48:10,23
49:16,20 50:18,20
51:7 52:3,15,16,18
52:22,24 53:1,2,5,7
53:9,11,12,18,20,23
54:13,21 58:15
59:14 60:20 62:8
65:25
**answering**
23:8
**answers**
6:4,6 68:5
**anticipate**
50:3
**anticipated**
59:11
**anybody**
22:3
**anymore**
52:19 53:3,8 55:7
**anywise**
68:8
**aortic**
12:17 13:20,23 14:10
14:21 17:3 20:6,14
20:18,22,25 21:7,10
21:13 22:1,18,22
23:1 26:2,3 31:9,11
32:14,16 34:4,6,11
34:17 39:5 41:4,12
42:6,23 44:17,23
45:1,4,20,21 58:3
64:20,24
**APPEARANCES**
3:1
**appears**
55:6
**apply**
44:7 57:14
**appreciate**
31:3 66:5
**appropriate**
57:14

**April**
59:2 68:25
**area**
14:5 26:16 34:5
38:10 40:9 42:8,9
**areas**
47:21 58:21
**array**
16:12
**arteries**
38:10
**article**
4:1 42:15,19,25
45:10,11,14,16,17
45:19 46:1 67:4
68:11
**articles**
22:20 42:13 46:3,7
**arts**
52:19,20,22,24 54:23
54:25
**asked**
5:13,16 9:9 23:3,4
49:15,21 56:24
60:15
**asking**
5:9
**aspects**
52:6
**aspirin**
49:18,18 61:20
**assess**
38:9
**assessing**
36:18 43:12
**assistance**
37:16,20 38:3
**Associates**
7:23,25 8:9,14,24
10:1,4,11,22 11:2
**assume**
5:15,24 47:7
**Atlanta**
6:23,25 16:1 20:3,5
22:8,11
**atrial**


MAGNA
LEGAL SERVICES

58:11
**attach**
42:13
**attached**
22:20 68:12
**attempt**
27:15,16
**attempted**
52:24
**attorney**
1:4 13:4
**attribute**
34:17
**attributed**
34:19
**attributing**
65:20
**authored**
22:17
**average**
18:2
**awake**
29:2
**aware**
29:5 38:4 41:1,6 43:8
64:2

**B**

**b**
67:11 68:12
**B-1172**
67:22
**baby**
49:18
**back**
5:7 17:16 21:15,18
22:23 23:17 32:9,12
42:25 47:4
**background**
31:24 32:22,23,25
33:4,5,10,11
**balance**
34:20 40:20 41:3
48:16 63:4
**ball**
53:6,7 55:7

**Baltimore**
3:16
**basal**
39:9 40:2,5,7 46:20
46:22 47:3,7,17,24
48:6,11 58:21
**based**
26:11 31:25 35:8,8
36:21 37:18 43:11
44:3 47:6,18,22
48:2,6 50:6,9,23
51:24 54:5,11 55:16
57:4,17 58:13,19
59:7 64:21,22 65:14
**basic**
5:9
**basically**
35:23
**basis**
40:4 56:17
**basket**
53:25
**bathrooms**
53:21 54:1
**bear**
45:7 48:5
**behalf**
1:16 3:2,11 9:2 11:14
11:22,24
**believe**
8:8 11:19 22:24 24:1
29:25 48:19 57:19
60:20 61:13
**believed**
57:13
**belly**
35:22
**bending**
54:2
**Bennett**
1:16 67:21 68:23
**best**
6:6 17:14 22:4,14
45:22,24
**beyond**
26:14

**bilateral**
47:16,17,24 48:6
**bills**
25:23
**bladder**
36:3
**blood**
18:20 33:20,25 34:3
57:6 58:4,20 61:2
61:18,19,23,24 62:2
62:6,11,11 63:16
64:5,22
**blurry**
50:19
**board**
4:2 26:22 27:2,5,14
67:4 68:11
**board-certified**
26:16,20 27:8,11
48:3
**body**
50:21 51:19 52:8
**bowel**
36:3
**bowl**
53:3,3 54:23
**bowling**
53:4 55:1
**brain**
34:20 38:23 39:7,8
40:18,19,23 46:20
46:23 47:21 51:18
51:21 52:4,7 57:9
57:11 58:2,17,23
**bread**
56:2,9
**break**
6:8,9,11
**breath**
50:22 52:14
**brief**
45:9 46:16 47:11
**broad**
21:1 32:18
**broken**
12:5

**building**
29:7
**bunch**
17:13
**business**
6:14,15,18,19 7:3,5,7
7:7,11,17,22 10:4
10:22
**butter**
56:2,10
**button**
35:22

**C**

**C**
68:1,1
**call**
17:24 18:1
**called**
10:14 58:11
**campus**
6:23 20:4,5,9 22:11
**campuses**
22:8
**candidate**
33:13
**cane**
37:24
**capabilities**
18:21
**capacity**
9:10 55:10
**caption**
68:4
**car**
5:6
**cardiac**
18:19 20:1 22:6,15
61:21
**cardioembolic**
44:16,22 45:2 57:1,3
57:9,15,19,23 58:7
58:16,18 60:10
**cardiogenic**
32:5,8,15,16,20
**cardiothoracic**



21:10
**care**
13:9,15,16 16:7 17:7
23:24 32:4 33:24
34:2 56:22
**career**
21:9,16
**caring**
21:25 34:23
**Carolina**
9:5,24
**case**
12:2,20 13:1,14,19
15:1,9 19:8 22:25
24:21 25:24 26:12
28:11 30:18,23
31:24 41:17 43:18
43:25 46:10 52:21
55:17,25 67:13,13
67:15 68:8,9
**cases**
8:20 11:10,14,20,22
12:2,6,16 13:5,9
**categories**
19:12
**categorization**
44:18
**categorize**
35:1 43:3
**categorized**
57:19
**catheterization**
18:19
**causal**
32:17
**cause**
31:11 33:3,9 35:23
61:5 62:25 63:16
65:6
**causing**
62:11,12
**CCR**
67:22
**CCR-B-1172**
68:23
**center**

1:8 18:9,11,12,13,15
18:23,24 19:1,2,5,6
19:9 23:21 28:13
37:2 40:18 43:23
52:7,23
**centers**
18:17
**cerebella**
39:24 40:17 47:6
**cerebellar**
40:15
**cerebellum**
39:6,7 40:17,18
47:16 48:15
**cerebellums**
47:25 48:7
**cerebral**
34:10 39:25 47:5,16
51:18
**certain**
51:17
**certainly**
61:5
**certainty**
47:20,22,23 48:4
51:1,13,17 59:25
65:18
**certification**
27:6,14,18 55:20,22
**Certified**
1:17 67:6
**certify**
68:4,7
**cervical**
35:11
**cetera**
42:2
**charge**
30:2,6 67:15
**Charles**
3:14
**chart**
11:4
**checking**
56:8
**cherry**

29:19
**chest**
35:24
**child**
19:10
**chores**
53:18,19
**chronic**
16:11 19:20,21,25
**Civil**
1:2,5 66:7
**claimants**
9:5,15
**clarify**
21:3
**classification**
57:2
**classify**
57:23
**cleaning**
14:4 53:21 54:1
**clear**
56:19
**clinical**
40:11
**clonidine**
49:17 61:17,24 63:14
63:15,18,22,24
**closely**
42:25
**clot**
18:20
**cognitive**
34:21 40:24 41:3
55:10,10 59:17,21
**cognitively**
59:6
**college**
5:7
**COLUMBIA**
1:1
**combination**
4:9 51:20,24,25
**come**
15:21 16:20 35:17
**comes**

16:10 18:16 43:16
54:22
**coming**
14:3 44:7 53:14
**commencing**
1:18
**comment**
23:6 38:13,14 62:10
64:15
**commented**
45:21
**commission**
68:24
**common**
63:9,20
**community**
52:23
**complain**
63:21
**complaints**
60:21
**complete**
5:22,25 25:20 68:6
**complicated**
32:4
**complication**
14:20 32:7,13
**complications**
14:24 21:10 41:11
42:16 45:12 56:12
**component**
27:20
**comprehensive**
18:17,22 19:5 45:16
**compression**
38:20,22
**concluded**
66:11
**condensed**
4:11
**condition**
37:8 38:10 58:11
**conditions**
16:12 18:6
**confident**
58:17



**conflicts**
55:17
**confusion**
33:7,9
**consider**
29:19,20
**consideration**
65:16
**considered**
57:15
**consulting**
16:19
**contacted**
12:19 13:1 67:8
**contained**
44:6
**context**
53:15
**continue**
9:19
**contract**
9:4 67:10,12
**control**
40:10,18 52:5
**controlled**
40:8
**controlling**
40:8
**controls**
52:7
**coordinate**
54:24
**coordinated**
46:24 54:24
**coordination**
40:8 46:25 48:13
  53:17 55:2
**copy**
4:9 30:21 31:2,23
**cord**
16:16 21:13 34:10,24
  35:4,9,10 48:1 52:5
  57:11 58:2,22,24
**correct**
8:6,10 10:11,12
  12:11 13:12,16,17

13:20,21,23 14:10
14:18,21 15:3,12,17
16:22 17:2 21:7,19
21:22,23 22:2,5,10
22:22,24 23:11,22
23:23,25 24:1,8
25:24 27:6,7,18
28:9,10 29:9,12
30:7,13 31:14 33:14
33:15,17,18 34:6,11
34:12 37:25 38:8,17
38:18 39:1,2 41:12
41:14 42:11,12 44:9
44:10 46:7,8 56:23
60:10,13,14 61:10
68:6
**correctly**
9:16 10:13
**cortex**
39:7
**Costco**
53:9
**cough**
64:6
**Council**
4:3 67:5 68:12
**counsel**
3:1 4:7,17 30:20 31:1
  49:21 53:14 56:24
  60:4 65:16 66:3
  67:13 68:7,8
**counselor**
56:5
**count**
21:12
**country**
56:16
**course**
32:4
**court**
1:1,17 4:2,3,7,14,17
  12:9,13 14:16 15:18
  25:11 51:11 54:17
  67:4,6,9 68:11
**cover**
22:12 67:14

**covered**
45:23 46:2
**cranial**
28:19
**CRC**
1:17 67:21
**crew**
14:4
**critical**
55:13
**CRR**
1:17 67:21
**CT**
20:9
**current**
6:14,15 15:24 38:5
  49:16,22,25 50:16
  59:5,20
**currently**
6:20,22 17:8,9 29:12
  36:4 50:7 61:9 62:3
**customary**
67:15

---
### D

**D-e-c-a-t-u-r**
7:1
**D.C**
13:9,12 19:11
**daily**
41:22 53:18
**Dakota**
6:24
**damage**
40:9 52:9
**date**
12:22 30:23 32:10
  59:7 67:3
**dated**
12:24
**dates**
17:16 21:18
**day**
1:17 30:13 56:10,10
  64:13 67:18 68:14
**days**

19:19,23,25
**DC**
3:7
**deal**
28:22
**deals**
46:24
**Decatur**
1:15 6:16,16 7:1
**defendant**
11:15
**defendants**
1:9,16 3:11 56:21
**defer**
41:18,20 44:5 62:16
**deficit**
28:6
**deficits**
28:2 34:16,19 35:24
  39:14,18 42:20
  48:13 59:8
**define**
19:14,17,21 35:16,19
  39:4 40:5 41:15
**definitely**
11:8 13:2,3 19:25
  37:4,4 47:5
**definitive**
58:8
**degree**
14:9 15:9 31:19 34:9
  47:19 48:4 50:25
  51:12,17 59:24
  60:11 65:18
**delirium**
33:7,9
**demonstrates**
59:17
**department**
20:2
**deponent**
66:8
**deposition**
1:14 5:4,5,7 12:7,13
  37:25 38:2 49:7
  50:2 54:6,9,19



55:19 59:1,7 60:16
60:17,22 61:13
64:10 66:9,10,11
67:2,9,10,14
**depositions**
5:19 23:18 24:10,11
24:14,15,20 30:11
**depth**
55:12
**describe**
53:4
**determining**
57:14,18
**devastating**
35:12
**deviate**
28:25
**device**
37:23
**different**
15:2,2,11,11 19:12
20:9,19 39:3 52:6
57:12 62:16
**difficult**
55:3
**difficulties**
37:5 53:22 59:6
**direct**
60:16
**direction**
68:6
**disability**
8:17,19,23 9:1,12,13
9:14,20 10:2,8
12:12,13 59:17,18
**disagree**
38:15
**disagreeing**
38:24
**discharge**
43:16
**disclosure**
4:4 67:1,5 68:12
**discount**
67:16
**discuss**

51:3
**discussed**
46:9
**discussing**
36:8
**discussion**
60:9
**disease**
61:21
**dishes**
53:20,24
**disorders**
16:14
**dissection**
12:17 13:20,23 14:10
14:21 17:4 20:15,19
20:22,25 21:7,14
22:1,18,22 26:2,3
31:9,11 32:14,17
34:4,7,11,17 39:5
39:18 41:4,5,12
42:7,23 44:17,23
45:1,4,20 60:12,13
64:20,25
**dissections**
20:6 21:11 23:1
45:22 58:3
**DISTRICT**
1:1,1
**Division**
1:2
**dizziness**
63:2,7,23 64:6
**doctor**
7:9 11:24 14:17,19
15:18,25 29:25
46:14,20 53:16
55:16 65:11 66:4
**document**
43:14
**doing**
5:12 8:22 9:2 10:10
11:6 53:17
**Donna**
3:12 5:4
**donna.sturtz@nels...**

3:18
**dosages**
49:19
**downwards**
35:25
**Dr**
5:3 25:13,13 60:6
**drive**
53:11
**drives**
55:9
**driving**
55:13
**drop**
63:16
**due**
55:10
**duly**
4:23 68:5
**dysarthria**
48:14
**dysfunction**
48:16

---
**E**
---
**E**
3:3 68:1,1
**E-l-a-k-i-l**
25:13
**earlier**
55:19 60:22
**early**
21:16
**easier**
6:3
**Eastern**
1:19
**effect**
62:10 63:2,4,8,9,11
63:18,20,23 64:7
**effects**
48:4 62:5,15,19,21
63:15 64:1
**effort**
36:11
**either**

12:21 24:8 27:25
29:8 55:16
**Elakil**
25:13
**electronic**
4:9,10,14
**elevated**
62:11
**embolic**
41:10
**emergency**
16:7
**employ**
68:8
**employed**
7:6
**ended**
21:20,21
**endovascular**
18:18,21 33:13
**entitled**
42:16 45:11
**epilepsy**
16:14
**equally**
28:24
**especially**
5:11
**ESQ**
3:3,12
**estimate**
12:25
**et**
1:8 42:2
**etiology**
32:18,20 44:16,22
57:12,13,17 58:9,18
60:9,11
**evaluated**
16:21
**evaluation**
12:13 24:7
**evaluations**
10:2
**event**
32:6



**evidence**
68:7
**exact**
11:12,25 12:22 32:10
39:12,16
**exactly**
8:3 10:17 12:22
31:16,19 34:1,16
39:8 46:1
**exam**
36:5
**examination**
2:3,4,5,6 5:1 9:7,8
27:20,21 46:18 60:7
65:12
**examinations**
2:1 8:17,19,23 9:1,12
9:13,20
**examined**
4:23
**example**
16:14 17:3 35:11
**exams**
9:15
**exclusive**
67:12
**exclusively**
8:22
**Excuse**
54:2
**executive**
34:22
**exercise**
55:6
**exhibit**
48:20 51:2 59:11
**exhibition**
52:1
**exhibits**
2:10
**exist**
26:23
**expect**
54:10
**expectancy**
42:6,11

**expectation**
36:22 37:14,18
**expected**
26:5 37:21
**experience**
17:5 20:17,21,24
21:4,6,25 40:2 48:2
50:4 52:14,16 54:11
57:4
**expert**
7:5,7,10,13,16,21
8:16,19 10:2,5,7
11:1,7,11,18 12:10
13:5 29:14,19 30:1
30:7 41:14,18,20
62:16
**expertise**
34:5 42:8,9
**experts**
24:23 25:1
**expires**
68:24
**explain**
18:14 51:11 53:23
**expressed**
50:1 54:8,18 55:17
**extensively**
56:1
**extent**
38:14 41:17
**extremities**
28:7 36:9
**extremity**
34:25 35:12,13,14
36:1,2,5,18,23 37:1
37:9,9,11,23 48:18
**eye**
28:22

---
**F**
---

**F**
68:1
**facial**
28:24
**fact**
57:8 58:1,22 59:8

**factor**
57:18
**failure**
32:21
**fall**
44:1
**familiar**
39:10 41:24 49:22
62:17
**familiarity**
19:9 65:14
**family**
7:20 19:11
**far**
6:24 17:12 18:8
**fast**
62:23,25
**faster**
47:13
**fatigue**
63:11,18,19,19,21
65:7
**February**
12:24 13:2 26:10
**Federal**
66:6
**fee**
30:1,14
**feel**
28:8 52:17 55:23
58:8,10,17
**fellowships**
56:18
**fibrillation**
58:12
**fifth**
47:25 48:8
**FILE**
1:5
**files**
24:16,17 25:11
**finances**
42:1
**financial**
67:16
**find**

21:4 47:13
**finding**
47:19,22
**finished**
5:20
**first**
4:23 8:13 10:6 12:8
12:19 27:15,21,23
42:15 58:25 68:5
**five**
18:2
**floors**
16:8
**focal**
28:2,5
**focuses**
27:3
**folic**
49:17 61:19 64:1
**follow-up**
17:13,16 46:17
**followed**
26:2
**following**
12:17 20:14,18,18,21
21:6 26:5 33:16
34:4 39:5 41:3 67:5
**follows**
4:24 16:24 17:6
**foregoing**
68:4,6
**foreseeable**
59:22
**form**
4:11 48:9,22 50:17
54:12 57:24 59:13
65:24
**formed**
8:8,13
**formulas**
43:3
**forth**
46:4,11
**found**
32:1 47:15
**foundation**



48:10,23 54:13
57:25 65:25
**four**
4:11
**fourth**
28:21
**front**
37:24
**full**
4:13 5:22,24 28:24
37:22
**full-time**
10:19,24 15:25
**fully**
29:4
**function**
46:25,25
**functioning**
34:22
**further**
2:5,6 60:3,7 65:12
66:2 68:7
**future**
59:22

---

**G**

**G**
3:5
**gait**
29:9 36:2 37:15,20
38:3 48:15 53:5
**ganglia**
40:2,5,7 46:20,22
47:3,7,17,24 48:7
48:11 58:21
**ganglion**
39:9
**general**
7:20
**generated**
30:17
**Georgia**
1:15 4:3 6:16,24 7:1
9:23,25 67:5,6
68:12
**give**

5:22 6:3,6 9:7 12:7
12:25 16:13 57:22
**given**
8:7 26:1 30:17 55:22
59:5 67:16 68:7
**giving**
52:21 53:5
**gjackson@govern...**
3:9
**glitches**
5:12
**GN**
36:13
**go**
5:8,14 19:24 21:15
22:23 32:9,12 35:16
49:2,6 50:12,13
51:7 52:11 53:13,22
**goes**
50:19 62:7
**going**
5:9,15,24 38:15 44:7
56:20
**good**
5:3 35:5
**gotten**
60:17
**Governor**
3:3,4 23:3,5 30:3
**graduate**
8:1
**graduated**
8:5 27:10
**Great**
6:13
**greater**
18:7
**grossly**
28:19
**ground**
5:9
**guess**
19:22,23 30:20
**guys**
47:6

---

**H**

**Hamilton**
1:15 2:2 4:22 5:3
7:23,24 8:8,13,23
10:1,4,10,21 11:1
60:6 67:2
**Hand-eye**
53:17
**handwrite**
26:11
**happen**
32:15,16,17
**happened**
31:16,20
**happy**
6:9 47:13
**hard**
4:9 5:18 6:4
**Hargrove**
1:4 24:12,15 25:14
49:11,12
**Hargrove's**
64:9
**head**
6:5
**health**
50:16 61:20
**healthcare**
7:23,24 8:8,14,23
10:1,4,10,22 11:2
24:3
**hear**
5:13 14:13,14 15:21
45:25
**heard**
5:16 14:17 19:10
44:11
**hearing**
68:7
**heart**
62:23 63:1 64:13,17
**heavy**
54:1
**hemispheres**
47:16

**hemorrhagic**
56:11
**high**
58:4 61:2,19 62:7
64:22
**Hockstein**
25:19
**hold**
59:24
**home**
52:25 53:1
**horizontally**
28:23
**hospital**
1:7 6:17,23,25 8:12
10:14,15,16 11:15
11:24 16:6,19 17:1
17:5,20 18:9,22
19:1,5,9 20:1,3,11
20:13,17,19,22
21:17 22:4,6,7,8
23:10,21 28:12,16
37:2,6 43:23 56:13
**hospitalist**
16:24 18:4
**hospitalization**
17:7 59:3,9
**hospitalized**
16:6 45:15
**hospitals**
10:13 22:13,14
**hour**
1:18 30:2,6,9,11
**hours**
30:22
**house**
53:10
**housework**
42:2
**HS**
36:13
**humming**
14:5
**hundred**
8:2
**hydralazine**



49:17 61:17,24
62:24 63:2,5,8,11
**hypertension**
61:5,10,19 64:22
**hypoperfusion**
57:6 58:5,15

---

**I**

**ICU**
22:6,15 26:5
**identification**
2:10
**II**
28:19,20
**III**
3:3,4 28:21
**imaging**
28:11,15
**IME**
30:9
**impact**
40:6
**impacted**
52:6
**impairments**
55:12
**important**
24:18 32:6 39:17
**improve**
36:23
**improved**
37:8
**improvement**
59:20
**In-Hospital**
45:11
**inability**
54:23,24
**inappropriate**
29:18
**include**
24:11 25:16
**incontinence**
36:3
**incorrect**
27:19

**increased**
40:23
**independent**
11:4
**INDEX**
2:1
**indicate**
28:2 36:9
**indicates**
27:10
**indicating**
64:12
**indication**
38:20
**individual**
29:4,6
**individuals**
36:1
**infarct**
34:10 35:1,5,9 38:7
38:21 39:25 47:3
48:6 50:10 55:24
**infarction**
40:3,6
**infarcts**
13:19 14:9 15:1,10
21:13 31:16,20
34:10,13,18,19,24
35:6 38:23 40:15
44:16,22 45:4 47:5
47:21 51:3 54:11
56:25 57:3,5,23
59:12 60:23 65:21
**infarcts/strokes**
51:18
**information**
32:23,25 33:4,6,10
33:11
**Ingeman**
45:11
**initials**
36:9
**injured**
9:2 11:23
**injury**
23:6 35:10 65:1

**inside**
16:6 40:23
**instability**
36:3
**intact**
28:5,19
**intend**
46:9
**intensive**
16:7 32:4 35:7
**interested**
68:8
**intervention**
15:3,12 33:14
**interventions**
18:18
**intolerance**
55:6
**invoice**
30:18,21 31:2
**invoices**
30:17 31:2
**involve**
12:16 13:9 18:5
**involves**
16:4
**ischemic**
56:11
**issue**
16:20
**issues**
9:6,6,17,17,18 16:16
34:21,21 40:12,13
40:20,24 41:3,3
48:13,16 55:2,3,10
55:24 61:18 62:11
63:4
**items**
25:15 31:24

---

**J**

**Jackson**
2:4,6 3:3,4 4:10,19
14:4,12,22 15:4,14
23:17 24:22 26:7,13
29:22 36:15,19 46:6

46:16,19 47:18
48:19,25 50:17
51:10,23 52:11
54:14,15,16 55:15
56:19 58:25 59:23
60:3 61:1 62:8
65:11,13 66:2
**Jackson's**
60:20
**job**
6:2 9:7 10:19
**Jr**
1:15 2:2 4:22 67:2
**Judicial**
4:3 67:5 68:12
**June**
23:10,21 59:4

---

**K**

**K-a-p-l-a-n**
25:17
**Kaplan**
25:4,6,16
**keep**
6:3 12:2
**kept**
10:22
**Kevin**
1:4 25:14 49:10
**Kimberly**
1:16 14:14 67:21
68:23
**Kimberly's**
6:2
**kin**
68:7
**kind**
57:18
**know**
4:8 5:14,21 6:10
12:19 13:8 14:2
17:11 18:11 20:7,10
24:19 25:3,8,10
26:10 27:22 30:16
30:17,20,22 36:4,11
36:12 37:7,11 38:4


MAGNA
LEGAL SERVICES

39:3 42:14 43:18,21
58:14 60:17 61:8
62:18 64:8,14 65:3
**knowledge**
22:4,14
**known**
14:20 41:11

### L

**lack**
40:9 55:20
**lake**
53:9
**lane**
53:6
**Langhorne**
42:15
**large**
41:8
**launch**
5:21
**laundry**
53:20,25,25
**Law**
3:4
**lead**
40:9 51:25
**leading**
38:10
**left**
37:5 50:21 51:19
52:1
**leg**
34:25
**Legal**
1:23 67:7,8,10,12,15
67:25
**length**
26:5 45:12
**level**
18:9,11,23 19:1
35:10,20 39:23
47:25 48:7,8
**levels**
35:7
**life**

42:5,11 54:3
**lift**
53:7 55:7
**limited**
16:23
**line**
35:22 49:15 50:13,15
50:18 52:12 53:16
**linking**
60:21
**links**
61:1
**list**
12:2,4 50:16 62:1
**listed**
63:20 64:21
**literature**
19:22 41:2
**litigation**
67:16
**little**
49:6 50:13
**living**
41:22
**LLC**
3:4 7:23,25
**LLP**
3:13 67:8
**located**
1:15 29:6 39:6
**location**
35:9 38:7 39:12,16
39:16,20,22
**locations**
58:19
**long**
6:10 8:22 11:5 17:22
**long-term**
17:11 34:21 37:22
48:5 50:3,9 51:1,9
54:9 59:10
**longer**
9:23 52:18 53:2 55:9
**look**
22:23 29:15 30:14
31:22 32:12 34:24

39:11 42:25 44:4
47:4,8 49:14 52:12
58:25
**looking**
47:1,12
**looks**
8:4 12:23
**losartan**
49:18 61:18,22,23,24
64:4
**lot**
40:20 50:22
**low**
57:6 58:4,20 63:17
**lower**
34:25 35:13,14,14
36:1,2,5,8,22,25
37:9,22 48:18

### M

**ma'am**
5:17 6:12 14:1 25:18
25:22 26:15 30:8,10
32:2 36:14,16 43:1
46:21 60:19,24 61:4
62:4
**Magna**
1:23 67:7,8,10,12,15
67:25
**main**
14:5
**majority**
16:9 18:8 20:8 56:15
56:17
**malpractice**
8:20
**manage**
42:1
**management**
16:11
**manner**
29:16
**marked**
2:10
**martial**
52:19,20,22,24 54:23

54:25
**Maryland**
3:16
**master**
12:4
**material**
29:15,19
**matter**
5:6 39:20
**Maxwell**
25:19
**MD**
1:15 2:2 4:22 67:2
**meals**
42:2
**mean**
5:19 25:10 28:6,19
29:3 40:15 63:8,9
**meaning**
57:6
**meaningful**
59:20
**means**
18:15 28:20 29:4
**med**
8:1
**medical**
7:9,12,18 8:5,20 11:4
15:3,11 16:8 17:16
23:9,13,19,20 24:20
25:23 27:11 31:4
32:1,6 42:16,20
44:15,19,21 45:11
46:7 51:1,13,17,24
59:24 65:18
**medically**
58:6
**medication**
61:17,23 62:6,10
64:5
**medications**
29:12 42:2 49:16,22
49:25 50:6 61:12,14
61:25 62:2,3,15,17
63:20 64:13,14,15
64:19,25 65:14



medicine
6:21,22 7:20 13:11
    56:2
meds
64:21
MedStar
1:7 19:1,4,9 23:10,21
    28:12,16 37:1 43:23
    59:3,9
mental
16:15
mention
32:21 33:2,19
mentioned
19:12,13,20
middle
10:9 35:24
miles
7:2
mind
6:3
mine
47:5
mini
4:13
minimum
30:12
minute
45:7
Modified
43:13
momentarily
14:6
month
17:20,25 18:1,2
moonlight
8:11 10:15
moonlighted
10:15
moonlighting
10:13
Mortality
45:12
motor
28:2 40:8,9 46:24
    48:12 52:5,7 55:11

55:14
move
28:7,22
moved
9:25
movement
28:22,25 40:8 46:24
    52:5 54:24
MRI
39:25 47:2,4,8,19,22
Mullins
3:13 67:8
multiple
9:11 18:2 21:9 22:8
muscles
28:24
mute
30:4

---
**N**
---

name
5:3 7:21 25:16
named
25:4,6,9 56:21
names
24:24 25:5 31:5
nature
58:3
NE
3:5
near
53:10
need
6:8,11 49:11 64:25
needs
16:21
neither
22:21 66:8
Nelson
3:13 67:8
nerve
28:21,21,22
nerves
28:19
neurohospitalist
16:1,4,5

neurologic
9:16,18 16:12,20
    17:4 18:6 21:9
    22:17 23:6 35:24
    36:5
neurologist
9:10 16:24 17:6 28:1
    28:4,18 36:8 48:3
    56:1
neurologists
17:11 31:6 56:15
neurology
9:14 26:18,20,24
    27:3 33:19 43:2
    55:21 56:3,10
neuromuscular
16:14
neuropathies
16:16
never
12:9 13:11 24:5
NIH
44:11
nipple
35:22
nods
6:5
noise
14:2,6
noisy
30:4
normal
36:17,20
normally
53:6
North
6:15
Northside
6:22,25 10:16,19,20
    10:25 16:1 17:20
    18:9 20:1,13,15,17
    21:8 22:6,7,8,11
note
32:3 59:1
Noted
15:23

notes
26:11,14
number
11:12 28:20
numbness
36:2 48:18

---
**O**
---

O.C.G.A
66:7 67:11 68:12
object
14:12 48:9
objection
14:22 15:4,14,19
    26:7 29:22 36:15,19
    48:22 50:17 51:4,6
    51:14 52:2 54:12,20
    56:4 57:24 59:13
    62:8 65:24
objective
29:15
observed
29:9
occlusion
41:8
occur
32:14 57:5
occurred
58:1
occurrence
52:21 53:4
occurring
59:6
occurs
57:10
October
11:9,11 12:21
offer
18:17
offering
13:18 14:25 15:8
    31:15,18 32:19 33:2
    33:8,21 41:16 42:10
    43:25 44:2 56:20
office
3:4 6:18



offices
67:8
**Oh**
52:25 56:6
**okay**
5:8,16,25 6:1,7,11,17
6:20 7:6,13,18 8:4
8:13,18,22 9:19
10:8,24 11:6 12:23
14:7 16:3,17 17:15
18:14 19:12 20:13
21:3,18 22:10 23:19
24:18 26:16 30:11
30:16,25 32:13,19
34:3 42:22 45:3
47:8,18 48:19 49:4
49:6,15 53:3,7 54:2
54:16 56:7,19 60:2
60:20 62:18 65:3,6
66:2
**open**
38:11
**operate**
55:11
**opine**
51:2 54:10 55:23
**opined**
65:22
**opinion**
9:8 13:18,22 14:8
15:1,9 29:20,21
31:15,18 33:2,8,21
34:8,13 39:13,17
41:16 42:11 43:25
44:2 47:20 48:3,21
50:25 51:12 54:8,15
54:18 56:25 59:10
59:16,24 60:10
65:17
**opinions**
32:19 46:9 50:1,9
55:17 56:20
**oral**
27:17,20
**ordering**
4:8

**oriented**
29:3
**original**
4:12
**outpatient**
17:6,9,13,15
**outpatients**
16:25
**outside**
8:11,12 31:10,12
34:5 42:7,9

————————————
**P**
————————————
**P**
3:12
**p.m**
1:18 17:23 66:11
**page**
2:2 4:11 49:2,2,3,5,6
49:6,13,14 50:13,13
50:17 52:11 53:13
53:16 54:6 58:25
60:16,25 61:13
65:17
**pages**
60:15 68:6
**pans**
53:25
**parameter**
33:25
**park**
53:10,10
**part**
35:14 39:8 46:20,23
**participation**
52:20
**particular**
11:16 18:18 20:3
**particularly**
43:14 58:10
**parties**
67:15 68:7,8
**party**
9:3,4,20 11:23 66:8
67:12,16
**pass**

27:14
**passed**
27:22
**patient**
16:18 17:3,6 20:14
20:18,21,24 21:6
26:2 28:3,7
**patients**
7:4 8:11,15 9:14 16:5
16:9,25 18:5,17
21:9,12,25 40:6,20
40:23 41:2 45:13
56:12,14,16 58:3,20
58:23 63:21 64:24
**pause**
45:9 47:11 57:22
**pending**
60:4
**people**
64:6
**percent**
8:2 18:7
**percentage**
11:22,23,25 18:5
**perception**
55:12
**perform**
9:7,12,13 20:6,12
34:22 41:22 54:23
54:25 55:3
**performance**
21:6
**performed**
9:15 20:19 24:7
**performing**
8:17 23:8
**permanent**
34:14 36:2 59:21
**person**
22:13 24:8 29:3,8
**ph**
49:17
**phase**
40:21
**phrase**
28:1,4,18 29:2

**physical**
59:17,21
**physically**
29:6 59:6
**physician**
7:12,18 9:11 57:22
57:22
**physicians'**
24:24
**pick**
29:19
**picking**
53:24
**picture**
38:12
**place**
29:3
**plaintiff**
1:5 3:2 11:23 25:1
**plaintiff's**
13:4
**plaintiff/defense**
12:5
**Planning**
34:22
**please**
4:11 5:14 11:17
13:24 14:1 15:7
31:17 37:17 39:15
44:20 47:9 49:19
50:5,16 54:17 57:16
**point**
5:11 8:8 23:14 33:16
**pointed**
65:17
**portion**
27:17 50:23
**possible**
58:7,14 62:13
**possibly**
25:2 51:21
**postdate**
23:20
**potential**
40:16 62:21
**potentially**



35:13
**pots**
53:24
**pound**
53:7
**Power**
1:4
**practice**
6:21,22 7:20 15:25
16:3,17,23 17:9,10
18:4,8 26:9 31:10
31:12 43:6 44:13
65:2
**practiced**
13:11
**predominance**
47:17
**preference**
4:8
**prepare**
42:1
**present**
39:5
**pressure**
33:20,25 34:3 40:23
57:7 58:4,20 61:2
61:18,19,23,25 62:2
62:7,11,12 63:16
64:5,22
**pretty**
35:12 45:16
**prevention**
61:20
**primary**
18:13,15,23
**privy**
9:6
**probability**
14:9 15:10 31:19
34:9 60:11
**probably**
8:2 14:5 18:7 27:25
37:3,24 54:25 61:16
**problem**
56:9
**problems**

50:16,19 51:16,16
52:16 53:17 60:23
61:6 62:6,12 65:19
65:21
**Procedure**
66:7
**professional**
47:20,22
**prohibited**
67:10
**promise**
45:8 53:14
**provide**
16:19 30:21 67:9,12
**provided**
13:5,9,16 20:13
24:22 25:21 30:1
46:6
**providers**
13:15 24:3
**providing**
8:15,16,19
**publications**
22:16
**pull**
25:11 47:9 48:25
49:2
**purely**
40:13,13
**purpose**
8:14,16
**Pursuant**
4:1 66:6 67:4 68:11
**put**
31:25 39:25 53:14
**puts**
55:13

_____
Q
_____
**QD**
36:13
**qualification**
21:24
**qualified**
55:23
**quarter**

10:6
**question**
5:13,15,21,22,24
11:17,21 14:1 15:6
17:8,14 21:1,2 23:2
23:4,9 31:17 33:1
35:3 37:17 39:15
49:18 50:5,15 52:13
52:15,17,19,23,25
53:1,3,6,8,10,11,13
53:16,18,21 57:16
58:15 65:11
**questioned**
55:19
**questions**
5:10 6:4 46:13 60:3,4
60:21 65:10 68:5
**quidepost**
12:24
**quite**
32:18 58:6,14

_____
R
_____
**R**
68:1
**r?sum**
8:4
**radiologist**
28:9 38:16
**radiology**
38:13,17,25
**ramifications**
35:17
**range**
19:16,23,25
**Rankin**
43:13,19,21 44:1,8
**rate**
62:23 63:1
**rates**
67:15
**read**
50:24 54:5 68:9
**reading**
66:9
**reason**

6:11 49:20
**reasonable**
14:9 15:9 31:19
33:23 34:8 47:19
48:4 50:25 51:12
59:24 60:11 65:18
**recall**
9:16 10:13,17 11:7
11:12,25 24:16,24
25:5 26:13 30:24
33:20 34:1 37:13
38:19 39:8,21 43:22
43:24 45:18,21 46:1
60:23 64:12,17
**received**
49:1
**recognize**
31:5
**recognized**
14:20 41:11
**recollection**
36:25
**recommend**
33:24
**recommendation**
33:21,22 34:1,2,4
**recommended**
33:19
**record**
24:20
**records**
23:9,14,18,19,20,25
31:5,6,8 32:1,12
36:21 37:19,21 44:3
44:4,6,15,19,21
51:25 57:21 58:13
**reduced**
68:5
**reference**
8:8 39:9 45:10,14
**referenced**
42:18
**referral**
67:13
**refers**
40:17,17


MAGNA
LEGAL SERVICES

| | | | |
|---|---|---|---|
| **reflex** 62:25 | **report** 12:23 22:20 25:3,8 25:16,18 26:10 31:22 32:9,22,24 33:4,5,10,11 38:12 38:13,14,17 39:11 39:24 40:1,14 42:14 42:19,19 46:4,11 47:2,8 50:2 54:9,19 65:22 | 52:24 | **S** |
| **regarding** 39:18 50:9 54:9 55:24 59:10 | | **return** 37:22 | **S** 1:16 67:21 68:23 |
| **regular** 16:8 40:4 56:17 68:8 | | **review** 13:6 25:21 28:11 30:2,7 31:8 46:7 49:7,12 51:24 58:13 64:11 66:9 | **saying** 44:7 60:23 64:17 |
| **Regulations** 4:2 67:4 68:11 | | | **says** 30:15 |
| **rehab** 43:16,17,19 | | | **Scale** 43:13 44:11 |
| **rehabilitation** 37:4,8 | **reporter** 1:17 4:3,7,14,17 14:16 15:18 67:6,13 | **reviewed** 11:10,19 12:1,3 13:8 23:9,13,18,20 24:10 24:14,17,17,19,21 25:3,8,15,23 26:12 28:15 29:15 31:4 36:22 37:14,19,25 43:11 46:3 49:1,9 64:9 | **scales** 43:2,14 |
| **relate** 22:17 | | | **Scarborough** 3:13 67:8 |
| **related** 13:23 14:10 16:16 23:1 34:17 38:21 40:24 42:22 45:1 57:20 64:13 | **reporting** 4:2 67:4,9,12,13 68:11 | | **schedule** 30:1,15 |
| | **reports** 24:23,25 38:25 41:1 | | **school** 8:1,5 27:11 |
| | **represent** 68:6 | **reviews** 11:4,4 | **Schulman** 25:9,14 |
| **relates** 45:19 | **representative** 67:7 | **right** 6:13 16:1 21:21 35:22 39:21 41:16 42:3,24 66:9 68:9 | **scope** 20:10 23:2 26:9 31:10,12 65:2 |
| **relocated** 9:22 | **requested** 66:8 | | **score** 44:1,8,8 |
| **remember** 8:3 12:22 27:9,24 32:10 39:23,23 47:6 | **require** 37:23 | **Riley** 3:13 67:8 | **scores** 36:17 |
| | **required** 12:7 31:9 64:19,21 | **rise** 52:21 | **scoring** 43:19,22 44:6 |
| **remote** 1:14 4:18 5:19 | **research** 22:25 | **risk** 55:13 58:4 | **screen** 47:14 |
| **remotely** 4:23 5:12 29:8 | **reserve** 68:9 | **Road** 6:16 | **second** 15:19 27:16 45:10 |
| **remove** 18:20 | **residual** 39:14,18 | **Robeterol** 49:17 | **secondary** 32:16 44:17,23 45:4 |
| **removed** 17:12 | **respiratory** 32:21 61:17 | **Roland** 1:14 2:2 4:22 67:2 | **section** 31:24 |
| **render** 46:10 | **respond** 14:12,23 15:5,15 29:23 50:18 | **role** 16:20 29:14 | **sedated** 29:5 |
| **repair** 42:7 44:17,23 45:5 60:13 64:20,25 65:1 | | **room** 16:7 | **see** 7:3 8:11 16:5,11 18:5 22:3 39:9 40:4 57:10 60:25 61:2 |
| | **responsibilities** 8:12 | **RPR** 1:17 67:21 | |
| **repeat** 13:24 14:1,17 15:6 31:17 37:17 39:15 44:20 57:16 | **responsible** 40:7 46:22 | **Rule** 66:6 | **seeing** 49:24 |
| | **result** 51:2 59:12 68:9 | **rules** 4:1 5:9 66:6 67:4 68:11 | **seen** |
| **rephrase** 11:16 35:3 50:5 | **resume** | | |


**MAGNA**
LEGAL SERVICES

21:8,12 23:16,24
**Seizures**
16:14
**send**
31:3
**sensation**
28:5,8
**sensorium**
16:15
**sensory**
40:13 46:25 48:13
**sent**
23:17 24:17
**September**
11:8,9,11 12:21
**sequela**
55:24
**sequelae**
12:17 17:4,12 22:17
22:21 40:16 41:2
48:5,20 50:3,9 51:1
51:9 54:10 59:10
65:21
**services**
1:23 8:16,20 20:14
67:7,8,9,10,12,12
67:15,25
**set**
17:25 18:1 46:4,11
**setting**
57:5
**seven**
19:23,24
**seven-day**
19:16
**severe**
35:5
**severity**
35:2 43:3,12
**shakes**
6:5
**Shana**
1:4 24:11,15 25:14
**share**
47:13
**shift**

17:22 22:4
**shifts**
17:19,21,24
**shock**
32:5,8,15,16,20
**shoulders**
29:1
**shown**
61:12
**shrug**
29:1
**sic**
6:24
**side**
10:16 28:25 50:21
51:19 52:1 62:5,10
62:14,18,21 63:2,4
63:8,9,11,15,18,20
63:23 64:1,7
**sides**
12:1 57:10
**sign**
68:9
**signal**
52:9
**Signals**
52:8
**significant**
39:13
**signing**
66:10
**signs**
55:7
**similar**
18:19
**sir**
26:17 46:21,21 51:8
55:18 57:4 59:15
**sitting**
61:8
**sixth**
28:21
**size**
4:13
**skipped**
61:1

**slurred**
48:14
**smell**
28:20
**smile**
28:23
**social**
54:3
**sorry**
35:16 45:25 49:2
50:20 51:6,7 54:2
**sort**
19:22 24:18 43:2
52:5
**sound**
27:12
**sounds**
39:10
**South**
3:14 9:5,24
**speak**
15:20
**specialties**
9:11
**specialty**
27:5
**specific**
22:21 33:25 52:17
53:19
**specifically**
51:11 57:20
**speech**
40:12 46:25 48:14
**spent**
30:22
**spinal**
16:16 21:13 34:9,24
35:4,6,9,10 41:10
47:25 51:21 52:5
57:11 58:2,22,24
**spine**
35:1,7,11,14,20 38:7
38:11,21,22 48:17
52:9
**spoken**
24:2,5 25:6

**standard**
13:15 34:2 56:21
**start**
6:13 7:24 10:1 11:6
**started**
8:10,11 10:5,18,20
**starting**
10:25 11:18 34:20
52:12
**starts**
52:9
**state**
9:5,23 29:7 38:5
44:15,21 47:18,20
49:19
**stated**
57:1 68:4
**statement**
4:4 45:3
**statements**
54:15,17
**states**
1:1 51:15 59:21
**status**
16:15
**stay**
26:5 45:12 50:12
**stem**
51:17
**stemming**
41:4 45:20
**stems**
51:20
**stop**
9:21 14:6
**stopped**
9:22
**Street**
3:5,14
**strength**
28:5 36:18 37:22
**strictly**
16:6
**stroke**
18:5,13,15,17,18,22
18:23 19:5,14,18,20



23:7 33:24 40:22
42:17,21 43:3,12
44:5,11 45:13 56:2
56:16,18 57:10,19
58:7,23,24,24 61:21
**strokes**
13:22 14:20 15:10
16:9,10 18:8,16
19:13 27:3 39:4,4
39:12,14,17,19 41:4
41:11 42:23,23 44:1
44:25 45:19,19,23
46:2 51:21,21 56:11
56:12,12,13,14 57:8
57:15 58:16,20
60:12
**struggle**
53:19,23
**struggles**
54:3
**Sturtz**
2:3,5 3:12 4:12,15,20
5:2,4 14:7,8,13,19
14:25 15:8,16,24
26:8 29:25 30:3,6
31:1,4 36:17,21
47:12 48:9,22 50:20
51:4,6,14 52:2
54:12,20 56:6,8
57:24 59:13 60:5,8
62:14 65:9,24 66:4
**subacute**
16:10 19:13,14,15,23
**subspecialties**
26:22
**subspecialty**
26:19 27:2 55:20
**suffer**
41:7 64:24
**suffered**
13:19 15:2 20:22,25
21:13 23:7 26:2
34:9 42:6 44:16,22
44:25 60:12
**suffers**
61:9 65:4

**suggest**
57:21
**Suite**
3:6,15
**support**
29:20,21 51:10 54:15
54:18 59:15
**supports**
51:8,12 55:16
**sure**
16:13,18 32:11 43:10
45:2 57:1,2
**surgeons**
20:6,8,11
**surgeries**
20:11
**surgery**
20:2,6,9,14,18 21:7
21:10 22:1 26:3,6
31:9 32:11,14,17
33:16 34:5 57:6
**surgical**
42:7 64:25 65:1
**sustained**
47:3 50:10 65:21
**sustaining**
48:6 51:2 54:11
**swearing**
4:18
**swelling**
40:22
**sworn**
4:23 68:5
**symmetrically**
28:23
**symptoms**
40:11

———————
T
———————
**T**
68:1,1
**T5**
35:19,21
**take**
6:9 18:1 22:16 23:17
26:4 27:21 30:14

38:15 39:10 42:2
47:4 49:20
**taken**
1:15 5:5 49:14 59:2
68:4
**takes**
29:12 55:11 64:12,14
**talk**
5:19
**talked**
24:20 38:6 46:10
**talks**
42:20
**teach**
52:22
**team**
33:19
**technically**
22:12 25:11
**techniques**
55:1
**telemedicine**
7:15 24:8
**tell**
5:23 16:3 32:3 42:18
45:13 52:19
**telling**
6:14 47:7
**temporary**
40:22
**ten**
11:13,20 12:2,6,16
18:3
**tend**
57:9 58:21
**tendered**
4:4
**term**
40:14,15
**terms**
15:24 23:19 34:3
35:2,7,19 36:8 37:9
38:6,7,9 39:13,17
40:12 41:2 43:12
52:13 60:9 62:14
**terribly**

6:10
**testified**
4:24 12:9 50:7 65:15
65:19
**testify**
12:12
**testifying**
13:14 31:13 38:24
**testimony**
12:7 30:12 49:24,25
50:8,23,24 51:12
54:5,7 55:16 59:5
65:16,23
**Thank**
30:5 46:14,15 56:8
60:4 65:10 66:3,4
**therapy**
33:13
**thereto**
68:5
**thing**
5:18 6:2,8 55:5
**things**
6:5 29:20,21 31:25
65:6
**think**
6:9 10:3 12:25 14:13
19:13 24:19 27:10
30:3,16 37:3 57:11
58:6 60:16
**third**
9:4,20 10:6 28:21
**thoracic**
20:7,10 39:23 47:25
48:7,17 51:20
**three**
19:19,24,24
**three-**
19:15
**three-hour**
30:12
**thrombolytic**
33:13
**throw**
53:6
**time**


MAGNA
LEGAL SERVICES

5:11,19 6:9 8:21
9:23 10:3,3,7,14
15:20 17:25 18:1
23:14 27:22,23 29:3
29:7 32:15 33:16
43:15,16 46:14
50:19,19 66:5
**times**
18:2
**today**
5:4 6:10 41:23 42:1
46:11,13 49:8 50:2
61:8
**told**
26:1
**tongue**
28:24
**tools**
43:5,8,11
**top**
55:1
**trained**
56:2
**training**
8:10 17:12,16 21:15
21:18 48:2
**transcript**
4:5,8 49:1,7,15 50:12
52:12 65:20 68:4,6
68:9
**transfer**
56:14
**transferred**
56:13
**transitioned**
10:18
**transmits**
52:10
**transmitted**
52:8
**trauma**
18:9,12 19:1
**treat**
56:16
**treating**
24:2 31:6

**treatment**
8:15 16:11 18:19
33:20 56:22 57:21
**trial**
30:12 31:13,15,18
32:20 33:2,8 38:15
38:24 42:10 44:7
**tried**
52:25,25
**true**
68:6
**try**
6:6 47:13
**trying**
16:17 21:4 22:3 35:4
53:14
**twice**
52:22,23
**two**
22:20 24:20 42:13
46:4 52:6 59:3,8,16
**type**
7:15,18 15:11 16:15
26:11 34:10 41:3
42:6,23
**types**
39:4
**typewriting**
68:5

_____
**U**
_____

**Uh-huh**
53:1
**uncommon**
64:7
**underneath**
18:23 26:19
**understand**
5:13 16:18 35:4 38:2
**understanding**
18:25 19:4 20:8 21:5
26:4 29:11 41:21,25
42:5 47:1 61:14
64:18,23
**understood**
5:16

**unfortunately**
40:21
**unit**
16:7 32:4 45:13
**UNITED**
1:1
**universal**
43:14
**unrelated**
9:14 13:20
**upper**
35:12 37:11
**use**
37:23 38:3 40:14
43:5,12 44:13
**useful**
43:15,16
**usual**
67:15
**uvula**
28:25

_____
**V**
_____

**vacuum**
14:6
**vague**
63:9
**varies**
19:22
**various**
9:6 16:11
**vascular**
57:6 61:20
**vast**
16:9 18:8 56:15,17
**vehicle**
55:11,14
**verbal**
6:4,6
**versed**
56:11
**versus**
18:6 45:19
**vertically**
28:22
**vessel**

41:8
**Videoconference**
1:14
**violated**
56:21
**vision**
50:18,19 51:16,16
52:16 60:21,22 61:1
61:6 62:6,12 65:19
65:20
**visit**
19:11
**visiting**
19:10
**visual**
55:11
**vitamin**
61:20
**vocational**
41:14,15,18,20
**vs**
1:6

_____
**W**
_____

**wait**
15:19
**waived**
66:10
**walk**
37:15,20 53:5,9
54:17
**walker**
37:24 38:3
**walking**
55:5
**walks**
29:9
**want**
16:13 21:3 25:10
**wants**
14:17
**washing**
53:20,24
**Washington**
1:7 3:7 13:9,11 19:1
19:5,9,11 23:10,21



28:12,16 37:1 43:23
**wasn't**
9:6
**way**
17:14 29:9 45:18
49:25 50:8,8,24,24
54:7,7 59:9 61:8
64:8,23 65:3
**we'll**
6:10
**we're**
5:12 25:10
**weakness**
16:16 28:3 34:25,25
35:13,15 36:2,6,23
37:1,9,12,23 40:13
48:12,12,18 50:21
51:19 52:1,14 55:2
55:2,8 65:7
**Wednesday**
59:2
**week**
52:23
**Welch**
1:4 13:16,19 15:1
23:6 24:5,11,15
25:14 29:12 31:9
33:12 34:9 36:5
37:15,19,21 41:7,17
41:22 42:1 43:9,19
44:15,21 45:15 48:5
48:12 49:10,22 50:6
51:2 54:10 56:22
58:7,12 59:11,16
60:12 61:1,9 65:4
65:16,19
**Welch's**
15:10 23:24 29:9
34:16 36:22 42:11
44:1 47:2 48:25
49:15 51:24 54:6
55:25 57:14,20 59:1
**welcome**
31:22
**WellStar**
10:15,18 11:3 21:16

21:21
**went**
37:4,8
**weren't**
10:10
**wheel**
37:24
**wife**
7:8,9
**witness**
4:18 7:7,11,13,21
8:16,19 10:2 11:1,7
11:11,19 12:10 13:6
14:18,24 15:6,23
29:24 30:1 36:16,20
47:15 48:11,24 51:5
51:8,15 52:4 54:14
54:22 56:4,7,9 58:1
59:15 62:9 66:1
68:5,9
**witness's**
29:14
**witnessing**
7:5 10:5,7
**work**
7:10,13,15,16 10:1,2
10:8,10,21 11:7,19
12:12,14 15:25
17:19 21:21 22:10
30:1 41:18
**worked**
10:14,16 13:4 21:16
**working**
10:20
**world**
56:16
**wouldn't**
62:9
**written**
27:17,19 38:16 68:12
**wrote**
47:5
**www.MagnaLS.com**
1:24

— **X** —

**XII**
28:19

— **Y** —

**yeah**
14:2 19:11 49:6
52:22 64:15
**year**
10:6 13:3 27:8 29:7
52:23
**years**
21:15 59:3,8,16
**Yep**
4:15 47:15

— **Z** —

**Zero**
19:19

— **0** —

— **1** —

**1**
18:9 19:1 68:6
**1:00**
1:18
**1:23-cv-3381**
1:6
**10**
3:5 7:2 59:2
**10.B**
4:1 67:4 68:11
**100**
3:14
**14**
19:23,24,25 49:15
**15**
52:12 53:7,16
**15-14-37**
67:11 68:12
**15-pound**
55:7
**1600**
3:15
**17**
67:3

**17th**
1:17 67:18 68:14
**1st**
68:25

— **2** —

**2:45**
66:11
**20**
17:21
**2000**
42:16
**20002**
3:7
**2010**
8:5 27:11
**2011**
45:11
**2012**
8:9,25 9:2
**2012ish**
8:2
**2014**
27:25
**2015**
8:25 9:2,20,21,22,25
10:9 17:17 21:18
27:25
**2016**
10:9 27:12,22
**2017**
10:21,25 21:22 22:1
26:3
**2022**
23:10,22 59:4
**2023**
10:9,25 11:6,11,19
13:3 23:25
**2024**
1:18 12:24 13:2
23:25 59:2,7 67:3
67:18 68:14
**2025**
68:25
**21**
50:15



**2107**
6:15
**21201**
3:16
**22**
50:13
**29**
49:2,3,5,6,13,14
60:15 61:13

---
**3**

**3**
37:3 50:18
**30(e)**
66:6
**31**
49:2 50:13,13,15
**32**
50:17
**34**
60:16,25 65:17
**35**
52:11 54:6 60:16
**36**
54:6
**37**
54:6
**39**
53:13,16 54:6
**392-9400**
3:17

---
**4**

**4,000**
30:12
**40**
54:7
**410**
3:8
**443**
3:17
**46**
2:4

---
**5**

**5**

2:3 36:17,20 37:3
**5:00**
17:23
**528-5150**
3:8

---
**6**

**60**
2:5 18:7
**600**
3:6 30:2,6
**65**
2:6
**67**
68:6

---
**7**

**70**
18:7

---
**8**

**8:00**
17:23
**800**
30:9,11
**866-624-6221**
1:23

---
**9**

**9**
7:2
**9-11-30(e)**
66:7

