IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF COLUMBIA

CIVIL DIVISION

- - -

SHANA HARGROVE             : CIVIL ACTION
                           :NO: 1:23-cv-3381
AS POWER OF ATTORNEY       :
FOR KEVIN WELCH,           :
     Plaintiff,            :
                           :
vs.                        :
                           :
MEDSTAR WASHINGTON         :
HOSPITAL CENTER, ET AL.,:
     Defendants.           :

- - -

WEDNESDAY, JUNE 12, 2024

- - -

Oral deposition of RICHARD S. KAPLAN, M.D., taken pursuant to Notice, was held via video conference, commencing at 10:03 a.m., on the above date, before JACOB DAGENAIS, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
(866) 624 6221



Page 2

APPEARANCES:

LAW OFFICE OF GOVERNOR JACKSON III, LLC
BY: GOVERNOR JACKSON III, ESQUIRE
10G Street NE
Suite 600
Washington, D.C. 20002
gjackson@governorjacksonlaw.com
REPRESENTING THE PLAINTIFF

NELSON, MULLINS, RILEY & SCARBOROUGH
BY: DONNA STURTZ, ESQUIRE
100 S Charles Street
Suite 1600
Baltimore, MD 21201
Donna.sturtz@nelsonmullins.com
REPRESENTING THE DEFENDANTS

Page 3

- - -
I N D E X
- - -

Testimony of:  RICHARD S. KAPLAN    PAGE
    BY MS. STURTZ.................. 05
    BY MR. JACKSON................. 111

- - -

E X H I B I T S

- - -

NO.      DESCRIPTION        PAGE
EXHIBIT 1   3/11/24 NOTES............ 45

Page 4

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
Page Line    Page Line    Page Line
None

Request for Production of Documents
Page Line    Page Line    Page Line
45  20

Stipulations
Page Line    Page Line    Page Line
05  02

Question Marked
Page Line    Page Line    Page Line
None

Page 5

- - -
(It is hereby stipulated and
agreed by and between counsel for
the respective parties that
reading, signing, sealing, filing
and certification are waived; and
that all objections, except as to
the form of questions, be reserved
until the time of trial.)
- - -
RICHARD S. KAPLAN, M.D.,
after having been duly sworn, was
examined and testified as follows:
THE WITNESS:  I do.
THE COURT REPORTER:  You may
proceed, Counsel.
- - -
EXAMINATION
- - -
BY MS. STURTZ:
Q.   Hi, Dr. Kaplan.  My name,
again, is Donna Sturtz.  I'll be taking
your deposition today.  I know you've had
your deposition taken many times, so I



2 (Pages 2 to 5)

Page 6

won't go over our ground rules.

If at any point in time you don't hear a question I've asked you, since we're doing this by Zoom, let me know. If you go ahead and answer my question, I'm going to assume that you heard and understood the question as asked.

Okay?

A. Yes.

Q. If I inadvertently cut over an answer that you're giving, I don't mean to. Let me know, and I'll be happy to let you finish your answer. If you don't let me know that, I'm going to assume you gave me a full and complete answer to your question. Okay?

A. Yes.

Q. And if you need to take a break at any time, let me know.

And finally, I'll try to always include, to the reasonable degree of probability in my questions.

But can we have an agreement

Page 7

that, when I ask for your opinion, I am asking for your opinion to a reasonable degree of probability?

A. Yes. Can you clarify? I presume you mean by that 51 percent or greater?

Q. Yes.

A. Okay.

Q. And how many times have you been deposed over the years?

A. Well over a thousand probably over 2000.

Q. And over how many years?

A. Thirty.

Q. And on average, how many depositions do you give in a year?

A. Maybe 40 or 50.

Q. And for over how many years have you been doing forensic work?

A. I've been doing it over 30 years, but increasingly, and as the years have gone on, I've done more forensic work and less clinical work.

Q. Okay. And did it become more

Page 8

forensic work, was that around in 2019 or before that?

A. Well, it's always increased, but in -- around 2019 was when I formally added lifecare planning to what I do. I've always done lifecare planning, but it was -- but I've added it as a formal certificate and something that I -- that I formally sought out more than before. So it certainly jumped further at that -- that point.

Q. And you do your forensic work through what entity? Is it Uniontown Medical Rehabilitation, Inc. or a different entity?

A. Well, all of my income flows through a professional corporation, which is called Uniontown Medical Rehabilitation, PC. There are a number of DBAs that I use, but it all goes to the same corporation. The DBAs include Kaplan Life Care Planning, Kaplan Rehab and EMG, and Uniontown Medical Rehab.

Q. Okay. And how are those

Page 9

entities connected to each other, or are they separate --

A. Again, they're all --

Q. corporate entities?

A. They're all DBAs. They're just alternative names that are used, fictitious names that are used for marketing purposes. The money all goes into the same professional corporation.

As a -- as practical matter, if it makes it more clear, I initially set up my practice in Uniontown, Pennsylvania, which is a sort of rural Pittsburgh, and called it Uniontown Medical Rehab. And as life evolves, I would end up moving to Pittsburgh, and I can't really call it Uniontown Medical Rehab in Monroeville. So I kept the same corporation that existed, and -- and when I see patients in Uniontown, which I still do, it's called Uniontown Medical Rehab. And when I see patients in Monroeville, it's called Kaplan Rehab and EMG. And when I do the forensic cases, I

**MAGNA**
LEGAL SERVICES

Page 10

call it Kaplan Life Care Planning. But in the end, it all goes into the same entity. There's only one tax return for all of it.

Q. So what entity applies to your work in this case?

A. Well, legally, the entity is Uniontown Medical Rehabilitation, PC because that applies to everything. But the letterhead I used for this case was Kaplan Life Care Planning.

Q. And when was Uniontown Medical Rehabilitation, Inc. formed?

A. 1995.

Q. And how many employees are part of Uniontown Medical Rehabilitation, Inc.?

A. About eight or nine, total.

Q. Are there more than one lifecare planner, or are you the only lifecare planner?

A. I'm the only principal. I'm the only physician. I'm the only lifecare planner. All of the

Page 11

intellectual or professional work is mine. The rest of the people do administrative tasks. But there's nobody else who's licensed in any way.

Q. Okay. And how many hours per week, currently, do you spend caring for patients?

A. I spend about 20 hours per week caring for patients, about 40 hours per week doing a variety of forensic work.

Q. Are any of the 20 hours a week, in terms of caring for patients, patients that you also developed a lifecare plan for, for litigation purposes?

A. No.

Q. Mr. Welch is not a patient of yours. Correct?

A. Correct.

Q. To date, you have never examined Mr. Welch?

A. We can debate whether telemedicine is an exam, but I've

Page 12

certainly never established a physician-patient relationship with him.

Q. You say 40 hours a week is spent with your forensic work.
Is that correct?

A. Yes.

Q. How many lifecare plans have you prepared for litigation purposes?

A. Hundreds. I don't know, exactly. It's over 500 for sure.

Q. Over 500, total?

A. Yes.

Q. Is it over a thousand?

A. It might be. I'm not sure.

Q. In terms of your lifecare plan work, what percentage is on behalf of the plaintiff in litigation versus the defendant?

A. It's about equal and then there's a small percentage that's for neutral parties.

Q. And the lifecare planning work, what percentage of it involves medical malpractice cases?

Page 13

A. I don't have exact numbers. I would guess it's between 10 and 20% percent. It's not -- it's not rare, but it's not the majority of what I do.

Q. And what is the majority of what you do, in terms of the lifecare plans, if it's not medical malpractice?

A. Personal injury.

Q. Have you prepared a lifecare plan before for a patient involving a type A aortic dissection with surgical repair?

A. No. I do not believe I've done that. I have, however, done lifecare plans regarding spinal cord infarcts and cerebellar strokes and other types of strokes, which -- which are the fundamentals diagnoses that apply. In -- in this case -- and to help clarify that, if it helps with your question, I'm not offering testimony in this case regarding causation or liability, which is primarily how the aortic dissection comes about. My -- my testimony is largely

Page 14

regarding damages, and that is regarding the cerebellar infarct -- excuse me -- the strokes and the -- and the spinal cord infarct. I'm not looking into or testifying as to how it happened, I'm just saying this is, one way or another, he has this neurological injury, and what are the effects of it.

Q. Okay. So you're not going to be offering any standard of care opinions in this case. Correct?

A. Correct.

Q. You're not going to be offering any causation opinions in this case. Correct?

A. Correct.

Q. You're not going to be offering any opinions in this case as to when, exactly, the strokes occurred. Correct?

A. Correct.

Q. And your opinions are going to be limited to opinions related to damages and future care needs. Correct?

Page 15

A. Correct.

Q. You are not a vocational rehabilitation expert. Correct?

A. I would disagree there.

Q. Are you going to be offering vocational opinions in this case?

A. I may be offering opinions in this case regarding what type of work Mr. Welch could do, in other words, what his residual physical abilities are. That opinion would be the basis to inform a vocational counselor, whose job is then to figure out what exact type of work is available with those abilities and how much does that pay.

Q. Okay. But to date, you haven't had any consultations with any vocational counselor regarding Mr. Welch. Correct?

A. Correct.

Q. You're not aware of a vocational counselor being designated as an expert in this case. Correct?

A. I'm not aware.

Page 16

Q. And in terms of your lifecare plan work, understanding the limitations we just talked about, you can't recall preparing a lifecare plan in the past for a patient who had suffered a type A aortic dissection with surgical repair.

Is that correct?

A. Well, that's sort of a -- that's sort of a nuanced question because this lifecare plan is not about aortic -- an aortic dissection either. And that's the point I think I need to adhere. This lifecare plan is about strokes and a spinal cord infarct.

Q. That are residually related to his -- you agree that Mr. Welch suffered a type A aortic dissection. Correct?

A. Yes.

Q. And you agree he underwent surgery for a type A aortic dissection. Correct?

A. Yes.

Q. So my question to you, is

Page 17

there another instance where you've prepared a lifecare plan where the patient had that as part of his medical history, a type A aortic dissection, with surgical repair?

A. I -- I'd have to look into it. I've certainly done any number of lifecare plans that have -- that have to do with a stroke or a spinal cord injury that occurred as a consequence of malpractice. I don't recall if it was specifically a type A aortic dissection.

Frankly, it wouldn't make any difference in my -- in my lifecare plan because, again, I'm not addressing that. So that's why I'm not -- that -- but if you want, I'd have -- I'd have to research it and see. I've certainly done -- I've done lifecare plans where the patient had these neurological effects, as a consequence of malpractice. I'd have to look and see if it had to do with the hematoma or other effects.

Q. Okay. And I'm just asking if

MAGNA
LEGAL SERVICES

Page 18

you recall a case where you had a -- that was part of the patient's medical history, it was an aortic dissection with surgical repair.  If you recall.

A.  I don't know if it happened in a lifecare plan.  I've certainly treated countless patients where that's happened clinically, okay, and -- and done forensic cases where that's been involved at all, certain, clinically. I'm certainly familiar with that.  It is not news to me.

Q.  How many patients have you treated clinically who suffered a type A aortic dissection with surgical repair?

A.  Over 30 years, maybe a dozen, maybe two dozen.

Q.  And what were you treating them for?

A.  Residual effects.

Q.  And what type of residual effects?

A.  Stroke, spinal cord infarct, deconditioning.

Page 19

Q.  And were these patients outside the context of litigation?

A.  Both.

Q.  And do you agree that strokes are known and recognized complications of a type A aortic dissection and surgical repair, or is that beyond your area of expertise?

MR. JACKSON:  Objection.  You may respond.

THE WITNESS:  It's not beyond my area of expertise, but it's beyond my area of designation in this case.  I'm simply testifying regarding damages.  I wasn't asked to testify about that in this case.

BY MS. STURTZ:

Q.  So you will not be testifying regarding the known and recognized complications of a type A aortic dissection and surgical repair.  Correct?

A.  Correct.

Q.  Have you worked on other litigation cases with Governor Jackson or

Page 20

Kim Parker?

A.  I've worked on a small number of cases with Governor Jackson before; I'd have to look at my records to see exactly how many.

Q.  Do you have an estimate of or a range of how many cases you believed you've worked on with him in the past?

A.  I'd guess three others, but I'm not sure, exactly.

Q.  How about Nelson Mullins? Have you ever worked on a lifecare plan for an attorney at Nelson Mullins?

A.  I don't believe so.

Q.  Did you get this case directly from Governor Jackson or did you get it through some other source?

A.  The case was referred through an intermediary, a vendor who match -- who helps to locate experts, called MedQuest.

Q.  And is MedQuest -- do you list yourself as an expert witness on MedQuest or with MedQuest?

Page 21

A.  Yes.

Q.  And do you have to pay a fee to MedQuest to do that?

A.  No.

Q.  And does the billing for the case then go through MedQuest or is it directly from you?

A.  The billing for the initial report goes through MedQuest, and MedQuest also bills the attorney administrative fee for helping to locate the expert.  Any subsequent -- and subsequent work, which includes any addendum reports or deposition testimony or trial testimony, is billed directly by me.

Q.  So, in this case, have you -- what was the amount that you provided to MedQuest to be billed for your services in this case?

A.  I was paid $7500 by MedQuest for my initial report.

Q.  And do you know what MedQuest billed for the administrative fee for

MAGNA
LEGAL SERVICES

Page 22

your initial report?
    A.    I believe it varies between 500 and $1000.
    Q.    And is the 7500 that you charged for the initial report a flat fee or does it reflect a total number of hours worked on the case?
    A.    That was a flat fee up until the completion of the initial report and then any subsequent work, including this deposition and including any future work, it would be billed separately.
    Q.    Okay.  So do you have an estimate of how many hours you spent preparing the initial report?
    A.    I don't track that.
    Q.    Did anyone else work with you preparing the initial report or was it all done by you?
    A.    The intellectual consumption of the report is completely mine.  I had some help from staff listing the records that are included, scheduling the telemedicine visit, and transcribing the

Page 23

report.  Those are all clerical tasks.  But, other than those clerical tasks, it's entirely mine.
    Q.    Okay.  And then I understand you don't know how many hours you spent preparing the initial report.
          Do you know how many hours -- have you sent an invoice, since the initial report, for additional work on the case?
    A.    No.
    Q.    Do you know how many hours you've spent working on the case since the report you prepared?
    A.    No.
    Q.    You don't even have an estimate of the range?
    A.    I testify to a reasonable degree of medical certainty.  I prefer not to.  And -- and I -- and again, I try not to bill that way.  I try to bill for a flat rate whenever I can.
    Q.    Do you know what ExpertPays is?

Page 24

    A.    Yes.
    Q.    What is ExpertPays?
    A.    ExpertPays is a lien company that sometimes works with MedQuest.
    Q.    Have you interacted at all with ExpertPays for your services in this case?
    A.    Let me think.  I lump them all together as MedQuest, but maybe I shouldn't.  Some of those cases are lien cases and some are not.  Let me just remind myself.  It looks to me in the e-mail that the injur -- the communication with ExpertPays was coordinated by MedQuest.  So, in other words, MedQuest -- Med -- MedQuest arranged for the lien and took -- took care of that.  I'm sorry.  I'm incorrect.  I did -- I did get at least one e-mail from MedQuest when they gave me a copy of an expert re -- report that Attor -- Attorney Jackson had forwarded through them.  So there was -- I have one e-mail I received from them.  But the majority

Page 25

of the communication that I had was through MedQuest, and MedQuest arranged the lien through ExpertPays.
    Q.    Okay.  And I have a -- I was provided with a bill from ExpertPays dated May 31, 2024, listing a cost for your lifecare plan at $20,700.
          Are you aware of that?
    A.    Well, I know ExpertPays charges of lien fees.  I wasn't aware of the exact amount in this case.
    Q.    So what you're telling me, just so I understand how the process works, is that your fee for your report that you sent to MedQuest was $7500 and that's what you were paid, and this invoice from ExpertPays of 20,700, the difference between 20,700 and 7500, was not paid to you?
    A.    Correct.
    Q.    And you believe that that's a lien fee that's charged by ExpertPays for their participation in the case?
    A.    Correct.  My understanding is

7 (Pages 22 to 25)

Page 26

-- again, I believe that -- again, whether the case wins or loses, I was paid my amount. Obviously, I can't be paid on contingency. MedQuest is also paid their administrative fee, regardless of the outcome of the pay -- of the case. And that's, I think, 500 or 1000. The rest of the amount, I don't believe, is paid at all. And basically what happens is if -- if the case wins, then the lien is applied to the case, and if the case loses, then ExpertPays -- it's a no recourse thing. So, if the case loses, then ExpertPays doesn't get reimbursed and they've essentially paid my initial fee.

Q. Okay. And other than your initial fee for $7500, you haven't generated any additional invoice in this case for work since that time?

A. Other than the -- the invoice that you're aware of for my time for the deposition today, correct.

Q. And you required a payment of

Page 27

$3000 upfront for your deposition today that I paid to you. Correct?

A. Correct.

Q. Or my firm paid to you. Correct?

A. Correct.

Q. So, other than the deposition invoice, the 7500 flat fee, you haven't generated any other invoices for this case to date?

A. Let me just make sure that's a hundred percent true, but I don't believe so. That's correct.

Q. Do you track your hours, or do you know how many hours you've spent since your report to today?

A. No.

Q. Do you plan to bill per hour for additional work you've done since your report?

A. There was no additional work, other than prepar -- preparation, which is in -- for the deposition, which is included in the fee.

Page 28

Q. Okay. So you did not do any additional work on this case between the date of your report and the date of this deposition, other than work you did to prepare for the deposition today. Correct?

A. Correct.

Q. How much time did you spend preparing for the deposition today?

A. I didn't track the time. I would guess about five hours.

Q. And what did you do to prepare for the deposition today in that five hours?

A. I read through my file, which includes the initial records and my report. And then, today, I reviewed a neuropsychology report that I -- that I received from MedStar from Dr. Gorder.

Q. Okay. Other than the report from MedStar Psychological Services, that I believe is dated May 2023, have you received any additional material since the time when you prepared the report?

Page 29

A. The only other item that was separate was Dr. Elakil report, but I believe that was already -- let me just check. I believe I had that at the time. Yeah, I had that at the time of my initial report. So, no, there was nothing else. The only additional information was the neuropsychology report.

Q. Okay. And Dr. Elakil, you understand, he's an expert witness for the plaintiff. Correct?

A. Correct.

Q. So you haven't reviewed any medical records from any providers in 2024. Correct?

A. Correct.

Q. And you haven't reviewed any medical records from any providers in 2023, prior to today. Correct?

A. Correct.

Q. And sitting here today, the only records you have reviewed are these 11 pages from May 2023 and the neuropsych

MAGNA
LEGAL SERVICES

Page 30

evaluation. Correct?

A. Correct.

Q. Why was this provided to you today?

A. Because I advised -- well, I -- I had requested it in my initial lifecare plan, and when I reviewed the lifecare plan, I realized that that hadn't been followed up and had never been given to me.

Q. Is that the only thing that you requested?

A. I requested current speech pathology reports, if available, and I noted that it may be necessary to do an in-person exam.

Q. Did you request any other medical records beyond requesting any speech pathology records and this document from May 2023?

A. I didn't explicitly req -- request that, but that certainly was -- you know, certainly, that may be something that I do request, depending on

Page 31

the outcome of my exam and -- and the other records.

Q. And at the time that you did the telemedicine call on May 11, 2024, you had not seen any medical records that post dated September of 2022. Correct?

A. Correct.

Q. How much did you earn --

A. I'm sorry. September 2022.

Q. Right. Because Dr. Elakil is a plaintiff's report.

A. No, I'm sorry. The records beginning June 2022.

Q. The latest date, the most recent date --

A. Oh, oh, I thought you said earliest. Yes, yes. The -- the latest date, yes, otherwise, it -- it was that date. Correct.

Q. At the time you did the telemedicine call on March 11, 2024, you had not reviewed any medical records later than September of 2022?

A. Yeah, I'm sorry. I had your

Page 32

question reversed. Yes, that's correct.

Q. Okay. How much did you earn in 2023 for your medicolegal work?

A. I don't break down the numbers between the --

Q. You don't have any estimate of how much you earned from your medicolegal work in 2023?

A. Again, I'm not here to test to estimate, I'm here to testify to a reasonable degree of medical certainty. I don't do cost accounting between my medical -- my clinical practice and -- and my -- and my other practice.

Q. Have you ever testified in the past that, in the calendar year 2021, you earned approximately 500,000?

A. I may have.

Q. Do you think that that is an accurate assessment of the amount you earned in 2021 from medicolegal work?

A. Yes.

Q. Do you think it would be the same or similar since that time?

Page 33

A. It's probably a bit higher.

Q. How much higher?

A. I don't know, exactly. I believe I -- I believe I testified that my income from 2023 was something short of a million, I think seven or eight hundred thousand dollars, and -- and that about 10 or 20 percent of it came from clinical work and the rest of it came from medicolegal work. Again, that -- that's an estimate. It depends how you count gross and net charges and what's counted as -- as expenses or whatever, but you know, it's -- you know, that would give you a ballpark range.

Q. Okay. Do you list your services with other places beyond MedQuest?

A. I list my services with the expert agency known as SEAK.

Q. How many cases per year do you get from SEAK, would you estimate?

A. Maybe 20 a year.

Q. And have you written

MAGNA
LEGAL SERVICES

Page 34

publications for SEAK?

A. I have taught for SEAK. SEAK -- SEAK produces educational seminars for physicians and others who do lifecare planning and other forms of forensic work. And -- and on two occasions, I have taught the SEAK -- core measures for SEAK on -- on how to perform lifecare plans and -- and how to calculate life expectancy.

Q. Did you also author a document for them of how to start and build and run a successful lifecare planning practice?

A. No. That -- that was the title of the webinar, the seminar. They may have -- they may have published some notes that go along with it, but fundamentally, it's a -- it's actually an in-person -- it's actually an in-person course, but the fir -- but one of the times that I taught it, it was during COVID, so it became a webinar instead of in person.

Page 35

Q. And that was -- does that -- that has chapters and everything?

A. Well, I believe there's a book that -- that they -- they put together, they -- what SEAK does is they compile the -- the presentations of each speaker and they put it into a book, that set -- set of notes, but they don't sell the book as a separate item. It's really the -- it's considered to be the notes that accompany the -- the class or the webinar.

Q. Okay. And how about MedQuest -- how many cases per year do you get from MedQuest?

A. I would estimate 40.

Q. You do not currently have any hospital privileges.

Is that correct?

A. I have courtesy privileges at Uniontown Hospital.

Q. But you don't live near Uniontown Hospital anymore. Correct?

A. Correct.

Page 36

Q. You don't have admitting privileges at Uniontown Hospital. Correct?

A. Correct.

Q. And you haven't had admitting privileges for more than 10 years.

Is that correct?

A. Correct.

Q. To your knowledge, have your opinions ever been ruled to be not admissible at trial by a judge?

A. To my knowledge --

MR. JACKSON: Objection. You can respond.

THE WITNESS: To my knowledge, they never have been. Well, let me clarify. I think there have been a couple of cases where there have been issues of attorneys not meeting discovery deadlines or other technical issues that have nothing to do with my testimony. But there's never been a case where my testimony has been

Page 37

stricken on its merits.

BY MS. STURTZ:

Q. Okay. When you looked at the medical records, did you recognize any of the healthcare providers in this case?

A. I did not.

Q. And you've never practiced medicine in Washington, DC. Correct?

A. That's correct.

Q. You're not licensed in Washington, DC. Correct?

A. Correct.

Q. There's a reference to Washington on your CV, but that's the state of Washington.

Is that right?

A. I think there -- there may be two references. I --I -- at one point, I had privileges at Washington Hospital in Washington, Pennsylvania. Washington is a city in Pennsylvania. Additionally, I have a medical license, which remains active, in the state of Washington because, at one point, I did independent

MAGNA
LEGAL SERVICES

Page 38

medical examinations in Seattle, Washington.

Q. All right. So I was clarifying, under the states of licensure on your CV, the reference to Washington is the state of Washington, not Washington, DC. Correct?

A. Correct.

Q. You finished your medical training in 1994.

Is that right?

A. Correct.

Q. And then you started your solo practice in 1995?

A. Correct.

Q. Your CV I was provided with is dated March of 2024.

I assume that's a current and up-to-date copy of your CV?

A. Yes.

Q. And you haven't authored -- other than the SEAK webinar document in 2020, there are no publications on your CV that are after 2012.

Page 39

Is that right?

A. That's true. I should --I should add that I -- I have a presentation that's been accepted that will be made at the Academy of Physical Medicine and Rehabilitation on artificial intelligence and physical medicine and rehabilitation. That was just recently accepted. So I didn't add it to my CV yet, but that will be presented later this year. That -- that is -- I don't think that has anything to do with the content of this deposition.

Q. Okay. Your CV states that you're a certified lifecare planner?

A. Yes.

Q. When did you become certified in lifecare planning?

A. I certified through the ICHCC in 2019. And then a couple of years ago, FIG also began to issue certified lifecare planner certificates.

Q. Sorry. So you became certified with the ICHCC in 2019.

Page 40

Are you still certified with ICHCC?

A. No, I -- no. FIG -- ICHCC, you have to pay a fee and renew it. FIG has a lifetime certificate, so I have FIG's lifetime certificate now.

Q. When did your certification with ICHCC lapse?

A. I think it would've been three years after the -- I don't know if it's three years or five years; I think it's three years after the initial training, initial certificate.

Q. So, if you got it initially in 2019, likely sometime around 2022?

A. Yes.

Q. And it's your testimony that you switched certification to FIG because FIG required only a one-time payment instead of an annual payment for certification?

A. Well, actually, there's no payment at all because I really did the training to FIG. But I would -- I would

Page 41

clarify, in my testimony that, frankly, none of this "certificates" matter. My testimony -- my qualifications as a lifecare planner and the basis for admission as a lifecare planner is that I'm a physiatrist. I could -- it wouldn't make any difference. I test -- I did lifecare plans before being "certified."

The purpose of certification as a lifecare planner is for nonphysicians who wish to be a lifecare planner. A physiatrist is qualified as a lifecare planner by virtue of physiatry board certification.

Q. Oh, okay. So, to become certified by FIG, you didn't have to do anything in terms of taking a test or pay a fee?

A. No. I did a home -- I did a home-study course. I did a in-person -- an in-person course with FIG.

Q. Okay.

A. Basically, FIG -- FIG is an

MAGNA
LEGAL SERVICES

Page 42

educational organization that -- that has long done -- offered the course that prepares individuals for the certified lifecare planner examination. They're -- they're actually more so -- they're -- my involvement with FIG is much more substantial than ICHCC.

But FIG -- FIG dis -- at the time I took the course with FIG, they -- they didn't issue "certificates" because, again, they didn't see too much significance in that. But in any event, they decided that they would offer certificates them -- as well. So -- so they both offer competing certificates.

I think, again, the key issue here is it's not a certificate in the sense same -- same sense as a board certification in PM and R or -- or being a member of the bar. There's no legal or regulatory significance. It a certificate of lifecare planning.

Q. I understand, but you listed on your CV, so I'm just trying to clarify

Page 43

what the certification is that --

A. Okay. So, currently, it's through FIG.

Q. Okay. And you didn't have to do anything to become certified through FIG in terms of taking a test or paying a fee. Correct?

A. No. FIG issues their certificate only to people who've taken their course and have passed the -- the lifecare planner exam.

Q. When did you take the FIG course?

A. 2018. That's what prepared me to take the ICHCC exam.

Q. Is there a certification out there for physician lifecare planners called CPLCP?

A. Yes, but there's questionable ethics involved with it.

Q. Okay. So you're not certified by CPLCP.

Is that correct?

A. That's correct because the

Page 44

CPLCP is a certificate that's for plaintiff-only lifecare planners, and I do plaintiff and defense work.

Q. Okay. Are there any professional requirements with FIG that you are required to maintain to keep your certification with FIG?

A. Yes. I need to maintain my license of -- of medicine and the continuing medical education requirements that go along with my medical license.

Q. Do you belong to any professional societies?

A. I belong to the International Academy of Rehabilitation Professionals, which includes a section on lifecare planning. I'm a member of their advisory board on consensus guidelines for lifecare planning. I also belong to the American Academy of Physical Medicine Rehabilitation.

Q. Do you agree that the expert reviews of facts should be thorough, fair, and impartial and should not

Page 45

exclude any relevant information to create a view favoring either the plaintiff or the defendant?

A. I agree.

Q. Do you have any file notes?

A. I have notes for my telemedicine visit with Mr. Welch, and I have notes from my staff when they scheduled that.

MS. STURTZ: Okay. So I'm going to ask the court reporter to hold open Exhibit 1. And I'd like to make Exhibit 1 be your notes from the telephone or telemedicine visit on March 11, 2024.

- - -

(Whereupon, Exhibit 1 was marked for identification.)

- - -

MS. STURTZ: And if you could provide those to Mr. Jackson, he'll get those to me. Okay?

THE WITNESS: Okay. You want me to send them now or after, or --

**MAGNA**
LEGAL SERVICES

Page 46

or do you want me to send them --
MS. STURTZ: I mean, if you can send them now, that's fine. Or maybe we'll take a quick break and you can send them, otherwise, I can get them later.
BY MS. STURTZ:
Q. And then there's a reference in your report to -- well, let me ask you -- back up for a second.
Other than the notes from the interview, do you have any questionnaires or any forms that were filled out by Mr. Welch or you?
A. No, because I didn't see him in person. If I get to see him in person, I may have him fill out a form. But I do -- I only do those forms when -- when I see someone in person.
Q. Did you ask to see him in person back when you were considering preparing this report?
A. It's noted in my report that it's a preliminary report and that I

Page 47

anticipate examining him in person.
Q. But you didn't ask for that to be done prior to you drafting a report and forming your opinions, as outlined in the report. Correct?
A. Correct. That's why it was a preliminary report.
Q. When were you first contacted in the case? If the report is dated -- or the phone call happened on March 11th, 2024, when were you first contacted?
A. I was first contacted on January 18th, 2024.
Q. And when were you first provided with the materials that are listed on page 3 of your report?
A. I was provided with some materials on January 18th, 2024, and then I later got Dr. Elkeli's -- Dr. El -- Elakil's narrative report on March 4th, 2024.
Q. Okay. I'm sorry. You initially were provided materials January 18th, and then what was provided later?

Page 48

A. Dr. Elakil's expert report.
Q. Okay. So everything, other than Dr. Elakil's report, who's a plaintiff expert, was provided to you on January 18, 2024. Correct?
A. Yes.
Q. And have you ever reviewed the complaint in this case?
A. I have not.
Q. Okay. And the purpose of your report was to evaluate and assess the extent to which he incurred injuries on June 14, 2022. Correct?
A. That's ultimately what the focus -- that's ultimately the scope of the report that was agreed upon. Initially, when I was contacted, there were some questions as to what type of report would be appropriate and what would be with -- within my expertise.
Q. Okay. And the conclusion, as stated on your report of March 26, 2024, was the purpose of the evaluation is to assess the extent to which he has

Page 49

incurred injuries on June 14, 2022. Correct?
A. Yes. And -- and again, that -- that is stated in my report, and I stand by that, but maybe that's not as clear as it should be because, as I testified earlier, I guess if I say to assess the extent of injuries, that sort of -- that could be interpreted to imply that I'm doing a causation review, and I'm not, so I -- should've stated it more clearly.
My -- my purpose -- and I -- and I think later -- later in the report, I do make the statement that I'm assuming causation. So a better way of stating it would be assuming that there's liability, the point is to determine the extent of those injuries that -- that occurred. And in other words, I'm accept -- my report accepts the fact that the stroke and the cerebell -- the stroke and the spinal cord infarct occurred, and my report is regarding the disability and

MAGNA
LEGAL SERVICES

Page 50

future medical care that are required as a result of that. My report does not attempt to determine whether the aortic dissection or any specific standard of care breach caused that.

Q. Okay. So there's no forms. There's the notes from the one contact with Mr. Welch on March 11. And your report talks about a mental-status exam of 28 out of 32.

Are there any notes of that., or is that part of your interview notes?

A. That's part of my interview note.

Q. And what exact mental status exam did you perform? Is it the MMSE?

A. Yes.

Q. And he scored 28, so that's in the normal range.

,Is that correct?

A. Yes.

Q. And do your notes spell out exactly, each section of the scoring for the MMSE?

Page 51

A. No. That was intended simply as a screen. My -- ultimately, regarding cognition, I'm going to rely on the neuropsychology -- on the evaluation, which is way more detailed than that.

Q. I understand, but your testimony is that you did do an MMSE assessment of Mr. Welch on March 11, 2024. Correct?

A. Correct.

Q. And that included all the MMSE categories of orientation, recognition, attention, recall, language. Correct?

A. Correct.

Q. And the score was 28 out of 32 and was in the normal cognition range. Correct?

A. Correct.

Q. And do you know or have any recollection, sitting here today, what the point score was for each one of those categories, or you don't recall?

A. His -- his deficits were in

Page 52

recall and calculation, in delayed recall and calculation.

Q. Did you do any research in this case to form your opinions?

A. No.

Q. The references listed on page 9 and 10, are those sort of standard references that are included in your reports?

A. They're standard reference -- they're -- well, they're standard references that I've -- that I've -- essentially, you'd say they're my intellectual property or -- or my intellectual work to establish the methodology for differential diagnosis of impairment.

Q. And in this case, did you look at -- I think those are itemized as 1 through 18.

Did you look at any of those, specifically in this case?

A. No. Those -- the methodology is something -- well, something I do rou

Page 53

-- routinely.

Q. So is the methodology you used called something by name or it's just a methodology you created?

A. Differential diagnosis of impairment, which is the foundation of physical medicine and rehabilitation, is foundation of what's accepted for the Daubert standard.

Q. So the methodology you used is called differential diagnosis of impairment?

A. Correct.

Q. And what is the source for the methodology of differential diagnosis of impairment?

A. Thirty years of experience as a physiatrist.

Q. Is there a methodology that's set forth by any lifecare planning organizations that's different than this?

A. Well, lifecare planning organizations don't set forth the methodology because lifecare planners can

MAGNA
LEGAL SERVICES

Page 54

-- may be of varying backgrounds. Some lifecare planners aren't even qualified to -- to per -- perform that.

What the lifecare planning consensus standards state is that a physician needs to practice based upon his qualifications and experience and -- and the standard of practice. This is qualifications for physiatrists. If it -- if it may help you, this methodology was subject to a Daubert hearing in the District of Columbia and was ruled to be admissible.

Q. Okay. When was that?

A. I believe it was last summer. It was a case that -- that I prepared.

Q. Uh-huh. And are you familiar with the term, Delphi methodology?

A. Yeah. I think that refers -- the -- the Delphi methodology is what I refer to as the consensus standards. That's the -- that's the standards set by the lifecare planning. And I testified earlier today that I'm on the committee

Page 55

that sets those. So I'm on the -- the Delphi standards are the standards by which lifecare planning methodology is set. And not only am I familiar with that, but I'm on the current committee to re -- to review and revise those to be -- to be appropriate.

Q. So is the Delphi criteria what you used in this case, or did you use something different?

A. It's what I used in this case, but my point is that the Delphi criteria are very general. The Delphi criteria simply state that a lifecare planner should function within the scope of his licensure and consistent with the standard of practice in his or her licensure. So, in other words, the Delphi cri -- criteria would, in turn, state that I should function as a physiatrist. I should use my physiatry background.

Q. Okay. I just want to know what the methodology is that you used in

Page 56

this case. So does the Delphi criteria have anything to do with the methodology used in this case or no?

A. It simply says that the methodology is what my medical license says I should use.

Q. Okay. And so your testimony that the Delphi criteria says use the methodology that you're supposed to use in your medical license and then you call that methodology differential diagnosis of impairment, and the basis for that methodology is the references 1 through 18 in your report.

A. Yes. And this specific --

MR. JACKSON: Objection.

THE WITNESS: Yes. And this specific issue has been litigated in District of Columbia Court and found to be accepted.

BY MS. STURTZ:

Q. What was the name of that case? Do you know?

A. The plaintiff's name was

Page 57

Ebonee Johnson, spelled E-B-O-N-E-E.

Q. And do you know if a different court or the District of Washington, D.C. has ever reached a conclusion where the methodology was not adequate?

A. I don't know if its ever found otherwise.

Q. And other than these references in your report, there's no other research you did and no other literature you'll be relying upon at trial.

Is that correct?

A. Well, I'll rely on my 30 years' experience as a physical medicine and rehabilitation physician. And it's also possible that if I have the opportunity to examine the patient in person, that there may be other issues that I -- that I choose to research that I might put in a final report. Again, this is a preliminary report. I don't anticipate that this is necessarily my

MAGNA
LEGAL SERVICES

Page 58

final report before trial.

Q.   But with all due respect, I know you've been involved in this circumstance for a long time. We have a schedule, we have parameters. This is my chance to ask you questions about what you've done to date. If you do something later, we'll deal with that. But sitting here today, there's no other research or literature that you intend to rely upon a trial, other than what's referenced in your report.

Is that fair?

MR. JACKSON:  Objection. You may respond.

THE WITNESS:  Okay. I seem to be upsetting you, and I'm sorry if that's the case. That's not my intent. But -- but the reason -- the for my -- my response, which was very intentionally parsed, is because I don't want to appear at trial and -- and have you feel that I made a misrepresentation to you

Page 59

about my -- my opinions in this case. So I'm not claiming that this is the final report. I very much intend and expect that there will be a revised report and that it may change significantly after I have the opportunity to examine him in person. If that means we have to do another deposition, so be it. But I think that should be made clear because I don't want that there to be any misunderstanding when it comes to trial.

MS. STURTZ:  I just simply asked you whether, sitting here today, you intend to rely on any research or any literature other than what's set forth in your report.

MR. JACKSON:  Objection. And the -- and the answer is it's very likely I will do other research after I examine the patient in person.

Page 60

BY MS. STURTZ:

Q.   So why -- why, sitting here today, do you think your opinions are going to change so much when you examine the patient?

MR. JACKSON:  Objection. You can respond.

THE WITNESS:  Because it's likely that a physical examination will give me more insight into his deficits, and because the neuropsychological report, which I've reviewed, indeed confirms that there appear to be very -- to be substantial deficits.

BY MS. STURTZ:

Q.   But you felt comfortable authoring your report on March 26th, 2024, based on what you had received back in January of 2024. Correct?

MR. JACKSON:  Objection. You can respond.

THE WITNESS:  I felt comfortable offering it as a

Page 61

preliminary report. I very specifically did not offer it as a final report because I anticipated exactly the questions you're asking me now.

BY MS. STURTZ:

Q.   Did you write the word, preliminary, on your report?

A.   Yes, I did.

Q.   Do you usually have reports that say preliminary and final?

A.   Okay. My report says specifically that it's a preliminary report.

Q.   Right. And is that your typical practice when -- you do this all the time. Right? Is that your typical practice that you write a preliminary report and then you write a final report?

A.   No.

Q.   You usually just do one report?

A.   Correct.

Q.   You had the phone call with

MAGNA
LEGAL SERVICES

Page 62

Mr. Welch on March 11, 2024.

How long did that last?

A. I would estimate about 25 minutes with me. He also met with my assistant, Jonathan, prior to that, who took some of the basic medical history.

Q. How long did he talk with the assistant?

A. I'd have to ask Jonathan. Typically, Jonathan spends an hour with the patient whether -- or an appointment.

Q. So, all total, it was about an hour with your assistant, Jonathan, getting medical history and 25 minutes with you on the telemedicine call. Correct?

A. Correct.

Q. Where was Mr. Welch at the time when this happened?

A. I presume in his home, but I don't know for sure.

Q. Was anyone with him in the room?

A. No.

Page 63

Q. Did you speak to anyone else that he lives with?

A. No. I know he lives with his cousin, Marvin, but I did not speak to Marvin. I did not believe Jonathan did.

Q. Are you aware that he also lives with someone named Daniel? I assume you didn't speak to someone named Daniel?

A. I did not. And I was not aware of that.

Q. Did you speak to any of his treating healthcare providers?

A. I did not.

Q. Did you speak to anyone else in his family?

A. I did not.

Q. Did you speak to his employer?

A. I did not.

Q. Did you send any forms or requests for information to any of his treating providers?

A. I did not.

Page 64

Q. I take it you did not go to his home?

A. Correct.

Q. You didn't do any sort of home evaluation?

A. I did not.

Q. Did you videotape the call at all?

A. I'm sorry. What's the question?

Q. Did you videotape the call?

A. I did not.

Q. Did you take any photographs or still shots?

A. I did not.

Q. Did you ask him to get up and walk around?

A. I did not.

Q. Well, it says "During the telemedicine visit, Mr. Welch appeared to have gait within normal limits."

A. I'm -- I'm sorry. I'm sorry. Yes, he did briefly walk around the -- the room for that -- for that purpose, as

Page 65

could be accomplished via the -- the video.

Q. So did you ask him to do that?

A. Yes, I did. Yes.

Q. And your conclusion was that he appeared to have a gait within normal limits of at least for short distances within the room.

A. Correct.

Q. And what, exactly, did he do -- just walk in a circle in the room?

A. Correct.

Q. What room was it?

A. I don't know which room it was.

Q. You don't know if it was his bedroom or his living room?

A. It didn't seem pertinent. I don't know for sure.

Q. Did you ask him to do anything else, other than to walk around the room?

A. No.

MAGNA
LEGAL SERVICES

Page 66

Q. Did his speech appear normal to you?

A. Yes.

Q. Was he able to answer your questions?

A. Yes.

Q. Was he cooperative?

A. Yes, he was.

Q. Do you agree that the US Life Tables, based on general population, are not useful in accurately assessing life expectancy for someone with a serious condition?

MR. JACKSON: Objection. You can respond if you know.

THE WITNESS: That's too vague a question. They're accurate for some serious conditions but not for others. And it also --

MS. STURTZ: Is it --

THE WITNESS: It also depends on which life table. So it's a -- it's a big question. I might've made that statement, but -- but you

Page 67

might be taking that out of context. If I made the statement before, and you might be quoting my testimony before, we'd have to look at the context in which it was asked. If you want to tell me the case, I'd be glad to look at it. But it might be in that particular case, I didn't think it was helpful. It all depends.

BY MS. STURTZ:

Q. Did you review or determine a conditional life expectancy given Mr. Welch's type A aortic dissection and surgical repair?

A. I'm -- I'm not aware that that would reduce his life expectancy.

Q. Did you do any research into what the 10-year life expectancy is for someone who has had a type A aortic dissection and repair?

A. In the case -- in this case -- yes, in this case, my -- in this case, I don't believe there's any

Page 68

reduction that's indicated.

Q. But my question to you was, did you do any research into what the 10-year life expectancy is, or the average 10-year life expectancy is for someone who has suffered a type A aortic dissection and repair?

A. I did a survey of the period of literature regarding whether there's any -- any literature that supports a life expectancy reduction at all in this case. And the answer was I could find none.

Q. What literature did you survey to assess the life expectancy of someone who's had a type A aortic dissection and surgical repair?

A. "PubMed" and "Consensus."

Q. So what search did you put into "PubMed" in terms of the life expectancy for someone who has suffered a type A aortic dissection and surgical repair?

A. I did a search for life

Page 69

expectancy after aortic dissection.

Q. And it's your testimony that when you did that search that the search results advised you that there was no reduction in life expectancy for someone who suffered a type A aortic dissection and surgical repair?

A. I could not find any.

Q. Are you familiar with an organization called IRAD, I-R-A-D, International Registry of Acute Aortic Dissection?

A. I'm not.

Q. Do you defer to a cardiothoracic surgeon or a cardiologist on what the survival rate is for someone who has suffered a type A aortic dissection and repair?

A. No.

MR. JACKSON: Objection. You can respond.

THE WITNESS: No, I do not.

MS. STURTZ: No?

THE WITNESS: No, I do not.

Page 70

BY MS. STURTZ:

Q. Do you deny that there is literature stating that the 10-year survival rate following a type A aortic dissection repair is 52 percent?

A. I don't deny that. I would ask to look at the literature. What I say is that there's none that apply in this case. Okay? There are certainly many peo -- people who die of aortic dissections, but -- but there's lots of nuances involved. Lots of them die right away. Okay? There's lots of nuances involved.

When I look -- when I searched the literature, I could not find any literature on aortic dissection life expectancy reduction that applied in this case. If you -- if you have an expert that feels that that is applied, I'll be glad to look at it and I'll -- and I'll address that. But that wouldn't matter. I could not find -- I didn't -- and again, I didn't say I didn't find any

Page 71

literature on aortic dissection, and I didn't say I didn't find any literature on aortic dissection and life expectancy. What I said was I didn't find any aortic -- any literature that applies to this case.

Q. Okay. And so what is it -- this case involves a medical history of a type A aortic dissection. Correct?

A. Yes.

Q. And this case involves a medical history of surgery for a type A aortic dissection. Correct?

A. Yes.

Q. A type A aortic dissection is a medical emergency. Correct?

A. Yes.

Q. And this case involves residual complications following the type A aortic dissection and surgical repair. Correct?

A. Yes.

Q. So, when you say I didn't see anything about a reduced life expectancy

Page 72

that applied to this case, what is it about this case? What are you referring to?

A. I think you're asking me to testify about the negative. My assertion is that there's no life expectancy reduction that's applicable in this case based on the diagnoses. It's not up to me to offer literature to prove that there isn't such a life expectancy reduction. The assumption in life expectancy analysis is that life expectancy is unadjusted. If you or one of the treating physicians or one of the experts believes that there -- it should be a reduction in life expectancy, then I expect there'll be a report that states that. And if that's the case, then I'll respond to that. But it is not my position, it's not my role to prove a negative.

Q. Okay. But you, in your report, included -- you include an opinion about life expectancy and have

Page 73

him with a life expectancy of 81.7 years. Correct?

A. Correct.

Q. And so you are basing that opinion on research you did in "PubMed" where you believe indicated you were unable to find any information about a reduced life expectancy for someone with this medical history. Correct?

A. Correct. In other words, the -- the way -- the way that life expectancy works is this: As a baseline, I use the Social Security Administration unadjusted life expectancy table and then I go through the medical literature to identify if there's any reduction that's indicated based on the medical history. In this case, that would include the history of a dissection, that includes his stroke, that includes his spinal cord infarct. And if I find medical literature that -- that indicates that the life expectancy should be reduced, then I would reference that literature.

MAGNA
LEGAL SERVICES

Page 74

But if I find no literature to suggest it should be reduced, then there's nothing to report and it stays unadjusted.

Q. Okay. Did you see anything about whether, with aortic dissection patients, they should avoid strenuous activities that can cause an increase in blood pressure after having the type A dissection and surgical repair?

A. That's a recommendation that's made by some surgeons. I don't know that there's -- I don't know that there's a consensus in the literature that that should be applied long term. But again, that goes outside the scope of my testimony.

If there is an expert who believes that this patient is at risk of -- of a life expectancy reduction for that reason, then I'll be glad to review such a report. But, in the absence of expert testimony saying otherwise, I cannot be expected to prove a negative. That's not my role.

Page 75

Q. Do you defer to a cardiologist or cardiothoracic surgeon as to whether Mr. Welch could perform karate following a type A aortic dissection and surgical repair?

A. I wouldn't blindly defer, I would listen to their opinion and see what it's based on and -- and view the literature. No, I wouldn't blindly defer to it. I consider myself qualified to -- to opine as well.

Q. And what you're telling me is that you did do that research also in "PubMed" on what the lifestyle limitations are for someone who has suffered a type A aortic dissection and surgical repair, or is that not a search you did?

A. That wasn't my search. That wasn't applicable to the report that I prepared at this time.

Q. You noted, from your interview on March 11, 2024, that Mr. Welch is able to perform all basic

Page 76

activities of daily living. Correct?

A. Yes.

Q. You did not do a stroke fellowship. Correct?

A. Correct.

Q. You're not a stroke doctor. Correct?

A. Incorrect. I've treated --

Q. You are not a neurologist.

A. I've treated -- I've treated thousands of patients with strokes. I've treated thousands.

Q. You're not a neurologist. Correct?

A. Correct.

Q. How about that?

A. Correct.

Q. You, sitting here today, have not seen any recent neurologic assessments of Mr. Welch. Correct?

A. Correct.

Q. What does a finding of no paresthesia, no limb weakness, alert and oriented mean to you?

Page 77

A. I'm sorry. What were the first words you used?

Q. P-A-R-E-S-T-H-E-S-I-A.

A. Oh, para -- paresthesias. Okay. That means the patient has numbness.

Q. So no paresthesias means no numbness?

A. Correct.

Q. No limb weakness means?

A. What it seems to be. No -- right. Correct.

Q. Alert and oriented means what?

A. They're responsive. They're alert. That means they're not drowsy or tired. Oriented means they know who they are, they know where they are, they know what the date and time is.

Q. What does no focal motor deficits mean?

A. That means, on an examination, on a screening motor examination -- on a screening physical

MAGNA
LEGAL SERVICES

Page 78

examination, it does not feel -- it does not appear that the physician identified any focal weakness.

Q. What does strength and sensation are intact without any focal deficit mean?

A. It's a way of saying that the patient's -- the manual muscle testing, that the strength testing of individual muscles and sensation testing of the nerves appears to be normal. They're basic parts of a neurological exam.

Q. What does sensation to light touch intact mean?

A. That's another way of -- of quantifying or -- or qualifying the -- the statement you made about sensation. Sensation can be to light touch or could be to pinprick. There are different ways that you can measure sensation.

Q. When is the last time that Mr. Welch received PM and R, if you know?

A. I don't know.

Q. When is the last time Mr.

Page 79

Welch was seen by neurology, if you know?

A. I don't know.

Q. When is the last time, if ever, he received any speech therapy, if you know?

A. I don't know.

Q. When is the last time he received any physical therapy, if any, if you know?

A. I don't know.

Q. Do you agree that, in forming a lifecare plan, you want to take into consideration all relevant information?

A. Yes.

Q. Do you agree that, in forming a lifecare plan, you want to take into consideration all available information?

A. Yes.

Q. Do you agree that the goal of a lifecare plan is to provide for reasonable support for care as it relates to the injury at issue in the case?

A. Yes.

Q. You have not reviewed any

Page 80

deposition testimony.

Is that correct?

A. That's correct.

Q. Do you understand that Mr. Welch was not living independently prior to June of 2022, he lived with other people?

A. That's different from saying he's not living independently.

Q. That he was -- okay. Do you have an understanding that prior to June 2022, Mr. Welch lived with other people, or do you not know one way or the other?

A. I don't know one way or the other.

Q. You haven't reviewed any employment records?

A. Correct.

Q. The long-term medications that you referenced in your report, do you know what those are prescribed for? On page 5.

A. Okay. Losartan, hydralazine, labetalol, and clonidine could be -- any

Page 81

of those could be prescribed for blood pressure. Typically, those particular medications and that number of medications is used for patients at particular high risk of blood pressure. So those would -- those would be typical medications given to someone with a history of an aortic dissection, therefore, is at risk of complications of hypertension.

Aspirin would be for primary cardiac prevention. Folic acid is for uncertain reasons. Some people believe it has prophylactic-based reasons for health or affect -- help paresthesias, but it's debatable.

Q. Does it -- do you agree that those medications are related to the type A aortic dissection and surgical repair?

A. Yes.

Q. Mr. Welch indicated that he was able to walk on a treadmill. Correct?

A. Yes.



Page 82

Q.   He was able to perform all basic activities of daily living, including showering, dressing, and doing things around the home.  Correct?

A.   Correct.

Q.   He goes grocery shopping with his girlfriend or his cousin.  Correct?

A.   Correct.

Q.   He uses his cell phone. Correct?

A.   I don't believe we discussed that.  Did I say phone.  Did he use a cell phone?

Q.   Yes.  I thought that was in your report, but maybe not.

A.   I don't -- I don't think so.

Q.   You don't know one way or the other?

A.   I don't know.

Q.   You noted that he does not have difficulty reading or watching television.  Correct?

A.   Correct.

Q.   So looking at your, what this

Page 83

is called, the sort of Excel spreadsheet part of your report?

A.   Yes.

Q.   You -- I'm not sure if it's there.  There's something that's called a PFR multiplier.

What is that?

A.   It's the physician fee reference multiplier.  It's the database that I use called -- called PFR from Wasserman Publication publishes fees as a national average fee, and then it's adjusted.  So basically what that means is that for ZIP Code 20613, the fees are 4.2 percent higher than national average. And therefore, I've reflected that in my calculations.

Q.   So how did you come up with a PFR cost multiplier of 1.042?

A.   Using the book PFR 2023.

Q.   And just I'm not familiar with that.

How -- what is the range of a PFR cost multiplier or is it just

Page 84

something that you go to a certain page and reference and get that number?  How does it work?

A.   Okay.  So that publication, it's available for purchase from Wasserman publications.  Again, they -- they state all the prices as a national average and then you have to adjust it geographically.  So you look up the ZIP Code and it says 1.042.  So that means you --

Q.   Okay.

A.   --multiply everything by that.  They do a national survey.  If you look through their -- their publication, I believe the highest multiplier that exists anywhere is either Long Island or Connecticut, somewhere in that region, there's a multiplier that's about 1.25. It's about 25 percent higher than anywhere.  And I think there are some areas of Appalachia where the number gets down to about 0.8, which is about a 20 percent reduction from the national

Page 85

average.  That may vary from time to time.

But basically, it's -- the adjustment can be as high as 20 or 25 or a reduction of high -- 20 to 25, which reflects the cost of living in -- in that area compared to the national average. So for this ZIP Code, it's an adjustment of plus 4.2 percent.

Q.   And the ZIP Code you use is for his home on Brandywine Road, wherever his home is?

A.   Correct.

Q.   Okay.  And you have PM and R physician visits three per year.

What is the basis for you, your assessment of a need for three PMR visits per year?

A.   In my judgment as a physiatrist who's followed long-term patients for 30 years, three visits per year is typical of what would be necessary for a patient with this type of injury.

**MAGNA**
LEGAL SERVICES

Page 86

I think it's important to realize, though, that's not saying I believe that this year or next year, he's going to have three visits. It's an average over time. Really what it means is, on average, he'll need about 113 visits over his lifetime. He may not need any PM and R visits for the next five years, but he may then develop worsened impairment issues and require more than that in any given year.

Q. Okay.

A. So I'm trying to project what's likely to occur over his lifetime.

Q. And to address what?

A. Well, he has -- he has apparently cerebellar deficits and perceptual deficits and cognitive deficits, which are likely to progress in the future. And as he gets older, he's likely to have difficulties with balance, with gait, with cognition, which will require evaluation for safety, and ultimately are likely to need to the --

Page 87

lead to the need for physical assistance.

Q. Okay. And then you have one visit per year to a cardiac surgeon?

A. Correct.

Q. What is the -- I mean, he would need to go to a cardiac surgeon by virtue of the type A dissection. Correct?

A. Correct.

Q. And so why did you include that in your report?

A. Again, I'm not addressing the liability and causality issues that are associated with that. I -- you know, I suppose if your argument is that that would have happened no matter what, that that's not part of liability, then maybe we should -- maybe we should reduce that.

Q. Let me ask it this way. If hypothetically, even if hypothetically he had not incurred the complication from the surgery of the strokes, you would agree with me that he would need followup with cardiology or a cardiac surgeon,

Page 88

even if those complications hadn't happened. Correct?

A. I don't -- I don't know. I would -- I would defer. I would say this, you may have a point. I would defer. I don't have an opinion yet for the experts in that regard.

If there's an expert in this case that -- that is of the opinion that the frequency of followup can lead with cardiac surgeon is no changed whether the alleged deviation of standard care did or did not occur, then I might delete that line. I don't know. Since I'm not making an opinion on standard of care, I couldn't make that as a definite decision.

But again, I will concede that it is -- pending the opinions of those experts, it is possible that we -- that it may be appropriate to delete that line in the life care plan. We need -- I need more information to know that.

Q. It's not really a standard of

Page 89

care. It's based on his condition and his complications.

But how about primary care? Why did you include one primary care visit per year?

A. Oh, clearly given his spinal cord injury and the strokes, clearly his ongoing management will be more complicated. And so that is not the only primary care visit needing.

What I'm saying is, I'd apportion that at least one primary care physician per year will be necessary to manage the cognitive and -- and other neurological complications that he has as a result.

Q. You're saying because he suffered complications from the type A aortic dissection and surgical repair, it's your opinion that he will require one additional primary care visit per year?

A. Correct.

Q. Okay. Neuropsychological

MAGNA
LEGAL SERVICES

Page 90

reevaluation, five of those.

Why do you have five of those in your plan?

A.    Because it's common for -- in situations such as this for a cognitive deficit to worsen -- to worsen over time as a person ages and -- and therefore input as to how that impacts his safety and the allowed assistance that he needs will be helpful.

Q.    Has any neuropsychologist in the medical records recommended five separate assessments?  If you know.

A.    I don't know for sure.  And frankly, that would eventually be needed. It's often the physiatrist who makes that determination.  I'm well qualified and fairly comfortable making the assessment that someone in this situation requires psychological reevaluation on an ongoing -- on an ongoing basis.  And I -- and I think it goes to a point that -- that extends to the entire life care plan.

Page 91

What's important to realize is this life care plan is not a statement of what Mr. Welch needs today.  This life care plan first and foremost is a projection of what I believe as a physiatrist he's going to require for the next 37 years of his life expectancy.

Q.    Okay.  The PT, OT, speech therapy, again, you don't know whether he's received any of that in the calendar year of 2023 or 2024.  Correct?

A.    Correct.

Q.    And what is your basis for including that in this plan for those stated frequencies?

A.    Thirty years of experience as a physiatrist treating patients with all sorts of strokes and all sorts of spinal cord injuries.

Q.    Home accessibility allowance times three.  You've never been to the home.  Correct?

A.    Correct.

Q.    What exactly is the $104,000

Page 92

times three to four?

A.    There's a standard -- there's a practice that's become essentially standard of practice in life care planning, which has been adopted from the Veterans Administration.  And that's the following.

In order to determine exactly what -- what sort of modifications are needed in any given -- given home in a litigation sense, you would need to have a PT, an OT, an architect, contractor all go out and all make assessments and offer recommendations.  And by the time you do that, you're spending a significant amount of money, which could have just gone to the modifications anyway.

And so the Veterans Administration went through this issue in terms of trying to figure out what sort of modifications are reasonable for soldiers who are returning home after injuries.

And they have concluded that

Page 93

it's more efficient and provides -- and -- and equally accurate and more appropriate to simply have an allowance that they give to individuals with a substantial injury.  And that practice has been adopted by the life care planning community.

So the current fee for that by the Veterans Administration is $104,000 as a budget.  So that applies to any home no matter what.  The assumption is someone who's 37 years old is probably not going to live in the same home for the rest of his life.

It seems reasonable to assume that he -- that not only does he need his current home modified, but he might move at least twice in the time of 37 years. So therefore, I've included that three times.  Anyway, that's a common -- that's accepted within the life care planning community.

Q.    No one, to your knowledge, has assessed him as in need of home

MAGNA
LEGAL SERVICES

Page 94

modifications currently. Correct?

A. Correct. That's my experience, my opinion as a physiatrist in terms of what's likely to occur for someone with this type of injury.

And again, a lot of your questions you're asking today are focused on he really doesn't seem to need this now. He seems to be -- do fine now.

This life care plan is not about what he needs now. This life care plan first and foremost is about a prognosis of how he's likely to worsen neurologically into the future.

Q. Okay. So you agree right now he doesn't need it?

A. Correct.

Q. And same with the home health aide attendant care. He doesn't need it right now. Correct?

A. Correct, nor is it alleged for that. The home health aide attendant care is listed as occurring either in the last 15 years of his life or the last 25

Page 95

years of his life, depending upon how that evolves.

Q. Okay. So the answer to my question in terms of now is correct?

A. Correct.

Q. He doesn't need this now. And you have come up with three different levels.

And what you're telling me is the section that says years is it's your opinion that he needs these for the last 15, 25, or 20 years of his life?

A. Correct.

Q. So assuming -- if your life expectancy of 81.7, just to make sure I'm understanding this right, so with the moderate gait deficit, he would need that when he is 60 years old, starting when he's 60?

A. Sixty-one, yes. Correct.

Q. Okay. And the -- what is the source for the $33 per hour?

A. Source is a database known as Genworth.

Page 96

Q. And the -- in terms of these three categories, which are moderate gait deficit, what is the source for that category?

A. Thirty years experiences of physiatrists treating patients with stroke and spinal cord injuries, plus the methodology for differential diagnosis of impairment about which I testified earlier today.

Q. So how did you come up with the three categories of gait deficits?

A. In my experience, patients with an injury such as this generally worsen into the future and require significant physical assistance. However, it cannot be -- I cannot precisely state how much help they're going to need. What this is basically a way of saying is this is a minimum and a maximum of how much help people need.

I've taken care of many patients who've had chronic neurological injuries, and the vast majority of those

Page 97

patients with an injury such as this would fall somewhere into this range of assistance. I can't tell you if it would be the low end or the high end. So therefore, it simply becomes a range for a jury to decide.

Q. Okay. And so the low end is the category mild antalgic.

A. Mild antalgic gait. Correct.

Q. And the high is the moderate severe deficit?

A. Correct.

Q. And which one of these categories you don't -- you're not opining, he's more likely than not to be in one or the other?

A. Correct. The only statement I can make more likely than not is that he'll fall -- he'll fall somewhere within that range.

Q. Okay. And the -- what does the home -- what will the home health aide be doing? What types of activities?

A. That depends on the level

MAGNA
LEGAL SERVICES

Page 98

that we've mentioned there. It could be helping him so he doesn't fall. It could be helping with bathing, dressing, toileting. It could be helping him with laundry. It could be helping him with shopping. It could be helping him to get -- to retrieve things from a -- from a high shelf. Any basic activity of daily living or any instrumental activity of daily living.

Q. Okay. Could it -- does it have to be a home health aide or could it be a different category of person than that?

A. Well, home health aide is the lowest level there is.

Q. Okay.

A. Sure. You know, the licensed practical nurse or a registered nurse that would be a whole lot more money, and I don't think it's necessary.

Q. How about something like a sitter? Is that a lower level or no?

A. It would be equivalent.

Page 99

Q. And do you know whether someone who has suffered a type A aortic dissection with surgical repair without the known complications of a stroke, what percentage of them would require this type of home health aide assistance in their life?

A. Typically, they would not require assistance if they didn't have that sequelae. That's the whole point. Those who don't have a stroke or other major complications do well.

Q. Do you --

A. It's those who have the complications that need the assistance.

Q. Okay. Do you know what the other potential known and recognized complications are of a type A aortic dissection with surgical repair? Would you defer to a cardiothoracic surgeon on that?

A. You can have any sort -- all sorts of cardiac disease, all sorts of cardiac valvular disease and vascular

Page 100

malfunction, but I'm not aware that this patient has any of those. I can -- I'm not aware that he has any such sequelae other than the neurological sequelae.

Q. Do you know whether he has any sequelae in terms of problems with hypertension?

A. I'm not aware of any expert who's offered the opinion that he has sequelae of hypertension related to the aortic dissection.

But even if he did, he wouldn't need a home health aide for that. He might need a visiting nurse to monitor his blood pressure in that case. But that would be separate from the long-term care that I've put down.

Q. How about, do you know if he has any issues, residual issues from a nephrology standpoint?

A. I'm not of any -- aware of any that are likely to impact life expectancy or to require assistance from a home health aide.

Page 101

Q. Mr. Welch does not use any gait aid. Correct?

A. Correct.

Q. And are you aware that he hasn't used any gait aid since 2022?

A. I put that in my report, yes.

Q. The apportionment percentage, why are two of them at a hundred percent and one at 50 percent?

A. What I'm accounting for there is that some people can develop -- some people develop physical impairment requiring assistance, even when they don't have a stroke or a spinal cord injury.

So it's possible that he could develop any number of disabilities. He could develop arthritis. He could have some unrelated stroke. He could have some other accident and fractures. There's all sorts of things that could occur.

He's at risk if he gets any other medical condition that that could

MAGNA
LEGAL SERVICES

Page 102

add to this and push him to the limit that he requires profound assistance, even 24-hour assistance.

But that level -- but if he gets to the point that he needs 24-hour assistance, it's not likely to occur solely as a result of the issues now. It's likely to be related to other issues into the future.

So I'm simply accounting for in the -- in the best-case, worst-case scenario, that he could develop other medical conditions that add to his need for the physical assistance. And -- and in that case, the -- the need for the home health aide would be only partly related to the -- the sequelae in this case.

Q.   Okay.  But why would there not be some apportionment for that with a mild or moderate level?

A.   Because by definition, I'm giving the alternatives.  Right?  Now, there's one scenario is that he doesn't

Page 103

get any other comorbidities, in which case I'm listing the best case of how much help he needs.

The alternative is the worst case is he does develop some other comorbidity.  And in that case, they're going to -- they're going to interact with one another.  And therefore, we have to acknowledge that they're both related. That's the whole point.

Q.   So the one where you allow for some apportionment of 50 percent, does that mean the number of 3,613,500 essentially can be cut in half?

A.   No, it means it's already been cut in half.  It was 7.2 million, and it's been cut.

Q.   Oh, okay.  So that's a -- that number is a 50 percent calculation. Okay.

A.   Correct.

Q.   And can you give me what your definition is of mild antalgic gait?

A.   It means a mild limp.  It

Page 104

means he's having difficulties walking because of limping because either pain or balance difficulties.

Q.   And what is your definition of moderate gait deficit?

A.   Someone who requires handheld assistance and/or a gait aid for walking and -- and requires physical assistance for transfers.

Q.   Okay.  And what is your definition of moderate severe gait deficit?

A.   When there's a high risk of a fall and requires hands-on assistance for virtually any mobility or ambulation tasks.

Q.   And at present -- I think we covered this already, but at present, Mr. Welch does not fall into any one of these categories.  This is a projection you're making for the future.  Correct?

A.   Correct.

Q.   Okay.  And the physician fees references, those sources, did you look

Page 105

at all those sources in this case?

A.   Yeah.  Well, I didn't look at every single source in this case.  Those are sources that I use depending on the -- the specifics who's involved. There are sources that I've researched in the past that help to validate the appropriateness of the prices that I use. The actual sources that I've used in this case are PFR, Fair Health, and the Veterans Administration.

Q.   Okay.  And can hypertension cause strokes?

A.   Yes.

Q.   Can hypertension cause changes in someone's gait?

A.   It can as a consequence of a stroke.  It would not usually cause change in gait by itself.

Q.   Do you know what percentage of patients who suffered a type A aortic dissection die before the surgery?

A.   No.

Q.   Do you know what percentage

**MAGNA**
LEGAL SERVICES

Page 106

of the patients who suffered a type A aortic dissection died during the surgery?

A.   No.

Q.   Do you know what percentage of patients who have a type A aortic dissection have some sequelae after the surgery?

A.   Again, I explicitly say that none of that has anything to do with my testimony.

Q.   Okay.  I'm just asking if you --

A.   I'm not getting into causality --

Q.   Okay.

A.   I'm not getting into causality issues or -- or liability issues.

Q.   Okay.  So the answer to my question is no.  You do not know what percentage of patients who have a type A aortic dissection have sequelae after surgery?

Page 107

A.   I don't know exactly, no.

Q.   And you don't know what percentage of patients who've suffered a type A aortic dissection have the sequelae of strokes.  Correct?

A.   I don't know.

Q.   Did you observe any coordination deficits when you saw him in March of 2024?

A.   I did not.  And again, I think with -- nor would I expect to.  One of the reasons why I requested to do or advised that I think an in-person exam is needed is because the nature of the -- of the neurological deficits in this case are such that it would be difficult to detect over telemedicine.

Q.   But over the telemedicine, you didn't observe any facial or coordination deficits?

A.   Correct.

Q.   And have you scheduled this in-person examination of him?

A.   I discussed it with Counsel

Page 108

and I believe he's -- he's trying to work it out with his client.  There's a question of whether the client can travel to me or whether I should travel to him.  And that hasn't been determined.

Q.   Is the first time you discussed this with Plaintiff's Counsel today?

A.   No, it's in my report.

Q.   I know.  Other than the comment in your report -- let me -- I guess let me ask you this.

Between the date of your report and today, was there any discussion with Mr. Jackson about arranging this in-person assessment of Mr. Welch prior to today?

A.   No.

Q.   What time today did you and he discuss arranging for an in-person assessment of Mr. Welch?  The deposition started at ten o'clock.

A.   We had a number of calls an hour before the deposition.

Page 109

Q.   You had a call at nine o'clock today?

A.   We had two -- we had two different calls during the hour, two or maybe three calls in the hour before the deposition.

Q.   So you and he had two and three phone calls between 9 and 10 a.m. today, and that's when this was discussed for the first time since your report was prepared in March of 2024.  Correct?

A.   Yeah, but I don't have to say the first time.  My report is my communication with the attorneys.

Q.   But you didn't have any communication in between your report and 9 a.m. today about arranging for an in-person assessment of Mr. Welch.  Correct?

A.   Correct.

Q.   And so was it sometime between 9 and 10 a.m. today that you reviewed the neuropsychological report from May of 2023?

28 (Pages 106 to 109)

Page 110

A.  Yes.

Q.  And you haven't spoken to those providers about Mr. Welch. Correct?

A.  Correct.

Q.  And you are not a neuropsychologist.  Correct?

A.  That's correct.

MS. STURTZ:  All right.  I, at this point in time, don't have any further questions.  I just am -- we are by agreement leaving this deposition open for me to depose you based on an examination if that happens and any supplemental reports.  And I will then, of course, request that the defense be given a period of time after that to respond to any supplemental opinions because I know our expert designation deadline is coming up.  So we'll just -- Governor Jackson and I will work that out, but we are leaving

Page 111

the deposition open.  And with that, I don't have any more questions at this time.

- - -

EXAMINATION

- - -

BY MR. JACKSON:

Q.  I just have a couple, Doctor.

Based on your review of Dr. Gorder's report, does that change any of the opinions that you've expressed today or in your report, your preliminary report?

A.  No.

Q.  You had mentioned the differential diagnosis of impairment as the methodology that you used in forming your opinions in this case.  Is that -- and your 30 years of experience and using it as a basis of it being commonly acceptable.

Do you have any other basis for knowing whether that methodology is generally acceptable in the medical

Page 112

community of physiatrists like yourself?

MS. STURTZ:  Objection to form and foundation, but you can answer.

THE WITNESS:  It's the only method that I know of to offer opinions like that.  I don't know that the name differential diagnosis of impairment, it would be the exact name that's given to anybody.  But -- but the underlying principles are exactly what every physiatrist has done.  It's -- that's really day one of physiatric school.

BY MR. JACKSON:

Q.  Okay.  And are those principles used in clinical practice?

A.  Yes.

MR. JACKSON:  Okay.  I have no further questions.

MS. STURTZ:  Okay.  Thank you, everyone, for your time. Thank you, Doctor.  Have a good

Page 113

rest of your day.

THE WITNESS:  Thank you. Bye.

THE COURT REPORTER:  Doctor, right before you go, will you be --

MR. JACKSON:  Thanks, Doctor.

THE WITNESS:  Am I gone?  You need me or are we okay?

THE COURT REPORTER:  You're all set, Doctor.

THE WITNESS:  Okay, thanks.

THE COURT REPORTER: Counsels, just to go over one more time.  You guys are both ordering today's transcript?

MS. STURTZ:  Yes.

MR. JACKSON:  Yes.

MS. STURTZ:  I'll take whatever we usually order.

THE COURT REPORTER: Understood.  And then will the witness be reading or waiving today?

MR. JACKSON:  I'm sorry?

MAGNA
LEGAL SERVICES

Page 114

THE COURT REPORTER: Will the doctor be reading or waiving today?

MR. JACKSON: I will waive.

THE COURT REPORTER: Understood. All right. Thank you so much. I don't have anything else for you guys.

- - -

(Whereupon, the Witness was excused.)

- - -

(Whereupon, the deposition concluded at approximately 11:51 a.m.)

- - -

Page 115

CERTIFICATE

I HEREBY CERTIFY that the Witness was duly sworn by me and that the deposition is a true record of the testimony given by the Witness.

_____
JACOB DAGENAIS, a
Court Reporter and Notary Public
Date: June 12, 2024

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 116

LAWYER'S NOTES

PAGE  LINE

____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____

MAGNA
LEGAL SERVICES

## A

**a.m**
1:16 109:8,17,22
114:14
**abilities**
15:10,14
**able**
66:4 75:24 81:22
82:1
**absence**
74:21
**Academy**
39:5 44:15,20
**accept**
49:20
**acceptable**
111:21,24
**accepted**
39:4,9 53:8 56:20
93:21
**accepts**
49:21
**accessibility**
91:20
**accident**
101:20
**accompany**
35:11
**accomplished**
65:1
**accounting**
32:12 101:10 102:10
**accurate**
32:20 66:17 93:2
**accurately**
66:11
**acid**
81:12
**acknowledge**
103:9
**ACTION**
1:4
**active**
37:23
**activities**

74:7 76:1 82:2 97:23
**activity**
98:8,9
**actual**
105:9
**Acute**
69:11
**add**
39:3,9 102:1,13
**added**
8:5,7
**addendum**
21:14
**additional**
23:9 26:19 27:19,21
28:2,23 29:7 89:21
**Additionally**
37:21
**address**
70:22 86:15
**addressing**
17:15 87:12
**adequate**
57:6
**adhere**
16:12
**adjust**
84:8
**adjusted**
83:13
**adjustment**
85:4,8
**Administration**
73:13 92:6,19 93:9
105:11
**administrative**
11:3 21:11,24 26:5
**admissible**
36:11 54:13
**admission**
41:5
**admitting**
36:1,5
**adopted**
92:5 93:6
**advised**

30:5 69:4 107:13
**advisory**
44:17
**affect**
81:15
**agency**
33:20
**ages**
90:7
**ago**
39:20
**agree**
16:16,20 19:4 44:22
45:4 66:9 79:11,15
79:19 81:17 87:23
94:15
**agreed**
5:3 48:16
**agreement**
6:24 110:12
**ahead**
6:5
**aid**
101:2,5 104:7
**aide**
94:19,22 97:23 98:12
98:15 99:6 100:13
100:24 102:16
**AL**
1:9
**alert**
76:23 77:13,16
**alleged**
88:12 94:21
**allow**
103:11
**allowance**
91:20 93:3
**allowed**
90:9
**alternative**
9:6 103:4
**alternatives**
102:23
**ambulation**
104:15

**American**
44:20
**amount**
21:18 25:11 26:3,8
32:20 92:16
**analysis**
72:12
**and/or**
104:7 115:20
**annual**
40:20
**answer**
4:5 6:5,12,14,17
59:21 66:4 68:12
95:3 106:20 112:4
**antalgic**
97:8,9 103:23
**anticipate**
47:1 57:24
**anticipated**
61:3
**anybody**
112:11
**anymore**
35:23
**anyway**
92:17 93:20
**aortic**
13:11,23 16:6,10,11
16:17,21 17:4,12
18:3,15 19:6,20
50:3 67:14,20 68:6
68:16,22 69:1,6,11
69:17 70:4,10,17
71:1,3,4,9,13,15,20
74:5 75:4,16 81:8
81:19 89:19 99:2,18
100:11 105:21
106:2,6,23 107:4
**Appalachia**
84:22
**apparently**
86:17
**appear**
58:22 60:14 66:1
78:2



**APPEARANCES**
2:1
**appeared**
64:20 65:7
**appears**
78:11
**applicable**
72:7 75:20
**applied**
26:11 70:18,20 72:1
  74:14
**applies**
10:5,9 71:5 93:10
**apply**
13:18 70:8 115:18
**appointment**
62:11
**apportion**
89:12
**apportionment**
101:7 102:20 103:12
**appropriate**
48:19 55:7 88:21
  93:3
**appropriateness**
105:8
**approximately**
32:17 114:13
**architect**
92:12
**area**
19:7,12,13 85:7
**areas**
84:22
**argument**
87:15
**arranged**
24:17 25:2
**arranging**
108:16,20 109:17
**arthritis**
101:18
**artificial**
39:6
**asked**
6:3,8 19:15 59:15

67:6
**asking**
7:2 17:24 61:4 72:4
  94:7 106:12
**Aspirin**
81:11
**assertion**
72:5
**assess**
48:11,24 49:8 68:15
**assessed**
93:24
**assessing**
66:11
**assessment**
32:20 51:8 85:17
  90:18 108:16,21
  109:18
**assessments**
76:20 90:13 92:13
**assistance**
87:1 90:9 96:16 97:3
  99:6,9,15 100:23
  101:13 102:2,3,6,14
  104:7,8,14
**assistant**
62:5,8,13
**associated**
87:14
**assume**
6:6,16 38:18 63:8
  93:15
**assuming**
49:15,17 95:14
**assumption**
72:11 93:11
**attempt**
50:3
**attendant**
94:19,22
**attention**
51:13
**Attor**
24:21
**attorney**
1:5 20:13 21:10

24:22
**attorneys**
36:20 109:14
**author**
34:11
**authored**
38:21
**authoring**
60:18
**available**
15:14 30:14 79:17
  84:5
**average**
7:15 68:5 83:12,15
  84:8 85:1,7 86:5,6
**avoid**
74:6
**aware**
15:21,24 25:8,10
  26:22 63:6,11 67:16
  100:1,3,8,21 101:4

---
**B**
---

**B**
3:11
**back**
46:10,21 60:19
**background**
55:22
**backgrounds**
54:1
**balance**
86:21 104:3
**ballpark**
33:15
**Baltimore**
2:9
**bar**
42:20
**based**
54:6 60:19 66:10
  72:8 73:17 75:8
  89:1 110:14 111:9
**baseline**
73:12
**basic**

62:6 75:24 78:12
  82:2 98:8
**basically**
26:9 41:24 83:13
  85:3 96:19
**basing**
73:4
**basis**
15:11 41:4 56:12
  85:16 90:21 91:13
  111:20,22
**bathing**
98:3
**bedroom**
65:18
**began**
39:21
**beginning**
31:13
**behalf**
12:16
**believe**
13:13 20:14 22:2
  25:21 26:1,8 27:13
  28:22 29:3,4 33:4,4
  35:3 54:15 63:5
  67:24 73:6 81:13
  82:11 84:16 86:3
  91:5 108:1
**believed**
20:7
**believes**
72:15 74:18
**belong**
44:12,14,19
**best**
103:2
**best-case**
102:11
**better**
49:16
**beyond**
19:7,11,13 30:18
  33:17
**big**
66:23



**bill**
23:21,21 25:5 27:18
**billed**
21:15,19,24 22:12
**billing**
21:5,8
**bills**
21:10
**bit**
33:1
**blindly**
75:6,9
**blood**
74:8 81:1,5 100:15
**board**
41:15 42:18 44:18
**book**
35:4,7,9 83:20
**Brandywine**
85:11
**breach**
50:5
**break**
6:20 32:4 46:4
**briefly**
64:23
**budget**
93:10
**build**
34:13
**Bye**
113:3

---
**C**
**calculate**
34:9
**calculation**
52:1,2 103:19
**calculations**
83:17
**calendar**
32:16 91:10
**call**
9:17 10:1 31:4,21
47:10 56:10 61:24
62:15 64:7,11 109:1

**called**
8:18 9:14,21,23
20:20 43:18 53:3,11
69:10 83:1,5,10,10
**calls**
108:23 109:4,5,8
**cardiac**
81:12 87:3,6,24
88:11 99:23,24
**cardiologist**
69:15 75:2
**cardiology**
87:24
**cardiothoracic**
69:15 75:2 99:20
**care**
8:22 10:1,11 14:10
14:24 24:18 50:1,5
79:21 88:12,15,22
89:1,3,4,10,12,21
90:23 91:2,4 92:4
93:6,21 94:10,11,19
94:23 96:22 100:17
**caring**
11:6,9,13
**case**
10:6,10 13:19,21
14:11,15,18 15:6,8
15:23 18:1 19:14,16
20:15,18 21:6,17,20
22:7 23:10,13 24:7
25:11,23 26:2,6,10
26:11,11,13,20
27:10 28:2 36:24
37:5 47:9 48:8 52:4
52:18,22 54:16 55:9
55:12 56:1,3,23
58:18 59:2 67:7,9
67:22,23,23,24
68:12 70:9,19 71:6
71:8,11,18 72:1,2,7
72:18 73:18 79:22
88:9 100:15 102:15
102:18 103:2,2,5,6
105:1,3,10 107:15
111:18

**cases**
9:24 12:24 18:9
19:24 20:3,7 24:10
24:11 33:21 35:14
36:18
**categories**
51:12,23 96:2,12
97:14 104:20
**category**
96:4 97:8 98:13
**causality**
87:13 106:15,18
**causation**
13:22 14:14 49:10,16
**cause**
74:7 105:13,15,18
**caused**
50:5
**cell**
82:9,13
**CENTER**
1:9
**cerebell**
49:22
**cerebellar**
13:16 14:2 86:17
**certain**
18:10 84:1
**certainly**
8:10 12:1 17:7,18
18:6,11 30:22,23
70:9
**certainty**
23:19 32:11
**certificate**
8:8 40:5,6,13 42:17
42:22 43:9 44:1
115:1
**certificates**
39:22 41:2 42:10,14
42:15
**certification**
5:6 40:7,18,21 41:10
41:15 42:19 43:1,16
44:7 115:17
**certified**

39:15,17,19,21,24
40:1 41:9,17 42:3
43:5,22
**CERTIFY**
115:4
**certifying**
115:21
**chance**
58:6
**change**
59:6 60:4 105:19
111:10
**changed**
88:11
**changes**
105:16
**chapters**
35:2
**charged**
22:5 25:22
**charges**
25:10 33:12
**Charles**
2:8
**check**
29:4
**choose**
57:21
**chronic**
96:23
**circle**
65:12
**circumstance**
58:4
**city**
37:21
**CIVIL**
1:3,4
**claiming**
59:2
**clarify**
7:4 13:19 36:17 41:1
42:24
**clarifying**
38:4
**class**


MAGNA
LEGAL SERVICES

35:11
**clear**
9:11 49:6 59:11
**clearly**
49:12 89:6,7
**clerical**
23:1,2
**client**
108:2,3
**clinical**
7:23 32:13 33:9
112:18
**clinically**
18:8,10,14
**clonidine**
80:24
**Code**
83:14 84:10 85:8,10
**cognition**
51:3,17 86:22
**cognitive**
86:18 89:14 90:5
**Columbia**
1:2 54:12 56:19
**come**
83:18 95:7 96:11
**comes**
13:23 59:13
**comfortable**
60:17,24 90:18
**coming**
110:22
**commencing**
1:15
**comment**
108:11
**committee**
54:24 55:5
**common**
90:4 93:20
**commonly**
111:20
**Commonwealth**
1:18
**communication**
24:14 25:1 109:14,16

**community**
93:7,22 112:1
**comorbidities**
103:1
**comorbidity**
103:6
**company**
24:3
**compared**
85:7
**competing**
42:15
**compile**
35:6
**complaint**
48:8
**complete**
6:16
**completely**
22:21
**completion**
22:9
**complicated**
89:9
**complication**
87:21
**complications**
19:5,20 71:19 81:9
88:1 89:2,15,18
99:4,12,15,18
**concede**
88:18
**concluded**
92:24 114:13
**conclusion**
48:21 57:5 65:6
**condition**
66:13 89:1 101:24
**conditional**
67:13
**conditions**
66:18 102:13
**conference**
1:15
**confirms**
60:13

**connected**
9:1
**Connecticut**
84:18
**consensus**
44:18 54:5,21 68:18
74:13
**consequence**
17:10,21 105:17
**consider**
75:10
**consideration**
79:13,17
**considered**
35:10
**considering**
46:21
**consistent**
55:16
**consultations**
15:17
**consumption**
22:20
**contact**
50:7
**contacted**
47:8,11,12 48:17
**content**
39:13
**context**
19:2 67:2,5
**contingency**
26:4
**continuing**
44:10
**contractor**
92:12
**control**
115:20
**cooperative**
66:7
**coordinated**
24:15
**coordination**
107:8,20
**copy**

24:20 38:19
**cord**
13:15 14:4 16:14
17:9 18:23 49:23
73:20 89:7 91:19
96:7 101:14
**core**
34:7
**corporate**
9:4
**corporation**
8:17,21 9:9,19
**correct**
11:19,20 12:5 14:11
14:12,15,16,20,21
14:24 15:1,3,19,20
15:23 16:7,18,22
19:21,22 25:20,24
26:23 27:2,3,5,6,13
28:6,7 29:12,13,16
29:17,20,21 30:1,2
31:6,7,19 32:1
35:19,23,24 36:3,4
36:7,8 37:8,9,11,12
38:7,8,12,15 43:7
43:23,24 47:5,6
48:5,13 49:2 50:20
51:9,10,14,15,18,19
53:13 57:14 60:20
61:23 62:16,17 64:3
65:10,13 71:9,13,16
71:21 73:2,3,9,10
76:1,4,5,7,14,15,17
76:20,21 77:9,12
80:2,3,18 81:23
82:4,5,7,8,10,22,23
85:13 87:4,8,9 88:2
89:23 91:11,12,22
91:23 94:1,2,17,20
94:21 95:4,5,13,20
97:9,12,17 101:2,3
103:21 104:21,22
107:5,21 109:11,19
109:20 110:4,5,7,8
**cost**
25:6 32:12 83:19,24



85:6
**counsel**
5:3,16 107:24 108:7
**counselor**
15:12,18,22
**Counsels**
113:13
**count**
33:12
**counted**
33:13
**countless**
18:7
**couple**
36:18 39:20 111:8
**course**
34:21 41:21,22 42:2
42:9 43:10,13
110:17
**court**
1:1,17 5:15 45:11
56:19 57:3 113:4,9
113:12,20 114:1,4
115:11
**courtesy**
35:20
**cousin**
63:4 82:7
**covered**
104:18
**COVID**
34:23
**CPLCP**
43:18,22 44:1
**create**
45:2
**created**
53:4
**cri**
55:19
**criteria**
55:8,13,14,19 56:1,8
**current**
30:13 38:18 55:5
93:8,17
**currently**

11:6 35:17 43:2 94:1
**cut**
6:11 103:14,16,17
**CV**
37:14 38:5,16,19,24
39:9,14 42:24

---
**D**

**D**
3:2
**D.C**
2:4 57:4
**DAGENAIS**
1:17 115:11
**daily**
76:1 82:2 98:9,10
**damages**
14:1,24 19:15
**Daniel**
63:7,9
**database**
83:9 95:23
**date**
1:16 11:21 15:16
27:10 28:3,3 31:14
31:15,18,19 58:7
77:19 108:13
115:12
**dated**
25:6 28:22 31:6
38:17 47:9
**Daubert**
53:9 54:11
**day**
112:14 113:1
**DBAs**
8:20,21 9:5
**DC**
37:8,11 38:7
**deadline**
110:22
**deadlines**
36:21
**deal**
58:8
**debatable**

81:16
**debate**
11:23
**decide**
97:6
**decided**
42:13
**decision**
88:17
**deconditioning**
18:24
**defendant**
12:18 45:3
**Defendants**
1:9 2:10
**defense**
44:3 110:18
**defer**
69:14 75:1,6,9 88:4,6
99:20
**deficit**
78:6 90:6 95:17 96:3
97:11 104:5,12
**deficits**
51:24 60:11,15 77:21
86:17,18,19 96:12
107:8,15,20
**definite**
88:16
**definition**
102:22 103:23 104:4
104:11
**degree**
6:22 7:3 23:19 32:11
**delayed**
52:1
**delete**
88:13,21
**Delphi**
54:18,20 55:2,8,12
55:13,19 56:1,8
**deny**
70:2,6
**depending**
30:24 95:1 105:4
**depends**

33:11 66:21 67:10
97:24
**depose**
110:14
**deposed**
7:10
**deposition**
1:13 4:2 5:23,24
21:14 22:11 26:23
27:1,7,23 28:4,5,9
28:13 39:13 59:9
80:1 108:21,24
109:6 110:13 111:1
114:12 115:6
**depositions**
7:16
**DESCRIPTION**
3:14
**designated**
15:22
**designation**
19:13 110:21
**detailed**
51:5
**detect**
107:17
**determination**
90:17
**determine**
49:18 50:3 67:12
92:8
**determined**
108:5
**develop**
86:9 101:11,12,17,18
102:12 103:5
**developed**
11:14
**deviation**
88:12
**diagnoses**
13:18 72:8
**diagnosis**
52:16 53:5,11,15
56:11 96:8 111:16
112:9



MAGNA
LEGAL SERVICES

die
70:10,12 105:22
died
106:2
difference
17:14 25:18 41:7
different
8:15 53:21 55:10
57:3 78:19 80:8
95:7 98:13 109:4
differential
52:16 53:5,11,15
56:11 96:8 111:16
112:8
difficult
107:16
difficulties
86:21 104:1,3
difficulty
82:21
direct
115:20
Direction
4:5
directly
20:16 21:7,15
dis
42:8
disabilities
101:17
disability
49:24
disagree
15:4
discovery
36:20
discuss
108:20
discussed
82:11 107:24 108:7
109:9
discussion
108:15
disease
99:23,24
dissection

13:11,23 16:6,11,17
16:21 17:4,12 18:3
18:15 19:6,21 50:4
67:14,21 68:7,17,22
69:1,6,12,18 70:5
70:17 71:1,3,9,13
71:15,20 73:19 74:5
74:9 75:4,16 81:8
81:19 87:7 89:19
99:3,19 100:11
105:22 106:2,7,23
107:4
dissections
70:11
distances
65:8
District
1:1,2 54:12 56:19
57:3
DIVISION
1:3
doctor
76:6 111:8 112:24
113:4,6,10 114:2
document
30:20 34:12 38:22
Documents
4:10
doing
6:4 7:19,20 11:10
49:10 82:3 97:23
dollars
33:7
Donna
2:7 5:22
Donna.sturtz@nel...
2:9
dozen
18:16,17
Dr
5:21 28:19 29:2,10
31:10 47:19,19 48:1
48:3 111:9
drafting
47:3
dressing

82:3 98:3
drowsy
77:16
due
58:2
duly
5:12 115:5

——————————————
E
——————————————
E
3:2,11
E-B-O-N-E-E
57:1
e-mail
24:13,19,23
earlier
49:7 54:24 96:10
earliest
31:17
earn
31:8 32:2
earned
32:7,17,21
Ebonee
57:1
education
44:10
educational
34:3 42:1
effects
14:8 17:20,23 18:20
18:22
efficient
93:1
eight
10:18 33:6
either
16:11 45:2 84:17
94:23 104:2
El
47:19
Elakil
29:2,10 31:10
Elakil's
47:20 48:1,3
Elkeli's

47:19
emergency
71:16
EMG
8:23 9:24
employees
10:15
employer
63:19
employment
80:17
entire
90:23
entirely
23:3
entities
9:1,4
entity
8:13,15 10:3,5,7
equal
12:19
equally
93:2
equivalent
98:24
ESQUIRE
2:3,7
essentially
26:15 52:13 92:3
103:14
establish
52:15
established
12:1
estimate
20:6 22:14 23:17
32:6,10 33:11,22
35:16 62:3
ET
1:9
ethics
43:20
evaluate
48:11
evaluation
30:1 48:23 51:4 64:5



86:23
**event**
42:12
**eventually**
90:15
**evolves**
9:15 95:2
**exact**
13:1 15:13 25:11
50:15 112:10
**exactly**
12:10 14:19 20:5,10
33:3 50:23 61:4
65:11 91:24 92:8
107:1 112:12
**exam**
11:24 30:16 31:1
43:11,15 50:9,16
78:12 107:13
**examination**
5:18 42:4 60:9 77:23
77:24 78:1 107:23
110:14 111:5
**examinations**
38:1
**examine**
57:19 59:7,23 60:4
**examined**
5:13 11:22
**examining**
47:1
**Excel**
83:1
**exclude**
45:1
**excuse**
14:2
**excused**
114:10
**Exhibit**
3:15 45:12,13,17
**existed**
9:19
**exists**
84:17
**expect**

59:4 72:17 107:11
**expectancy**
34:10 66:12 67:13,17
67:19 68:4,5,11,15
68:21 69:1,5 70:18
71:3,24 72:6,10,12
72:13,16,24 73:1,8
73:12,14,23 74:19
91:7 95:15 100:23
**expected**
74:23
**expenses**
33:13
**experience**
53:17 54:7 57:16
91:16 94:3 96:13
111:19
**experiences**
96:5
**expert**
15:3,23 20:23 21:12
24:21 29:11 33:20
44:22 48:1,4 70:19
74:17,22 88:8 100:8
110:21
**expertise**
19:8,12 48:20
**ExpertPays**
23:23 24:2,3,6,14
25:3,5,9,17,22
26:12,14
**experts**
20:20 72:15 88:7,20
**explicitly**
30:21 106:9
**expressed**
111:11
**extends**
90:23
**extent**
48:12,24 49:8,18

_____
F
_____
**facial**
107:19
**fact**

49:21
**facts**
44:23
**fair**
44:24 58:13 105:10
**fairly**
90:18
**fall**
97:2,19,19 98:2
104:14,19
**familiar**
18:11 54:17 55:4
69:9 83:21
**family**
63:16
**favoring**
45:2
**fee**
21:2,11,24 22:5,8
25:14,22 26:5,16,18
27:8,24 40:4 41:19
43:7 83:8,12 93:8
**feel**
58:23 78:1
**feels**
70:20
**fees**
25:10 83:11,14
104:23
**fellowship**
76:4
**felt**
60:17,23
**fictitious**
9:7
**FIG**
39:21 40:3,4,18,19
40:24 41:17,22,24
41:24 42:6,8,8,9
43:3,6,8,12 44:5,7
**FIG's**
40:6
**figure**
15:13 92:20
**file**
28:15 45:5

**filing**
5:5
**fill**
46:17
**filled**
46:13
**final**
57:22 58:1 59:3 61:3
61:11,19
**finally**
6:21
**find**
68:12 69:8 70:16,23
70:24 71:2,4 73:7
73:21 74:1
**finding**
76:22
**fine**
46:3 94:9
**finish**
6:14
**finished**
38:9
**fir**
34:21
**firm**
27:4
**first**
47:8,11,12,14 77:2
91:4 94:12 108:6
109:10,13
**five**
28:11,14 40:11 86:9
90:1,2,12
**flat**
22:5,8 23:22 27:8
**flows**
8:16
**focal**
77:20 78:3,5
**focus**
48:15
**focused**
94:7
**Folic**
81:12


MAGNA
LEGAL SERVICES

followed
30:9 85:20
following
70:4 71:19 75:4 92:7
follows
5:13
followup
87:23 88:10
foregoing
115:17
foremost
91:4 94:12
forensic
7:19,22 8:1,12 9:24
11:10 12:4 18:9
34:5
form
5:8 46:17 52:4 112:3
formal
8:7
formally
8:4,9
formed
10:13
forming
47:4 79:11,15 111:17
forms
34:5 46:13,18 50:6
63:21
forth
53:20,23 59:18
forwarded
24:22
found
56:20 57:8
foundation
53:6,8 112:3
four
92:1
fractures
101:20
frankly
17:13 41:1 90:15
frequencies
91:15
frequency

88:10
full
6:16
function
55:15,20
fundamentally
34:19
fundamentals
13:18
further
8:10 110:11 112:21
future
14:24 22:11 50:1
86:20 94:14 96:15
102:9 104:21

---
**G**
---

gait
64:21 65:7 86:22
95:17 96:2,12 97:9
101:2,5 103:23
104:5,7,11 105:16
105:19
general
55:13 66:10
generally
96:14 111:24
generated
26:19 27:9
Genworth
95:24
geographically
84:9
getting
62:14 106:14,17
girlfriend
82:7
give
7:16 33:15 60:10
93:4 103:22
given
30:10 67:13 81:7
86:11 89:6 92:10,10
110:18 112:10
115:7
giving

6:12 102:23
gjackson@govern...
2:5
glad
67:7 70:21 74:20
go
6:1,5 21:6 34:18
44:11 64:1 73:15
84:1 87:6 92:13
113:5,13
goal
79:19
goes
8:20 9:8 10:2 21:9
74:15 82:6 90:22
going
6:6,15 14:9,13,17,22
15:5 45:11 51:3
60:4 86:4 91:6
93:13 96:19 103:7,7
good
112:24
Gorder
28:19
Gorder's
111:10
Governor
2:2,3 19:24 20:3,16
110:23
greater
7:6
grocery
82:6
gross
33:12
ground
6:1
guess
13:2 20:9 28:11 49:7
108:12
guidelines
44:18
guys
113:14 114:7

---
**H**
---

H
3:11
half
103:14,16
handheld
104:6
hands-on
104:14
happened
14:5 18:5,8 47:10
62:19 87:16 88:2
happens
26:9 110:15
happy
6:13
HARGROVE
1:4
he'll
45:21 86:6 97:19,19
health
81:15 94:18,22 97:22
98:12,15 99:6
100:13,24 102:16
105:10
healthcare
37:5 63:13
hear
6:3
heard
6:7
hearing
54:12
held
1:15
help
13:19 22:22 54:10
81:15 96:18,21
103:3 105:7
helpful
67:10 90:10
helping
21:11 98:2,3,4,5,6
helps
13:20 20:20
hematoma
17:23



**Hi**
5:21
**high**
81:5 85:4,5 97:4,10
98:8 104:13
**higher**
33:1,2 83:15 84:20
**highest**
84:16
**history**
17:4 18:3 62:6,14
71:8,12 73:9,17,19
81:8
**hold**
45:12
**home**
41:20 62:20 64:2,5
82:4 85:11,12 91:20
91:22 92:10,22
93:11,13,17,24
94:18,22 97:22,22
98:12,15 99:6
100:13,24 102:16
**home-study**
41:21
**hospital**
1:9 35:18,21,23 36:2
37:19
**hour**
27:18 62:10,13 95:22
108:24 109:4,5
**hours**
11:5,8,9,12 12:3 22:7
22:14 23:5,7,12
27:14,15 28:11,14
**hundred**
27:12 33:7 101:8
**Hundreds**
12:9
**hydralazine**
80:23
**hypertension**
81:10 100:7,10
105:12,15
**hypothetically**
87:20,20

**I**
**I-R-A-D**
69:10
**ICHCC**
39:19,24 40:2,3,8
42:7 43:15
**identification**
45:18
**identified**
78:2
**identify**
73:16
**III**
2:2,3
**impact**
100:22
**impacts**
90:8
**impairment**
52:17 53:6,12,16
56:12 86:10 96:9
101:12 111:16
112:9
**impartial**
44:24
**imply**
49:9
**important**
86:1 91:1
**in-person**
30:16 34:20,20 41:21
41:22 107:13,23
108:16,20 109:18
**inadvertently**
6:11
**include**
6:22 8:21 72:23
73:18 87:10 89:4
**included**
22:23 27:24 51:11
52:8 72:23 93:19
**includes**
21:13 28:16 44:16
73:19,20
**including**

22:10,11 82:3 91:14
**income**
8:16 33:5
**incorrect**
24:18 76:8
**increase**
74:7
**increased**
8:3
**increasingly**
7:21
**incurred**
48:12 49:1 87:21
**independent**
37:24
**independently**
80:5,9
**INDEX**
4:2
**indicated**
68:1 73:6,17 81:21
**indicates**
73:22
**individual**
78:9
**individuals**
42:3 93:4
**infarct**
14:2,4 16:14 18:23
49:23 73:21
**infarcts**
13:16
**inform**
15:11
**information**
29:8 45:1 63:22 73:7
79:13,17 88:23
**initial**
21:8,22 22:1,5,9,15
22:18 23:6,9 26:15
26:18 28:16 29:6
30:6 40:12,13
**initially**
9:11 40:14 47:23
48:17
**injur**

24:13
**injuries**
48:12 49:1,8,19
91:19 92:23 96:7,24
**injury**
13:8 14:7 17:9 79:22
85:24 89:7 93:5
94:5 96:14 97:1
101:15
**input**
90:8
**insight**
60:10
**instance**
17:1
**instrumental**
98:9
**intact**
78:5,14
**intellectual**
11:1 22:20 52:14,15
**intelligence**
39:7
**intend**
58:10 59:4,16
**intended**
51:1
**intent**
58:19
**intentionally**
58:21
**interact**
103:7
**interacted**
24:5
**intermediary**
20:19
**International**
44:14 69:11
**interpreted**
49:9
**interview**
46:12 50:12,13 75:23
**invoice**
23:8 25:17 26:19,21
27:8



**invoices**
27:9
**involved**
18:10 43:20 58:3
70:12,14 105:5
**involvement**
42:6
**involves**
12:23 71:8,11,18
**involving**
13:10
**IRAD**
69:10
**Island**
84:17
**issue**
39:21 42:10,16 56:18
79:22 92:19
**issues**
36:19,21 43:8 57:20
86:10 87:13 100:19
100:19 102:7,8
106:18,19
**item**
29:1 35:9
**itemized**
52:19

### J

**Jackson**
2:2,3 3:7 19:9,24
20:3,16 24:22 36:13
45:21 56:16 58:14
59:20 60:6,21 66:14
69:20 108:15
110:23 111:7
112:16,20 113:6,17
113:24 114:3
**JACOB**
1:17 115:11
**January**
47:13,18,23 48:5
60:20
**job**
15:12
**Johnson**

57:1
**Jonathan**
62:5,9,10,13 63:5
**judge**
36:11
**judgment**
85:19
**jumped**
8:10
**June**
1:11 31:13 48:13
49:1 80:6,11 115:12
**jury**
97:6

### K

**Kaplan**
1:14 3:5 5:11,21 8:22
8:22 9:23 10:1,11
**karate**
75:3
**keep**
44:6
**kept**
9:18
**KEVIN**
1:6
**key**
42:16
**Kim**
20:1
**know**
5:23 6:5,13,15,20
12:9 18:5 21:23
23:5,7,12,23 25:9
27:15 30:23 33:3,14
33:14 40:10 51:20
55:23 56:23 57:2,7
58:3 62:21 63:3
65:15,17,20 66:15
74:12,12 77:17,18
77:18 78:22,23 79:1
79:2,5,6,9,10 80:13
80:14,21 82:17,19
87:14 88:3,14,23
90:13,14 91:9 98:18

99:1,16 100:5,18
105:20,24 106:5,21
107:1,2,6 108:10
110:21 112:6,7
**knowing**
111:23
**knowledge**
36:9,12,16 93:23
**known**
19:5,19 33:20 95:23
99:4,17

### L

**labetalol**
80:24
**language**
51:13
**lapse**
40:8
**largely**
13:24
**latest**
31:14,17
**laundry**
98:5
**LAW**
2:2
**LAWYER'S**
116:1
**lead**
87:1 88:10
**leaving**
110:12,24
**legal**
1:23 42:20
**legally**
10:7
**letterhead**
10:10
**level**
97:24 98:16,23 102:4
102:21
**levels**
95:8
**liability**
13:22 49:17 87:13,17

106:18
**license**
37:22 44:9,11 56:5
56:10
**licensed**
11:4 37:10 98:18
**licensure**
38:4 55:16,18
**lien**
24:3,10,17 25:3,10
25:22 26:10
**life**
8:22 9:15 10:1,11
34:9 66:9,11,22
67:13,17,19 68:4,5
68:11,15,20,24 69:5
70:17 71:3,24 72:6
72:10,11,12,16,24
73:1,8,11,14,23
74:19 88:22 90:23
91:2,3,7 92:4 93:6
93:14,21 94:10,11
94:24 95:1,12,14
99:7 100:22
**lifecare**
8:5,6 10:20,21,24
11:15 12:7,15,22
13:6,9,15 16:1,4,10
16:13 17:2,8,14,19
18:6 20:12 25:7
30:7,8 34:4,8,13
39:15,18,22 41:4,5
41:8,11,12,14 42:4
42:22 43:11,17 44:2
44:16,19 53:20,22
53:24 54:2,4,23
55:3,14 79:12,16,20
**lifestyle**
75:14
**lifetime**
40:5,6 86:7,14
**light**
78:13,18
**limb**
76:23 77:10
**limit**



102:1
**limitations**
16:2 75:15
**limited**
14:23
**limits**
64:21 65:8
**limp**
103:24
**limping**
104:2
**line**
4:6,6,6,11,11,11,16
4:16,16,21,21,21
88:14,22 116:2
**list**
20:23 33:16,19
**listed**
42:23 47:16 52:6
94:23
**listen**
75:7
**listing**
22:22 25:6 103:2
**literature**
57:12 58:10 59:17
68:9,10,14 70:3,7
70:16,17 71:1,2,5
72:9 73:15,22,24
74:1,13 75:9
**litigated**
56:18
**litigation**
11:15 12:8,17 19:2
19:24 92:11
**live**
35:22 93:13
**lived**
80:6,12
**lives**
63:2,3,7
**living**
65:18 76:1 80:5,9
82:2 85:6 98:9,10
**LLC**
2:2

**locate**
20:20 21:11
**long**
42:2 58:4 62:2,7
74:14 84:17
**long-term**
80:19 85:20 100:17
**look**
17:6,22 20:4 52:19
52:21 67:4,7 70:7
70:15,21 84:9,15
104:24 105:2
**looked**
37:3
**looking**
14:4 82:24
**looks**
24:12
**Losartan**
80:23
**loses**
26:2,12,13
**lot**
94:6 98:20
**lots**
70:11,12,13
**low**
97:4,7
**lower**
98:23
**lowest**
98:16
**lump**
24:8

---

**M**

**M.D**
1:14 5:11
**MAGNA**
1:23
**maintain**
44:6,8
**major**
99:12
**majority**
13:4,5 24:24 96:24

**making**
88:15 90:18 104:21
**malfunction**
100:1
**malpractice**
12:24 13:7 17:11,21
**manage**
89:14
**management**
89:8
**manual**
78:8
**March**
31:21 38:17 45:15
47:10,20 48:22 50:8
51:8 60:18 62:1
75:23 107:9 109:11
**marked**
4:20 45:18
**marketing**
9:8
**Marvin**
63:4,5
**match**
20:19
**material**
28:23
**materials**
47:15,18,23
**matter**
9:10 41:2 70:22
87:16 93:11
**maximum**
96:21
**MD**
2:9
**mean**
6:13 7:5 46:2 76:24
77:21 78:6,14 87:5
103:13
**means**
59:8 77:5,7,10,13,16
77:17,22 83:13
84:10 86:5 103:15
103:24 104:1
115:19

**measure**
78:20
**measures**
34:7
**Med**
24:16
**medical**
8:14,18,23 9:15,17
9:21 10:8,13,16
12:24 13:7 17:3
18:2 23:19 29:15,19
30:18 31:5,22 32:11
32:13 37:4,22 38:1
38:9 44:10,11 50:1
56:5,10 62:6,14
71:8,12,16 73:9,15
73:17,21 90:12
101:24 102:13
111:24
**medications**
80:19 81:3,4,7,18
**medicine**
37:8 39:6,7 44:9,20
53:7 57:16
**medicolegal**
32:3,8,21 33:10
**MedQuest**
20:21,22,24,24 21:3
21:6,9,10,19,21,23
24:4,9,15,16,16,20
25:2,2,15 26:4
33:18 35:13,15
**MedStar**
1:8 28:19,21
**meeting**
36:20
**member**
42:20 44:17
**mental**
50:15
**mental-status**
50:9
**mentioned**
98:1 111:15
**merits**
37:1



met
62:4
method
112:6
methodology
52:16,23 53:2,4,10
53:15,19,24 54:11
54:18,20 55:3,24
56:2,5,9,11,13 57:5
96:8 111:17,23
might've
66:23
mild
97:8,9 102:21 103:23
103:24
million
33:6 103:16
mine
11:2 22:21 23:3
minimum
96:20
minutes
62:4,14
misrepresentation
58:24
misunderstanding
59:12
MMSE
50:16,24 51:7,12
mobility
104:15
moderate
95:17 96:2 97:10
102:21 104:5,11
modifications
92:9,17,21 94:1
modified
93:17
money
9:8 92:16 98:20
monitor
100:15
Monroeville
9:18,23
motor
77:20,23

move
93:17
moving
9:16
Mullins
2:7 20:11,13
multiplier
83:6,9,19,24 84:16
84:19
multiply
84:13
muscle
78:8
muscles
78:10

— N —

N
3:2
name
5:21 53:3 56:22,24
112:8,10
named
63:7,8
names
9:6,7
narrative
47:20
national
83:12,15 84:7,14,24
85:7
nature
107:14
NE
2:3
near
35:22
necessarily
57:24
necessary
30:15 85:23 89:13
98:21
need
6:19 16:12 44:8
85:17 86:6,8,24
87:1,6,23 88:22,23

92:11 93:16,24 94:8
94:16,19 95:6,17
96:19,21 99:15
100:13,14 102:13
102:15 113:8
needed
90:15 92:10 107:14
needing
89:10
needs
14:24 54:6 90:9 91:3
94:11 95:11 102:5
103:3
negative
72:5,21 74:23
Nelson
2:7 20:11,13
nephrology
100:20
nerves
78:11
net
33:12
neurologic
76:19
neurological
14:7 17:20 78:12
89:15 96:23 100:4
107:15
neurologically
94:14
neurologist
76:9,13
neurology
79:1
neuropsych
29:24
neuropsychological
60:12 89:24 109:23
neuropsychologist
90:11 110:7
neuropsychology
28:18 29:8 51:4
neutral
12:21
never

11:21 12:1 30:9
36:16,23 37:7 91:21
news
18:12
nine
10:18 109:1
nonphysicians
41:12
normal
50:19 51:17 64:21
65:7 66:1 78:11
Notary
1:18 115:11
note
50:14
noted
30:15 46:23 75:22
82:20
notes
3:15 34:18 35:8,10
45:5,6,8,13 46:11
50:7,11,12,22 116:1
Notice
1:14
nuanced
16:9
nuances
70:12,13
number
8:19 17:7 20:2 22:6
81:3 84:2,22 101:17
103:13,19 108:23
numbers
13:1 32:5
numbness
77:6,8
nurse
98:19,19 100:14

— O —

o'clock
108:22 109:2
Objection
19:9 36:13 56:16
58:14 59:20 60:6,21
66:14 69:20 112:2



objections
5:7
observe
107:7,19
Obviously
26:3
occasions
34:6
occur
86:14 88:13 94:4
101:22 102:6
occurred
14:19 17:10 49:19,23
occurring
94:23
offer
42:13,15 61:2 72:9
92:13 112:6
offered
42:2 100:9
offering
13:21 14:10,14,18
15:5,7 60:24
OFFICE
2:2
oh
31:16,16 41:16 77:4
89:6 103:18
okay
6:9,17 7:8,24 8:24
11:5 14:9 15:16
17:24 18:8 22:13
23:4 25:4 26:17
28:1,20 29:10 32:2
33:16 35:13 37:3
39:14 41:16,23 43:2
43:4,21 44:4 45:10
45:22,23 47:22 48:2
48:10,21 50:6 54:14
55:23 56:7 58:16
61:12 70:9,13 71:7
72:22 74:4 77:5
80:10,23 84:4,12
85:14 86:12 87:2
89:24 91:8 94:15
95:3,21 97:7,21

98:11,17 99:16
102:19 103:18,20
104:10,23 105:12
106:12,16,20
112:17,20,22 113:8
113:11
old
93:12 95:18
older
86:20
one-time
40:19
ongoing
89:8 90:21,21
open
45:12 110:13 111:1
opine
75:11
opining
97:15
opinion
7:1,2 15:11 72:24
73:5 75:7 88:6,9,15
89:20 94:3 95:11
100:9
opinions
14:10,14,18,22,23
15:6,7 36:10 47:4
52:4 59:1 60:3
88:19 110:20
111:11,18 112:7
opportunity
57:19 59:7
Oral
1:13
order
92:8 113:19
ordering
113:14
organization
42:1 69:10
organizations
53:21,23
orientation
51:12
oriented

76:24 77:13,17
OT
91:8 92:12
outcome
26:6 31:1
outlined
47:4
outside
19:2 74:15

---

P

P-A-R-E-S-T-H-E-...
77:3
page
3:5,14 4:6,6,6,11,11
4:11,16,16,16,21,21
4:21 47:16 52:6
80:22 84:1 116:2
pages
29:24
paid
21:21 25:16,19 26:3
26:4,5,9,15 27:2,4
pain
104:2
para
77:4
parameters
58:5
paresthesia
76:23
paresthesias
77:4,7 81:15
Parker
20:1
parsed
58:21
part
10:16 17:3 18:2
50:12,13 83:2 87:17
participation
25:23
particular
67:8 81:2,5
parties
5:4 12:21

partly
102:16
parts
78:12
passed
43:10
pathology
30:14,19
patient
11:18 13:10 16:5
17:3,20 57:19 59:23
60:5 62:11 74:18
77:5 85:23 100:2
patient's
18:2 78:8
patients
9:20,22 11:7,9,13,14
18:7,13 19:1 74:6
76:11 81:4 85:21
91:17 96:6,13,23
97:1 105:21 106:1,6
106:22 107:3
pay
15:15 21:2 26:6 40:4
41:18
paying
43:6
payment
26:24 40:19,20,23
PC
8:19 10:8
pending
88:19
Pennsylvania
1:19 9:13 37:20,21
peo
70:10
people
11:2 43:9 70:10 80:7
80:12 81:13 96:21
101:11,12
percent
7:5 13:3 27:12 33:8
70:5 83:15 84:20,24
85:9 101:8,9 103:12
103:19



percentage
12:16,20,23 99:5
101:7 105:20,24
106:5,22 107:3
perceptual
86:18
perform
34:8 50:16 54:3 75:3
75:24 82:1
period
68:8 110:18
person
34:24 46:16,17,19,21
47:1 57:20 59:8,24
90:7 98:13
Personal
13:8
pertinent
65:19
PFR
83:6,10,19,20,24
105:10
phone
47:10 61:24 82:9,12
82:13 109:8
photographs
64:13
physiatric
112:14
physiatrist
41:6,13 53:18 55:21
85:20 90:16 91:6,17
94:3 112:13
physiatrists
54:9 96:6 112:1
physiatry
41:14 55:21
physical
15:10 39:5,7 44:20
53:7 57:16 60:9
77:24 79:8 87:1
96:16 101:12
102:14 104:8
physician
10:23 43:17 54:6
57:17 78:2 83:8

85:15 89:13 104:23
physician-patient
12:2
physicians
34:4 72:14
pinprick
78:19
Pittsburgh
9:14,16
places
33:17
plaintiff
1:6 2:5 12:17 29:12
44:3 45:3 48:4
plaintiff's
31:11 56:24 108:7
plaintiff-only
44:2
plan
11:15 12:16 13:10
16:2,4,10,13 17:2
17:14 18:6 20:12
25:7 27:18 30:7,8
79:12,16,20 88:22
90:3,24 91:2,4,14
94:10,12
planner
10:20,21,24 39:15,22
41:4,5,11,13,14
42:4 43:11 55:15
planners
43:17 44:2 53:24
54:2
planning
8:5,6,22 10:1,11
12:22 34:5,14 39:18
42:22 44:17,19
53:20,22 54:4,23
55:3 92:5 93:7,21
plans
12:7 13:7,15 17:8,19
34:9 41:8
plus
85:9 96:7
PM
42:19 78:22 85:14

86:8
PMR
85:17
point
6:2 8:11 16:12 37:18
37:24 49:18 51:22
55:12 88:5 90:22
99:10 102:5 103:10
110:10
population
66:10
position
72:20
possible
57:18 88:20 101:16
post
31:6
potential
99:17
POWER
1:5
practical
9:10 98:19
practice
9:12 32:13,14 34:14
38:14 54:6,8 55:17
61:16,18 92:3,4
93:5 112:18
practiced
37:7
precisely
96:18
prefer
23:19
preliminary
46:24 47:7 57:23
61:1,8,11,13,18
111:12
prepar
27:22
preparation
27:22
prepare
28:5,13
prepared
12:8 13:9 17:2 23:14

28:24 43:14 54:16
75:21 109:11
prepares
42:3
preparing
16:4 22:15,18 23:6
28:9 46:22
prescribed
80:21 81:1
present
104:17,18
presentation
39:4
presentations
35:6
presented
39:10
pressure
74:8 81:2,5 100:15
presume
7:5 62:20
prevention
81:12
prices
84:7 105:8
primarily
13:23
primary
81:11 89:3,4,10,12
89:21
principal
10:22
principles
112:12,18
prior
29:20 47:3 62:5 80:5
80:11 108:17
privileges
35:18,20 36:2,6
37:19
probability
6:23 7:3
probably
7:11 33:1 93:12
problems
100:6


MAGNA
LEGAL SERVICES

proceed
5:16
process
25:13
produces
34:3
Production
4:10
professional
8:17 9:9 11:1 44:5,13
Professionals
44:15
profound
102:2
prognosis
94:13
progress
86:19
project
86:13
projection
91:5 104:20
property
52:14
prophylactic-based
81:14
prove
72:9,20 74:23
provide
45:21 79:20
provided
21:18 25:5 30:3
38:16 47:15,17,23
47:24 48:4
providers
29:15,19 37:5 63:13
63:23 110:3
provides
93:1
psychological
28:21 90:20
PT
91:8 92:12
Public
1:18 115:11
publication

83:11 84:4,15
publications
34:1 38:23 84:6
published
34:17
publishes
83:11
PubMed
68:18,20 73:5 75:14
purchase
84:5
purpose
41:10 48:10,23 49:13
64:24
purposes
9:8 11:16 12:8
pursuant
1:14
push
102:1
put
35:4,7 57:22 68:19
100:17 101:6

_____
Q
_____
qualifications
41:3 54:7,9
qualified
41:13 54:2 75:10
90:17
qualifying
78:16
quantifying
78:16
question
4:20 6:3,6,7,17 13:20
16:9,24 32:1 64:10
66:17,23 68:2 95:4
106:21 108:3
questionable
43:19
questionnaires
46:12
questions
5:8 6:23 48:18 58:6
61:4 66:5 94:7

110:11 111:3
112:21
quick
46:4
quoting
67:3

_____
R
_____
R
42:19 78:22 85:14
86:8
range
20:7 23:17 33:15
50:19 51:17 83:23
97:2,5,20
rare
13:3
rate
23:22 69:16 70:4
reached
57:4
read
28:15
reading
5:5 82:21 113:22
114:2
realize
86:2 91:1
realized
30:8
really
9:17 35:9 40:23 86:5
88:24 94:8 112:14
reason
58:19 74:20
reasonable
6:22 7:2 23:18 32:11
79:21 92:21 93:15
reasons
81:13,14 107:12
recall
16:3 17:11 18:1,4
51:13,23 52:1,1
received
24:24 28:19,23 60:19
78:22 79:4,8 91:10



recognition
51:13
recognize
37:4
recognized
19:5,19 99:17
recollection
51:21
recommendation
74:10
recommendations
92:14
recommended
90:12
record
115:6
records
20:4 22:22 28:16
29:15,19,23 30:18
30:19 31:2,5,12,22
37:4 80:17 90:12
recourse
26:13
reduce
67:17 87:18
reduced
71:24 73:8,23 74:2
reduction
68:1,11 69:5 70:18
72:7,11,16 73:16
74:19 84:24 85:5
reevaluation
90:1,20
refer
54:21
reference
37:13 38:5 46:8
52:10 73:24 83:9
84:2
referenced
58:11 80:20
references
37:18 52:6,8,12
56:13 57:10 104:24
referred
20:18



**referring**
72:2
**refers**
54:19
**reflect**
22:6
**reflected**
83:16
**reflects**
85:6
**regard**
88:7
**regarding**
13:15,21 14:1,1 15:8
 15:18 19:15,19
 49:24 51:2 68:9
**regardless**
26:5
**region**
84:18
**registered**
98:19
**Registry**
69:11
**regulatory**
42:21
**Rehab**
8:22,23 9:15,18,22
 9:23
**rehabilitation**
8:14,19 10:8,13,16
 15:3 39:6,8 44:15
 44:21 53:7 57:17
**reimbursed**
26:14
**related**
14:23 16:15 81:18
 100:10 102:8,17
 103:9
**relates**
79:21
**relationship**
12:2
**relevant**
45:1 79:13
**rely**

51:3 57:15 58:10
 59:16
**relying**
57:12
**remains**
37:22
**remind**
24:12
**renew**
40:4
**repair**
13:12 16:6 17:5 18:4
 18:15 19:7,21 67:15
 67:21 68:7,17,23
 69:7,18 70:5 71:20
 74:9 75:5,17 81:19
 89:19 99:3,19
**report**
21:9,22 22:1,5,9,15
 22:18,21 23:1,6,9
 23:14 24:21 25:14
 27:16,20 28:3,17,18
 28:20,24 29:2,6,9
 31:11 46:9,22,23,24
 47:3,5,7,9,16,20
 48:1,3,11,16,19,22
 49:4,14,21,24 50:2
 50:9 56:14 57:10,22
 57:23 58:1,12 59:3
 59:5,19 60:12,18
 61:1,3,8,12,14,19
 61:19,22 72:17,23
 74:3,21 75:20 80:20
 82:15 83:2 87:11
 101:6 108:9,11,14
 109:10,13,16,23
 111:10,12,13
**reporter**
1:17 5:15 45:11
 113:4,9,12,20 114:1
 114:4 115:11,21
**reports**
21:14 30:14 52:9
 61:10 110:16
**REPRESENTING**
2:5,10

**reproduction**
115:19
**req**
30:21
**request**
4:10 30:17,22,24
 110:17
**requested**
30:6,12,13 107:12
**requesting**
30:18
**requests**
63:22
**require**
86:10,23 89:20 91:6
 96:15 99:5,9 100:23
**required**
26:24 40:19 44:6
 50:1
**requirements**
44:5,10
**requires**
90:19 102:2 104:6,8
 104:14
**requiring**
101:13
**research**
17:18 52:3 57:11,21
 58:9 59:17,22 67:18
 68:3 73:5 75:13
**researched**
105:6
**reserved**
5:8
**residual**
15:10 18:20,21 71:19
 100:19
**residually**
16:15
**respect**
58:2
**respective**
5:4
**respond**
19:10 36:14 58:15
 60:7,22 66:15 69:21

72:19 110:19
**response**
58:20
**responsive**
77:15
**rest**
11:2 26:8 33:9 93:14
 113:1
**result**
50:2 89:16 102:7
**results**
69:4
**retrieve**
98:7
**return**
10:3
**returning**
92:22
**reversed**
32:1
**review**
49:10 55:6 67:12
 74:20 111:9
**reviewed**
28:17 29:14,18,23
 30:7 31:22 48:7
 60:13 79:24 80:16
 109:23
**reviews**
44:23
**revise**
55:6
**revised**
59:5
**RICHARD**
1:13 3:5 5:11
**right**
31:10 37:16 38:3,11
 39:1 61:15,17 70:12
 77:12 94:15,20
 95:16 102:23 110:9
 113:5 114:5
**RILEY**
2:7
**risk**
74:18 81:5,9 101:23



104:13
**Road**
85:11
**role**
72:20 74:24
**room**
62:23 64:24 65:9,12
65:14,15,18,23
**rou**
52:24
**routinely**
53:1
**ruled**
36:10 54:13
**rules**
6:1
**run**
34:13
**rural**
9:13

**S**

**S**
1:13 2:8 3:5,11 5:11
**safety**
86:23 90:8
**saw**
107:8
**saying**
14:6 74:22 78:7 80:8
86:2 89:11,17 96:20
**says**
56:4,6,8 61:12 64:19
84:10 95:10
**SCARBOROUGH**
2:7
**scenario**
102:12,24
**schedule**
58:5
**scheduled**
45:9 107:22
**scheduling**
22:23
**school**
112:15

**scope**
48:15 55:15 74:15
**score**
51:16,22
**scored**
50:18
**scoring**
50:23
**screen**
51:2
**screening**
77:23,24
**SEAK**
33:20,22 34:1,2,2,3,7
34:8 35:5 38:22
**sealing**
5:5
**search**
68:19,24 69:3,3
75:17,19
**searched**
70:16
**Seattle**
38:1
**second**
46:10
**section**
44:16 50:23 95:10
**Security**
73:13
**see**
9:20,22 17:18,22
20:4 42:11 46:15,16
46:19,20 71:23 74:4
75:7
**seen**
31:5 76:19 79:1
**sell**
35:8
**seminar**
34:16
**seminars**
34:3
**send**
45:24 46:1,3,5 63:21
**sensation**

78:5,10,13,17,18,20
**sense**
42:18,18 92:11
**sent**
23:8 25:15
**separate**
9:2 29:2 35:9 90:13
100:16
**separately**
22:12
**September**
31:6,9,23
**sequelae**
99:10 100:3,4,6,10
102:17 106:7,23
107:5
**serious**
66:12,18
**services**
1:23 21:19 24:6
28:21 33:17,19
**set**
9:12 35:8,8 53:20,23
54:22 55:4 59:18
113:10
**sets**
55:1
**seven**
33:6
**severe**
97:11 104:11
**SHANA**
1:4
**shelf**
98:8
**shopping**
82:6 98:6
**short**
33:5 65:8
**shots**
64:14
**should've**
49:11
**showering**
82:3
**significance**

42:12,21
**significant**
92:15 96:16
**significantly**
59:6
**signing**
5:5
**similar**
32:24
**simply**
19:14 51:1 55:14
56:4 59:14 93:3
97:5 102:10
**single**
105:3
**sitter**
98:23
**sitting**
29:22 51:21 58:8
59:15 60:2 76:18
**situation**
90:19
**situations**
90:5
**Sixty-one**
95:20
**small**
12:20 20:2
**Social**
73:13
**societies**
44:13
**soldiers**
92:22
**solely**
102:7
**solo**
38:14
**someone's**
105:16
**sorry**
24:18 31:9,12,24
39:23 47:22 58:17
64:9,22,22 77:1
113:24
**sort**



9:13 16:8,9 49:8 52:7 64:4 83:1 92:9 92:20 99:22

**sorts**
91:18,18 99:23,23 101:21

**sought**
8:9

**source**
20:17 53:14 95:22,23 96:3 105:3

**sources**
104:24 105:1,4,6,9

**speak**
63:1,4,8,12,15,18

**speaker**
35:7

**specific**
50:4 56:15,18

**specifically**
17:12 52:22 61:2,13

**specifics**
105:5

**speech**
30:13,19 66:1 79:4 91:8

**spell**
50:22

**spelled**
57:1

**spend**
11:6,8 28:8

**spending**
92:15

**spends**
62:10

**spent**
12:4 22:14 23:5,13 27:15

**spinal**
13:15 14:3 16:14 17:9 18:23 49:23 73:20 89:6 91:18 96:7 101:14

**spoken**
110:2

**spreadsheet**
83:1

**staff**
22:22 45:8

**stand**
49:5

**standard**
14:10 50:4 52:7,10 52:11 53:9 54:8 55:17 88:12,15,24 92:2,4

**standards**
54:5,21,22 55:2,2

**standpoint**
100:20

**start**
34:12

**started**
38:13 108:22

**starting**
95:18

**state**
37:15,23 38:6 54:5 55:14,20 84:7 96:18

**stated**
48:22 49:4,11 91:15

**statement**
49:15 66:24 67:2 78:17 91:2 97:17

**states**
1:1 38:4 39:14 72:17

**stating**
49:16 70:3

**status**
50:15

**stays**
74:3

**stipulated**
5:2

**Stipulations**
4:15

**Street**
2:3,8

**strength**
78:4,9

**strenuous**

74:6

**stricken**
37:1

**stroke**
17:9 18:23 49:21,22 73:20 76:3,6 96:7 99:4,11 101:14,19 105:18

**strokes**
13:16,17 14:3,19 16:13 19:4 76:11 87:22 89:7 91:18 105:13 107:5

**Sturtz**
2:7 3:6 5:20,22 19:17 37:2 45:10,20 46:2 46:7 56:21 59:14 60:1,16 61:6 66:20 67:11 69:23 70:1 110:9 112:2,22 113:16,18

**subject**
54:11

**subsequent**
21:12,13 22:10

**substantial**
42:7 60:15 93:5

**successful**
34:13

**suffered**
16:5,17 18:14 68:6 68:21 69:6,17 75:16 89:18 99:2 105:21 106:1 107:3

**suggest**
74:1

**Suite**
2:4,8

**summer**
54:15

**supervision**
115:21

**supplemental**
110:16,20

**support**
4:2 79:21

**supports**
68:10

**suppose**
87:15

**supposed**
56:9

**sure**
12:10,14 20:10 27:11 62:21 65:20 83:4 90:14 95:15 98:18

**surgeon**
69:15 75:2 87:3,6,24 88:11 99:20

**surgeons**
74:11

**surgery**
16:21 71:12 87:22 105:22 106:3,8,24

**surgical**
13:11 16:6 17:5 18:4 18:15 19:6,21 67:15 68:17,22 69:7 71:20 74:9 75:5,17 81:19 89:19 99:3,19

**survey**
68:8,15 84:14

**survival**
69:16 70:4

**switched**
40:18

**sworn**
5:12 115:5

---

**T**

**T**
3:11

**table**
66:22 73:14

**Tables**
66:10

**take**
6:19 43:12,15 46:4 64:1,13 79:12,16 113:18

**taken**
1:14 5:24 43:9 96:22



| | | | |
|---|---|---|---|
| **talk** | 3:5 13:21,24 21:14 | **time** | **transfers** |
| 62:7 | 21:15 36:23,24 | 5:9 6:2,20 26:20,22 | 104:9 |
| **talked** | 40:17 41:1,3 51:7 | 28:8,10,24 29:4,5 | **travel** |
| 16:3 | 56:7 67:4 69:2 | 31:3,20 32:24 42:9 | 108:3,4 |
| **talks** | 74:16,22 80:1 | 58:4 61:17 62:19 | **treadmill** |
| 50:9 | 106:11 115:7 | 75:21 77:19 78:21 | 81:22 |
| **tasks** | **testing** | 78:24 79:3,7 85:1,2 | **treated** |
| 11:3 23:1,2 104:16 | 78:8,9,10 | 86:5 90:6 92:14 | 18:7,14 76:8,10,10 |
| **taught** | **Thank** | 93:18 108:6,19 | 76:12 |
| 34:2,7,22 | 112:22,24 113:2 | 109:10,13 110:10 | **treating** |
| **tax** | 114:5 | 110:18 111:3 | 18:18 63:13,23 72:14 |
| 10:3 | **thanks** | 112:23 113:14 | 91:17 96:6 |
| **technical** | 113:6,11 | **times** | **trial** |
| 36:21 | **therapy** | 5:24 7:9 34:22 91:21 | 5:9 21:15 36:11 |
| **telemedicine** | 79:4,8 91:9 | 92:1 93:20 | 57:13 58:1,11,23 |
| 11:24 22:24 31:4,21 | **thing** | **tired** | 59:13 |
| 45:7,14 62:15 64:20 | 26:13 30:11 | 77:17 | **true** |
| 107:17,18 | **things** | **title** | 27:12 39:2 115:6 |
| **telephone** | 82:4 98:7 101:21 | 34:16 | **try** |
| 45:14 | **think** | **today** | 6:21 23:20,21 |
| **television** | 16:12 24:8 26:7 | 5:23 26:23 27:1,16 | **trying** |
| 82:22 | 32:19,23 33:6 36:17 | 28:5,9,13,17 29:20 | 42:24 86:13 92:20 |
| **tell** | 37:17 39:12 40:9,11 | 29:22 30:4 51:21 | 108:1 |
| 67:6 97:3 | 42:16 49:14 52:19 | 54:24 58:9 59:16 | **turn** |
| **telling** | 54:19 59:10 60:3 | 60:3 76:18 91:3 | 55:19 |
| 25:12 75:12 95:9 | 67:9 72:4 82:16 | 94:7 96:10 108:8,14 | **twice** |
| **ten** | 84:21 86:1 90:22 | 108:17,19 109:2,9 | 93:18 |
| 108:22 | 98:21 104:17 | 109:17,22 111:11 | **two** |
| **term** | 107:11,13 | 113:23 114:2 | 18:17 34:6 37:18 |
| 54:18 74:14 | **Thirty** | **today's** | 101:8 109:3,3,4,7 |
| **terms** | 7:14 53:17 91:16 | 113:15 | **type** |
| 11:13 12:15 13:6 | 96:5 | **toileting** | 13:11 15:8,13 16:5 |
| 16:1 41:18 43:6 | **thorough** | 98:4 | 16:17,21 17:4,12 |
| 68:20 92:20 94:4 | 44:23 | **total** | 18:14,21 19:6,20 |
| 95:4 96:1 100:6 | **thought** | 10:18 12:11 22:6 | 48:18 67:14,20 68:6 |
| **test** | 31:16 82:14 | 62:12 | 68:16,22 69:6,17 |
| 32:9 41:7,18 43:6 | **thousand** | **touch** | 70:4 71:9,12,15,19 |
| **testified** | 7:11 12:13 33:7 | 78:14,18 | 74:8 75:4,16 81:18 |
| 5:13 32:15 33:4 49:7 | **thousands** | **track** | 85:23 87:7 89:18 |
| 54:23 96:9 | 76:11,12 | 22:16 27:14 28:10 | 94:5 99:2,6,18 |
| **testify** | **three** | **training** | 105:21 106:1,6,22 |
| 19:16 23:18 32:10 | 20:9 40:10,11,12 | 38:10 40:13,24 | 107:4 |
| 72:5 | 85:15,17,21 86:4 | **transcribing** | **types** |
| **testifying** | 91:21 92:1 93:19 | 22:24 | 13:17 97:23 |
| 14:5 19:14,18 | 95:7 96:2,12 109:5 | **transcript** | **typical** |
| **testimony** | 109:8 | 113:15 115:18 | 61:16,17 81:6 85:22 |



**Typically**
62:10 81:2 99:8

**U**

**Uh-huh**
54:17
**ultimately**
48:14,15 51:2 86:24
**unable**
73:7
**unadjusted**
72:13 73:14 74:3
**uncertain**
81:13
**underlying**
112:11
**understand**
23:4 25:13 29:11
42:23 51:6 80:4
**understanding**
16:2 25:24 80:11
95:16
**understood**
6:7 113:21 114:5
**underwent**
16:20
**Uniontown**
8:13,18,23 9:12,14
9:17,20,21 10:8,12
10:16 35:21,23 36:2
**UNITED**
1:1
**unrelated**
101:19
**up-to-date**
38:19
**upfront**
27:1
**upsetting**
58:17
**use**
8:20 55:10,21 56:6,8
56:9 73:13 82:12
83:10 85:10 101:1
105:4,8
**useful**

66:11
**uses**
82:9
**usually**
61:10,21 105:18
113:19

**V**

**vague**
66:17
**validate**
105:7
**valvular**
99:24
**varies**
22:2
**variety**
11:10
**vary**
85:1
**varying**
54:1
**vascular**
99:24
**vast**
96:24
**vendor**
20:19
**versus**
12:17
**Veterans**
92:6,18 93:9 105:11
**video**
1:15 65:2
**videotape**
64:7,11
**view**
45:2 75:8
**virtually**
104:15
**virtue**
41:14 87:7
**visit**
22:24 45:7,15 64:20
87:3 89:5,10,21
**visiting**

100:14
**visits**
85:15,18,21 86:4,7,8
**vocational**
15:2,6,12,18,22
**vs**
1:7

**W**

**waive**
114:3
**waived**
5:6
**waiving**
113:22 114:2
**walk**
64:17,23 65:12,22
81:22
**walking**
104:1,7
**want**
17:17 45:23 46:1
55:23 58:22 59:11
67:6 79:12,16
**Washington**
1:8 2:4 37:8,11,14,15
37:19,20,20,23 38:2
38:5,6,7 57:4
**wasn't**
19:15 25:10 75:19,20
**Wasserman**
83:11 84:6
**watching**
82:21
**way**
11:4 14:6 23:21
49:16 51:5 73:11,11
78:7,15 80:13,14
82:17 87:19 96:20
**ways**
78:19
**we'll**
46:4 58:8 110:22
**we're**
6:4
**we've**

98:1
**weakness**
76:23 77:10 78:3
**webinar**
34:16,23 35:12 38:22
**WEDNESDAY**
1:11
**week**
11:6,9,10,13 12:3
**Welch**
1:6 11:18,22 15:9,18
16:16 45:7 46:14
50:8 51:8 62:1,18
64:20 75:3,24 76:20
78:22 79:1 80:5,12
81:21 91:3 101:1
104:19 108:17,21
109:18 110:3
**Welch's**
67:14
**went**
92:19
**who've**
43:9 96:23 107:3
**wins**
26:2,10
**wish**
41:12
**witness**
4:5 5:14 19:11 20:23
29:11 36:15 45:23
56:17 58:16 60:8,23
66:16,21 69:22,24
112:5 113:2,7,11,22
114:9 115:5,7
**word**
61:7
**words**
15:9 24:16 49:20
55:18 73:10 77:2
**work**
7:19,23,23 8:1,12
10:6 11:1,11 12:4
12:16,23 15:8,13
16:2 21:13 22:10,11
22:17 23:9 26:20



27:19,21 28:2,4
32:3,8,21 33:9,10
34:6 44:3 52:15
84:3 108:1 110:24
**worked**
19:23 20:2,8,12 22:7
**working**
23:13
**works**
24:4 25:14 73:12
**worsen**
90:6,6 94:13 96:15
**worsened**
86:10
**worst**
103:4
**worst-case**
102:11
**would've**
40:9
**wouldn't**
17:13 41:7 70:22
75:6,9 100:13
**write**
61:7,18,19
**written**
33:24

---
**X**

**X**
3:2,11

---
**Y**

**Yeah**
29:5 31:24 54:19
105:2 109:12
**year**
7:16 32:16 33:21,23
35:14 39:11 85:15
85:18,22 86:3,3,11
87:3 89:5,13,22
91:11
**years**
7:10,13,18,21,21
18:16 36:6 39:20
40:10,11,11,12

53:17 73:1 85:21
86:9 91:7,16 93:12
93:18 94:24 95:1,10
95:12,18 96:5
111:19
**years'**
57:16

---
**Z**

**ZIP**
83:14 84:9 85:8,10
**Zoom**
6:4

---
**0**

**0.8**
84:23
**02**
4:17
**05**
3:6 4:17

---
**1**

**1**
3:15 45:12,13,17
52:20 56:13
**1.042**
83:19 84:10
**1.25**
84:19
**1:23-cv-3381**
1:5
**10**
13:2 33:8 36:6 52:7
109:8,22
**10-year**
67:19 68:4,5 70:3
**10:03**
1:16
**100**
2:8
**1000**
22:3 26:7
**104,000**
91:24 93:10
**10G**

2:3
**11**
29:24 31:4,21 45:15
50:8 51:8 62:1
75:23
**11:51**
114:13
**111**
3:7
**113**
86:6
**11th**
47:10
**12**
1:11 115:12
**14**
48:13 49:1
**15**
94:24 95:12
**1600**
2:8
**18**
48:5 52:20 56:14
**18th**
47:13,18,24
**1994**
38:10
**1995**
10:14 38:14

---
**2**

**20**
4:12 11:8,12 33:8,23
84:23 85:4,5 95:12
**20%**
13:2
**20,700**
25:7,17,18
**2000**
7:12
**20002**
2:4
**2012**
38:24
**2018**
43:14

**2019**
8:1,4 39:20,24 40:15
**2020**
38:23
**2021**
32:16,21
**2022**
31:6,9,13,23 40:15
48:13 49:1 80:6,12
101:5
**2023**
28:22 29:20,24 30:20
32:3,8 33:5 83:20
91:11 109:24
**2024**
1:11 25:6 29:16 31:4
31:21 38:17 45:15
47:11,13,18,21 48:5
48:22 51:9 60:19,20
62:1 75:23 91:11
107:9 109:11
115:12
**20613**
83:14
**21201**
2:9
**24-hour**
102:3,5
**25**
62:3,14 84:20 85:4,5
94:24 95:12
**26**
48:22
**26th**
60:18
**28**
50:10,18 51:16

---
**3**

**3**
47:16
**3,613,500**
103:13
**3/11/24**
3:15
**30**



7:20 18:16 57:15
85:21 111:19
**3000**
27:1
**31**
25:6
**32**
50:10 51:17
**33**
95:22
**37**
91:7 93:12,18

---
**4**

**4.2**
83:15 85:9
**40**
7:17 11:9 12:3 35:16
**45**
3:15 4:12
**4th**
47:20

---
**5**

**5**
80:22
**50**
7:17 101:9 103:12,19
**500**
12:10,11 22:3 26:7
**500,000**
32:17
**51**
7:5
**52**
70:5

---
**6**

**60**
95:18,19
**600**
2:4
**6221**
1:24
**624**
1:24

---
**7**

**7.2**
103:16
**7500**
21:21 22:4 25:15,18
26:18 27:8

---
**8**

**81.7**
73:1 95:15
**866**
1:24

---
**9**

**9**
52:7 109:8,17,22

