UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHANA HARGROVE, *as power of attorney for Kevin Welch*,<br><br>Plaintiff,<br><br>v.<br><br>MEDSTAR WASHINGTON HOSPITAL CENTER, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Case No. 23-3381 (RJL)<br>)<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM OPINION
August 7th, 2025 [Dkt. #38, Dkt. #39, Dkt. #44]

Plaintiff Kevin Welch ("Welch" or "plaintiff"), by and through his power of attorney, brings this medical malpractice suit against MedStar Washington Hospital Center and three doctors (together, "defendants"). Plaintiff alleges that while he was in their care for surgery to repair an aortic dissection, defendants failed to diagnose and treat his post-operative strokes. Pending now before the Court are three motions filed by defendants: two motions in limine to exclude the testimony of plaintiff's experts and a motion for summary judgment. For the reasons set forth below, I will **GRANT** all three motions.

I.  **BACKGROUND**

On June 14, 2022, plaintiff was transported to MedStar Washington Hospital Center with extreme chest pains. Am. Compl. [Dkt. #15] ¶¶ 12–14. He was diagnosed with an "ascending aortic dissection" and underwent surgery, including a Type A aortic dissection ("TAAD") repair. *Id.* ¶¶ 15–16. "The procedure was performed without any complication," and plaintiff was "transferred to the Intensive Care Unit (ICU) in critical

1

but stable condition." *Id.* ¶ 16. There, he was treated by the defendant doctors—ICU attending physician Maxwell Hockstein, critical care physician Stephen Luczycki, and surgical ICU rotating resident Kaitlyn Marie Dunphy. *Id.* ¶ 17.

On June 15, the day after surgery, plaintiff's progress report stated that he "was only oriented to self" and "was not aware of place or time and did not know why he was in the hospital." *Id.* The next day, his doctors charted that they were "concerned about the onset of encephalopathy (i.e. changes in how the brain operates)" "given [the] lack of improvement in [plaintiff's] delirium." *Id.* ¶ 18. Plaintiff began "exhibiting severe bilateral lower extremity weakness," and he underwent a neurology consultation on June 17. *Id.* ¶ 19. The neurologist recommended magnetic resonance imaging (an "MRI") because of a "concern for spinal cord infarct," a stroke that occurs in the spinal cord. *Id.* ¶¶ 19–20. Plaintiff did not receive an MRI on either June 18 or June 19 "for safety reasons" and because of his "much improved exam." *Id.* ¶¶ 20–21. On June 21, the MRI was again deferred, with a notation that plaintiff's "[b]lood pressure is under better control" and he was "[a]pproaching floor readiness." *Id.* ¶ 23.

Plaintiff received an MRI on June 22, which indicated that he had suffered a stroke. *Id.* ¶¶ 24–28. According to plaintiff, no actions were taken prior to June 21 "to increase [his] blood pressure to mitigate the risk of neurological insult," nor was there any consideration given prior to June 22 to "the placement of a lumbar drain to mitigate the risk of neurological insult." *Id.* ¶ 28.

A few weeks later, plaintiff was transferred to MedStar National Rehabilitation Hospital "to address residual impairments of functional mobility and self-care." *Id.* ¶ 29.

He completed his inpatient therapy in September, and he was discharged with instructions to obtain occupational therapy, physical therapy, and speech language pathology. *Id.* Plaintiff claims that he continues to struggle with executive functioning, apathy, and visual-spatial issues. *Id.* ¶ 30.

Plaintiff filed suit in this Court in November 2023, alleging that defendants negligently failed to recognize, diagnose, and treat his strokes. *See generally* Compl. [Dkt. #1]; Am. Compl. Specifically, he asserts that defendants "prolonged the performance of [an MRI]," "fail[ed] to take steps to control [his] blood pressure," and "fail[ed] to document and/or otherwise place a lumbar drain." Am. Compl. ¶¶ 36, 38.

At the close of discovery, defendants filed motions in limine seeking to exclude the testimony of two of plaintiff's experts—Dr. Ahmad Elakil and Dr. Peter Schulman—on proximate causation and damages. *See* Defs.' Mot. to Exclude Test. of Pl.'s Proposed Expert Ahmad Elakil, M.D. ("Defs.' Elakil Mot.") [Dkt. #38]; Defs.' Mem. of Law in Supp. of Defs.' Elakil Mot. ("Defs.' Elakil Mem.") [Dkt. #38-1]; Defs.' Mot. to Exclude Test. of Pl.'s Proposed Expert Peter Schulman, M.D. ("Defs.' Schulman Mot.") [Dkt. #39]; Defs.' Mem. of Law in Supp. of Defs.' Schulman Mot. ("Defs.' Schulman Mem.") [Dkt. #39-1]. Plaintiff opposes both motions. *See* Pl.'s Opp'n to Defs.' Elakil Mot. ("Pl.'s Elakil Opp'n") [Dkt. #40]; Pl.'s Opp'n to Defs.' Schulman Mot. ("Pl.'s Schulman Opp'n") [Dkt. #41]; *see also* Defs.' Reply in Supp. of Defs.' Elakil Mot. [Dkt. #42]; Defs.' Reply in Supp. of Defs.' Schulman Mot. [Dkt. #43].

Once the motions in limine were ripe, defendants filed a motion for summary judgment. *See generally* Defs.' Mot. for Summ. J. ("Defs.' MSJ") [Dkt. #44]. Defendants

contend that if I grant the motions in limine, I should also grant summary judgment because plaintiff will be unable to prove proximate causation, an essential element of medical malpractice. *See id.* ¶¶ 7–8. Plaintiff opposes summary judgment. *See generally* Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s MSJ Opp'n") [Dkt. #45].

## II.   LEGAL STANDARD

### A.   Expert Testimony

Expert testimony must meet multiple procedural and substantive requirements. Under Federal Rule of Civil Procedure 26(a)(2), a party must disclose its expert witnesses to the other parties, and each disclosed expert is required to provide a written report containing "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as "the facts or data considered by the witness in forming them." If a party fails to disclose an expert witness, "th[at] party is not allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Even if the disclosure requirements are met, a proposed expert must satisfy the standards set out in Federal Rule of Evidence 702. This rule mandates that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Here, the Court has a "gatekeeping" obligation to ensure that the expert testimony is both relevant and reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596–97 (1993). The purpose of this requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. Reliability is critical because "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592.

*Daubert* provides a non-exhaustive list of "factors that can inform the reliability analysis," including "whether the expert's 'theory or technique' (i) 'can be (and has been) tested,' (ii) 'has been subjected to peer review and publication,' (iii) has a high 'known or potential rate of error,' and (iv) enjoys 'general acceptance'" within a 'relevant scientific community.'" *United States v. Morgan*, 45 F.4th 192, 200 (D.C. Cir. 2022) (quoting *Daubert*, 509 U.S. at 593–94). The analysis should focus "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

The Court has broad discretion in deciding whether to exclude expert testimony for procedural or substantive reasons. *See, e.g., Kumho Tire Co.*, 526 U.S. at 141–42; *United States v. Day*, 524 F.3d 1361, 1367 (D.C. Cir. 2008).

B.  Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant

5

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant can satisfy his initial burden of demonstrating that there is no genuine dispute of material fact by "citing to particular parts of materials in the record" or by showing "that [the non-movant] cannot produce admissible evidence to support" the "presence of a genuine dispute." *See* Fed. R. Civ. P. 56(c)(1).

If the parties have had adequate time for discovery, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.

## III.   ANALYSIS

Plaintiff alleges medical malpractice, which requires him to establish: "(1) the applicable standard of care; (2) a deviation from that standard by the defendant[s]; and (3) a causal relationship between that deviation and [his] injury." *Washington v. Wash. Hosp. Ctr.*, 579 A.2d 177, 181 (D.C. 1990); *see also Bederson v. United States*, 935 F. Supp. 2d 48, 73 (D.D.C. 2013). Expert testimony is typically required to establish each element. *See Wash. Hosp. Ctr.*, 579 A.2d at 181; *Bederson*, 935 F. Supp. 2d at 73.

Plaintiff disclosed Dr. Schulman as an expert on standard of care and breach, and Dr. Elakil as an expert on proximate causation. *See* Pl.'s Expert Disclosures [Dkt. #28] at 20–21, 23. Defendants filed motions in limine to exclude their testimony, but only with

6

respect to causation and damages. *See generally* Defs.' Elakil Mot.; Defs.' Schulman Mot. I will address these motions in limine before turning to the motion for summary judgment.

A.   Motions in Limine

Defendants seek to exclude Dr. Elakil's and Dr. Schulman's expert testimony on proximate causation.[1] To prove causation, plaintiff must establish "a direct and substantial causal relationship between the defendant[s'] breach of the standard of care and the plaintiff's injuries." *Grant v. Am. Nat'l Red Cross*, 745 A.2d 316, 319 (D.C. 2000) (citation omitted). Expert testimony on this point must demonstrate, "based on a reasonable degree of medical certainty, that the defendant[s'] negligence is more likely than anything else to have been the cause (or a cause) of the plaintiff's injuries." *Id.*

Causation here turns on whether defendants' alleged failure to timely diagnose and treat plaintiff's stroke symptoms—namely, through blood pressure management or a lumbar drain—caused plaintiff to incur permanent neurologic deficits which he otherwise would not have sustained. *See* Pl.'s MSJ Opp'n at 22; Am. Compl. ¶¶ 38–41. Put another way, if defendants had diagnosed the strokes and implemented blood pressure management or a lumbar drain sooner, would plaintiff have experienced better outcomes?

1.   *Motion to Exclude Testimony of Dr. Elakil*

Dr. Elakil is the Chief of the Department of Neurosurgery at Insight Hospital and Medical Center in Chicago, Illinois. Pl.'s Expert Disclosures at 21. He is board certified in neurosurgery. *Id.* He received his medical degree from King Saud University,

---

[1] Defendants move to exclude their testimony as to both causation and damages, but since I will exclude their causation testimony and grant summary judgment for defendants, I need not reach the damages issue.

completed his neurosurgery residency at the University of Calgary, and completed his neurosurgical postgraduate training at the University of Miami. *Id.*

Plaintiff disclosed Dr. Elakil as an expert witness on proximate causation. *Id.* at 23. Dr. Elakil opines that to a reasonable degree of medical certainty, "[i]t is more likely than not that the severity of [plaintiff's] symptoms can be attributed to a significant delay in the diagnosis of [plaintiff's] conditions, including stroke and spinal cord infarction," and to "the failure to implement measures aimed at optimizing the patient's physiological state, such as blood pressure management and the installation of a cerebrospinal fluid drain. . . ." *Id.* at 75. Defendants seek to exclude Dr. Elakil's testimony because he "undertook no rigor that is accepted in neurology (of which he is not an expert) or gave any legitimate consideration to all the medical facts in this case . . . ." Defs.' Elakil Mot. at 2.

I must address one threshold issue at the outset. The parties dispute how the Court should frame the causation issues in this case. Defendants argue that the Court should analyze the diagnosis and treatment of the strokes in the context of plaintiff's post-operative recovery from the TAAD repair. *See* Defs.' Elakil Mem. at 21–22. Plaintiff urges the Court to ignore that context and look to stroke mitigation procedures more generally, not necessarily following TAAD repairs. *See* Pl.'s Elakil Opp'n at 14.

I agree with defendants that plaintiff's recovery from the TAAD repair is inseparable from the causation analysis. Dr. Elakil opines that placing a lumbar drain or managing plaintiff's blood pressure would have, more likely than not, resulted in better outcomes for plaintiff. *See* Pl.'s Expert Disclosures at 75. Yet *all* aspects of plaintiff's condition and care impacted his outcomes, and ignoring those related to his TAAD

recovery strips important variables out of the causation analysis.[2]  *See* Defs.' Elakil Mem. at 6–7.  Thus I will evaluate whether Dr. Elakil has "good grounds" to opine on whether stroke mitigation procedures *following the TAAD repair* would have improved plaintiff's outcomes.  *See Daubert*, 509 U.S. at 590.

I turn now to the core question: whether Dr. Elakil applied reliable principles and methodologies as required by *Daubert*.  He purportedly relied on three sources: (1) "his own clinical experience"; (2) his review of some medical records and deposition transcripts in this case; and (3) "peer-reviewed literature."  *See* Pl.'s Elakil Opp'n at 18, 25, 36, 41.  Unfortunately for plaintiff, none provide good grounds for Dr. Elakil's opinions.

*Dr. Elakil's Clinical Experience.*  The medical issues in this case lie at the intersection of cardiothoracic surgery and vascular neurology.  Dr. Elakil is not a specialist in either field.  He is a neurosurgeon who primarily performs elective spinal surgery and some brain surgery.  Tr. of Dep. of Dr. Ahmad Elakil ("Elakil Dep. Tr.") [Dkt. #40-10] at 11:8–11, 13:21–14:5, 27:13–16.  He is not a neurologist,[3] nor has he completed a stroke fellowship.  *Id.* at 28:17–21, 42:12–13.  He is not a cardiothoracic surgeon and he does not perform, or care for patients after, TAAD repairs.  *Id.* at 32:10–12, 43:4–13.

While "a physician need not be a specialist in a particular field" in order to testify as an expert, he must be "familiar with the medical procedure at issue."  *Dickerson v.*

---

[2] An article relied upon by Dr. Elakil supports this conclusion.  *See* Alessandro Leone et al., *Delayed Onset Postoperative Paraplegia in Acute Type A Aortic Dissection*, 111:4 Annals of Thoracic Surgery 283 (2021), Defs.' Elakil Mot. Ex. F [Dkt. 38-11 at 3].  This article, which discusses a TAAD repair patient who suffered post-operative spinal cord injuries, suggests that multiple factors impacted the patient's outcomes, including the extensiveness of the aortic dissection repair and the patient's medications.  *See id.* at 4.

[3] Neurology is distinct from neurosurgery, and within neurology "[t]here are different areas and specialties . . . , with vascular neurologists specializing in the treatment of strokes . . . ."  Defs.' Elakil Mem. at 5 n.5.

9

*District of Columbia*, 182 A.3d 721, 728–29 (D.C. 2018) (quoting *Battle v. Thornton*, 646 A.2d 315, 322 n.8 (D.C. 1994)). The medical procedures at issue here are the diagnosis of strokes, the placement of lumbar drains, and the management of blood pressure following TAAD repair surgeries. Dr. Elakil does not "follow patients to see how they're doing and what their needs are after they've suffered an aortic dissection," *see* Elakil Dep. Tr. at 43:4–13, and he has placed only one lumbar drain after a TAAD repair in the last five years, *see id.* at 81:1–17. As such, Dr. Elakil's reliance on his own clinical experience is misplaced, as it does not align with the medical expertise needed to opine on the nuanced causation questions in this case.

*Review of Medical Records and Deposition Transcripts*. In reaching his opinion that the alleged negligence caused plaintiff's deficits to be "permanent . . . instead of likely temporary," *id.* at 116:2–6, Dr. Elakil relied on plaintiff's hospital records while he was admitted; deposition transcripts for plaintiff, plaintiff's power of attorney, and defendant Dr. Hockstein; and plaintiff's radiology imaging and accompanying reports, *see* Pl.'s Elakil Opp'n at 18. Dr. Elakil did not review any of plaintiff's medical records after 2022 or plaintiff's rehabilitation records. *See* Elakil Dep. Tr. at 29:8–22. Dr. Elakil did not examine plaintiff himself or review any physical examinations of plaintiff since 2022. *See id.* at 28:22–25, 118:9–11. Dr. Elakil instead bases his conclusions about plaintiff's current condition on plaintiff's own deposition testimony. *See* Pl.'s Elakil Opp'n at 19–20. This is insufficient. As Dr. Elakil testified, "[i]t's really hard to say without a medical assessment, medical examination" "how much improvement [plaintiff] had after all these years." *See* Elakil Dep. Tr. at 117:15–118:4. Yet Dr. Elakil's methodology incudes no

10

such examination, or even a review of plaintiff's recent examination records. His opinion that plaintiff's condition is permanent is therefore, by Dr. Elakil's own standards, not "based on sufficient facts or data." *See* Fed. R. Evid. 702(b).

*Review of Medical Literature*. Dr. Elakil relied on four articles in reaching his opinions. Even taken together, these articles do not establish that his theories have been tested, subject to peer review, or generally accepted. *See Morgan*, 45 F.4th at 200 (citing *Daubert*, 509 U.S. at 593–94). Three articles are facially irrelevant. One discusses the standards for TAAD repair surgeries,[4] but does not discuss the diagnosis or treatment of strokes following TAAD repairs. *See* Am. Coll. of Cardiologists & Am. Heart Ass'n, 2022 ACC/AHA Guideline for the Diagnosis and Mgmt. of Aortic Disease (2022) ("ACC/AHA Article"), Defs.' Elakil Mot. Ex. F [Dkt. 38-11 at 19] at 20–29.[5]

Two of the other articles discuss spinal cord injuries after thoracoabdominal aortic aneurysm repairs, not TAAD repairs. *See generally* Alexander S. Fairman et al., *Spinal Cord Ischemia Management: Current Indications and Timing for Drainage*, 19:11 Endovascular Today 74 (2020) ("Fairman Article"), Defs.' Elakil Mot. Ex. F [Dkt. 38-11 at 15]; Subhasis Chatterjee et al., *Perioperative Care After Thoracoabdominal Aortic Aneurysm Repair*, 161:2 J. Thoracic & Cardiovascular Surgery 699 (2020), Defs.' Elakil Mot. Ex. F [Dkt. 38-11 at 7]. Dr. Elakil does not explain how the conclusions drawn in these articles about post-operative care for *different* surgeries apply to post-operative care

---

[4] Dr. Elakil testified that he "will not be offering any opinions in this case as to the standard of care regarding the performance of the surgical repair of" plaintiff's TAAD. Elakil Dep. Tr. at 21:14–22.
[5] This article does mention how *preoperative* strokes can impact the timing and outcome of TAAD repair surgeries, but this is not relevant to whether the *postoperative* failure to diagnosis and treat plaintiff's strokes caused his neurologic deficits. *See* ACC/AHA Article at 24.

for TAAD repairs.[6] *See Taylor v. Bristol-Myers Squibb Co.*, 93 F.4th 339, 347 (6th Cir. 2024) ("Courts must ensure both that expert opinions are 'the product of reliable principles and methods,' and that these methods have been 'reliably applied' to the 'facts of the case.'" (quoting Fed. R. Evid. 702)).

The fourth article is pertinent but insufficient to support Dr. Elakil's opinions. It discusses a 77-year old patient who underwent a TAAD repair and suffered post-operative spinal cord injuries. Alessandro Leone et al., *Delayed Onset Postoperative Paraplegia in Acute Type A Aortic Dissection*, 111:4 Annals of Thoracic Surgery 283 (2021), Defs.' Elakil Mot. Ex. F [Dkt. 38-11 at 3] at 3. When the patient began experiencing neurological symptoms, a lumbar drain "was immediately positioned . . . , *but only with partial benefit*." *See id.* at 5 (emphasis added). The treating doctors rejected "blood pressure aggressive management . . . because the aortic repair was not so extensive" and because they "usually maintain a normal blood pressure in cases of TAAD." *Id.* This article establishes only that for one TAAD repair patient, a lumbar drain provided a partial benefit and aggressive blood pressure management was not necessary. It cannot establish, to a reasonable degree of medical certainty, that a lumbar drain or blood pressure management would have, more likely than not, prevented plaintiff from suffering permanent neurologic deficits.

All told, Dr. Elakil's causation opinions do not reflect the "level of intellectual rigor" required under Federal Rule of Evidence 702, *see Kumho Tire Co.*, 526 U.S. at 152,

---

[6] As explained *supra*, the specific surgery from which plaintiff was recovering is essential to the causation analysis. In fact, the Fairman Article itself suggests that there is no one-size-fits-all approach to post-operative care for different types of cardiothoracic surgeries. *See* Fairman Article at 16 (indicating that the recommended approach for placing lumbar drains following open thoracic aortic surgeries may not be appropriate for placing lumbar drains following thoracic endovascular aortic repairs).

as they are grounded in tangential personal experience, a grossly deficient review of medical records, and largely irrelevant medical literature. I will therefore **GRANT** defendant's motion and exclude Dr. Elakil's testimony regarding proximate causation.

2. *Motion to Exclude Testimony of Dr. Schulman*

Plaintiff disclosed Dr. Schulman as an expert on the standard of care and breach elements of medical malpractice. *See* Pl.'s Expert Disclosures at 20–21, 58–59. Neither plaintiff's disclosures nor Dr. Schulman's expert report suggest that he will testify about proximate causation. *See generally id.* Nevertheless, defendants assert that during his deposition, Dr. Schulman made "a few causation-like comments." Defs.' Schulman Mem. at 14. Defendants point to the following excerpt from Dr. Schulman's deposition:

> Q. . . . Are you going to testify that the breach in the standard of care that you identify caused injury to [plaintiff] or are you unable to state that to a reasonable degree of probability?
>
> A. I guess I feel that it likely did but I would largely defer to a neurologist.

*Id.* at 14–15 (quoting Tr. of Dep. of Peter Schulman, M.D. ("Schulman Dep. Tr."), Defs.' Schulman Mot. Ex. H [Dkt. #39-13] at 54:13–55:1).[7]

Plaintiff admits that he may, in fact, seek to have Dr. Schulman opine on proximate causation. Pl.'s Schulman Opp'n at 29, 41 ("Dr. Schulman also sufficiently opined as to causation."). Defendants seek to exclude any such causation testimony from Dr. Schulman because plaintiff did not disclose those opinions under Federal Rule of Civil Procedure

---

[7] It is worth noting here that Dr. Schulman identifies a neurologist, not a neurosurgeon like Dr. Elakil, as the relevant specialist to opine on causation.

26(a)(2). *See* Defs.' Schulman Mem. at 15. I agree with defendants and will exclude Dr. Schulman's causation testimony. How so?

Plaintiff did not disclose Dr. Schulman as a causation expert, and Dr. Schulman agreed during his deposition that "in this case [he is] going to testify about standard of care only, and that on causation opinions, [he] will defer to an expert in other areas such as neurology[.]" Schulman Dep. Tr. at 55:2–10. Under Rule 37(c)(1), if a party does not disclose an expert as required by Rule 26(a)(2), that expert may not testify at trial unless the failure to disclose was substantially justified or harmless. *See Halcomb v. WMATA*, 526 F. Supp. 2d 24, 28 (D.D.C. 2007). Plaintiff provides no argument as to why his failure to disclose Dr. Schulman as a causation expert was either substantially justified or harmless. Defendants, on the other hand, indicate that they were unfairly surprised by and unable to respond to Dr. Schulman's causation opinions. *See* Defs.' Schulman Mem. at 13. Expert discovery has long been closed, and without an expert report on this element defendants will not be able to fairly predict the scope of Dr. Schulman's causation testimony at trial. As such, I will **GRANT** defendants' motion and exclude Dr. Schulman's testimony on proximate causation.

B.   Motion for Summary Judgment

Having concluded that Dr. Elakil and Dr. Schulman are precluded from testifying about proximate causation, I now turn to defendants' motion for summary judgment.

Causation is an "essential" element of a medical malpractice claim, and failure to prove it is fatal to plaintiff's claim. *See Bederson*, 935 F. Supp. 2d at 80. Expert testimony is required to establish causation in this case, as "the proof is [not] so obvious as to lie

within the ken of the average lay juror." *See Wash. Hosp. Cnt.*, 579 A.2d at 181. I have now excluded plaintiff's two potential causation experts—Dr. Elakil and Dr. Schulman—and plaintiff does not put forth any other experts on this element.[8] Plaintiff thus cannot establish proximate causation and cannot prevail on his medical malpractice claim. *See, e.g.*, *Nichols v. Greater Southeast Cmty Hosp.*, 382 F. Supp. 2d 109, 115 (D.D.C. 2005) ("Because plaintiff has not presented any expert evidence establishing a prima facie claim for negligence against any defendant, all defendants are entitled to judgment as a matter of law."); *Tavakoli-Nouri v. Gunther*, 745 A.2d 939, 941 (D.C. 2000) (affirming summary judgment where plaintiff failed to obtain expert witnesses to establish the elements of medical malpractice). As such, I will **GRANT** summary judgment for defendants.

## IV. CONCLUSION

For the foregoing reasons, I will **GRANT** defendants' motions in limine and **GRANT** defendants' motion for summary judgment. An Order consistent with the above accompanies this Memorandum Opinion.



RICHARD J. LEON
United States District Judge

---

[8] Plaintiff explicitly does not put forth Dr. Roland Hamilton as an expert on proximate causation. *See* Pl.'s Elakil Opp'n at 11 (stating that Dr. Hamilton's "scope of participation in the case was to opine on the neurologic injury to [plaintiff] as a result of the stroke, not the cause and/or exacerbation of the stroke itself." (emphasis in original)). Moreover, Dr. Hamilton testified that he is "not offering an opinion in this case that to a reasonable degree of probability that [plaintiff's] strokes or infarcts would have been different with some different type of medical intervention[.]" Tr. of Dep. of Dr. Roland Hamilton, Defs.' Elakil Mot. Ex. C [Dkt. #38-8] at 15:8–17.